# EXHIBIT 1

In The Matter Of:
## *Griffin vs. City of Atlanta*

Deposition Of:
## *Matthew Abad*

Taken On:
## *11/5/2020*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966
www.popereporting.com



POPE REPORTING & VIDEO

EXPERIENCED · PROFESSIONAL · DEPENDABLE

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TYLER GRIFFIN,
    Plaintiff,
vs.      Case No. 1:20-CV-02514-TWT

CITY OF ATLANTA, DONALD
VICKERS, MATTHEW ABAD and
JOHN DOE #1-5,

    Defendants.

REMOTE VIDEOTAPED DEPOSITION
of
MATTHEW ABAD
November 5, 2020
9:30 a.m.
Atlanta, Georgia
Lucy C. Rateau, CCR, RPR

---

1 APPEARANCES OF COUNSEL (via Zoom videoconference):
2 On behalf of the Plaintiff:
3      MATTHEW R. KAHN, ESQ.
4      Butler Law Firm
5      10 Lenox Pointe, NE
6      Atlanta, GA 30324
7      404.587.8423
8      matt@butlerfirm.com
9
10 On behalf of the Defendants:
11      STACI MILLER, ESQ.
12      ALISHA MARIE S. NAIR, ESQ.
13      JACQUITA PARKS, ESQ.
14      City of Atlanta Law Department
15      55 Trinity Avenue SW
16      Suite 5000
17      Atlanta, GA 30303
18      404.330.6402
19      smiller@atlantaga.gov
20      amnair@atlantaga.gov
21      jparks@atlantaga.gov
22
23      (All counsel stipulated to the remote
24 swearing in of the witness due to the COVID-19
25 pandemic.)

---

INDEX OF EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1.1 | Video clip | 33 |
| Exhibit 1.2 | Video clip | 34 |
| Exhibit 1.3 | Video clip | 46 |
| Exhibit 1.4 | Video clip | 47 |
| Exhibit 2.2 | Video clip | 51 |
| Exhibit 3.3 | Video clips | 56 |
| Exhibit 3.4 | Video clip | 59 |
| Exhibit 4.1 | Video clip | 48 |
| Exhibit 4.2 | Video clip | 53 |
| Exhibit 5.3 | Video clip | 56 |

INDEX TO EXAMINATIONS      PAGE

By Mr. Kahn      4
By Ms. Parks      98
By Mr. Kahn      103

---

1      MR. KAHN: Good morning, Officer Abad.
2 I guess we're recording. We're good to go.
3      This will be the deposition of Defendant
4 Matthew Abad taken pursuant to notice and
5 agreement. The deposition is taken in the case
6 Tyler Griffin versus the City of Atlanta.
7      The deposition will be taken pursuant to
8 the Federal Rules of Civil Procedure for all
9 purposes permitted by the Rules, including use
10 at trial. And the deposition is being taken on
11 Zoom because of the COVID pandemic.
12      Madam Court Reporter, will you please swear
13 in the witness?
14      MATTHEW ABAD
15 having been first duly sworn, was examined and
16 testified as follows:
17      EXAMINATION
18 BY MR. KAHN:
19      Q. Officer Abad, my name is Matt Kahn. I
20 represent the Plaintiff, Tyler Griffin. Do you know
21 why you're here today, sir?
22      A. Yes, I do.
23      Q. And why is it that you think you're here
24 today?
25      A. Based on the incident between myself,

1 **Officer Vickers and Mr. Griffin.**
2    Q. What is your full name?
3    **A. Matthew Abad.**
4    Q. And, Mr. Abad, where did you grow up?
5    **A. I'm sorry. Where did I grow up?**
6    Q. Yes, sir.
7    **A. Long Island, New York.**
8    Q. When did you move down to Georgia?
9    **A. In April 2016.**
10    Q. You went to high school in New York?
11    **A. Yes, sir.**
12    Q. Do you have a college degree, sir?
13    **A. I have an associate's degree.**
14    Q. And where is that from?
15    **A. Suffolk County Community College.**
16    Q. And what is that degree? What is the focus
17 of that degree?
18    **A. Criminal justice.**
19    Q. Have you ever served in the military?
20    **A. No, sir.**
21    Q. Do you have any family members, that would
22 include direct family or other relatives, that are
23 above the age of 18 that live in the state of
24 Georgia?
25    **A. Just my wife.**

1    Q. And I usually give a little preface to
2 that. The reason we ask that is so if this case
3 goes to trial and we have to pick a jury, we don't
4 want your cousin or your wife to be on the jury. So
5 it's somewhat of an intrusive question, but it's
6 just something that we have to ask.
7      And so what is your wife's name, sir?
8    **A. Lauren Kane.**
9    Q. Are you currently employed by APD?
10    **A. Yes, sir, I am.**
11    Q. Were you suspended for any period of time
12 for the way that you treated Tyler Griffin?
13    **A. No, sir. I believe my investigation is yet**
14 **to be closed.**
15    Q. No one from APD has told you the outcome of
16 any OPS investigation?
17    **A. Nothing official yet.**
18    Q. Have you heard anything informally or
19 unofficially?
20    **A. They said -- there were no specifics. They**
21 **said it could be a few days, but they said we don't**
22 **know yet.**
23    Q. And just for clarity, when you say a few
24 days, that would be a few days suspension?
25    **A. Yes, sir.**

1    Q. What is your current job title with APD?
2    **A. Officer.**
3    Q. And how long have you been with APD?
4    **A. Four years sworn next month.**
5    Q. Did you start with APD as a recruit?
6    **A. Yes, sir, I did.**
7    Q. And do you have any law enforcement
8 experience pre-dating APD?
9    **A. I do not.**
10    Q. What year did you graduate from Suffolk,
11 sir?
12    **A. 2016.**
13    Q. Did you go straight to Suffolk from high
14 school?
15    **A. I did, and then I took a break and I came**
16 **back to finish it.**
17    Q. What did you do during the break from
18 school?
19    **A. I worked.**
20    Q. How long was the break?
21    **A. Maybe four years.**
22    Q. What sort of training do you have from the
23 policy academy?
24    **A. On my POST record I have -- I've posted**
25 **1,000 hours worth of training. As far as**

1 **specialized training, it would be DUI standardized**
2 **field sobriety testing, a lot of family violence**
3 **classes, things of that nature.**
4    Q. Have you undergone use of force training?
5    **A. Yes, sir, I have.**
6    Q. Was SPO Patrick Fite your instructor on use
7 of force?
8    **A. I believe so.**
9    Q. Do you know SPO Fite personally?
10    **A. I do.**
11    Q. Would you consider SPO Fite to be a friend?
12    **A. An acquaintance.**
13    Q. So you mentioned DUI training. What's the
14 extent of your DUI training?
15    **A. It was a three-day course on learning and**
16 **understanding the effects of alcohol, how to notice**
17 **them, how to detect, clues leaning towards possible**
18 **impairment.**
19    Q. And so do you have training on how to
20 administer a field sobriety test?
21    **A. I do, sir.**
22    Q. Was that part of the three-day training or
23 is that something separate?
24    **A. It was part of the training.**
25    Q. Have you ever administered a field sobriety

Page 9

1  test in the field?
2    **A. Yes, sir, I have.**
3    Q. How many would you say?
4    **A. I'm not sure exactly. Probably maybe**
5  **around 20. Not a whole lot.**
6    Q. If you saw another officer use excessive
7  force would you report them?
8    **A. Yes, sir.**
9    Q. In your career as a police officer have you
10 ever seen another officer use what you would
11 consider to be excessive force?
12   **A. Not in my presence.**
13   Q. Not in your presence. Would that mean that
14 you have heard about excessive force used in your
15 career?
16   **A. We hear -- when things get reported you**
17 **hear about it. It travels around.**
18   Q. Is that a common occurrence in the Atlanta
19 Police Department?
20   **A. No, sir. That's why it travels so well I**
21 **would guess.**
22   Q. Have you ever testified in an official
23 proceeding that another officer used unreasonable
24 force?
25   **A. I have not.**

Page 10

1    Q. If you saw another officer violate a
2  standard operating procedure, wouldn't you report
3  that?
4    **A. I would.**
5    Q. In your career as a police officer have you
6  ever seen another officer violate an SOP?
7    **A. Nothing blatant that comes to my mind.**
8    Q. Have you ever reported another officer for
9  violating an SOP?
10   **A. No, I have not.**
11   Q. I guess just going back, so you said
12 nothing blatant. Can you elaborate on that? What
13 do you mean by that?
14   **A. When I say that I mean like nothing that I**
15 **can recall, nothing that I can think of.**
16   Q. Have you ever been deposed before?
17   **A. No, sir.**
18   Q. Have you ever been a party to a lawsuit
19 either as a plaintiff or defendant?
20   **A. Not before this.**
21   Q. Have you been a party to a lawsuit other
22 than this one?
23   **A. No, sir.**
24   Q. Excluding conversations with your lawyers
25 from the City of Atlanta, did you do anything to

Page 11

1  prepare for this deposition?
2    **A. Yes, sir.**
3    Q. What did you do?
4    **A. I reviewed the video and information**
5  **pertaining to this incident.**
6    Q. When you say the video, what do you mean by
7  that?
8    **A. My body-worn camera footage.**
9    Q. Did you review any of the other officers'
10 body-worn camera footage?
11   **A. Not entirely. I watched parts of Donald**
12 **Vickers' body camera footage.**
13   Q. When was the last time you looked at your
14 body camera footage?
15   **A. I watched a clip from it this morning.**
16   Q. Which part of the video did you watch?
17   **A. The moment of initial contact between**
18 **myself and Mr. Griffin.**
19   Q. Did you watch any other parts of your
20 footage?
21   **A. This morning, no. It was just the initial**
22 **contact up until I walked up to the vehicle -- I**
23 **walked up to a patrol vehicle.**
24   Q. So the video that you watched this morning
25 included the tackle by Donald Vickers?

Page 12

1    **A. Yes, sir.**
2    Q. Have you reviewed the complaint that was
3  filed in this case?
4    **A. I'm not sure what you mean.**
5    Q. So in civil litigation the parties file a
6  lawsuit, and that's referred to as the complaint.
7  Have you reviewed the lawsuit outlining the
8  allegations against you in this case?
9    **A. Yes, sir.**
10   Q. And when was the last time you looked at
11 that?
12   **A. Maybe a week ago. It was before we did --**
13 **we were supposed to meet last time.**
14   Q. I see. Okay. And back to my previous
15 question. In addition to the body camera footage
16 you mentioned other pertinent information that you
17 reviewed. What would be included in the other
18 pertinent information that you reviewed?
19   **A. OPS information regarding my report.**
20   Q. And when was the last time you looked at
21 that?
22   **A. Maybe a couple of days ago.**
23   Q. Have you read any of the depositions in
24 this case?
25   **A. I have.**

1   Q. Which depositions have you looked at?

2   **A. Oh, I'm sorry. Have I read depositions?**

3 **No, I have not.**

4   Q. I'm not trying to be aggressive, but what

5 do you think I meant when I asked whether you had

6 reviewed the depositions?

7   **A. I thought you meant the -- I don't know**

8 **what it's called, the packet with the lawsuit, like**

9 **the --**

10   Q. Discovery?

11   **A. Yes, sir.**

12   Q. I got you. All right. Have you watched

13 any of the videos of the depositions?

14   **A. No, sir.**

15   Q. Are you aware of any of the testimony that

16 has been given in this case?

17   **A. No, sir.**

18   Q. Did you speak to Vickers after his

19 deposition?

20   **A. I did not.**

21   Q. Have you spoken to him at anytime between

22 right now and when his deposition was taken last

23 week?

24   **A. No, sir.**

25   Q. And have you communicated with him in any

1 way? And that would include text messages or emails

2 or any instant messaging since his deposition?

3   **A. I have not.**

4   Q. Have you reviewed any of the discovery

5 responses in this case? And that would be the

6 questions that we sent to you and the City of

7 Atlanta and those you and the other Defendants

8 submitted responses, have you reviewed any of those

9 responses?

10   **A. I have reviewed mine.**

11   Q. And I'm going to briefly share my screen

12 with you. Can you see Plaintiff's Exhibit 26 on

13 your screen?

14   **A. Yes, sir.**

15   Q. And this is an 11-page document. So I'm

16 just going to scroll through very quickly. If at

17 any point you want me to stop or want to take a

18 closer look at it, just let me know, but I just want

19 to confirm that these are in fact your interrogatory

20 responses.

21   Does Plaintiff's Exhibit 26 appear to be

22 your responses to Plaintiff's interrogatories?

23   **A. I wasn't able to read all of them, but it**

24 **looks like the same formatting as what I have.**

25   Q. Have you seen this document before,

1 generally a document appearing to be this document?

2   **A. Yes, sir, I believe so.**

3   Q. Is there anything in your responses that

4 you need to correct as of today?

5   **A. No, sir.**

6   Q. Have you reviewed any of the City of

7 Atlanta's discovery responses?

8   **A. I don't think -- I don't believe so. I**

9 **don't believe I've read anything outside of my own.**

10   Q. When you were reviewing the body camera

11 footage did you watch the part of the footage that

12 showed you making Mr. Griffin walk around on a

13 broken ankle?

14     MS. PARKS: Objection. You may answer.

15     MR. KAHN: What is the basis of that

16   objection?

17     MS. PARKS: It's an admission -- asking

18   for possible admission from Officer Abad.

19     MR. KAHN: This is a deposition. It's

20   been noted. I'll rephrase the question or

21   re-ask the question.

22 BY MR. KAHN:

23   Q. Have you seen the body camera footage where

24 you make Mr. Griffin walk around on a broken ankle?

25   **A. Where I have requested -- when I initially**

1 **attempted to get him to stand up before I knew he**

2 **was injured, yes.**

3   Q. So it's your testimony today that you made

4 him stand up before you knew he was injured?

5   **A. Before he --**

6   Q. I'm sorry. That's not correct. I just

7 jumbled that up. That's my mistake.

8   No, never mind. That is right. You made

9 him stand up before -- strike that. I apologize.

10   Is it your testimony today that you made

11 him stand up before -- Mr. Griffin stand up before

12 you knew that he was injured?

13     MS. PARKS: Objection. Calls for

14   speculation.

15 BY MR. KAHN:

16   Q. You can answer.

17   I'll ask the question again. Is it your

18 testimony today that you made Mr. Griffin stand up

19 before you knew that his ankle was injured?

20   **A. Before I knew it was broken.**

21   Q. So you knew that it was injured at the time

22 you made him stand up?

23   **A. Yes, sir.**

24   Q. And you knew that it was injured at the

25 time that you made him walk around on it?

1    A. I didn't -- no, I don't recall making him
2 walk around.
3    Q. And we'll get to that in a little bit.
4    Besides your attorneys, did you speak with
5 anyone to prepare for today's deposition?
6    A. No, sir.
7    Q. In the early morning of April 5, 2019, what
8 was your assignment? What were you doing out there
9 in west Atlanta?
10    A. My assignment was on Zone 1 Field
11 Investigative Team.
12    Q. What does that mean?
13    A. We went out -- primarily they wanted us
14 looking for stolen vehicles.
15    Q. Did you think that Mr. Griffin had stolen
16 the vehicle he was driving?
17    A. Yes.
18    Q. Did you run the plates?
19    A. No, sir.
20    Q. Isn't that something that you should do if
21 you're following a vehicle under the suspicion of it
22 being stolen?
23    A. Well, what we were doing is we were
24 following it. We were trying to get the tags ran.
25 We were in a vehicle that did not have a MDT in it,

1 a computer in it. We were trying to get it ran.
2 And the suspicion was based off of his pattern of
3 driving, which in my training and experience is
4 common with a stolen vehicle.
5    Q. Don't you think that a police vehicle
6 should be equipped with technology to allow you to
7 run a tag if you're specifically looking for stolen
8 vehicles?
9    A. I do; however, we were in an unmarked
10 vehicle, so essentially to blend in with the general
11 public.
12    Q. And blend in meaning that the purpose of
13 the unmarked vehicle is so citizens do not know that
14 it is a police vehicle, correct?
15    A. Yes, sir.
16    Q. We'll get into the details of everything in
17 a second, but I would like to start by just asking
18 you what happened that night from the beginning to
19 the end.
20    A. So we were driving on -- I believe it was
21 Chattahoochee Avenue, and Mr. Griffin was driving on
22 the wrong side of the road and almost made
23 head-to-head contact with us before he swerved back
24 over onto his correct side of the road. Officer
25 Vickers was driving the vehicle. We turned around

1 and got behind him and we followed him up to Howell
2 Mill at the light, where he went -- I can't recall
3 the name of the street. But it is a -- it's a
4 one-way road. He went up the one-way road. We
5 maintained visual contact with his vehicle. He made
6 a left hand turn. We continued to trail him. He
7 drove across someone's -- I believe it was their
8 driveway and down a small embankment into the
9 neighboring house's yard, and that was where I
10 exited the vehicle wearing a mesh vest that had
11 bright yellow police lettering on it. I began to
12 approach where Mr. Griffin had driven back into,
13 assuming still the vehicle was stolen. And the
14 reason I got down there is because I thought he was
15 going to abandon the vehicle, and I was trying to
16 make contact.
17    I came down. He was trying to come up the
18 driveway where it was his vehicle, me and another
19 vehicle, and I was alongside of a house. Once I
20 finally caught up to his vehicle, I was shouting
21 "Atlanta Police". I got to his vehicle. He was not
22 cooperating, he was questioning me. I had removed
23 him from the vehicle. And at that time was when I
24 -- when I made contact with him I had noticed the
25 vehicle probably wasn't stolen, because I was able

1 to smell the amount of alcohol on his breath, and
2 having the training in DUI and field sobriety
3 testing, I had removed him from the vehicle. When
4 he stepped out of the vehicle I had my hand on the
5 -- I guess it would be the shoulder, right between
6 the shoulder and the collar of his shirt so I could
7 maintain contact with him. And Mr. Griffin had
8 moved my -- knocked my hand off of his shirt and he
9 stated, "Don't hold me like that."
10    At that time Officer Vickers came down the
11 driveway and tackled Mr. Griffin. After Mr. Griffin
12 was on the ground he stated his ankle was hurting.
13 I tried to stand him up. He fell over. At that
14 time I wasn't going to press that any further.
15 Other officers arrived. And I had made my way up
16 the driveway so I could get the report started and
17 let Officer Vickers and the other responding
18 officers maintain contact with Mr. Griffin.
19    Q. So when you first saw Mr. Griffin you and
20 Vickers both claim that he almost hit you head-on,
21 correct?
22    A. Yes, sir.
23    Q. But you don't have any evidence to prove
24 that, do you?
25    A. I do not.

1    Q. There was no dash cam in the vehicle you
2  were driving, right?
3    **A. Correct.**
4    Q. So the only proof that you have is the word
5  of two officers that are being sued in federal court
6  for police brutality, correct?
7    **A. Yes, sir.**
8    Q. And on the night in question you were in an
9  unmarked police car, right?
10   **A. This is true.**
11   Q. What was the make and model of that
12 vehicle?
13   **A. I want to say it was a Nissan Rogue, I**
14 **believe.**
15   Q. And that vehicle was not equipped with
16 police lights?
17   **A. Correct.**
18   Q. And the vehicle was not equipped with a
19 siren either, right?
20   **A. Correct.**
21   Q. In fact, there were no markings on the
22 vehicle to indicate that the vehicle was a police
23 vehicle, right?
24   **A. Correct.**
25   Q. Why didn't you pull Mr. Griffin over after

1  he allegedly almost hit you head-on?
2    **A. I'm sorry?**
3    Q. Why didn't you pull Mr. Griffin over after
4  he allegedly almost hit you head-on?
5    **A. We didn't have lights or sirens equipped on**
6  **the vehicle to pull him over.**
7    Q. So what was the plan then in following him?
8    **A. It was to get a unit to come out and pull**
9  **him over.**
10   Q. Is there a reason that you didn't wait for
11 the unit to get there before you approached the
12 vehicle?
13   **A. I did not want -- while I believed the**
14 **vehicle was stolen, I did not want the suspect to**
15 **escape, and the best way to prevent that would be if**
16 **I were to make the initial contact.**
17   Q. Would you agree that police vehicles are
18 required to be marked so citizens can identify the
19 vehicle as a police vehicle?
20   **A. When you ask that question do you mean all**
21 **vehicles utilized by the Police Department?**
22   Q. I'm referring to like a marked police
23 vehicle.
24   **A. Oh, yes, sir.**
25   Q. And that's just common sense, right?

1    **A. Correct.**
2    Q. The police report that I believe you
3  authored claimed that Mr. Griffin drove off of a
4  ledge that was approximately four feet high, didn't
5  it?
6    **A. I didn't measure it. Looking at it, that's**
7  **what I would, if I were to guess, it would be about**
8  **four feet.**
9    Q. Did you actually observe Mr. Griffin drive
10 over any ledge?
11   **A. I did.**
12   Q. How did you see that?
13   **A. We were behind him and he -- there's a stop**
14 **sign at the intersection right in front of where the**
15 **house is, and he continued straight which ended him**
16 **into somebody's front yard, and he veered right and**
17 **that's where the ledge was.**
18   Q. So you actually saw him veer right and go
19 over the ledge?
20   **A. Yes, sir.**
21   Q. So do you disagree with Vickers' testimony
22 then that the homeowner's car blocked the view from
23 your all's vehicle?
24   **A. Yes, I disagree with that.**
25   Q. That testimony is not true?

1    **A. I was able to see that car go down the**
2  **ledge.**
3    Q. Is there any video footage showing that?
4    **A. No, sir.**
5    Q. So, again, the only proof of that is your
6  testimony?
7    **A. And the damage on his vehicle which I**
8  **believe would be from him driving over that ledge.**
9    Q. And I believe you said this, but you did
10 not measure the height of that ledge?
11   **A. Correct.**
12   Q. So the ledge could be less than four feet,
13 correct?
14   **A. It's possible.**
15   Q. Do you agree with Defendant Vickers'
16 testimony that there's, quote, a good possibility,
17 end quote, that Mr. Griffin hurt his ankle before he
18 even got out of the car?
19       MS. PARKS: Objection. You may answer.
20 BY MR. KAHN:
21   Q. I'm going to restate the question so we can
22 have a clean record.
23       Do you agree with Vickers' testimony that
24 there's, quote, a good possibility, end quote, that
25 Mr. Griffin hurt his ankle before he even got out of

1 the car?

2      MS. PARKS: Objection.

3      **A. Yes, sir.**

4 BY MR. KAHN:

5      Q. Do you know the details about Mr. Griffin's

6 injuries?

7      **A. I do not.**

8      Q. You don't know his injuries?

9      **A. Well, I don't know the full extent of it.**

10 **I'm aware he had a broken ankle.**

11      Q. Let me pull up an exhibit. Can you see

12 Plaintiff's Exhibit 30.1 on your screen?

13      **A. Yes, sir.**

14      Q. Before right now have you ever seen

15 Plaintiff's Exhibit 30.1, which is a preop x-ray of

16 Mr. Griffin's ankle after the tackle?

17      **A. I believe I have, yes, sir.**

18      Q. Do you see any broken bones in Plaintiff's

19 Exhibit 30.1?

20      **A. I do.**

21      Q. Now can you see Plaintiff Exhibit 30, which

22 is an x-ray scan after Mr. Griffin had surgery?

23      **A. Yes, sir.**

24      Q. And do you see the 10 screws that are in

25 his ankle and leg?

1      **A. Yes, sir.**

2      Q. Do you really think driving off of a ledge

3 did that?

4      MS. PARKS: Objection. You may answer,

5      Officer Abad, if you have personal knowledge.

6      **A. I'm not sure. I don't know. I mean it's**

7 **possible.**

8 BY MR. KAHN:

9      Q. I'm not asking you for a medical opinion.

10 I'm asking you for your personal common sense

11 opinion, whether you think driving off of a tiny

12 ledge that you saw could do that to a man's ankle?

13      MS. PARKS: Objection. You may answer,

14      Officer Abad, if you have personal knowledge.

15      **A. I mean, like I said, it's possible. I**

16 **believe it could be possible.**

17 BY MR. KAHN:

18      Q. Vickers stayed by the car while you

19 approached Mr. Griffin, correct?

20      **A. Yes, sir.**

21      Q. Do you know what Vickers was doing by the

22 car?

23      **A. I do not. I'm assuming radioing for other**

24 **units.**

25      Q. And Vickers stopped the car right at the

1 intersection of Buchanan and Bellemeade, correct?

2      **A. Yes, sir.**

3      Q. Could you see the bottom of the driveway

4 from your all's car?

