# EXHIBIT I

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3
   ZABORA BROWN INDIVIDUALLY,     )
 4 AND AS A NATURAL PARENT AND AS )
   NEXT FRIEND ANTRAVEIOUS PAYNE  )
 5                                )
                Plaintiff,        )
 6         v.                     )  CIVIL ACTION
                                  )  FILE NO. 1:17-CV-04850-MLB
 7                                )
   CITY OF ATLANTA, ET AL,        )
 8                                )
                Defendants.       )
 9 _____)

10 ----------------------------------------------------------

11        BEFORE THE HONORABLE MICHAEL L. BROWN.
                TRANSCRIPT OF PROCEEDINGS
12                  APRIL 24, 2018

13 ----------------------------------------------------------

14 APPEARANCES:

15 For the Plaintiffs:        SAMUEL L. STARKS
                             SHEAN DECARLOS WILLIAMS
16                           MECCA SHALI ANDERSON
                             Attorneys at Law
17
   For the Defendant:        RITA M. CHERRY
18                           STACI J. MILLER
                             REGINALD BERNARD McCLENDON
19                           Attorneys at Law

20
           Proceedings recorded by mechanical stenography
21          and computer-aided transcript produced by

22         JANA B. COLTER, FAPR, RMR, CRR, CRC
                Realtime Systems Administrator
23              Official Court Reporter
                1949 U.S. Courthouse
24              75 Ted Turner Drive, SW
                Atlanta, Georgia  30303
25                  (404) 215-1456
```

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3

 4   MELVA ROGERS NATURAL PARENT    )
     OF DERAVIS CAINE ROGERS,       )
 5   DECEASED,ET AL,                )
                                    )
 6              Plaintiffs,         )
           v.                       )   CIVIL ACTION
 7                                  )   FILE NO. 1:16-CV-02578-MLB
                                    )
 8   CITY OF ATLANTA, ET AL,        )
                                    )
 9              Defendants.         )
     _____)
10

11

12   ------------------------------------------------------------

13          BEFORE THE HONORABLE MICHAEL L. BROWN
                 TRANSCRIPT OF PROCEEDINGS
14                    APRIL 24, 2018

15   ------------------------------------------------------------

16

     APPEARANCES:
17

18   For the Plaintiffs:       SAMUEL L. STARKS
                               SHEAN DECARLOS WILLIAMS
                               MECCA SHALI ANDERSON
19                             Attorneys at Law

20   For the Defendant:        RITA M. CHERRY
                               STACI J. MILLER
21                             Attorneys at Law

22

23

24

25
```

```
 1      (Atlanta, Fulton County, Georgia, April 24, 2018, in
 2   chambers.)
 3                         −  −  −
 4                  P R O C E E D I N G S
 5           THE COURT:  Good afternoon, everyone.
 6           MS. CHERRY:  Good afternoon.
 7           THE COURT:  Okay.  So we are here on I think two
 8   cases, Rogers versus City of Atlanta, 16-CV-2578 and Brown
 9   versus City of Atlanta, 17-CV-4850.  Let's just have everybody
10   announce themselves and then we'll go through first with the
11   Rogers case and then with the Brown case, or if there is a way
12   that you want to talk about them at the same time, that's fine,
13   but let's just make sure that we identify ourselves when you're
14   speaking and on which case you are speaking so that we have a
15   good record.
16           So first of all, why doesn't everybody identify
17   themselves for the Rogers case.
18           MR. STARKS:  Sam Starks for the plaintiffs in the
19   Rogers case.
20           MS. ANDERSON:  Mecca Anderson for the plaintiff.
21           MR. WILLIAMS:  Shean Williams for the plaintiff in
22   the Rogers case.
23           MS. CHERRY:  Rita Cherry for the City in Rogers.
24           MS. MILLER:  Staci Miller for the City in Rogers.
25           THE COURT:  And how about for the Brown case?
```

1          MR. STARKS:  Sam Starks again, you know, for the

2  plaintiff in the *Brown* case.  And all counsel are the same for

3  plaintiffs in both cases on the plaintiffs' side.

4          THE COURT:  Okay.  And for the City?

5          MS. CHERRY:  Rita Cherry for the City on the *Brown*

6  case.

7          MR. McKENZIE:  Reginald McClendon for the City in

8  *Brown*.

9          MS. MILLER:  And Staci Miller for the City in *Brown*.

10         THE COURT:  Okay.  Are you-all altogether?

11         MS. CHERRY:  Your Honor, in the law department for

12  the City of Atlanta, Reginald McClendon and I are in my office

13  and I believe Staci Miller is present by phone remotely.

14         THE COURT:  Okay.

15         MS. MILLER:  Yes, you know, I stepped out of a

16  deposition to be able to take this call, so I'm not present

17  with the other two attorneys who are together.

18         THE COURT:  Okay.  Thank you, Ms. Miller.

19         MR. STARKS:  All the plaintiffs are together,

20  Your Honor.

21         THE COURT:  Okay.  So how do y'all want to proceed?

22  In the *Brown* case, or maybe it's the *Payne* case, it looks like

23  the primary issue is the scheduling of depositions.  While in

24  *Rogers*, it looks like there's an issue about the extent of some

25  of the other discovery.  So maybe why don't we take the issue

1  of the nine depositions first, which I believe is the *Payne*

2  case.  Is that correct?  Is that the *Payne* case?

3  　　　　MR. STARKS:  Yes, Your Honor.  In the *Payne* case, the

4  initial -- what the plaintiffs initially wrote to the Court

5  about related to the manner and just the difficulty that we

6  believe we've had with deposition scheduling.  And so what we

7  did not want to do, because we've done this before and it has

8  led to having to contact the Court, we did not want to

9  unilaterally --

10  　　　　(Shean Williams and Mecca Anderson have left the

11  conference.)

12  　　　　MR. McCLENDON:  I guess they lost their connection.

13  　　　　THE COURT:  Well, they were all together, so

14  unfortunately now they're all gone.

15  　　　　MS. CHERRY:  Your Honor, would you like for us to

16  just stand by on hold or to hang up and start over with the

17  call-in?

18  　　　　THE COURT:  Let me find out if we know how to find

19  them.  Hang on a second.

20  　　　　MS. CHERRY:  Okay.

21  　　　　THE COURT:  Let's just give them a minute.  They'll

22  probably call back in.

23  　　　　MS. ANDERSON:  The plaintiffs are here, Your Honor.

24  We were disconnected.

25  　　　　THE COURT:  Okay, great.  So I think this was

1  Mr. Starks, is that correct, that was speaking?

2              MR. STARKS:  Yes, Your Honor, Sam Starks for the

3  plaintiff in the *Brown* matter.  I sent the initial email to the

4  Court because we were having difficulty scheduling nine or so

5  depositions that we had requested, I think at least a month or

6  so ago.  My concern, Your Honor, is that if we were -- if we

7  continue to have that kind of delay with scheduling

8  depositions, we would ultimately be back before the Court at

9  some later point asking for an extension.

10             Now, since we sent that email to the Court,

11  Ms. Cherry has responded and I think provided additional dates

12  and given us additional times when we can notice those

13  depositions.  So in that regard, I suppose, as it relates to

14  those pending depositions, which are not the only ones that we

15  will want to take, the issue is resolved.

16             But the concern we have, Your Honor, is what should

17  we do in the future if two or three weeks go by, we've given

18  them names of individuals we want to depose, they're city

19  employees, we're not getting a response back with dates, what

20  should we do as it relates to how to timely notice and perfect

21  our right to take those depositions so that we don't later ask

22  for a discovery extension and the question is why haven't we

23  done things sooner.

24             So that was the -- that was the main concern in the

25  *Brown* matter.  And I may be mistaken, Your Honor, but I don't

1  know whether the Court has signed off on the initial scheduling

2  and discovery plan that we submitted, so the times that I've

3  looked, I didn't see where we actually had a definitive

4  scheduling order that was signed.  I think we would have

5  requested, I think, a six- to eight-month discovery track, in

6  part because of the *Monell* issues and these sort of issues, but

7  the main point of that email was just to put the Court on

8  notice that, from the plaintiffs' point of view, and we

9  understand we have the burden here and all of the depositions

10  are going to be requested by us.  By in large, we just wanted

11  to put the Court on notice that we aren't able to proceed with

12  discovery in a timely manner.  And that's a concern that we

13  have in this case.  And we've seen it play out to an even

14  greater extent in the *Rogers* case.

