In The Matter Of:

# *Griffin vs. City of Atlanta*

Deposition Of:

# *Matthew Abad*

Taken On:

## *11/5/2020*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


TYLER GRIFFIN,

      Plaintiff,

 vs.                  Case No. 1:20-CV-02514-TWT


CITY OF ATLANTA, DONALD

VICKERS, MATTHEW ABAD and

JOHN DOE #1-5,


        Defendants.




REMOTE VIDEOTAPED DEPOSITION

of

MATTHEW ABAD

November 5, 2020

9:30 a.m.

Atlanta, Georgia

Lucy C. Rateau, CCR, RPR

Griffin vs. City of Atlanta                    Matthew Abad

```
 1                    INDEX OF EXHIBITS

 2

          Exhibit          Description              Page
 3

 4     Exhibit 1.1     Video clip                    33

 5     Exhibit 1.2     Video clip                    34

 6     Exhibit 1.3     Video clip                    46

 7     Exhibit 1.4     Video clip                    47

 8     Exhibit 2.2     Video clip                    51

 9     Exhibit 3.3     Video clips                   56

10     Exhibit 3.4     Video clip                    59

11     Exhibit 4.1     Video clip                    48

12     Exhibit 4.2     Video clip                    53

13     Exhibit 5.3     Video clip                    56

14

15

16

                  INDEX TO EXAMINATIONS         PAGE

17

18     By Mr. Kahn                                    4

19     By Ms. Parks                                  98

20     By Mr. Kahn                                  103

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL (via Zoom videoconference):

 2   On behalf of the Plaintiff:

 3          MATTHEW R. KAHN, ESQ.

 4          Butler Law Firm

 5          10 Lenox  Pointe, NE

 6          Atlanta, GA  30324

 7          404.587.8423

 8          matt@butlerfirm.com

 9

10   On behalf of the Defendants:

11          STACI MILLER, ESQ.

12          ALISHA MARIE S. NAIR, ESQ.

13          JACQUITA PARKS, ESQ.

14          City of Atlanta Law Department

15          55 Trinity Avenue SW

16          Suite 5000

17          Atlanta, GA  30303

18          404.330.6402

19          smiller@atlantaga.gov

20          amnair@atlantaga.gov

21          jparks@atlantaga.gov

22

23              (All counsel stipulated to the remote

24      swearing in of the witness due to the COVID-19

25      pandemic.)
```

```
 1                    MR. KAHN:  Good morning, Officer Abad.

 2          I guess we're recording.  We're good to go.

 3                    This will be the deposition of Defendant

 4          Matthew Abad taken pursuant to notice and

 5          agreement.  The deposition is taken in the case

 6          Tyler Griffin versus the City of Atlanta.

 7                 The deposition will be taken pursuant to

 8          the Federal Rules of Civil Procedure for all

 9          purposes permitted by the Rules, including use

10          at trial.  And the deposition is being taken on

11          Zoom because of the COVID pandemic.

12                    Madam Court Reporter, will you please swear

13          in the witness?

14                              MATTHEW ABAD

15   having been first duly sworn, was examined and

16   testified as follows:

17                              EXAMINATION

18   BY MR. KAHN:

19          Q.  Officer Abad, my name is Matt Kahn.  I

20   represent the Plaintiff, Tyler Griffin.  Do you know

21   why you're here today, sir?

22          A.  Yes, I do.

23          Q.  And why is it that you think you're here

24   today?

25          A.  Based on the incident between myself,
```

Griffin vs. City of Atlanta                    Matthew Abad

```
 1    Officer Vickers and Mr. Griffin.

 2        Q.  What is your full name?

 3        A.  Matthew Abad.

 4        Q.  And, Mr. Abad, where did you grow up?

 5        A.  I'm sorry.  Where did I grow up?

 6        Q.  Yes, sir.

 7        A.  Long Island, New York.

 8        Q.  When did you move down to Georgia?

 9        A.  In April 2016.

10        Q.  You went to high school in New York?

11        A.  Yes, sir.

12        Q.  Do you have a college degree, sir?

13        A.  I have an associate's degree.

14        Q.  And where is that from?

15        A.  Suffolk County Community College.

16        Q.  And what is that degree?  What is the focus

17    of that degree?

18        A.  Criminal justice.

19        Q.  Have you ever served in the military?

20        A.  No, sir.

21        Q.  Do you have any family members, that would

22    include direct family or other relatives, that are

23    above the age of 18 that live in the state of

24    Georgia?

25        A.  Just my wife.
```

```
1        Q.  And I usually give a little preface to

2    that.  The reason we ask that is so if this case

3    goes to trial and we have to pick a jury, we don't

4    want your cousin or your wife to be on the jury.  So

5    it's somewhat of an intrusive question, but it's

6    just something that we have to ask.

7            And so what is your wife's name, sir?

8        A.  Lauren Kane.

9        Q.  Are you currently employed by APD?

10       A.  Yes, sir, I am.

11       Q.  Were you suspended for any period of time

12   for the way that you treated Tyler Griffin?

13       A.  No, sir.  I believe my investigation is yet

14   to be closed.

15       Q.  No one from APD has told you the outcome of

16   any OPS investigation?

17       A.  Nothing official yet.

18       Q.  Have you heard anything informally or

19   unofficially?

20       A.  They said -- there were no specifics.  They

21   said it could be a few days, but they said we don't

22   know yet.

23       Q.  And just for clarity, when you say a few

24   days, that would be a few days suspension?

25       A.  Yes, sir.
```

Griffin vs. City of Atlanta                Matthew Abad                11/5/2020

```
 1         Q.  What is your current job title with APD?

 2         A.  Officer.

 3         Q.  And how long have you been with APD?

 4         A.  Four years sworn next month.

 5         Q.  Did you start with APD as a recruit?

 6         A.  Yes, sir, I did.

 7         Q.  And do you have any law enforcement

 8    experience pre-dating APD?

 9         A.  I do not.

10         Q.  What year did you graduate from Suffolk,

11    sir?

12         A.  2016.

13         Q.  Did you go straight to Suffolk from high

14    school?

15         A.  I did, and then I took a break and I came

16    back to finish it.

17         Q.  What did you do during the break from

18    school?

19         A.  I worked.

20         Q.  How long was the break?

21         A.  Maybe four years.

22         Q.  What sort of training do you have from the

23    policy academy?

24         A.  On my POST record I have -- I've posted

25    1,000 hours worth of training.  As far as
```

```
 1    specialized training, it would be DUI standardized

 2    field sobriety testing, a lot of family violence

 3    classes, things of that nature.

 4         Q.  Have you undergone use of force training?

 5         A.  Yes, sir, I have.

 6         Q.  Was SPO Patrick Fite your instructor on use

 7    of force?

 8         A.  I believe so.

 9         Q.  Do you know SPO Fite personally?

10         A.  I do.

11         Q.  Would you consider SPO Fite to be a friend?

12         A.  An acquaintance.

13         Q.  So you mentioned DUI training.  What's the

14    extent of your DUI training?

15         A.  It was a three-day course on learning and

16    understanding the effects of alcohol, how to notice

17    them, how to detect, clues leaning towards possible

18    impairment.

19         Q.  And so do you have training on how to

20    administer a field sobriety test?

21         A.  I do, sir.

22         Q.  Was that part of the three-day training or

23    is that something separate?

24         A.  It was part of the training.

25         Q.  Have you ever administered a field sobriety
```

1   test in the field?

2       **A.  Yes, sir, I have.**

3       Q.  How many would you say?

4       **A.  I'm not sure exactly.  Probably maybe**

5   **around 20.  Not a whole lot.**

6       Q.  If you saw another officer use excessive

7   force would you report them?

8       **A.  Yes, sir.**

9       Q.  In your career as a police officer have you

10  ever seen another officer use what you would

11  consider to be excessive force?

12      **A.  Not in my presence.**

13      Q.  Not in your presence.  Would that mean that

14  you have heard about excessive force used in your

15  career?

16      **A.  We hear -- when things get reported you**

17  **hear about it.  It travels around.**

18      Q.  Is that a common occurrence in the Atlanta

19  Police Department?

20      **A.  No, sir.  That's why it travels so well I**

21  **would guess.**

22      Q.  Have you ever testified in an official

23  proceeding that another officer used unreasonable

24  force?

25      **A.  I have not.**

```
 1          Q.  If you saw another officer violate a

 2     standard operating procedure, wouldn't you report

 3     that?

 4          A.  I would.

 5          Q.  In your career as a police officer have you

 6     ever seen another officer violate an SOP?

 7          A.  Nothing blatant that comes to my mind.

 8          Q.  Have you ever reported another officer for

 9     violating an SOP?

10          A.  No, I have not.

11          Q.  I guess just going back, so you said

12     nothing blatant.  Can you elaborate on that?  What

13     do you mean by that?

14          A.  When I say that I mean like nothing that I

15     can recall, nothing that I can think of.

16          Q.  Have you ever been deposed before?

17          A.  No, sir.

18          Q.  Have you ever been a party to a lawsuit

19     either as a plaintiff or defendant?

20          A.  Not before this.

21          Q.  Have you been a party to a lawsuit other

22     than this one?

23          A.  No, sir.

24          Q.  Excluding conversations with your lawyers

25     from the City of Atlanta, did you do anything to
```

Griffin vs. City of Atlanta                 Matthew Abad

```
 1    prepare for this deposition?
 2        A.  Yes, sir.
 3        Q.  What did you do?
 4        A.  I reviewed the video and information
 5    pertaining to this incident.
 6        Q.  When you say the video, what do you mean by
 7    that?
 8        A.  My body-worn camera footage.
 9        Q.  Did you review any of the other officers'
10    body-worn camera footage?
11        A.  Not entirely.  I watched parts of Donald
12    Vickers' body camera footage.
13        Q.  When was the last time you looked at your
14    body camera footage?
15        A.  I watched a clip from it this morning.
16        Q.  Which part of the video did you watch?
17        A.  The moment of initial contact between
18    myself and Mr. Griffin.
19        Q.  Did you watch any other parts of your
20    footage?
21        A.  This morning, no.  It was just the initial
22    contact up until I walked up to the vehicle -- I
23    walked up to a patrol vehicle.
24        Q.  So the video that you watched this morning
25    included the tackle by Donald Vickers?
```

```
 1          A.  Yes, sir.

 2          Q.  Have you reviewed the complaint that was

 3     filed in this case?

 4          A.  I'm not sure what you mean.

 5          Q.  So in civil litigation the parties file a

 6     lawsuit, and that's referred to as the complaint.

 7     Have you reviewed the lawsuit outlining the

 8     allegations against you in this case?

 9          A.  Yes, sir.

10          Q.  And when was the last time you looked at

11     that?

12          A.  Maybe a week ago.  It was before we did --

13     we were supposed to meet last time.

14          Q.  I see.  Okay.  And back to my previous

15     question.  In addition to the body camera footage

16     you mentioned other pertinent information that you

17     reviewed.  What would be included in the other

18     pertinent information that you reviewed?

19          A.  OPS information regarding my report.

20          Q.  And when was the last time you looked at

21     that?

22          A.  Maybe a couple of days ago.

23          Q.  Have you read any of the depositions in

24     this case?

25          A.  I have.
```

Griffin vs. City of Atlanta                    Matthew Abad

```
 1        Q.   Which depositions have you looked at?

 2        A.   Oh, I'm sorry.  Have I read depositions?

 3   No, I have not.

 4        Q.   I'm not trying to be aggressive, but what

 5   do you think I meant when I asked whether you had

 6   reviewed the depositions?

 7        A.   I thought you meant the -- I don't know

 8   what it's called, the packet with the lawsuit, like

 9   the --

10        Q.   Discovery?

11        A.   Yes, sir.

12        Q.   I got you.  All right.  Have you watched

13   any of the videos of the depositions?

14        A.   No, sir.

15        Q.   Are you aware of any of the testimony that

16   has been given in this case?

17        A.   No, sir.

18        Q.   Did you speak to Vickers after his

19   deposition?

20        A.   I did not.

21        Q.   Have you spoken to him at anytime between

22   right now and when his deposition was taken last

23   week?

24        A.   No, sir.

25        Q.   And have you communicated with him in any
```

1    way?  And that would include text messages or emails

2    or any instant messaging since his deposition?

3        **A.  I have not.**

4        Q.  Have you reviewed any of the discovery

5    responses in this case?  And that would be the

6    questions that we sent to you and the City of

7    Atlanta and those you and the other Defendants

8    submitted responses, have you reviewed any of those

9    responses?

10       **A.  I have reviewed mine.**

11       Q.  And I'm going to briefly share my screen

12   with you.  Can you see Plaintiff's Exhibit 26 on

13   your screen?

14       **A.  Yes, sir.**

15       Q.  And this is an 11-page document.  So I'm

16   just going to scroll through very quickly.  If at

17   any point you want me to stop or want to take a

18   closer look at it, just let me know, but I just want

19   to confirm that these are in fact your interrogatory

20   responses.

21           Does Plaintiff's Exhibit 26 appear to be

22   your responses to Plaintiff's interrogatories?

23       **A.  I wasn't able to read all of them, but it**

24   **looks like the same formatting as what I have.**

25       Q.  Have you seen this document before,

Griffin vs. City of Atlanta                    Matthew Abad

1    generally a document appearing to be this document?

2        **A.  Yes, sir, I believe so.**

3        Q.  Is there anything in your responses that

4    you need to correct as of today?

5        **A.  No, sir.**

6        Q.  Have you reviewed any of the City of

7    Atlanta's discovery responses?

8        **A.  I don't think -- I don't believe so.  I**

9    **don't believe I've read anything outside of my own.**

10       Q.  When you were reviewing the body camera

11   footage did you watch the part of the footage that

12   showed you making Mr. Griffin walk around on a

13   broken ankle?

14              MS. PARKS:  Objection.  You may answer.

15              MR. KAHN:  What is the basis of that

16       objection?

17              MS. PARKS:  It's an admission -- asking

18       for possible admission from Officer Abad.

19              MR. KAHN:  This is a deposition.  It's

20       been noted.  I'll rephrase the question or

21       re-ask the question.

22   BY MR. KAHN:

23       Q.  Have you seen the body camera footage where

24   you make Mr. Griffin walk around on a broken ankle?

25       **A.  Where I have requested -- when I initially**

```
 1    attempted to get him to stand up before I knew he

 2    was injured, yes.

 3         Q.  So it's your testimony today that you made

 4    him stand up before you knew he was injured?

 5         A.  Before he --

 6         Q.  I'm sorry.  That's not correct.  I just

 7    jumbled that up.  That's my mistake.

 8             No, never mind.  That is right.  You made

 9    him stand up before -- strike that.  I apologize.

10             Is it your testimony today that you made

11    him stand up before -- Mr. Griffin stand up before

12    you knew that he was injured?

13                MS. PARKS:  Objection.  Calls for

14         speculation.

15    BY MR. KAHN:

16         Q.  You can answer.

17             I'll ask the question again.  Is it your

18    testimony today that you made Mr. Griffin stand up

19    before you knew that his ankle was injured?

20         A.  Before I knew it was broken.

21         Q.  So you knew that it was injured at the time

22    you made him stand up?

23         A.  Yes, sir.

24         Q.  And you knew that it was injured at the

25    time that you made him walk around on it?
```

1    A.  I didn't -- no, I don't recall making him

2   walk around.

3        Q.  And we'll get to that in a little bit.

4            Besides your attorneys, did you speak with

5   anyone to prepare for today's deposition?

6        A.  No, sir.

7        Q.  In the early morning of April 5, 2019, what

8   was your assignment?  What were you doing out there

9   in west Atlanta?

10       A.  My assignment was on Zone 1 Field

11  Investigative Team.

12       Q.  What does that mean?

13       A.  We went out -- primarily they wanted us

14  looking for stolen vehicles.

15       Q.  Did you think that Mr. Griffin had stolen

16  the vehicle he was driving?

17       A.  Yes.

18       Q.  Did you run the plates?

19       A.  No, sir.

20       Q.  Isn't that something that you should do if

21  you're following a vehicle under the suspicion of it

22  being stolen?

23       A.  Well, what we were doing is we were

24  following it.  We were trying to get the tags ran.

25  We were in a vehicle that did not have a MDT in it,

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 19 of 125

Exhibit A
Griffin vs. City of Atlanta                Matthew Abad                          11/5/2020

 1    a computer in it.  We were trying to get it ran.

 2    And the suspicion was based off of his pattern of

 3    driving, which in my training and experience is

 4    common with a stolen vehicle.

 5        Q.  Don't you think that a police vehicle

 6    should be equipped with technology to allow you to

 7    run a tag if you're specifically looking for stolen

 8    vehicles?

 9        A.  I do; however, we were in an unmarked

10    vehicle, so essentially to blend in with the general

11    public.

12        Q.  And blend in meaning that the purpose of

13    the unmarked vehicle is so citizens do not know that

14    it is a police vehicle, correct?

15        A.  Yes, sir.

16        Q.  We'll get into the details of everything in

17    a second, but I would like to start by just asking

18    you what happened that night from the beginning to

19    the end.

20        A.  So we were driving on -- I believe it was

21    Chattahoochee Avenue, and Mr. Griffin was driving on

22    the wrong side of the road and almost made

23    head-to-head contact with us before he swerved back

24    over onto his correct side of the road.  Officer

25    Vickers was driving the vehicle.  We turned around

```
 1    and got behind him and we followed him up to Howell

 2    Mill at the light, where he went -- I can't recall

 3    the name of the street.  But it is a -- it's a

 4    one-way road.  He went up the one-way road.  We

 5    maintained visual contact with his vehicle.  He made

 6    a left hand turn.  We continued to trail him.  He

 7    drove across someone's -- I believe it was their

 8    driveway and down a small embankment into the

 9    neighboring house's yard, and that was where I

10    exited the vehicle wearing a mesh vest that had

11    bright yellow police lettering on it.  I began to

12    approach where Mr. Griffin had driven back into,

13    assuming still the vehicle was stolen.  And the

14    reason I got down there is because I thought he was

15    going to abandon the vehicle, and I was trying to

16    make contact.

17            I came down.  He was trying to come up the

18    driveway where it was his vehicle, me and another

19    vehicle, and I was alongside of a house.  Once I

20    finally caught up to his vehicle, I was shouting

21    "Atlanta Police".  I got to his vehicle.  He was not

22    cooperating, he was questioning me.  I had removed

23    him from the vehicle.  And at that time was when I

24    -- when I made contact with him I had noticed the

25    vehicle probably wasn't stolen, because I was able
```

```
 1    to smell the amount of alcohol on his breath, and

 2    having the training in DUI and field sobriety

 3    testing, I had removed him from the vehicle.  When

 4    he stepped out of the vehicle I had my hand on the

 5    -- I guess it would be the shoulder, right between

 6    the shoulder and the collar of his shirt so I could

 7    maintain contact with him.  And Mr. Griffin had

 8    moved my -- knocked my hand off of his shirt and he

 9    stated, "Don't hold me like that."

10            At that time Officer Vickers came down the

11    driveway and tackled Mr. Griffin.  After Mr. Griffin

12    was on the ground he stated his ankle was hurting.

13    I tried to stand him up.  He fell over.  At that

14    time I wasn't going to press that any further.

15    Other officers arrived.  And I had made my way up

16    the driveway so I could get the report started and

17    let Officer Vickers and the other responding

18    officers maintain contact with Mr. Griffin.

19        Q.  So when you first saw Mr. Griffin you and

20    Vickers both claim that he almost hit you head-on,

21    correct?

22        A.  Yes, sir.

23        Q.  But you don't have any evidence to prove

24    that, do you?

25        A.  I do not.
```

Griffin vs. City of Atlanta                  Matthew Abad

```
 1        Q.  There was no dash cam in the vehicle you

 2   were driving, right?

 3        A.  Correct.

 4        Q.  So the only proof that you have is the word

 5   of two officers that are being sued in federal court

 6   for police brutality, correct?

 7        A.  Yes, sir.

 8        Q.  And on the night in question you were in an

 9   unmarked police car, right?

10        A.  This is true.

11        Q.  What was the make and model of that

12   vehicle?

13        A.  I want to say it was a Nissan Rogue, I

14   believe.

15        Q.  And that vehicle was not equipped with

16   police lights?

17        A.  Correct.

18        Q.  And the vehicle was not equipped with a

19   siren either, right?

20        A.  Correct.

21        Q.  In fact, there were no markings on the

22   vehicle to indicate that the vehicle was a police

23   vehicle, right?

24        A.  Correct.

25        Q.  Why didn't you pull Mr. Griffin over after
```

Griffin vs. City of Atlanta                    Matthew Abad                              11/5/2020

```
 1    he allegedly almost hit you head-on?

 2         A.  I'm sorry?

 3         Q.  Why didn't you pull Mr. Griffin over after

 4    he allegedly almost hit you head-on?

 5         A.  We didn't have lights or sirens equipped on

 6    the vehicle to pull him over.

 7         Q.  So what was the plan then in following him?

 8         A.  It was to get a unit to come out and pull

 9    him over.

10         Q.  Is there a reason that you didn't wait for

11    the unit to get there before you approached the

12    vehicle?

13         A.  I did not want -- while I believed the

14    vehicle was stolen, I did not want the suspect to

15    escape, and the best way to prevent that would be if

16    I were to make the initial contact.

17         Q.  Would you agree that police vehicles are

18    required to be marked so citizens can identify the

19    vehicle as a police vehicle?

20         A.  When you ask that question do you mean all

21    vehicles utilized by the Police Department?

22         Q.  I'm referring to like a marked police

23    vehicle.

24         A.  Oh, yes, sir.

25         Q.  And that's just common sense, right?
```

Griffin vs. City of Atlanta                  Matthew Abad                    11/5/2020

```
 1        A.   Correct.

 2        Q.   The police report that I believe you

 3   authored claimed that Mr. Griffin drove off of a

 4   ledge that was approximately four feet high, didn't

 5   it?

 6        A.   I didn't measure it.  Looking at it, that's

 7   what I would, if I were to guess, it would be about

 8   four feet.

 9        Q.   Did you actually observe Mr. Griffin drive

10   over any ledge?

11        A.   I did.

12        Q.   How did you see that?

13        A.   We were behind him and he -- there's a stop

14   sign at the intersection right in front of where the

15   house is, and he continued straight which ended him

16   into somebody's front yard, and he veered right and

17   that's where the ledge was.

18        Q.   So you actually saw him veer right and go

19   over the ledge?

20        A.   Yes, sir.

21        Q.   So do you disagree with Vickers' testimony

22   then that the homeowner's car blocked the view from

23   your all's vehicle?

24        A.   Yes, I disagree with that.

25        Q.   That testimony is not true?
```

1      **A.   I was able to see that car go down the**

2   **ledge.**

3      Q.   Is there any video footage showing that?

4      **A.   No, sir.**

5      Q.   So, again, the only proof of that is your

6   testimony?

7      **A.   And the damage on his vehicle which I**

8   **believe would be from him driving over that ledge.**

9      Q.   And I believe you said this, but you did

10   not measure the height of that ledge?

11     **A.   Correct.**

12     Q.   So the ledge could be less than four feet,

13   correct?

14     **A.   It's possible.**

15     Q.   Do you agree with Defendant Vickers'

16   testimony that there's, quote, a good possibility,

17   end quote, that Mr. Griffin hurt his ankle before he

18   even got out of the car?

19          MS. PARKS:   Objection.   You may answer.

20   BY MR. KAHN:

21     Q.   I'm going to restate the question so we can

22   have a clean record.

23          Do you agree with Vickers' testimony that

24   there's, quote, a good possibility, end quote, that

25   Mr. Griffin hurt his ankle before he even got out of

```
 1    the car?

 2                    MS. PARKS:  Objection.

 3         A.  Yes, sir.

 4    BY MR. KAHN:

 5         Q.  Do you know the details about Mr. Griffin's

 6    injuries?

 7         A.  I do not.

 8         Q.  You don't know his injuries?

 9         A.  Well, I don't know the full extent of it.

10    I'm aware he had a broken ankle.

11         Q.  Let me pull up an exhibit.  Can you see

12    Plaintiff's Exhibit 30.1 on your screen?

13         A.  Yes, sir.

14         Q.  Before right now have you ever seen

15    Plaintiff's Exhibit 30.1, which is a preop x-ray of

16    Mr. Griffin's ankle after the tackle?

17         A.  I believe I have, yes, sir.

18         Q.  Do you see any broken bones in Plaintiff's

19    Exhibit 30.1?

20         A.  I do.

21         Q.  Now can you see Plaintiff Exhibit 30, which

22    is an x-ray scan after Mr. Griffin had surgery?

23         A.  Yes, sir.

24         Q.  And do you see the 10 screws that are in

25    his ankle and leg?
```

1      A.  Yes, sir.

2      Q.  Do you really think driving off of a ledge

3   did that?

4           MS. PARKS:  Objection.  You may answer,

5        Officer Abad, if you have personal knowledge.

6      A.  I'm not sure.  I don't know.  I mean it's

7   possible.

8   BY MR. KAHN:

9      Q.  I'm not asking you for a medical opinion.

10   I'm asking you for your personal common sense

11   opinion, whether you think driving off of a tiny

12   ledge that you saw could do that to a man's ankle?

13           MS. PARKS:  Objection.  You may answer,

14        Officer Abad, if you have personal knowledge.

15      A.  I mean, like I said, it's possible.  I

16   believe it could be possible.

17   BY MR. KAHN:

18      Q.  Vickers stayed by the car while you

19   approached Mr. Griffin, correct?