5      **A. From where the car was, I'm not sure from**

6 **where he was -- where I exited the vehicle I don't**

7 **believe I was able to see the bottom of the**

8 **driveway.**

9      Q. And that's because there was a car blocking

10 the view of the bottom of the driveway, wasn't

11 there?

12      **A. Correct.**

13      Q. After you exited your unmarked police

14 vehicle, at what point did you first see Mr.

15 Griffin's car?

16      **A. As soon as I got around that front vehicle**

17 **that was in the driveway I saw him coming up.**

18      Q. And what did you see?

19      **A. Mr. Griffin trying to come up out of the**

20 **driveway even though he was blocked in.**

21      Q. Were you aiming your pistol at Mr.

22 Griffin's car?

23      **A. I had the firearm in the low ready**

24 **position, which is lower than the target. I don't**

25 **mean to use the word target so much as I do**

1 **potential threat.**

2      Q. Why did you have your gun pointed at Mr.

3 Griffin?

4      **A. Because in my experience, while I still**

5 **believed that it was a stolen vehicle, with stolen**

6 **vehicles you tend to find a firearm or someone in**

7 **possession of a firearm.**

8      Q. Isn't it true that you're not supposed to

9 point a gun at a citizen unless you be justified in

10 shooting that citizen?

11      **A. That is correct, which is why I had the**

12 **firearm at a low ready position.**

13      Q. Do you think it would have been all right

14 for you to shoot Mr. Griffin while you had your gun

15 pointed at him?

16      MS. PARKS: Objection. You may answer,

17      Officer Abad.

18      **A. Well, I had the firearm at the low ready**

19 **position. No, I don't think it was justified to**

20 **fire.**

21 BY MR. KAHN:

22      Q. Did you grab Mr. Griffin by the shirt when

23 he got out of the car?

24      **A. Yes, sir.**

25      Q. Why did you do that?

1  **A. Just so I could maintain contact with him**
2  **initially so that he would -- I could gain some**
3  **level of (Zoom audio drop) to make sure he's not**
4  **going to attempt to flee, get away, to hang on to**
5  **him. His level of intoxication, I didn't know how**
6  **he would be on his feet, so I was hanging on to him.**
7  Q. Was it absolutely necessary for you to grab
8  Mr. Griffin?
9  **A. Yes, sir.**
10 Q. Would it have been possible for you to ask
11 Mr. Griffin what he was doing without grabbing him?
12 **A. It's possible to ask that question, yes.**
13 Q. So why did you choose to use physical force
14 instead of words?
15 **A. Because I was maintaining contact with him.**
16 **Him being intoxicated by the amount that I smelled,**
17 **I was attempting to hold on to him to prevent him**
18 **from making the choice of if he wanted to flee or if**
19 **he was intoxicated to the point that he wasn't able**
20 **to stand on his own two feet, that I would be able**
21 **to hopefully hold him up or prevent him from falling**
22 **over, which has happened on DUI calls before.**
23 Q. Did you do a field sobriety test in this
24 case?
25 **A. I did not.**

1  Q. Did you do a Breathalyzer in this case?
2  **A. I did not.**
3  Q. So, once again, the only evidence that you
4  have that he was intoxicated is your testimony?
5  **A. That is correct.**
6  Q. Were you scared when Mr. Griffin brushed
7  your hand off of his shoulder?
8  **A. No, sir.**
9  Q. You weren't afraid that he was going to
10 hurt you?
11 **A. No, sir.**
12 Q. Vickers thought that you looked scared
13 though, didn't he?
14 **A. I don't know how Mr. Officer Vickers felt.**
15 Q. When did you first see Vickers come up?
16 **A. I'm sorry?**
17 Q. When did you first see Mr. Vickers, Officer
18 Vickers approach you and Mr. Griffin?
19 **A. Pretty much at the time of contact, when**
20 **Officer Vickers and Mr. Griffin were making contact.**
21 Q. Did you know Mr. Griffin's ankle was hurt
22 after Vickers tackled him?
23 **A. Not until he said something.**
24 Q. Did you ever call an ambulance to come
25 check on Mr. Griffin?

1  **A. Personally, I did not.**
2  Q. Are you aware of anyone else that did call
3  an ambulance?
4  **A. I'm not sure.**
5  Q. Well, did an ambulance show up to the scene
6  of the arrest?
7  **A. No, sir.**
8  Q. So then no one called an ambulance, right?
9  **A. I would assume.**
10 Q. Why not? Why didn't anyone call an
11 ambulance?
12 **A. I'm sorry?**
13 Q. I want to rephrase that question. Why
14 didn't you call an ambulance?
15 **A. The reason that I didn't was -- after**
16 **contact was made and other officers arrived on the**
17 **scene, I allowed them to handle Mr. Griffin and deal**
18 **with that as I went to go and handle the paperwork**
19 **side.**
20 Q. Will you agree that it was obvious that Mr.
21 Griffin was in pain as you made him walk around?
22     MS. PARKS: Objection. You may answer,
23     Officer Abad.
24 **A. Was it obvious that he was in pain was the**
25 **question?**

1  BY MR. KAHN:
2  Q. Will you agree that it was obvious that Mr.
3  Griffin was in pain as you made him walk around?
4  **A. Yes, sir.**
5  Q. Is there a reason you made Mr. Griffin walk
6  around while he was clearly in pain?
7  **A. When he was saying his ankle hurt, I didn't**
8  **know the extent of his pain. Everybody has a**
9  **different level of pain tolerance. If I knew his**
10 **ankle was broken I would definitely not have had him**
11 **stand up on it. I didn't know if he would be able**
12 **to get up the driveway or not.**
13 Q. Isn't that why officers are supposed to
14 call medical professionals to come check on a
15 citizen when they claim to be injured?
16 **A. If we called an ambulance every single time**
17 **someone initially believes there is an issue, the**
18 **wait times would be out of control. A lot of times**
19 **-- sometimes -- I'm trying to think of how to word**
20 **this the right way. If something is hurt or feels**
21 **hurt, it's not broken, so you get him out of this**
22 **guy's backyard and up to the front of the driveway**
23 **where we can have him checked out. If it was**
24 **broken, if we knew it was broken, obviously I would**
25 **have handled it differently. I did not know.**

1　Q. Well, I want to show you some video clips
2　and ask you some questions. I'm going to share my
3　screen with you.
4　　　The first video is going to be marked
5　Plaintiff's Exhibit 1.1.
6　　　(Exhibit 1.1 marked.)
7　　　MR. KAHN: If you'll give me one second.
8　Sorry.
9　BY MR. KAHN:
10　Q. Can you see Plaintiff's Exhibit 1.1 on your
11　screen?
12　**A. Yes, sir.**
13　Q. I'll play that video.
14　　　(Video playing.)
15　Were you doing a Google search for DUI law
16　in that video?
17　**A. There's the national standard for how field**
18　**sobriety testing is supposed to be done in order.**
19　**I've always double-checked that I'm doing everything**
20　**in the correct order before it's done.**
21　Q. You're a police officer, right?
22　**A. That is correct.**
23　Q. Why is it that you had to Google DUI law?
24　**A. Better safe than sorry, to double-check**
25　**everything you do. You can't know every single law**

1　**like the back of your hand. DUI law is very, very,**
2　**specific.**
3　Q. Would you be comfortable if your house was
4　on fire and the firefighter was Googling how to put
5　out a fire on the way to your house?
6　　　MS. PARKS: Objection. You may answer,
7　　Officer Abad.
8　**A. Well, I would think if they have to Google**
9　**it, I would assume they would be doing it right.**
10　BY MR. KAHN:
11　Q. What would you think if you saw me Google
12　how to take a deposition?
13　　　MS. PARKS: Objection. You may answer,
14　　Officer Abad.
15　**A. I would think that you would be**
16　**double-checking your work and making sure you're**
17　**doing it correctly.**
18　BY MR. KAHN:
19　Q. I'm going to show you another video that's
20　been marked as Plaintiff's Exhibit 1.2. Can you see
21　the exhibit on your screen?
22　**A. Yes, sir.**
23　　　(Exhibit 1.2 marked.)
24　　　(Video playing.)
25　Q. Sir, do you think that you did anything

1　wrong in Plaintiff's Exhibit 1.2?
2　**A. No, sir.**
3　Q. Do you think it was okay to aim your pistol
4　at Mr. Griffin?
5　**A. Are you referring to when I was approaching**
6　**the vehicle?**
7　Q. Yes, sir.
8　**A. I do.**
9　Q. But didn't you agree earlier that it
10　wouldn't have been okay to shoot Mr. Griffin?
11　**A. What I meant when I said I do -- that's why**
12　**I went to correct it and I left it. I was aiming it**
13　**towards the vehicle, because you could hear him**
14　**accelerating the vehicle. I wasn't sure if he was**
15　**attempting to hit me with the car.**
16　Q. Do you think that the Atlanta Police
17　Department encourages police officers to act the way
18　that you did in Plaintiff's Exhibit 1.2?
19　　　MS. PARKS: Objection. You may answer
20　　Officer Abad.
21　**A. I believe so.**
22　BY MR. KAHN:
23　Q. Do they teach you to point loaded weapons
24　at citizens at the Police Academy?
25　　　MS. PARKS: Objection. You may answer,

1　Officer Abad.
2　**A. Depending on the level of threat, yes, sir.**
3　BY MR. KAHN:
4　Q. Is there a reason that you grabbed Mr.
5　Griffin and pulled him towards you?
6　**A. When coming out of the vehicle?**
7　Q. Yes, sir.
8　**A. To remove him from the vehicle.**
9　Q. Was he not getting out of the vehicle
10　himself?
11　**A. No. That's why I had to reach into the**
12　**vehicle to unlock it and opened the door myself.**
13　Q. I want to show you this clip, another clip
14　one more time from the same exhibit.
15　　　(Video playing.)
16　Was Mr. Griffin not getting out of the
17　vehicle before you grabbed him?
18　**A. At that time, yes.**
19　Q. So then why did you grab him?
20　**A. As I said before, to maintain contact,**
21　**prevent him from -- based on his level of**
22　**intoxication, so he doesn't fall over or he doesn't**
23　**make the decision to attempt to flee.**
24　Q. So you're claiming that in the few seconds
25　between the time that he opened the door and you

1  grabbed him that you were able to do an analysis and
2  determine that he was intoxicated?  Is that what
3  you're saying?
4  **A.  Based on what I was smelling.  How**
5  **typically we work is I would smell it, which would**
6  **be the first clue towards some level of alcohol**
7  **involvement, and after that would be the**
8  **standardized field sobriety testing.**
9  Q.  Are police officers allowed to grab
10  citizens and pull them for whatever reason the
11  police officer deems appropriate?
12  **A.  If there's a suspicion of a crime, yes,**
13  **sir.**
14  Q.  Did you tell Mr. Griffin why he was being
15  removed from his car at gunpoint?
16  **A.  Not prior to, no.**
17  Q.  Did you try to stop Vickers from tackling
18  Mr. Griffin?
19  **A.  No.**
20  Q.  You were facing Vickers as he approached,
21  weren't you?
22  **A.  My body was facing toward that angle, yes,**
23  **sir.**
24  Q.  You could have waved your hand to show
25  Vickers that everything was fine, couldn't you?

1  **A.  I could have.**
2  Q.  But you did not do that, right?
3  **A.  I did not.**
4  Q.  And you could have said, hey, Vickers,
5  everything is good, right?
6  **A.  It's possible, yes, sir.**
7  Q.  But you didn't do that either, did you?
8  **A.  No, sir.**
9  Q.  Do you think that Vickers did anything
10  wrong in Plaintiff's Exhibit 1.2?
11  MS. PARKS:  Objection.  You may answer,
12  Officer Abad.
13  MR. KAHN:  What's the basis of that
14  objection?
15  MS. PARKS:  I'm sorry?
16  MR. KAHN:  What's the basis of that
17  objection so I can cure the question to the
18  extent there is a problem with it.
19  MS. PARKS:  It calls for speculation as
20  to what Vickers was thinking.
21  MR. KAHN:  My question wasn't at all
22  what Vickers was thinking.
23  BY MR. KAHN:
24  Q.  My question was whether you, Officer Abad,
25  think that Vickers did anything wrong.  It's what

1  you think.
2  MR. KAHN:  So your objection is noted.
3  I'll ask the question again.
4  BY MR. KAHN:
5  Q.  Do you think that Vickers did anything
6  wrong in Plaintiff's Exhibit 1.2?
7  **A.  As long as he was acting in good faith, I**
8  **think not.**
9  Q.  So you think that it was okay for Vickers
10  to tackle Mr. Griffin?
11  **A.  Based on his -- if he was -- once again, if**
12  **he was acting in good faith, if he was perceiving a**
13  **level of threat, then it would be deemed**
14  **appropriate.**
15  Q.  Do you think that a reasonably prudent
16  police officer would have tackled Mr. Griffin?
17  **A.  Yes.  Once again, based on their**
18  **perception, if they're acting within good faith,**
19  **then yes.**
20  Q.  When Mr. Griffin got out of the car he put
21  his weight on his left foot, didn't he?
22  **A.  I don't know.  I do not recall.**
23  Q.  Let's take a look at the video again.  This
24  is Plaintiff's Exhibit 1.2.
25  (Video playing.)

1  Q.  Now, sir, isn't it true when Mr. Griffin
2  got out of his car he put his weight on his left
3  foot?
4  **A.  Yes, sir.**
5  Q.  Did you hear Mr. Griffin cry out in pain as
6  he got out of the car?
7  **A.  No, sir.**
8  Q.  Did you hear Mr. Griffin complain about his
9  ankle hurting as he got out of the car?
10  **A.  No, sir.**
11  Q.  He didn't do any of that, did he?
12  **A.  No, sir.**
13  Q.  Mr. Griffin was standing up when he got out
14  of the car, wasn't he?
15  **A.  Yes, sir.**
16  Q.  And he didn't have any trouble standing up
17  before Vickers tackled him, did he?
18  **A.  No, sir.**
19  Q.  Did you hear Mr. Griffin slurring his words
20  at anytime before Vickers tackled him?
21  **A.  I don't recall much slurring, no, sir.**
22  Q.  That's because he wasn't slurring his
23  words, right?
24  **A.  Yes, sir.**
25  Q.  Did you hear Mr. Griffin scream out in pain

1    as Vickers tackled him in Plaintiff's Exhibit 1.2?
2        **A. Yes, sir.**
3        Q. How do you think Mr. Griffin hurt his
4    ankle?
5            MS. PARKS:  Objection.  You may answer,
6        Officer Abad.
7        **A. I'm not entirely sure.**
8    BY MR. KAHN:
9        Q. Do you think that the fracture, the broken
10   bone that we looked at in Plaintiff's Exhibit 30.1
11   was existing at the time that Mr. Griffin got out of
12   the car?
13           MS. PARKS:  Objection.  You may answer,
14       Officer Abad.
15       **A. I'm not sure.**
16   BY MR. KAHN:
17       Q. Do you think that if the fracture that we
18   looked at in Plaintiff's 30.1 was in fact there
19   before he got out of the car, that he would have
20   cried out in pain when he put his entire bodyweight
21   on that foot when he got out of the car?
22           MS. PARKS:  Objection.  You may answer,
23       Officer Abad.
24       **A. Could you ask that question one more time?**
25   BY MR. KAHN:

1        Q. Sure.  And let me pull the exhibit up for
2    you so you can reference that.
3        Can you see Plaintiff's Exhibit 30.1 on
4    your screen?
5        **A. Yes.**
6        Q. Now if Mr. Griffin's ankle looked like
7    that, like it does in Plaintiff's Exhibit 30.1 at
8    the time he put his entire bodyweight on it to get
9    out of the car, don't you think that he would have
10   made some sort of indication that he was in pain?
11           MS. PARKS:  Objection.  You may answer,
12       Officer Abad.
13       **A. It's possible, yes, sir.**
14   BY MR. KAHN:
15       Q. I mean this is just a matter of common
16   sense, right?  If a man or woman steps on that
17   injury that you're looking at in Exhibit 30.1, it's
18   going to hurt and you're going to know they're in
19   pain; isn't that true?
20           MS. PARKS:  Objection.  You may answer,
21       Officer Abad.
22       **A. I would assume they would make it known.**
23   BY MR. KAHN:
24       Q. As we sit here today do you think Vickers
25   was completely justified in tackling Mr. Griffin?

1        **A. As long as he was acting in good faith,**
2    **yes, sir, I do.**
3        Q. What if he was not acting in good faith,
4    how does that change your decision?
5        **A. Well, if he was not acting in good faith,**
6    **then I don't think that that was good.**
7        Q. What is your understanding of the
8    distinction between an objective belief and a
9    subjective belief?
10       **A. I'm not sure.**
11       Q. Don't they teach that at the policy
12   academy?
13           MS. PARKS:  Objection.  You may answer,
14       Officer Abad, if you have personal knowledge.
15       **A. They may.**
16   BY MR. KAHN:
17       Q. Isn't it true that police officers are
18   taught, including yourself, at the policy academy
19   that the subjective belief that force is necessary
20   alone is not justified the use of force?
21           MS. PARKS:  Objection.  You may answer
22       if you have personal knowledge, Officer Abad.
23       **A. I don't recall that exact lesson.**
24   BY MR. KAHN:
25       Q. Are police officers taught to tackle folks

1    like that at the policy academy?
2            MS. PARKS:  Objection.  You may answer
3        if you have personal knowledge.
4        **A. I believe there are take-down maneuvers**
5    **we're taught.**
6            MR. KAHN:  I want to put this on the
7        record, every question that I ask Officer Abad
8        is for his personal knowledge, so it's not
9        necessary or proper for you to instruct him
10       that he can answer if he has personal
11       knowledge.  That's given.  If he has personal
12       knowledge he will answer, so I would like to
13       request that you stop making these speaking
14       objections.
15           MS. PARKS:  I will guide my client as I
16       need to through my objections.  They were not
17       speaking objections.  I am advising him to go
18       ahead and answer the question once I make the
19       objection.
20   BY MR. KAHN:
21       Q. Sir, were you taught to tackle folks like
22   Vickers did in Exhibit 1.2 at the policy academy?
23           MS. PARKS:  Objection.  You may answer,
24       Officer Abad.
25       **A. I recall that specific take-down.**

1 BY MR. KAHN:

2      Q. Do you think there's anything that Vickers

3 could have done other than tackle Mr. Griffin?

4      **A. I am not sure, sir. From his angle it's**

5 **hard to speak from his perspective.**

6      Q. The question is whether there's anything he

7 could have done in the realm of possibilities? Is

8 there anything else that he could have done other

9 than tackling Mr. Griffin, or was that the only

10 option?

11          MS. PARKS: Objection. You may answer.

12      **A. In the realm of possibilities, yes, sir.**

13 BY MR. KAHN:

14      Q. Do you think it would have been possible

15 for Vickers to ask you if you needed help?

16      **A. It's possible he could have.**

17      Q. Do you think that Vickers should have done

18 things differently?

19      **A. Knowing what we know now, hindsight being**

20 **20/20, yes.**

21      Q. Do you think that you should have done

22 things differently?

23      **A. Knowing what we know now, it would have**

24 **been -- I mean, yeah, things could have gone a lot**

25 **differently if we knew everything we know.**

1 BY MR. KAHN:

2      Q. At what point did you read Mr. Griffin his

3 Miranda Rights?

4      **A. I'm not sure.**

5      Q. But you didn't read them to him, did you?

6      **A. I don't believe so.**

7      Q. Now Vickers claimed that he tackled Mr.

8 Griffin because he felt Mr. Griffin was resisting,

9 correct?

10      **A. Yes, sir.**

11      Q. I want to show you another exhibit. This

12 is going to be marked as Plaintiff's Exhibit 1.3.

13          (Exhibit 1.3 marked.)

14      Can you see 1.3 on your screen, sir?

15      **A. Yes, sir.**

16          (Video playing.)

17      Q. Plaintiff Exhibit 1.3 shows Mr. Griffin

18 brushed your hand away and said, "Wait a minute.

19 Hold on." Correct?

20      **A. Correct.**

21      Q. Isn't it true that Vickers didn't start

22 charging at Mr. Griffin until after he brushed your

23 hand away and was standing completely still?

24      **A. Yes, sir.**

25      Q. I'm going to show another exhibit marked as

1 Plaintiff Exhibit 1.4.

2          (Exhibit 1.4 marked.)

3 BY MR. KAHN:

4      Q. Can you see Plaintiff's Exhibit 1.4 on your

5 screen?

6      **A. I can.**

7          (Video playing).

8      Q. Did you hear Mr. Griffin say, "I can't move

9 my leg", end quote?

10      **A. I didn't hear that. If you could play it**

11 **again.**

12      Q. Sure.

13          (Video playing).

14      Q. Were you able to hear Mr. Griffin say, "I

15 can't move my leg"?

16      **A. Yes, sir.**

17      Q. And then did you hear when you asked Mr.

18 Griffin if his leg was broken, and Mr. Griffin

19 responded, quote, "I mean you guys hurt it", end

20 quote.

21      **A. I heard that, yes, sir.**

22      Q. Did you hear Mr. Griffin slur his words

23 when he said, "I can't move my leg"?

24      **A. No, sir.**

25      Q. That's because he was not slurring his

1 words, correct?

2      **A. Yes, sir.**

3      Q. Did you hear Mr. Griffin slur his words

4 when he said, "I mean you guys hurt it"?

5      **A. That's correct, sir.**

6      Q. And that's because he was not slurring his

7 words there either, right?

8      **A. Correct.**

9      Q. I'm going to show another exhibit that's

10 been marked as Plaintiff Exhibit 4.1.

11          (Exhibit 4.1 marked.)

12      Sir, can you see Plaintiff's Exhibit 4.1 on

13 your screen.

14      **A. I can.**

15      Q. Do you agree that in Plaintiff's Exhibit

16 4.1 you made Mr. Griffin stand up and walk?

17      **A. I wasn't intending to make him walk. It**

18 **looks like more he was trying to gain his balance.**

19 **Because I wasn't escorting; I was standing.**

20      Q. Let me show you a clip from that exhibit

21 again.

22          (Video playing).

23      Is it your testimony that you were not

24 leading Mr. Griffin toward the end of the driveway?

25      **A. We did move, yes, it does look like we**

Page 49

1 **moved a couple of feet. I didn't catch that the**
2 **first time. Yes, sir.**
3 Q. So I'll ask the question again. Isn't it
4 true that in Plaintiff's Exhibit 4.1 you made Mr.
5 Griffin stand up and walk?
6 **A. Yes, sir.**
7 Q. It looked like Mr. Griffin was in pain in
8 Exhibit 4.1, didn't it?
9 **A. It did.**
10 Q. Did you call an ambulance after it was
11 clear that Mr. Griffin couldn't walk?
12 **A. I did not.**
13 Q. None of the police officers called an
14 ambulance, did they?
15 **A. I believe not.**
16 Q. Now in Plaintiff's Exhibit 4.1 do you think
17 that you did anything wrong?
18 **A. Based on what we just saw? That was the**
19 **video you just showed, correct?**
20 Q. Yes, sir.
21 **A. No, sir.**
22 Q. So is it okay for a police officer to make
23 a seriously injured citizen walk around on a broken
24 ankle?
25     MS. PARKS: Objection. You may answer.

Page 50

1 **A. I mean I didn't force him to walk any**
2 **further than we did. I didn't force him back up on**
3 **his feet after understanding the extent of his**
4 **injury; no, I did not force him to walk around any**
5 **further.**
6 BY MR. KAHN:
7 Q. Sir, the question was whether or not it's
8 okay for police officers to make a seriously injured
9 citizen walk around on a broken ankle?
10 **A. I'm sorry. No --**
11     MS. PARKS: Objection. You may answer,
12 Officer Abad.
13 **A. I'm sorry. No, it's not okay.**
14 BY MR. KAHN:
15 Q. I'm going to redo that just so we have a
16 clean record. Just so you know, sir, the court
17 reporter is taking down all of the words that we're
18 saying, we're speaking, and so when we speak over
19 each other sometimes it creates a difficult
20 transcript and it's just choppy. So I'm not trying
21 to agitate you; I just want to have a clean record.
22 **A. Okay.**
23 Q. So the question was, is whether or not it's
24 okay for police officers to make a seriously injured
25 citizen walk around on a broken ankle?