15          THE COURT:  Ms. Cherry?

16          MS. CHERRY:  Your Honor, Mr. Starks contacted the

17  Court and represented to the Court that the City had

18  unreasonably delayed discovery.  We presented to the Court

19  evidence that on the same day that plaintiffs -- that

20  Mr. Starks requested those depositions, we responded the very

21  same day, and then we responded with more officer names that

22  could be scheduled maybe two or three days afterwards.  So

23  we -- I think we -- you know, we demonstrated to the Court that

24  what Mr. Starks said was not accurate.

25          But even in light of that, we said okay, to resolve

1  this matter, we'll offer another day, which will give plaintiff

2  the five slots that they need for five depositions.  So,

3  Your Honor, the City is, quite frankly, shocked that that

4  didn't resolve it in the plaintiffs' eyes.  We really don't

5  know why we're still talking about scheduling when the City

6  offered a resolution.

7          THE COURT:  Mr. Starks?

8          MR. STARKS:  Your Honor -- yes, Your Honor.  The

9  problem that we have had with the City, which I think is

10  probably best illustrated in the *Rogers* case before Judge

11  Batten, when we had a hearing before the Judge about this very

12  same issue and he said to us if you don't get a response within

13  a reasonable period of time, go ahead and notice those

14  depositions.  I did not because he's not our judge in this

15  case.  I did not want to follow that procedure with respect to

16  any of the pending cases before this Court.

17          But we've had a number of issues that I can easily

18  document where on the day before the depositions, we get a

19  notice of cancellation.  It's been a repeated problem.  And,

20  frankly, the point of this email is so that ultimately we're

21  not held responsible as the plaintiffs for any sort of delays

22  in discovery, because we've been very professional about saying

23  here are the people we want to depose.  If they're not city

24  employees or you can't make them available, let us know, we

25  will serve them.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1          Your Honor, we just have not gotten that courtesy
 2   back from the City.  Now, as we sit here -- as we sit here
 3   today, only because of my email, I would submit, you're right,
 4   the City has certainly done some things to clear up some of the
 5   issues that I first emailed the Court about.  But I believe
 6   it's only because of my email.  Because I can show the Court
 7   where I sent emails to the City prior to my email to the Court
 8   saying can we use any of these other days, and I got no
 9   response back.  The only time I got a response was when I
10   emailed this Court.
11          And the reason I wanted the Court to hear from us is
12   because my concern is that this will continue to happen unless
13   the Court gives the parties some guidelines and instructions
14   about the manner in which the plaintiffs or any party can
15   proceed if the deposition is requested and no response is given
16   about when the lawyers can be available or the witnesses can be
17   available.
18          THE COURT:  And are you talking about -- when you
19   said there's been repeated problems with the cancellation of
20   depositions, is that in this case or is that in a different
21   case?
22          MR. STARKS:  That is more specifically in the *Rogers*
23   case, but it has also recently occurred in this case where the
24   witness said they had a medical excuse.  We're not questioning
25   whether or not that is true or not, but that has been a pattern
```

| | |
|---|---|
| 1 | that we have seen.  And these are witnesses that are under the |
| 2 | City's possession and control.  And I would submit that even if |
| 3 | we subpoena them, we're going to end up with the same problem |
| 4 | because they're going to go to the City and not show up and |
| 5 | we're still going to be coming back to the Court to compel. |
| 6 | It seems as if the fact that they are law |
| 7 | enforcement, at least that's my impression, it seems to |
| 8 | embolden them to feel like they can appear or not appear |
| 9 | whenever they are requested to come to a deposition.  And it's |
| 10 | making -- it's making it difficult for us to meet our burden. |
| 11 | THE COURT:  So, Mr. Starks, I hear what you're |
| 12 | saying.  It sounds to me -- do you have other cases with the |
| 13 | City where this happens? |
| 14 | MR. STARKS:  Yes, *Rogers* is one of them.  And that's |
| 15 | a case that is before Your Honor. |
| 16 | THE COURT:  Right, but what about -- |
| 17 | MR. STARKS:  And also as to -- |
| 18 | THE COURT:  Are you basing this on other cases that |
| 19 | are neither *Rogers* or *Brown*? |
| 20 | MR. STARKS:  I am not basing it on other cases, not |
| 21 | *Rogers* or *Brown*, because *Rogers*, I say, typifies all of the |
| 22 | problems we have litigating with the City, and we're seeing |
| 23 | that same pattern repeat itself in *Brown*. |
| 24 | THE COURT:  Okay.  So I don't know what the disputes |
| 25 | are and the pattern is in other instances.  And so I don't want |

1  to try to rule in any way based upon what's happening in other

2  cases that is frustrating to you.  I hear the frustration and I

3  understand the frustration.

4        Also, I do recognize that maybe for law enforcement

5  officers, because of the type of work that they do, there might

6  be some limited flexibility.  I would say, though, that you

7  deserve an email back.  I think everybody deserves an email

8  back.  I never understand why it is that lawyers sometimes

9  don't respond to emails.  As long as I've been a lawyer, I have

10  always been told that a lawyer should respond to an email

11  before they leave before the end of the day, even if not simply

12  to say I'm sorry that I didn't respond and can't give you a

13  substantive response now.  That's just my personal preference.

14        If there is a dispute that comes before me later,

15  because it sounds like in this case, in *Brown*, like the dispute

16  about the depositions has been resolved, but if you-all come

17  back before me at another time in this case where something has

18  not been resolved, I will tell you that the fact that nobody

19  has responded to your emails is something that I would find to

20  be compelling.  Because I think ignoring counsel's emails is a

21  sign that you are not doing your best to work through the

22  discovery process.  That's all I can tell you about that.

23        If there is a case in which Judge Batten has

24  previously stated that if the City does not respond or provide

25  something in a timely manner, then you may go ahead and set the

1   deposition, I'm not going to reconsider anything that Judge

2   Batten has ruled.  I would enforce that if that's a rule that

3   Judge Batten has put in place, because he must have had a

4   reason for doing it.  And without going in and analyzing

5   everything that he did before, I'm simply going to do what I've

6   done in other cases, and that is honor the decisions by judges

7   that have been involved before me.  Does that answer your

8   question for you?

9           MR. STARKS:  Yes, it does, Your Honor.  We do have

10  Judge Batten having given some specific instructions to the

11  parties about how we could respond to this problem.  And so

12  going forward, we will -- and now that's in the *Brown* case,

13  which is also Your Honor's case, where Judge Batten addressed

14  this same issue.

15          Your Honor, the other thing that makes it -- these

16  are related cases, and so what I think the Court will find when

17  we get to discussing some of the discovery issues in the *Rogers*

18  case, because of the *Monell* claim and the close proximity in

19  time to the two excessive force incidents that we're looking

20  at, there's a fair amount of overlapping discovery.  And so in

21  many instances, the written discovery in both cases will be the

22  same.

23          And so by resolving some of the issues that we

24  currently have in the *Rogers* case, I think that will

25  necessarily resolve some issues that we potentially are going

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1   to have in the *Brown* case.  But as it relates to depositions in

2   the *Brown* case, I think the Court is correct, we -- Rita, on

3   behalf of the City, has resolved, since my email to the Court,

4   all of those issues.

5          However, preemptively, I wanted to have this

6   conversation so that hopefully we don't have to come back to

7   the Court again about the matter of scheduling depositions.

8   And so the only other matter in *Brown* that I just wanted to

9   raise is to get some clarification about our discovery

10  deadline, which we are very mindful of --

11          THE COURT:  Yeah.

12          MR. STARKS:  -- in the *Brown* case.  And I know we

13  made a proposal, but I don't think the Court ever signed off on

14  the planning conference discovery proposal that I think we

15  jointly made.

16          THE COURT:  Right.  So apparently this was filed

17  right about the time that I was sworn in and I got the case.

18  As a result of that, it did not come up on the docket with me

19  until just now, and we've pulled it while we've been on the

20  phone, so I have the joint discovery plan in front of me.  And

21  I will look at it and sign off on it.

22          Now, is there anything in here that is in any way

23  controversial?  Are there any disputes in here?  Any reasons of

24  disagreement?

25          MR. STARKS:  Your Honor, I don't have it in front of

1  me, but the one question I have is there were -- there was an

2  instance in one case, and I'm not certain if it was *Brown*,

3  where the plaintiffs felt that because of the *Monell* claim and

4  because of the problems, at least in our history of getting

5  things done in a timely manner, where we felt like it was a

6  complex case that needed an extended discovery track and the

7  City had opposed that.

8          If this is, in fact, the case where that was an

9  issue, you may see representations that are different from the

10  City and from the plaintiffs regarding the amount of time that

11  was needed.  But this may have been one where we both agreed

12  that an extended discovery track would be needed.

13          THE COURT:  It is the case.  I'm seeing it now.  So

14  I'm going to have to read it over and then we can get together

15  and talk about it.  But it does look like there is a dispute

16  about this one.  So I will look it over.  It may be that the

17  amount of time that discovery has been ongoing already obviates

18  the dispute, but unless I hear that, I will take a look at it.

19  It looks like there's a part where both of you ask for a

20  conference in order to talk about the appropriate time for

21  discovery.

22          MR. STARKS:  That's correct, Your Honor.  Because,

23  frankly, we have not been able to reach an agreement about, as

24  the Court will see here when we talk about *Rogers*, about what

25  is the legitimate scope of discovery as well as the timing of

1  discovery. And given that we're the ones that are going to
2  face the summary judgment motion, we just need to be -- out of
3  an abundance of caution, we felt like we needed to alert the
4  Court as to the things that are hampering us.
5            THE COURT:  Sure.  Well, I will look over this and we
6  will contact you-all to set up a time to talk about it and to
7  set the dates.
8            MR. STARKS:  Very well, Your Honor.
9            THE COURT:  So I think now we are on to *Rogers*?
10           MS. CHERRY:  Your Honor, if I may be heard on *Brown*
11 before we move on.  I just had a few comments --
12           THE COURT:  Sure.
13           MS. CHERRY:  -- in response to what Mr. Starks said.
14           First of all, as an experienced lawyer who has been a
15 member of this court since 1996, I do not ignore email.
16 Mr. Starks sends emails and we respond readily, so that was
17 just not true when he represented that.
18           Secondly, this matter was resolved before it got to
19 this.  I think my response and motion to the Court where we
20 offered to set aside May 4th or any other day that they chose,
21 for that matter, but to set aside another date so plaintiff
22 would have five slots for five -- there are five remaining
23 depositions, that resolved it in the City's eyes.
24           Mr. Martin sent an email saying this appears to be
25 resolved, but Mr. Starks said, no, it's not resolved.  And what

1  he has just offered to the Court is it's not resolved because

2  the City doesn't return my emails, which is not true.  And he

3  also said it's not resolved because we want to know what to do

4  in the future.

5         In my motion to the Court, which Mr. Starks got a

6  copy of, I said notice the depositions without the need to

7  confer, so it's resolved.  So I just have to put that on the

8  record, Your Honor, because it's blatantly false.  And with

9  that said, we are ready to move on if Your Honor is ready.

10        THE COURT:  So, Ms. Cherry, I saw the emails that

11  you're talking about.  It appears to me that Mr. Starks is also

12  maybe relying upon experiences he's had in other cases.  I

13  don't know what those experiences are.  I'm glad to hear that

14  you-all are responding to emails.  The emails I see here would

15  indicate that you are, so I'm really kind of treating this I

16  think the way that you're suggesting, which is that there's not

17  really an issue like that.

18        I'm not going to grant a sort of an order as to how

19  you should do something in the future when I don't think that

20  there is a basis for it based upon the current situation.  I'm

21  simply saying, and I think you agree, that you ought to respond

22  to emails, everybody ought to respond to emails.  I know

23  sometimes it's not possible, and, by the way, I also know that

24  sometimes you work really hard to get a deposition set and then

25  somebody at the last minute comes up and tells you that he's

1   got or she's got a doctor's appointment.  I know that getting

2   witnesses together sometimes can be like herding cats.  And

3   you've got to get a whole bunch of people and they've got other

4   things, that might be more important to them.

5          So the way I see it is this issue is not really an

6   issue right now and I can't worry about whether in other

7   instances there's been disputes between the parties.  I don't

8   see a dispute right here in this case.

9          MS. CHERRY:  Thank you, Your Honor.

10          THE COURT:  So moving on to the other one, the

11  *Rogers*, I have read the submission by Ms. Cherry, and a

12  description about the number of depositions and the request for

13  the production of documents and how broad those requests are.

14  We can talk about the request for additional depositions in a

15  moment, but maybe we ought to go over the request for

16  production.  It does seem to me as though -- I'd like to

17  understand how these are limited to what might be relevant.

18          MR. STARKS:  Sure, Your Honor.

19          THE COURT:  Can one of you tell me very briefly in

20  the *Rogers* case what is the claim?

21          MR. STARKS:  Yes, Your Honor.  The claim in the

22  *Rogers* case is the same claim as in the *Brown* case, it's a

23  claim against the City of Atlanta, in part, there are also

24  claims against Officer Burns, but it's a claim against the City

25  of Atlanta that comes under the *Monell* case.