20      A.  Yes, sir.

21      Q.  Do you know what Vickers was doing by the

22   car?

23      A.  I do not.  I'm assuming radioing for other

24   units.

25      Q.  And Vickers stopped the car right at the

```
 1    intersection of Buchanan and Bellemeade, correct?

 2        A.  Yes, sir.

 3        Q.  Could you see the bottom of the driveway

 4    from your all's car?

 5        A.  From where the car was, I'm not sure from

 6    where he was -- where I exited the vehicle I don't

 7    believe I was able to see the bottom of the

 8    driveway.

 9        Q.  And that's because there was a car blocking

10    the view of the bottom of the driveway, wasn't

11    there?

12        A.  Correct.

13        Q.  After you exited your unmarked police

14    vehicle, at what point did you first see Mr.

15    Griffin's car?

16        A.  As soon as I got around that front vehicle

17    that was in the driveway I saw him coming up.

18        Q.  And what did you see?

19        A.  Mr. Griffin trying to come up out of the

20    driveway even though he was blocked in.

21        Q.  Were you aiming your pistol at Mr.

22    Griffin's car?

23        A.  I had the firearm in the low ready

24    position, which is lower than the target.  I don't

25    mean to use the word target so much as I do
```

1    **potential threat.**

2        Q.  Why did you have your gun pointed at Mr.

3    Griffin?

4        **A.  Because in my experience, while I still**

5    **believed that it was a stolen vehicle, with stolen**

6    **vehicles you tend to find a firearm or someone in**

7    **possession of a firearm.**

8        Q.  Isn't it true that you're not supposed to

9    point a gun at a citizen unless you be justified in

10   shooting that citizen?

11       **A.  That is correct, which is why I had the**

12   **firearm at a low ready position.**

13       Q.  Do you think it would have been all right

14   for you to shoot Mr. Griffin while you had your gun

15   pointed at him?

16            MS. PARKS:  Objection.  You may answer,

17       Officer Abad.

18       **A.  Well, I had the firearm at the low ready**

19   **position.  No, I don't think it was justified to**

20   **fire.**

21   BY MR. KAHN:

22       Q.  Did you grab Mr. Griffin by the shirt when

23   he got out of the car?

24       **A.  Yes, sir.**

25       Q.  Why did you do that?

```
 1            A.   Just so I could maintain contact with him

 2      initially so that he would -- I could gain some

 3      level of (Zoom audio drop) to make sure he's not

 4      going to attempt to flee, get away, to hang on to

 5      him.  His level of intoxication, I didn't know how

 6      he would be on his feet, so I was hanging on to him.

 7            Q.   Was it absolutely necessary for you to grab

 8      Mr. Griffin?

 9            A.   Yes, sir.

10            Q.   Would it have been possible for you to ask

11      Mr. Griffin what he was doing without grabbing him?

12            A.   It's possible to ask that question, yes.

13            Q.   So why did you choose to use physical force

14      instead of words?

15            A.   Because I was maintaining contact with him.

16      Him being intoxicated by the amount that I smelled,

17      I was attempting to hold on to him to prevent him

18      from making the choice of if he wanted to flee or if

19      he was intoxicated to the point that he wasn't able

20      to stand on his own two feet, that I would be able

21      to hopefully hold him up or prevent him from falling

22      over, which has happened on DUI calls before.

23            Q.   Did you do a field sobriety test in this

24      case?

25            A.   I did not.
```

1      Q.  Did you do a Breathalyzer in this case?

2      **A.  I did not.**

3      Q.  So, once again, the only evidence that you

4   have that he was intoxicated is your testimony?

5      **A.  That is correct.**

6      Q.  Were you scared when Mr. Griffin brushed

7   your hand off of his shoulder?

8      **A.  No, sir.**

9      Q.  You weren't afraid that he was going to

10  hurt you?

11     **A.  No, sir.**

12     Q.  Vickers thought that you looked scared

13  though, didn't he?

14     **A.  I don't know how Mr. Officer Vickers felt.**

15     Q.  When did you first see Vickers come up?

16     **A.  I'm sorry?**

17     Q.  When did you first see Mr. Vickers, Officer

18  Vickers approach you and Mr. Griffin?

19     **A.  Pretty much at the time of contact, when**

20  **Officer Vickers and Mr. Griffin were making contact.**

21     Q.  Did you know Mr. Griffin's ankle was hurt

22  after Vickers tackled him?

23     **A.  Not until he said something.**

24     Q.  Did you ever call an ambulance to come

25  check on Mr. Griffin?

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 32 of 125

Exhibit A
Griffin vs. City of Atlanta                Matthew Abad                    11/5/2020

```
 1        A.   Personally, I did not.

 2        Q.   Are you aware of anyone else that did call

 3   an ambulance?

 4        A.   I'm not sure.

 5        Q.   Well, did an ambulance show up to the scene

 6   of the arrest?

 7        A.   No, sir.

 8        Q.   So then no one called an ambulance, right?

 9        A.   I would assume.

10        Q.   Why not?  Why didn't anyone call an

11   ambulance?

12        A.   I'm sorry?

13        Q.   I want to rephrase that question.  Why

14   didn't you call an ambulance?

15        A.   The reason that I didn't was -- after

16   contact was made and other officers arrived on the

17   scene, I allowed them to handle Mr. Griffin and deal

18   with that as I went to go and handle the paperwork

19   side.

20        Q.   Will you agree that it was obvious that Mr.

21   Griffin was in pain as you made him walk around?

22             MS. PARKS:  Objection.  You may answer,

23        Officer Abad.

24        A.   Was it obvious that he was in pain was the

25   question?
```

```
 1    BY MR. KAHN:

 2         Q.  Will you agree that it was obvious that Mr.

 3    Griffin was in pain as you made him walk around?

 4         A.  Yes, sir.

 5         Q.  Is there a reason you made Mr. Griffin walk

 6    around while he was clearly in pain?

 7         A.  When he was saying his ankle hurt, I didn't

 8    know the extent of his pain.  Everybody has a

 9    different level of pain tolerance.  If I knew his

10    ankle was broken I would definitely not have had him

11    stand up on it.  I didn't know if he would be able

12    to get up the driveway or not.

13         Q.  Isn't that why officers are supposed to

14    call medical professionals to come check on a

15    citizen when they claim to be injured?

16         A.  If we called an ambulance every single time

17    someone initially believes there is an issue, the

18    wait times would be out of control.  A lot of times

19    -- sometimes -- I'm trying to think of how to word

20    this the right way.  If something is hurt or feels

21    hurt, it's not broken, so you get him out of this

22    guy's backyard and up to the front of the driveway

23    where we can have him checked out.  If it was

24    broken, if we knew it was broken, obviously I would

25    have handled it differently.  I did not know.
```

```
 1        Q.  Well, I want to show you some video clips

 2   and ask you some questions.  I'm going to share my

 3   screen with you.

 4        The first video is going to be marked

 5   Plaintiff's Exhibit 1.1.

 6              (Exhibit 1.1 marked.)

 7              MR. KAHN:  If you'll give me one second.

 8    Sorry.

 9   BY MR. KAHN:

10        Q.  Can you see Plaintiff's Exhibit 1.1 on your

11   screen?

12        A.  Yes, sir.

13        Q.  I'll play that video.

14              (Video playing.)

15        Were you doing a Google search for DUI law

16   in that video?

17        A.  There's the national standard for how field

18   sobriety testing is supposed to be done in order.

19   I've always double-checked that I'm doing everything

20   in the correct order before it's done.

21        Q.  You're a police officer, right?

22        A.  That is correct.

23        Q.  Why is it that you had to Google DUI law?

24        A.  Better safe than sorry, to double-check

25   everything you do.  You can't know every single law
```

1    like the back of your hand.  DUI law is very, very,

2    specific.

3        Q.  Would you be comfortable if your house was

4    on fire and the firefighter was Googling how to put

5    out a fire on the way to your house?

6            MS. PARKS:  Objection.  You may answer,

7         Officer Abad.

8        A.  Well, I would think if they have to Google

9    it, I would assume they would be doing it right.

10   BY MR. KAHN:

11       Q.  What would you think if you saw me Google

12   how to take a deposition?

13           MS. PARKS:  Objection.  You may answer,

14        Officer Abad.

15       A.  I would think that you would be

16   double-checking your work and making sure you're

17   doing it correctly.

18   BY MR. KAHN:

19       Q.  I'm going to show you another video that's

20   been marked as Plaintiff's Exhibit 1.2.  Can you see

21   the exhibit on your screen?

22       A.  Yes, sir.

23           (Exhibit 1.2 marked.)

24           (Video playing.)

25       Q.  Sir, do you think that you did anything

1    wrong in Plaintiff's Exhibit 1.2?

2        **A.  No, sir.**

3        Q.  Do you think it was okay to aim your pistol

4    at Mr. Griffin?

5        **A.  Are you referring to when I was approaching**

6    **the vehicle?**

7        Q.  Yes, sir.

8        **A.  I do.**

9        Q.  But didn't you agree earlier that it

10   wouldn't have been okay to shoot Mr. Griffin?

11       **A.  What I meant when I said I do -- that's why**

12   **I went to correct it and I left it.  I was aiming it**

13   **towards the vehicle, because you could hear him**

14   **accelerating the vehicle.  I wasn't sure if he was**

15   **attempting to hit me with the car.**

16       Q.  Do you think that the Atlanta Police

17   Department encourages police officers to act the way

18   that you did in Plaintiff's Exhibit 1.2?

19              MS. PARKS:  Objection.  You may answer

20        Officer Abad.

21       **A.  I believe so.**

22   BY MR. KAHN:

23       Q.  Do they teach you to point loaded weapons

24   at citizens at the Police Academy?

25              MS. PARKS:  Objection.  You may answer,

```
 1          Officer Abad.

 2          A.  Depending on the level of threat, yes, sir.

 3     BY MR. KAHN:

 4          Q.  Is there a reason that you grabbed Mr.

 5     Griffin and pulled him towards you?

 6          A.  When coming out of the vehicle?

 7          Q.  Yes, sir.

 8          A.  To remove him from the vehicle.

 9          Q.  Was he not getting out of the vehicle

10     himself?

11          A.  No.  That's why I had to reach into the

12     vehicle to unlock it and opened the door myself.

13          Q.  I want to show you this clip, another clip

14     one more time from the same exhibit.

15               (Video playing.)

16               Was Mr. Griffin not getting out of the

17     vehicle before you grabbed him?

18          A.  At that time, yes.

19          Q.  So then why did you grab him?

20          A.  As I said before, to maintain contact,

21     prevent him from -- based on his level of

22     intoxication, so he doesn't fall over or he doesn't

23     make the decision to attempt to flee.

24          Q.  So you're claiming that in the few seconds

25     between the time that he opened the door and you
```

Griffin vs. City of Atlanta                    Matthew Abad

```
 1    grabbed him that you were able to do an analysis and

 2    determine that he was intoxicated?  Is that what

 3    you're saying?

 4         A.  Based on what I was smelling.  How

 5    typically we work is I would smell it, which would

 6    be the first clue towards some level of alcohol

 7    involvement, and after that would be the

 8    standardized field sobriety testing.

 9         Q.  Are police officers allowed to grab

10    citizens and pull them for whatever reason the

11    police officer deems appropriate?

12         A.  If there's a suspicion of a crime, yes,

13    sir.

14         Q.  Did you tell Mr. Griffin why he was being

15    removed from his car at gunpoint?

16         A.  Not prior to, no.

17         Q.  Did you try to stop Vickers from tackling

18    Mr. Griffin?

19         A.  No.

20         Q.  You were facing Vickers as he approached,

21    weren't you?

22         A.  My body was facing toward that angle, yes,

23    sir.

24         Q.  You could have waved your hand to show

25    Vickers that everything was fine, couldn't you?
```

```
 1          A.  I could have.

 2          Q.  But you did not do that, right?

 3          A.  I did not.

 4          Q.  And you could have said, hey, Vickers,

 5     everything is good, right?

 6          A.  It's possible, yes, sir.

 7          Q.  But you didn't do that either, did you?

 8          A.  No, sir.

 9          Q.  Do you think that Vickers did anything

10     wrong in Plaintiff's Exhibit 1.2?

11               MS. PARKS:  Objection.  You may answer,

12          Officer Abad.

13               MR. KAHN:  What's the basis of that

14          objection?

15               MS. PARKS:  I'm sorry?

16               MR. KAHN:  What's the basis of that

17          objection so I can cure the question to the

18          extent there is a problem with it.

19               MS. PARKS:  It calls for speculation as

20          to what Vickers was thinking.

21               MR. KAHN:  My question wasn't at all

22          what Vickers was thinking.

23     BY MR. KAHN:

24          Q.  My question was whether you, Officer Abad,

25     think that Vickers did anything wrong.  It's what
```

```
 1    you think.

 2              MR. KAHN:  So your objection is noted.

 3        I'll ask the question again.

 4    BY MR. KAHN:

 5        Q.  Do you think that Vickers did anything

 6    wrong in Plaintiff's Exhibit 1.2?

 7        A.  As long as he was acting in good faith, I

 8    think not.

 9        Q.  So you think that it was okay for Vickers

10    to tackle Mr. Griffin?

11        A.  Based on his -- if he was -- once again, if

12    he was acting in good faith, if he was perceiving a

13    level of threat, then it would be deemed

14    appropriate.

15        Q.  Do you think that a reasonably prudent

16    police officer would have tackled Mr. Griffin?

17        A.  Yes.  Once again, based on their

18    perception, if they're acting within good faith,

19    then yes.

20        Q.  When Mr. Griffin got out of the car he put

21    his weight on his left foot, didn't he?

22        A.  I don't know.  I do not recall.

23        Q.  Let's take a look at the video again.  This

24    is Plaintiff's Exhibit 1.2.

25              (Video playing.)
```

```
 1          Q.  Now, sir, isn't it true when Mr. Griffin

 2     got out of his car he put his weight on his left

 3     foot?

 4          A.  Yes, sir.

 5          Q.  Did you hear Mr. Griffin cry out in pain as

 6     he got out of the car?

 7          A.  No, sir.

 8          Q.  Did you hear Mr. Griffin complain about his

 9     ankle hurting as he got out of the car?

10          A.  No, sir.

11          Q.  He didn't do any of that, did he?

12          A.  No, sir.

13          Q.  Mr. Griffin was standing up when he got out

14     of the car, wasn't he?

15          A.  Yes, sir.

16          Q.  And he didn't have any trouble standing up

17     before Vickers tackled him, did he?

18          A.  No, sir.

19          Q.  Did you hear Mr. Griffin slurring his words

20     at anytime before Vickers tackled him?

21          A.  I don't recall much slurring, no, sir.

22          Q.  That's because he wasn't slurring his

23     words, right?

24          A.  Yes, sir.

25          Q.  Did you hear Mr. Griffin scream out in pain
```

```
 1    as Vickers tackled him in Plaintiff's Exhibit 1.2?

 2         A.  Yes, sir.

 3         Q.  How do you think Mr. Griffin hurt his

 4    ankle?

 5              MS. PARKS:  Objection.  You may answer,

 6         Officer Abad.

 7         A.  I'm not entirely sure.

 8    BY MR. KAHN:

 9         Q.  Do you think that the fracture, the broken

10    bone that we looked at in Plaintiff's Exhibit 30.1

11    was existing at the time that Mr. Griffin got out of

12    the car?

13              MS. PARKS:  Objection.  You may answer,

14         Officer Abad.

15         A.  I'm not sure.

16    BY MR. KAHN:

17         Q.  Do you think that if the fracture that we

18    looked at in Plaintiff's 30.1 was in fact there

19    before he got out of the car, that he would have

20    cried out in pain when he put his entire bodyweight

21    on that foot when he got out of the car?

22              MS. PARKS:  Objection.  You may answer,

23         Officer Abad.

24         A.  Could you ask that question one more time?

25    BY MR. KAHN:
```

```
 1        Q.  Sure.  And let me pull the exhibit up for

 2   you so you can reference that.

 3             Can you see Plaintiff's Exhibit 30.1 on

 4   your screen?

 5        A.  Yes.

 6        Q.  Now if Mr. Griffin's ankle looked like

 7   that, like it does in Plaintiff's Exhibit 30.1 at

 8   the time he put his entire bodyweight on it to get

 9   out of the car, don't you think that he would have

10   made some sort of indication that he was in pain?

11             MS. PARKS:  Objection.  You may answer,

12        Officer Abad.

13        A.  It's possible, yes, sir.

14   BY MR. KAHN:

15        Q.  I mean this is just a matter of common

16   sense, right?  If a man or woman steps on that

17   injury that you're looking at in Exhibit 30.1, it's

18   going to hurt and you're going to know they're in

19   pain; isn't that true?

20             MS. PARKS:  Objection.  You may answer,

21        Officer Abad.

22        A.  I would assume they would make it known.

23   BY MR. KAHN:

24        Q.  As we sit here today do you think Vickers

25   was completely justified in tackling Mr. Griffin?
```

1      **A.  As long as he was acting in good faith,**

2      **yes, sir, I do.**

3      Q.  What if he was not acting in good faith,

4      how does that change your decision?

5      **A.  Well, if he was not acting in good faith,**

6      **then I don't think that that was good.**

7      Q.  What is your understanding of the

8      distinction between an objective belief and a

9      subjective belief?

10      **A.  I'm not sure.**

11      Q.  Don't they teach that at the policy

12      academy?

13              MS. PARKS:  Objection.  You may answer,

14          Officer Abad, if you have personal knowledge.

15      **A.  They may.**

16  BY MR. KAHN:

17      Q.  Isn't it true that police officers are

18      taught, including yourself, at the policy academy

19      that the subjective belief that force is necessary

20      alone is not justified the use of force?

21              MS. PARKS:  Objection.  You may answer

22          if you have personal knowledge, Officer Abad.

23      **A.  I don't recall that exact lesson.**

24  BY MR. KAHN:

25      Q.  Are police officers taught to tackle folks

```
1    like that at the policy academy?

2              MS. PARKS:  Objection.  You may answer

3         if you have personal knowledge.

4         A.  I believe there are take-down maneuvers

5    we're taught.

6              MR. KAHN:  I want to put this on the

7         record, every question that I ask Officer Abad

8         is for his personal knowledge, so it's not

9         necessary or proper for you to instruct him

10        that he can answer if he has personal

11        knowledge.  That's a given.  If he has personal

12        knowledge he will answer, so I would like to

13        request that you stop making these speaking

14        objections.

15             MS. PARKS:  I will guide my client as I

16        need to through my objections.  They were not

17        speaking objections.  I am advising him to go

18        ahead and answer the question once I make the

19        objection.

20   BY MR. KAHN:

21        Q.  Sir, were you taught to tackle folks like

22   Vickers did in Exhibit 1.2 at the policy academy?

23             MS. PARKS:  Objection.  You may answer,

24        Officer Abad.

25        A.  I recall that specific take-down.
```

```
 1   BY MR. KAHN:

 2       Q.  Do you think there's anything that Vickers

 3   could have done other than tackle Mr. Griffin?

 4       A.  I am not sure, sir.  From his angle it's

 5   hard to speak from his perspective.

 6       Q.  The question is whether there's anything he

 7   could have done in the realm of possibilities?  Is

 8   there anything else that he could have done other

 9   than tackling Mr. Griffin, or was that the only

10   option?

11           MS. PARKS:  Objection.  You may answer.

12       A.  In the realm of possibilities, yes, sir.

13   BY MR. KAHN:

14       Q.  Do you think it would have been possible

15   for Vickers to ask you if you needed help?

16       A.  It's possible he could have.

17       Q.  Do you think that Vickers should have done

18   things differently?

19       A.  Knowing what we know now, hindsight being

20   20/20, yes.

21       Q.  Do you think that you should have done

22   things differently?

23       A.  Knowing what we know now, it would have

24   been -- I mean, yeah, things could have gone a lot

25   differently if we knew everything we know.
```

```
 1    BY MR. KAHN:

 2        Q.  At what point did you read Mr. Griffin his

 3    Miranda Rights?

 4        A.  I'm not sure.

 5        Q.  But you didn't read them to him, did you?

 6        A.  I don't believe so.

 7        Q.  Now Vickers claimed that he tackled Mr.

 8    Griffin because he felt Mr. Griffin was resisting,

 9    correct?

10        A.  Yes, sir.

11        Q.  I want to show you another exhibit.  This

12    is going to be marked as Plaintiff's Exhibit 1.3.

13              (Exhibit 1.3 marked.)

14    Can you see 1.3 on your screen, sir?

15        A.  Yes, sir.

16              (Video playing.)

17        Q.  Plaintiff Exhibit 1.3 shows Mr. Griffin

18    brushed your hand away and said, "Wait a minute.

19    Hold on."  Correct?

20        A.  Correct.

21        Q.  Isn't it true that Vickers didn't start

22    charging at Mr. Griffin until after he brushed your

23    hand away and was standing completely still?

24        A.  Yes, sir.

25        Q.  I'm going to show another exhibit marked as
```

```
 1   Plaintiff Exhibit 1.4.

 2              (Exhibit 1.4 marked.)

 3   BY MR. KAHN:

 4      Q.  Can you see Plaintiff's Exhibit 1.4 on your

 5   screen?

 6      A.  I can.

 7              (Video playing).

 8      Q.  Did you hear Mr. Griffin say, "I can't move

 9   my leg", end quote?

10      A.  I didn't hear that.  If you could play it

11   again.

12      Q.  Sure.

13              (Video playing).

14      Q.  Were you able to hear Mr. Griffin say, "I

15   can't move my leg"?

16      A.  Yes, sir.

17      Q.  And then did you hear when you asked Mr.

18   Griffin if his leg was broken, and Mr. Griffin

19   responded, quote, "I mean you guys hurt it", end

20   quote.

21      A.  I heard that, yes, sir.

22      Q.  Did you hear Mr. Griffin slur his words

23   when he said, "I can't move my leg"?

24      A.  No, sir.

25      Q.  That's because he was not slurring his
```

| | |
|---|---|
| 1 | words, correct? |
| 2 | **A.  Yes, sir.** |
| 3 | Q.  Did you hear Mr. Griffin slur his words |
| 4 | when he said, "I mean you guys hurt it"? |
| 5 | **A.  That's correct, sir.** |
| 6 | Q.  And that's because he was not slurring his |
| 7 | words there either, right? |
| 8 | **A.  Correct.** |
| 9 | Q.  I'm going to show another exhibit that's |
| 10 | been marked as Plaintiff Exhibit 4.1. |
| 11 | (Exhibit 4.1 marked.) |
| 12 | Sir, can you see Plaintiff's Exhibit 4.1 on |
| 13 | your screen. |
| 14 | **A.  I can.** |
| 15 | Q.  Do you agree that in Plaintiff's Exhibit |
| 16 | 4.1 you made Mr. Griffin stand up and walk? |
| 17 | **A.  I wasn't intending to make him walk.  It** |
| 18 | **looks like more he was trying to gain his balance.** |
| 19 | **Because I wasn't escorting; I was standing.** |
| 20 | Q.  Let me show you a clip from that exhibit |
| 21 | again. |
| 22 | (Video playing). |
| 23 | Is it your testimony that you were not |
| 24 | leading Mr. Griffin toward the end of the driveway? |
| 25 | **A.  We did move, yes, it does look like we** |

```
 1    moved a couple of feet.  I didn't catch that the

 2    first time.  Yes, sir.

 3         Q.  So I'll ask the question again.  Isn't it

 4    true that in Plaintiff's Exhibit 4.1 you made Mr.

 5    Griffin stand up and walk?

 6         A.  Yes, sir.

 7         Q.  It looked like Mr. Griffin was in pain in

 8    Exhibit 4.1, didn't it?

 9         A.  It did.

10         Q.  Did you call an ambulance after it was

11    clear that Mr. Griffin couldn't walk?

12         A.  I did not.

13         Q.  None of the police officers called an

14    ambulance, did they?

15         A.  I believe not.

16         Q.  Now in Plaintiff's Exhibit 4.1 do you think

17    that you did anything wrong?

18         A.  Based on what we just saw?  That was the

19    video you just showed, correct?

20         Q.  Yes, sir.

21         A.  No, sir.

22         Q.  So is it okay for a police officer to make

23    a seriously injured citizen walk around on a broken

24    ankle?

25              MS. PARKS:  Objection.  You may answer.
```

```
 1          A.   I mean I didn't force him to walk any

 2     further than we did.   I didn't force him back up on

 3     his feet after understanding the extent of his

 4     injury; no, I did not force him to walk around any

 5     further.

 6     BY MR. KAHN:

 7          Q.   Sir, the question was whether or not it's

 8     okay for police officers to make a seriously injured

 9     citizen walk around on a broken ankle?

10          A.   I'm sorry.   No --

11               MS. PARKS:   Objection.   You may answer,

12          Officer Abad.

13          A.   I'm sorry.   No, it's not okay.

14     BY MR. KAHN:

15          Q.   I'm going to redo that just so we have a

16     clean record.   Just so you know, sir, the court

17     reporter is taking down all of the words that we're

18     saying, we're speaking, and so when we speak over

19     each other sometimes it creates a difficult

20     transcript and it's just choppy.   So I'm not trying

21     to agitate you; I just want to have a clean record.

22          A.   Okay.

23          Q.   So the question was, is whether or not it's

24     okay for police officers to make a seriously injured

25     citizen walk around on a broken ankle?
```

```
 1              MS. PARKS:  Objection.  You may answer.

 2         A.  No, it is not okay.

 3    BY MR. KAHN:

 4         Q.  I'm going to show you a clip that's been

 5    marked as Plaintiff Exhibit 2.2.

 6              (Exhibit 2.2 marked.)

 7              (Video playing.)

 8         Did you hear where the other officer said,

 9    "He's got a lot of weight on it."  And Vickers

10    responded, "Just a little bit"?

11         A.  I did.

12         Q.  Vickers was joking about Mr. Griffin's

13    weight, wasn't he?

14              MS. PARKS:  Objection.

15    BY MR. KAHN:

16         Q.  Do you think that Vickers was joking about

17    Mr. Griffin's weight?

18              MS. PARKS:  Objection.  Calls for

19         speculation.  You may answer, Officer Abad.

20         A.  Yes.

21    BY MR. KAHN:

22         Q.  Is it okay for a police officer to make fun

23    of a citizen's weight?

24         A.  No, sir.

25         Q.  Does APD tolerate that sort of behavior?
```

1        **A.  No, sir.**

2        Q.  Do you think that's a good look for the

3    Police Department?

4        **A.  I do not.**

5        Q.  Now did you hear where Vickers was talking

6    to another officer and said, quote, "I did like 50",

7    end quote, and then he said, quote, "There's the

8    skid marks", end quote?