Page 51

1     MS. PARKS: Objection. You may answer.
2 **A. No, it is not okay.**
3 BY MR. KAHN:
4 Q. I'm going to show you a clip that's been
5 marked as Plaintiff Exhibit 2.2.
6     (Exhibit 2.2 marked.)
7     (Video playing.)
8     Did you hear where the other officer said,
9 "He's got a lot of weight on it." And Vickers
10 responded, "Just a little bit"?
11 **A. I did.**
12 Q. Vickers was joking about Mr. Griffin's
13 weight, wasn't he?
14     MS. PARKS: Objection.
15 BY MR. KAHN:
16 Q. Do you think that Vickers was joking about
17 Mr. Griffin's weight?
18     MS. PARKS: Objection. Calls for
19 speculation. You may answer, Officer Abad.
20 **A. Yes.**
21 BY MR. KAHN:
22 Q. Is it okay for a police officer to make fun
23 of a citizen's weight?
24 **A. No, sir.**
25 Q. Does APD tolerate that sort of behavior?

Page 52

1 **A. No, sir.**
2 Q. Do you think that's a good look for the
3 Police Department?
4 **A. I do not.**
5 Q. Now did you hear where Vickers was talking
6 to another officer and said, quote, "I did like 50",
7 end quote, and then he said, quote, "There's the
8 skid marks", end quote?
9 **A. I heard it.**
10 Q. Isn't it true that Vickers was bragging to
11 another officer about tackling Mr. Griffin?
12     MS. PARKS: Objection. You may answer.
13 **A. Yes, sir.**
14 BY MR. KAHN:
15 Q. And Vickers laughed after that, didn't he?
16 **A. He did, sir.**
17 Q. Do you think there is anything funny about
18 what happened here?
19 **A. I do not.**
20 Q. Is it okay for a police officer to laugh at
21 a citizen that he's seriously injured?
22     MS. PARKS: Objection. You may answer.
23 **A. No, sir.**
24 BY MR. KAHN:
25 Q. Just give me one second here. I'm going to

1 show you another clip from the same exhibit, which
2 is Plaintiff's Exhibit 2.2.
3        (Video playing.)
4    Q. Did you hear where Vickers said, "We're
5 laughing because you fell pretty hard after pushing
6 an officer, man. I find that funny, man."
7    **A. I did, sir.**
8    Q. And that's not funny either, is it? Do you
9 find that funny?
10   **A. No, sir.**
11   Q. Do you think that Vickers' conduct in
12 Plaintiff's Exhibit 2.2, the video that we just
13 watched, is okay?
14   **A. No, sir.**
15   Q. Let me show you another exhibit that's been
16 marked as Plaintiff's Exhibit 4.2.
17       (Exhibit 4.2 marked.)
18      Can you see Plaintiff's Exhibit 4.2 on your
19 screen.
20   **A. I can, sir.**
21       (Video playing.)
22   Q. Do you hear when Vickers told Mr. Griffin,
23 quote, "You're such a little girl right now", end
24 quote?
25   **A. Yes, sir.**

1    Q. Is it okay for a police officer to hurt a
2 citizen and then insult them?
3       MS. PARKS: Objection. You may answer.
4    **A. No, sir.**
5 BY MR. KAHN:
6    Q. That's exactly what Vickers did though,
7 isn't it?
8    **A. Yes, sir.**
9    Q. Did you hear Vickers and the other officer
10 laughing and joking about Mr. Griffin?
11   **A. Yes, sir.**
12   Q. Does the policy academy teach recruits to
13 mock injured citizens?
14       MS. PARKS: Objection. You may answer.
15   **A. No, sir.**
16 BY MR. KAHN:
17   Q. That's not okay, is it?
18   **A. No, sir.**
19   Q. Why did Vickers make Mr. Griffin try to
20 walk after seeing how much pain he was in when you
21 tried to make him walk?
22       MS. PARKS: Objection. You may answer.
23   **A. I'm not sure how to answer that, sir.**
24 BY MR. KAHN:
25   Q. Well, let me ask you this. Earlier you

1 were saying that Vickers would have been justified
2 if he was acting in good faith, right?
3    **A. Correct.**
4    Q. Do you think that anything that you just
5 saw in Plaintiff's Exhibit 4.2 and in Plaintiff's
6 2.2 was in good faith?
7    **A. No, sir, when I said that I was referring
8 to the take-down.**
9    Q. Sure. But does the conduct that you just
10 watched, do you think that someone that behaves like
11 that is behaving in good faith?
12   **A. At that time, no, sir.**
13   Q. And even after Mr. Griffin fell, again in
14 Plaintiff's Exhibit 4.2, you didn't call an
15 ambulance; isn't that right?
16   **A. I wasn't down there at that time.**
17   Q. Vickers didn't call an ambulance, did he?
18   **A. No, sir.**
19       MS. PARKS: Objection. You may answer
20    if you have personal knowledge.
21   **A. No, sir.**
22 BY MR. KAHN:
23   Q. Do you think that Vickers should have
24 called an ambulance after seeing how much pain Mr.
25 Griffin was in?

1    **A. Yes, sir.**
2    Q. I'll show another clip that's been marked
3 as Plaintiff's Exhibit 3.3.
4       (Exhibit 3.3 marked.)
5       (Video playing.)
6    Q. What's that vehicle called that Vickers was
7 trying to shove Mr. Griffin in?
8    **A. It's a transport van, sir.**
9    Q. And did you see the other officer grabbed
10 Mr. Griffin by the left ankle?
11   **A. Yes, sir.**
12   Q. And then did you see Vickers handle Mr.
13 Griffin's left ankle after that?
14   **A. Yes, sir.**
15   Q. Is there anything wrong with the way that
16 those police officers behaved in Plaintiff's Exhibit
17 3.3?
18       MS. PARKS: Objection. You may answer.
19   **A. Yes, sir.**
20 BY MR. KAHN:
21   Q. I'm going to show you another video that's
22 been marked as Plaintiff Exhibit 5.3.
23       (Exhibit 5.3 marked.)
24      Sir, did you hear yourself say, quote, "I damn
25 near shot him"?

1    **A. Yes, sir.**

2    Q. And did you hear yourself say, quote, "I

3  was about two seconds from putting bullets in his

4  window"?

5    **A. Yes, sir.**

6    Q. Why did you say those things?

7    **A. In the hypothetical situation if I was hit**

8  **by a car, when was accelerating, if I'm struck by a**

9  **vehicle I'm going to do whatever I can to get that**

10 **to stop.**

11   Q. Let's say you had put bullets into his

12 window when you had your gun pointed at him, do you

13 think you would have been justified in doing that?

14   **A. Like I said, in the hypothetical situation,**

15 **if I was struck by the vehicle and I was pinned by**

16 **the vehicle, then, yes, I believe so.**

17   Q. Sure. I'm not asking you about any

18 hypothetical scenario that I'm asking about the actual

19 scenario that you were in.

20   **A. No.**

21   Q. Had you put bullets in his window, that

22 would have been murder, right?

23   **A. Yes, sir.**

24   Q. Do those sound like the words of a police

25 officer that has respect for human life?

1    MS. PARKS: Objection.

2    MR. KAHN: What's the basis of that

3  objection? Those were his own words.

4    MS. PARKS: It is in the form of asking

5  for an admission.

6    MR. KAHN: This is his deposition. I'm

7  allowed to ask him to admit things.

8    MS. PARKS: And I am objecting on the

9  record. You may answer, Officer Abad.

10 BY MR. KAHN:

11   Q. Do those sound like the words of a police

12 officer who has respect for human life?

13   MS. PARKS: Objection. You may answer.

14   **A. Yes, sir.**

15 BY MR. KAHN:

16   Q. After the incident on April 5th did you

17 speak with Vickers about what happened?

18   **A. After the incident? Yes, sir.**

19   Q. Did either of you speculate that Mr.

20 Griffin might make a complaint?

21   **A. Not that I can recall.**

22   Q. Did you ever send text messages to Vickers

23 about what happened with Mr. Griffin?

24   **A. I don't believe we texted about it. We**

25 **work in the same office. We mostly spoke about work**

1  in person.

2    Q. Did you meet with Vickers at anytime before

3  the OPS interviews to talk about what happened on

4  April 5th?

5    **A. No, sir.**

6    Q. Did you meet with Vickers at anytime after

7  the OPS interviews to talk about what happened?

8    **A. No, sir.**

9    Q. At anytime has Vickers asked you to testify

10 a certain way in this case?

11   **A. No, sir.**

12   Q. At anytime has Vickers asked you to say

13 something a specific way to OPS?

14   **A. No, sir.**

15   Q. I want to show you another video clip.

16 It's going to be marked as Plaintiff's Exhibit 3.4.

17      (Exhibit 3.4 marked.)

18   Did you hear Vickers say, quote, "He's the

19 biggest dramatic person I've ever seen", end quote?

20   **A. Yes, sir.**

21   Q. And Vickers was talking about Mr. Griffin,

22 right?

23   **A. Yes, sir.**

24   Q. And then you said, quote, "Oh my God, dude.

25 My only concern about with all that...", end quote,

1  and then the camera cuts off, right?

2    **A. Yes, sir.**

3    Q. What did you say after the camera cut off?

4    **A. I don't know. I do not recall.**

5    Q. What was your concern about what happened?

6    **A. I don't remember what I was saying. I had**

7  **a lot of concerns. I just recall being frustrated**

8  **at that time, sir.**

9    Q. Did that conversation occur before or after

10 you authored and submitted the police report?

11   **A. I'm not sure if it had been submitted at**

12 **that particular time.**

13   Q. At that moment in time did you think that

14 Vickers did something wrong?

15   **A. No, sir.**

16   Q. Were you concerned that Mr. Griffin might

17 complain about the use of excessive force at that

18 time?

19   **A. I didn't think so.**

20   MS. PARKS: Objection. You may answer.

21 BY MR. KAHN:

22   Q. Were you concerned that Mr. Griffin was

23 going to complain about the use of excessive force

24 at that time?

25   MS. PARKS: Objection. You may answer.

1    **A. I didn't think so, sir.**
2   BY MR. KAHN:
3     Q. Did you and Vickers ever try and come up
4   with a plan to minimize the fallout from that
5   incident?
6     **A. No, sir.**
7     Q. I want to ask you a few specific questions
8   about the police report, if you'll give me just a
9   minute to pull it up. I guess, first, you prepared
10   the police report, didn't you?
11     **A. I did, sir.**
12     Q. Can you see Plaintiff's Exhibit 48 on your
13   screen?
14     **A. I can.**
15     Q. Can you see a page -- let me actually --
16   can you see the highlighted text on Plaintiff's
17   Exhibit 48 that says Mr. Griffin, quote, was having
18   difficulty maintaining balance on his own as he was
19   leaning onto Abad's arm that was holding his shirt
20   to assist him in balancing"?
21     **A. Yes, sir.**
22     Q. We watched that video of all this today,
23   didn't we?
24     **A. We did.**
25     Q. And before Vickers tackled him -- before

1   Vickers tackled Mr. Griffin, he had no trouble
2   maintaining his balance, did he?
3     **A. When I was wording that, what I was**
4   **referring to was I was holding on to him. I felt**
5   **him leaning -- he was leaning into me. He wasn't**
6   **holding on to me. He wasn't swaying is what I was**
7   **meaning.**
8     Q. Wasn't he leaning toward you because you
9   pulled him out of the car?
10     **A. It's possible.**
11     Q. So the highlighted part of the police
12   report is false, isn't it?
13     **A. I don't believe so. I wouldn't make it**
14   **false.**
15     Q. Do you think that Mr. Griffin was leaning
16   into your arm?
17     **A. Yes; yes, sir.**
18     Q. And he was leaning forward because you
19   pulled him toward you, right?
20     **A. For that initial -- I wasn't pulling him as**
21   **much as I was holding on to him.**
22     Q. We'll move on.
23     Were you investigated by the Office of
24   Professional Standards for the way that you treated
25   Mr. Griffin?

1     **A. Yes, sir.**
2     Q. What violations were involved in your
3   investigation?
4     **A. It was -- I don't recall the wording. I**
5   **think it was failure of -- I can't think of what**
6   **it's called. I'm drawing a blank. Failure to act**
7   **appropriately I believe is what it was.**
8     Q. I guess -- I'm less concerned -- and we'll
9   go through the report. I'm less concerned with the
10   official title of the violations. Just to clarify,
11   I'm asking more about like what conduct was the
12   subject of the investigation.
13     **A. My conduct, they were asking about an**
14   **ambulance, I believe was the big focus on my end.**
15     Q. And when you say asking about the
16   ambulance, that would be the failure to call an
17   ambulance for a seriously injured citizen, correct?
18     **A. Yes, sir.**
19     Q. I'm going to pull up an exhibit. Bear with
20   me for just a moment. Let me try this. For some
21   reason it's not showing up.
22     Can you see Plaintiff's Exhibit 42 on your
23   screen?
24     **A. Yes, sir.**
25     Q. I do want to ask you about your

1   investigation, but I want to ask a few questions
2   about your opinion about Vickers. Do you see
3   Plaintiff's Exhibit 42, there's the heading that
4   says Investigative Disposition?
5     **A. Yes, sir.**
6     Q. And the first category lists all of the
7   violations for Donald Vickers?
8     **A. Yes, sir.**
9     Q. And then if you see on Plaintiff's Exhibit
10   42 it says that Donald Vickers was exonerated for
11   his use of force. Do you see that?
12     **A. I do.**
13     Q. Do you agree with that finding?
14     **A. Yes, sir.**
15     Q. Have you heard the testimony of other
16   police officers regarding Vickers' use of force?
17     **A. Pertaining to this incident?**
18     Q. Yes, sir.
19     **A. No, I have not, sir.**
20     Q. Have you heard Investigator Nixon's
21   testimony on behalf of the City of Atlanta that the
22   force Vickers used against Mr. Griffin was
23   excessive?
24     MS. PARKS: Objection. You may answer.
25   BY MR. KAHN:

1    Q. Let's take a look at his testimony. Do you
2  see the first page of what appears to be a 30(b)(6)
3  deposition of Arthur Nixon?
4    **A. I do.**
5    Q. And do you see it's highlighted? Do you
6  see where it says, "Do you think there's anything
7  wrong with the way Defendant Vickers acted in
8  Plaintiff's Exhibit 1.2." And Investigator Nixon
9  responds yes?
10   **A. I do.**
11   Q. What do you think about that?
12      MS. PARKS: Objection.
13      MR. KAHN: What's the basis of that
14   objection?
15      MS. PARKS: Objection as to form.
16   You're not stating exactly what you're asking
17   him regarding this testimony.
18      MR. KAHN: I'll rephrase the question
19   so Officer Abad can understand.
20  BY MR. KAHN:
21   Q. And the question is, sir, what do you think
22  about Investigator Nixon's testimony on behalf of
23  the City of Atlanta that Donald Vickers did
24  something wrong in Plaintiff's Exhibit 1.2?
25   **A. I think it looks like Investigator Nixon is**

1   **saying what he would have done rather than what was**
2   **done wrong.**
3   Q. Let's focus on this testimony we just
4  talked about. What do you think -- so the question
5  is what do you think about Investigator Nixon's
6  testimony on behalf of the City of Atlanta that
7  Donald Vickers did something wrong in Plaintiff's
8  Exhibit 1.2?
9   **A. I think that he said he found something**
10   **wrong.**
11   Q. Do you think that the jury should listen to
12  Investigator Nixon?
13      MS. PARKS: Objection. You may answer,
14   Officer Abad.
15   **A. Should they listen to him? Yes, sir.**
16  BY MR. KAHN:
17   Q. Have you heard SPO Fite's testimony on
18  behalf of the City of Atlanta that the force Vickers
19  used against Mr. Griffin was not justified?
20   **A. I did not.**
21   Q. Can you see the cover page of what appears
22  to be the 30(b)(6) deposition of Officer Fite?
23   **A. Yes, sir.**
24   Q. This testimony is on two separate pages, so
25  I'm going to have to just flip it. But do you see

1  where it says, quote, "So I'm going to ask the
2  question again. That was an answer, but I don't
3  think it answered my question. And that's based on
4  what you saw Mr. Fite, was the use of force
5  justified in the video?"
6      And then SPO Fite testifies on behalf of
7  the City of Atlanta, "From what I saw I wouldn't
8  think so." Do you see that?
9   **A. I do, sir.**
10   Q. What do you think about SPO Fite's
11  testimony, the APD's use of force instructor, that
12  Donald Vickers was not justified in his use of
13  force?
14   **A. I think SPO Fite is educated on this topic**
15   **enough to teach it.**
16   Q. Do you agree with SPO Fite?
17   **A. I mean I'm not sure how to answer that. I**
18   **figure if he was... I'm sorry.**
19   Q. Let me ask it this way. Let me pull this
20  up. Do you think that SPO Fite's testimony that
21  you're looking at, that Vickers used excessive
22  force, do you think that he's wrong about that?
23   **A. I think SPO Fite would know the specifics**
24   **on what would be right and wrong better than I**
25   **would. I would like to know further specifically**

1   **what could have been wrong.**
2   Q. So I guess the short answer is you would
3  defer to SPO Fite's opinion; is that correct?
4   **A. Yes, sir.**
5   Q. Do you have any idea why Vickers was
6  exonerated if two senior-ranking officials,
7  including the person who investigated him and the
8  person who trained him on the use of force thought
9  that the force was not justified?
10      MS. PARKS: Objection. You may answer.
11   **A. I'm not sure.**
12  BY MR. KAHN:
13   Q. That's pretty puzzling, isn't it?
14   **A. Yes, sir.**
15   Q. Do you find it problematic that two
16  senior-ranking officers, including the person who
17  investigated Vickers and the person who trained
18  Vickers on the use of force thought that Vickers'
19  force was excessive but Vickers wasn't punished for
20  that force?
21      MS. PARKS: Objection. You may answer.
22   **A. Yes, sir.**
23  BY MR. KAHN:
24   Q. Why is that problematic?
25   **A. If there's an issue it should be addressed.**

Page 69

1    Q.  Would you agree that if these issues are
2  not addressed then police officers can use force
3  with impunity?
4    **A.  Yes, sir.**
5    Q.  Let's look at your investigation.  Can you
6  see Plaintiff's Exhibit 42 on your screen again?
7    **A.  Yes, sir.**
8    Q.  So, first, it looks like you were sustained
9  for violating the rule on reporting when force is
10 used.  Does that look right to you?
11   **A.  Yes, sir.**
12   Q.  And do you agree with that finding?
13   **A.  I do.**
14   Q.  And that means that you failed to report
15 that Vickers used force against Mr. Griffin, doesn't
16 it?
17   **A.  Yes, sir.  I failed to -- the SOP was**
18 **supposed to contact the supervisor, and I failed to**
19 **do so.**
20   Q.  Why didn't you report it?
21   **A.  It just -- It didn't register in my head to**
22 **think of it.**
23   Q.  Were you trying to protect Vickers?
24   **A.  No, sir.  It just didn't come to my head.**
25 **When I have made contact I've always made the call.**

Page 70

1  **When someone else did, that's just how my thought**
2  **process went.  Like I said, it was my slip-up.**
3    Q.  The next violation, it says that you are
4  sustained for unsatisfactory performance, right?
5    **A.  Yes, sir.**
6    Q.  And do you agree with that finding?
7    **A.  I do.  I think there are things I could**
8  **have corrected.**
9    Q.  We're going to flip to page two.  Do you
10 see the highlighted text that says, "Griffin swiped
11 Abad's hand around and Abad kind of froze and looked
12 kind of shocked."
13   **A.  Yes, sir.**
14   Q.  Did you freeze when Mr. Griffin brushed
15 your hand away?
16   **A.  I did not freeze.  I do not think I froze.**
17   Q.  And we already covered this, but you were
18 not scared when Mr. Griffin brushed your hand away,
19 were you?
20   **A.  That is correct, I was not.**
21   Q.  Let me ask this.  If Vickers is willing to
22 put something that is not true into his OPS
23 investigation, how are we supposed to believe
24 anything that he says in this case?
25   MS. PARKS:  Objection.  You may answer.

Page 71

1    **A.  If that was his perception that I froze, I**
2  **mean I don't know how to really respond to that,**
3  **honestly.**
4  BY MR. KAHN:
5    Q.  Well, do you think that Vickers might have
6  said that to justify tackling Mr. Griffin?
7      MS. PARKS:  Objection.  You may answer.
8    **A.  I'm not sure.  It's possible.**
9  BY MR. KAHN:
10   Q.  I mean we're sitting here today and you're
11 telling me that you were not scared and you did not
12 freeze, right?
13   **A.  That's correct.**
14   Q.  We're going to flip to page three.  Do you
15 see the highlighted text that says, "Uh, we were as
16 curious as possible", end quote?
17   **A.  I do, sir.**
18   Q.  Is that true?
19   **A.  No, sir.**
20   Q.  And that's because you were not as
21 courteous as possible, correct?
22   **A.  That's correct.**
23   Q.  Do you think it was courteous to make Mr.
24 Griffin walk around on a broken ankle?
25     MS. PARKS:  Objection.  You may answer.

Page 72

1    **A.  No, it wasn't courteous to do so.  I did**
2  **not know his ankle was broken.  I didn't know the**
3  **extent of his injury.**
4    Q.  Was it courteous to shove Mr. Griffin into
5  the back of the prisoner transport wagon instead of
6  an ambulance?
7    **A.  No, it was not.**
8    Q.  Flip to page six.  Do you see the
9  highlighted text that says, "Officer Abad does not
10 advise him that SPO Vickers tackled Mr. Griffin,
11 that Mr. Griffen was complaining of an injury that
12 occurred during the arrest or that Mr. Griffin was
13 in need of medical attention.  Officer Abad's
14 incident report does not describe the exact use of
15 force that was employed by SPO Vickers."
16   **A.  I see that.**
17   Q.  Why didn't you tell anyone that Mr. Griffin
18 was seriously injured?
19   **A.  I didn't know the extent of the injury.  I**
20 **didn't know if he was seriously injured and his**
21 **ankle was broken.**
22   Q.  That wasn't obvious to you based on
23 watching him fall down and cry out in pain?
24   **A.  That I would assume it was broken, no.  In**
25 **my experience I haven't been around many people with**

1 broken bones. I'm not super familiar with enough to
2 say this is a common reaction with a bodily injury.
3     Q. You see the highlight text that says,
4 "Officer Abad's multiple failures during this
5 incident, as indicated, placed him in clear
6 violation of APD SOP 2010, Work Rules, 4.2.37"?
7     A. Yes, sir.
8     Q. And that violation was your failure to call
9 an ambulance for Mr. Griffin, correct?
10     A. That is correct.
11     Q. Surely you were suspended for this abuse of
12 Mr. Griffin, right?
13         MS. PARKS: Objection. You may answer.
14     A. Not yet.
15 BY MR. KAHN:
16     Q. We're here now about a year and a half
17 after the incident and you still haven't been
18 suspended??
19     A. I have my actual meeting on the 12th, which
20 I believe to be involved with this.
21     Q. So the first meeting that the City of
22 Atlanta is having with you on your conduct from
23 April 5, 2019 is going to be on November 12, 2020;
24 is that right?
25     A. Outside of OPS, that is correct.

1     Q. I want to get through your disciplinary
2 worksheet. Can you see Plaintiff's Exhibit 47 on
3 your screen?
4     A. Yes, sir. Is this something that you've
5 seen before, Plaintiff's Exhibit 47?
6     Q. Have you ever seen a document similar to
7 this in any other context?
8     A. I've spoken with my lieutenant regarding --
9 Lieutenant Albertini that's on here -- regarding the
10 incident, and he had me waiting the reprimanding. I
11 haven't seen this form though, no.
12     Q. I'm sorry. I wasn't able to hear what you
13 said about the reprimand. Would you mind repeating
14 that, sir?
15     A. That's what I'm waiting on. That's what
16 I'm waiting on. I have not yet seen this form, no.
17     Q. Thank you. Do you see where it says Rule
18 4.2.51?
19     A. I do.
20     Q. That was for failing to report the use of
21 force, correct?
22     A. Correct.
23     Q. And then the recommended action was OA. Do
24 you see that?
25     A. I do.