```
 1           And as this Court knows, and as we discussed
 2  previously, the Monell theory of liability requires us to show
 3  that above and beyond the incident that led to our client's
 4  death, above and beyond that, we need to show that the City of
 5  Atlanta has been engaged in either deliberate indifference or a
 6  pattern and practice of not disciplining, training or
 7  supervising or hiring officers with due regard to how they use
 8  force.
 9           So the Monell claims, it's -- frankly, if we were at
10  trial, we would first have to prove that Defendant Burns used
11  unreasonable force when he shot and killed Deravis Rogers.
12  That may satisfy our burden as to Burns, it's only one element
13  as to the City, which is why I've always been just totally
14  confused by the City suggesting why would we go beyond Burns
15  for Monell purposes.  You know, the claim is based on -- and I
16  can give the Court some specific factual proffers that support
17  this discovery.
18           THE COURT:  Right.  So that's what I'd like to get.
19  I understand the purpose of Monell, and I understand the
20  additional burden you face beyond showing what occurred in this
21  instance.
22           MR. STARKS:  Very well, Your Honor.
23           THE COURT:  But of course that means that your
24  discovery to satisfy Monell should be in some way related to
25  the type of incident that you are complaining of in the first
```

```
 1   instance.

 2            MR. STARKS:  That's correct, Your Honor.  That's

 3   correct in the sense that this is a use of force case.  Now,

 4   use of force means more than just use of a firearm, it's also

 5   use of pepper spray, it's use of the baton, it's physical

 6   force, so this -- so our *Monell* claim from a subject matter

 7   standpoint, it's a use of force claim, so, for instance, with

 8   RPD Number 5, which says produce all documentation prepared by

 9   the OPS advocates unit, the advocacy unit is -- is part of the

10   internal affairs division of the Atlanta Police Department,

11   which they refer to as the Office of Professional Standards.

12   OPS essentially means internal affairs for the Atlanta Police

13   Department.

14            We have evidence that at least in one instance, there

15   was a recommendation from internal affairs that a particular

16   officer be terminated because of his improper use of force.

17   And during the adverse action, final adverse action process,

18   the N.P.A.A., what's referred to there when that officer went

19   through the final stage of the disciplinary process, the chief

20   of police at the time, Chief Turner, he rejected the

21   recommendation of the Office of Professional Standards.  That

22   is a relevant -- that is a very relevant fact to our ability to

23   prove that there is evidence that the City is showing

24   deliberate indifference to officers when they use excessive

25   force.
```

```
 1              So what we're requesting in RPD Number 5 are examples
 2    of officers who, by virtue of their conduct being deemed to be
 3    something that requires discipline, this documentation all
 4    relates to the disciplinary process as it relates to the
 5    internal affairs division recommending discipline regarding an
 6    officer, so what we want --
 7              THE COURT:  Wait.  Hold on.  Let me just interrupt
 8    you for a second.  Because I want to ask Ms. Cherry a question,
 9    and then I want to come back to this issue.
10              Ms. Cherry, do you understand his contention that
11    there is a situation in which OPS recommended termination of an
12    officer for excessive force and that the chief of police
13    rejected that recommendation?  Do you agree --
14              MS. CHERRY:  Yes, I understand that.
15              THE COURT:  Do you agree that that type of
16    information would be relevant and discoverable given the Monell
17    claim in this case, which apparently involves the excessive use
18    of force?
19              MS. CHERRY:  Yes, of course, Your Honor.  But that's
20    not what plaintiff is asking for in RPD Number 5.
21              THE COURT:  Hold on, Ms. Cherry.  I'm getting to
22    that.  I'm just trying to make sure that we have a base as to
23    what is admissible, or, I'm sorry, what is discoverable.  And I
24    would agree with you that I think that that would be.
25              MS. CHERRY:  Yes.
```