9        **A.  I heard it.**

10        Q.  Isn't it true that Vickers was bragging to

11    another officer about tackling Mr. Griffin?

12              MS. PARKS:  Objection.  You may answer.

13        **A.  Yes, sir.**

14    BY MR. KAHN:

15        Q.  And Vickers laughed after that, didn't he?

16        **A.  He did, sir.**

17        Q.  Do you think there is anything funny about

18    what happened here?

19        **A.  I do not.**

20        Q.  Is it okay for a police officer to laugh at

21    a citizen that he's seriously injured?

22              MS. PARKS:  Objection.  You may answer.

23        **A.  No, sir.**

24    BY MR. KAHN:

25        Q.  Just give me one second here.  I'm going to

Griffin vs. City of Atlanta                    Matthew Abad

1    show you another clip from the same exhibit, which

2    is Plaintiff's Exhibit 2.2.

3                (Video playing.)

4        Q.   Did you hear where Vickers said, "We're

5    laughing because you fell pretty hard after pushing

6    an officer, man.   I find that funny, man."

7        **A.   I did, sir.**

8        Q.   And that's not funny either, is it?   Do you

9    find that funny?

10       **A.   No, sir.**

11       Q.   Do you think that Vickers' conduct in

12   Plaintiff's Exhibit 2.2, the video that we just

13   watched, is okay?

14       **A.   No, sir.**

15       Q.   Let me show you another exhibit that's been

16   marked as Plaintiff's Exhibit 4.2.

17                (Exhibit 4.2 marked.)

18            Can you see Plaintiff's Exhibit 4.2 on your

19   screen.

20       **A.   I can, sir.**

21                (Video playing).

22       Q.   Do you hear when Vickers told Mr. Griffin,

23   quote, "You're such a little girl right now", end

24   quote?

25       **A.   Yes, sir.**

Exhibit A

Griffin vs. City of Atlanta                    Matthew Abad                    11/5/2020

```
 1          Q.  Is it okay for a police officer to hurt a

 2     citizen and then insult them?

 3               MS. PARKS:  Objection.  You may answer.

 4          A.  No, sir.

 5     BY MR. KAHN:

 6          Q.  That's exactly what Vickers did though,

 7     isn't it?

 8          A.  Yes, sir.

 9          Q.  Did you hear Vickers and the other officer

10     laughing and joking about Mr. Griffin?

11          A.  Yes, sir.

12          Q.  Does the policy academy teach recruits to

13     mock injured citizens?

14               MS. PARKS:  Objection.  You may answer.

15          A.  No, sir.

16     BY MR. KAHN:

17          Q.  That's not okay, is it?

18          A.  No, sir.

19          Q.  Why did Vickers make Mr. Griffin try to

20     walk after seeing how much pain he was in when you

21     tried to make him walk?

22               MS. PARKS:  Objection.  You may answer.

23          A.  I'm not sure how to answer that, sir.

24     BY MR. KAHN:

25          Q.  Well, let me ask you this.  Earlier you
```

```
 1   were saying that Vickers would have been justified

 2   if he was acting in good faith, right?

 3        A.  Correct.

 4        Q.  Do you think that anything that you just

 5   saw in Plaintiff's Exhibit 4.2 and in Plaintiff's

 6   2.2 was in good faith?

 7        A.  No, sir, when I said that I was referring

 8   to the take-down.

 9        Q.  Sure.  But does the conduct that you just

10   watched, do you think that someone that behaves like

11   that is behaving in good faith?

12        A.  At that time, no, sir.

13        Q.  And even after Mr. Griffin fell, again in

14   Plaintiff's Exhibit 4.2, you didn't call an

15   ambulance; isn't that right?

16        A.  I wasn't down there at that time.

17        Q.  Vickers didn't call an ambulance, did he?

18        A.  No, sir.

19             MS. PARKS:  Objection.  You may answer

20        if you have personal knowledge.

21        A.  No, sir.

22   BY MR. KAHN:

23        Q.  Do you think that Vickers should have

24   called an ambulance after seeing how much pain Mr.

25   Griffin was in?
```

Griffin vs. City of Atlanta                    Matthew Abad

```
1          A.  Yes, sir.

2          Q.  I'll show another clip that's been marked

3     as Plaintiff's Exhibit 3.3.

4                    (Exhibit 3.3 marked.)

5                    (Video playing.)

6          Q.  What's that vehicle called that Vickers was

7     trying to shove Mr. Griffin in?

8          A.  It's a transport van, sir.

9          Q.  And did you see the other officer grabbed

10    Mr. Griffin by the left ankle?

11         A.  Yes, sir.

12         Q.  And then did you see Vickers handle Mr.

13    Griffin's left ankle after that?

14         A.  Yes, sir.

15         Q.  Is there anything wrong with the way that

16    those police officers behaved in Plaintiff's Exhibit

17    3.3?

18                    MS. PARKS:  Objection.  You may answer.

19         A.  Yes, sir.

20    BY MR. KAHN:

21         Q.  I'm going to show you another video that's

22    been marked as Plaintiff Exhibit 5.3.

23                    (Exhibit 5.3 marked.)

24         Sir, did you hear yourself say, quote, "I damn

25    near shot him"?
```

1      A.  Yes, sir.

2      Q.  And did you hear yourself say, quote, "I

3  was about two seconds from putting bullets in his

4  window"?

5      A.  Yes, sir.

6      Q.  Why did you say those things?

7      **A.  In the hypothetical situation if I was hit**

8  **by a car, when was accelerating, if I'm struck by a**

9  **vehicle I'm going to do whatever I can to get that**

10  **to stop.**

11      Q.  Let's say you had put bullets into his

12  window when you had your gun pointed at him, do you

13  think you would have been justified in doing that?

14      **A.  Like I said, in the hypothetical situation,**

15  **if I was struck by the vehicle and I was pinned by**

16  **the vehicle, then, yes, I believe so.**

17      Q.  Sure.  I'm not asking you about any

18  hypothetical scenario.  I'm asking about the actual

19  scenario that you were in.

20      **A.  No.**

21      Q.  Had you put bullets in his window, that

22  would have been murder, right?

23      **A.  Yes, sir.**

24      Q.  Do those sound like the words of a police

25  officer that has respect for human life?

```
 1              MS. PARKS:  Objection.

 2              MR. KAHN:  What's the basis of that

 3         objection?  Those were his own words.

 4              MS. PARKS:  It is in the form of asking

 5         for an admission.

 6              MR. KAHN:  This is his deposition.  I'm

 7         allowed to ask him to admit things.

 8              MS. PARKS:  And I am objecting on the

 9         record.  You may answer, Officer Abad.

10    BY MR. KAHN:

11         Q.  Do those sound like the words of a police

12    officer who has respect for human life?

13              MS. PARKS:  Objection.  You may answer.

14         A.  Yes, sir.

15    BY MR. KAHN:

16         Q.  After the incident on April 5th did you

17    speak with Vickers about what happened?

18         A.  After the incident?  Yes, sir.

19         Q.  Did either of you speculate that Mr.

20    Griffin might make a complaint?

21         A.  Not that I can recall.

22         Q.  Did you ever send text messages to Vickers

23    about what happened with Mr. Griffin?

24         A.  I don't believe we texted about it.  We

25    work in the same office.  We mostly spoke about work
```

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 60 of 125

Exhibit A
Griffin vs. City of Atlanta                    Matthew Abad                         11/5/2020

1    **in person.**

2        Q.  Did you meet with Vickers at anytime before

3    the OPS interviews to talk about what happened on

4    April 5th?

5        **A.  No, sir.**

6        Q.  Did you meet with Vickers at anytime after

7    the OPS interviews to talk about what happened?

8        **A.  No, sir.**

9        Q.  At anytime has Vickers asked you to testify

10   a certain way in this case?

11       **A.  No, sir.**

12       Q.  At anytime has Vickers asked you to say

13   something a specific way to OPS?

14       **A.  No, sir.**

15       Q.  I want to show you another video clip.

16   It's going to be marked as Plaintiff's Exhibit 3.4.

17               (Exhibit 3.4 marked.)

18       Did you hear Vickers say, quote, "He's the

19   biggest dramatic person I've ever seen", end quote?

20       **A.  Yes, sir.**

21       Q.  And Vickers was talking about Mr. Griffin,

22   right?

23       **A.  Yes, sir.**

24       Q.  And then you said, quote, "Oh my God, dude.

25   My only concern about with all that...", end quote,

Griffin vs. City of Atlanta                 Matthew Abad

```
 1    and then the camera cuts off, right?

 2         A.  Yes, sir.

 3         Q.  What did you say after the camera cut off?

 4         A.  I don't know.  I do not recall.

 5         Q.  What was your concern about what happened?

 6         A.  I don't remember what I was saying.  I had

 7    a lot of concerns.  I just recall being frustrated

 8    at that time, sir.

 9         Q.  Did that conversation occur before or after

10    you authored and submitted the police report?

11         A.  I'm not sure if it had been submitted at

12    that particular time.

13         Q.  At that moment in time did you think that

14    Vickers did something wrong?

15         A.  No, sir.

16         Q.  Were you concerned that Mr. Griffin might

17    complain about the use of excessive force at that

18    time?

19         A.  I didn't think so.

20              MS. PARKS:  Objection.  You may answer.

21    BY MR. KAHN:

22         Q.  Were you concerned that Mr. Griffin was

23    going to complain about the use of excessive force

24    at that time?

25              MS. PARKS:  Objection.  You may answer.
```

Exhibit A

Griffin vs. City of Atlanta                    Matthew Abad                    11/5/2020

```
 1        A.  I didn't think so, sir.

 2   BY MR. KAHN:

 3        Q.  Did you and Vickers ever try and come up

 4   with a plan to minimize the fallout from that

 5   incident?

 6        A.  No, sir.

 7        Q.  I want to ask you a few specific questions

 8   about the police report, if you'll give me just a

 9   minute to pull it up.  I guess, first, you prepared

10   the police report, didn't you?

11        A.  I did, sir.

12        Q.  Can you see Plaintiff's Exhibit 48 on your

13   screen?

14        A.  I can.

15        Q.  Can you see a page -- let me actually --

16   can you see the highlighted text on Plaintiff's

17   Exhibit 48 that says Mr. Griffin, quote, was having

18   difficulty maintaining balance on his own as he was

19   leaning onto Abad's arm that was holding his shirt

20   to assist him in balancing"?

21        A.  Yes, sir.

22        Q.  We watched that video of all this today,

23   didn't we?

24        A.  We did.

25        Q.  And before Vickers tackled him -- before
```

```
1    Vickers tackled Mr. Griffin, he had no trouble

2    maintaining his balance, did he?

3         A.  When I was wording that, what I was

4    referring to was I was holding on to him.  I felt

5    him leaning -- he was leaning into me.  He wasn't

6    holding on to me.  He wasn't swaying is what I was

7    meaning.

8         Q.  Wasn't he leaning toward you because you

9    pulled him out of the car?

10        A.  It's possible.

11        Q.  So the highlighted part of the police

12   report is false, isn't it?

13        A.  I don't believe so.  I wouldn't make it

14   false.

15        Q.  Do you think that Mr. Griffin was leaning

16   into your arm?

17        A.  Yes; yes, sir.

18        Q.  And he was leaning forward because you

19   pulled him toward you, right?

20        A.  For that initial -- I wasn't pulling him as

21   much as I was holding on to him.

22        Q.  We'll move on.

23             Were you investigated by the Office of

24   Professional Standards for the way that you treated

25   Mr. Griffin?
```

1      A.  Yes, sir.

2      Q.  What violations were involved in your

3  investigation?

4      A.  It was -- I don't recall the wording.  I

5  think it was failure of -- I can't think of what

6  it's called.  I'm drawing a blank.  Failure to act

7  appropriately I believe is what it was.

8      Q.  I guess -- I'm less concerned -- and we'll

9  go through the report.  I'm less concerned with the

10  official title of the violations.  Just to clarify,

11  I'm asking more about like what conduct was the

12  subject of the investigation.

13      A.  My conduct, they were asking about an

14  ambulance, I believe was the big focus on my end.

15      Q.  And when you say asking about the

16  ambulance, that would be the failure to call an

17  ambulance for a seriously injured citizen, correct?

18      A.  Yes, sir.

19      Q.  I'm going to pull up an exhibit.  Bear with

20  me for just a moment.  Let me try this.  For some

21  reason it's not showing up.

22          Can you see Plaintiff's Exhibit 42 on your

23  screen?

24      A.  Yes, sir.

25      Q.  I do want to ask you about your

| | |
|---|---|
| 1 | investigation, but I want to ask a few questions |
| 2 | about your opinion about Vickers.  Do you see |
| 3 | Plaintiff's Exhibit 42, there's the heading that |
| 4 | says Investigative Disposition? |
| 5 | **A.  Yes, sir.** |
| 6 | Q.  And the first category lists all of the |
| 7 | violations for Donald Vickers? |
| 8 | **A.  Yes, sir.** |
| 9 | Q.  And then if you see on Plaintiff's Exhibit |
| 10 | 42 it says that Donald Vickers was exonerated for |
| 11 | his use of force.  Do you see that? |
| 12 | **A.  I do.** |
| 13 | Q.  Do you agree with that finding? |
| 14 | **A.  Yes, sir.** |
| 15 | Q.  Have you heard the testimony of other |
| 16 | police officers regarding Vickers' use of force? |
| 17 | **A.  Pertaining to this incident?** |
| 18 | Q.  Yes, sir. |
| 19 | **A.  No, I have not, sir.** |
| 20 | Q.  Have you heard Investigator Nixon's |
| 21 | testimony on behalf of the City of Atlanta that the |
| 22 | force Vickers used against Mr. Griffin was |
| 23 | excessive? |
| 24 | MS. PARKS:  Objection.  You may answer. |
| 25 | BY MR. KAHN: |

```
 1        Q.  Let's take a look at his testimony.  Do you

 2    see the first page of what appears to be a 30(b)(6)

 3    deposition of Arthur Nixon?

 4        A.  I do.

 5        Q.  And do you see it's highlighted?  Do you

 6    see where it says, "Do you think there's anything

 7    wrong with the way Defendant Vickers acted in

 8    Plaintiff's Exhibit 1.2."  And Investigator Nixon

 9    responds yes?

10        A.  I do.

11        Q.  What do you think about that?

12              MS. PARKS:  Objection.

13              MR. KAHN:  What's the basis of that

14         objection?

15              MS. PARKS:  Objection as to form.

16         You're not stating exactly what you're asking

17         him regarding this testimony.

18              MR. KAHN:  I'll rephrase the question

19         so Officer Abad can understand.

20    BY MR. KAHN:

21        Q.  And the question is, sir, what do you think

22    about Investigator Nixon's testimony on behalf of

23    the City of Atlanta that Donald Vickers did

24    something wrong in Plaintiff's Exhibit 1.2?

25        A.  I think it looks like Investigator Nixon is
```

1    **saying what he would have done rather than what was**

2    **done wrong.**

3         Q.  Let's focus on this testimony we just

4    talked about.  What do you think -- so the question

5    is what do you think about Investigator Nixon's

6    testimony on behalf of the City of Atlanta that

7    Donald Vickers did something wrong in Plaintiff's

8    Exhibit 1.2?

9         **A.  I think that he said he found something**

10   **wrong.**

11        Q.  Do you think that the jury should listen to

12   Investigator Nixon?

13             MS. PARKS:  Objection.  You may answer,

14        Officer Abad.

15        **A.  Should they listen to him?  Yes, sir.**

16   BY MR. KAHN:

17        Q.  Have you heard SPO Fite's testimony on

18   behalf of the City of Atlanta that the force Vickers

19   used against Mr. Griffin was not justified?

20        **A.  I did not.**

21        Q.  Can you see the cover page of what appears

22   to be the 30(b)(6) deposition of Officer Fite?

23        **A.  Yes, sir.**

24        Q.  This testimony is on two separate pages, so

25   I'm going to have to just flip it.  But do you see

1    where it says, quote, "So I'm going to ask the

2    question again.  That was an answer, but I don't

3    think it answered my question.  And that's based on

4    what you saw Mr. Fite, was the use of force

5    justified in the video?"

6          And then SPO Fite testifies on behalf of

7    the City of Atlanta, "From what I saw I wouldn't

8    think so."  Do you see that?

9    **A.  I do, sir.**

10   Q.  What do you think about SPO Fite's

11   testimony, the APD's use of force instructor, that

12   Donald Vickers was not justified in his use of

13   force?

14   **A.  I think SPO Fite is educated on this topic**

15   **enough to teach it.**

16   Q.  Do you agree with SPO Fite?

17   **A.  I mean I'm not sure how to answer that.  I**

18   **figure if he was...  I'm sorry.**

19   Q.  Let me ask it this way.  Let me pull this

20   up.  Do you think that SPO Fite's testimony that

21   you're looking at, that Vickers used excessive

22   force, do you think that he's wrong about that?

23   **A.  I think SPO Fite would know the specifics**

24   **on what would be right and wrong better than I**

25   **would.  I would like to know further specifically**

```
 1   what could have been wrong.

 2        Q.  So I guess the short answer is you would

 3   defer to SPO Fite's opinion; is that correct?

 4        A.  Yes, sir.

 5        Q.  Do you have any idea why Vickers was

 6   exonerated if two senior-ranking officials,

 7   including the person who investigated him and the

 8   person who trained him on the use of force thought

 9   that the force was not justified?

10             MS. PARKS:  Objection.  You may answer.

11        A.  I'm not sure.

12   BY MR. KAHN:

13        Q.  That's pretty puzzling, isn't it?

14        A.  Yes, sir.

15        Q.  Do you find it problematic that two

16   senior-ranking officers, including the person who

17   investigated Vickers and the person who trained

18   Vickers on the use of force thought that Vickers'

19   force was excessive but Vickers wasn't punished for

20   that force?

21             MS. PARKS:  Objection.  You may answer.

22        A.  Yes, sir.

23   BY MR. KAHN:

24        Q.  Why is that problematic?

25        A.  If there's an issue it should be addressed.
```

```
 1          Q.  Would you agree that if these issues are

 2    not addressed then police officers can use force

 3    with impunity?

 4          A.  Yes, sir.

 5          Q.  Let's look at your investigation.  Can you

 6    see Plaintiff's Exhibit 42 on your screen again?

 7          A.  Yes, sir.

 8          Q.  So, first, it looks like you were sustained

 9    for violating the rule on reporting when force is

10    used.  Does that look right to you?

11          A.  Yes, sir.

12          Q.  And do you agree with that finding?

13          A.  I do.

14          Q.  And that means that you failed to report

15    that Vickers used force against Mr. Griffin, doesn't

16    it?

17          A.  Yes, sir.  I failed to -- the SOP was

18    supposed to contact the supervisor, and I failed to

19    do so.

20          Q.  Why didn't you report it?

21          A.  It just -- It didn't register in my head to

22    think of it.

23          Q.  Were you trying to protect Vickers?

24          A.  No, sir.  It just didn't come to my head.

25    When I have made contact I've always made the call.
```

Griffin vs. City of Atlanta                    Matthew Abad

```
 1    When someone else did, that's just how my thought

 2    process went.  Like I said, it was my slip-up.

 3        Q.  The next violation, it says that you are

 4    sustained for unsatisfactory performance, right?

 5        A.  Yes, sir.

 6        Q.  And do you agree with that finding?

 7        A.  I do.  I think there are things I could

 8    have corrected.

 9        Q.  We're going to flip to page two.  Do you

10    see the highlighted text that says, "Griffin swiped

11    Abad's hand around and Abad kind of froze and looked

12    kind of shocked."

13        A.  Yes, sir.

14        Q.  Did you freeze when Mr. Griffin brushed

15    your hand away?

16        A.  I did not freeze.  I do not think I froze.

17        Q.  And we already covered this, but you were

18    not scared when Mr. Griffin brushed your hand away,

19    were you?

20        A.  That is correct, I was not.

21        Q.  Let me ask this.  If Vickers is willing to

22    put something that is not true into his OPS

23    investigation, how are we supposed to believe

24    anything that he says in this case?

25            MS. PARKS:  Objection.  You may answer.
```

Griffin vs. City of Atlanta                    Matthew Abad

```
 1        A.  If that was his perception that I froze, I

 2   mean I don't know how to really respond to that,

 3   honestly.

 4   BY MR. KAHN:

 5        Q.  Well, do you think that Vickers might have

 6   said that to justify tackling Mr. Griffin?

 7             MS. PARKS:  Objection.  You may answer.

 8        A.  I'm not sure.  It's possible.

 9   BY MR. KAHN:

10        Q.  I mean we're sitting here today and you're

11   telling me that you were not scared and you did not

12   freeze, right?

13        A.  That's correct.

14        Q.  We're going to flip to page three.  Do you

15   see the highlighted text that says, "Uh, we were as

16   curious as possible", end quote?

17        A.  I do, sir.

18        Q.  Is that true?

19        A.  No, sir.

20        Q.  And that's because you were not as

21   courteous as possible, correct?

22        A.  That's correct.

23        Q.  Do you think it was courteous to make Mr.

24   Griffin walk around on a broken ankle?

25             MS. PARKS:  Objection.  You may answer.
```

Griffin vs. City of Atlanta                     Matthew Abad

1      **A.   No, it wasn't courteous to do so.   I did**

2   **not know his ankle was broken.   I didn't know the**

3   **extent of his injury.**

4      Q.   Was it courteous to shove Mr. Griffin into

5   the back of the prisoner transport wagon instead of

6   an ambulance?

7      **A.   No, it was not.**

8      Q.   Flip to page six.   Do you see the

9   highlighted text that says, "Officer Abad does not

10  advise him that SPO Vickers tackled Mr. Griffin,

11  that Mr. Griffen was complaining of an injury that

12  occurred during the arrest or that Mr. Griffin was

13  in need of medical attention.   Officer Abad's

14  incident report does not describe the exact use of

15  force that was employed by SPO Vickers."

16     **A.   I see that.**

17     Q.   Why didn't you tell anyone that Mr. Griffin

18  was seriously injured?

19     **A.   I didn't know the extent of the injury.   I**

20  **didn't know if he was seriously injured and his**

21  **ankle was broken.**

22     Q.   That wasn't obvious to you based on

23  watching him fall down and cry out in pain?

24     **A.   That I would assume it was broken, no.   In**

25  **my experience I haven't been around many people with**

1    broken bones.  I'm not super familiar with enough to

2    say this is a common reaction with a bodily injury.

3        Q.  You see the highlight text that says,

4    "Officer Abad's multiple failures during this

5    incident, as indicated, placed him in clear

6    violation of APD SOP 2010, Work Rules, 4.2.37"?

7        A.  Yes, sir.

8        Q.  And that violation was your failure to call

9    an ambulance for Mr. Griffin, correct?

10       A.  That is correct.

11       Q.  Surely you were suspended for this abuse of

12   Mr. Griffin, right?

13           MS. PARKS:  Objection.  You may answer.

14       A.  Not yet.

15   BY MR. KAHN:

16       Q.  We're here now about a year and a half

17   after the incident and you still haven't been

18   suspended?

19       A.  I have my actual meeting on the 12th, which

20   I believe to be involved with this.

21       Q.  So the first meeting that the City of

22   Atlanta is having with you on your conduct from

23   April 5, 2019 is going to be on November 12, 2020;

24   is that right?