1     Q. And OA is an abbreviation for an oral
2 admonishment, right?
3     A. Correct.
4     Q. What happens during an oral admonishment?
5     A. During an oral admonishment, from my
6 understanding -- I don't have much history with OPS.
7 I typically try to stay out of trouble. But an oral
8 admonishment is when you sit down and you review the
9 SOP which was violated and understand what was done
10 wrong, and you're advised not to do so again; and if
11 it is repeated there is a heightened offense for
12 repeating (audio drop).
13     Q. Let me break away for a second and ask you
14 this. Do you have any understanding of Vickers'
15 extensive OPS disciplinary history?
16     A. I've heard about it.
17     Q. What do you think about that?
18         MS. PARKS: Objection. You may answer.
19 BY MR. KAHN:
20     Q. I'll rephrase. What do you think about
21 Officer Vickers' extensive OPS disciplinary history?
22         MS. PARKS: Objection. You may answer.
23     A. That it's not good. (Inaudible)
24 BY MR. KAHN:
25     Q. Go ahead. Sorry. I didn't mean to

1 interrupt you.
2     A. I apologize. It's not a good history.
3     Q. Do you find it problematic that the City of
4 Atlanta has officers on the force that have
5 disciplinary histories that extensive?
6         MS. PARKS: Objection. You may answer.
7     A. I do, sir.
8 BY MR. KAHN:
9     Q. Did you know -- I guess were you -- were
10 you Vickers' partner? What is the classification of
11 your work relationship to Vickers at the time of the
12 incident?
13     A. We were -- yes, we were partners. We were
14 assigned to ride together.
15     Q. How long did you work with him before that
16 night in question?
17     A. As his partner?
18     Q. Yes, sir.
19     A. I would say probably a few months maybe,
20 not a long period of time.
21     Q. And then how long did you work with Vickers
22 after the incident?
23     A. Shortly after that incident was when I had
24 gone to my current assignment of APEX.
25     Q. Were you aware of Officer Vickers' OPS

1  history at the time of the incident?

2      A.  I wasn't aware of the -- I've heard that

3  he's had an OPS history.  I don't know the

4  truthfulness behind it.  I don't know the extent of

5  it.  I don't know his actual exonerations, what he's

6  been sustained on.  I don't know all of that.  I

7  just heard that he's been through OPS several times.

8      Q.  I guess, did it make you anxious to know

9  that you were being partnered with someone with a

10  disciplinary history like that?

11      A.  Being someone who typically makes, I would

12  say, good choices, I felt confident in myself.

13      Q.  But did it make you anxious, like were you

14  -- when you found out that -- when you learned of

15  his history and you knew that you were going to be

16  his partner, did it make you like worried that you

17  were going to have to deal with that sort of

18  behavior?

19        MS. PARKS:  Objection.  Objection as to

20     form.

21  BY MR. KAHN:

22      Q.  Sir, do you need me to repeat the question?

23      A.  Oh.  Yes.  I'm sorry.

24      Q.  No worries.  You're totally fine.  Let me

25  just try to remember what the question was.

1      So the question was, when you learned about

2  Vickers' history, OPS history, and you learned that

3  you were going to be his partner, did it make you

4  nervous that you would have to deal with the conduct

5  that was described in the OPS history?

6        MS. PARKS:  Objection as to form.  You

7     may answer, Officer Abad.

8      A.  I don't think I was so much nervous about

9  it as much as I thought that it wasn't going -- you

10  just assume or hope nothing would happy, I guess I

11  would word it.  I didn't expect something that would

12  happen of this magnitude in general.

13  BY MR. KAHN:

14      Q.  Does Vickers have a reputation among the

15  City of Atlanta Police Department?

16      A.  To be completely honest, not that I'm aware

17  of.  I tend to kind of do my thing, go to work.  I

18  had my own beat.  I did my own thing, and I went

19  home.  I try to avoid any sort of trouble.

20      Q.  Have you ever heard anyone mention that

21  Vickers is a hot-head or has a hot temper or

22  anything like that?

23      A.  Not regarding temper, no.

24      Q.  Have you heard any rumors or statements

25  made by other police officers about Vickers'

1  tendency to use force in the field?

2      A.  Yes, I've heard.  Yes.

3      Q.  Tell me about that.

4      A.  I just heard that he has an extensive

5  history of -- he's got a history of having use of

6  force documentations.

7      Q.  Is that sort of thing -- in the Police

8  Department, is that viewed with disdain or is he

9  applauded for that?

10      A.  It depends on how -- on the circumstances.

11  Some people are -- if things are done appropriately,

12  and you have I guess fair judgment and bad luck.

13  So, like I said, I don't know much about his history

14  with OPS or how things turned out or the totality of

15  the circumstances of when his force was used.  I

16  just heard that he's had a few -- quite a few use of

17  force history.

18      Q.  So I guess -- so what I'm gathering -- and

19  please correct me if I'm wrong, but it's pretty much

20  well known throughout the department, the Atlanta

21  Police Department that Vickers has a history with

22  excessive force allegations?

23        MS. PARKS:  Objection.  You may answer.

24      A.  I don't know about excessive force.  I

25  don't know if he's been in -- I don't know if he's

1  ever been in trouble with that before.  But when I

2  say use of force, use of force is anytime you use

3  any elevated level of force.  I don't know what has

4  been labeled -- deemed as excessive or not.  That I

5  have no idea.

6  BY MR. KAHN:

7      Q.  Well, let me rephrase it then.  So I guess

8  would it be fair to say that Vickers has somewhat of

9  a reputation among the City of Atlanta Police

10  Department for his history of use of force

11  allegations?

12      A.  Yes.

13      Q.  We can go back to that exhibit now.  Can

14  you see Plaintiff's Exhibit 47 on your screen again?

15      A.  I do.

16      Q.  And do you see where it says Rule 4.2.37?

17      A.  Yes, sir.

18      Q.  And that was for failing to transport Mr.

19  Griffin to the hospital in an ambulance, right?

20      A.  Yes, sir.

21      Q.  And for that you got a WR or what I

22  understand is a written reprimand, correct?

23      A.  Yes, sir.

24      Q.  And would you say -- is it fair to say that

25  a written reprimand is a little more serious than an

1 oral admonishment but not quite as serious as
2 suspension or termination?
3     A. It is.
4     Q. For a written reprimand, is that
5 essentially a letter -- I'm paraphrasing -- is that
6 a letter that basically says that what you did was
7 wrong, don't do it again?
8     A. Yes. It's a higher level of documentation.
9     I'm sorry. Can I take two seconds to go
10 grab a cup of water?
11     MR. KAHN: Of course. And I forgot to
12     mention this, and that's my fault. Anytime you
13     need to take a break, just let me know. This
14     is not a marathon. So let's take a break and
15     get water, go to the bathroom and reconvene at
16     say 11:40.
17     A. Okay. Sounds good.
18     Q. All right. Thank you.
19     (Recess 11:31 a.m. - 11:40 a.m.)
20 BY MR. KAHN:
21     Q. I want to go through -- have you ever been
22 investigated for the use of excessive force?
23     A. No, sir.
24     Q. Can you see Plaintiff's Exhibit 51 on your
25 screen?

1     A. Yes, sir.
2     Q. This appears to be your OPS disciplinary
3 history. I just want to ask you a few questions
4 about some of these complaints in here. Do you see
5 the first citizen complaint listed?
6     A. I do.
7     Q. What was that complaint about?
8     A. I'm not sure. I'm not sure. I've only
9 been to OPS two times. I'm not sure.
10     Q. Do you see this second entry for use of
11 force?
12     A. Yes, sir.
13     Q. Do you have any idea what that's about?
14     A. I've never been to OPS about use of force
15 before. I don't know. I would have to look up that
16 case number. 2019. I'm not sure.
17     Q. Do you know what the highlighted complaint
18 is about, this citizen's complaint?
19     A. That one -- I didn't even know I had all
20 these. I don't know specifically. I only know of
21 two times, one for this and one was a complaint
22 (audio drop).
23     Q. I'm sorry. You broke up a little bit.
24 What was the other complaint?
25     A. It was a complaint about -- someone came to

1 me with a -- it was an expired protection order and
2 it wasn't in that person's correct name. They
3 utilized their middle name instead of their first
4 name in it. And I pointed them towards a supervisor
5 -- I told -- no, I'm sorry. I told them that they
6 needed to correct it, pointed them in the direction
7 of how to correct it. And they requested a
8 supervisor, saying that I was failing to do so. The
9 supervisor told them the same thing, that I was
10 failing to assist them. The supervisor came out and
11 said the same thing, and then she went to file the
12 complaint.
13     Q. I'm going to ask you -- let me pull up an
14 exhibit for you. Can you see Plaintiff's Exhibit 33
15 on your screen?
16     A. Yes, sir.
17     Q. Does this appear to be a City of Atlanta
18 performance evaluation for the year 2019?
19     A. Yes, sir.
20     Q. And you see Vickers' last name?
21     A. Yes.
22     Q. And this evaluation period is July 1st,
23 2018 through June 30th, 2019.
24     A. Yes, sir.
25     Q. That date range would include the incident

1 in question that we're here about today, right?
2     A. Yes, sir.
3     Q. We're going to go to page two, and you'll
4 see goal number one says CARE and then describes it
5 as represents the department in a courteous and
6 professional manner. Do you see that?
7     A. Yes, sir.
8     Q. And in the comments section for Vickers, it
9 says works with a sense of urgency, treats everyone
10 fairly and with respect. Do you see that?
11     A. I do, sir.
12     Q. And there's a rating, and it says it's a
13 four. And, as we know from the key, a four is
14 highly effective, exceeds the expected performance
15 standards on a regular basis, correct?
16     A. Yes, sir.
17     Q. Now isn't it true that the sergeant
18 performing the evaluation can put anything that he
19 or she wants in this comments section?
20     MS. PARKS: Objection. You may answer.
21     A. I believe so. I'm not -- I've never filled
22 one of those out. I'm not sure if there's a list
23 that they pick from or...
24     Q. Well, I guess, for example, if the officer
25 being evaluated was not courteous and professional,

1  the reviewing sergeant could have said something

2  about that in the comments section presumably,

3  correct?

4    **A. That is correct.**

5    Q. And the reviewing sergeant could have given

6  the officer a lower rating, such as a three, a two

7  or a one, correct?

8    **A. That is correct.**

9    Q. We're going to flip to the bottom of page

10 two, goal four of Vickers' 2019 performance review

11 is professionalism. And do you see where it says

12 displays concern and empathy when interacting with

13 citizens?

14   **A. Yes, sir.**

15   Q. And he got a four for that, did he not?

16     I'm sorry. I didn't hear your response.

17   **A. You asked if I saw it?**

18   Q. Yes.

19   **A. Yes, sir, I do.**

20   Q. We watched today -- we watched the videos

21 of Vickers mocking a citizen, of laughing at a

22 citizen who needed help, tackling a citizen. Do you

23 think that that conduct displays concern and

24 empathy?

25   **A. During that incident, no, sir.**

1    Q. Do you think that Vickers deserves a four

2  in the category that addresses displaying concern

3  and empathy with citizens?

4      MS. PARKS: Objection. You may answer.

5    **A. I've seen Officer Vickers engage with**

6  **people dozens and dozens and dozens of times, and he**

7  **typically is very professional. This is one not**

8  **professional incident.**

9    Q. Will you agree that the way that Vickers

10 treated Tyler Griffin was terrible?

11     MS. PARKS: Objection. You may answer.

12   **A. It was definitely unprofessional.**

13 BY MR. KAHN:

14   Q. Let's use the City of Atlanta's own rating

15 system. If you had to assign one of these ratings

16 to Vickers' conduct towards Mr. Griffin, which would

17 you give him?

18     MS. PARKS: Objection. You may answer.

19   **A. In my opinion, probably a one.**

20   Q. And that's because Vickers' conduct is

21 unacceptable, right?

22   **A. That's correct.**

23   Q. And Vickers' conduct does not meet most of

24 the expected performance standards and fails to meet

25 significant performance standards, correct?

1      MS. PARKS: Objection. You may answer.

2    **A. In this incident, yes.**

3  BY MR. KAHN:

4    Q. Would you agree that somebody just looking

5  through this performance evaluation would never know

6  about the conduct, would never know about Vickers'

7  conduct toward Mr. Griffin?

8      MS. PARKS: Objection. You may answer.

9    **A. It's possible.**

10 BY MR. KAHN:

11   Q. Well, tell me, what in Plaintiff's Exhibit

12 33 would let anybody know about the way that Vickers

13 treated Mr. Griffin?

14     MS. PARKS: Objection. You may answer.

15 BY MR. KAHN:

16   Q. I'm going to share my screen. I'm going to

17 give you control of the screen -- I don't know that

18 I -- can we give the witness control of the

19 documents so he can scroll it?

20     REPORTER: I don't believe so. You may

21     have to ask Denae that, but I don't believe you

22     can.

23 BY MR. KAHN:

24   Q. Officer Abad, I'll scroll through, and when

25 you see something that indicates that Vickers did

1  those things to Mr. Griffin, you just tell me to

2  stop, okay?

3    **A. Yes, sir.**

4    Q. So we've reached the end of Plaintiff's

5  Exhibit 33, didn't we?

6    **A. Yes, sir.**

7    Q. And there's nothing in Plaintiff's Exhibit

8  33 that would allow the person reading the document

9  to know about the way Vickers treated Mr. Griffin,

10 right?

11   **A. Correct.**

12   Q. Do you think it's okay for an officer to

13 act the way that Vickers did and not have it

14 documented in a performance evaluation?

15   **A. I would think you document it.**

16   Q. Wouldn't it be fair to say that this

17 performance evaluation is misleading because it

18 would lead the reader to believe that Donald Vickers

19 is highly effective and exceeds the expected

20 performance standards on a regular basis?

21     MS. PARKS: Objection. You may answer.

22   **A. That's correct.**

23 BY MR. KAHN:

24   Q. Would you agree that it's generally frowned

25 upon in the City of Atlanta Police Department for a

1 police officer to report another police officer's
2 misconduct?
3     **A. I don't think it's frowned upon, no. I**
4 **know people who have done it and no one ever had an**
5 **issue with it.**
6     Q. Have you ever heard of someone reporting
7 another officer's misconduct, SOP violations or use
8 of force and then that person being ostracized or
9 retaliated against?
10     **A. No, sir, not that I know of.**
11     Q. Have you ever heard of a police officer who
12 testifies or reports another police officer referred
13 to as a rat or a snitch or something derogatory
14 along those lines?
15     **A. I haven't heard that, no.**
16     Q. In your experience with APD have you seen
17 another officer state on the record that another
18 police officer used excessive force other than the
19 police officers whose testimony we looked at today?
20     **A. No. I've never even been involved in**
21 **something like this before.**
22     Q. Have you ever heard of a department-wide
23 practice where officers refuse to bear witness
24 against a fellow officer who's alleged to have
25 violated a citizen's rights?

1     **A. I've heard of things like that, like people**
2 **-- there's a word for it, and I can't think of the**
3 **name of it.**
4     Q. What do they call that?
5     **A. I can't think of what it's called. I know**
6 **it's like -- it's almost, at this point, it's like**
7 **frowned upon to not say anything because of the way**
8 **we're currently viewed. We don't want to be cast in**
9 **a bad light any further than the current view of**
10 **policing is.**
11     Q. So, I guess, let me just name a few
12 potential things that you're thinking of. Would it
13 be the code of silence?
14     **A. Maybe.**
15     Q. And so is it your testimony that there's
16 sort of a systemic change from the code of silence
17 to more transparency given the political climate
18 we're in?
19         MS. PARKS: Objection.
20     **A. Absolutely. People are definitely more**
21 **willing to speak up when there's an issue.**
22     Q. What was the state of the code of silence
23 in April 2019?
24     **A. The same as it is now. I mean it's a moral**
25 **thing. If you see a problem, assess it.**

1     Q. Do you think that there's a systemic -- let
2 me go back. Have you been following the news with
3 all of the police violence in the United States?
4     **A. I have.**
5     Q. Do you think that there's a systemic
6 problem with police violence in America right now?
7     **A. I think that there's things that can be**
8 **trained -- that can be changed through training, in**
9 **a better way. A lot of the time, it's unfortunate**
10 **and it's not pretty, but violence is unavoidable.**
11     Q. And I mean you truly do seem like a good,
12 honest police officer. But would you agree that
13 there are police officers in the force that aren't
14 as honest and well-intentioned as you?
15         MS. PARKS: Objection. You may answer.
16     **A. In general, yes, sir.**
17 BY MR. KAHN:
18     Q. Do you think there's a systemic problem
19 with police violence in the City of Atlanta?
20         MS. PARKS: Objection. You may answer.
21     **A. I don't think so, or I would like to think**
22 **not.**
23 BY MR. KAHN:
24     Q. I want to share an exhibit with you. Are
25 you familiar with the Use of Force Advisory Council?

1     **A. Yes.**
2     Q. The Plaintiff's Exhibit 502 is an excerpt
3 from the Use of Force Advisory Council pamphlet.
4 Can you see this on your screen, sir?
5     **A. I can.**
6     Q. I want to ask a few questions about the
7 things that are said in this document and your
8 opinion on them. So the first thing I want to ask
9 you is do you see where it says at the very top
10 left-hand corner of this document -- it's
11 Plaintiff's Exhibit 502 -- where it says, "But there
12 are lingering issues and opportunities for
13 improvement"?
14     **A. Yes, sir, I see that.**
15     Q. Isn't that a nice way of saying there's a
16 problem and it needs to be fixed?
17     **A. Yes.**
18     Q. Do you see directly below that there is a
19 little statistic that says, "Despite declining
20 arrests over the past seven years, reported annual
21 use of force incidents have increased on average of
22 two percent every year with 615 total incidents in
23 2019."
24     **A. I see that.**
25     Q. Doesn't that seem to suggest that there's a

Page 93

1    systemic problem?
2        A. I think -- I'm almost certain that over the
3    past several years there also has been an increase
4    in violent crime, and with violent crime things of
5    this nature are probable to happen. Does that mean
6    it's good? No. But when there's violence, it is
7    often met with violence, unfortunately.
8        Q. Do you find it problematic as an Atlanta
9    police officer that annual use of force incidents
10   are increasing on an average of two percent every
11   year?
12       A. Yes. Just like I said previously, at the
13   same time an increase is always -- not always -- is
14   never a good thing, is always something that we
15   don't want. We never want something to increase
16   like that. Nobody wants that.
17       Q. Do you have any personal ideas or opinions
18   as to how the City can get that number lower?
19           MS. PARKS: Objection. You may answer.
20       A. I don't know.
21       Q. Would it be fair to say that one way to
22   maybe get that number lower would be to not employ
23   police officers who have an extensive history of
24   using force?
25           MS. PARKS: Objection. You may answer.

Page 94

1        A. That's a possible option.
2    BY MR. KAHN:
3        Q. Wouldn't another option be to appropriately
4    punish officers who have been found to use excessive
5    force?
6        A. In events of excessive force, yes, sir.
7        Q. Have you ever heard of OPS conducting an
8    investigation into the use of force and finding or
9    recommending that the use of force be sustained but
10   then the officer being investigated, his chain of
11   command undoes the recommendation? Have you heard
12   of that?
13       A. I didn't know you could do that.
14       Q. Would that shock you to learn that OPS
15   could find the use of force as excessive and then
16   the chain of command could simply undo it?
17       A. That would be surprising to me. I figured
18   OPS was the end of the line.
19       Q. That's a pretty big problem, wouldn't you
20   say?
21           MS. PARKS: Objection. You may answer.
22       A. Yes, sir.
23   BY MR. KAHN:
24       Q. Do you think that Donald Vickers owes Tyler
25   Griffin an apology for the way that he treated him?

Page 95

1           MS. PARKS: Objection. You may answer.
2        A. Yes, I would say it couldn't hurt, an
3    apology.
4    BY MR. KAHN:
5        Q. Has anyone you know either through work or
6    personally said anything to you about the video of
7    Vickers tackling Mr. Griffin?
8        A. Nothing substantial. People just being
9    like what's going on. Like people heard about it.
10   I don't enjoy talking about things like that, so I
11   kind of shy away from negativity. I kind of just
12   shrug it off. I'm not talking to them about it. I
13   don't like use of force. I don't like having those
14   on my record. I don't like to be involved in them.
15       Q. Has anyone suggested to you that Vickers
16   violated Mr. Griffin's constitutional rights?
17       A. I never had that conversation with anybody
18   about it, about a violation, no.
19       Q. Let me ask you this. Are you aware that
20   the videos are publicly available of Vickers
21   tackling Mr. Griffin?
22       A. Yes, sir. I know all of our footage, body
23   camera footage is publicly available.
24       Q. Have any of your friends or family members
25   seen the video?

Page 96

1        A. I don't -- I would guess, because it was on
2    the news.
3        Q. Which friends -- like how many friends and
4    family members saw the video?
5        A. I was getting phone calls from quite a few.
6        Q. Really? Like what kind of phone calls?
7        A. Like what happened, are you okay, people
8    checking in and seeing if I was okay, asking what
9    happened.
10       Q. And these calls are from friends and family
11   members? Like can you tell me -- and I don't expect
12   you to recount every person who called you, but can
13   you just generally tell me who was calling you about
14   the video?
15       A. Mostly family, because they know like --
16   my first couple of years when I had a beat, I took a
17   lot of pride in helping people in the community,
18   especially around holidays and anything I could to
19   help people out. So when they saw something like
20   that they were kind of surprised that I was -- that
21   that happened. They were asking like how does this
22   happen.
23       Q. What does your family think? What did they
24   think about the way that Vickers treated Mr.
25   Griffin?

Page 97

1          MS. PARKS:  Objection.  You may answer.
2      **A. I mean they said it doesn't look good.  It**
3  **doesn't look good.  Not particularly thrilled about**
4  **it.**
5  BY MR. KAHN:
6      Q.  Do you sort of like -- do you understand
7  why they think that?
8      **A.  Yes.  It doesn't look good.  No one likes**
9  **to see anybody get hurt or see anybody in pain or**
10  **anything like that.**
11      Q.  Are you embarrassed to have that video all
12  over the internet and the news?
13      **A.  Yes.  I'm not proud of it.  Not happy about**
14  **it.**
15      Q.  I just have two more questions and then I'm
16  done.
17          Do you have any regrets about the way that
18  you treated Mr. Griffin?
19      **A.  Yes.  I should have called an ambulance,**
20  **for starters.  Like looking back, yes, I should have**
21  **definitely should have done that.**
22      Q.  And then lastly, is there anything that you
23  would like to say to Mr. Griffin while we're on the
24  record?
25      **A.  Yes.  Sorry he went through that.  I don't**

Page 98

1  **ever want to see anybody get hurt.  I don't want to**
2  **see anybody go through any level of struggle.  I'm**
3  **sorry that he's in this position.**
4      Q.  Thank you, sir.  No further questions from
5  me.  I just want you to know we appreciate your time
6  and we know that you had rather be somewhere else
7  right now.  But this is an important part of the
8  civil litigation process.  And we appreciate it and
9  respect you and your service, so thank you.
10      **A.  Thank you, sir.**
11          MS. PARKS:  Let's have five minutes
12      please.
13          (Recess 12:09 p.m. - 12:15 p.m.)
14              EXAMINATION
15  BY MS. PARKS:
16      Q.  Officer Abad, I have some questions for
17  you.
18      **A.  Sure.**
19      Q.  Regarding the low ready position, please
20  explain what that position is.
21      **A.  The low ready position is a way you would**
22  **hold the firearm, and it's just lightly off the**
23  **potential threat but ready in case of necessary use.**
24      Q.  And why were you in the low ready position?
25      **A.  Because I was concerned if I would be**

Page 99

1  struck by the vehicle.
2      Q.  Is the low ready position something that
3  you were taught in the Academy?
4      **A.  Yes, ma'am.**
5      Q.  Now regarding performing a field sobriety
6  test, why did you not perform a field sobriety test
7  or a Breathalyzer test on Plaintiff Tyler Griffin?
8      **A.  Mr. Griffin was injured.  I didn't want to**
9  **put him through any additional stresses or**
10  **pressures.  I felt that what I had noticed would**
11  **suffice.  I didn't want to put him through anything**
12  **extra.**
13      Q.  Is that the standard, not to perform a
14  field sobriety test or a Breathalyzer test --
15      **A.  That is up to the officer, the officer's**
16  **discretion.**
17      Q.  Now regarding the tackle by Officer
18  Vickers, how much time passed between Mr. Griffin
19  swiping your hand off of his shoulder and Officer
20  Vickers tackling him?
21          MR. KAHN:  Objection, leading.
22          MS. PARKS:  Actually that is not
23      leading.
24  BY MS. PARKS:
25      Q.  Officer Abad, how much timed passed between

Page 100

1  Mr. Griffin swiping your hand off of his shoulder
2  and Officer Vickers tackling him?
3      **A.  Maybe a second.  It happened very, very**
4  **fast.**
5      Q.  Did you have enough time in that second,
6  one second, to waive Vickers off?
7      **A.  No, I did not.**
8          MR. KAHN:  Object to the form of the
9      question.
10          MS. NAIR:  I'm sorry.  I couldn't
11      understand the objection, Mr. Butler.  I
12      couldn't hear it.
13          MR. KAHN:  It's Matt Kahn here --
14          MS. NAIR:  I'm sorry, Mr. Kahn.
15          MR. KAHN:  I said I object to the form
16      of the question.
17  BY MS. PARKS:
18      Q.  Let's go back so that the record is clear.
19          Officer Abad, you answered that maybe one
20  second passed between Tyler Griffin swiping your
21  hand off of his shoulder and Officer Vickers
22  tackling him?
23      **A.  Yes, ma'am.**
24          MR. KAHN:  Objection, leading.
25          MS. PARKS:  That's not leading.  I'm