```
 1              THE COURT:  The question, and I think where
 2   Ms. Cherry was going, Mr. Starks, is there is nothing in 5,
 3   Request Number 5, that limits it to formal charges or notices
 4   of final adverse actions involving the excessive use of force.
 5   So, for example, you would get some here where they are
 6   recommending action for other problems like, I don't know,
 7   drinking or whatever else police officers might do to come
 8   under suspicion by OPS.
 9              Is that your point, Ms. Cherry?
10              MS. CHERRY:  That's exactly -- that's exactly my
11   point, Your Honor.
12              MR. STARKS:  Your Honor, I understand what the Court
13   is saying.  We don't have any problems if limiting that to use
14   of force is something that satisfies the Court and satisfies
15   Ms. Cherry.  We don't have a problem with that.
16              But here's how things beyond that could be relevant,
17   Your Honor.  One of the other things you're going to see is
18   that a number of these officers we believe are being untruthful
19   in their written and spoken word while they are on duty.  One
20   of the things that internal affairs investigates and that you
21   can be fired for if internal affairs determines that you've
22   been untruthful, even as to a traffic ticket, you can be
23   terminated for that.  With use of force, you can foreseeable
24   use excessive force and not be terminated for that.
25              So I would submit to the Court that while for now we
```

1  would be okay with use of force being a limiting factor with

2  that, I would submit to the Court, though, that it is

3  reasonable -- reasonably calculated to lead to the discovery of

4  admissible evidence if we saw truthfulness violations that were

5  going to the chief of police with the recommendation that an

6  officer be disciplined or terminated and that not happen.

7  While it's not use of force, it's relevant to the deliberate

8  indifference to following the rules of the department, so...

9          THE COURT:  But wait a minute.  Isn't that broader

10  than what you have to show in *Monell*?  I mean, if you were to

11  show in your *Monell* claim that they were not firing people who

12  were known to be untruthful or they were not following OPS's

13  recommendation to terminate people for untruthfulness, that

14  would not satisfy your *Monell* claim.  I think for your *Monell*

15  claim, you have to show some level of a pattern or practice or

16  some deliberate indifference with regard to the use of force.

17          MR. STARKS:  With all due respect, however, here's

18  how it would, if the truthfulness claim were tied into it.  As

19  we often see, whenever an officer has the use of force

20  incident, truthfulness is always an issue, whether or not they

21  respond truthfully or not.  The nexus, I would submit to the

22  Court, is whether or not by not properly disciplining officers

23  for truthfulness, have you allowed them to escape and avoid and

24  misrepresent what they've done when they used force, that would

25  be a relevant nexus.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    MS. CHERRY:  Your Honor, I disagree with what

2  Mr. Starks just said.

3    MR. WILLIAMS:  Your Honor, this is Shean Williams.

4  I'm for the plaintiff.  I just want to interject just briefly.

5  I've actually had this *Monell* issue before the Northern

6  District and have an order on this thing in a case that I filed

7  against the City of Atlanta.  Mr. Starks is correct, one of the

8  issues in use of force.  In determining whether or not it was

9  properly supervised and disciplined is checking the veracity of

10  the claims of the use of force and how it went down by the

11  police department.

12    I will tell you and proffer to this Court that our

13  expert who has been allowed to give testimony on this same

14  issue is going to look at that and is relying on this issue as

15  part of the *Monell* case in this perspective.  I've used that

16  argument as relates to the discipline or lack thereof by the

17  City of Atlanta Police Department and one summary judgment on

18  *Monell* on this direct issue, and so while I do appreciate,

19  generally, how untruthfulness may not directly be involved,

20  overall if the untruthfulness was apparent, it should have been

21  investigated by the police department and they deliberately

22  didn't do it to avoid coming to the reasonable conclusion.

23    Then *Monell* is at issue and there is cases where that

24  has been supported, not only in this jurisdiction but others.

25  And we will obviously be ready and prepared to brief that at

 1  that point.  But I think the point we're saying is at this
 2  point, discovery, from our perspective, and we even got it from
 3  Judge Batten earlier, is to be broad.  And we are looking at it
 4  from a perspective that we believe there is documents that show
 5  where the chief of police was recommended by his own OPS
 6  department to terminate somebody and he didn't, which he has
 7  the right to do.  But we have a right to discover it.  We
 8  should have the right to look at the basis and use that
 9  information to potentially show that this is a pattern and
10  practice of deliberate indifference by the City of Atlanta and
11  the chief of police.  And so I don't want to -- we can get into
12  the law right now, but our perspective from just discovery is
13  we think it's relevant.
14          Now, we are willing to limit it to use of force at
15  this point, but I will say this also about the response in
16  Judge Batten's order, he specifically tells us not to just give
17  a response of irrelevance.  If Ms. Cherry just told you that
18  she believes use of force for this question was relevant, what
19  should have happened, based on Judge Batten's previous order,
20  is they should have objected and still produced the documents
21  that they thought were relevant regarding use of force.
22          What we got as a response, Your Honor, is we object,
23  irrelevant, overly broad, and did not produce any of those
24  other documents that Ms. Cherry just told you she believed were
25  relevant.