25       A.  Outside of OPS, that is correct.

```
 1        Q.  I want to get through your disciplinary

 2    worksheet.  Can you see Plaintiff's Exhibit 47 on

 3    your screen?

 4        A.  Yes, sir.  Is this something that you've

 5    seen before, Plaintiff's Exhibit 47?

 6        Q.  Have you ever seen a document similar to

 7    this in any other context?

 8        A.  I've spoken with my lieutenant regarding --

 9    Lieutenant Albertini that's on here -- regarding the

10    incident, and he had me waiting the reprimanding.  I

11    haven't seen this form though, no.

12        Q.  I'm sorry.  I wasn't able to hear what you

13    said about the reprimand.  Would you mind repeating

14    that, sir?

15        A.  That's what I'm waiting on.  That's what

16    I'm waiting on.  I have not yet seen this form, no.

17        Q.  Thank you.  Do you see where it says Rule

18    4.2.51?

19        A.  I do.

20        Q.  That was for failing to report the use of

21    force, correct?

22        A.  Correct.

23        Q.  And then the recommended action was OA.  Do

24    you see that?

25        A.  I do.
```

```
 1        Q.  And OA is an abbreviation for an oral

 2   admonishment, right?

 3        A.  Correct.

 4        Q.  What happens during an oral admonishment?

 5        A.  During an oral admonishment, from my

 6   understanding -- I don't have much history with OPS.

 7   I typically try to stay out of trouble.  But an oral

 8   admonishment is when you sit down and you review the

 9   SOP which was violated and understand what was done

10   wrong, and you're advised not to do so again; and if

11   it is repeated there is a heightened offense for

12   repeating (audio drop).

13        Q.  Let me break away for a second and ask you

14   this.  Do you have any understanding of Vickers'

15   extensive OPS disciplinary history?

16        A.  I've heard about it.

17        Q.  What do you think about that?

18             MS. PARKS:  Objection.  You may answer.

19   BY MR. KAHN:

20        Q.  I'll rephrase.  What do you think about

21   Officer Vickers' extensive OPS disciplinary history?

22             MS. PARKS:  Objection.  You may answer.

23        A.  That it's not good.  (Inaudible)

24   BY MR. KAHN:

25        Q.  Go ahead.  Sorry.  I didn't mean to
```

Exhibit A
11/5/2020

Griffin vs. City of Atlanta                    Matthew Abad

```
 1    interrupt you.

 2         A.  I apologize.  It's not a good history.

 3         Q.  Do you find it problematic that the City of

 4    Atlanta has officers on the force that have

 5    disciplinary histories that extensive?

 6              MS. PARKS:  Objection.  You may answer.

 7         A.  I do, sir.

 8    BY MR. KAHN:

 9         Q.  Did you know -- I guess were you -- were

10    you Vickers' partner?  What is the classification of

11    your work relationship to Vickers at the time of the

12    incident?

13         A.  We were -- yes, we were partners.  We were

14    assigned to ride together.

15         Q.  How long did you work with him before that

16    night in question?

17         A.  As his partner?

18         Q.  Yes, sir.

19         A.  I would say probably a few months maybe,

20    not a long period of time.

21         Q.  And then how long did you work with Vickers

22    after the incident?

23         A.  Shortly after that incident was when I had

24    gone to my current assignment of APEX.

25         Q.  Were you aware of Officer Vickers' OPS
```

```
 1   history at the time of the incident?

 2        A.  I wasn't aware of the -- I've heard that

 3   he's had an OPS history.  I don't know the

 4   truthfulness behind it.  I don't know the extent of

 5   it.  I don't know his actual exonerations, what he's

 6   been sustained on.  I don't know all of that.  I

 7   just heard that he's been through OPS several times.

 8        Q.  I guess, did it make you anxious to know

 9   that you were being partnered with someone with a

10   disciplinary history like that?

11        A.  Being someone who typically makes, I would

12   say, good choices, I felt confident in myself.

13        Q.  But did it make you anxious, like were you

14   -- when you found out that -- when you learned of

15   his history and you knew that you were going to be

16   his partner, did it make you like worried that you

17   were going to have to deal with that sort of

18   behavior?

19             MS. PARKS:  Objection.  Objection as to

20        form.

21   BY MR. KAHN:

22        Q.  Sir, do you need me to repeat the question?

23        A.  Oh.  Yes.  I'm sorry.

24        Q.  No worries.  You're totally fine.  Let me

25   just try to remember what the question was.
```

```
 1              So the question was, when you learned about

 2     Vickers' history, OPS history, and you learned that

 3     you were going to be his partner, did it make you

 4     nervous that you would have to deal with the conduct

 5     that was described in the OPS history?

 6              MS. PARKS:  Objection as to form.  You

 7          may answer, Officer Abad.

 8         A.  I don't think I was so much nervous about

 9     it as much as I thought that it wasn't going -- you

10     just assume or hope nothing would happy, I guess I

11     would word it.  I didn't expect something that would

12     happen of this magnitude in general.

13     BY MR. KAHN:

14         Q.  Does Vickers have a reputation among the

15     City of Atlanta Police Department?

16         A.  To be completely honest, not that I'm aware

17     of.  I tend to kind of do my thing, go to work.  I

18     had my own beat.  I did my own thing, and I went

19     home.  I try to avoid any sort of trouble.

20         Q.  Have you ever heard anyone mention that

21     Vickers is a hot-head or has a hot temper or

22     anything like that?

23         A.  Not regarding temper, no.

24         Q.  Have you heard any rumors or statements

25     made by other police officers about Vickers'
```

```
 1    tendency to use force in the field?

 2        A.  Yes, I've heard.  Yes.

 3        Q.  Tell me about that.

 4        A.  I just heard that he has an extensive

 5    history of -- he's got a history of having use of

 6    force documentations.

 7        Q.  Is that sort of thing -- in the Police

 8    Department, is that viewed with disdain or is he

 9    applauded for that?

10        A.  It depends on how -- on the circumstances.

11    Some people are -- if things are done appropriately,

12    and you have I guess fair judgment and bad luck.

13    So, like I said, I don't know much about his history

14    with OPS or how things turned out or the totality of

15    the circumstances of when his force was used.  I

16    just heard that he's had a few -- quite a few use of

17    force history.

18        Q.  So I guess -- so what I'm gathering -- and

19    please correct me if I'm wrong, but it's pretty much

20    well known throughout the department, the Atlanta

21    Police Department that Vickers has a history with

22    excessive force allegations?

23            MS. PARKS:  Objection.  You may answer.

24        A.  I don't know about excessive force.  I

25    don't know if he's been in -- I don't know if he's
```

```
 1    ever been in trouble with that before.  But when I

 2    say use of force, use of force is anytime you use

 3    any elevated level of force.  I don't know what has

 4    been labeled -- deemed as excessive or not.  That I

 5    have no idea.

 6    BY MR. KAHN:

 7         Q.  Well, let me rephrase it then.  So I guess

 8    would it be fair to say that Vickers has somewhat of

 9    a reputation among the City of Atlanta Police

10    Department for his history of use of force

11    allegations?

12         A.  Yes.

13         Q.  We can go back to that exhibit now.  Can

14    you see Plaintiff's Exhibit 47 on your screen again?

15         A.  I do.

16         Q.  And do you see where it says Rule 4.2.37?

17         A.  Yes, sir.

18         Q.  And that was for failing to transport Mr.

19    Griffin to the hospital in an ambulance, right?

20         A.  Yes, sir.

21         Q.  And for that you got a WR or what I

22    understand is a written reprimand, correct?

23         A.  Yes, sir.

24         Q.  And would you say -- is it fair to say that

25    a written reprimand is a little more serious than an
```

Griffin vs. City of Atlanta                Matthew Abad                11/5/2020

```
 1    oral admonishment but not quite as serious as

 2    suspension or termination?

 3        A.  It is.

 4        Q.  For a written reprimand, is that

 5    essentially a letter -- I'm paraphrasing -- is that

 6    a letter that basically says that what you did was

 7    wrong, don't do it again?

 8        A.  Yes.  It's a higher level of documentation.

 9            I'm sorry.  Can I take two seconds to go

10    grab a cup of water?

11            MR. KAHN:  Of course.  And I forgot to

12        mention this, and that's my fault.  Anytime you

13        need to take a break, just let me know.  This

14        is not a marathon.  So let's take a break and

15        get water, go to the bathroom and reconvene at

16        say 11:40.

17        A.  Okay.  Sounds good.

18        Q.  All right.  Thank you.

19            (Recess 11:31 a.m. - 11:40 a.m.)

20    BY MR. KAHN:

21        Q.  I want to go through -- have you ever been

22    investigated for the use of excessive force?

23        A.  No, sir.

24        Q.  Can you see Plaintiff's Exhibit 51 on your

25    screen?
```

```
 1            A.  Yes, sir.

 2            Q.  This appears to be your OPS disciplinary

 3       history.  I just want to ask you a few questions

 4       about some of these complaints in here.  Do you see

 5       the first citizen complaint listed?

 6            A.  I do.

 7            Q.  What was that complaint about?

 8            A.  I'm not sure.  I'm not sure.  I've only

 9       been to OPS two times.  I'm not sure.

10            Q.  Do you see this second entry for use of

11       force?

12            A.  Yes, sir.

13            Q.  Do you have any idea what that's about?

14            A.  I've never been to OPS about use of force

15       before.  I don't know.  I would have to look up that

16       case number.  2019.  I'm not sure.

17            Q.  Do you know what the highlighted complaint

18       is about, this citizen's complaint?

19            A.  That one -- I didn't even know I had all

20       these.  I don't know specifically.  I only know of

21       two times, one for this and one was a complaint

22       (audio drop).

23            Q.  I'm sorry.  You broke up a little bit.

24       What was the other complaint?

25            A.  It was a complaint about -- someone came to
```

1    me with a -- it was an expired protection order and

2    it wasn't in that person's correct name.  They

3    utilized their middle name instead of their first

4    name in it.  And I pointed them towards a supervisor

5    -- I told -- no, I'm sorry.  I told them that they

6    needed to correct it, pointed them in the direction

7    of how to correct it.  And they requested a

8    supervisor, saying that I was failing to do so.  The

9    supervisor told them the same thing, that I was

10   failing to assist them.  The supervisor came out and

11   said the same thing, and then she went to file the

12   complaint.

13        Q.  I'm going to ask you -- let me pull up an

14   exhibit for you.  Can you see Plaintiff's Exhibit 33

15   on your screen?

16        A.  Yes, sir.

17        Q.  Does this appear to be a City of Atlanta

18   performance evaluation for the year 2019?

19        A.  Yes, sir.

20        Q.  And you see Vickers' last name?

21        A.  Yes.

22        Q.  And this evaluation period is July 1st,

23   2018 through June 30th, 2019.

24        A.  Yes, sir.

25        Q.  That date range would include the incident

Griffin vs. City of Atlanta                    Matthew Abad

```
 1   in question that we're here about today, right?
 2       A.  Yes, sir.
 3       Q.  We're going to go to page two, and you'll
 4   see goal number one says CARE and then describes it
 5   as represents the department in a courteous and
 6   professional manner.  Do you see that?
 7       A.  Yes, sir.
 8       Q.  And in the comments section for Vickers, it
 9   says works with a sense of urgency, treats everyone
10   fairly and with respect.  Do you see that?
11       A.  I do, sir.
12       Q.  And there's a rating, and it says it's a
13   four.  And, as we know from the key, a four is
14   highly effective, exceeds the expected performance
15   standards on a regular basis, correct?
16       A.  Yes, sir.
17       Q.  Now isn't it true that the sergeant
18   performing the evaluation can put anything that he
19   or she wants in this comments section?
20           MS. PARKS:  Objection.  You may answer.
21       A.  I believe so.  I'm not -- I've never filled
22   one of those out.  I'm not sure if there's a list
23   that they pick from or...
24       Q.  Well, I guess, for example, if the officer
25   being evaluated was not courteous and professional,
```

Griffin vs. City of Atlanta                    Matthew Abad

```
 1    the reviewing sergeant could have said something

 2    about that in the comments section presumably,

 3    correct?

 4         A.   That is correct.

 5         Q.   And the reviewing sergeant could have given

 6    the officer a lower rating, such as a three, a two

 7    or a one, correct?

 8         A.   That is correct.

 9         Q.   We're going to flip to the bottom of page

10    two, goal four of Vickers' 2019 performance review

11    is professionalism.  And do you see where it says

12    displays concern and empathy when interacting with

13    citizens?

14         A.   Yes, sir.

15         Q.   And he got a four for that, did he not?

16              I'm sorry.  I didn't hear your response.

17         A.   You asked if I saw it?

18         Q.   Yes.

19         A.   Yes, sir, I do.

20         Q.   We watched today -- we watched the videos

21    of Vickers mocking a citizen, of laughing at a

22    citizen who needed help, tackling a citizen.  Do you

23    think that that conduct displays concern and

24    empathy?

25         A.   During that incident, no, sir.
```

1    Q.  Do you think that Vickers deserves a four

2   in the category that addresses displaying concern

3   and empathy with citizens?

4              MS. PARKS:  Objection.  You may answer.

5       **A.  I've seen Officer Vickers engage with**

6   **people dozens and dozens and dozens of times, and he**

7   **typically is very professional.  This is one not**

8   **professional incident.**

9       Q.  Will you agree that the way that Vickers

10  treated Tyler Griffin was terrible?

11             MS. PARKS:  Objection.  You may answer.

12      **A.  It was definitely unprofessional.**

13  BY MR. KAHN:

14      Q.  Let's use the City of Atlanta's own rating

15  system.  If you had to assign one of these ratings

16  to Vickers' conduct towards Mr. Griffin, which would

17  you give him?

18             MS. PARKS:  Objection.  You may answer.

19      **A.  In my opinion, probably a one.**

20      Q.  And that's because Vickers' conduct is

21  unacceptable, right?

22      **A.  That's correct.**

23      Q.  And Vickers' conduct does not meet most of

24  the expected performance standards and fails to meet

25  significant performance standards, correct?

Case 1:20-cv-02514-VMC     Document 89-2     Filed 05/03/21     Page 88 of 125

Exhibit A
Griffin vs. City of Atlanta                Matthew Abad                11/5/2020

 1              MS. PARKS:  Objection.  You may answer.

 2        **A.  In this incident, yes.**

 3   BY MR. KAHN:

 4        Q.  Would you agree that somebody just looking

 5   through this performance evaluation would never know

 6   about the conduct, would never know about Vickers'

 7   conduct toward Mr. Griffin?

 8              MS. PARKS:  Objection.  You may answer.

 9        **A.  It's possible.**

10   BY MR. KAHN:

11        Q.  Well, tell me, what in Plaintiff's Exhibit

12   33 would let anybody know about the way that Vickers

13   treated Mr. Griffin?

14              MS. PARKS:  Objection.  You may answer.

15   BY MR. KAHN:

16        Q.  I'm going to share my screen.  I'm going to

17   give you control of the screen -- I don't know that

18   I -- can we give the witness control of the

19   documents so he can scroll it?

20              REPORTER:  I don't believe so.  You may

21         have to ask Denae that, but I don't believe you

22         can.

23   BY MR. KAHN:

24        Q.  Officer Abad, I'll scroll through, and when

25   you see something that indicates that Vickers did

```
 1    those things to Mr. Griffin, you just tell me to

 2    stop, okay?

 3        A.  Yes, sir.

 4        Q.  So we've reached the end of Plaintiff's

 5    Exhibit 33, didn't we?

 6        A.  Yes, sir.

 7        Q.  And there's nothing in Plaintiff's Exhibit

 8    33 that would allow the person reading the document

 9    to know about the way Vickers treated Mr. Griffin,

10    right?

11        A.  Correct.

12        Q.  Do you think it's okay for an officer to

13    act the way that Vickers did and not have it

14    documented in a performance evaluation?

15        A.  I would think you document it.

16        Q.  Wouldn't it be fair to say that this

17    performance evaluation is misleading because it

18    would lead the reader to believe that Donald Vickers

19    is highly effective and exceeds the expected

20    performance standards on a regular basis?

21            MS. PARKS:  Objection.  You may answer.

22        A.  That's correct.

23    BY MR. KAHN:

24        Q.  Would you agree that it's generally frowned

25    upon in the City of Atlanta Police Department for a
```

1    police officer to report another police officer's

2    misconduct?

3         A.   I don't think it's frowned upon, no.  I

4    know people who have done it and no one ever had an

5    issue with it.

6         Q.   Have you ever heard of someone reporting

7    another officer's misconduct, SOP violations or use

8    of force and then that person being ostracized or

9    retaliated against?

10        A.   No, sir, not that I know of.

11        Q.   Have you ever heard of a police officer who

12   testifies or reports another police officer referred

13   to as a rat or a snitch or something derogatory

14   along those lines?

15        A.   I haven't heard that, no.

16        Q.   In your experience with APD have you seen

17   another officer state on the record that another

18   police officer used excessive force other than the

19   police officers whose testimony we looked at today?

20        A.   No.  I've never even been involved in

21   something like this before.

22        Q.   Have you ever heard of a department-wide

23   practice where officers refuse to bear witness

24   against a fellow officer who's alleged to have

25   violated a citizen's rights?

Griffin vs. City of Atlanta                    Matthew Abad

```
 1        A.   I've heard of things like that, like people

 2   -- there's a word for it, and I can't think of the

 3   name of it.

 4        Q.   What do they call that?

 5        A.   I can't think of what it's called.  I know

 6   it's like -- it's almost, at this point, it's like

 7   frowned upon to not say anything because of the way

 8   we're currently viewed.  We don't want to be cast in

 9   a bad light any further than the current view of

10   policing is.

11        Q.   So, I guess, let me just name a few

12   potential things that you're thinking of.  Would it

13   be the code of silence?

14        A.   Maybe.

15        Q.   And so is it your testimony that there's

16   sort of a systemic change from the code of silence

17   to more transparency given the political climate

18   we're in?

19             MS. PARKS:  Objection.

20        A.   Absolutely.  People are definitely more

21   willing to speak up when there's an issue.

22        Q.   What was the state of the code of silence

23   in April 2019?

24        A.   The same as it is now.  I mean it's a moral

25   thing.  If you see a problem, assess it.
```

```
1        Q.  Do you think that there's a systemic -- let
2   me go back.  Have you been following the news with
3   all of the police violence in the United States?
4        A.  I have.
5        Q.  Do you think that there's a systemic
6   problem with police violence in America right now?
7        A.  I think that there's things that can be
8   trained -- that can be changed through training, in
9   a better way.  A lot of the time, it's unfortunate
10  and it's not pretty, but violence is unavoidable.
11       Q.  And I mean you truly do seem like a good,
12  honest police officer.  But would you agree that
13  there are police officers in the force that aren't
14  as honest and well-intentioned as you?
15            MS. PARKS:  Objection.  You may answer.
16       A.  In general, yes, sir.
17  BY MR. KAHN:
18       Q.  Do you think there's a systemic problem
19  with police violence in the City of Atlanta?
20            MS. PARKS:  Objection.  You may answer.
21       A.  I don't think so, or I would like to think
22  not.
23  BY MR. KAHN:
24       Q.  I want to share an exhibit with you.  Are
25  you familiar with the Use of Force Advisory Council?
```

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 93 of 125
Exhibit A
Griffin vs. City of Atlanta                    Matthew Abad                    11/5/2020

1       **A.   Yes.**

2       Q.   The Plaintiff's Exhibit 502 is an excerpt

3   from the Use of Force Advisory Council pamphlet.

4   Can you see this on your screen, sir?

5       **A.   I can.**

6       Q.   I want to ask a few questions about the

7   things that are said in this document and your

8   opinion on them.  So the first thing I want to ask

9   you is do you see where it says at the very top

10  left-hand corner of this document -- it's

11  Plaintiff's Exhibit 502 -- where it says, "But there

12  are lingering issues and opportunities for

13  improvement"?

14      **A.   Yes, sir, I see that.**

15      Q.   Isn't that a nice way of saying there's a

16  problem and it needs to be fixed?

17      **A.   Yes.**

18      Q.   Do you see directly below that there is a

19  little statistic that says, "Despite declining

20  arrests over the past seven years, reported annual

21  use of force incidents have increased on average of

22  two percent every year with 615 total incidents in

23  2019."

24      **A.   I see that.**

25      Q.   Doesn't that seem to suggest that there's a

```
 1   systemic problem?

 2       A.  I think -- I'm almost certain that over the

 3   past several years there also has been an increase

 4   in violent crime, and with violent crime things of

 5   this nature are probable to happen.  Does that mean

 6   it's good?  No.  But when there's violence, it is

 7   often met with violence, unfortunately.

 8       Q.  Do you find it problematic as an Atlanta

 9   police officer that annual use of force incidents

10   are increasing on an average of two percent every

11   year?

12       A.  Yes.  Just like I said previously, at the

13   same time an increase is always -- not always -- is

14   never a good thing, is always something that we

15   don't want.  We never want something to increase

16   like that.  Nobody wants that.

17       Q.  Do you have any personal ideas or opinions

18   as to how the City can get that number lower?

19           MS. PARKS:  Objection.  You may answer.

20       A.  I don't know.

21       Q.  Would it be fair to say that one way to

22   maybe get that number lower would be to not employ

23   police officers who have an extensive history of

24   using force?

25           MS. PARKS:  Objection.  You may answer.
```

```
 1        A.   That's a possible option.

 2   BY MR. KAHN:

 3        Q.   Wouldn't another option be to appropriately

 4   punish officers who have been found to use excessive

 5   force?

 6        A.   In events of excessive force, yes, sir.

 7        Q.   Have you ever heard of OPS conducting an

 8   investigation into the use of force and finding or

 9   recommending that the use of force be sustained but

10   then the officer being investigated, his chain of

11   command undoes the recommendation?  Have you heard

12   of that?

13        A.   I didn't know you could do that.

14        Q.   Would that shock you to learn that OPS

15   could find the use of force as excessive and then

16   the chain of command could simply undo it?

17        A.   That would be surprising to me.  I figured

18   OPS was the end of the line.

19        Q.   That's a pretty big problem, wouldn't you

20   say?

21             MS. PARKS:   Objection.  You may answer.

22        A.   Yes, sir.

23   BY MR. KAHN:

24        Q.   Do you think that Donald Vickers owes Tyler

25   Griffin an apology for the way that he treated him?
```

```
 1              MS. PARKS:  Objection.  You may answer.

 2       A.  Yes, I would say it couldn't hurt, an

 3   apology.

 4   BY MR. KAHN:

 5       Q.  Has anyone you know either through work or

 6   personally said anything to you about the video of

 7   Vickers tackling Mr. Griffin?

 8       A.  Nothing substantial.  People just being

 9   like what's going on.  Like people heard about it.

10   I don't enjoy talking about things like that, so I

11   kind of shy away from negativity.  I kind of just

12   shrug it off.  I'm not talking to them about it.  I

13   don't like use of force.  I don't like having those

14   on my record.  I don't like to be involved in them.

15       Q.  Has anyone suggested to you that Vickers

16   violated Mr. Griffin's constitutional rights?

17       A.  I never had that conversation with anybody

18   about it, about a violation, no.

19       Q.  Let me ask you this.  Are you aware that

20   the videos are publicly available of Vickers

21   tackling Mr. Griffin?

22       A.  Yes, sir.  I know all of our footage, body

23   camera footage is publicly available.

24       Q.  Have any of your friends or family members

25   seen the video?
```

1        A.   I don't -- I would guess, because it was on

2    the news.

3        Q.   Which friends -- like how many friends and

4    family members saw the video?

5        A.   I was getting phone calls from quite a few.

6        Q.   Really?  Like what kind of phone calls?

7        A.   Like what happened, are you okay, people

8    checking in and seeing if I was okay, asking what

9    happened.

10       Q.   And these calls are from friends and family

11   members?  Like can you tell me -- and I don't expect

12   you to recount every person who called you, but can

13   you just generally tell me who was calling you about

14   the video?

15       A.   Mostly family, because they know like --

16   my first couple of years when I had a beat, I took a

17   lot of pride in helping people in the community,

18   especially around holidays and anything I could to

19   help people out.  So when they saw something like

20   that they were kind of surprised that I was -- that

21   that happened.  They were asking like how does this

22   happen.

23       Q.   What does your family think?  What did they

24   think about the way that Vickers treated Mr.

25   Griffin?

| | |
|---|---|
| 1 | MS. PARKS:  Objection.  You may answer. |
| 2 | **A.  I mean they said it doesn't look good.  It** |
| 3 | **doesn't look good.  Not particularly thrilled about** |
| 4 | **it.** |
| 5 | BY MR. KAHN: |
| 6 | Q.  Do you sort of like -- do you understand |
| 7 | why they think that? |
| 8 | **A.  Yes.  It doesn't look good.  No one likes** |
| 9 | **to see anybody get hurt or see anybody in pain or** |
| 10 | **anything like that.** |
| 11 | Q.  Are you embarrassed to have that video all |
| 12 | over the internet and the news? |
| 13 | **A.  Yes.  I'm not proud of it.  Not happy about** |
| 14 | **it.** |
| 15 | Q.  I just have two more questions and then I'm |
| 16 | done. |
| 17 | Do you have any regrets about the way that |
| 18 | you treated Mr. Griffin? |
| 19 | **A.  Yes.  I should have called an ambulance,** |
| 20 | **for starters.  Like looking back, yes, I should have** |
| 21 | **definitely should have done that.** |
| 22 | Q.  And then lastly, is there anything that you |
| 23 | would like to say to Mr. Griffin while we're on the |
| 24 | record? |
| 25 | **A.  Yes.  Sorry he went through that.  I don't** |

1    ever want to see anybody get hurt.  I don't want to

2    see anybody go through any level of struggle.  I'm

3    sorry that he's in this position.

4         Q.   Thank you, sir.  No further questions from

5    me.  I just want you to know we appreciate your time

6    and we know that you had rather be somewhere else

7    right now.  But this is an important part of the

8    civil litigation process.  And we appreciate it and

9    respect you and your service, so thank you.

10        A.   Thank you, sir.

11             MS. PARKS:  Let's have five minutes

12         please.

13             (Recess 12:09 p.m. - 12:15 p.m.)

14                    EXAMINATION

15    BY MS. PARKS:

16        Q.   Officer Abad, I have some questions for

17    you.