Page 101

1  clarifying what he answered previously for the
2  record.
3       MR. KAHN:  In a leading manner.
4       MS. PARKS:  No, I am clarifying on the
5  record what Officer Abad previously testified
6  to --
7       MR. KAHN:  And I am objecting to the
8  leading.
9       MS. PARKS: -- one question ago.
10 BY MS. PARKS:
11      Q.  Officer Abad, I'm going to clarify for you
12 again.  You just answered the question that one
13 second passed.  Within that one second did you have
14 enough time to wave Officer Vickers off?
15      MR. KAHN:  Objection, leading.
16 BY MS. PARKS:
17      Q.  You may answer, Officer Abad.
18      A.  I did not have time, no.
19      Q.  Were you looking at Officer Vickers when he
20 tackled Tyler Griffin?
21      A.  I was not looking at him, no.
22      Q.  Did you have time to respond to the tackle
23 by Officer Vickers?
24      A.  No.  No, ma'am.
25      Q.  Did you know whether Mr. Griffin was

Page 102

1  injured by Officer Vickers tackle at that time?
2      A.  I did not.  I did not.
3      Q.  Did you have any concern about potential
4  injuries after the tackle?
5      A.  After Mr. Griffin began stating he was
6  experiencing pain, then that's when I began to
7  realize that he's probably injured.
8      Q.  Did you ask him if anything was broken?
9      A.  I did.
10     Q.  Regarding the report that you written on
11 the night of the incident, did you review any video
12 footage before writing your report?
13     A.  No, ma'am.  I believe you're not
14 particularly allowed to.
15     Q.  Was your report written based upon your
16 knowledge at that time?
17     A.  Yes, ma'am.
18     Q.  Was your report accurate and truthful from
19 what you remembered at that time?
20     A.  Yes, ma'am.
21     Q.  Regarding the 2019 performance evaluation
22 regarding Officer Vickers, were you the sergeant who
23 evaluated Officer Vickers?
24     A.  I was not.
25     MS. PARKS:  Those are all the questions

Page 103

1  the City has for Officer Abad.
2       MR. KAHN:  I just have a couple of
3  questions for you, Officer Abad, and then we'll
4  let you get out of here.
5       FURTHER EXAMINATION
6  BY MR. KAHN:
7      Q.  So we stopped, went off the record at
8  approximately 12:15 and reconvened at -- at 12:12
9  and reconvened at 12:15.  During that break did you
10 speak to any of the City of Atlanta lawyers that are
11 in this conference room?
12     A.  No, sir.
13     Q.  Did you communicate with any of those
14 lawyers in any way during the break that we just
15 had?
16     A.  No, sir.
17     MR. KAHN:  No further questions.
18     (Signature reserved.)
19     (Deposition concluded at 12:25 p.m.)
20
21
22
23
24
25

Page 104

1       The following reporter and firm
  disclosures are as follows:
2
3       REPORTER DISCLOSURES
4       The following representations and
  disclosures are made in compliance with Georgia Law,
5  more specifically:
       Article 10(B) of the Rules and Regulations
6  of the Board of Court Reporting (disclosure forms)
  O.C.G.A. 9-11-28(c) (disqualification of reporter for
7  financial interest).
       O.C.G.A. 15-14-37(a) and (b) (prohibitions
8  against contracts except on a case-by-case basis).
  - I am a certified reporter in the State of Georgia.
  - I am a subcontractor for Pope Reporting & Video.
9  - I have been assigned to make a complete and
  accurate record of these proceedings.
10 - I have no relationship of interest in the matter
  on which I am about to report which would disqualify
11 me from making a verbatim record or maintaining my
  obligation of impartiality in compliance with the
12 Code of Professional Ethics.
  - I have no direct contract with any party in this
13 action and my compensation is determined solely by
  the terms of my subcontractor agreement.
14      FIRM DISCLOSURES
15 - Pope Reporting & Video was contacted to provide
  reporting services by the noticing or taking
16 attorney in this matter.
  - There is no agreement in place that is prohibited
17 by O.C.G.A. 15-14-37(a) and (b).  Any case-specific
  discounts are automatically applied to all parties,
18 at such time as any party receives a discount.
  - Transcripts:  The transcript of this proceeding as
19 produced will be a true, correct and complete record
  of the colloquies, questions, and answers as
20 submitted by the certified court reporter.
  - Exhibits:  No changes will be made to the exhibits
21 as submitted by the reporter, attorneys, or
  witnesses.
22 - Password-Protected Access:  Transcripts and
  exhibits relating to this proceeding will be
23 uploaded to a password-protected repository, to
  which all ordering parties will have access.
24
25

Page 105

1          CERTIFICATE OF COURT REPORTER
2     STATE OF GEORGIA:
3     COUNTY OF FULTON:
4          I hereby certify that the foregoing
5     transcript was taken down, as stated in the caption,
6     and the colloquies, questions and answers were
7     reduced to typewriting under my direction; that the
8     transcript is a true and correct transcript of the
9     evidence given upon said proceeding.
10
11
12          This the 20th day of November 2020.
13
14
15          Lucy C. Rateau, RPR, CCR 2766
16
17
18
19
20
21
22
23
24
25

<span style="color:red">VIA EMAIL</span>

Date:  11/23/2020

To:  Staci Miller, Esq.

Re:  Signature of Deponent Matthew Abad

Greetings:

The deponent has reserved the right to read and sign. Please have the deponent review the attached transcript, noting any changes or corrections on the attached Errata.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Pope Reporting (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time below, the original transcript may be filed with the court without the signature of the deponent.

<span style="color:red">Date Errata due back at our offices:  12/30/2020</span>

Please send completed Errata to:
Pope Reporting & Video, LLC
2741 Pangborn Road
Decatur, Georgia 30033
(404) 856-0966

## ERRATA

JOB NUMBER:  18559

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

\_\_\_\_\_  There are no changes noted.
\_\_\_\_\_  The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____


_____
DEPONENT'S SIGNATURE


Sworn to and subscribed before me this _____ day of

_____, _____.

_____
NOTARY PUBLIC

My Commission Expires: _____

## WORD INDEX

**< 1 >**
**1** 17:*10*
**1,000** 7:*25*
**1.1** 2:*4* 33:*5, 6, 10*
**1.2** 2:*5* 34:*20, 23*
35:*1, 18* 38:*10*
39:*6, 24* 41:*1*
44:22 65:8, *24*
66:*8*
**1.3** 2:*6* 46:*12, 13,*
*14, 17*
**1.4** 2:*7* 47:*1, 2, 4*
**1:20-CV-02514-**
**TWT** 1:*1*
**10** 3:*5* 25:*24*
**10(B** 104:*5*
**103** 2:*20*
**11:31** 81:*19*
**11:40** 81:*16, 19*
**11-page** 14:*15*
**12** 73:*23*
**12:09** 98:*13*
**12:12** 103:*8*
**12:15** 98:*13* 103:*8,*
*9*
**12:25** 103:*19*
**12th** 73:*19*
**1-5** 1:*1*
**15-14-37(a** 104:*7,*
*17*
**18** 5:*23*
**1st** 83:*22*

**< 2 >**
**2.2** 2:*8* 51:*5, 6*
53:*2, 12* 55:*6*
**20** 9:*5*
**20/20** 45:*20*
**2010** 73:*6*
**2016** 5:*9* 7:*12*
**2018** 83:*23*
**2019** 17:*7* 73:*23*
82:*16* 83:*18, 23*
85:*10* 90:*23* 92:*23*
102:*21*
**2020** 1:*1* 73:*23*

**105**:*12*
**20th** 105:*12*
**26** 14:*12, 21*
**2766** 105:*15*

**< 3 >**
**3.3** 2:*9* 56:*3, 4, 17*
**3.4** 2:*10* 59:*16, 17*
**30** 25:*21*
**30(b)(6** 65:*2* 66:*22*
**30.1** 25:*12, 15, 19*
41:*10, 18* 42:*3, 7,*
*17*
**30303** 3:*17*
**30324** 3:*6*
**30th** 83:*23*
**33** 2:*4* 83:*14*
87:*12* 88:*5, 8*
**34** 2:*5*

**< 4 >**
**4** 2:*18*
**4.1** 2:*11* 48:*10, 11,*
*12, 16* 49:*4, 8, 16*
**4.2** 2:*12* 53:*16, 17,*
*18* 55:*5, 14*
**4.2.37** 73:*6* 80:*16*
**4.2.51** 74:*18*
**404.330.6402** 3:*18*
**404.587.8423** 3:*7*
**42** 63:*22* 64:*3, 10*
69:*6*
**46** 2:*6*
**47** 2:*7* 74:*2, 5*
80:*14*
**48** 2:*11* 61:*12, 17*

**< 5 >**
**5** 1:*1* 17:*7* 73:*23*
**5.3** 2:*13* 56:*22, 23*
**50** 52:*6*
**5000** 3:*16*
**502** 92:*2, 11*
**51** 2:*8* 81:*24*
**53** 2:*12*
**55** 3:*15*
**56** 2:*9, 13*
**59** 2:*10*

**5th** 58:*16* 59:*4*

**< 6 >**
**615** 92:*22*

**< 9 >**
**9:30** 1:*1*
**9-11-28(c** 104:*6*
**98** 2:*19*

**< A >**
**a.m** 1:*1* 81:*19*
**ABAD** 1:*1* 4:*1, 4,*
*14, 19* 5:*3, 4* 15:*18*
26:*5, 14* 28:*17*
31:*23* 34:*7, 14*
35:*20* 36:*1* 38:*12,*
*24* 41:*6, 14, 23*
42:*12, 21* 43:*14, 22*
44:*7, 24* 50:*12*
51:*19* 58:*9* 65:*19*
66:*14* 70:*11* 72:*9*
78:*7* 87:*24* 98:*16*
99:*25* 100:*19*
101:*5, 11, 17* 103:*1,*
*3*
**Abad's** 61:*19*
70:*11* 72:*13* 73:*4*
**abandon** 19:*15*
**abbreviation** 75:*1*
**able** 14:*23* 19:*25*
24:*1* 27:*7* 29:*19,*
*20* 32:*11* 37:*1*
47:*14* 74:*12*
**absolutely** 29:*7*
90:*20*
**abuse** 73:*11*
**academy** 7:*23*
35:*24* 43:*12, 18*
44:*1, 22* 54:*12*
99:*3*
**accelerating** 35:*14*
57:*8*
**Access** 104:*22, 24*
**accurate** 102:*18*
104:*10*
**acquaintance** 8:*12*
**act** 35:*17* 63:*6*

**88**:*13*
**acted** 65:*7*
**acting** 39:*7, 12, 18*
43:*1, 3, 5* 55:*2*
**action** 74:*23*
104:*13*
**actual** 57:*18*
73:*19* 77:*5*
**addition** 12:*15*
**additional** 99:*9*
**addressed** 68:*25*
69:*2*
**addresses** 86:*2*
**administer** 8:*20*
**administered** 8:*25*
**admission** 15:*17,*
*18* 58:*5*
**admit** 58:*7*
**admonishment**
75:*2, 4, 5, 8* 81:*1*
**advise** 72:*10*
**advised** 75:*10*
**advising** 44:*17*
**Advisory** 91:*25*
92:*3*
**afraid** 30:*9*
**age** 5:*23*
**aggressive** 13:*4*
**agitate** 50:*21*
**ago** 12:*12, 22*
101:*9*
**agree** 22:*17* 24:*15,*
*23* 31:*20* 32:*2*
35:*9* 48:*15* 64:*13*
67:*16* 69:*1, 12*
70:*6* 86:*9* 87:*4*
88:*24* 91:*12*
**agreement** 4:*5*
104:*14, 17*
**ahead** 44:*18* 75:*25*
**aim** 35:*3*
**aiming** 27:*21*
35:*12*
**Albertini** 74:*9*
**alcohol** 8:*16* 20:*1*
37:*6*
**ALISHA** 3:*12*
**allegations** 12:*8*

79:22  80:11
**alleged**  89:24
**allegedly**  22:1, 4
**allow**  18:6  88:8
**allowed**  31:17
37:9  58:7  102:14
**all's**  23:23  27:4
**alongside**  19:19
**ambulance**  30:24
31:3, 5, 8, 11, 14
32:16  49:10, 14
55:15, 17, 24  63:14,
16, 17  72:6  73:9
80:19  97:19
**America**  91:6
**amnair@atlantaga.g
ov**  3:20
**amount**  20:1  29:16
**analysis**  37:1
**angle**  37:22  45:4
**ankle**  15:13, 24
16:19  20:12  24:17,
25  25:10, 16, 25
26:12  30:21  32:7,
10  40:9  41:4  42:6
49:24  50:9, 25
56:10, 13  71:24
72:2, 21
**annual**  92:20  93:9
**answer**  15:14
16:16  24:19  26:4,
13  28:16  31:22
34:6, 13  35:19, 25
38:11  41:5, 13, 22
42:11, 20  43:13, 21
44:2, 10, 12, 18, 23
45:11  49:25  50:11
51:1, 19  52:12, 22
54:3, 14, 22, 23
55:19  56:18  58:9,
13  60:20, 25  64:24
66:13  67:2, 17
68:2, 10, 21  70:25
71:7, 25  73:13
75:18, 22  76:6
78:7  79:23  84:20
86:4, 11, 18  87:1, 8,
14  88:21  91:15, 20

93:19, 25  94:21
95:1  97:1  101:17
**answered**  67:3
100:19  101:1, 12
**answers**  104:20
105:6
**anxious**  77:8, 13
**anybody**  87:12
95:17  97:9  98:1, 2
**anytime**  13:21
40:20  59:2, 6, 9, 12
80:2  81:12
**APD**  6:9, 15  7:1, 3,
5, 8  51:25  73:6
89:16
**APD's**  67:11
**APEX**  76:24
**apologize**  16:9
76:2
**apology**  94:25
95:3
**appear**  14:21
83:17
**APPEARANCES**
3:1
**appearing**  15:1
**appears**  65:2
66:21  82:2
**applauded**  79:9
**applied**  104:18
**appreciate**  98:5, 8
**approach**  19:12
30:18
**approached**  22:11
26:19  37:20
**approaching**  35:5
**appropriate**  37:11
39:14
**appropriately**  63:7
79:11  94:3
**approximately**
23:4  103:8
**April**  5:9  17:7
58:16  59:4  73:23
90:23
**arm**  61:19  62:16
**arrest**  31:6  72:12
**arrests**  92:20

**arrived**  20:15
31:16
**Arthur**  65:3
**Article**  104:5
**asked**  13:5  47:17
59:9, 12  85:17
**asking**  15:17
18:17  26:9, 10
57:17, 18  58:4
63:11, 13, 15  65:16
96:8, 21
**assess**  90:25
**assign**  86:15
**assigned**  76:14
104:9
**assignment**  17:8,
10  76:24
**assist**  61:20  83:10
**associate's**  5:13
**assume**  31:9  34:9
42:22  72:24  78:10
**assuming**  19:13
26:23
**ATLANTA**  1:1
3:6, 14, 17  4:6
9:18  10:25  14:7
17:9  19:21  35:16
64:21  65:23  66:6,
18  67:7  73:22
76:4  78:15  79:20
80:9  83:17  88:25
91:19  93:8  103:10
**Atlanta's**  15:7
86:14
**attempt**  29:4
36:23
**attempted**  16:1
**attempting**  29:17
35:15
**attention**  72:13
**attorney**  104:16
**attorneys**  17:4
104:21
**audio**  29:3  75:12
82:22
**authored**  23:3
60:10
**automatically**

104:18
**available**  95:20, 23
**Avenue**  3:15  18:21
**average**  92:21
93:10
**avoid**  78:19
**aware**  13:15
25:10  31:2  76:25
77:2  78:16  95:19

**< B >**
**back**  7:16  10:11
12:14  18:23  19:12
34:1  50:2  72:5
80:13  91:2  97:20
100:18
**backyard**  32:22
**bad**  79:12  90:9
**balance**  48:18
61:18  62:2
**balancing**  61:20
**Based**  4:25  18:2
36:21  37:4  39:11,
17  49:18  67:3
72:22  102:15
**basically**  81:6
**basis**  15:15  38:13,
16  58:2  65:13
84:15  88:20  104:8
**bathroom**  81:15
**Bear**  63:19  89:23
**beat**  78:18  96:16
**began**  19:11  102:5,
6
**beginning**  18:18
**behalf**  3:2, 10
64:21  65:22  66:6,
18  67:6
**behaved**  56:16
**behaves**  55:10
**behaving**  55:11
**behavior**  51:25
77:18
**belief**  43:8, 9, 19
**believe**  6:13  8:8
15:2, 8, 9  18:20
19:7  21:14  23:2
24:8, 9  25:17
26:16  27:7  35:21

44:*4* 46:*6* 49:*15*
57:*16* 58:*24* 62:*13*
63:*7, 14* 70:*23*
73:*20* 84:*21* 87:*20,*
*21* 88:*18* 102:*13*
**believed** 22:*13*
28:*5*
**believes** 32:*17*
**Bellemeade** 27:*1*
**best** 22:*15*
**Better** 33:*24*
67:*24* 91:*9*
**big** 63:*14* 94:*19*
**biggest** 59:*19*
**bit** 17:*3* 51:*10*
82:*23*
**blank** 63:*6*
**blatant** 10:*7, 12*
**blend** 18:*10, 12*
**blocked** 23:22
27:20
**blocking** 27:*9*
**Board** 104:*6*
**bodily** 73:2
**body** 11:*12, 14*
12:*15* 15:*10, 23*
37:22 95:22
**bodyweight** 41:*20*
42:*8*
**body-worn** 11:*8, 10*
**bone** 41:*10*
**bones** 25:*18* 73:*1*
**bottom** 27:*3, 7, 10*
85:*9*
**bragging** 52:*10*
**break** 7:*15, 17, 20*
75:*13* 81:*13, 14*
103:*9, 14*
**breath** 20:*1*
**Breathalyzer** 30:*1*
99:*7, 14*
**briefly** 14:*11*
**bright** 19:*11*
**broke** 82:*23*
**broken** 15:*13, 24*
16:*20* 25:*10, 18*
32:*10, 21, 24* 41:*9*
47:*18* 49:*23* 50:*9,*

*25* 71:*24* 72:2, *21,*
*24* 73:*1* 102:*8*
**brushed** 30:*6*
46:*18, 22* 70:*14, 18*
**brutality** 21:*6*
**Buchanan** 27:*1*
**bullets** 57:*3, 11, 21*
**Butler** 3:*4* 100:*11*

< C >
**call** 30:*24* 31:*2, 10,*
*14* 32:*14* 49:*10*
55:*14, 17* 63:*16*
69:*25* 73:*8* 90:*4*
**called** 13:*8* 31:*8*
32:*16* 49:*13* 55:*24*
56:*6* 63:*6* 90:*5*
96:*12* 97:*19*
**calling** 96:*13*
**Calls** 16:*13* 29:*22*
38:*19* 51:*18* 96:*5,*
*6, 10*
**cam** 21:*1*
**camera** 11:*8, 10,*
*12, 14* 12:*15* 15:*10,*
*23* 60:*1, 3* 95:*23*
**caption** 105:*5*
**car** 21:*9* 23:*22*
24:*1, 18* 25:*1*
26:*18, 22, 25* 27:*4,*
*5, 9, 15, 22* 28:*23*
35:*15* 37:*15* 39:*20*
40:*2, 6, 9, 14* 41:*12,*
*19, 21* 42:*9* 57:*8*
62:*9*
**CARE** 84:*4*
**career** 9:*9, 15* 10:*5*
**Case** 1:*1* 4:*5* 6:*2*
12:*3, 8, 24* 13:*16*
14:*5* 29:*24* 30:*1*
59:*10* 70:*24* 82:*16*
98:*23*
**case-by-case** 104:*8*
**case-specific** 104:*17*
**cast** 90:*8*
**catch** 49:*1*
**category** 64:*6* 86:*2*
**caught** 19:*20*

**CCR** 1:*1* 105:*15*
**certain** 59:*10* 93:*2*
**CERTIFICATE**
105:*1*
**certified** 104:*8, 20*
**certify** 105:*4*
**chain** 94:*10, 16*
**change** 43:*4* 90:*16*
**changed** 91:*8*
**changes** 104:*21*
**charging** 46:*22*
**Chattahoochee**
18:*21*
**check** 30:*25* 32:*14*
**checked** 32:*23*
**checking** 96:*8*
**choice** 29:*18*
**choices** 77:*12*
**choose** 29:*13*
**choppy** 50:*20*
**circumstances**
79:*10, 15*
**citizen** 28:*9, 10*
32:*15* 49:*23* 50:*9,*
*25* 52:*21* 54:*2*
63:*17* 82:*5* 85:*21,*
*22*
**citizens** 18:*13*
22:*18* 35:*24* 37:*10*
54:*13* 85:*13* 86:*3*
**citizen's** 51:*23*
82:*18* 89:*25*
**CITY** 1:*1* 3:*14*
4:*6* 10:*25* 14:*6*
15:*6* 64:*21* 65:*23*
66:*6, 18* 67:*7*
73:*21* 76:*3* 78:*15*
80:*9* 83:*17* 86:*14*
88:*25* 91:*19* 93:*18*
103:*1, 10*
**Civil** 4:*8* 12:*5*
98:*8*
**claim** 20:*20* 32:*15*
**claimed** 23:*3* 46:*7*
**claiming** 36:*24*
**clarify** 63:*10*
101:*11*
**clarifying** 101:*1, 4*

**clarity** 6:*23*
**classes** 8:*3*
**classification** 76:*10*
**clean** 24:*22* 50:*16,*
*21*
**clear** 49:*11* 73:*5*
100:*18*
**clearly** 32:*6*
**client** 44:*15*
**climate** 90:*17*
**clip** 2:*4, 5, 6, 7, 8,*
*10, 11, 12, 13* 11:*15*
36:*13* 48:*20* 51:*4*
53:*1* 56:*2* 59:*15*
**clips** 2:*9* 33:*1*
**closed** 6:*14*
**closer** 14:*18*
**clue** 37:*6*
**clues** 8:*17*
**code** 90:*13, 16, 22*
104:*12*
**collar** 20:*6*
**college** 5:*12, 15*
**colloquies** 104:*20*
105:*6*
**come** 19:*17* 22:*8*
27:*19* 30:*15, 24*
32:*14* 61:*3* 69:*24*
**comes** 10:*7*
**comfortable** 34:*3*
**coming** 27:*17* 36:*6*
**command** 94:*11, 16*
**comments** 84:*8, 19*
85:*2*
**common** 9:*18*
18:*4* 22:*25* 26:*10*
42:*15* 73:*2*
**communicate**
103:*13*
**communicated**
13:*25*
**Community** 5:*15*
96:*17*
**compensation**
104:*13*
**complain** 40:*8*
60:*17, 23*
**complaining** 72:*11*

complaint 12:2, *6*
*58*:20 82:5, *7, 17,*
*18, 21, 24, 25* 83:*12*
complaints 82:*4*
complete 104:9, *19*
completely 42:25
*46*:23 78:*16*
compliance 104:*4,*
*12*
computer 18:*1*
concern 59:25
60:*5* 85:*12, 23*
86:2 102:*3*
concerned 60:*16,*
*22* 63:8, *9* 98:25
concerns 60:*7*
concluded 103:*19*
conduct 53:*11*
55:9 63:*11, 13*
73:22 78:*4* 85:*23*
86:*16, 20, 23* 87:6,
*7*
conducting 94:7
conference 103:*11*
confident 77:*12*
confirm 14:*19*
consider 8:*11* 9:*11*
constitutional 95:*16*
contact 11:*17, 22*
18:*23* 19:*5, 16, 24*
20:*7, 18* 22:*16*
29:*1, 15* 30:*19, 20*
31:*16* 36:*20* 69:*18,*
*25*
contacted 104:*15*
context 74:7
continued 19:*6*
23:*15*
contract 104:*13*
contracts 104:*8*
control 32:*18*
87:*17, 18*
conversation 60:9
95:*17*
conversations 10:*24*
cooperating 19:*22*
corner 92:*10*
correct 15:*4* 16:*6*
*18*:*14, 24* 20:*21*