```
 1          THE COURT:  Well, let me go back.  And, Mr. Williams,
 2    I'd be happy to look at the case that you referred to.  I'll
 3    look at that now or I'll look at it at a time when it becomes
 4    more ripe to be briefed before me.
 5          Okay.  I also get the argument that if there was
 6    somebody who was under investigation for excessive use of force
 7    and there was untruthfulness in the interview and that
 8    untruthfulness somehow allowed the person to avoid discipline
 9    for excessive use of force and then there was no follow-up on
10    the untruthfulness, and so I think that's the way that both you
11    and Mr. Starks have described it, that the failure to either
12    investigate or the failure to enforce the truthfulness
13    requirement somehow allows for excessive use of force to go
14    unpunished.  I would see where that could be relevant.  And so
15    I'm not trying right now to cut off some argument or evidence
16    like that.  I don't have enough in front of me to do that.
17          But as a threshold matter, I think you-all have
18    agreed to limit five and perhaps some of the others to
19    complaints that, in the first instance, involve excessive use
20    of force.  If there is another way, if there is something else
21    that needs to be included, then we can do that either now or at
22    another time.  But it certainly is apparent to me that some of
23    this could be totally irrelevant.  If you had somebody that got
24    in trouble with the OPS for gambling or for drinking or for
25    theft or for something like that that had nothing to do with
```

1  excessive use of force or getting away with excessive use of

2  force, I don't think you can make a *Monell* claim unless you're

3  trying to make a *Monell* claim based on the idea that the APD

4  just has essentially no rules and let's people get away with

5  anything that they want to get away with.  And I don't believe

6  that's your claim here.

7        MR. WILLIAMS:  Well, Your Honor, I will say this, so

8  that you understand that -- like I said, I've done several of

9  these, not only against this City but against other ones.  I

10 will say this, as it relates to the expert who I think is going

11 to opine in this case, he will proffer that if there is a

12 pattern and practice of allowing officers to violate,

13 deliberately violate written policies and procedures, as it

14 relates to truthfulness and other things, whether excessive

15 force or not, you are deliberately saying it's okay to do

16 whatever you want, because you create an environment within

17 that department that says nothing I do is going to be punished.

18        And I will tell you I took the deposition of Chief

19 Turner in this case, and I specifically asked him what -- isn't

20 truthfulness in these type of actions -- is this policy on

21 truthfulness at the heart of the essence of what police work is

22 all about?  And Chief Turner said:  You are right.  If I can't

23 trust you, if you're not honest about one thing, you don't need

24 to be working for me or should be working as a police officer,

25 because everything you do, including use of force, is at

1    question.  I will tell you that will be the testimony that will

2    be proffered.  And I'm going to tell you that our expert, whose

3    been doing this for 30, 40 years, is going to also agree with

4    Chief Turner.

5          And that being said, I've done enough cases with the

6    City, including looking at this *Rogers* stuff, that one of the

7    things that's going to come before this Court is evidence of

8    continuously allowing officers off the hook on blatant

9    violations of rules and instead of enforcing the rules like

10   truthfulness and other things, they're not.  And it creates an

11   environment that -- an environment that says you can do

12   whatever you want, and it's okay.

13         And that's the same issue I had when I did the

14   Captain Johnston case and it's the same issue I had against the

15   City with *Bond*, because it's just -- it's not just excessive

16   force, it's a history that is known of the OPS department that

17   they're not doing the right thing as relates to following their

18   own policies and procedures regarding discipline.

19         That's why I said, Your Honor, I believe there's case

20   law that we can pull out at the appropriate time that says

21   discipline or failure to discipline somebody that you know

22   should be disciplined and blatantly and deliberately not doing

23   it and letting that officer that you know is a problem on day

24   one or day two and it comes back on day 200 and it ends up

25   causing a civil rights violation would be relevant for *Monell*.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1   And that's what I was just saying, Your Honor.

 2            THE COURT:  So you-all can make a decision.  I had

 3   heard from Mr. Starks and from you, I thought a couple of

 4   minutes ago, that I would limit this right now to excessive use

 5   of force, which I think is a limitation that the City would not

 6   object to, that that would do away with their objection.  If

 7   you don't want to do that and you want to argue more broadly,

 8   then I'm going to need some briefing on that.  Because I

 9   understand what you are saying as to how an expert might opine

10   in that way.  It is not clear to me that that would be enough

11   to establish a Monell claim in the absence of evidence that

12   there was some type of deliberate indifference or pattern or

13   practice in regards to excessive force.  I'm not ruling that

14   today, please understand.  I'm simply saying --

15            MR. WILLIAMS:  I understand.

16            THE COURT:  -- that you-all have to make a decision

17   about whether you are or are not going to limit these requests

18   as Mr. Starks had previously indicated.  Or, if not, then I

19   would welcome you-all to brief whether it should be so limited.

20            MS. CHERRY:  And, Your Honor, I would ask that the

21   plaintiff respond to our motion that is currently before the

22   Court.  And we would ask the Court rule and allow the City

23   to -- if there are any new issues that are brought up in

24   plaintiffs' response to the motion, that we're allowed a very

25   short reply.  And then we would ask the Court to rule on this.
```

```
 1          Secondly, Your Honor, the plaintiff in the Rogers
 2  case has gone on and on and on for months about their expert
 3  this, their expert that, but they have not yet disclosed that
 4  expert in accordance with Rule 26.  We disclosed our expert in
 5  September of last year.  They've been talking about theirs, but
 6  they won't disclose that expert.  We would ask the Court to
 7  talk with plaintiff about that disclosure.
 8          MR. WILLIAMS:  Your Honor, I'll respond to your
 9  question first and then I'll respond to Ms. Cherry.  Your first
10  question, Your Honor, we are agreeable, as Mr. Starks said, to
11  limiting the discovery, but the question we are saying is it's
12  not just excessive force, because how the City may identify
13  something may not be how we would.  We would just say use of
14  force is what we are willing to limit, because the City of
15  Atlanta's own policies and procedures call use of force to be
16  firearm, baton, taser and other things, so we are willing to do
17  that.
18          As relates to the motion, I don't know if a formal
19  motion has been filed.  I know motions are not to be filed with
20  discovery issues, we should take them to the Court first, but
21  as relates --
22          MS. CHERRY:  That was filed at the request of the
23  Court, Shean.  I just sent an email.
24          THE COURT:  Ms. Cherry, you are talking about the
25  email?
```

1    MS. CHERRY:  Yeah, the email.  And I put it in the

2  form of a motion.  The Court asked the City to file that email.

3  We put that email in the form of a motion for clarity's sake,

4  and to make sure that the docket remained clear, and I'm sure

5  you were served with a copy of that.

6    THE COURT:  I have it.

7    MS. CHERRY:  It was not sua sponte.  That was on the

8  instruction of the Court.

9    THE COURT:  No, I have it.  And my understanding is

10  if they limit this, you, in a sense, are asking that these in

11  Number, 5, 6, 7 and maybe we've got to go through each one, be

12  limited to something having to do with use of force; is that

13  right?

14    MS. CHERRY:  Yes, we would ask that the discovery

15  responses that are at issue be limited in a manner that is

16  proportional to a *Monell* claim.  Your Honor, the plaintiff has

17  asked the City for everything under the sun and the moon,

18  relevant, irrelevant, proportional, disproportionate and some

19  things that are overlapping twice.  They've asked for the same

20  thing in two different requests for production of documents.

21    And at this point, we have got to, I think, be

22  reasonable about this discovery.  We often get emails from

23  Mr. Starks asking for the same thing over and over.  We respond

24  saying, Sam, we sent that to you.  And his response will be,

25  oh, okay.  I may be wrong.  We are overwhelmed with these

1 unreasonable discovery requests from plaintiff.  And we're just

2 asking you to just narrow them to a reasonable, proportionate

3 level, that's all.

4 　　　　THE COURT:  So I think that, Ms. Cherry, as a

5 threshold issue, if 5, 6, 7, 13 and 14 are limited in regards

6 to items involving the use of force, does that allay your

7 concern regarding the scope of those requests?

8 　　　　MS. CHERRY:  Yes, Your Honor, it does.

9 　　　　THE COURT:  And I understood plaintiff to say that

10 they are willing to give that limitation, that is the use of

11 force, not necessarily just excessive force.

12 　　　　MR. STARKS:  We are, Your Honor, with the exception

13 of one RPD, which is an RPD that goes toward Mr. Williams, and

14 what Mr. Williams expressed a moment ago about truthfulness and

15 the extent to which we've had testimony from the former --

16 　　　　THE COURT:  Which RPD is that?

17 　　　　MR. STARKS:  Number 13.  And here's the relevance of

18 that RPD.  Before you can be an Atlanta Police Department

19 officer, you are given, in essence, what's a polygraph exam,

20 they call it a computer voice stress analyzing exam.  This goes

21 to the testimony we got from the chief.  The reason they do

22 that is because truthfulness is such a critical component of

23 being a police officer.

24 　　　　One of the things that we also expect our expert to

25 say, who we haven't disclosed because we haven't completed

1    discovery and because I thought we all had an understanding
2    that until we deposed Officer Burns, we don't have that
3    obligation yet.

4           But for the benefit of the Court and Ms. Cherry, so
5    that she didn't think we were just requesting everything under
6    the sun and the moon, we proffered to her that there was an
7    expert who we were getting direction from about what sort of
8    things would be relevant.

9           Our position on Number 13 is this:  The APD has the
10   right any time they investigate an officer for anything to give
11   them what's called the CVSA exam.  And apparently the internal
12   affairs division, they also have the option to use that same
13   exam.  Our theory is that that exam is rarely, if ever, used.
14   And the reason that it's rarely, if ever, used is because they
15   want the officers to have the benefit of not telling the truth.
16   Because if they're ever found to not have told the truth,
17   they're terminated.  So we're asking for five years of
18   relevance, tell us within the five years preceding this
19   incident how many times in the internal affairs context where
20   you're investigating an officer have you ever given the CVSA
21   exam.

22          And according to their SOP, they're supposed to have
23   had a record of that.  My guess is that there are 50 instances
24   or 25 instances, and so that is a request that is not, unlike
25   all of the others, it is not one that I believe is tied to use

 1  of force in a way where if we narrow it, we won't -- I think

 2  potentially we get nothing back and it misses the point of what

 3  we're asking for.

 4          THE COURT:  And is that -- is that Request 14 or 13?

 5          MR. STARKS:  That -- I'm sorry, Your Honor, that is

 6  actually --

 7          MS. CHERRY:  It's 13, Your Honor.

 8          MR. STARKS:  13 and 14.

 9          THE COURT:  Well, 14 is --

10          MS. MILLER:  And, Your Honor, actually, we need to

11  make a statement based upon what Mr. Starks just told you.

12  That statement was very disingenuous, just because every time

13  an officer sits down, they have to sign a truthfulness

14  statement before their interview ever begins, so that I don't

15  think that is entirely correct.

16          THE COURT:  You need to slow down.  The court

17  reporter is having trouble getting what you said.  We heard you

18  say that it's not accurate because every time an officer sits

19  down with OPS, they have to fill out a form?  Is that the 337?

20          MS. MILLER:  No, it's a truthfulness statement where

21  they say that everything that they say in that interview is

22  true and plaintiffs' counsel knows this because every OPS file

23  that they have received has this statement in there.  And they

24  have asked different deponents about this truthfulness

25  statement.  It's in every file.  So the idea that APS -- that

1  APD doesn't give out these tests to give the officers an out

2  for lying, that's completely incorrect and disingenuous for

3  plaintiffs to say to this Court.