18        A.   Sure.

19        Q.   Regarding the low ready position, please

20    explain what that position is.

21        A.   The low ready position is a way you would

22    hold the firearm, and it's just lightly off the

23    potential threat but ready in case of necessary use.

24        Q.   And why were you in the low ready position?

25        A.   Because I was concerned if I would be

1    **struck by the vehicle.**

2        Q.  Is the low ready position something that

3    you were taught in the Academy?

4        **A.  Yes, ma'am.**

5        Q.  Now regarding performing a field sobriety

6    test, why did you not perform a field sobriety test

7    or a Breathalyzer test on Plaintiff Tyler Griffin?

8        **A.  Mr. Griffin was injured.  I didn't want to**

9    **put him through any additional stresses or**

10   **pressures.  I felt that what I had noticed would**

11   **suffice.  I didn't want to put him through anything**

12   **extra.**

13       Q.  Is that the standard, not to perform a

14   field sobriety test or a Breathalyzer test --

15       **A.  That is up to the officer, the officer's**

16   **discretion.**

17       Q.  Now regarding the tackle by Officer

18   Vickers, how much time passed between Mr. Griffin

19   swiping your hand off of his shoulder and Officer

20   Vickers tackling him?

21           MR. KAHN:  Objection, leading.

22           MS. PARKS:  Actually that is not

23       leading.

24   BY MS. PARKS:

25       Q.  Officer Abad, how much timed passed between

```
 1   Mr. Griffin swiping your hand off of his shoulder

 2   and Officer Vickers tackling him?

 3        A.  Maybe a second.  It happened very, very

 4   fast.

 5        Q.  Did you have enough time in that second,

 6   one second, to waive Vickers off?

 7        A.  No, I did not.

 8             MR. KAHN:  Object to the form of the

 9        question.

10             MS. NAIR:  I'm sorry.  I couldn't

11        understand the objection, Mr. Butler.  I

12        couldn't hear it.

13             MR. KAHN:  It's Matt Kahn here --

14             MS. NAIR:  I'm sorry, Mr. Kahn.

15             MR. KAHN:  I said I object to the form

16        of the question.

17   BY MS. PARKS:

18        Q.  Let's go back so that the record is clear.

19             Officer Abad, you answered that maybe one

20   second passed between Tyler Griffin swiping your

21   hand off of his shoulder and Officer Vickers

22   tackling him?

23        A.  Yes, ma'am.

24             MR. KAHN:  Objection, leading.

25             MS. PARKS:  That's not leading.  I'm
```

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 102 of 125

Exhibit A
Griffin vs. City of Atlanta                    Matthew Abad                    11/5/2020

```
 1              clarifying what he answered previously for the

 2              record.

 3                   MR. KAHN:  In a leading manner.

 4                   MS. PARKS:  No, I am clarifying on the

 5              record what Officer Abad previously testified

 6              to --

 7                   MR. KAHN:  And I am objecting to the

 8              leading.

 9                   MS. PARKS: -- one question ago.

10    BY MS. PARKS:

11         Q.  Officer Abad, I'm going to clarify for you

12    again.  You just answered the question that one

13    second passed.  Within that one second did you have

14    enough time to wave Officer Vickers off?

15                   MR. KAHN:  Objection, leading.

16    BY MS. PARKS:

17         Q.  You may answer, Officer Abad.

18         A.  I did not have time, no.

19         Q.  Were you looking at Officer Vickers when he

20    tackled Tyler Griffin?

21         A.  I was not looking at him, no.

22         Q.  Did you have time to respond to the tackle

23    by Officer Vickers?

24         A.  No.  No, ma'am.

25         Q.  Did you know whether Mr. Griffin was
```

Exhibit A
11/5/2020

Griffin vs. City of Atlanta                Matthew Abad

```
1    injured by Officer Vickers tackle at that time?

2         A.  I did not.  I did not.

3         Q.  Did you have any concern about potential

4    injuries after the tackle?

5         A.  After Mr. Griffin began stating he was

6    experiencing pain, then that's when I began to

7    realize that he's probably injured.

8         Q.  Did you ask him if anything was broken?

9         A.  I did.

10        Q.  Regarding the report that you written on

11   the night of the incident, did you review any video

12   footage before writing your report?

13        A.  No, ma'am.  I believe you're not

14   particularly allowed to.

15        Q.  Was your report written based upon your

16   knowledge at that time?

17        A.  Yes, ma'am.

18        Q.  Was your report accurate and truthful from

19   what you remembered at that time?

20        A.  Yes, ma'am.

21        Q.  Regarding the 2019 performance evaluation

22   regarding Officer Vickers, were you the sergeant who

23   evaluated Officer Vickers?

24        A.  I was not.

25              MS. PARKS:  Those are all the questions
```

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 104 of 125

Griffin vs. City of Atlanta                 Matthew Abad
Exhibit A
11/5/2020

 1        the City has for Officer Abad.

 2              MR. KAHN:  I just have a couple of

 3        questions for you, Officer Abad, and then we'll

 4        let you get out of here.

 5                    FURTHER EXAMINATION

 6   BY MR. KAHN:

 7        Q.  So we stopped, went off the record at

 8   approximately 12:15 and reconvened at -- at 12:12

 9   and reconvened at 12:15.  During that break did you

10   speak to any of the City of Atlanta lawyers that are

11   in this conference room?

12        **A.  No, sir.**

13        Q.  Did you communicate with any of those

14   lawyers in any way during the break that we just

15   had?

16        **A.  No, sir.**

17              MR. KAHN:  No further questions.

18              (Signature reserved.)

19              (Deposition concluded at 12:25 p.m.)

20

21

22

23

24

25

```
 1         The following reporter and firm
    disclosures are as follows:
 2
 3              REPORTER DISCLOSURES
 4         The following representations and
    disclosures are made in compliance with Georgia Law,
 5  more specifically:
              Article 10(B) of the Rules and Regulations
 6  of the Board of Court Reporting (disclosure forms)
    O.C.G.A. 9-11-28(c) (disqualification of reporter for
 7  financial interest).
              O.C.G.A. 15-14-37(a) and (b) (prohibitions
 8  against contracts except on a case-by-case basis).
    - I am a certified reporter in the State of Georgia.
 9  - I am a subcontractor for Pope Reporting & Video.
    - I have been assigned to make a complete and
10  accurate record of these proceedings.
    - I have no relationship of interest in the matter
11  on which I am about to report which would disqualify
    me from making a verbatim record or maintaining my
12  obligation of impartiality in compliance with the
    Code of Professional Ethics.
13  - I have no direct contract with any party in this
    action and my compensation is determined solely by
14  the terms of my subcontractor agreement.
15              FIRM DISCLOSURES
    - Pope Reporting & Video was contacted to provide
16  reporting services by the noticing or taking
    attorney in this matter.
17  - There is no agreement in place that is prohibited
    by O.C.G.A. 15-14-37(a) and (b).  Any case-specific
18  discounts are automatically applied to all parties,
    at such time as any party receives a discount.
19  - Transcripts:  The transcript of this proceeding as
    produced will be a true, correct and complete record
20  of the colloquies, questions, and answers as
    submitted by the certified court reporter.
21  - Exhibits:  No changes will be made to the exhibits
    as submitted by the reporter, attorneys, or
22  witnesses.
    - Password-Protected Access:  Transcripts and
23  exhibits relating to this proceeding will be
    uploaded to a password-protected repository, to
24  which all ordering parties will have access.
25
```

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 106 of 125

Exhibit A
Griffin vs. City of Atlanta                    Matthew Abad                    11/5/2020

1        CERTIFICATE OF COURT REPORTER

2    STATE OF GEORGIA:

3    COUNTY OF FULTON:

4        I hereby certify that the foregoing

5    transcript was taken down, as stated in the caption,

6    and the colloquies, questions and answers were

7    reduced to typewriting under my direction; that the

8    transcript is a true and correct transcript of the

9    evidence given upon said proceeding.

10

11

12            This the 20th day of November 2020.

13

14    _____

15    Lucy C. Rateau, RPR, CCR 2766

16

17

18

19

20

21

22

23

24

25

VIA EMAIL


Date:  11/23/2020

To:  Staci Miller, Esq.

Re:  Signature of Deponent Matthew Abad


Greetings:

The deponent has reserved the right to read and sign. Please have the deponent review the attached transcript, noting any changes or corrections on the attached Errata.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Pope Reporting (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time below, the original transcript may be filed with the court without the signature of the deponent.


Date Errata due back at our offices:  12/30/2020


Please send completed Errata to:
Pope Reporting & Video, LLC
2741 Pangborn Road
Decatur, Georgia 30033
(404) 856-0966

Exhibit A

Griffin vs. City of Atlanta                    Matthew Abad                              11/5/2020

## ERRATA

JOB NUMBER:  18559


I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

\_\_\_\_\_  There are no changes noted.
\_\_\_\_\_  The following changes are noted:


Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.


PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

Griffin vs. City of Atlanta                     Matthew Abad                          11/5/2020

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE    _____


_____
                    DEPONENT'S SIGNATURE


Sworn to and subscribed before me this _____ day of

_____, _____.

_____
NOTARY PUBLIC

My Commission Expires: _____

Griffin vs. City of Atlanta                Matthew Abad

**WORD INDEX**

**< 1 >**
**1**  17:*10*
**1,000**  7:*25*
**1.1**  2:*4*  33:*5, 6, 10*
**1.2**  2:*5*  34:*20, 23*
35:*1, 18*  38:*10*
39:*6, 24*  41:*1*
44:*22*  65:*8, 24*
66:*8*
**1.3**  2:*6*  46:*12, 13,*
*14, 17*
**1.4**  2:*7*  47:*1, 2, 4*
**1:20-CV-02514-**
**TWT**  1:*1*
**10**  3:*5*  25:*24*
**10(B**  104:*5*
**103**  2:*20*
**11:31**  81:*19*
**11:40**  81:*16, 19*
**11-page**  14:*15*
**12**  73:*23*
**12:09**  98:*13*
**12:12**  103:*8*
**12:15**  98:*13*  103:*8,*
*9*
**12:25**  103:*19*
**12th**  73:*19*
**1-5**  1:*1*
**15-14-37(a**  104:*7,*
*17*
**18**  5:*23*
**1st**  83:*22*

**< 2 >**
**2.2**  2:*8*  51:*5, 6*
53:*2, 12*  55:*6*
**20**  9:*5*
**20/20**  45:*20*
**2010**  73:*6*
**2016**  5:*9*  7:*12*
**2018**  83:*23*
**2019**  17:*7*  73:*23*
82:*16*  83:*18, 23*
85:*10*  90:*23*  92:*23*
102:*21*
**2020**  1:*1*  73:*23*

**105**:*12*
**20th**  105:*12*
**26**  14:*12, 21*
**2766**  105:*15*

**< 3 >**
**3.3**  2:*9*  56:*3, 4, 17*
**3.4**  2:*10*  59:*16, 17*
**30**  25:*21*
**30(b)(6**  65:*2*  66:*22*
**30.1**  25:*12, 15, 19*
41:*10, 18*  42:*3, 7,*
*17*
**30303**  3:*17*
**30324**  3:*6*
**30th**  83:*23*
**33**  2:*4*  83:*14*
87:*12*  88:*5, 8*
**34**  2:*5*

**< 4 >**
**4**  2:*18*
**4.1**  2:*11*  48:*10, 11,*
*12, 16*  49:*4, 8, 16*
**4.2**  2:*12*  53:*16, 17,*
*18*  55:*5, 14*
**4.2.37**  73:*6*  80:*16*
**4.2.51**  74:*18*
**404.330.6402**  3:*18*
**404.587.8423**  3:*7*
**42**  63:*22*  64:*3, 10*
69:*6*
**46**  2:*6*
**47**  2:*7*  74:*2, 5*
80:*14*
**48**  2:*11*  61:*12, 17*

**< 5 >**
**5**  1:*1*  17:*7*  73:*23*
**5.3**  2:*13*  56:*22, 23*
**50**  52:*6*
**5000**  3:*16*
**502**  92:*2, 11*
**51**  2:*8*  81:*24*
**53**  2:*12*
**55**  3:*15*
**56**  2:*9, 13*
**59**  2:*10*

**5th**  58:*16*  59:*4*

**< 6 >**
**615**  92:*22*

**< 9 >**
**9:30**  1:*1*
**9-11-28(c**  104:*6*
**98**  2:*19*

**< A >**
**a.m**  1:*1*  81:*19*
**ABAD**  1:*1*  4:*1, 4,*
*14, 19*  5:*3, 4*  15:*18*
26:*5, 14*  28:*17*
31:*23*  34:*7, 14*
35:*20*  36:*1*  38:*12,*
*24*  41:*6, 14, 23*
42:*12, 21*  43:*14, 22*
44:*7, 24*  50:*12*
51:*19*  58:*9*  65:*19*
66:*14*  70:*11*  72:*9*
78:*7*  87:*24*  98:*16*
99:*25*  100:*19*
101:*5, 11, 17*  103:*1,*
*3*
**Abad's**  61:*19*
70:*11*  72:*13*  73:*4*
**abandon**  19:*15*
**abbreviation**  75:*1*
**able**  14:*23*  19:*25*
24:*1*  27:*7*  29:*19,*
*20*  32:*11*  37:*1*
47:*14*  74:*12*
**absolutely**  29:*7*
90:*20*
**abuse**  73:*11*
**academy**  7:*23*
35:*24*  43:*12, 18*
44:*1, 22*  54:*12*
99:*3*
**accelerating**  35:*14*
57:*8*
**Access**  104:*22, 24*
**accurate**  102:*18*
104:*10*
**acquaintance**  8:*12*
**act**  35:*17*  63:*6*

**88**:*13*
**acted**  65:*7*
**acting**  39:*7, 12, 18*
43:*1, 3, 5*  55:*2*
**action**  74:*23*
104:*13*
**actual**  57:*18*
73:*19*  77:*5*
**addition**  12:*15*
**additional**  99:*9*
**addressed**  68:*25*
69:*2*
**addresses**  86:*2*
**administer**  8:*20*
**administered**  8:*25*
**admission**  15:*17,*
*18*  58:*5*
**admit**  58:*7*
**admonishment**
75:*2, 4, 5, 8*  81:*1*
**advise**  72:*10*
**advised**  75:*10*
**advising**  44:*17*
**Advisory**  91:*25*
92:*3*
**afraid**  30:*9*
**age**  5:*23*
**aggressive**  13:*4*
**agitate**  50:*21*
**ago**  12:*12, 22*
101:*9*
**agree**  22:*17*  24:*15,*
*23*  31:*20*  32:*2*
35:*9*  48:*15*  64:*13*
67:*16*  69:*1, 12*
70:*6*  86:*9*  87:*4*
88:*24*  91:*12*
**agreement**  4:*5*
104:*14, 17*
**ahead**  44:*18*  75:*25*
**aim**  35:*3*
**aiming**  27:*21*
35:*12*
**Albertini**  74:*9*
**alcohol**  8:*16*  20:*1*
37:*6*
**ALISHA**  3:*12*
**allegations**  12:*8*

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 111 of 125

Exhibit A
Griffin vs. City of Atlanta                    Matthew Abad                    11/5/2020

79:22  80:11
**alleged**  89:24
**allegedly**  22:1, 4
**allow**  18:6  88:8
**allowed**  31:17
37:9  58:7  102:14
**all's**  23:23  27:4
**alongside**  19:19
**ambulance**  30:24
31:3, 5, 8, 11, 14
32:16  49:10, 14
55:15, 17, 24  63:14,
16, 17  72:6  73:9
80:19  97:19
**America**  91:6
**amnair@atlantaga.g**
**ov**  3:20
**amount**  20:1  29:16
**analysis**  37:1
**angle**  37:22  45:4
**ankle**  15:13, 24
16:19  20:12  24:17,
25  25:10, 16, 25
26:12  30:21  32:7,
10  40:9  41:4  42:6
49:24  50:9, 25
56:10, 13  71:24
72:2, 21
**annual**  92:20  93:9
**answer**  15:14
16:16  24:19  26:4,
13  28:16  31:22
34:6, 13  35:19, 25
38:11  41:5, 13, 22
42:11, 20  43:13, 21
44:2, 10, 12, 18, 23
45:11  49:25  50:11
51:1, 19  52:12, 22
54:3, 14, 22, 23
55:19  56:18  58:9,
13  60:20, 25  64:24
66:13  67:2, 17
68:2, 10, 21  70:25
71:7, 25  73:13
75:18, 22  76:6
78:7  79:23  84:20
86:4, 11, 18  87:1, 8,
14  88:21  91:15, 20

93:19, 25  94:21
95:1  97:1  101:17
**answered**  67:3
100:19  101:1, 12
**answers**  104:20
105:6
**anxious**  77:8, 13
**anybody**  87:12
95:17  97:9  98:1, 2
**anytime**  13:21
40:20  59:2, 6, 9, 12
80:2  81:12
**APD**  6:9, 15  7:1, 3,
5, 8  51:25  73:6
89:16
**APD's**  67:11
**APEX**  76:24
**apologize**  16:9
76:2
**apology**  94:25
95:3
**appear**  14:21
83:17
**APPEARANCES**
3:1
**appearing**  15:1
**appears**  65:2
66:21  82:2
**applauded**  79:9
**applied**  104:18
**appreciate**  98:5, 8
**approach**  19:12
30:18
**approached**  22:11
26:19  37:20
**approaching**  35:5
**appropriate**  37:11
39:14
**appropriately**  63:7
79:11  94:3
**approximately**
23:4  103:8
**April**  5:9  17:7
58:16  59:4  73:23
90:23
**arm**  61:19  62:16
**arrest**  31:6  72:12
**arrests**  92:20

**arrived**  20:15
31:16
**Arthur**  65:3
**Article**  104:5
**asked**  13:5  47:17
59:9, 12  85:17
**asking**  15:17
18:17  26:9, 10
57:17, 18  58:4
63:11, 13, 15  65:16
96:8, 21
**assess**  90:25
**assign**  86:15
**assigned**  76:14
104:9
**assignment**  17:8,
10  76:24
**assist**  61:20  83:10
**associate's**  5:13
**assume**  31:9  34:9
42:22  72:24  78:10
**assuming**  19:13
26:23
**ATLANTA**  1:1
3:6, 14, 17  4:6
9:18  10:25  14:7
17:9  19:21  35:16
64:21  65:23  66:6,
18  67:7  73:22
76:4  78:15  79:20
80:9  83:17  88:25
91:19  93:8  103:10
**Atlanta's**  15:7
86:14
**attempt**  29:4
36:23
**attempted**  16:1
**attempting**  29:17
35:15
**attention**  72:13
**attorney**  104:16
**attorneys**  17:4
104:21
**audio**  29:3  75:12
82:22
**authored**  23:3
60:10
**automatically**

104:18
**available**  95:20, 23
**Avenue**  3:15  18:21
**average**  92:21
93:10
**avoid**  78:19
**aware**  13:15
25:10  31:2  76:25
77:2  78:16  95:19

**< B >**
**back**  7:16  10:11
12:14  18:23  19:12
34:1  50:2  72:5
80:13  91:2  97:20
100:18
**backyard**  32:22
**bad**  79:12  90:9
**balance**  48:18
61:18  62:2
**balancing**  61:20
**Based**  4:25  18:2
36:21  37:4  39:11,
17  49:18  67:3
72:22  102:15
**basically**  81:6
**basis**  15:15  38:13,
16  58:2  65:13
84:15  88:20  104:8
**bathroom**  81:15
**Bear**  63:19  89:23
**beat**  78:18  96:16
**began**  19:11  102:5,
6
**beginning**  18:18
**behalf**  3:2, 10
64:21  65:22  66:6,
18  67:6
**behaved**  56:16
**behaves**  55:10
**behaving**  55:11
**behavior**  51:25
77:18
**belief**  43:8, 9, 19
**believe**  6:13  8:8
15:2, 8, 9  18:20
19:7  21:14  23:2
24:8, 9  25:17
26:16  27:7  35:21

44:*4*  46:*6*  49:*15*
57:*16*  58:*24*  62:*13*
63:*7, 14*  70:*23*
73:*20*  84:*21*  87:*20,*
*21*  88:*18*  102:*13*
**believed**  22:*13*
28:*5*
**believes**  32:*17*
**Bellemeade**  27:*1*
**best**  22:*15*
**Better**  33:*24*
67:*24*  91:*9*
**big**  63:*14*  94:*19*
**biggest**  59:*19*
**bit**  17:*3*  51:*10*
82:*23*
**blank**  63:*6*
**blatant**  10:*7, 12*
**blend**  18:*10, 12*
**blocked**  23:22
27:20
**blocking**  27:9
**Board**  104:*6*
**bodily**  73:2
**body**  11:*12, 14*
12:*15*  15:*10, 23*
37:22  95:22
**bodyweight**  41:*20*
42:*8*
**body-worn**  11:*8, 10*
**bone**  41:*10*
**bones**  25:*18*  73:*1*
**bottom**  27:*3, 7, 10*
85:*9*
**bragging**  52:*10*
**break**  7:*15, 17, 20*
75:*13*  81:*13, 14*
103:*9, 14*
**breath**  20:*1*
**Breathalyzer**  30:*1*
99:*7, 14*
**briefly**  14:*11*
**bright**  19:*11*
**broke**  82:23
**broken**  15:*13, 24*
16:20  25:*10, 18*
32:*10, 21, 24*  41:*9*
47:*18*  49:*23*  50:*9,*

*25*  71:*24*  72:2, *21,*
*24*  73:*1*  102:*8*
**brushed**  30:*6*
46:*18, 22*  70:*14, 18*
**brutality**  21:*6*
**Buchanan**  27:*1*
**bullets**  57:*3, 11, 21*
**Butler**  3:*4*  100:*11*

< C >
**call**  30:*24*  31:2, *10,*
*14*  32:*14*  49:*10*
55:*14, 17*  63:*16*
69:*25*  73:8  90:*4*
**called**  13:8  31:8
32:*16*  49:*13*  55:24
56:6  63:6  90:*5*
96:*12*  97:*19*
**calling**  96:*13*
**Calls**  16:*13*  29:22
38:*19*  51:*18*  96:*5,*
*6, 10*
**cam**  21:*1*
**camera**  11:*8, 10,*
*12, 14*  12:*15*  15:*10,*
*23*  60:*1, 3*  95:23
**caption**  105:*5*
**car**  21:9  23:22
24:*1, 18*  25:*1*
26:*18, 22, 25*  27:*4,*
*5, 9, 15, 22*  28:*23*
35:*15*  37:*15*  39:*20*
40:*2, 6, 9, 14*  41:*12,*
*19, 21*  42:9  57:*8*
62:*9*
**CARE**  84:*4*
**career**  9:*9, 15*  10:*5*
**Case**  1:*1*  4:*5*  6:*2*
12:*3, 8, 24*  13:*16*
14:*5*  29:*24*  30:*1*
59:*10*  70:*24*  82:*16*
98:*23*
**case-by-case**  104:*8*
**case-specific**  104:*17*
**cast**  90:*8*
**catch**  49:*1*
**category**  64:*6*  86:*2*
**caught**  19:*20*

**CCR**  1:*1*  105:*15*
**certain**  59:*10*  93:2
**CERTIFICATE**
105:*1*
**certified**  104:*8, 20*
**certify**  105:*4*
**chain**  94:*10, 16*
**change**  43:*4*  90:*16*
**changed**  91:*8*
**changes**  104:*21*
**charging**  46:22
**Chattahoochee**
18:*21*
**check**  30:*25*  32:*14*
**checked**  32:*23*
**checking**  96:*8*
**choice**  29:*18*
**choices**  77:*12*
**choose**  29:*13*
**choppy**  50:*20*
**circumstances**
79:*10, 15*
**citizen**  28:*9, 10*
32:*15*  49:*23*  50:*9,*
*25*  52:*21*  54:2
63:*17*  82:*5*  85:*21,*
*22*
**citizens**  18:*13*
22:*18*  35:*24*  37:*10*
54:*13*  85:*13*  86:*3*
**citizen's**  51:*23*
82:*18*  89:*25*
**CITY**  1:*1*  3:*14*
4:*6*  10:*25*  14:*6*
15:*6*  64:*21*  65:*23*
66:*6, 18*  67:*7*
73:*21*  76:*3*  78:*15*
80:*9*  83:*17*  86:*14*
88:*25*  91:*19*  93:*18*
103:*1, 10*
**Civil**  4:*8*  12:*5*
98:*8*
**claim**  20:*20*  32:*15*
**claimed**  23:*3*  46:*7*
**claiming**  36:*24*
**clarify**  63:*10*
101:*11*
**clarifying**  101:*1, 4*

**clarity**  6:*23*
**classes**  8:*3*
**classification**  76:*10*
**clean**  24:22  50:*16,*
*21*
**clear**  49:*11*  73:*5*
100:*18*
**clearly**  32:*6*
**client**  44:*15*
**climate**  90:*17*
**clip**  2:*4, 5, 6, 7, 8,*
*10, 11, 12, 13*  11:*15*
36:*13*  48:*20*  51:*4*
53:*1*  56:*2*  59:*15*
**clips**  2:*9*  33:*1*
**closed**  6:*14*
**closer**  14:*18*
**clue**  37:*6*
**clues**  8:*17*
**code**  90:*13, 16, 22*
104:*12*
**collar**  20:*6*
**college**  5:*12, 15*
**colloquies**  104:*20*
105:*6*
**come**  19:*17*  22:*8*
27:*19*  30:*15, 24*
32:*14*  61:*3*  69:*24*
**comes**  10:*7*
**comfortable**  34:*3*
**coming**  27:*17*  36:*6*
**command**  94:*11, 16*
**comments**  84:*8, 19*
85:*2*
**common**  9:*18*
18:*4*  22:*25*  26:*10*
42:*15*  73:2
**communicate**
103:*13*
**communicated**
13:*25*
**Community**  5:*15*
96:*17*
**compensation**
104:*13*
**complain**  40:*8*
60:*17, 23*
**complaining**  72:*11*