21:*3, 6, 17, 20, 24*
*23*:*1* 24:*11, 13*
*26*:*19* 27:*1, 12*
*28*:*11* 30:*5* 33:*20,*
*22* 35:*12* 46:*9, 19,*
*20* 48:*1, 5, 8* 49:*19*
*55*:*3* 63:*17* 68:*3*
*70*:*20* 71:*13, 21, 22*
*73*:*9, 10, 25* 74:*21,*
*22* 75:*3* 79:*19*
*80*:*22* 83:*2, 6, 7*
*84*:*15* 85:*3, 4, 7, 8*
*86*:*22, 25* 88:*11, 22*
*104*:*19* 105:*8*
corrected 70:*8*
correctly 34:*17*
Council 91:*25*
92:*3*
COUNSEL 3:*1, 23*
County 5:*15* 105:*3*
couple 12:22 49:*1*
*96*:*16* 103:*2*
course 8:*15* 81:*11*
COURT 1:*1* 4:*12*
*21*:*5* 50:*16* 104:*6,*
*20* 105:*1*
courteous 71:*21,*
*23* 72:*1, 4* 84:*5, 25*
cousin 6:*4*
cover 66:*21*
covered 70:*17*
COVID 4:*11*
COVID-19 3:*24*
creates 50:*19*
cried 41:*20*
crime 37:*12* 93:*4*
Criminal 5:*18*
cry 40:*5* 72:*23*
cup 81:*10*
cure 38:*17*
curious 71:*16*
current 7:*1* 76:*24*
*90*:*9*
currently 6:*9* 90:*8*
cut 60:*3*
cuts 60:*1*

< D >

damage 24:*7*
damn 56:*24*
dash 21:*1*
date 83:*25*
day 105:*12*
days 6:*21, 24*
*12*:*22*
deal 31:*17* 77:*17*
*78*:*4*
decision 36:*23*
*43*:*4*
declining 92:*19*
deemed 39:*13* 80:*4*
deems 37:*11*
Defendant 4:*3*
*10*:*19* 24:*15* 65:*7*
Defendants 1:*1*
*3*:*10* 14:*7*
defer 68:*3*
definitely 32:*10*
*86*:*12* 90:*20* 97:*21*
degree 5:*12, 13, 16,*
*17*
Denae 87:*21*
Department 3:*14*
*9*:*19* 22:*21* 35:*17*
*52*:*3* 78:*15* 79:*8,*
*20, 21* 80:*10* 84:*5*
*88*:*25*
department-wide
*89*:*22*
Depending 36:*2*
depends 79:*10*
deposed 10:*16*
DEPOSITION 1:*1*
*4*:*3, 5, 7, 10* 11:*1*
*13*:*19, 22* 14:*2*
*15*:*19* 17:*5* 34:*12*
*58*:*6* 65:*3* 66:*22*
*103*:*19*
depositions 12:*23*
*13*:*1, 2, 6, 13*
derogatory 89:*13*
describe 72:*14*
described 78:*5*
describes 84:*4*
Description 2:*1*
deserves 86:*1*

Despite 92:*19*
details 18:*16* 25:*5*
detect 8:*17*
determine 37:*2*
determined 104:*13*
different 32:*9*
differently 32:25
*45*:*18, 22, 25*
difficult 50:*19*
difficulty 61:*18*
direct 5:*22* 104:*13*
direction 83:*6*
*105*:*7*
directly 92:*18*
disagree 23:*21, 24*
disciplinary 74:*1*
*75*:*15, 21* 76:*5*
*77*:*10* 82:*2*
disclosure 104:*6*
disclosures 104:*1,*
*3, 4, 15*
discount 104:*18*
discounts 104:*18*
Discovery 13:*10*
*14*:*4* 15:*7*
discretion 99:*16*
disdain 79:*8*
displaying 86:*2*
displays 85:*12, 23*
Disposition 64:*4*
disqualification
*104*:*6*
disqualify 104:*11*
distinction 43:*8*
DISTRICT 1:*1*
DIVISION 1:*1*
document 14:*15,*
*25* 15:*1* 74:*6* 88:*8,*
*15* 92:*7, 10*
documentation
*81*:*8*
documentations
*79*:*6*
documented 88:*14*
documents 87:*19*
DOE 1:*1*
doing 17:*8, 23*
*26*:*21* 29:*11* 33:*15,*
*19* 34:*9, 17* 57:*13*

**DONALD** 1:*1*
11:*11*, *25* 64:7, *10*
65:*23* 66:7 67:*12*
88:*18* 94:*24*
**door** 36:*12*, *25*
**double-check** 33:*24*
**double-checked**
*33:19*
**double-checking**
*34:16*
**dozens** 86:*6*
**dramatic** 59:*19*
**drawing** 63:*6*
**drive** 23:*9*
**driven** 19:*12*
**driveway** 19:*8*, *18*
20:*11*, *16* 27:*3*, *8*,
*10*, *17*, *20* 32:*12*, *22*
48:*24*
**driving** 17:*16*
18:*3*, *20*, *21*, *25*
21:2 24:*8* 26:*2*, *11*
**drop** 29:*3* 75:*12*
82:*22*
**drove** 19:*7* 23:*3*
**dude** 59:*24*
**due** 3:*24*
**DUI** 8:*1*, *13*, *14*
20:*2* 29:*22* 33:*15*,
*23* 34:*1*
**duly** 4:*15*

**< E >**
**earlier** 35:*9* 54:*25*
**early** 17:*7*
**educated** 67:*14*
**effective** 84:*14*
88:*19*
**effects** 8:*16*
**either** 10:*19* 21:*19*
38:7 48:7 53:*8*
58:*19* 95:*5*
**elaborate** 10:*12*
**elevated** 80:*3*
**emails** 14:*1*
**embankment** 19:*8*
**embarrassed** 97:*11*
**empathy** 85:*12*, *24*

86:*3*
**employ** 93:*22*
**employed** 6:*9*
72:*15*
**encourages** 35:*17*
**ended** 23:*15*
**enforcement** 7:*7*
**engage** 86:*5*
**enjoy** 95:*10*
**entire** 41:*20* 42:*8*
**entirely** 11:*11* 41:*7*
**entry** 82:*10*
**equipped** 18:*6*
21:*15*, *18* 22:*5*
**escape** 22:*15*
**escorting** 48:*19*
**especially** 96:*18*
**ESQ** 3:*3*, *11*, *12*, *13*
**essentially** 18:*10*
81:*5*
**Ethics** 104:*12*
**evaluated** 84:*25*
102:*23*
**evaluation** 83:*18*,
*22* 84:*18* 87:*5*
88:*14*, *17* 102:*21*
**events** 94:*6*
**Everybody** 32:*8*
**evidence** 20:*23*
30:*3* 105:*9*
**exact** 43:*23* 72:*14*
**exactly** 9:*4* 54:*6*
65:*16*
**EXAMINATION**
4:*17* 98:*14* 103:*5*
**EXAMINATIONS**
2:*13*
**examined** 4:*15*
**example** 84:*24*
**exceeds** 84:*14*
88:*19*
**excerpt** 92:*2*
**excessive** 9:*6*, *11*,
*14* 60:*17*, *23* 64:*23*
67:*21* 68:*19* 79:*22*,
*24* 80:*4* 81:*22*
89:*18* 94:*4*, *6*, *15*
**Excluding** 10:*24*

**Exhibit** 2:*1*, *4*, *5*, *6*,
*7*, *8*, *9*, *10*, *11*, *12*, *13*
14:*12*, *21* 25:*11*, *12*,
*15*, *19*, *21* 33:*5*, *6*,
*10* 34:*20*, *21*, *23*
35:*1*, *18* 36:*14*
38:*10* 39:*6*, *24*
41:*1*, *10* 42:*1*, *3*, *7*,
*17* 44:*22* 46:*11*, *12*,
*13*, *17*, *25* 47:*1*, *2*, *4*
48:*9*, *10*, *11*, *12*, *15*,
*20* 49:*4*, *8*, *16* 51:*5*,
*6* 53:*1*, *2*, *12*, *15*, *16*,
*17*, *18* 55:*5*, *14*
56:*3*, *4*, *16*, *22*, *23*
59:*16*, *17* 61:*12*, *17*
63:*19*, *22* 64:*3*, *9*
65:*8*, *24* 66:*8* 69:*6*
74:*2*, *5* 80:*13*, *14*
81:*24* 83:*14* 87:*11*
88:*5*, *7* 91:*24* 92:*2*,
*11*
**EXHIBITS** 2:*1*
104:*21*, *23*
**existing** 41:*11*
**exited** 19:*10* 27:*6*,
*13*
**exonerated** 64:*10*
68:*6*
**exonerations** 77:*5*
**expect** 78:*11* 96:*11*
**expected** 84:*14*
86:*24* 88:*19*
**experience** 7:*8*
18:*3* 28:*4* 72:*25*
89:*16*
**experiencing** 102:*6*
**expired** 83:*1*
**explain** 98:*20*
**extensive** 75:*15*, *21*
76:*5* 79:*4* 93:*23*
**extent** 8:*14* 25:*9*
32:*8* 38:*18* 50:*3*
72:*3*, *19* 77:*4*
**extra** 99:*12*

**< F >**
**facing** 37:*20*, *22*

**fact** 14:*19* 21:*21*
41:*18*
**failed** 69:*14*, *17*, *18*
**failing** 74:*20*
80:*18* 83:*8*, *10*
**fails** 86:*24*
**failure** 63:*5*, *6*, *16*
73:*8*
**failures** 73:*4*
**fair** 79:*12* 80:*8*, *24*
88:*16* 93:*21*
**fairly** 84:*10*
**faith** 39:*7*, *12*, *18*
43:*1*, *3*, *5* 55:*2*, *6*,
*11*
**fall** 36:*22* 72:*23*
**falling** 29:*21*
**fallout** 61:*4*
**false** 62:*12*, *14*
**familiar** 73:*1*
91:*25*
**family** 5:*21*, *22*
8:*2* 95:*24* 96:*4*, *10*,
*15*, *23*
**far** 7:*25*
**fast** 100:*4*
**fault** 81:*12*
**Federal** 4:*8* 21:*5*
**feels** 32:*20*
**feet** 23:*4*, *8* 24:*12*
29:*6*, *20* 49:*1* 50:*3*
**fell** 20:*13* 53:*5*
55:*13*
**fellow** 89:*24*
**felt** 30:*14* 46:*8*
62:*4* 77:*12* 99:*10*
**field** 8:*2*, *20*, *25*
9:*1* 17:*10* 20:*2*
29:*23* 33:*17* 37:*8*
79:*1* 99:*5*, *6*, *14*
**figure** 67:*18*
**figured** 94:*17*
**file** 12:*5* 83:*11*
**filed** 12:*3*
**filled** 84:*21*
**finally** 19:*20*
**financial** 104:*7*

**find** 28:6 53:6, 9 68:15 76:3 93:8 94:15

**finding** 64:13 69:12 70:6 94:8

**fine** 37:25 77:24

**finish** 7:16

**fire** 28:20 34:4, 5

**firearm** 27:23 28:6, 7, 12, 18 98:22

**firefighter** 34:4

**Firm** 3:4 104:1, 15

**first** 4:15 20:19 27:14 30:15, 17 33:4 37:6 49:2 61:9 64:6 65:2 69:8 73:21 82:5 83:3 92:8 96:16

**Fite** 8:6, 9, 11 66:22 67:4, 6, 14, 16, 23

**Fite's** 66:17 67:10, 20 68:3

**five** 98:11

**fixed** 92:16

**flee** 29:4, 18 36:23

**flip** 66:25 70:9 71:14 72:8 85:9

**focus** 5:16 63:14 66:3

**folks** 43:25 44:21

**followed** 19:1

**following** 17:21, 24 22:7 91:2 104:1, 4

**follows** 4:16 104:1

**foot** 39:21 40:3 41:21

**footage** 11:8, 10, 12, 14, 20 12:15 15:11, 23 24:3 95:22, 23 102:12

**force** 8:4, 7 9:7, 11, 14, 24 29:13 43:19, 20 50:1, 2, 4 60:17, 23 64:11, 16, 22 66:18 67:4, 11, 13, 22 68:8, 9, 18, 19, 20 69:2, 9, 15

72:15 74:21 76:4 79:1, 6, 15, 17, 22, 24 80:2, 3, 10 81:22 82:11, 14 89:8, 18 91:13, 25 92:3, 21 93:9, 24 94:5, 6, 8, 9, 15 95:13

**foregoing** 105:4

**forgot** 81:11

**form** 58:4 65:15 74:11, 16 77:20 78:6 100:8, 15

**formatting** 14:24

**forms** 104:6

**forward** 62:18

**found** 66:9 77:14 94:4

**Four** 7:4, 21 23:4, 8 24:12 84:13 85:10, 15 86:1

**fracture** 41:9, 17

**freeze** 70:14, 16 71:12

**friend** 8:11

**friends** 95:24 96:3, 10

**front** 23:14, 16 27:16 32:22

**frowned** 88:24 89:3 90:7

**froze** 70:11, 16 71:1

**frustrated** 60:7

**full** 5:2 25:9

**FULTON** 105:3

**fun** 51:22

**funny** 52:17 53:6, 8, 9

**further** 20:14 50:2, 5 67:25 90:9 98:4 103:5, 17

**< G >**

**GA** 3:6, 17

**gain** 29:2 48:18

**gathering** 79:18

**general** 18:10 78:12 91:16

**generally** 15:1 88:24 96:13

**GEORGIA** 1:1 5:8, 24 104:4, 8 105:2

**getting** 36:9, 16 96:5

**girl** 53:23

**give** 6:1 33:7 52:25 61:8 86:17 87:17, 18

**given** 13:16 44:11 85:5 90:17 105:9

**go** 4:2 7:13 23:18 24:1 31:18 44:17 63:9 75:25 78:17 80:13 81:9, 15, 21 84:3 91:2 98:2 100:18

**goal** 84:4 85:10

**God** 59:24

**goes** 6:3

**going** 10:11 14:11, 16 19:15 20:14 24:21 29:4 30:9 33:2, 4 34:19 42:18 46:12, 25 48:9 50:15 51:4 52:25 56:21 57:9 59:16 60:23 63:19 66:25 67:1 70:9 71:14 73:23 77:15, 17 78:3, 9 83:13 84:3 85:9 87:16 95:9 101:11

**Good** 4:1, 2 24:16, 24 38:5 39:7, 12, 18 43:1, 3, 5, 6 52:2 55:2, 6, 11 75:23 76:2 77:12 81:17 91:11 93:6, 14 97:2, 3, 8

**Google** 33:15, 23 34:8, 11

**Googling** 34:4

**grab** 28:22 29:7 36:19 37:9 81:10

**grabbed** 36:4, 17

37:1 56:9

**grabbing** 29:11

**graduate** 7:10

**Griffen** 72:11

**GRIFFIN** 1:1 4:6, 20 5:1 6:12 11:18 15:12, 24 16:11, 18 17:15 18:21 19:12 20:7, 11, 18, 19 21:25 22:3 23:3, 9 24:17, 25 25:22 26:19 27:19 28:3, 14, 22 29:8, 11 30:6, 18, 20, 25 31:17, 21 32:3, 5 35:4, 10 36:5, 16 37:14, 18 39:10, 16, 20 40:1, 5, 8, 13, 19, 25 41:3, 11 42:25 45:3, 9 46:2, 8, 17, 22 47:8, 14, 18, 22 48:3, 16, 24 49:5, 7, 11 52:11 53:22 54:10, 19 55:13, 25 56:7, 10 58:20, 23 59:21 60:16, 22 61:17 62:1, 15, 25 64:22 66:19 69:15 70:10, 14, 18 71:6, 24 72:4, 10, 12, 17 73:9, 12 80:19 86:10, 16 87:7, 13 88:1, 9 94:25 95:7, 21 96:25 97:18, 23 99:7, 8, 18 100:1, 20 101:20, 25 102:5

**Griffin's** 25:5, 16 27:15, 22 30:21 42:6 51:12, 17 56:13 95:16

**ground** 20:12

**grow** 5:4, 5

**guess** 4:2 9:21 10:11 20:5 23:7 61:9 63:8 68:2 76:9 77:8 78:10 79:12, 18 80:7

84:24  90:11  96:1
**guide**  44:15
**gun**  28:2, 9, 14
  57:12
**gunpoint**  37:15
**guys**  47:19  48:4
**guy's**  32:22

**< H >**
**half**  73:16
**hand**  19:6  20:4, 8
  30:7  34:1  37:24
  46:18, 23  70:11, 15,
  18  99:19  100:1, 21
**handle**  31:17, 18
  56:12
**handled**  32:25
**hang**  29:4
**hanging**  29:6
**happen**  78:12
  93:5  96:22
**happened**  18:18
  29:22  52:18  58:17,
  23  59:3, 7  60:5
  96:7, 9, 21  100:3
**happens**  75:4
**happy**  78:10  97:13
**hard**  45:5  53:5
**head**  69:21, 24
**heading**  64:3
**head-on**  20:20
  22:1, 4
**head-to-head**  18:23
**hear**  9:16, 17
  35:13  40:5, 8, 19,
  25  47:8, 10, 14, 17,
  22  48:3  51:8  52:5
  53:4, 22  54:9
  56:24  57:2  59:18
  74:12  85:16
  100:12
**heard**  6:18  9:14
  47:21  52:9  64:15,
  20  66:17  75:16
  77:2, 7  78:20, 24
  79:2, 4, 16  89:6, 11,
  15, 22  90:1  94:7,
  11  95:9

**height**  24:10
**heightened**  75:11
**help**  45:15  85:22
  96:19
**helping**  96:17
**hey**  38:4
**high**  5:10  7:13
  23:4
**higher**  81:8
**highlight**  73:3
**highlighted**  61:16
  62:11  65:5  70:10
  71:15  72:9  82:17
**highly**  84:14  88:19
**hindsight**  45:19
**histories**  76:5
**history**  75:6, 15, 21
  76:2  77:1, 3, 10, 15
  78:2, 5  79:5, 13, 17,
  21  80:10  82:3
  93:23
**hit**  20:20  22:1, 4
  35:15  57:7
**hold**  20:9  29:17,
  21  46:19  98:22
**holding**  61:19
  62:4, 6, 21
**holidays**  96:18
**home**  78:19
**homeowner's**  23:22
**honest**  78:16
  91:12, 14
**honestly**  71:3
**hope**  78:10
**hopefully**  29:21
**hospital**  80:19
**hot**  78:21
**hot-head**  78:21
**hours**  7:25
**house**  19:19  23:15
  34:3, 5
**house's**  19:9
**Howell**  19:1
**human**  57:25
  58:12
**hurt**  24:17, 25
  30:10, 21  32:7, 20,
  21  41:3  42:18

47:19  48:4  54:1
  95:2  97:9  98:1
**hurting**  20:12  40:9
**hypothetical**  57:7,
  14, 18

**< I >**
**idea**  68:5  80:5
  82:13
**ideas**  93:17
**identify**  22:18
**impairment**  8:18
**impartiality**  104:12
**important**  98:7
**improvement**  92:13
**impunity**  69:3
**Inaudible**  75:23
**incident**  4:25  11:5
  58:16, 18  61:5
  64:17  72:14  73:5,
  17  74:10  76:12, 22,
  23  77:1  83:25
  85:25  86:8  87:2
  102:11
**incidents**  92:21, 22
  93:9
**include**  5:22  14:1
  83:25
**included**  11:25
  12:17
**including**  4:9
  43:18  68:7, 16
**increase**  93:3, 13,
  15
**increased**  92:21
**increasing**  93:10
**INDEX**  2:1, 13
**indicate**  21:22
**indicated**  73:5
**indicates**  87:25
**indication**  42:10
**informally**  6:18
**information**  11:4
  12:16, 18, 19
**initial**  11:17, 21
  22:16  62:20
**initially**  15:25
  29:2  32:17

**injured**  16:2, 4, 12,
  19, 21, 24  32:15
  49:23  50:8, 24
  52:21  54:13  63:17
  72:18, 20  99:8
  102:1, 7
**injuries**  25:6, 8
  102:4
**injury**  42:17  50:4
  72:3, 11, 19  73:2
**instant**  14:2
**instruct**  44:9
**instructor**  8:6
  67:11
**insult**  54:2
**intending**  48:17
**interacting**  85:12
**interest**  104:7, 10
**internet**  97:12
**interrogatories**
  14:22
**interrogatory**  14:19
**interrupt**  76:1
**intersection**  23:14
  27:1
**interviews**  59:3, 7
**intoxicated**  29:16,
  19  30:4  37:2
**intoxication**  29:5
  36:22
**intrusive**  6:5
**investigated**  62:23
  68:7, 17  81:22
  94:10
**investigation**  6:13,
  16  63:3, 12  64:1
  69:5  70:23  94:8
**Investigative**  17:11
  64:4
**Investigator**  64:20
  65:8, 22, 25  66:5,
  12
**involved**  63:2
  73:20  89:20  95:14
**involvement**  37:7
**Island**  5:7
**issue**  32:17  68:25
  89:5  90:21

issues 69:*1* 92:*12*

< J >
JACQUITA 3:*13*
job 7:*1*
JOHN 1:*1*
joking 51:*12*, *16*
54:*10*
jparks@atlantaga.g
ov 3:*21*
judgment 79:*12*
July 83:*22*
jumbled 16:*7*
June 83:*23*
jury 6:*3*, *4* 66:*11*
justice 5:*18*
justified 28:*9*, *19*
42:*25* 43:*20* 55:*1*
57:*13* 66:*19* 67:*5*,
*12* 68:*9*
justify 71:*6*

< K >
Kahn 2:*18*, *20* 3:*3*
4:*1*, *18*, *19* 15:*15*,
*19*, *22* 16:*15* 24:*20*
25:*4* 26:*8*, *17*
28:*21* 32:*1* 33:*7*, *9*
34:*10*, *18* 35:*22*
36:*3* 38:*13*, *16*, *21*,
*23* 39:*2*, *4* 41:*8*, *16*,
*25* 42:*14*, *23* 43:*16*,
*24* 44:*6*, *20* 45:*1*,
*13* 46:*1* 47:*3* 50:*6*,
*14* 51:*3*, *15*, *21*
52:*14*, *24* 54:*5*, *16*,
*24* 55:*22* 56:*20*
58:*2*, *6*, *10*, *15*
60:*21* 61:*2* 64:*25*
65:*13*, *18*, *20* 66:*16*
68:*12*, *23* 71:*4*, *9*
73:*15* 75:*19*, *24*
76:*8* 77:*21* 78:*13*
80:*6* 81:*11*, *20*
86:*13* 87:*3*, *10*, *15*,
*23* 88:*23* 91:*17*, *23*
94:*2*, *23* 95:*4* 97:*5*
99:*21* 100:*8*, *13*, *14*,
*15*, *24* 101:*3*, *7*, *15*
103:*2*, *6*, *17*
Kane 6:*8*
key 84:*13*
kind 70:*11*, *12*
78:*17* 95:*11* 96:*6*,
*20*
knew 16:*1*, *4*, *12*,
*19*, *20*, *21*, *24* 32:*9*,
*24* 45:*25* 77:*15*
knocked 20:*8*
know 4:*20* 6:*22*
8:*9* 13:*7* 14:*18*
18:*13* 25:*5*, *8*, *9*
26:*6*, *21* 29:*5*
30:*14*, *21* 32:*8*, *11*,
*25* 33:*25* 39:*22*
42:*18* 45:*19*, *23*, *25*
50:*16* 60:*4* 67:*23*,
*25* 71:*2* 72:*2*, *19*,
*20* 76:*9* 77:*3*, *4*, *5*,
*6*, *8* 79:*13*, *24*, *25*
80:*3* 81:*13* 82:*15*,
*17*, *19*, *20* 84:*13*
87:*5*, *6*, *12*, *17* 88:*9*
89:*4*, *10* 90:*5*
93:*20* 94:*13* 95:*5*,
*22* 96:*15* 98:*5*, *6*
101:*25*
Knowing 45:*19*, *23*
knowledge 26:*5*, *14*
43:*14*, *22* 44:*3*, *8*,
*11*, *12* 55:*20*
102:*16*
known 42:*22*
79:*20*