4              (Multiple voices overlapping)

5         THE COURT:  Hold on.  Hold on, Mr. Starks and

6  Mr. Williams.

7         Go ahead, Ms. Cherry.

8         MS. CHERRY:  Your Honor, this is Rita Cherry.  And I

9  wanted to just add to what Ms. Miller just said.  Plaintiffs'

10 counsel just represented to the Court that the truthfulness or

11 the lack thereof, that testing is the City's way of giving the

12 officer an out.  In the instant case, Your Honor, where James

13 Burns is named as a co-defendant, who is the former APD officer

14 who shot and killed Deravis Rogers, the chief terminated his

15 employment because of untruthfulness.  A CVSA exam was not

16 conducted, and the reason for that, Your Honor, is because the

17 chief saw the footage.  So the CVSA exam is not the end-all

18 be-all to determine truthfulness.  Sometimes there is dash-cam

19 footage, so here again, we are only seeking reasonable

20 discovery that is proportional to this case and not fishing

21 expedition style discovery requests.

22        MR. WILLIAMS:  Can I respond, Your Honor?

23        THE COURT:  Yes.

24        MR. WILLIAMS:  So the first thing is we never said

25 that they don't have to sign some document.  What we said,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    Your Honor, is pursuant to their own policies, they have the

2    computer voice stress analyzing exam that they have the ability

3    at any moment to perform that test.  And we believe there are

4    instances that that should have been done, not only among

5    Mr. Burns but other officers, because there are instances,

6    Your Honor, unlike this case, that we don't have a video.

7           Number two, whether or not Mr. Burns got fired

8    because of the video is missing the point.  It's not just this

9    incident we have to look at.  We have to look at not only

10   Mr. Burns' prior instances where this CVSA could have been

11   performed and should have shown his untruthfulness in other

12   instances, but other officers' ability to do this exam.

13          Like I said, I'm not trying to litigate this case

14   right now, because this is a discovery dispute, and generally

15   discovery is supposed to be broad.  But Chief Turner has

16   testified in his deposition, because I asked him, shouldn't

17   this exam be used in certain aspects to show whether or not

18   someone is being truthful in their use of force or whether

19   they're truthful about lying?  He says, Yes, my policy is in

20   place for that.

21          It gets back to this point, Your Honor, what other

22   method they have for truthfulness is irrelevant from this

23   question.  All we're saying is show us all the instances that

24   you, in fact, followed your own policy.  Because if you didn't

25   follow it when you should have, that's going to be evidence

1  either a jury, the judge, an expert can use to say you are

2  clearly not trying to get to the truthfulness of a use of force

3  incident or another incident.  That's why it's relevant,

4  Your Honor.

5          That's why we limited -- I didn't go for 20 years.  I

6  suspect when we get a response to this request that I'm going

7  to probably only have about five or ten instances where this

8  was used.  Now, that statistic is going to be able to be used

9  by the jury, by you, or by an expert to say this is exactly the

10  point.  Y'all purposely don't use this thing when you could.

11  And the reason we know is because you only used it five times

12  in five years.  That's the point, Your Honor.

13          I don't know what the evidence is going to be and

14  neither does Ms. Cherry.  But I do know this, I think I should

15  have a right to at least inquire about it.  And if it's not

16  admissible at a later point, the Court can tell me that.  But I

17  at least should be able to ask the question, since their own

18  policy says it should have been done.  I'm only going on

19  questions that their own policy -- and I've cited the policy,

20  Your Honor, I cited it.  I don't know what else I can do.

21          THE COURT:  Right.  I don't disagree with you that

22  this type of information may be relevant and is probably within

23  the scope of discovery.  The question I have is whether or not

24  it also needs to be limited to incidents involving the use of

25  force or potential violations of the use of force.  In other

1    words, I don't know why if there's somebody that is being

2    disciplined for stealing or for drug use and they are or are

3    not given a stress test while they are being interviewed about

4    that, I don't know what the relevance is.  And I don't know how

5    that can lead to other admissible evidence.

6              MR. WILLIAMS:  And, Your Honor, can I say one thing?

7    I want to make sure that I was clear on something.  If it's

8    something that is a part of OPS, that wouldn't be somebody on

9    drug use or something like -- that's not an OPS issue, it won't

10   get to OPS.

11             MS. MILLER:  That's not true.  That's not true.

12             MS. CHERRY:  That is not true, Your Honor.

13             MR. WILLIAMS:  Can I please, finish?  I'm sorry.

14             THE COURT:  That's okay.

15             MR. WILLIAMS:  Is it okay if I finish?

16             THE COURT:  Yes.

17             MR. WILLIAMS:  Okay.  Thank you.  If someone has a

18   drug problem, that is not an OPS issue, or someone has a

19   personal theft, if they are -- an OPS issue comes to internal

20   affairs because they are doing something either through a

21   direct complaint by a citizen or through someone in the police

22   department violating a working rule that's part of their

23   day-to-day duties and responsibilities as a police officer.

24             And the only reason we are saying that it still may

25   be relevant, even if it's not a use of force issue, is I can

1  give you one example.  What if they lied about something

2  critical to their job performance that would have determined

3  them to be fired and they have done other instances and then

4  ultimately five years later, they have an excessive use of

5  force, and in part of that, it would have shown that if they

6  had followed certain things regarding their OPS -- regarding

7  discipline before that incident of the excessive force and we

8  have a pattern and practice of several officers doing that,

9  then it may be relevant, Your Honor.  That's the point.

10          THE COURT:  Are you suggesting that there would be a

11  situation where there would be a person that should have been

12  fired for something else, but they were not fired, for some

13  type of honesty violation for something else, other than use of

14  force, they were not fired and the CVSA was not provided and

15  then somewhere down the road, they engaged in excessive force

16  and somehow the lack of the CVSA is relevant to that *Monell*

17  claim?

18          MR. WILLIAMS:  Yes.  I'm going to tell you why,

19  Your Honor.  Because the issue is whether or not your

20  deliberate indifference to signs and situations that would show

21  that this officer would have a tendency or a pattern and

22  practice of violating civil rights.  You just --

23          THE COURT:  I know, but we don't need to go around

24  and around on this, Mr. Williams.  This case involves the

25  alleged violation of civil rights by the excessive use of force

1   or the inappropriate use of force.  And I don't see how you can
2   tie that back to the failure of the police department to use
3   voice stress analysis on something unrelated to the use of
4   force.  I can see how if somebody's being investigated for the
5   use of force and they know that they're not going to have to go
6   through a CVSA, that might be relevant to encouraging them or
7   not dissuading an officer from using excessive force because
8   they know, hey, when I'm investigated, the City is not going to
9   use this other weapon that they have.
10          But I don't understand how if they are being
11  investigated for something else that occurs while on duty that
12  is not use of force, how the fact that they don't use the CVSA
13  in that instance would be relevant to it.
14          MR. STARKS:  Your Honor, this is Mr. Starks.  I think
15  that we have a disagreement with the Court to some extent, but
16  here's my solution to that, would be this, I hear what the
17  Court is saying.  Frankly, what I would propose is that if the
18  City is willing to produce any CVSA exams that were
19  administered over the course of these five years requested
20  regarding any use of force investigation, I think that makes
21  the same point.  I believe the point can be made different
22  ways, but if we see that in five years they have never used the
23  CVSA exam in a use of force investigation, it seems like the
24  Court deems that to be directly relevant, we believe it could
25  be relevant beyond that, but frankly, Your Honor, we can brief

1   that later.

2               But for purposes of now, if the City is willing -- if

3   the Court is willing to require the City to produce the CVSA

4   exams ever administered in a use of force case by OPS for the

5   past five years, I think that's going to tell us all a lot.

6               THE COURT:  Let me ask you this:  Are you looking

7   just for a log that indicates how many times they're used?

8               MR. STARKS:  I'm looking for a log that indicates how

9   many times they're used, which their SOP requires, and also the

10  result of the exam itself.  And it's because truthfulness is so

11  important that they're required to keep a log of every time

12  you've ever administered this exam.  And so I'm -- personally,

13  I'm fine with limiting that to give us in the use of force

14  context any time in the past five years preceding this shooting

15  incident when a CVSA exam was used by internal affairs, because

16  what I believe, based on what we've seen so far and the

17  testimony we've gotten, is that rarely, if ever.