**complaint** 12:2, *6*
58:20 82:5, 7, *17*,
*18*, *21*, 24, 25 83:12
**complaints** 82:*4*
**complete** 104:9, *19*
**completely** 42:25
46:*23* 78:16
**compliance** 104:*4*,
*12*
**computer** 18:*1*
**concern** 59:25
60:5 85:12, 23
86:2 102:3
**concerned** 60:*16*,
22 63:8, 9 98:25
**concerns** 60:7
**concluded** 103:19
**conduct** 53:*11*
55:9 63:11, 13
73:22 78:4 85:23
86:*16*, 20, 23 87:6,
7
**conducting** 94:7
**conference** 103:11
**confident** 77:12
**confirm** 14:19
**consider** 8:11 9:11
**constitutional** 95:16
**contact** 11:17, 22
18:23 19:5, 16, 24
20:7, 18 22:16
29:1, 15 30:19, 20
31:16 36:20 69:18,
25
**contacted** 104:15
**context** 74:7
**continued** 19:6
23:15
**contract** 104:13
**contracts** 104:8
**control** 32:18
87:17, 18
**conversation** 60:9
95:17
**conversations** 10:24
**cooperating** 19:22
**corner** 92:10
**correct** 15:4 16:6
18:14, 24 20:21

21:*3*, 6, *17*, 20, 24
23:1 24:11, 13
26:19 27:1, 12
28:11 30:5 33:20,
22 35:12 46:9, 19,
20 48:1, 5, 8 49:19
55:3 63:17 68:3
70:20 71:13, 21, 22
73:9, 10, 25 74:21,
22 75:3 79:19
80:22 83:2, 6, 7
84:15 85:3, 4, 7, 8
86:22, 25 88:11, 22
104:19 105:8
**corrected** 70:8
**correctly** 34:17
**Council** 91:25
92:3
**COUNSEL** 3:1, 23
**County** 5:15 105:3
**couple** 12:22 49:1
96:16 103:2
**course** 8:15 81:11
**COURT** 1:1 4:12
21:5 50:16 104:6,
20 105:1
**courteous** 71:21,
23 72:1, 4 84:5, 25
**cousin** 6:4
**cover** 66:21
**covered** 70:17
**COVID** 4:11
**COVID-19** 3:24
**creates** 50:19
**cried** 41:20
**crime** 37:12 93:4
**Criminal** 5:18
**cry** 40:5 72:23
**cup** 81:10
**cure** 38:17
**curious** 71:16
**current** 7:1 76:24
90:9
**currently** 6:9 90:8
**cut** 60:3
**cuts** 60:1

**< D >**

**damage** 24:7
**damn** 56:24
**dash** 21:1
**date** 83:25
**day** 105:12
**days** 6:21, 24
12:22
**deal** 31:17 77:17
78:4
**decision** 36:23
43:4
**declining** 92:19
**deemed** 39:13 80:4
**deems** 37:11
**Defendant** 4:3
10:19 24:15 65:7
**Defendants** 1:1
3:10 14:7
**defer** 68:3
**definitely** 32:10
86:12 90:20 97:21
**degree** 5:12, 13, 16,
17
**Denae** 87:21
**Department** 3:14
9:19 22:21 35:17
52:3 78:15 79:8,
20, 21 80:10 84:5
88:25
**department-wide**
89:22
**Depending** 36:2
**depends** 79:10
**deposed** 10:16
**DEPOSITION** 1:1
4:3, 5, 7, 10 11:1
13:19, 22 14:2
15:19 17:5 34:12
58:6 65:3 66:22
103:19
**depositions** 12:23
13:1, 2, 6, 13
**derogatory** 89:13
**describe** 72:14
**described** 78:5
**describes** 84:4
**Description** 2:1
**deserves** 86:1

**Despite** 92:19
**details** 18:16 25:5
**detect** 8:17
**determine** 37:2
**determined** 104:13
**different** 32:9
**differently** 32:25
45:18, 22, 25
**difficult** 50:19
**difficulty** 61:18
**direct** 5:22 104:13
**direction** 83:6
105:7
**directly** 92:18
**disagree** 23:21, 24
**disciplinary** 74:1
75:15, 21 76:5
77:10 82:2
**disclosure** 104:6
**disclosures** 104:1,
3, 4, 15
**discount** 104:18
**discounts** 104:18
**Discovery** 13:10
14:4 15:7
**discretion** 99:16
**disdain** 79:8
**displaying** 86:2
**displays** 85:12, 23
**Disposition** 64:4
**disqualification**
104:6
**disqualify** 104:11
**distinction** 43:8
**DISTRICT** 1:1
**DIVISION** 1:1
**document** 14:15,
25 15:1 74:6 88:8,
15 92:7, 10
**documentation**
81:8
**documentations**
79:6
**documented** 88:14
**documents** 87:19
**DOE** 1:1
**doing** 17:8, 23
26:21 29:11 33:15,
19 34:9, 17 57:13

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 114 of 125

Exhibit A
11/5/2020
Griffin vs. City of Atlanta                Matthew Abad

**DONALD** 1:*1*
11:*11, 25* 64:7, *10*
65:*23* 66:7 67:*12*
88:*18* 94:*24*
**door** 36:*12, 25*
**double-check** 33:*24*
**double-checked**
33:*19*
**double-checking**
34:*16*
**dozens** 86:*6*
**dramatic** 59:*19*
**drawing** 63:*6*
**drive** 23:9
**driven** 19:*12*
**driveway** 19:*8, 18*
20:*11, 16* 27:*3, 8,
10, 17, 20* 32:*12, 22*
48:*24*
**driving** 17:*16*
18:*3, 20, 21, 25*
21:2 24:8 26:2, *11*
**drop** 29:*3* 75:*12*
82:22
**drove** 19:7 23:*3*
**dude** 59:*24*
**due** 3:*24*
**DUI** 8:*1, 13, 14*
20:2 29:22 33:*15,
23* 34:*1*
**duly** 4:*15*

**< E >**
**earlier** 35:9 54:*25*
**early** 17:7
**educated** 67:*14*
**effective** 84:*14*
88:*19*
**effects** 8:*16*
**either** 10:*19* 21:*19*
38:7 48:7 53:*8*
58:*19* 95:*5*
**elaborate** 10:*12*
**elevated** 80:*3*
**emails** 14:*1*
**embankment** 19:*8*
**embarrassed** 97:*11*
**empathy** 85:*12, 24*

86:*3*
**employ** 93:*22*
**employed** 6:9
72:*15*
**encourages** 35:*17*
**ended** 23:*15*
**enforcement** 7:7
**engage** 86:*5*
**enjoy** 95:*10*
**entire** 41:*20* 42:8
**entirely** 11:*11* 41:7
**entry** 82:*10*
**equipped** 18:*6*
21:*15, 18* 22:5
**escape** 22:*15*
**escorting** 48:*19*
**especially** 96:*18*
**ESQ** 3:*3, 11, 12, 13*
**essentially** 18:*10*
81:*5*
**Ethics** 104:*12*
**evaluated** 84:*25*
102:*23*
**evaluation** 83:*18,
22* 84:*18* 87:*5*
88:*14, 17* 102:*21*
**events** 94:*6*
**Everybody** 32:*8*
**evidence** 20:*23*
30:*3* 105:*9*
**exact** 43:*23* 72:*14*
**exactly** 9:*4* 54:*6*
65:*16*
**EXAMINATION**
4:*17* 98:*14* 103:*5*
**EXAMINATIONS**
2:*13*
**examined** 4:*15*
**example** 84:*24*
**exceeds** 84:*14*
88:*19*
**excerpt** 92:*2*
**excessive** 9:*6, 11,
14* 60:*17, 23* 64:*23*
67:*21* 68:*19* 79:*22,
24* 80:*4* 81:*22*
89:*18* 94:*4, 6, 15*
**Excluding** 10:*24*

**Exhibit** 2:*1, 4, 5, 6,
7, 8, 9, 10, 11, 12, 13*
14:*12, 21* 25:*11, 12,
15, 19, 21* 33:5, *6,
10* 34:*20, 21, 23*
35:*1, 18* 36:*14*
38:*10* 39:6, *24*
41:*1, 10* 42:*1, 3, 7,
17* 44:*22* 46:*11, 12,
13, 17, 25* 47:*1, 2, 4*
48:*9, 10, 11, 12, 15,
20* 49:*4, 8, 16* 51:*5,
6* 53:*1, 2, 12, 15, 16,
17, 18* 55:*5, 14*
56:*3, 4, 16, 22, 23*
59:*16, 17* 61:*12, 17*
63:*19, 22* 64:*3, 9*
65:*8, 24* 66:*8* 69:*6*
74:*2, 5* 80:*13, 14*
81:*24* 83:*14* 87:*11*
88:*5, 7* 91:*24* 92:*2,
11*
**EXHIBITS** 2:*1*
104:*21, 23*
**existing** 41:*11*
**exited** 19:*10* 27:*6,
13*
**exonerated** 64:*10*
68:*6*
**exonerations** 77:*5*
**expect** 78:*11* 96:*11*
**expected** 84:*14*
86:*24* 88:*19*
**experience** 7:*8*
18:*3* 28:*4* 72:*25*
89:*16*
**experiencing** 102:*6*
**expired** 83:*1*
**explain** 98:*20*
**extensive** 75:*15, 21*
76:*5* 79:*4* 93:*23*
**extent** 8:*14* 25:9
32:*8* 38:*18* 50:*3*
72:*3, 19* 77:*4*
**extra** 99:*12*

**< F >**
**facing** 37:*20, 22*

**fact** 14:*19* 21:*21*
41:*18*
**failed** 69:*14, 17, 18*
**failing** 74:*20*
80:*18* 83:8, *10*
**fails** 86:*24*
**failure** 63:5, *6, 16*
73:8
**failures** 73:*4*
**fair** 79:*12* 80:*8, 24*
88:*16* 93:*21*
**fairly** 84:*10*
**faith** 39:7, *12, 18*
43:*1, 3, 5* 55:2, *6,
11*
**fall** 36:22 72:*23*
**falling** 29:*21*
**fallout** 61:*4*
**false** 62:*12, 14*
**familiar** 73:*1*
91:*25*
**family** 5:*21, 22*
8:2 95:*24* 96:*4, 10,
15, 23*
**far** 7:*25*
**fast** 100:*4*
**fault** 81:*12*
**Federal** 4:*8* 21:*5*
**feels** 32:*20*
**feet** 23:*4, 8* 24:*12*
29:*6, 20* 49:*1* 50:*3*
**fell** 20:*13* 53:*5*
55:*13*
**fellow** 89:*24*
**felt** 30:*14* 46:*8*
62:*4* 77:*12* 99:*10*
**field** 8:*2, 20, 25*
9:*1* 17:*10* 20:*2*
29:*23* 33:*17* 37:*8*
79:*1* 99:*5, 6, 14*
**figure** 67:*18*
**figured** 94:*17*
**file** 12:*5* 83:*11*
**filed** 12:*3*
**filled** 84:*21*
**finally** 19:*20*
**financial** 104:*7*

**find**  28:*6*  53:*6, 9*
68:*15*  76:*3*  93:*8*
94:*15*
**finding**  64:*13*
69:*12*  70:*6*  94:*8*
**fine**  37:*25*  77:*24*
**finish**  7:*16*
**fire**  28:*20*  34:*4, 5*
**firearm**  27:*23*
28:*6, 7, 12, 18*
98:*22*
**firefighter**  34:*4*
**Firm**  3:*4*  104:*1, 15*
**first**  4:*15*  20:*19*
27:*14*  30:*15, 17*
33:*4*  37:*6*  49:*2*
61:*9*  64:*6*  65:*2*
69:*8*  73:*21*  82:*5*
83:*3*  92:*8*  96:*16*
**Fite**  8:*6, 9, 11*
66:*22*  67:*4, 6, 14,*
*16, 23*
**Fite's**  66:*17*  67:*10,*
*20*  68:*3*
**five**  98:*11*
**fixed**  92:*16*
**flee**  29:*4, 18*  36:*23*
**flip**  66:*25*  70:*9*
71:*14*  72:*8*  85:*9*
**focus**  5:*16*  63:*14*
66:*3*
**folks**  43:*25*  44:*21*
**followed**  19:*1*
**following**  17:*21, 24*
22:*7*  91:*2*  104:*1, 4*
**follows**  4:*16*  104:*1*
**foot**  39:*21*  40:*3*
41:*21*
**footage**  11:*8, 10,*
*12, 14, 20*  12:*15*
*15:11, 23*  24:*3*
95:*22, 23*  102:*12*
**force**  8:*4, 7*  9:*7,*
*11, 14, 24*  29:*13*
*43:19, 20*  50:*1, 2, 4*
*60:17, 23*  64:*11, 16,*
*22*  66:*18*  67:*4, 11,*
*13, 22*  68:*8, 9, 18,*
*19, 20*  69:*2, 9, 15*

**generally**  15:*1*
88:*24*  96:*13*
**GEORGIA**  1:*1*
5:*8, 24*  104:*4, 8*
105:*2*
**getting**  36:*9, 16*
96:*5*
**girl**  53:*23*
**give**  6:*1*  33:*7*
52:*25*  61:*8*  86:*17*
87:*17, 18*
**given**  13:*16*  44:*11*
85:*5*  90:*17*  105:*9*
**go**  4:*2*  7:*13*  23:*18*
24:*1*  31:*18*  44:*17*
63:*9*  75:*25*  78:*17*
80:*13*  81:*9, 15, 21*
84:*3*  91:*2*  98:*2*
100:*18*
**goal**  84:*4*  85:*10*
**God**  59:*24*
**goes**  6:*3*
**going**  10:*11*  14:*11,*
*16*  19:*15*  20:*14*
24:*21*  29:*4*  30:*9*
33:*2, 4*  34:*19*
42:*18*  46:*12, 25*
48:*9*  50:*15*  51:*4*
52:*25*  56:*21*  57:*9*
59:*16*  60:*23*  63:*19*
66:*25*  67:*1*  70:*9*
71:*14*  73:*23*  77:*15,*
*17*  78:*3, 9*  83:*13*
84:*3*  85:*9*  87:*16*
95:*9*  101:*11*
**Good**  4:*1, 2*  24:*16,*
*24*  38:*5*  39:*7, 12,*
*18*  43:*1, 3, 5, 6*
52:*2*  55:*2, 6, 11*
75:*23*  76:*2*  77:*12*
81:*17*  91:*11*  93:*6,*
*14*  97:*2, 3, 8*
**Google**  33:*15, 23*
34:*8, 11*
**Googling**  34:*4*
**grab**  28:*22*  29:*7*
36:*19*  37:*9*  81:*10*
**grabbed**  36:*4, 17*

37:*1*  56:*9*
**grabbing**  29:*11*
**graduate**  7:*10*
**Griffen**  72:*11*
**GRIFFIN**  1:*1*  4:*6,*
*20*  5:*1*  6:*12*  11:*18*
15:*12, 24*  16:*11, 18*
17:*15*  18:*21*  19:*12*
20:*7, 11, 18, 19*
21:*25*  22:*3*  23:*3, 9*
24:*17, 25*  25:*22*
26:*19*  27:*19*  28:*3,*
*14, 22*  29:*8, 11*
30:*6, 18, 20, 25*
31:*17, 21*  32:*3, 5*
35:*4, 10*  36:*5, 16*
37:*14, 18*  39:*10, 16,*
*20*  40:*1, 5, 8, 13, 19,*
*25*  41:*3, 11*  42:*25*
45:*3, 9*  46:*2, 8, 17,*
*22*  47:*8, 14, 18, 22*
48:*3, 16, 24*  49:*5, 7,*
*11*  52:*11*  53:*22*
54:*10, 19*  55:*13, 25*
56:*7, 10*  58:*20, 23*
59:*21*  60:*16, 22*
61:*17*  62:*1, 15, 25*
64:*22*  66:*19*  69:*15*
70:*10, 14, 18*  71:*6,*
*24*  72:*4, 10, 12, 17*
73:*9, 12*  80:*19*
86:*10, 16*  87:*7, 13*
88:*1, 9*  94:*25*  95:*7,*
*21*  96:*25*  97:*18, 23*
99:*7, 8, 18*  100:*1,*
*20*  101:*20, 25*
102:*5*
**Griffin's**  25:*5, 16*
27:*15, 22*  30:*21*
42:*6*  51:*12, 17*
56:*13*  95:*16*
**ground**  20:*12*
**grow**  5:*4, 5*
**guess**  4:*2*  9:*21*
10:*11*  20:*5*  23:*7*
61:*9*  63:*8*  68:*2*
76:*9*  77:*8*  78:*10*
79:*12, 18*  80:*7*

72:*15*  74:*21*  76:*4*
79:*1, 6, 15, 17, 22,*
*24*  80:*2, 3, 10*
81:*22*  82:*11, 14*
89:*8, 18*  91:*13, 25*
92:*3, 21*  93:*9, 24*
94:*5, 6, 8, 9, 15*
95:*13*
**foregoing**  105:*4*
**forgot**  81:*11*
**form**  58:*4*  65:*15*
74:*11, 16*  77:*20*
78:*6*  100:*8, 15*
**formatting**  14:*24*
**forms**  104:*6*
**forward**  62:*18*
**found**  66:*9*  77:*14*
94:*4*
**Four**  7:*4, 21*  23:*4,*
*8*  24:*12*  84:*13*
85:*10, 15*  86:*1*
**fracture**  41:*9, 17*
**freeze**  70:*14, 16*
71:*12*
**friend**  8:*11*
**friends**  95:*24*  96:*3,*
*10*
**front**  23:*14, 16*
27:*16*  32:*22*
**frowned**  88:*24*
89:*3*  90:*7*
**froze**  70:*11, 16*
71:*1*
**frustrated**  60:*7*
**full**  5:*2*  25:*9*
**FULTON**  105:*3*
**fun**  51:*22*
**funny**  52:*17*  53:*6,*
*8, 9*
**further**  20:*14*
50:*2, 5*  67:*25*  90:*9*
98:*4*  103:*5, 17*

**< G >**
**GA**  3:*6, 17*
**gain**  29:*2*  48:*18*
**gathering**  79:*18*
**general**  18:*10*
78:*12*  91:*16*

Exhibit A
11/5/2020

Griffin vs. City of Atlanta                Matthew Abad

84:24  90:11  96:1
**guide**  44:15
**gun**  28:2, 9, 14
  57:12
**gunpoint**  37:15
**guys**  47:19  48:4
**guy's**  32:22

**< H >**
**half**  73:16
**hand**  19:6  20:4, 8
  30:7  34:1  37:24
  46:18, 23  70:11, 15,
  18  99:19  100:1, 21
**handle**  31:17, 18
  56:12
**handled**  32:25
**hang**  29:4
**hanging**  29:6
**happen**  78:12
  93:5  96:22
**happened**  18:18
  29:22  52:18  58:17,
  23  59:3, 7  60:5
  96:7, 9, 21  100:3
**happens**  75:4
**happy**  78:10  97:13
**hard**  45:5  53:5
**head**  69:21, 24
**heading**  64:3
**head-on**  20:20
  22:1, 4
**head-to-head**  18:23
**hear**  9:16, 17
  35:13  40:5, 8, 19,
  25  47:8, 10, 14, 17,
  22  48:3  51:8  52:5
  53:4, 22  54:9
  56:24  57:2  59:18
  74:12  85:16
  100:12
**heard**  6:18  9:14
  47:21  52:9  64:15,
  20  66:17  75:16
  77:2, 7  78:20, 24
  79:2, 4, 16  89:6, 11,
  15, 22  90:1  94:7,
  11  95:9

**height**  24:10
**heightened**  75:11
**help**  45:15  85:22
  96:19
**helping**  96:17
**hey**  38:4
**high**  5:10  7:13
  23:4
**higher**  81:8
**highlight**  73:3
**highlighted**  61:16
  62:11  65:5  70:10
  71:15  72:9  82:17
**highly**  84:14  88:19
**hindsight**  45:19
**histories**  76:5
**history**  75:6, 15, 21
  76:2  77:1, 3, 10, 15
  78:2, 5  79:5, 13, 17,
  21  80:10  82:3
  93:23
**hit**  20:20  22:1, 4
  35:15  57:7
**hold**  20:9  29:17,
  21  46:19  98:22
**holding**  61:19
  62:4, 6, 21
**holidays**  96:18
**home**  78:19
**homeowner's**  23:22
**honest**  78:16
  91:12, 14
**honestly**  71:3
**hope**  78:10
**hopefully**  29:21
**hospital**  80:19
**hot**  78:21
**hot-head**  78:21
**hours**  7:25
**house**  19:19  23:15
  34:3, 5
**house's**  19:9
**Howell**  19:1
**human**  57:25
  58:12
**hurt**  24:17, 25
  30:10, 21  32:7, 20,
  21  41:3  42:18

47:19  48:4  54:1
  95:2  97:9  98:1
**hurting**  20:12  40:9
**hypothetical**  57:7,
  14, 18

**< I >**
**idea**  68:5  80:5
  82:13
**ideas**  93:17
**identify**  22:18
**impairment**  8:18
**impartiality**  104:12
**important**  98:7
**improvement**  92:13
**impunity**  69:3
**Inaudible**  75:23
**incident**  4:25  11:5
  58:16, 18  61:5
  64:17  72:14  73:5,
  17  74:10  76:12, 22,
  23  77:1  83:25
  85:25  86:8  87:2
  102:11
**incidents**  92:21, 22
  93:9
**include**  5:22  14:1
  83:25
**included**  11:25
  12:17
**including**  4:9
  43:18  68:7, 16
**increase**  93:3, 13,
  15
**increased**  92:21
**increasing**  93:10
**INDEX**  2:1, 13
**indicate**  21:22
**indicated**  73:5
**indicates**  87:25
**indication**  42:10
**informally**  6:18
**information**  11:4
  12:16, 18, 19
**initial**  11:17, 21
  22:16  62:20
**initially**  15:25
  29:2  32:17

**injured**  16:2, 4, 12,
  19, 21, 24  32:15
  49:23  50:8, 24
  52:21  54:13  63:17
  72:18, 20  99:8
  102:1, 7
**injuries**  25:6, 8
  102:4
**injury**  42:17  50:4
  72:3, 11, 19  73:2
**instant**  14:2
**instruct**  44:9
**instructor**  8:6
  67:11
**insult**  54:2
**intending**  48:17
**interacting**  85:12
**interest**  104:7, 10
**internet**  97:12
**interrogatories**
  14:22
**interrogatory**  14:19
**interrupt**  76:1
**intersection**  23:14
  27:1
**interviews**  59:3, 7
**intoxicated**  29:16,
  19  30:4  37:2
**intoxication**  29:5
  36:22
**intrusive**  6:5
**investigated**  62:23
  68:7, 17  81:22
  94:10
**investigation**  6:13,
  16  63:3, 12  64:1
  69:5  70:23  94:8
**Investigative**  17:11
  64:4
**Investigator**  64:20
  65:8, 22, 25  66:5,
  12
**involved**  63:2
  73:20  89:20  95:14
**involvement**  37:7
**Island**  5:7
**issue**  32:17  68:25
  89:5  90:21

issues 69:1 92:12

< J >
JACQUITA 3:13
job 7:1
JOHN 1:1
joking 51:12, 16
54:10
jparks@atlantaga.g
ov 3:21
judgment 79:12
July 83:22
jumbled 16:7
June 83:23
jury 6:3, 4 66:11
justice 5:18
justified 28:9, 19
42:25 43:20 55:1
57:13 66:19 67:5,
12 68:9
justify 71:6

< K >
Kahn 2:18, 20 3:3
4:1, 18, 19 15:15,
19, 22 16:15 24:20
25:4 26:8, 17
28:21 32:1 33:7, 9
34:10, 18 35:22
36:3 38:13, 16, 21,
23 39:2, 4 41:8, 16,
25 42:14, 23 43:16,
24 44:6, 20 45:1,
13 46:1 47:3 50:6,
14 51:3, 15, 21
52:14, 24 54:5, 16,
24 55:22 56:20
58:2, 6, 10, 15
60:21 61:2 64:25
65:13, 18, 20 66:16
68:12, 23 71:4, 9
73:15 75:19, 24
76:8 77:21 78:13
80:6 81:11, 20
86:13 87:3, 10, 15,
23 88:23 91:17, 23
94:2, 23 95:4 97:5
99:21 100:8, 13, 14,

15, 24 101:3, 7, 15
103:2, 6, 17
Kane 6:8
key 84:13
kind 70:11, 12
78:17 95:11 96:6,
20
knew 16:1, 4, 12,
19, 20, 21, 24 32:9,
24 45:25 77:15
knocked 20:8
know 4:20 6:22
8:9 13:7 14:18
18:13 25:5, 8, 9
26:6, 21 29:5
30:14, 21 32:8, 11,
25 33:25 39:22
42:18 45:19, 23, 25
50:16 60:4 67:23,
25 71:2 72:2, 19,
20 76:9 77:3, 4, 5,
6, 8 79:13, 24, 25
80:3 81:13 82:15,
17, 19, 20 84:13
87:5, 6, 12, 17 88:9
89:4, 10 90:5
93:20 94:13 95:5,
22 96:15 98:5, 6
101:25
Knowing 45:19, 23
knowledge 26:5, 14
43:14, 22 44:3, 8,
11, 12 55:20
102:16
known 42:22
79:20