< L >
labeled 80:*4*
lastly 97:*22*
laugh 52:*20*
laughed 52:*15*
laughing 53:*5*
54:*10* 85:*21*
Lauren 6:*8*
Law 3:*4*, *14* 7:*7*
33:*15*, *23*, *25* 34:*1*
104:*4*

lawsuit 10:*18*, *21*
12:*6*, *7* 13:*8*
lawyers 10:*24*
103:*10*, *14*
lead 88:*18*
leading 48:*24*
99:*21*, *23* 100:*24*,
*25* 101:*3*, *8*, *15*
leaning 8:*17*
61:*19* 62:*5*, *8*, *15*,
*18*
learn 94:*14*
learned 77:*14*
78:*1*, *2*
learning 8:*15*
ledge 23:*4*, *10*, *17*,
*19* 24:*2*, *8*, *10*, *12*
26:*2*, *12*
left 19:*6* 35:*12*
39:*21* 40:*2* 56:*10*,
*13*
left-hand 92:*10*
leg 25:*25* 47:*9*, *15*,
*18*, *23*
Lenox 3:*5*
lesson 43:*23*
letter 81:*5*, *6*
lettering 19:*11*
level 29:*3*, *5* 32:*9*
36:*2*, *21* 37:*6*
39:*13* 80:*3* 81:*8*
98:*2*
lieutenant 74:*8*, *9*
life 57:*25* 58:*12*
light 19:*2* 90:*9*
lightly 98:*22*
lights 21:*16* 22:*5*
likes 97:*8*
line 94:*18*
lines 89:*14*
lingering 92:*12*
list 84:*22*
listed 82:*5*
listen 66:*11*, *15*
lists 64:*6*
litigation 12:*5*
98:*8*

little 6:*1* 17:*3*
51:*10* 53:*23* 80:*25*
82:*23* 92:*19*
live 5:*23*
loaded 35:*23*
Long 5:*7* 7:*3*, *20*
39:*7* 43:*1* 76:*15*,
*20*, *21*
look 14:*18* 39:*23*
48:*25* 52:*2* 65:*1*
69:*5*, *10* 82:*15*
97:*2*, *3*, *8*
looked 11:*13*
12:*10*, *20* 13:*1*
30:*12* 41:*10*, *18*
42:*6* 49:*7* 70:*11*
89:*19*
looking 17:*14*
18:*7* 23:*6* 42:*17*
67:*21* 87:*4* 97:*20*
101:*19*, *21*
looks 14:*24* 48:*18*
65:*25* 69:*8*
lot 8:*2* 9:*5* 32:*18*
45:*24* 51:*9* 60:*7*
91:*9* 96:*17*
low 27:*23* 28:*12*,
*18* 98:*19*, *21*, *24*
99:*2*
lower 27:*24* 85:*6*
93:*18*, *22*
luck 79:*12*
Lucy 1:*1* 105:*15*

< M >
ma'am 99:*4*
100:*23* 101:*24*
102:*13*, *17*, *20*
Madam 4:*12*
magnitude 78:*12*
maintain 20:*7*, *18*
29:*1* 36:*20*
maintained 19:*5*
maintaining 29:*15*
61:*18* 62:*2* 104:*11*
making 15:*12*
17:*1* 29:*18* 30:*20*
34:*16* 44:*13*

104:*11*
**man** 42:*16* 53:*6*
**maneuvers** 44:*4*
**manner** 84:*6*
101:*3*
**man's** 26:*12*
**marathon** 81:*14*
**MARIE** 3:*12*
**marked** 22:*18, 22*
33:*4, 6* 34:*20, 23*
46:*12, 13, 25* 47:*2*
48:*10, 11* 51:*5, 6*
53:*16, 17* 56:*2, 4,*
22, 23 59:*16, 17*
**markings** 21:*21*
**marks** 52:*8*
**Matt** 4:*19* 100:*13*
**matt@butlerfirm.co**
**m** 3:*8*
**matter** 42:*15*
104:*10, 16*
**MATTHEW** 1:*1*
3:*3* 4:*4, 14* 5:*3*
**MDT** 17:*25*
**mean** 9:*13* 10:*13,*
14 11:*6* 12:*4*
17:*12* 22:*20* 26:*6,*
15 27:*25* 42:*15*
45:*24* 47:*19* 48:*4*
50:*1* 67:*17* 71:*2,*
10 75:*25* 90:*24*
91:*11* 93:*5* 97:*2*
**meaning** 18:*12*
62:*7*
**means** 69:*14*
**meant** 13:*5, 7*
35:*11*
**measure** 23:*6*
24:*10*
**medical** 26:*9*
32:*14* 72:*13*
**meet** 12:*13* 59:*2, 6*
86:*23, 24*
**meeting** 73:*19, 21*
**members** 5:*21*
95:*24* 96:*4, 11*
**mention** 78:*20*
81:*12*

**mentioned** 8:*13*
12:*16*
**mesh** 19:*10*
**messages** 14:*1*
58:*22*
**messaging** 14:*2*
**met** 93:*7*
**middle** 83:*3*
**military** 5:*19*
**Mill** 19:*2*
**MILLER** 3:*11*
**mind** 10:*7* 16:*8*
74:*13*
**mine** 14:*10*
**minimize** 61:*4*
**minute** 46:*18* 61:*9*
**minutes** 98:*11*
**Miranda** 46:*3*
**misconduct** 89:*2, 7*
**misleading** 88:*17*
**mistake** 16:*7*
**mock** 54:*13*
**mocking** 85:*21*
**model** 21:*11*
**moment** 11:*17*
60:*13* 63:*20*
**month** 7:*4*
**months** 76:*19*
**moral** 90:*24*
**morning** 4:*1*
11:*15, 21, 24* 17:*7*
**move** 5:*8* 47:*8, 15,*
23 48:*25* 62:*22*
**moved** 20:*8* 49:*1*
**multiple** 73:*4*
**murder** 57:*22*

**< N >**
**NAIR** 3:*12* 100:*10,*
14
**name** 4:*19* 5:*2*
6:*7* 19:*3* 83:*2, 3, 4,*
20 90:*3, 11*
**national** 33:*17*
**nature** 8:*3* 93:*5*
**NE** 3:*5*
**near** 56:*25*
**necessary** 29:*7*
43:*19* 44:*9* 98:*23*

**need** 15:*4* 44:*16*
72:*13* 77:*22* 81:*13*
**needed** 45:*15* 83:*6*
85:*22*
**needs** 92:*16*
**negativity** 95:*11*
**neighboring** 19:*9*
**nervous** 78:*4, 8*
**never** 16:*8* 82:*14*
84:*21* 87:*5, 6*
89:*20* 93:*14, 15*
95:*17*
**New** 5:*7, 10*
**news** 91:*2* 96:*2*
97:*12*
**nice** 92:*15*
**night** 18:*18* 21:*8*
76:*16* 102:*11*
**Nissan** 21:*13*
**Nixon** 65:*3, 8, 25*
66:*12*
**Nixon's** 64:*20*
65:*22* 66:*5*
**NORTHERN** 1:*1*
**noted** 15:*20* 39:*2*
**notice** 4:*4* 8:*16*
**noticed** 19:*24*
99:*10*
**noticing** 104:*16*
**November** 1:*1*
73:*23* 105:*12*
**number** 82:*16*
84:*4* 93:*18, 22*

**< O >**
**O.C.G.A** 104:*6, 7,*
17
**OA** 74:*23* 75:*1*
**Object** 100:*8, 15*
**objecting** 58:*8*
101:*7*
**Objection** 15:*14,*
16 16:*13* 24:*19*
25:*2* 26:*4, 13*
28:*16* 31:*22* 34:*6,*
13 35:*19, 25* 38:*11,*
14, 17 39:*2* 41:*5,*
13, 22 42:*11, 20*
43:*13, 21* 44:*2, 19,*

23 45:*11* 49:*25*
50:*11* 51:*1, 14, 18*
52:*12, 22* 54:*3, 14,*
22 55:*19* 56:*18*
58:*1, 3, 13* 60:*20,*
25 64:*24* 65:*12, 14,*
15 66:*13* 68:*10, 21*
70:*25* 71:*7, 25*
73:*13* 75:*18, 22*
76:*6* 77:*19* 78:*6*
79:*23* 84:*20* 86:*4,*
11, 18 87:*1, 8, 14*
88:*21* 90:*19* 91:*15,*
20 93:*19, 25* 94:*21*
95:*1* 97:*1* 99:*21*
100:*11, 24* 101:*15*
**objections** 44:*14,*
16, 17
**objective** 43:*8*
**obligation** 104:*12*
**observe** 23:*9*
**obvious** 31:*20, 24*
32:*2* 72:*22*
**obviously** 32:*24*
**occur** 60:*9*
**occurred** 72:*12*
**occurrence** 9:*18*
**offense** 75:*11*
**office** 58:*25* 62:*23*
**Officer** 4:*1, 19* 5:*1*
7:*2* 9:*6, 9, 10, 23*
10:*1, 5, 6, 8* 15:*18*
18:*24* 20:*10, 17*
26:*5, 14* 28:*17*
30:*14, 17, 20* 31:*23*
33:*21* 34:*7, 14*
35:*20* 36:*1* 37:*11*
38:*12, 24* 39:*16*
41:*6, 14, 23* 42:*12,*
21 43:*14, 22* 44:*7,*
24 49:*22* 50:*12*
51:*8, 19, 22* 52:*6,*
11, 20 53:*6* 54:*1, 9*
56:*9* 57:*25* 58:*9,*
12 65:*19* 66:*14, 22*
72:*9, 13* 73:*4*
75:*21* 76:*25* 78:*7*
84:*24* 85:*6* 86:*5*
87:*24* 88:*12* 89:*1,*

*11, 12, 17, 18, 24*
91:*12* 93:*9* 94:*10*
98:*16* 99:*15, 17, 19,*
*25* 100:*2, 19, 21*
101:*5, 11, 14, 17, 19,*
*23* 102:*1, 22, 23*
103:*1, 3*
**officers** 11:*9*
20:*15, 18* 21:*5*
31:*16* 32:*13* 35:*17*
37:*9* 43:*17, 25*
49:*13* 50:*8, 24*
56:*16* 64:*16* 68:*16*
69:*2* 76:*4* 78:*25*
89:*19, 23* 91:*13*
93:*23* 94:*4*
**officer's** 89:*1, 7*
99:*15*
**official** 6:*17* 9:*22*
63:*10*
**officials** 68:*6*
**Oh** 13:*2* 22:*24*
59:*24* 77:*23*
**Once** 19:*19* 30:*3*
39:*11, 17* 44:*18*
**one-way** 19:*4*
**opened** 36:*12, 25*
**operating** 10:*2*
**opinion** 26:*9, 11*
64:*2* 68:*3* 86:*19*
92:*8*
**opinions** 93:*17*
**opportunities** 92:*12*
**OPS** 6:*16* 12:*19*
59:*3, 7, 13* 70:*22*
73:*25* 75:*6, 15, 21*
76:*25* 77:*3, 7* 78:*2,*
*5* 79:*14* 82:*2, 9, 14*
94:*7, 14, 18*
**option** 45:*10* 94:*1,*
*3*
**oral** 75:*1, 4, 5, 7*
81:*1*
**order** 33:*18, 20*
83:*1*
**ordering** 104:*24*
**ostracized** 89:*8*
**outcome** 6:*15*

**outlining** 12:*7*
**outside** 15:*9* 73:*25*
**owes** 94:*24*

**< P >**
**p.m** 98:*13* 103:*19*
**packet** 13:*8*
**Page** 2:*1, 13* 61:*15*
65:*2* 66:*21* 70:*9*
71:*14* 72:*8* 84:*3*
85:*9*
**pages** 66:*24*
**pain** 31:*21, 24*
32:*3, 6, 8, 9* 40:*5,*
*25* 41:*20* 42:*10, 19*
49:*7* 54:*20* 55:*24*
72:*23* 97:*9* 102:*6*
**pamphlet** 92:*3*
**pandemic** 3:*25*
4:*11*
**paperwork** 31:*18*
**paraphrasing** 81:*5*
**Parks** 2:*19* 3:*13*
15:*14, 17* 16:*13*
24:*19* 25:*2* 26:*4,*
*13* 28:*16* 31:*22*
34:*6, 13* 35:*19, 25*
38:*11, 15, 19* 41:*5,*
*13, 22* 42:*11, 20*
43:*13, 21* 44:*2, 15,*
*23* 45:*11* 49:*25*
50:*11* 51:*1, 14, 18*
52:*12, 22* 54:*3, 14,*
*22* 55:*19* 56:*18*
58:*1, 4, 8, 13* 60:*20,*
*25* 64:*24* 65:*12, 15*
66:*13* 68:*10, 21*
70:*25* 71:*7, 25*
73:*13* 75:*18, 22*
76:*6* 77:*19* 78:*6*
79:*23* 84:*20* 86:*4,*
*11, 18* 87:*1, 8, 14*
88:*21* 90:*19* 91:*15,*
*20* 93:*19, 25* 94:*21*
95:*1* 97:*1* 98:*11,*
*15* 99:*22, 24*
100:*17, 25* 101:*4, 9,*
*10, 16* 102:*25*

**part** 8:*22, 24*
11:*16* 15:*11* 62:*11*
98:*7*
**particular** 60:*12*
**particularly** 97:*3*
102:*14*
**parties** 12:*5*
104:*18, 24*
**partner** 76:*10, 17*
77:*16* 78:*3*
**partnered** 77:*9*
**partners** 76:*13*
**parts** 11:*11, 19*
**party** 10:*18, 21*
104:*13, 18*
**passed** 99:*18, 25*
100:*20* 101:*13*
**Password-Protected**
104:*22, 23*
**Patrick** 8:*6*
**patrol** 11:*23*
**pattern** 18:*2*
**people** 72:*25*
79:*11* 86:*6* 89:*4*
90:*1, 20* 95:*8, 9*
96:*7, 17, 19*
**perceiving** 39:*12*
**percent** 92:*22*
93:*10*
**perception** 39:*18*
71:*1*
**perform** 99:*6, 13*
**performance** 70:*4*
83:*18* 84:*14* 85:*10*
86:*24, 25* 87:*5*
88:*14, 17, 20*
102:*21*
**performing** 84:*18*
99:*5*
**period** 6:*11* 76:*20*
83:*22*
**permitted** 4:*9*
**person** 59:*1, 19*
68:*7, 8, 16, 17* 88:*8*
89:*8* 96:*12*
**personal** 26:*5, 10,*
*14* 43:*14, 22* 44:*3,*
*8, 10, 11* 55:*20*
93:*17*

**personally** 8:*9*
31:*1* 95:*6*
**person's** 83:*2*
**perspective** 45:*5*
**pertaining** 11:*5*
64:*17*
**pertinent** 12:*16, 18*
**phone** 96:*5, 6*
**physical** 29:*13*
**pick** 6:*3* 84:*23*
**pinned** 57:*15*
**pistol** 27:*21* 35:*3*
**place** 104:*17*
**placed** 73:*5*
**Plaintiff** 1:*1* 3:*2*
4:*20* 10:*19* 25:*21*
46:*17* 47:*1* 48:*10*
51:*5* 56:*22* 99:*7*
**Plaintiff's** 14:*12,*
*21, 22* 25:*12, 15, 18*
33:*5, 10* 34:*20*
35:*1, 18* 39:*10*
39:*6, 24* 41:*1, 10,*
*18* 42:*3, 7* 46:*12*
47:*4* 48:*12, 15*
49:*4, 16* 53:*2, 12,*
*16, 18* 55:*5, 14*
56:*3, 16* 59:*16*
61:*12, 16* 63:*22*
64:*3, 9* 65:*8, 24*
66:*7* 69:*6* 74:*2, 5*
80:*14* 81:*24* 83:*14*
87:*11* 88:*4, 7* 92:*2,*
*11*
**plan** 22:*7* 61:*4*
**plates** 17:*18*
**play** 33:*13* 47:*10*
**playing** 33:*14*
34:*24* 36:*15* 39:*25*
46:*16* 47:*7, 13*
48:*22* 51:*7* 53:*3,*
*21* 56:*5*
**please** 4:*12* 79:*19*
98:*12, 19*
**point** 14:*17* 27:*14*
28:*9* 29:*19* 35:*23*
46:*2* 90:*6*
**Pointe** 3:*5*

**pointed** 28:2, *15*
57:12 83:4, *6*
**police** 9:9, *19* 10:5
18:5, *14* 19:*11*, *21*
21:6, *9*, *16*, 22
22:*17*, *19*, *21*, 22
23:2 27:13 33:*21*
35:*16*, *17*, 24 37:9,
*11* 39:16 43:*17*, 25
49:*13*, 22 50:8, *24*
51:22 52:3, *20*
54:*1* 56:16 57:24
58:*11* 60:10 61:8,
*10* 62:11 64:16
69:2 78:15, 25
79:7, *21* 80:9
88:25 89:*1*, *11*, *12*,
*18*, *19* 91:3, *6*, *12*,
*13*, *19* 93:9, *23*
**policing** 90:*10*
**policy** 7:23 43:*11*,
*18* 44:1, 22 54:12
**political** 90:*17*
**Pope** 104:9, *15*
**position** 27:24
28:*12*, *19* 98:3, *19*,
*20*, *21*, 24 99:2
**possession** 28:7
**possibilities** 45:7,
*12*
**possibility** 24:*16*, 24
**possible** 8:*17*
15:*18* 24:*14* 26:7,
*15*, 16 29:*10*, *12*
38:6 42:13 45:*14*,
*16* 62:10 71:8, *16*,
*21* 87:9 94:*1*
**POST** 7:*24*
**posted** 7:*24*
**potential** 28:*1*
90:*12* 98:23 102:3
**practice** 89:*23*
**pre-dating** 7:8
**preface** 6:*1*
**preop** 25:*15*
**prepare** 11:*1* 17:5
**prepared** 61:9
**presence** 9:*12*, *13*

**press** 20:*14*
**pressures** 99:*10*
**presumably** 85:2
**Pretty** 30:*19* 53:5
68:*13* 79:19 91:*10*
94:*19*
**prevent** 22:*15*
29:*17*, *21* 36:21
**previous** 12:*14*
**previously** 93:*12*
101:*1*, 5
**pride** 96:*17*
**primarily** 17:*13*
**prior** 37:*16*
**prisoner** 72:5
**probable** 93:5
**Probably** 9:*4*
19:25 76:*19* 86:*19*
102:7
**problem** 38:*18*
90:25 91:6, *18*
92:*16* 93:*1* 94:*19*
**problematic** 68:*15*,
*24* 76:3 93:8
**Procedure** 4:*8*
10:2
**proceeding** 9:*23*
104:*19*, *23* 105:9
**proceedings** 104:*10*
**process** 70:2 98:8
**produced** 104:*19*
**Professional** 62:*24*
84:*6*, *25* 86:7, *8*
104:*12*
**professionalism**
85:*11*
**professionals** 32:*14*
**prohibited** 104:*17*
**prohibitions** 104:7
**proof** 21:*4* 24:5
**proper** 44:9
**protect** 69:*23*
**protection** 83:*1*
**proud** 97:*13*
**prove** 20:*23*
**provide** 104:*15*
**prudent** 39:*15*
**public** 18:*11*
**publicly** 95:*20*, 23

**pull** 21:25 22:*3*, *6*,
*8* 25:*11* 37:*10*
42:*1* 61:9 63:*19*
67:*19* 83:*13*
**pulled** 36:5 62:9,
*19*
**pulling** 62:*20*
**punish** 94:*4*
**punished** 68:*19*
**purpose** 18:*12*
**purposes** 4:9
**pursuant** 4:4, *7*
**pushing** 53:5
**put** 34:*4* 39:*20*
40:2 41:*20* 42:8
44:6 57:*11*, *21*
70:22 84:*18* 99:9,
*11*
**putting** 57:*3*
**puzzling** 68:*13*

**< Q >**
**question** 6:5
12:*15* 15:*20*, *21*
16:*17* 21:8 22:*20*
24:*21* 29:*12* 31:*13*,
*25* 38:*17*, *21*, *24*
39:3 41:*24* 44:7,
*18* 45:6 49:*3* 50:7,
*23* 65:*18*, *21* 66:4
67:2, *3* 76:*16*
77:22, *25* 78:*1*
84:*1* 100:9, *16*
101:9, *12*
**questioning** 19:*22*
**questions** 14:6
33:2 61:7 64:*1*
82:*3* 92:6 97:*15*
98:*4*, *16* 102:25
103:*3*, *17* 104:*20*
105:6
**quickly** 14:*16*
**quite** 79:*16* 81:*1*
96:5
**quote** 24:*16*, *17*, *24*
47:*9*, *19*, *20* 52:6, *7*,
*8* 53:*23*, *24* 56:*24*
57:2 59:*18*, *19*, *24*,

**25** 61:*17* 67:*1*
71:*16*

**< R >**
**radioing** 26:*23*
**ran** 17:*24* 18:*1*
**range** 83:25
**rat** 89:*13*
**Rateau** 1:*1* 105:*15*
**rating** 84:*12* 85:6
86:*14*
**ratings** 86:*15*
**reach** 36:*11*
**reached** 88:*4*
**reaction** 73:2
**read** 12:23 13:2
14:23 15:9 46:2, *5*
**reader** 88:*18*
**reading** 88:8
**ready** 27:23 28:*12*,
*18* 98:*19*, *21*, *23*, *24*
99:2
**realize** 102:7
**really** 26:2 71:2
96:6
**realm** 45:7, *12*
**re-ask** 15:*21*
**reason** 6:2 19:*14*
22:*10* 31:*15* 32:5
36:4 37:*10* 63:21
**reasonably** 39:*15*
**recall** 10:*15* 17:*1*
19:2 39:22 40:*21*
43:23 44:25 58:*21*
60:4, *7* 63:4
**receives** 104:*18*
**Recess** 81:*19*
98:*13*
**recommendation**
94:*11*
**recommended**
74:*23*
**recommending**
94:9
**reconvene** 81:*15*
**reconvened** 103:8,
*9*
**record** 7:*24* 24:22
44:7 50:*16*, *21*

58:9  89:17  95:14
97:24  100:18
101:2, 5  103:7
104:10, 11, 19
**recording**  4:2
**recount**  96:12
**recruit**  7:5
**recruits**  54:12
**redo**  50:15
**reduced**  105:7
**reference**  42:2
**referred**  12:6
89:12
**referring**  22:22
35:5  55:7  62:4
**refuse**  89:23
**regarding**  12:19
64:16  65:17  74:8,
9  78:23  98:19
99:5, 17  102:10, 21,
22
**register**  69:21
**regrets**  97:17
**regular**  84:15
88:20
**Regulations**  104:5
**relating**  104:23
**relationship**  76:11
104:10
**relatives**  5:22
**remember**  60:6
77:25
**remembered**
102:19
**REMOTE**  1:1
3:23
**remove**  36:8
**removed**  19:22
20:3  37:15
**repeat**  77:22
**repeated**  75:11
**repeating**  74:13
75:12
**rephrase**  15:20
31:13  65:18  75:20
80:7
**report**  9:7  10:2
12:19  20:16  23:2
60:10  61:8, 10

62:12  63:9  69:14,
20  72:14  74:20
89:1  102:10, 12, 15,
18  104:11
**reported**  9:16
10:8  92:20
**Reporter**  4:12
50:17  87:20  104:1,
3, 6, 8, 20, 21  105:1
**reporting**  69:9
89:6  104:6, 9, 15,
16
**reports**  89:12
**repository**  104:23
**represent**  4:20
**representations**
104:4
**represents**  84:5
**reprimand**  74:13
80:22, 25  81:4
**reprimanding**
74:10
**reputation**  78:14
80:9
**request**  44:13
**requested**  15:25
83:7
**required**  22:18
**reserved**  103:18
**resisting**  46:8
**respect**  57:25
58:12  84:10  98:9
**respond**  71:2
101:22
**responded**  47:19
51:10
**responding**  20:17
**responds**  65:9
**response**  85:16
**responses**  14:5, 8,
9, 20, 22  15:3, 7
**restate**  24:21
**retaliated**  89:9
**review**  11:9  75:8
85:10  102:11
**reviewed**  11:4
12:2, 7, 17, 18  13:6
14:4, 8, 10  15:6

**reviewing**  15:10
85:1, 5
**ride**  76:14
**right**  13:12, 22
16:8  20:5  21:2, 9,
19, 23  22:25  23:14,
16, 18  25:14  26:25
28:13  31:8  32:20
33:21  34:9  38:2, 5
40:23  42:16  48:7
53:23  55:2, 15
57:22  59:22  60:1
62:19  67:24  69:10
70:4  71:12  73:12,
24  75:2  80:19
81:18  84:1  86:21
88:10  91:6  98:7
**Rights**  46:3  89:25
95:16
**road**  18:22, 24
19:4
**Rogue**  21:13
**room**  103:11
**RPR**  1:1  105:15
**rule**  69:9  74:17
80:16
**Rules**  4:8, 9  73:6
104:5
**rumors**  78:24
**run**  17:18  18:7

**< S >**
**safe**  33:24
**saw**  9:6  10:1
20:19  23:18  26:12
27:17  34:11  49:18
55:5  67:4, 7  85:17
96:4, 19
**saying**  32:7  37:3
50:18  55:1  60:6
66:1  83:8  92:15
**says**  61:17  64:4,
10  65:6  67:1  70:3,
10, 24  71:15  72:9
73:3  74:17  80:16
81:6  84:4, 9, 12
85:11  92:9, 11, 19
**scan**  25:22