18              And I think Mr. Williams' point is that you can have

19  officers be untruthful in ways other than just regarding their

20  use of force, that it might put you on notice that that is an

21  officer who might drive his car recklessly or do other things,

22  that if we don't stop him now, we're going to have somebody

23  who's going to violate somebody's rights through shooting them

24  or through some other means.

25              THE COURT:  So I disagree with the relevance of that,

 1 | Mr. Starks.  I don't think that you can make a *Monell* claim by
 2 | saying they didn't enforce one policy, which then led -- which
 3 | then created a situation where an officer would know that they
 4 | didn't have to comply with a second policy.  Unless what you're
 5 | showing is that they created a situation where you don't have
 6 | to follow any policies, I don't see how you can create what
 7 | you've just said.
 8 |         But let me just -- I don't think we need to address
 9 | that, though.  If there's a time when this becomes relevant, I
10 | want to see very good briefing on it.
11 |         MR. STARKS:  Okay.
12 |         THE COURT:  And it is apparent to me that both you,
13 | Mr. Starks, and Mr. Williams and Ms. Cherry and Ms. Miller all
14 | know a lot about this law.  And I will look forward to reading
15 | that brief.
16 |         But for right now, I think we ought to -- I think if
17 | you-all want to limit it in the way that you have said, that is
18 | appropriate.  Although, to be honest with you, the argument
19 | that I have found the most compelling in regards to this was
20 | the argument that you just made a minute ago when I said I
21 | didn't think it was a good argument.  And I think I was wrong.
22 | I think that if you were to show -- if you were to show that
23 | they never used the voice stress analysis and that that led
24 | officers to believe that it would not be used as part of an
25 | investigation, and therefore, they were more free to use

1   excessive force because they thought they could just lie about

2   it and not be put to a CVSA, that might be relevant to it.

3          MR. STARKS:  That's what we're saying.

4          THE COURT:  I'm not sure that that's what you said,

5   but maybe it is.

6          MR. STARKS:  You said it better than us.

7          THE COURT:  Well, you don't have to say that.  But in

8   me saying it -- maybe it was just in saying it that I caught

9   the relevance of what y'all were saying.

10         MR. WILLIAMS:  That's what I was trying to say,

11  Your Honor, but I didn't do it -- it's called the custom of

12  tolerance factor doctrine under *Monell*.

13         THE COURT:  Okay.  So I think that if you-all are

14  agreeing to limit 13 and 14 to use of force, for now, that

15  would do away with this issue.  And you can come back to it if

16  you need to in the future.

17         MR. WILLIAMS:  We are, Your Honor.

18         THE COURT:  But I just want to make it clear that I

19  now see your relevance.  So I take it that you're limiting it

20  because you think you can still get to where you want to get

21  that way.  I don't want to -- I don't want to, by my argument

22  of what is relevant and not relevant, cut you off on what you

23  needed to do.  I think I see the path that you're trying to

24  take.

25         MR. STARKS:  Right.  And we're only conceding it

1  because we do think that we can get there, but we may want to

2  come back later and have this fight.  But we think we have a

3  more direct way of making the point.

4          THE COURT:  Okay.  So now we've got a limit on 5, 6,

5  7, 13 and 14.  The bigger issue I think the City has is that

6  there are now over 100 requests for documents, 7,000 documents

7  that have been produced, and I think they want to know if we're

8  getting near the end.  And, if not, then they want the Court to

9  step in and establish some reasonable limitation.

10          MR. STARKS:  Your Honor, this is Mr. Starks.  We are

11  getting near the end.  We are also getting the benefit of what,

12  in essence, is going to be two for one, the very same discovery

13  because of the time period of the Brown incident and the Rogers

14  incident, the discovery will overlap, and so that's why, for

15  purposes of perfecting the record -- and we've done this

16  previously, we have yet -- we have yet another case with the

17  City where the discovery has overlapped with *Rogers*, and we've

18  said to them, and in their responses they've said these are the

19  documents we've given you already, and we're okay with that

20  because it's all the same information.

21          THE COURT:  No, I get it.  But they want to make sure

22  that it's almost over in this case.  They're not saying they

23  would like to do it in another case, they're saying they think

24  it's enough for both cases.

25          MS. CHERRY:  Your Honor, may I -- may the City be

1   heard on its requests?

2          THE COURT:  Yes.

3          MS. CHERRY:  Okay.  In our motion to the Court,

4   Your Honor, we responded to plaintiffs' counsels' statement

5   that they have no idea how many depositions they're going to

6   need in this case because they don't know how many may grow out

7   of other depositions.  So with that, we did ask the Court to

8   step in, because that's -- I mean, this could go on forever if

9   the plaintiff has no idea how many depositions beyond the 30

10  they've been allotted that they will need.

11         We'll ask the Court to enforce the 30 depositions and

12  unless plaintiffs' counsel can provide a compelling reason for

13  depositions beyond the 30, which will really give them 32,

14  because they will have Burns and our expert presumably, we

15  would ask the Court to enforce the 30 depositions and allow

16  discovery to close on the discovery date, which is June 16th.

17         THE COURT:  I don't plan on moving the discovery

18  date.  And I don't plan on changing Judge Batten's ruling of 30

19  depositions.  I think that gives them leave to seek additional,

20  if needed.  And they have to provide a basis for it.  We're not

21  there yet.  And we'll address that when it gets there.  But I'm

22  not going to --

23         MS. CHERRY:  Okay.

24         THE COURT:  -- right now do away with what I think

25  was a thoughtful order by Judge Batten.

1        MR. WILLIAMS:  And so to answer your question,

2   Your Honor, I think the original question is are we close to

3   the end?  Yes, Your Honor.  That's why this last batch was more

4   specific on what we were looking for pursuant to what we

5   understood we needed to proceed on our *Monell* claim as well as

6   information we've gotten in the recent depos.  So like -- as

7   relates to the deposition things, we're going to follow the

8   Court's order and if we get to 30 and we need something else,

9   we will tell the Court, we will inform the Court.  And if not,

10  then we'll be done.

11        The only thing that I think was always clear in the

12  hearings we had with Judge Batten, and I don't know if it was

13  clear in the order, we could not finish our *Monell* argument, so

14  we haven't identified an expert until we take Burns'

15  deposition.  So as long as we understand that discovery ends as

16  relates to everything else except Burns.

17        The point, though, is this, Your Honor, what if Burns

18  says something in his deposition about some supervisor that

19  told him this or said he should do it this way.  I would

20  suggest that I might be back to the Court and say that I didn't

21  know that until I took Burns' depo.  And that's the only other

22  caveat I can say.  I'm not here to try to take a bunch of depos

23  that's not necessary.  I'm paying for this.  So I'm not trying

24  to do that.

25        But I do know that it's unfair for me to completely

1 | finish discovery when I have the key witness that pulled the
2 | trigger that I haven't been able to depose because of a stay
3 | against him.  And I understand why.  But I just don't want to
4 | be locked in later to say when Burns says something about
5 | somebody or gives some information about somebody and I might
6 | need that depo or documents, I don't want them to say, well,
7 | discovery's closed now.  That's kind of the only issue.  And
8 | Judge Batten when we -- when I made that same point to the
9 | Judge, he said he understood that.  And that's the only caveat
10 | I have to say about that.

11 |        THE COURT:  Ms. Cherry, what do you say about that?
12 | Because that seems reasonable to me.

13 |        MS. CHERRY:  Your Honor, the City would have no
14 | objection to that if based off what Mr. Williams just said, if
15 | there is some evidence that is that critical and central to
16 | this case, of course the City would want that deposition as
17 | well, or at least to be present for that testimony.  So we
18 | would have no objection to that.  But we want to be mindful
19 | that there's a limit to this, that growing out of Burns'
20 | deposition won't be 30 or 40 more.

21 |        THE COURT:  I don't think that -- I hear you and I
22 | don't think that that's likely.  But the idea is that they
23 | would have deposed him at a time when there was reasonable
24 | follow-up, and I think we all agree that some amount of
25 | reasonable follow-up might be necessary.

1    What about, Ms. Cherry, their argument that they're

2 not going to give you their expert until after that deposition

3 and there's a real close of discovery?

4    MS. CHERRY:  Well, Your Honor, we'd like to -- we'd

5 like to hear an explanation as to why not.  Why not disclose

6 this expert that they often refer to, that they're relying on

7 his testimony?  Why not produce his CV and file that

8 information with the Court?