< L >
labeled 80:4
lastly 97:22
laugh 52:20
laughed 52:15
laughing 53:5
54:10 85:21
Lauren 6:8
Law 3:4, 14 7:7
33:15, 23, 25 34:1
104:4

lawsuit 10:18, 21
12:6, 7 13:8
lawyers 10:24
103:10, 14
lead 88:18
leading 48:24
99:21, 23 100:24,
25 101:3, 8, 15
leaning 8:17
61:19 62:5, 8, 15,
18
learn 94:14
learned 77:14
78:1, 2
learning 8:15
ledge 23:4, 10, 17,
19 24:2, 8, 10, 12
26:2, 12
left 19:6 35:12
39:21 40:2 56:10,
13
left-hand 92:10
leg 25:25 47:9, 15,
18, 23
Lenox 3:5
lesson 43:23
letter 81:5, 6
lettering 19:11
level 29:3, 5 32:9
36:2, 21 37:6
39:13 80:3 81:8
98:2
lieutenant 74:8, 9
life 57:25 58:12
light 19:2 90:9
lightly 98:22
lights 21:16 22:5
likes 97:8
line 94:18
lines 89:14
lingering 92:12
list 84:22
listed 82:5
listen 66:11, 15
lists 64:6
litigation 12:5
98:8

little 6:1 17:3
51:10 53:23 80:25
82:23 92:19
live 5:23
loaded 35:23
Long 5:7 7:3, 20
39:7 43:1 76:15,
20, 21
look 14:18 39:23
48:25 52:2 65:1
69:5, 10 82:15
97:2, 3, 8
looked 11:13
12:10, 20 13:1
30:12 41:10, 18
42:6 49:7 70:11
89:19
looking 17:14
18:7 23:6 42:17
67:21 87:4 97:20
101:19, 21
looks 14:24 48:18
65:25 69:8
lot 8:2 9:5 32:18
45:24 51:9 60:7
91:9 96:17
low 27:23 28:12,
18 98:19, 21, 24
99:2
lower 27:24 85:6
93:18, 22
luck 79:12
Lucy 1:1 105:15

< M >
ma'am 99:4
100:23 101:24
102:13, 17, 20
Madam 4:12
magnitude 78:12
maintain 20:7, 18
29:1 36:20
maintained 19:5
maintaining 29:15
61:18 62:2 104:11
making 15:12
17:1 29:18 30:20
34:16 44:13

104:*11*
**man** 42:*16* 53:6
**maneuvers** 44:*4*
**manner** 84:6
101:*3*
**man's** 26:*12*
**marathon** 81:*14*
**MARIE** 3:*12*
**marked** 22:*18, 22*
33:*4, 6* 34:*20, 23*
46:*12, 13, 25* 47:2
48:*10, 11* 51:5, 6
53:*16, 17* 56:2, *4,*
*22, 23* 59:*16, 17*
**markings** 21:*21*
**marks** 52:8
**Matt** 4:*19* 100:*13*
**matt@butlerfirm.co**
**m** 3:8
**matter** 42:*15*
104:*10, 16*
**MATTHEW** 1:*1*
3:*3* 4:*4, 14* 5:*3*
**MDT** 17:*25*
**mean** 9:*13* 10:*13,*
*14* 11:6 12:*4*
17:*12* 22:*20* 26:*6,*
*15* 27:*25* 42:*15*
45:*24* 47:*19* 48:*4*
50:*1* 67:*17* 71:*2,*
*10* 75:*25* 90:*24*
91:*11* 93:5 97:2
**meaning** 18:*12*
62:7
**means** 69:*14*
**meant** 13:5, *7*
35:*11*
**measure** 23:6
24:*10*
**medical** 26:9
32:*14* 72:*13*
**meet** 12:*13* 59:2, 6
86:*23, 24*
**meeting** 73:*19, 21*
**members** 5:*21*
95:*24* 96:*4, 11*
**mention** 78:*20*
81:*12*

**mentioned** 8:*13*
12:*16*
**mesh** 19:*10*
**messages** 14:*1*
58:*22*
**messaging** 14:2
**met** 93:7
**middle** 83:*3*
**military** 5:*19*
**Mill** 19:*2*
**MILLER** 3:*11*
**mind** 10:7 16:*8*
74:*13*
**mine** 14:*10*
**minimize** 61:*4*
**minute** 46:*18* 61:*9*
**minutes** 98:*11*
**Miranda** 46:*3*
**misconduct** 89:2, *7*
**misleading** 88:*17*
**mistake** 16:7
**mock** 54:*13*
**mocking** 85:*21*
**model** 21:*11*
**moment** 11:*17*
60:*13* 63:*20*
**month** 7:*4*
**months** 76:*19*
**moral** 90:*24*
**morning** 4:*1*
11:*15, 21, 24* 17:*7*
**move** 5:*8* 47:*8, 15,*
*23* 48:*25* 62:*22*
**moved** 20:*8* 49:*1*
**multiple** 73:*4*
**murder** 57:*22*

**< N >**
**NAIR** 3:*12* 100:*10,*
*14*
**name** 4:*19* 5:2
6:7 19:*3* 83:2, *3, 4,*
*20* 90:*3, 11*
**national** 33:*17*
**nature** 8:*3* 93:5
**NE** 3:5
**near** 56:*25*
**necessary** 29:7
43:*19* 44:9 98:*23*

**need** 15:*4* 44:*16*
72:*13* 77:*22* 81:*13*
**needed** 45:*15* 83:6
85:*22*
**needs** 92:*16*
**negativity** 95:*11*
**neighboring** 19:*9*
**nervous** 78:*4, 8*
**never** 16:*8* 82:*14*
84:*21* 87:5, *6*
89:*20* 93:*14, 15*
95:*17*
**New** 5:*7, 10*
**news** 91:2 96:2
97:*12*
**nice** 92:*15*
**night** 18:*18* 21:8
76:*16* 102:*11*
**Nissan** 21:*13*
**Nixon** 65:*3, 8, 25*
66:*12*
**Nixon's** 64:*20*
65:*22* 66:5
**NORTHERN** 1:*1*
**noted** 15:*20* 39:2
**notice** 4:*4* 8:*16*
**noticed** 19:*24*
99:*10*
**noticing** 104:*16*
**November** 1:*1*
73:*23* 105:*12*
**number** 82:*16*
84:*4* 93:*18, 22*

**< O >**
**O.C.G.A** 104:*6, 7,*
*17*
**OA** 74:*23* 75:*1*
**Object** 100:*8, 15*
**objecting** 58:*8*
101:7
**Objection** 15:*14,*
*16* 16:*13* 24:*19*
25:2 26:*4, 13*
28:*16* 31:*22* 34:*6,*
*13* 35:*19, 25* 38:*11,*
*14, 17* 39:2 41:*5,*
*13, 22* 42:*11, 20*
43:*13, 21* 44:2, *19,*

*23* 45:*11* 49:*25*
50:*11* 51:*1, 14, 18*
52:*12, 22* 54:*3, 14,*
*22* 55:*19* 56:*18*
58:*1, 3, 13* 60:*20,*
*25* 64:*24* 65:*12, 14,*
*15* 66:*13* 68:*10, 21*
70:*25* 71:*7, 25*
73:*13* 75:*18, 22*
76:*6* 77:*19* 78:*6*
79:*23* 84:*20* 86:*4,*
*11, 18* 87:*1, 8, 14*
88:*21* 90:*19* 91:*15,*
*20* 93:*19, 25* 94:*21*
95:*1* 97:*1* 99:*21*
100:*11, 24* 101:*15*
**objections** 44:*14,*
*16, 17*
**objective** 43:*8*
**obligation** 104:*12*
**observe** 23:*9*
**obvious** 31:*20, 24*
32:2 72:*22*
**obviously** 32:*24*
**occur** 60:*9*
**occurred** 72:*12*
**occurrence** 9:*18*
**offense** 75:*11*
**office** 58:*25* 62:*23*
**Officer** 4:*1, 19* 5:*1*
7:2 9:*6, 9, 10, 23*
10:*1, 5, 6, 8* 15:*18*
18:*24* 20:*10, 17*
26:5, *14* 28:*17*
30:*14, 17, 20* 31:*23*
33:*21* 34:*7, 14*
35:*20* 36:*1* 37:*11*
38:*12, 24* 39:*16*
41:*6, 14, 23* 42:*12,*
*21* 43:*14, 22* 44:*7,*
*24* 49:*22* 50:*12*
51:*8, 19, 22* 52:*6,*
*11, 20* 53:*6* 54:*1, 9*
56:*9* 57:*25* 58:*9,*
*12* 65:*19* 66:*14, 22*
72:*9, 13* 73:*4*
75:*21* 76:*25* 78:*7*
84:*24* 85:*6* 86:*5*
87:*24* 88:*12* 89:*1,*

*11*, *12*, *17*, *18*, *24*
91:*12*  93:*9*  94:*10*
98:*16*  99:*15*, *17*, *19*,
*25*  100:*2*, *19*, *21*
101:*5*, *11*, *14*, *17*, *19*,
*23*  102:*1*, *22*, *23*
103:*1*, *3*

**officers**  11:*9*
20:*15*, *18*  21:*5*
31:*16*  32:*13*  35:*17*
37:*9*  43:*17*, *25*
49:*13*  50:*8*, *24*
56:*16*  64:*16*  68:*16*
69:*2*  76:*4*  78:*25*
89:*19*, *23*  91:*13*
93:*23*  94:*4*

**officer's**  89:*1*, *7*
99:*15*

**official**  6:*17*  9:*22*
63:*10*

**officials**  68:*6*

**Oh**  13:*2*  22:*24*
59:*24*  77:*23*

**Once**  19:*19*  30:*3*
39:*11*, *17*  44:*18*

**one-way**  19:*4*

**opened**  36:*12*, *25*

**operating**  10:*2*

**opinion**  26:*9*, *11*
64:*2*  68:*3*  86:*19*
92:*8*

**opinions**  93:*17*

**opportunities**  92:*12*

**OPS**  6:*16*  12:*19*
59:*3*, *7*, *13*  70:*22*
73:*25*  75:*6*, *15*, *21*
76:*25*  77:*3*, *7*  78:*2*,
*5*  79:*14*  82:*2*, *9*, *14*
94:*7*, *14*, *18*

**option**  45:*10*  94:*1*,
*3*

**oral**  75:*1*, *4*, *5*, *7*
81:*1*

**order**  33:*18*, *20*
83:*1*

**ordering**  104:*24*

**ostracized**  89:*8*

**outcome**  6:*15*

**outlining**  12:*7*

**outside**  15:*9*  73:*25*

**owes**  94:*24*

**< P >**

**p.m**  98:*13*  103:*19*

**packet**  13:*8*

**Page**  2:*1*, *13*  61:*15*
65:*2*  66:*21*  70:*9*
71:*14*  72:*8*  84:*3*
85:*9*

**pages**  66:*24*

**pain**  31:*21*, *24*
32:*3*, *6*, *8*, *9*  40:*5*,
*25*  41:*20*  42:*10*, *19*
49:*7*  54:*20*  55:*24*
72:*23*  97:*9*  102:*6*

**pamphlet**  92:*3*

**pandemic**  3:*25*
4:*11*

**paperwork**  31:*18*

**paraphrasing**  81:*5*

**Parks**  2:*19*  3:*13*
15:*14*, *17*  16:*13*
24:*19*  25:*2*  26:*4*,
*13*  28:*16*  31:*22*
34:*6*, *13*  35:*19*, *25*
38:*11*, *15*, *19*  41:*5*,
*13*, *22*  42:*11*, *20*
43:*13*, *21*  44:*2*, *15*,
*23*  45:*11*  49:*25*
50:*11*  51:*1*, *14*, *18*
52:*12*, *22*  54:*3*, *14*,
*22*  55:*19*  56:*18*
58:*1*, *4*, *8*, *13*  60:*20*,
*25*  64:*24*  65:*12*, *15*
66:*13*  68:*10*, *21*
70:*25*  71:*7*, *25*
73:*13*  75:*18*, *22*
76:*6*  77:*19*  78:*6*
79:*23*  84:*20*  86:*4*,
*11*, *18*  87:*1*, *8*, *14*
88:*21*  90:*19*  91:*15*,
*20*  93:*19*, *25*  94:*21*
95:*1*  97:*1*  98:*11*,
*15*  99:*22*, *24*
100:*17*, *25*  101:*4*, *9*,
*10*, *16*  102:*25*

**part**  8:*22*, *24*
11:*16*  15:*11*  62:*11*
98:*7*

**particular**  60:*12*

**particularly**  97:*3*
102:*14*

**parties**  12:*5*
104:*18*, *24*

**partner**  76:*10*, *17*
77:*16*  78:*3*

**partnered**  77:*9*

**partners**  76:*13*

**parts**  11:*11*, *19*

**party**  10:*18*, *21*
104:*13*, *18*

**passed**  99:*18*, *25*
100:*20*  101:*13*

**Password-Protected**
104:*22*, *23*

**Patrick**  8:*6*

**patrol**  11:*23*

**pattern**  18:*2*

**people**  72:*25*
79:*11*  86:*6*  89:*4*
90:*1*, *20*  95:*8*, *9*
96:*7*, *17*, *19*

**perceiving**  39:*12*

**percent**  92:*22*
93:*10*

**perception**  39:*18*
71:*1*

**perform**  99:*6*, *13*

**performance**  70:*4*
83:*18*  84:*14*  85:*10*
86:*24*, *25*  87:*5*
88:*14*, *17*, *20*
102:*21*

**performing**  84:*18*
99:*5*

**period**  6:*11*  76:*20*
83:*22*

**permitted**  4:*9*

**person**  59:*1*, *19*
68:*7*, *8*, *16*, *17*  88:*8*
89:*8*  96:*12*

**personal**  26:*5*, *10*,
*14*  43:*14*, *22*  44:*3*,
*8*, *10*, *11*  55:*20*
93:*17*

**personally**  8:*9*
31:*1*  95:*6*

**person's**  83:*2*

**perspective**  45:*5*

**pertaining**  11:*5*
64:*17*

**pertinent**  12:*16*, *18*

**phone**  96:*5*, *6*

**physical**  29:*13*

**pick**  6:*3*  84:*23*

**pinned**  57:*15*

**pistol**  27:*21*  35:*3*

**place**  104:*17*

**placed**  73:*5*

**Plaintiff**  1:*1*  3:*2*
4:*20*  10:*19*  25:*21*
46:*17*  47:*1*  48:*10*
51:*5*  56:*22*  99:*7*

**Plaintiff's**  14:*12*,
*21*, *22*  25:*12*, *15*, *18*
33:*5*, *10*  34:*20*
35:*1*, *18*  39:*10*
39:*6*, *24*  41:*1*, *10*,
*18*  42:*3*, *7*  46:*12*
47:*4*  48:*12*, *15*
49:*4*, *16*  53:*2*, *12*,
*16*, *18*  55:*5*, *14*
56:*3*, *16*  59:*16*
61:*12*, *16*  63:*22*
64:*3*, *9*  65:*8*, *24*
66:*7*  69:*6*  74:*2*, *5*
80:*14*  81:*24*  83:*14*
87:*11*  88:*4*, *7*  92:*2*,
*11*

**plan**  22:*7*  61:*4*

**plates**  17:*18*

**play**  33:*13*  47:*10*

**playing**  33:*14*
34:*24*  36:*15*  39:*25*
46:*16*  47:*7*, *13*
48:*22*  51:*7*  53:*3*,
*21*  56:*5*

**please**  4:*12*  79:*19*
98:*12*, *19*

**point**  14:*17*  27:*14*
28:*9*  29:*19*  35:*23*
46:*2*  90:*6*

**Pointe**  3:*5*

**pointed** 28:2, *15*
57:12 83:4, *6*
**police** 9:9, *19* 10:5
18:5, *14* 19:*11*, 21
21:6, *9, 16*, 22
22:*17, 19, 21*, 22
23:2 27:13 33:*21*
35:*16, 17*, 24 37:9,
*11* 39:16 43:*17*, 25
49:*13*, 22 50:8, *24*
51:22 52:3, *20*
54:*1* 56:16 57:24
58:*11* 60:10 61:8,
*10* 62:11 64:*16*
69:2 78:*15*, 25
79:7, *21* 80:9
88:25 89:*1, 11, 12,
18, 19* 91:*3, 6, 12,
13, 19* 93:9, 23
**policing** 90:*10*
**policy** 7:23 43:*11,
18* 44:*1*, 22 54:12
**political** 90:*17*
**Pope** 104:9, *15*
**position** 27:24
28:*12, 19* 98:3, *19,
20, 21, 24* 99:2
**possession** 28:7
**possibilities** 45:7,
*12*
**possibility** 24:*16, 24*
**possible** 8:*17*
15:*18* 24:*14* 26:7,
*15, 16* 29:*10, 12*
38:6 42:*13* 45:*14,
16* 62:*10* 71:8, *16,
21* 87:9 94:*1*
**POST** 7:24
**posted** 7:24
**potential** 28:*1*
90:*12* 98:*23* 102:*3*
**practice** 89:*23*
**pre-dating** 7:8
**preface** 6:*1*
**preop** 25:*15*
**prepare** 11:*1* 17:5
**prepared** 61:9
**presence** 9:*12, 13*

**press** 20:*14*
**pressures** 99:*10*
**presumably** 85:2
**Pretty** 30:*19* 53:5
68:*13* 79:19 91:*10*
94:*19*
**prevent** 22:*15*
29:*17*, 21 36:*21*
**previous** 12:*14*
**previously** 93:*12*
101:*1, 5*
**pride** 96:*17*
**primarily** 17:*13*
**prior** 37:*16*
**prisoner** 72:5
**probable** 93:5
**Probably** 9:*4*
19:*25* 76:*19* 86:*19*
102:7
**problem** 38:*18*
90:*25* 91:*6, 18*
92:*16* 93:*1* 94:*19*
**problematic** 68:*15,
24* 76:*3* 93:8
**Procedure** 4:8
10:2
**proceeding** 9:*23*
104:*19, 23* 105:9
**proceedings** 104:*10*
**process** 70:2 98:8
**produced** 104:*19*
**Professional** 62:*24*
84:*6*, 25 86:7, *8*
104:*12*
**professionalism**
85:*11*
**professionals** 32:*14*
**prohibited** 104:*17*
**prohibitions** 104:7
**proof** 21:*4* 24:5
**proper** 44:9
**protect** 69:*23*
**protection** 83:*1*
**proud** 97:*13*
**prove** 20:*23*
**provide** 104:*15*
**prudent** 39:*15*
**public** 18:*11*
**publicly** 95:20, *23*

**pull** 21:25 22:*3, 6,
8* 25:*11* 37:*10*
42:*1* 61:9 63:*19*
67:*19* 83:*13*
**pulled** 36:5 62:9,
*19*
**pulling** 62:*20*
**punish** 94:*4*
**punished** 68:*19*
**purpose** 18:*12*
**purposes** 4:9
**pursuant** 4:4, *7*
**pushing** 53:5
**put** 34:*4* 39:*20*
40:2 41:*20* 42:8
44:6 57:*11, 21*
70:22 84:*18* 99:9,
*11*
**putting** 57:*3*
**puzzling** 68:*13*

**< Q >**
**question** 6:5
12:*15* 15:*20, 21*
16:*17* 21:8 22:*20*
24:*21* 29:*12* 31:*13,
25* 38:*17, 21, 24*
39:*3* 41:*24* 44:7,
*18* 45:6 49:*3* 50:7,
*23* 65:*18, 21* 66:4
67:2, *3* 76:*16*
77:22, *25* 78:*1*
84:*1* 100:9, *16*
101:*9, 12*
**questioning** 19:*22*
**questions** 14:6
33:2 61:7 64:*1*
82:*3* 92:6 97:*15*
98:4, *16* 102:*25*
103:*3, 17* 104:*20*
105:6
**quickly** 14:*16*
**quite** 79:*16* 81:*1*
96:5
**quote** 24:*16, 17, 24*
47:*9, 19, 20* 52:6, *7,
8* 53:*23, 24* 56:*24*
57:2 59:*18, 19, 24,*

*25* 61:*17* 67:*1*
71:*16*

**< R >**
**radioing** 26:*23*
**ran** 17:*24* 18:*1*
**range** 83:*25*
**rat** 89:*13*
**Rateau** 1:*1* 105:*15*
**rating** 84:*12* 85:6
86:*14*
**ratings** 86:*15*
**reach** 36:*11*
**reached** 88:*4*
**reaction** 73:2
**read** 12:*23* 13:2
14:*23* 15:*9* 46:2, *5*
**reader** 88:*18*
**reading** 88:8
**ready** 27:*23* 28:*12,
18* 98:*19, 21, 23, 24*
99:2
**realize** 102:7
**really** 26:2 71:2
96:6
**realm** 45:7, *12*
**re-ask** 15:*21*
**reason** 6:2 19:*14*
22:*10* 31:*15* 32:5
36:*4* 37:*10* 63:*21*
**reasonably** 39:*15*
**recall** 10:*15* 17:*1*
19:2 39:22 40:*21*
43:*23* 44:25 58:*21*
60:*4, 7* 63:*4*
**receives** 104:*18*
**Recess** 81:*19*
98:*13*
**recommendation**
94:*11*
**recommended**
74:*23*
**recommending**
94:9
**reconvene** 81:*15*
**reconvened** 103:*8,
9*
**record** 7:24 24:22
44:7 50:*16, 21*

58:9  89:17  95:14
97:24  100:18
101:2, 5  103:7
104:10, 11, 19
**recording**  4:2
**recount**  96:12
**recruit**  7:5
**recruits**  54:12
**redo**  50:15
**reduced**  105:7
**reference**  42:2
**referred**  12:6
89:12
**referring**  22:22
35:5  55:7  62:4
**refuse**  89:23
**regarding**  12:19
64:16  65:17  74:8,
9  78:23  98:19
99:5, 17  102:10, 21,
22
**register**  69:21
**regrets**  97:17
**regular**  84:15
88:20
**Regulations**  104:5
**relating**  104:23
**relationship**  76:11
104:10
**relatives**  5:22
**remember**  60:6
77:25
**remembered**
102:19
**REMOTE**  1:1
3:23
**remove**  36:8
**removed**  19:22
20:3  37:15
**repeat**  77:22
**repeated**  75:11
**repeating**  74:13
75:12
**rephrase**  15:20
31:13  65:18  75:20
80:7
**report**  9:7  10:2
12:19  20:16  23:2
60:10  61:8, 10

62:12  63:9  69:14,
20  72:14  74:20
89:1  102:10, 12, 15,
18  104:11
**reported**  9:16
10:8  92:20
**Reporter**  4:12
50:17  87:20  104:1,
3, 6, 8, 20, 21  105:1
**reporting**  69:9
89:6  104:6, 9, 15,
16
**reports**  89:12
**repository**  104:23
**represent**  4:20
**representations**
104:4
**represents**  84:5
**reprimand**  74:13
80:22, 25  81:4
**reprimanding**
74:10
**reputation**  78:14
80:9
**request**  44:13
**requested**  15:25
83:7
**required**  22:18
**reserved**  103:18
**resisting**  46:8
**respect**  57:25
58:12  84:10  98:9
**respond**  71:2
101:22
**responded**  47:19
51:10
**responding**  20:17
**responds**  65:9
**response**  85:16
**responses**  14:5, 8,
9, 20, 22  15:3, 7
**restate**  24:21
**retaliated**  89:9
**review**  11:9  75:8
85:10  102:11
**reviewed**  11:4
12:2, 7, 17, 18  13:6
14:4, 8, 10  15:6

**reviewing**  15:10
85:1, 5
**ride**  76:14
**right**  13:12, 22
16:8  20:5  21:2, 9,
19, 23  22:25  23:14,
16, 18  25:14  26:25
28:13  31:8  32:20
33:21  34:9  38:2, 5
40:23  42:16  48:7
53:23  55:2, 15
57:22  59:22  60:1
62:19  67:24  69:10
70:4  71:12  73:12,
24  75:2  80:19
81:18  84:1  86:21
88:10  91:6  98:7
**Rights**  46:3  89:25
95:16
**road**  18:22, 24
19:4
**Rogue**  21:13
**room**  103:11
**RPR**  1:1  105:15
**rule**  69:9  74:17
80:16
**Rules**  4:8, 9  73:6
104:5
**rumors**  78:24
**run**  17:18  18:7

**< S >**
**safe**  33:24
**saw**  9:6  10:1
20:19  23:18  26:12
27:17  34:11  49:18
55:5  67:4, 7  85:17
96:4, 19
**saying**  32:7  37:3
50:18  55:1  60:6
66:1  83:8  92:15
**says**  61:17  64:4,
10  65:6  67:1  70:3,
10, 24  71:15  72:9
73:3  74:17  80:16
81:6  84:4, 9, 12
85:11  92:9, 11, 19
**scan**  25:22