**scared**  30:6, 12
70:18  71:11
**scenario**  57:18, 19
**scene**  31:5, 17
**school**  5:10  7:14,
18
**scream**  40:25
**screen**  14:11, 13
25:12  33:3, 11
34:21  42:4  46:14
47:5  48:13  53:19
61:13  63:23  69:6
74:3  80:14  81:25
83:15  87:16, 17
92:4
**screws**  25:24
**scroll**  14:16  87:19,
24
**search**  33:15
**second**  18:17  33:7
52:25  75:13  82:10
100:3, 5, 6, 20
101:13
**seconds**  36:24
57:3  81:9
**section**  84:8, 19
85:2
**see**  12:14  14:12
23:12  24:1  25:11,
18, 21, 24  27:3, 7,
14, 18  30:15, 17
33:10  34:20  42:3
46:14  47:4  48:12
53:18  56:9, 12
61:12, 15, 16  63:22
64:2, 9, 11  65:2, 5,
6  66:21, 25  67:8
69:6  70:10  71:15
72:8, 16  73:3  74:2,
17, 24  80:14, 16
81:24  82:4, 10
83:14, 20  84:4, 6,
10  85:11  87:25
90:25  92:4, 9, 14,
18, 24  97:9  98:1, 2
**seeing**  54:20
55:24  96:8
**seen**  9:10  10:6
14:25  15:23  25:14

59:*19* 74:*5, 6, 11,*
*16* 86:*5* 89:*16*
95:*25*
**send** 58:*22*
**senior-ranking**
68:*6, 16*
**sense** 22:*25* 26:*10*
42:*16* 84:*9*
**sent** 14:*6*
**separate** 8:*23*
66:*24*
**sergeant** 84:*17*
85:*1, 5* 102:*22*
**serious** 80:*25* 81:*1*
**seriously** 49:*23*
50:*8, 24* 52:*21*
63:*17* 72:*18, 20*
**served** 5:*19*
**service** 98:*9*
**services** 104:*16*
**seven** 92:*20*
**share** 14:*11* 33:*2*
87:*16* 91:*24*
**shirt** 20:*6, 8* 28:*22*
61:*19*
**shock** 94:*14*
**shocked** 70:*12*
**shoot** 28:*14* 35:*10*
**shooting** 28:*10*
**short** 68:*2*
**Shortly** 76:*23*
**shot** 56:*25*
**shoulder** 20:*5, 6*
30:*7* 99:*19* 100:*1,*
*21*
**shouting** 19:*20*
**shove** 56:*7* 72:*4*
**show** 31:*5* 33:*1*
34:*19* 36:*13* 37:*24*
46:*11, 25* 48:*9, 20*
51:*4* 53:*1, 15* 56:*2,*
*21* 59:*15*
**showed** 15:*12*
49:*19*
**showing** 24:*3*
63:*21*
**shows** 46:*17*
**shrug** 95:*12*
**shy** 95:*11*

**side** 18:*22, 24*
31:*19*
**sign** 23:*14*
**Signature** 103:*18*
**significant** 86:*25*
**silence** 90:*13, 16, 22*
**similar** 74:*6*
**simply** 94:*16*
**single** 32:*16* 33:*25*
**sir** 4:*21* 5:*6, 11,*
*12, 20* 6:*7, 10, 13,*
*25* 7:*6, 11* 8:*5, 21*
9:*2, 8, 20* 10:*17, 23*
11:*2* 12:*1, 9* 13:*11,*
*14, 17, 24* 14:*14*
15:*2, 5* 16:*23* 17:*6,*
*19* 18:*15* 20:*22*
21:*7* 22:*24* 23:*20*
24:*4* 25:*3, 13, 17,*
*23* 26:*1, 20* 27:*2*
28:*24* 29:*9* 30:*8,*
*11* 31:*7* 32:*4*
33:*12* 34:*22, 25*
35:*2, 7* 36:*2, 7*
37:*13, 23* 38:*6, 8*
40:*1, 4, 7, 10, 12, 15,*
*18, 21, 24* 41:*2*
42:*13* 43:*2* 44:*21*
45:*4, 12* 46:*10, 14,*
*15, 24* 47:*16, 21, 24*
48:*2, 5, 12* 49:*2, 6,*
*20, 21* 50:*7, 16*
51:*24* 52:*1, 13, 16,*
*23* 53:*7, 10, 14, 20,*
*25* 54:*4, 8, 11, 15,*
*18, 23* 55:*7, 12, 18,*
*21* 56:*1, 8, 11, 14,*
*19, 24* 57:*1, 5, 23*
58:*14, 18* 59:*5, 8,*
*11, 14, 20, 23* 60:*2,*
*8, 15* 61:*1, 6, 11, 21*
62:*17* 63:*1, 18, 24*
64:*5, 8, 14, 18, 19*
65:*21* 66:*15, 23*
67:*9* 68:*4, 14, 22*
69:*4, 7, 11, 17, 24*
70:*5, 13* 71:*17, 19*
73:*7* 74:*4, 14* 76:*7,*
*18* 77:*22* 80:*17, 20,*

*23* 81:*23* 82:*1, 12*
83:*16, 19, 24* 84:*2,*
*7, 11, 16* 85:*14, 19,*
*25* 88:*3, 6* 89:*10*
91:*16* 92:*4, 14*
94:*6, 22* 95:*22*
98:*4, 10* 103:*12, 16*
**siren** 21:*19*
**sirens** 22:*5*
**sit** 42:*24* 75:*8*
**sitting** 71:*10*
**situation** 57:*7, 14*
**six** 72:*8*
**skid** 52:*8*
**slip-up** 70:*2*
**slur** 47:*22* 48:*3*
**slurring** 40:*19, 21,*
*22* 47:*25* 48:*6*
**small** 19:*8*
**smell** 20:*1* 37:*5*
**smelled** 29:*16*
**smelling** 37:*4*
**smiller@atlantaga.g**
**ov** 3:*19*
**snitch** 89:*13*
**sobriety** 8:*2, 20, 25*
20:*2* 29:*23* 33:*18*
37:*8* 99:*5, 6, 14*
**solely** 104:*13*
**somebody** 87:*4*
**somebody's** 23:*16*
**someone's** 19:*7*
**somewhat** 6:*5* 80:*8*
**soon** 27:*16*
**SOP** 10:*6, 9* 69:*17*
73:*6* 75:*9* 89:*7*
**sorry** 5:*5* 13:*2*
16:*6* 22:*2* 30:*16*
31:*12* 33:*8, 24*
38:*15* 50:*10, 13*
67:*18* 74:*12* 75:*25*
77:*23* 81:*9* 82:*23*
83:*5* 85:*16* 97:*25*
98:*3* 100:*10, 14*
**sort** 7:*22* 42:*10*
51:*25* 77:*17* 78:*19*
79:*7* 90:*16* 97:*6*
**sound** 57:*24* 58:*11*
**Sounds** 81:*17*

**speak** 13:*18* 17:*4*
45:*5* 50:*18* 58:*17*
90:*21* 103:*10*
**speaking** 44:*13, 17*
50:*18*
**specialized** 8:*1*
**specific** 34:*2*
44:*25* 59:*13* 61:*7*
**specifically** 18:*7*
67:*25* 82:*20* 104:*5*
**specifics** 6:*20*
67:*23*
**speculate** 58:*19*
**speculation** 16:*14*
38:*19* 51:*19*
**SPO** 8:*6, 9, 11*
66:*17* 67:*6, 10, 14,*
*16, 20, 23* 68:*3*
72:*10, 15*
**spoke** 58:*25*
**spoken** 13:*21* 74:*8*
**STACI** 3:*11*
**stand** 16:*1, 4, 9, 11,*
*18, 22* 20:*13* 29:*20*
32:*11* 48:*16* 49:*5*
**standard** 10:*2*
33:*17* 99:*13*
**standardized** 8:*1*
37:*8*
**Standards** 62:*24*
84:*15* 86:*24, 25*
88:*20*
**standing** 40:*13, 16*
46:*23* 48:*19*
**start** 7:*5* 18:*17*
46:*21*
**started** 20:*16*
**starters** 97:*20*
**state** 5:*23* 89:*17*
90:*22* 104:*8* 105:*2*
**stated** 20:*9, 12*
105:*5*
**statements** 78:*24*
**STATES** 1:*1* 91:*3*
**stating** 65:*16*
102:*5*
**statistic** 92:*19*
**stay** 75:*7*

stayed 26:*18*
stepped 20:*4*
steps 42:*16*
stipulated 3:*23*
stolen 17:*14, 15, 22*
18:*4, 7* 19:*13, 25*
22:*14* 28:*5*
stop 14:*17* 23:*13*
37:*17* 44:*13* 57:*10*
88:*2*
stopped 26:*25*
103:*7*
straight 7:*13*
23:*15*
street 19:*3*
stresses 99:*9*
strike 16:*9*
struck 57:*8, 15*
99:*1*
struggle 98:*2*
subcontractor
104:*9, 14*
subject 63:*12*
subjective 43:*9, 19*
submitted 14:*8*
60:*10, 11* 104:*20,
21*
substantial 95:*8*
sued 21:*5*
suffice 99:*11*
Suffolk 5:*15* 7:*10,
13*
suggest 92:*25*
suggested 95:*15*
Suite 3:*16*
super 73:*1*
supervisor 69:*18*
83:*4, 8, 9, 10*
supposed 12:*13*
28:*8* 32:*13* 33:*18*
69:*18* 70:*23*
sure 9:*4* 12:*4*
26:*6* 27:*5* 29:*3*
31:*4* 34:*16* 35:*14*
41:*7, 15* 42:*1*
43:*10* 45:*4* 46:*4*
47:*12* 54:*23* 55:*9*
57:*17* 60:*11* 67:*17*

68:*11* 71:*8* 82:*8, 9,
16* 84:*22* 98:*18*
Surely 73:*11*
surgery 25:*22*
surprised 96:*20*
surprising 94:*17*
suspect 22:*14*
suspended 6:*11*
73:*11, 18*
suspension 6:*24*
81:*2*
suspicion 17:*21*
18:*2* 37:*12*
sustained 69:*8*
70:*4* 77:*6* 94:*9*
SW 3:*15*
swaying 62:*6*
swear 4:*12*
swearing 3:*24*
swerved 18:*23*
swiped 70:*10*
swiping 99:*19*
100:*1, 20*
sworn 4:*15* 7:*4*
system 86:*15*
systemic 90:*16*
91:*1, 5, 18* 93:*1*

< T >
tackle 11:*25* 25:*16*
39:*10* 43:*25* 44:*21*
45:*3* 99:*17* 101:*22*
102:*1, 4*
tackled 20:*11*
30:*22* 39:*16* 40:*17,
20* 41:*1* 46:*7*
61:*25* 62:*1* 72:*10*
101:*20*
tackling 37:*17*
42:*25* 45:*9* 52:*11*
71:*6* 85:*22* 95:*7,
21* 99:*20* 100:*2, 22*
tag 18:*7*
tags 17:*24*
take 14:*17* 34:*12*
39:*23* 65:*1* 81:*9,
13, 14*
take-down 44:*4, 25*
55:*8*

taken 4:*4, 5, 7, 10*
13:*22* 105:*5*
talk 59:*3, 7*
talked 66:*4*
talking 52:*5* 59:*21*
95:*10, 12*
target 27:*24, 25*
taught 43:*18, 25*
44:*5, 21* 99:*3*
teach 35:*23* 43:*11*
54:*12* 67:*15*
Team 17:*11*
technology 18:*6*
tell 37:*14* 72:*17*
79:*3* 87:*11* 88:*1*
96:*11, 13*
telling 71:*11*
temper 78:*21, 23*
tend 28:*6* 78:*17*
tendency 79:*1*
termination 81:*2*
terms 104:*14*
terrible 86:*10*
test 8:*20* 9:*1*
29:*23* 99:*6, 7, 14*
testified 4:*16* 9:*22*
101:*5*
testifies 67:*6* 89:*12*
testify 59:*9*
testimony 13:*15*
16:*3, 10, 18* 23:*21,
25* 24:*6, 16, 23*
30:*4* 48:*23* 64:*15,
21* 65:*1, 17, 22*
66:*3, 6, 17, 24*
67:*11, 20* 89:*19*
90:*15*
testing 8:*2* 20:*3*
33:*18* 37:*8*
text 14:*1* 58:*22*
61:*16* 70:*10* 71:*15*
72:*9* 73:*3*
texted 58:*24*
Thank 74:*17*
81:*18* 98:*4, 9, 10*
thing 78:*17, 18*
79:*7* 83:*9, 11*
90:*25* 92:*8* 93:*14*

things 8:*3* 9:*16*
45:*18, 22, 24* 57:*6*
58:*7* 70:*7* 79:*11,
14* 88:*1* 90:*1, 12*
91:*7* 92:*7* 93:*4*
95:*10*
think 4:*23* 10:*15*
13:*5* 15:*8* 17:*15*
18:*5* 26:*2, 11*
28:*13, 19* 32:*19*
34:*8, 11, 15, 25*
35:*3, 16* 38:*9, 25*
39:*1, 5, 8, 9, 15*
41:*3, 9, 17* 42:*9, 24*
43:*6* 45:*2, 14, 17,
21* 49:*16* 51:*16*
52:*2, 17* 53:*11*
55:*4, 10, 23* 57:*13*
60:*13, 19* 61:*1*
62:*15* 63:*5* 65:*6,
11, 21, 25* 66:*4, 5, 9,
11* 67:*3, 8, 10, 14,
20, 22, 23* 69:*22*
70:*7, 16* 71:*5, 23*
75:*17, 20* 78:*8*
85:*23* 86:*1* 88:*12,
15* 89:*3* 90:*2, 5*
91:*1, 5, 7, 18, 21*
93:*2* 94:*24* 96:*23,
24* 97:*7*
thinking 38:*20, 22*
90:*12*
thought 13:*7*
19:*14* 30:*12* 68:*8,
18* 70:*1* 78:*9*
threat 28:*1* 36:*2*
39:*13* 98:*23*
three 71:*14* 85:*6*
three-day 8:*15, 22*
thrilled 97:*3*
time 6:*11* 11:*13*
12:*10, 13, 20* 16:*21,
25* 19:*23* 20:*10, 14*
30:*19* 32:*16* 36:*14,
18, 25* 41:*11, 24*
42:*8* 49:*2* 55:*12,
16* 60:*8, 12, 13, 18,
24* 76:*11, 20* 77:*1*
91:*9* 93:*13* 98:*5*

99:*18*  100:*5*
101:*14, 18, 22*
102:*1, 16, 19*
104:*18*
**timed**  99:*25*
**times**  32:*18*  77:7
82:*9, 21*  86:*6*
**tiny**  26:*11*
**title**  7:*1*  63:*10*
**today**  4:*21, 24*
15:*4*  16:*3, 10, 18*
42:*24*  61:22  71:*10*
84:*1*  85:*20*  89:*19*
**today's**  17:*5*
**told**  6:*15*  53:22
83:*5, 9*
**tolerance**  32:*9*
**tolerate**  51:*25*
**top**  92:*9*
**topic**  67:*14*
**total**  92:22
**totality**  79:*14*
**totally**  77:*24*
**trail**  19:*6*
**trained**  68:*8, 17*
91:*8*
**training**  7:*22, 25*
8:*1, 4, 13, 14, 19, 22,*
*24*  18:*3*  20:*2*  91:*8*
**transcript**  50:*20*
104:*19*  105:*5, 8*
**Transcripts**  104:*19,*
*22*
**transparency**  90:*17*
**transport**  56:*8*
72:*5*  80:*18*
**travels**  9:*17, 20*
**treated**  6:*12*  62:*24*
86:*10*  87:*13*  88:*9*
94:*25*  96:*24*  97:*18*
**treats**  84:*9*
**trial**  4:*10*  6:*3*
**tried**  20:*13*  54:*21*
**Trinity**  3:*15*
**trouble**  40:*16*
62:*1*  75:*7*  78:*19*
80:*1*
**true**  21:*10*  23:25
28:*8*  40:*1*  42:*19*

43:*17*  46:*21*  49:*4*
52:*10*  70:22  71:*18*
84:*17*  104:*19*
105:*8*
**truly**  91:*11*
**truthful**  102:*18*
**truthfulness**  77:*4*
**try**  37:*17*  54:*19*
61:*3*  63:*20*  75:*7*
77:*25*  78:*19*
**trying**  13:*4*  17:*24*
18:*1*  19:*15, 17*
27:*19*  32:*19*  48:*18*
50:*20*  56:*7*  69:*23*
**turn**  19:*6*
**turned**  18:*25*
79:*14*
**two**  21:*5*  29:*20*
57:*3*  66:*24*  68:*6,*
*15*  70:*9*  81:*9*  82:*9,*
*21*  84:*3*  85:*6, 10*
92:22  93:*10*  97:*15*
**TYLER**  1:*1*  4:*6,*
*20*  6:*12*  86:*10*
94:*24*  99:*7*  100:*20*
101:*20*
**typewriting**  105:*7*
**typically**  37:*5*
75:*7*  77:*11*  86:*7*

< U >
**Uh**  71:*15*
**unacceptable**  86:*21*
**unavoidable**  91:*10*
**undergone**  8:*4*
**understand**  65:*19*
75:*9*  80:22  97:*6*
100:*11*
**understanding**
8:*16*  43:*7*  50:*3*
75:*6, 14*
**undo**  94:*16*
**undoes**  94:*11*
**unfortunate**  91:*9*
**unfortunately**  93:*7*
**unit**  22:*8, 11*
**UNITED**  1:*1*  91:*3*
**units**  26:*24*
**unlock**  36:*12*

**unmarked**  18:*9, 13*
21:*9*  27:*13*
**unofficially**  6:*19*
**unprofessional**
86:*12*
**unreasonable**  9:*23*
**unsatisfactory**  70:*4*
**uploaded**  104:*23*
**urgency**  84:*9*
**use**  4:*9*  8:*4, 6*  9:*6,*
*10*  27:*25*  29:*13*
43:*20*  60:*17, 23*
64:*11, 16*  67:*4, 11,*
*12*  68:*8, 18*  69:*2*
72:*14*  74:*20*  79:*1,*
*5, 16*  80:*2, 10*
81:22  82:*10, 14*
86:*14*  89:*7*  91:*25*
92:*3, 21*  93:*9*  94:*4,*
*8, 9, 15*  95:*13*
98:*23*
**usually**  6:*1*
**utilized**  22:*21*  83:*3*

< V >
**van**  56:*8*
**veer**  23:*18*
**veered**  23:*16*
**vehicle**  11:22, *23*
17:*16, 21, 25*  18:*4,*
*5, 10, 13, 14, 25*
19:*5, 10, 13, 15, 18,*
*19, 20, 21, 23, 25*
20:*3, 4*  21:*1, 12, 15,*
*18, 22, 23*  22:*6, 12,*
*14, 19, 23*  23:*23*
24:*7*  27:*6, 14, 16*
28:*5*  35:*6, 13, 14*
36:*6, 8, 9, 12, 17*
56:*6*  57:*9, 15, 16*
99:*1*
**vehicles**  17:*14*
18:*8*  22:*17, 21*
28:*6*
**verbatim**  104:*11*
**versus**  4:*6*
**vest**  19:*10*
**VICKERS**  1:*1*  5:*1*
11:*12, 25*  13:*18*

18:*25*  20:*10, 17, 20*
23:*21*  24:*15, 23*
26:*18, 21, 25*  30:*12,*
*14, 15, 17, 18, 20, 22*
37:*17, 20, 25*  38:*4,*
*9, 20, 22, 25*  39:*5, 9*
40:*17, 20*  41:*1*
42:*24*  44:22  45:*2,*
*15, 17*  46:*7, 21*
51:*9, 12, 16*  52:*5,*
*10, 15*  53:*4, 11, 22*
54:*6, 9, 19*  55:*1, 17,*
*23*  56:*6, 12*  58:*17,*
*22*  59:*2, 6, 9, 12, 18,*
*21*  60:*14*  61:*3, 25*
62:*1*  64:*2, 7, 10, 16,*
*22*  65:*7, 23*  66:*7,*
*18*  67:*12, 21*  68:*5,*
*17, 18, 19*  69:*15, 23*
70:*21*  71:*5*  72:*10,*
*15*  75:*14, 21*  76:*10,*
*11, 21, 25*  78:*2, 14,*
*21, 25*  79:*21*  80:*8*
83:*20*  84:*8*  85:*10,*
*21*  86:*1, 5, 9, 16, 20,*
*23*  87:*6, 12, 25*
88:*9, 13, 18*  94:*24*
95:*7, 15, 20*  96:*24*
99:*18, 20*  100:*2, 6,*
*21*  101:*14, 19, 23*
102:*1, 22, 23*
**Video**  2:*4, 5, 6, 7, 8,*
*9, 10, 11, 12, 13*
11:*4, 6, 16, 24*  24:*3*
33:*1, 4, 13, 14, 16*
34:*19, 24*  36:*15*
39:*23, 25*  46:*16*
47:*7, 13*  48:22
49:*19*  51:*7*  53:*3,*
*12, 21*  56:*5, 21*
59:*15*  61:22  67:*5*
95:*6, 25*  96:*4, 14*
97:*11*  102:*11*
104:*9, 15*
**videoconference**
3:*1*
**videos**  13:*13*
85:*20*  95:*20*
**VIDEOTAPED**  1:*1*

view 23:22 27:10 90:9
viewed 79:8 90:8
violate 10:1, 6
violated 75:9 89:25 95:16
violating 10:9 69:9
violation 70:3 73:6, 8 95:18
violations 63:2, 10 64:7 89:7
violence 8:2 91:3, 6, 10, 19 93:6, 7
violent 93:4
visual 19:5
vs 1:1

< W >
wagon 72:5
wait 22:10 32:18 46:18
waiting 74:10, 15, 16
waive 100:6
walk 15:12, 24 16:25 17:2 31:21 32:3, 5 48:16, 17 49:5, 11, 23 50:1, 4, 9, 25 54:20, 21 71:24
walked 11:22, 23
want 6:4 14:17, 18 21:13 22:13, 14 31:13 33:1 36:13 44:6 46:11 50:21 59:15 61:7 63:25 64:1 74:1 81:21 82:3 90:8 91:24 92:6, 8 93:15 98:1, 5 99:8, 11
wanted 17:13 29:18
wants 84:19 93:16
watch 11:16, 19 15:11
watched 11:11, 15, 24 13:12 53:13 55:10 61:22 85:20

watching 72:23
water 81:10, 15
wave 101:14
waved 37:24
way 6:12 14:1 20:15 22:15 32:20 34:5 35:17 56:15 59:10, 13 62:24 65:7 67:19 86:9 87:12 88:9, 13 90:7 91:9 92:15 93:21 94:25 96:24 97:17 98:21 103:14
weapons 35:23
wearing 19:10
week 12:12 13:23
weight 39:21 40:2 51:9, 13, 17, 23
well 9:20 17:23 25:9 28:18 31:5 33:1 34:8 43:5 54:25 71:5 79:20 80:7 84:24 87:11
well-intentioned 91:14
went 5:10 17:13 19:2, 4 31:18 35:12 70:2 78:18 83:11 97:25 103:7
we're 4:2 44:5 50:17, 18 53:4 70:9 71:10, 14 73:16 84:1, 3 85:9 90:8, 18 97:23
west 17:9
we've 88:4
wife 5:25 6:4
wife's 6:7
willing 70:21 90:21
window 57:4, 12, 21
witness 3:24 4:13 87:18 89:23
witnesses 104:22
woman 42:16
word 21:4 27:25 32:19 78:11 90:2
wording 62:3 63:4

words 29:14 40:19, 23 47:22 48:1, 3, 7 50:17 57:24 58:3, 11
work 34:16 37:5 58:25 73:6 76:11, 15, 21 78:17 95:5
worked 7:19
works 84:9
worksheet 74:2
worried 77:16
worries 77:24
worth 7:25
WR 80:21
writing 102:12
written 80:22, 25 81:4 102:10, 15
wrong 18:22 35:1 38:10, 25 39:6 49:17 56:15 60:14 65:7, 24 66:2, 7, 10 67:22, 24 68:1 75:10 79:19 81:7

< X >
x-ray 25:15, 22

< Y >
yard 19:9 23:16
yeah 45:24
year 7:10 73:16 83:18 92:22 93:11
years 7:4, 21 92:20 93:3 96:16
yellow 19:11
York 5:7, 10

< Z >
Zone 17:10
Zoom 3:1 4:11 29:3