9    MR. WILLIAMS:  I'll tell you the same thing,

10 Your Honor, I told Judge Batten.  The way it's practically

11 supposed to work is why I objected to the stay, is I get to

12 take the officer's deposition, he gives me information and then

13 I do other discovery, that my expert gets it all, not only in

14 support of his claims against the officer but against the City.

15 It is paramount to this issue on *Monell* that I take the

16 shooter's deposition.  If I've never gotten to take his

17 deposition, my expert opinions are incomplete.

18    MS. CHERRY:  I agree with that, but why not disclose

19 it?

20    THE COURT:  Just his name?

21    MS. CHERRY:  Yes.

22    MR. WILLIAMS:  You just want his name?

23    MS. CHERRY:  His name and his CV, the information

24 that's required under Rule 26.

25    MR. WILLIAMS:  No.  No, Rule 26 requires way more

1  than that.

2          MS. CHERRY:  Under 26(f), I believe it is.  I don't

3  have my rule book in front of me.  The name and the CV.  I

4  don't see that that's an unreasonable request.

5          MR. WILLIAMS:  Your Honor, I don't have a problem

6  identifying the name and the CV.  But Rule 26 doesn't stop

7  there, so if we're -- let me finish.

8          MS. CHERRY:  We'll accept the name and the CV.

9          MR. WILLIAMS:  I don't have a problem with that,

10 Your Honor.  I'm not hiding the ball.  And I will tell

11 Your Honor most of these requests that I specifically asked

12 for, my expert has been saying I need to see this and why.  So

13 I'm fine with that.  I don't -- that's -- but it's -- I'm not

14 identifying the expert pursuant to Rule 26, because it requires

15 more than that.  It requires an expert report, it requires all

16 the documents he's relied upon and the basis of it.  As long as

17 I'm not having to do that, then I'm fine.  I'll send -- I don't

18 have any problem with that, Your Honor.

19         MS. CHERRY:  Okay.

20         THE COURT:  That's up to you-all.  I think that would

21 probably be a good idea to do, because it would remove one more

22 point of contention, just make sure that it's timely under

23 Rule 26.  I understand that, you know, you can't really do it

24 until all of the discovery is done.  I don't know what -- and I

25 have not looked before today at what's in the scheduling order

1   in regards to it, but I assume it's experts are disclosed with

2   an expert report sometime after the close of discovery?

3        MR. WILLIAMS:  And it is.  And that's kind of the

4   point.  This is why I wanted clarity.  We have two discovery

5   tracks here, there's a track as relates to the City of Atlanta

6   and then there is going to be a track when Burns finishes the

7   criminal case.  So when does discovery and my obligations

8   really start?  For example, at the end of discovery, and Judge

9   Batten agreed with us, but I don't know if the City is going to

10   not do this, if they file a motion for summary judgment, I

11   can't respond to it because I haven't taken the deposition.

12        And there may be other discovery after taking Burns'

13   deposition.  So the discovery end and the responsibility of an

14   expert report at the end of the discovery of June 16th, because

15   what Judge Batten told us is that he is just going to push it

16   out to the 16th, and we'll do a status report with the Court as

17   it relates to what's going on in the criminal case.

18        And then at that point, he will decide what to go

19   forward with.  And that's kind of -- that's what we've been

20   doing the last few months, Your Honor.  I don't -- I don't --

21        THE COURT:  I suspect that that's what Ms. Cherry

22   expects to happen.

23        MS. CHERRY:  Exactly, Your Honor.  It's in Item

24   Number 3 in the motion I filed.

25        THE COURT:  Yeah.

50

```
 1              MS. CHERRY:  That is a City request that a stay after
 2    June 16th until Burns may be deposed.  We've already --
 3              THE COURT:  Right.  Discovery won't close.
 4              MS. CHERRY:  -- filed that.
 5              THE COURT:  On the 16th, discovery will stop on the
 6    16th until Burns can be deposed, and any reasonable follow-up.
 7    Then discovery will close and you will have whatever other
 8    deadlines fall from the closing of discovery.
 9              MR. WILLIAMS:  Okay.
10              THE COURT:  That's what we all agree to?
11              MS. CHERRY:  Yes, thank you.  Your Honor, the City
12    accepts that as an order of the Court, what you just said, in
13    response to Number 3 of our motion.
14              MR. WILLIAMS:  Well, first of all, Your Honor, this
15    is the problem for me.  I didn't know there was a formal motion
16    filed, because there's procedural things I have to do if
17    there's a motion filed.  If Ms. Cherry keeps talking about a
18    motion, I don't have a docket where a motion was filed.  And if
19    a motion was formally filed, then I have a right to respond to
20    it pursuant to the rules.  That's not what my understanding is
21    of what's happened.
22              She sent an email and put a motion in it.  And that's
23    not what this Court asked us to do.  The Court asked us to
24    respond by email.  So is this considered a motion?  Because if
25    it is, I would like to respond to the motion.
```

```
1              THE COURT:  The City filed a motion at the same time,
2    but if you want to take some time to look at it, I think what
3    we have to say today is the expectation, and I think it is
4    consistent with your expectation, that the discovery will end
5    or will suspend as of the date set by Judge Batten unless
6    something else happens, and then what will happen later is
7    there will have to be some additional discovery done when
8    Mr. Burns or Officer Burns is available to be deposed.  Isn't
9    that what you anticipate, Mr. Williams?
10             MR. WILLIAMS:  Yes, Your Honor.  Yes, Your Honor that
11   is what I anticipate.
12             THE COURT:  Okay.  So I think that's what I
13   anticipate.  I think that's what we all ought to plan on.  If
14   there is something that I'm missing because we're going a
15   little further than I thought we were going to go today, then
16   we can address it at another time.
17             MR. WILLIAMS:  Thank you, Your Honor.
18             THE COURT:  Is that enough for your purposes,
19   Ms. Cherry?
20             MS. CHERRY:  Yes, it is, Your Honor.  And there is
21   nothing else from the City.  Our questions have been answered
22   during this call.
23             MR. WILLIAMS:  Your Honor, the only thing else from
24   the plaintiffs is this, we were certainly -- all of the
25   depositions we want to take, no more than 30 without coming
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  back to the Court, we're going to have those noticed one way or

2  another to be done before the discovery deadline.  There are

3  three of them that are outstanding, three or four are

4  outstanding now, three of whom are witnesses we're expecting

5  the City to produce.  And I don't -- I don't -- I think I may

6  have missed in the City's response when they're going to

7  produce those witnesses, when we just noticed them, that's

8  Sergeant Pearson, Jarrod Harrell, Christopher Kettel.  These

9  are folks that we requested March 5th, one of whom was

10  scheduled and then canceled.  So where do we go?  Do we just

11  re-notice them, pick dates ourselves or does the City tell us

12  when they can be made available?

13       MS. CHERRY:  Your Honor, the City will be more than

14  happy to schedule those dates.  And I personally don't think

15  that this scheduling is something that we should waste the

16  Court's time with.  I think the Court has spoken with respect

17  to scheduling resolving, and I think, Counsel, we can get that

18  done.

19       THE COURT:  Okay.  I don't doubt that.  If not, let

20  me know, but I think y'all ought to get those done.  And, you

21  know, let's get to the close of discovery on this.

22       MR. WILLIAMS:  Thank you very much, Judge.

23       MS. CHERRY:  Thank you, Judge.

24       THE COURT:  Okay, thank you.

25       MS. CHERRY:  Bye-bye.

1

2          (Whereupon, the proceedings were adjourned at 3:32

3  p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        REPORTERS CERTIFICATE

2

3

4            I, Jana B. Colter, Official Court Reporter for the

5   United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7            That I reported on the Stenograph machine the

8   proceedings held in chambers on April 24, 2018, in the matter

9   of MELVA ROGERS VS. CITY OF ATLANTA, ET AL AND ZABORA BROWN VS.

10  CITY OF ATLANTA, ET AL., Case Numbers 1:16-CV-02578 AND

11  1:17-CV-04850; that said proceedings in connection with the

12  hearing were reduced to typewritten form by me; and that the

13  foregoing transcript (53 Pages) is a true and accurate record

14  of the proceedings.

15            This the 10th day of May, 2018.

16

17

18

19                       _____
                         /s/ Jana B. Colter, FAPR, RMR, CRR, CRC
20                            Official Court Reporter

21

22

23

24

25
```