**scared**  30:6, 12
70:18  71:11
**scenario**  57:18, 19
**scene**  31:5, 17
**school**  5:10  7:14,
18
**scream**  40:25
**screen**  14:11, 13
25:12  33:3, 11
34:21  42:4  46:14
47:5  48:13  53:19
61:13  63:23  69:6
74:3  80:14  81:25
83:15  87:16, 17
92:4
**screws**  25:24
**scroll**  14:16  87:19,
24
**search**  33:15
**second**  18:17  33:7
52:25  75:13  82:10
100:3, 5, 6, 20
101:13
**seconds**  36:24
57:3  81:9
**section**  84:8, 19
85:2
**see**  12:14  14:12
23:12  24:1  25:11,
18, 21, 24  27:3, 7,
14, 18  30:15, 17
33:10  34:20  42:3
46:14  47:4  48:12
53:18  56:9, 12
61:12, 15, 16  63:22
64:2, 9, 11  65:2, 5,
6  66:21, 25  67:8
69:6  70:10  71:15
72:8, 16  73:3  74:2,
17, 24  80:14, 16
81:24  82:4, 10
83:14, 20  84:4, 6,
10  85:11  87:25
90:25  92:4, 9, 14,
18, 24  97:9  98:1, 2
**seeing**  54:20
55:24  96:8
**seen**  9:10  10:6
14:25  15:23  25:14

Case 1:20-cv-02514-VMC    Document 89-2    Filed 05/03/21    Page 122 of 125

Exhibit A

Griffin vs. City of Atlanta                Matthew Abad                11/5/2020

59:*19*  74:*5, 6, 11, 16*  86:*5*  89:*16*  95:*25*
**send**  58:*22*
**senior-ranking**  68:*6, 16*
**sense**  22:*25*  26:*10*  42:*16*  84:*9*
**sent**  14:*6*
**separate**  8:*23*  66:*24*
**sergeant**  84:*17*  85:*1, 5*  102:*22*
**serious**  80:*25*  81:*1*
**seriously**  49:*23*  50:*8, 24*  52:*21*  63:*17*  72:*18, 20*
**served**  5:*19*
**service**  98:*9*
**services**  104:*16*
**seven**  92:*20*
**share**  14:*11*  33:*2*  87:*16*  91:*24*
**shirt**  20:*6, 8*  28:*22*  61:*19*
**shock**  94:*14*
**shocked**  70:*12*
**shoot**  28:*14*  35:*10*
**shooting**  28:*10*
**short**  68:*2*
**Shortly**  76:*23*
**shot**  56:*25*
**shoulder**  20:*5, 6*  30:*7*  99:*19*  100:*1, 21*
**shouting**  19:*20*
**shove**  56:*7*  72:*4*
**show**  31:*5*  33:*1*  34:*19*  36:*13*  37:*24*  46:*11, 25*  48:*9, 20*  51:*4*  53:*1, 15*  56:*2, 21*  59:*15*
**showed**  15:*12*  49:*19*
**showing**  24:*3*  63:*21*
**shows**  46:*17*
**shrug**  95:*12*
**shy**  95:*11*

**side**  18:*22, 24*  31:*19*
**sign**  23:*14*
**Signature**  103:*18*
**significant**  86:*25*
**silence**  90:*13, 16, 22*
**similar**  74:*6*
**simply**  94:*16*
**single**  32:*16*  33:*25*
**sir**  4:*21*  5:*6, 11, 12, 20*  6:*7, 10, 13, 25*  7:*6, 11*  8:*5, 21*  9:*2, 8, 20*  10:*17, 23*  11:*2*  12:*1, 9*  13:*11, 14, 17, 24*  14:*14*  15:*2, 5*  16:*23*  17:*6, 19*  18:*15*  20:*22*  21:*7*  22:*24*  23:*20*  24:*4*  25:*3, 13, 17, 23*  26:*1, 20*  27:*2*  28:*24*  29:*9*  30:*8, 11*  31:*7*  32:*4*  33:*12*  34:*22, 25*  35:*2, 7*  36:*2, 7*  37:*13, 23*  38:*6, 8*  40:*1, 4, 7, 10, 12, 15, 18, 21, 24*  41:*2*  42:*13*  43:*2*  44:*21*  45:*4, 12*  46:*10, 14, 15, 24*  47:*16, 21, 24*  48:*2, 5, 12*  49:*2, 6, 20, 21*  50:*7, 16*  51:*24*  52:*1, 13, 16, 23*  53:*7, 10, 14, 20, 25*  54:*4, 8, 11, 15, 18, 23*  55:*7, 12, 18, 21*  56:*1, 8, 11, 14, 19, 24*  57:*1, 5, 23*  58:*14, 18*  59:*5, 8, 11, 14, 20, 23*  60:*2, 8, 15*  61:*1, 6, 11, 21*  62:*17*  63:*1, 18, 24*  64:*5, 8, 14, 18, 19*  65:*21*  66:*15, 23*  67:*9*  68:*4, 14, 22*  69:*4, 7, 11, 17, 24*  70:*5, 13*  71:*17, 19*  73:*7*  74:*4, 14*  76:*7, 18*  77:*22*  80:*17, 20,*

*23*  81:*23*  82:*1, 12*  83:*16, 19, 24*  84:*2, 7, 11, 16*  85:*14, 19, 25*  88:*3, 6*  89:*10*  91:*16*  92:*4, 14*  94:*6, 22*  95:*22*  98:*4, 10*  103:*12, 16*
**siren**  21:*19*
**sirens**  22:*5*
**sit**  42:*24*  75:*8*
**sitting**  71:*10*
**situation**  57:*7, 14*
**six**  72:*8*
**skid**  52:*8*
**slip-up**  70:*2*
**slur**  47:*22*  48:*3*
**slurring**  40:*19, 21, 22*  47:*25*  48:*6*
**small**  19:*8*
**smell**  20:*1*  37:*5*
**smelled**  29:*16*
**smelling**  37:*4*
**smiller@atlantaga.gov**  3:*19*
**snitch**  89:*13*
**sobriety**  8:*2, 20, 25*  20:*2*  29:*23*  33:*18*  37:*8*  99:*5, 6, 14*
**solely**  104:*13*
**somebody**  87:*4*
**somebody's**  23:*16*
**someone's**  19:*7*
**somewhat**  6:*5*  80:*8*
**soon**  27:*16*
**SOP**  10:*6, 9*  69:*17*  73:*6*  75:*9*  89:*7*
**sorry**  5:*5*  13:*2*  16:*6*  22:*2*  30:*16*  31:*12*  33:*8, 24*  38:*15*  50:*10, 13*  67:*18*  74:*12*  75:*25*  77:*23*  81:*9*  82:*23*  83:*5*  85:*16*  97:*25*  98:*3*  100:*10, 14*
**sort**  7:*22*  42:*10*  51:*25*  77:*17*  78:*19*  79:*7*  90:*16*  97:*6*
**sound**  57:*24*  58:*11*
**Sounds**  81:*17*

**speak**  13:*18*  17:*4*  45:*5*  50:*18*  58:*17*  90:*21*  103:*10*
**speaking**  44:*13, 17*  50:*18*
**specialized**  8:*1*
**specific**  34:*2*  44:*25*  59:*13*  61:*7*
**specifically**  18:*7*  67:*25*  82:*20*  104:*5*
**specifics**  6:*20*  67:*23*
**speculate**  58:*19*
**speculation**  16:*14*  38:*19*  51:*19*
**SPO**  8:*6, 9, 11*  66:*17*  67:*6, 10, 14, 16, 20, 23*  68:*3*  72:*10, 15*
**spoke**  58:*25*
**spoken**  13:*21*  74:*8*
**STACI**  3:*11*
**stand**  16:*1, 4, 9, 11, 18, 22*  20:*13*  29:*20*  32:*11*  48:*16*  49:*5*
**standard**  10:*2*  33:*17*  99:*13*
**standardized**  8:*1*  37:*8*
**Standards**  62:*24*  84:*15*  86:*24, 25*  88:*20*
**standing**  40:*13, 16*  46:*23*  48:*19*
**start**  7:*5*  18:*17*  46:*21*
**started**  20:*16*
**starters**  97:*20*
**state**  5:*23*  89:*17*  90:*22*  104:*8*  105:*2*
**stated**  20:*9, 12*  105:*5*
**statements**  78:*24*
**STATES**  1:*1*  91:*3*
**stating**  65:*16*  102:*5*
**statistic**  92:*19*
**stay**  75:*7*

**stayed** 26:*18*
**stepped** 20:*4*
**steps** 42:*16*
**stipulated** 3:*23*
**stolen** 17:*14, 15, 22*
 18:*4, 7* 19:*13, 25*
 22:*14* 28:*5*
**stop** 14:*17* 23:*13*
 37:*17* 44:*13* 57:*10*
 88:*2*
**stopped** 26:*25*
 103:*7*
**straight** 7:*13*
 23:*15*
**street** 19:*3*
**stresses** 99:*9*
**strike** 16:*9*
**struck** 57:*8, 15*
 99:*1*
**struggle** 98:*2*
**subcontractor**
 104:*9, 14*
**subject** 63:*12*
**subjective** 43:*9, 19*
**submitted** 14:*8*
 60:*10, 11* 104:*20,
21*
**substantial** 95:*8*
**sued** 21:*5*
**suffice** 99:*11*
**Suffolk** 5:*15* 7:*10,
13*
**suggest** 92:*25*
**suggested** 95:*15*
**Suite** 3:*16*
**super** 73:*1*
**supervisor** 69:*18*
 83:*4, 8, 9, 10*
**supposed** 12:*13*
 28:*8* 32:*13* 33:*18*
 69:*18* 70:*23*
**sure** 9:*4* 12:*4*
 26:*6* 27:*5* 29:*3*
 31:*4* 34:*16* 35:*14*
 41:*7, 15* 42:*1*
 43:*10* 45:*4* 46:*4*
 47:*12* 54:*23* 55:*9*
 57:*17* 60:*11* 67:*17*

68:*11* 71:*8* 82:*8, 9,
16* 84:*22* 98:*18*
**Surely** 73:*11*
**surgery** 25:*22*
**surprised** 96:*20*
**surprising** 94:*17*
**suspect** 22:*14*
**suspended** 6:*11*
 73:*11, 18*
**suspension** 6:*24*
 81:*2*
**suspicion** 17:*21*
 18:*2* 37:*12*
**sustained** 69:*8*
 70:*4* 77:*6* 94:*9*
**SW** 3:*15*
**swaying** 62:*6*
**swear** 4:*12*
**swearing** 3:*24*
**swerved** 18:*23*
**swiped** 70:*10*
**swiping** 99:*19*
 100:*1, 20*
**sworn** 4:*15* 7:*4*
**system** 86:*15*
**systemic** 90:*16*
 91:*1, 5, 18* 93:*1*

**< T >**
**tackle** 11:*25* 25:*16*
 39:*10* 43:*25* 44:*21*
 45:*3* 99:*17* 101:*22*
 102:*1, 4*
**tackled** 20:*11*
 30:*22* 39:*16* 40:*17,
20* 41:*1* 46:*7*
 61:*25* 62:*1* 72:*10*
 101:*20*
**tackling** 37:*17*
 42:*25* 45:*9* 52:*11*
 71:*6* 85:*22* 95:*7,
21* 99:*20* 100:*2, 22*
**tag** 18:*7*
**tags** 17:*24*
**take** 14:*17* 34:*12*
 39:*23* 65:*1* 81:*9,
13, 14*
**take-down** 44:*4, 25*
 55:*8*

**taken** 4:*4, 5, 7, 10*
 13:*22* 105:*5*
**talk** 59:*3, 7*
**talked** 66:*4*
**talking** 52:*5* 59:*21*
 95:*10, 12*
**target** 27:*24, 25*
**taught** 43:*18, 25*
 44:*5, 21* 99:*3*
**teach** 35:*23* 43:*11*
 54:*12* 67:*15*
**Team** 17:*11*
**technology** 18:*6*
**tell** 37:*14* 72:*17*
 79:*3* 87:*11* 88:*1*
 96:*11, 13*
**telling** 71:*11*
**temper** 78:*21, 23*
**tend** 28:*6* 78:*17*
**tendency** 79:*1*
**termination** 81:*2*
**terms** 104:*14*
**terrible** 86:*10*
**test** 8:*20* 9:*1*
 29:*23* 99:*6, 7, 14*
**testified** 4:*16* 9:*22*
 101:*5*
**testifies** 67:*6* 89:*12*
**testify** 59:*9*
**testimony** 13:*15*
 16:*3, 10, 18* 23:*21,
25* 24:*6, 16, 23*
 30:*4* 48:*23* 64:*15,
21* 65:*1, 17, 22*
 66:*3, 6, 17, 24*
 67:*11, 20* 89:*19*
 90:*15*
**testing** 8:*2* 20:*3*
 33:*18* 37:*8*
**text** 14:*1* 58:*22*
 61:*16* 70:*10* 71:*15*
 72:*9* 73:*3*
**texted** 58:*24*
**Thank** 74:*17*
 81:*18* 98:*4, 9, 10*
**thing** 78:*17, 18*
 79:*7* 83:*9, 11*
 90:*25* 92:*8* 93:*14*

**things** 8:*3* 9:*16*
 45:*18, 22, 24* 57:*6*
 58:*7* 70:*7* 79:*11,
14* 88:*1* 90:*1, 12*
 91:*7* 92:*7* 93:*4*
 95:*10*
**think** 4:*23* 10:*15*
 13:*5* 15:*8* 17:*15*
 18:*5* 26:*2, 11*
 28:*13, 19* 32:*19*
 34:*8, 11, 15, 25*
 35:*3, 16* 38:*9, 25*
 39:*1, 5, 8, 9, 15*
 41:*3, 9, 17* 42:*9, 24*
 43:*6* 45:*2, 14, 17,
21* 49:*16* 51:*16*
 52:*2, 17* 53:*11*
 55:*4, 10, 23* 57:*13*
 60:*13, 19* 61:*1*
 62:*15* 63:*5* 65:*6,
11, 21, 25* 66:*4, 5, 9,
11* 67:*3, 8, 10, 14,
20, 22, 23* 69:*22*
 70:*7, 16* 71:*5, 23*
 75:*17, 20* 78:*8*
 85:*23* 86:*1* 88:*12,
15* 89:*3* 90:*2, 5*
 91:*1, 5, 7, 18, 21*
 93:*2* 94:*24* 96:*23,
24* 97:*7*
**thinking** 38:*20, 22*
 90:*12*
**thought** 13:*7*
 19:*14* 30:*12* 68:*8,
18* 70:*1* 78:*9*
**threat** 28:*1* 36:*2*
 39:*13* 98:*23*
**three** 71:*14* 85:*6*
**three-day** 8:*15, 22*
**thrilled** 97:*3*
**time** 6:*11* 11:*13*
 12:*10, 13, 20* 16:*21,
25* 19:*23* 20:*10, 14*
 30:*19* 32:*16* 36:*14,
18, 25* 41:*11, 24*
 42:*8* 49:*2* 55:*12,
16* 60:*8, 12, 13, 18,
24* 76:*11, 20* 77:*1*
 91:*9* 93:*13* 98:*5*

99:*18*  100:*5*
101:*14, 18, 22*
102:*1, 16, 19*
104:*18*
**timed**  99:*25*
**times**  32:*18*  77:*7*
  82:*9, 21*  86:*6*
**tiny**  26:*11*
**title**  7:*1*  63:*10*
**today**  4:*21, 24*
  15:*4*  16:*3, 10, 18*
  42:*24*  61:*22*  71:*10*
  84:*1*  85:*20*  89:*19*
**today's**  17:*5*
**told**  6:*15*  53:*22*
  83:*5, 9*
**tolerance**  32:*9*
**tolerate**  51:*25*
**top**  92:*9*
**topic**  67:*14*
**total**  92:*22*
**totality**  79:*14*
**totally**  77:*24*
**trail**  19:*6*
**trained**  68:*8, 17*
  91:*8*
**training**  7:*22, 25*
  8:*1, 4, 13, 14, 19, 22,*
  *24*  18:*3*  20:*2*  91:*8*
**transcript**  50:*20*
  104:*19*  105:*5, 8*
**Transcripts**  104:*19,*
*22*
**transparency**  90:*17*
**transport**  56:*8*
  72:*5*  80:*18*
**travels**  9:*17, 20*
**treated**  6:*12*  62:*24*
  86:*10*  87:*13*  88:*9*
  94:*25*  96:*24*  97:*18*
**treats**  84:*9*
**trial**  4:*10*  6:*3*
**tried**  20:*13*  54:*21*
**Trinity**  3:*15*
**trouble**  40:*16*
  62:*1*  75:*7*  78:*19*
  80:*1*
**true**  21:*10*  23:*25*
  28:*8*  40:*1*  42:*19*

43:*17*  46:*21*  49:*4*
52:*10*  70:*22*  71:*18*
84:*17*  104:*19*
105:*8*
**truly**  91:*11*
**truthful**  102:*18*
**truthfulness**  77:*4*
**try**  37:*17*  54:*19*
  61:*3*  63:*20*  75:*7*
  77:*25*  78:*19*
**trying**  13:*4*  17:*24*
  18:*1*  19:*15, 17*
  27:*19*  32:*19*  48:*18*
  50:*20*  56:*7*  69:*23*
**turn**  19:*6*
**turned**  18:*25*
  79:*14*
**two**  21:*5*  29:*20*
  57:*3*  66:*24*  68:*6,*
  *15*  70:*9*  81:*9*  82:*9,*
  *21*  84:*3*  85:*6, 10*
  92:*22*  93:*10*  97:*15*
**TYLER**  1:*1*  4:*6,*
  *20*  6:*12*  86:*10*
  94:*24*  99:*7*  100:*20*
  101:*20*
**typewriting**  105:*7*
**typically**  37:*5*
  75:*7*  77:*11*  86:*7*

< U >
**Uh**  71:*15*
**unacceptable**  86:*21*
**unavoidable**  91:*10*
**undergone**  8:*4*
**understand**  65:*19*
  75:*9*  80:*22*  97:*6*
  100:*11*
**understanding**
  8:*16*  43:*7*  50:*3*
  75:*6, 14*
**undo**  94:*16*
**undoes**  94:*11*
**unfortunate**  91:*9*
**unfortunately**  93:*7*
**unit**  22:*8, 11*
**UNITED**  1:*1*  91:*3*
**units**  26:*24*
**unlock**  36:*12*

**unmarked**  18:*9, 13*
  21:*9*  27:*13*
**unofficially**  6:*19*
**unprofessional**
  86:*12*
**unreasonable**  9:*23*
**unsatisfactory**  70:*4*
**uploaded**  104:*23*
**urgency**  84:*9*
**use**  4:*9*  8:*4, 6*  9:*6,*
  *10*  27:*25*  29:*13*
  43:*20*  60:*17, 23*
  64:*11, 16*  67:*4, 11,*
  *12*  68:*8, 18*  69:*2*
  72:*14*  74:*20*  79:*1,*
  *5, 16*  80:*2, 10*
  81:*22*  82:*10, 14*
  86:*14*  89:*7*  91:*25*
  92:*3, 21*  93:*9*  94:*4,*
  *8, 9, 15*  95:*13*
  98:*23*
**usually**  6:*1*
**utilized**  22:*21*  83:*3*

< V >
**van**  56:*8*
**veer**  23:*18*
**veered**  23:*16*
**vehicle**  11:*22, 23*
  17:*16, 21, 25*  18:*4,*
  *5, 10, 13, 14, 25*
  19:*5, 10, 13, 15, 18,*
  *19, 20, 21, 23, 25*
  20:*3, 4*  21:*1, 12, 15,*
  *18, 22, 23*  22:*6, 12,*
  *14, 19, 23*  23:*23*
  24:*7*  27:*6, 14, 16*
  28:*5*  35:*6, 13, 14*
  36:*6, 8, 9, 12, 17*
  56:*6*  57:*9, 15, 16*
  99:*1*
**vehicles**  17:*14*
  18:*8*  22:*17, 21*
  28:*6*
**verbatim**  104:*11*
**versus**  4:*6*
**vest**  19:*10*
**VICKERS**  1:*1*  5:*1*
  11:*12, 25*  13:*18*

18:*25*  20:*10, 17, 20*
  23:*21*  24:*15, 23*
  26:*18, 21, 25*  30:*12,*
  *14, 15, 17, 18, 20, 22*
  37:*17, 20, 25*  38:*4,*
  *9, 20, 22, 25*  39:*5, 9*
  40:*17, 20*  41:*1*
  42:*24*  44:*22*  45:*2,*
  *15, 17*  46:*7, 21*
  51:*9, 12, 16*  52:*5,*
  *10, 15*  53:*4, 11, 22*
  54:*6, 9, 19*  55:*1, 17,*
  *23*  56:*6, 12*  58:*17,*
  *22*  59:*2, 6, 9, 12, 18,*
  *21*  60:*14*  61:*3, 25*
  62:*1*  64:*2, 7, 10, 16,*
  *22*  65:*7, 23*  66:*7,*
  *18*  67:*12, 21*  68:*5,*
  *17, 18, 19*  69:*15, 23*
  70:*21*  71:*5*  72:*10,*
  *15*  75:*14, 21*  76:*10,*
  *11, 21, 25*  78:*2, 14,*
  *21, 25*  79:*21*  80:*8*
  83:*20*  84:*8*  85:*10,*
  *21*  86:*1, 5, 9, 16, 20,*
  *23*  87:*6, 12, 25*
  88:*9, 13, 18*  94:*24*
  95:*7, 15, 20*  96:*24*
  99:*18, 20*  100:*2, 6,*
  *21*  101:*14, 19, 23*
  102:*1, 22, 23*
**Video**  2:*4, 5, 6, 7, 8,*
  *9, 10, 11, 12, 13*
  11:*4, 6, 16, 24*  24:*3*
  33:*1, 4, 13, 14, 16*
  34:*19, 24*  36:*15*
  39:*23, 25*  46:*16*
  47:*7, 13*  48:*22*
  49:*19*  51:*7*  53:*3,*
  *12, 21*  56:*5, 21*
  59:*15*  61:*22*  67:*5*
  95:*6, 25*  96:*4, 14*
  97:*11*  102:*11*
  104:*9, 15*
**videoconference**
  3:*1*
**videos**  13:*13*
  85:*20*  95:*20*
**VIDEOTAPED**  1:*1*

view 23:22 27:10
  90:9
viewed 79:8 90:8
violate 10:1, 6
violated 75:9
  89:25 95:16
violating 10:9 69:9
violation 70:3
  73:6, 8 95:18
violations 63:2, 10
  64:7 89:7
violence 8:2 91:3,
  6, 10, 19 93:6, 7
violent 93:4
visual 19:5
vs 1:1

< W >
wagon 72:5
wait 22:10 32:18
  46:18
waiting 74:10, 15,
  16
waive 100:6
walk 15:12, 24
  16:25 17:2 31:21
  32:3, 5 48:16, 17
  49:5, 11, 23 50:1, 4,
  9, 25 54:20, 21
  71:24
walked 11:22, 23
want 6:4 14:17,
  18 21:13 22:13, 14
  31:13 33:1 36:13
  44:6 46:11 50:21
  59:15 61:7 63:25
  64:1 74:1 81:21
  82:3 90:8 91:24
  92:6, 8 93:15 98:1,
  5 99:8, 11
wanted 17:13
  29:18
wants 84:19 93:16
watch 11:16, 19
  15:11
watched 11:11, 15,
  24 13:12 53:13
  55:10 61:22 85:20

watching 72:23
water 81:10, 15
wave 101:14
waved 37:24
way 6:12 14:1
  20:15 22:15 32:20
  34:5 35:17 56:15
  59:10, 13 62:24
  65:7 67:19 86:9
  87:12 88:9, 13
  90:7 91:9 92:15
  93:21 94:25 96:24
  97:17 98:21
  103:14
weapons 35:23
wearing 19:10
week 12:12 13:23
weight 39:21 40:2
  51:9, 13, 17, 23
well 9:20 17:23
  25:9 28:18 31:5
  33:1 34:8 43:5
  54:25 71:5 79:20
  80:7 84:24 87:11
well-intentioned
  91:14
went 5:10 17:13
  19:2, 4 31:18
  35:12 70:2 78:18
  83:11 97:25 103:7
we're 4:2 44:5
  50:17, 18 53:4
  70:9 71:10, 14
  73:16 84:1, 3 85:9
  90:8, 18 97:23
west 17:9
we've 88:4
wife 5:25 6:4
wife's 6:7
willing 70:21
  90:21
window 57:4, 12, 21
witness 3:24 4:13
  87:18 89:23
witnesses 104:22
woman 42:16
word 21:4 27:25
  32:19 78:11 90:2
wording 62:3 63:4

words 29:14
  40:19, 23 47:22
  48:1, 3, 7 50:17
  57:24 58:3, 11
work 34:16 37:5
  58:25 73:6 76:11,
  15, 21 78:17 95:5
worked 7:19
works 84:9
worksheet 74:2
worried 77:16
worries 77:24
worth 7:25
WR 80:21
writing 102:12
written 80:22, 25
  81:4 102:10, 15
wrong 18:22 35:1
  38:10, 25 39:6
  49:17 56:15 60:14
  65:7, 24 66:2, 7, 10
  67:22, 24 68:1
  75:10 79:19 81:7

< X >
x-ray 25:15, 22

< Y >
yard 19:9 23:16
yeah 45:24
year 7:10 73:16
  83:18 92:22 93:11
years 7:4, 21
  92:20 93:3 96:16
yellow 19:11
York 5:7, 10

< Z >
Zone 17:10
Zoom 3:1 4:11
  29:3