In The Matter Of:
## *Griffin vs. City of Atlanta*

Deposition Of:
## *Donald Vickers*

Taken On:
## *10/21/2020*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



EXPERIENCED · PROFESSIONAL · DEPENDABLE

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT COUNTY
ATLANTA DIVISION

TYLER GRIFFIN,

    Plaintiff,

                               CIVIL ACTION FILE
v.                         NO. 1:20-cv-02514-TWT

CITY OF ATLANTA, DONALD
VICKERS, MATTHEW ABAD,
AND JOHN DOE #1-5,

    Defendants.


DEPOSITION CONDUCTED VIA VIDEO CONFERENCE


VIDEOTAPED DEPOSITION OF DONALD VICKERS


October 21, 2020
11:00 a.m. ET


Witness located in Atlanta, Georgia


By Jennifer Davis-McLain, RMR, CRR, CRC
Certified Court Reporter, License No. 2496

```
 1    REMOTE APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiff:

 3            MATTHEW R. KAHN, ESQUIRE
              MORGAN LYNDALL, ESQUIRE
 4            THOMAS GIANNOTTI, ESQUIRE
              Butler Law Firm
 5            10 Lenox Pointe NE
              Atlanta, Georgia 30324
 6            404.587.8423
              matt@butlerfirm.com
 7            morgan@butlerfirm.com
              tom@butlerfirm.com
 8
      On behalf of the Defendants:
 9
              STACI MILLER, ESQUIRE
10            ALISHA MARIE S. NAIR, ESQUIRE
              JACQUITA PARKS, ESQUIRE
11            City of Atlanta Law Department
              55 Trinity Avenue SW
12            Suite 5000
              Atlanta, Georgia 30303
13            404.330.6402
              sjmiller@atlantaga.gov
14            amnair@atlantaga.gov
              japarks@atlantaga.gov
15

16

17

18

19                        — — —

20

21

22            (Pursuant to Article 10(B) of the Rules and
      Regulations of the Georgia Board of Court Reporting, a
23    written disclosure statement was submitted by the
      court reporter to all counsel present at the
24    proceeding.)

25
```

```
 1                    INDEX TO EXAMINATIONS

 2                                                    PAGE

 3   DONALD VICKERS

 4   Examination by Mr. Kahn .........................7
     Examination by Ms. Miller .....................155
 5   Further Examination by Mr. Kahn ...............166

 6

 7

 8                    INDEX TO EXHIBITS

 9   EXHIBIT              DESCRIPTION              PAGE

10   For the Plaintiff:

11   Exhibit A         OPS Complaint File Closeout ......126
                       Report
12                     (Griffin v. COA 001041-001098)

13   Exhibit 1.2       Video ...........................39

14   Exhibit 1.3       Video ...........................45

15   Exhibit 1.4       Video ...........................46

16   Exhibit 2.2       Video ...........................52

17   Exhibit 2.5       Video ...........................69

18   Exhibit 3.1       Video ...........................71

19   Exhibit 3.3       Video ...........................63

20   Exhibit 4.1       Video ...........................47

21   Exhibit 4.2       Video ...........................57

22   Exhibit 24        Defendant Donald Vickers' .........17
                       Response to Plaintiff's First
23                     Continuing Interrogatories

24   Exhibit 30        X-ray ...........................30
                       (Griffin v. COA 000102)
25
```

Griffin vs. City of Atlanta                    Donald Vickers

```
 1              INDEX TO EXHIBITS (cont.)

 2    EXHIBIT            DESCRIPTION              PAGE

 3    Exhibit 33    FY2019 Performance ...............138
                    Evaluation for Donald Vickers
 4                  (Griffin v. COA 000762-000767)

 5    Exhibit 42    December 3, 2019, .................64
                    Memorandum from
 6                  Lieutenant H. Zenelaj
                    (Griffin v. COA 000008-000015)
 7
      Exhibit 45    Employee Discipline ...............97
 8                  Worksheet for Donald Vickers
                    (Griffin v. COA 000006)
 9
      Exhibit 48    Atlanta Police Department .........79
10                  Offense Report
                    (Griffin v. COA 000055-00057)
11
      Exhibit 52    Notice of Proposed Adverse .......111
12                  Action signed 2/6/12
                    (Griffin v. COA 000745-000746)
13
      Exhibit 53    October 16, 2011, ...............108
14                  Memorandum from
                    Lieutenant J.D. Webb
15                  (Griffin v. COA 000611-000614)

16    Exhibit 54    Internal Correspondence to .......108
                    Lieutenant S. Steed of Complaint
17                  Control No. 10-C-0324-UAF
                    (Griffin v. COA 000618-000628)
18
      Exhibit 56    Notice of Final Adverse .........119
19                  Action signed 12/21/11
                    (Griffin v. COA 000188-000189)
20
      Exhibit 57    E-mail chain ending .............122
21                  September 14, 2016, from
                    Elizabeth Espy
22                  (Griffin v. COA 000121)

23    Exhibit 58    June 1, 2012, Memorandum ........111
                    from Lieutenant J.D. Webb
24                  (Griffin v. COA 000775)

25
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 6 of 204
Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1                 INDEX TO EXHIBITS (cont.)

 2    EXHIBIT                DESCRIPTION                  PAGE

 3    Exhibit 502    APD Use of Force Advisory .......151
                     Council excerpt
 4

 5    For the Defendants:

 6    Exhibit 1      Video ..........................157

 7    Exhibit 2      OPS Complaint File Closeout ......162
                     Report for
 8                   OPS Control No. 17-C-03530UAF
                     (Griffin v. COA 001041-001098)
 9
      Exhibit 3      OPS Complaint File Closeout ......165
10                   Report
                     OPS Control No. 10-C0324-UAF
11                   (Griffin v. COA 000774-000930)

12

13
              (Plaintiff's exhibits were marked
14    electronically prior to the deposition.  Defendants'
      exhibits were marked electronically after the
15    deposition.)

16

17

18

19

20

21

22

23

24

25
```

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1              P R O C E E D I N G S

 2         MR. KAHN:  So this will be the deposition of

 3  Defendant Donald Vickers taken pursuant to notice and

 4  agreement.  The deposition is taken in the case Tyler

 5  Griffin versus the City of Atlanta.  The deposition

 6  will be taken pursuant to the Federal Rules of Civil

 7  Procedure and all purposes permitted under the rules,

 8  including use at trial.  The deposition is being taken

 9  on Zoom because of the COVID pandemic.

10         Madam Court Reporter, will you please swear

11  in the witness.

12         COURT REPORTER:  Yes, sir.  Before I do, I

13  must ask counsel to please introduce yourself and

14  state on the record that you have no objection to this

15  officer of the court administering a binding oath to

16  this witness via Zoom.  If we can please begin with

17  the noticing attorney.

18         MR. KAHN:  Sure.  This is Matt Kahn from

19  Butler Law Firm for the plaintiff, and with me I have

20  Tom Giannotti and Morgan Lyndall from our office, and

21  there is no objection.

22         MS. MILLER:  Staci Miller for the

23  defendants, and there is no objection.

24         MS. NAIR:  Good morning.  Alisha Marie Nair

25  for the City of Atlanta, Officer Vickers, and
```

Griffin vs. City of Atlanta                  Donald Vickers                  10/21/2020

```
 1   Officer Abad.  There are no objections.

 2            MS. PARKS:  Good morning.  Jacquita Parks.

 3   City of Atlanta.  No objections.

 4            COURT REPORTER:  Thank you.

 5                  DONALD VICKERS,

 6   having been first duly sworn, was examined and

 7   testified as follows:

 8                      EXAMINATION

 9   BY MR. KAHN:

10       Q.   All right.  Good morning, Officer Vickers.

11   My name is Matt Kahn, as you just heard.  I represent

12   Tyler Griffin.

13            I just want to start by asking if you've had

14   your deposition taken before.

15       A.   I had a deposition where I was a witness.

16       Q.   As a witness.

17            So you -- have you ever given one as a party

18   to a -- to a lawsuit?

19       A.   Not that I know of.  I don't know what --

20   I -- to be honest, it was so long ago I don't know

21   what it was about.  So --

22       Q.   Okay.  Fair enough.

23            I guess I'll just give you some brief ground

24   rules and sort of tell you what this is about.  I'm

25   going to ask -- be asking you questions.  I'll show
```

```
 1   you some pictures and some videos.  I'd just ask that

 2   if you don't understand my question or you can't hear

 3   me or, you know, I lag or something, just let me know,

 4   and I'll rephrase the question and reask it.

 5              If you -- if you need to take a break, just

 6   let me know.  You know, we can just pause this

 7   deposition and take a quick break if we need to.  I'd

 8   just ask if there's a question pending, you answer

 9   that question before we take a break.

10              And just because we're in different places,

11   it's a little harder to, you know, speak over each

12   other and everything.  So if you could just wait until

13   I finish the question, even if you know where I'm

14   going with it.  It just creates a cleaner record and

15   less jumbling of the -- of the Zoom lines.

16              So if you could, please state your full name

17   for the record.

18        A.   My full name is Donald Paul Vickers, Jr.

19        Q.   And, Officer Vickers, where did you grow up?

20        A.   Where did I grow up?

21        Q.   Yes, sir.

22        A.   All over Georgia.  I was shuffled around a

23   lot.

24        Q.   Were you in a military family?

25        A.   Yes, sir.
```

```
 1          Q.   Where did you go to high school?

 2          A.   Went to Osborne High School in Marietta.

 3          Q.   You play any sports in high school?

 4          A.   Off and on.  I did play football.

 5          Q.   What position did you play when you played

 6     football?

 7          A.   Safety and special teams.

 8          Q.   So you did a lot of tackling when you played

 9     football?

10          A.   I did.

11          Q.   Do you have a college degree, sir?

12          A.   No, sir, I do not.

13          Q.   Have you ever served in the military?

14          A.   Briefly.

15          Q.   And what branch did you serve?

16          A.   Marine Corps.

17          Q.   Thank you for your service, sir.

18               Were you discharged from the Marines?

19          A.   You broke up.  The question was was I

20     discharged?

21          Q.   Yes, sir.  That was the question.

22          A.   Due to an injury, yes, sir.

23          Q.   And what was the nature of the injury?

24          A.   It was a ankle injury with some hair

25     fractures.
```

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1        Q.   And so were you -- you were honorably
 2   discharged?
 3        A.   I was.  I believe you bring it up with --
 4   what is it? -- it was under honorable conditions, yes,
 5   sir.
 6        Q.   Thank you.
 7             My next question -- it alarms some people,
 8   but the reason I'm asking is just, you know, if this
 9   case goes to a jury trial, we need to pick a jury; we
10   need to make sure that none of your family or, you
11   know, remote cousins or, you know, family members are
12   on the jury.
13             So do you -- do you have any family members
14   in Georgia above the age of 18?
15        A.   I do.  If you want me to list them, it would
16   be --
17        Q.   Yes, please.
18        A.   -- I can list them.
19        Q.   Yeah.  If you don't mind just listing their
20   first and last name and relationship.
21        A.   So, briefly, I was adopted.  So my adopted
22   family is here.  Briefly, Larry Rogers, Holly Winkle,
23   Debra Rogers.  Or she just -- they got divorced.  I'm
24   sorry.  It's Debra Price now.
25        Q.   Other than those three folks, anyone in
```

```
 1    Georgia over the age of 18?

 2        A.    Not that I know of.

 3        Q.    And, sir, are you -- are you married?

 4        A.    I am.

 5        Q.    Was your wife among the people that you just

 6    listed?

 7        A.    No.  If you want my immediate family, yes, I

 8    have my wife and my kids.  My kids are under 18.  My

 9    wife, Laney Vickers.

10        Q.    And how many -- you said your children are

11    under the age of 18?

12        A.    Yeah.  They're toddlers.

13        Q.    Have you ever been in a fistfight either in

14    high school or the military?

15            MS. MILLER:  Objection.

16            But you can answer.

17            THE WITNESS:  You said I can answer?

18            MS. MILLER:  Yes.

19        A.    I have.

20    BY MR. KAHN:

21        Q.    How many times have you been in a fistfight?

22        A.    I couldn't --

23            MS. MILLER:  Same --

24        A.    -- tell you.

25            MS. MILLER:  -- objection.
```

```
 1              But you can answer.
 2    BY MR. KAHN:
 3         Q.   Sir?
 4         A.   Once again, I couldn't -- I couldn't tell
 5    you how many.  I was in mixed martial arts.  So . . .
 6         Q.   All right.  Well, I guess let me modify the
 7    question, then.
 8              Outside of organized, you know, fighting
 9    through a mixed martial arts event, how many
10    fistfights have you been in?
11              MS. MILLER:  Objection.
12              But you can answer.
13         A.   Outside all that, all that I can recall
14    would have been with the City of Atlanta, and I
15    couldn't tell you how many it would have been.
16    BY MR. KAHN:
17         Q.   Okay.  Would you say that you have a hot
18    temper?
19              MS. MILLER:  Objection.
20         A.   No, sir.
21              MS. MILLER:  But you can answer.
22    BY MR. KAHN:
23         Q.   I'm sorry.  What was --
24         A.   No, sir.
25         Q.   -- your answer, sir?
```

Griffin vs. City of Atlanta               Donald Vickers

1      **A.   It was "No, sir."**

2      Q.   Okay.   Thank you.

3           And just to -- just to let you know, like,

4   when -- if I ask you to clarify an answer, it's not --

5   I'm not trying to be rude or provoke you.   I just --

6   sometimes the Zoom gets jumbled up, and when there's

7   objections, it's hard to hear.   So no offense meant by

8   that.

9           Are you currently employ- --

10     **A.   I understand.**

11     Q.   Thank you.

12          Are you currently employed by APD?

13     **A.   I am.**

14     Q.   And what's your current job title?

15     **A.   Senior police officer.**

16     Q.   And how long have you been with APD?

17     **A.   Come February, it will be 15 years.**

18   **February 21st will be 15 years.**

19     Q.   And of those 15 years, how long have you

20   been an SPO?

21     **A.   I think it's been -- I don't think it's been**

22   **two years.**

23     Q.   Did you start with APD as a recruit?

24     **A.   I did.**

25     Q.   And do you have any law enforcement

Griffin vs. City of Atlanta                    Donald Vickers

```
 1   experience predating APD?

 2       A.   No, sir.

 3       Q.   Have you undergone use-of-force training?

 4       A.   Yes, sir.

 5       Q.   And was SPO Patrick Fite your instructor on

 6   use of force?

 7       A.   Yes, sir.

 8       Q.   Do you know SPO Fite personally?

 9       A.   No, sir.  I mean, I know him, but not

10   outside work I don't.

11       Q.   Okay.  Fair.  That's fair.

12            Do you have any DUI training?

13       A.   So as far as the DUI course, no, I've not

14   gone through that.  It -- I could say it's the minimum

15   requirement.

16       Q.   So do you know how to administer a field

17   sobriety test?

18       A.   No, sir.

19       Q.   Have you ever reported another officer for

20   the use of excessive force?

21       A.   No, sir.

22       Q.   Have you ever testified in an official

23   proceeding that another officer has used unreasonable

24   force?

25       A.   No, sir.
```

```
 1        Q.   In your career as a police officer, have you

 2   ever seen another officer use what you would consider

 3   to be excessive force?

 4        A.   No, sir.  Not physically seen it, no, sir.

 5        Q.   Okay.  Have you heard about it?

 6        A.   I mean, we hear about it all the time, but

 7   I've never witnessed it, you know, physically,

 8   personally there, standing there.  No, I've never

 9   witnessed it.

10        Q.   Now, have you -- you said that you had been

11   deposed a long time ago as a witness.  Was that in

12   your capacity as a police officer?

13        A.   I was.

14        Q.   And was that in a case involving allegations

15   of excessive force?

16        A.   I don't remember at all.  I -- to be honest,

17   I think it had something to do with the shooting that

18   happened in the neighborhood.  I don't think -- I

19   don't think it was a use of force.  And I --

20        Q.   Okay.

21        A.   It was a -- it was a contracting job that I

22   used to work; and I guess something happened at the

23   contracting job, and they brought me in.

24        Q.   I see.  Okay.  And have you ever been a

25   party to a lawsuit, either as a plaintiff or a
```

Griffin vs. City of Atlanta                    Donald Vickers

```
 1   defendant?
 2        A.   No, sir.
 3        Q.   All right.  All right.  So excluding any
 4   conversations that you had with any of your lawyers
 5   from the City of Atlanta, did you do anything to
 6   prepare for your deposition today?
 7        A.   Other than speaking to my lawyers?  No.  I
 8   don't know what else I could have done.
 9        Q.   Okay.  And now, again, you know, there is an
10   attorney-client privilege between what you said -- the
11   substance of what you said with your lawyers, and so I
12   don't want to know any of that.  But how much time did
13   you spend speaking with your lawyers to get ready for
14   the deposition?
15        A.   I couldn't tell you exact time.  I mean, it
16   was -- we met over a couple days, different
17   conversations, phone calls here and there.
18        Q.   Would you say cumulatively you spent over or
19   under one hour preparing with your lawyers?
20        A.   I'd have to say it's probably over one hour.
21        Q.   Over or under two hours?
22        A.   Close to two hours.  I don't -- I don't --
23   and, you know, maybe I'm wrong on that, but I don't --
24   I don't think we spoke longer than that.
25        Q.   Sure.  Sir, have you reviewed the complaint
```

```
 1    that was filed in this case?

 2         A.    I have.

 3         Q.    And do you understand what this case is

 4    about?

 5         A.    I do.

 6         Q.    And what's your understanding of the case?

 7         A.    I guess you brought me here because you want

 8    me to tell you -- because you want to -- my

 9    understanding is you brought me here because you're

10    not happy with the actions that were taken.

11         Q.    Okay.  Have you reviewed any of your

12    discovery responses in this case?

13         A.    Yes.

14         Q.    All right.  I'm going to -- I'm going to

15    share my screen with you real quick.  Let me -- give

16    me just a second here.

17              All right.  Can you see Plaintiff's

18    Exhibit 24 on your screen?

19         A.    You said -- okay.  I can.

20         Q.    Okay.  Excellent.

21              Now, have you ever seen this document

22    before?  And I can scroll through it.  It's an 11-page

23    document.  So I can -- I'll slowly scroll through it

24    here.

25              Is this a document that you've seen?
```

```
 1          A.    It appears to be, yes, sir.

 2          Q.    Is there anything in Plaintiff's Exhibit 24

 3   that you -- that, after reviewing, you feel that you

 4   need to correct?

 5          A.    No, sir.

 6          Q.    Did you review any of the City of Atlanta's

 7   discovery responses in this case?

 8          A.    Honestly, I can't -- I don't think I

 9   actually reviewed anything.

10          Q.    I'm sorry.  I couldn't hear what you said.

11          A.    I don't think I reviewed anything other than

12   that what you showed me as far as their discovery.

13          Q.    Okay.  Did you watch any of the body camera

14   footage from this case?

15          A.    I did.

16          Q.    And have you seen the body camera footage

17   where you tackled Mr. Griffin?

18          A.    I did.

19          Q.    And when was the last time that you watched

20   it?

21          A.    I remember only watching the whole video one

22   time.  It was, like, three separate videos.  I think

23   it was, like, two weeks ago.

24          Q.    I'm sorry.  You said two weeks ago?

25          A.    I believe it was two weeks ago.  It might
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 20 of 204

Exhibit D
Griffin vs. City of Atlanta            Donald Vickers            10/21/2020

```
 1   have -- it might have been -- I would say it was
 2   somewhere between a week and a half and two weeks ago.
 3        Q.   Okay.  Have you seen the body camera footage
 4   showing you and Abad, Officer Abad, making Mr. Griffin
 5   walk around on a broken ankle?
 6            MS. MILLER:  Objection.
 7            But you can answer.
 8        A.   I don't remember seeing Mr. Griffin walking
 9   on a broken ankle.
10   BY MR. KAHN:
11        Q.   Did you review any of APD's standard
12   operating procedures to get ready for the deposition?
13        A.   No, sir.
14        Q.   Besides your attorneys, did you speak with
15   anyone about this deposition?
16        A.   Mentioned it with my family members, but
17   that's it.
18        Q.   Which members of your family did you speak
19   to?
20        A.   My wife.
21        Q.   Did you speak with Abad at all?
22        A.   We talked a little bit here and there.  He
23   works on another unit now; so, you know, every once in
24   a while I'll touch base.  I mean, we're friends.
25        Q.   Did you specifically have any conversations
```

```
 1  about the case within the last week with Abad?

 2       A.   I think I spoke to him -- last time I spoke

 3  to Abad was last, I think, Thursday.

 4       Q.   What did y'all talk about?

 5       A.   Work, a little bit about the case.  That's

 6  it.

 7       Q.   What about the case did you speak about?

 8       A.   I don't know.  Just pretty much if he has

 9  heard anything from the City, you know, if I heard

10  anything from the City, what's going on, you know, as

11  far as the investigation.

12       Q.   All right.  In the -- in the early morning

13  of April 5th, 2019, what was your assignment?  And

14  what I mean by that is just, like, sort of what were

15  you doing in the -- in the area.

16       A.   It's a little distorted, but you're asking

17  what I was doing April 6th early in the morning as far

18  as work?

19       Q.   Yes, sir.  And April 5th.

20       A.   Okay.  Excuse me.  That day we were on a --

21  we were assigned to a FIT unit.  Me and Abad were

22  working together.  We were trying to cut down on some

23  of the burglaries and thefts in the area.  And so we

24  were going from one hot location to another that we

25  like to investigate or run surveillance on.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 22 of 204

Exhibit D
10/21/2020
Griffin vs. City of Atlanta              Donald Vickers

1        Q.    Does patrolling for burglaries generally

2    include making traffic stops?

3        A.    We were in an unmarked car.  There's -- if

4    we were going to make a traffic stop or had a vehicle

5    that we wanted to pull over, we would ask for a unit,

6    a marked unit, to pull that vehicle over.

7        Q.    Did you ask for a marked unit to pull

8    Mr. Griffin's car over?

9        A.    We were trying to before he fled, but he

10   ended up wrecking the car before the units could pull

11   him over.

12       Q.    You said he wrecked the car before the unit

13   could pull him over?

14       A.    He drove off of a retaining wall in

15   somebody's backyard before we could get a unit there

16   to pull somebody -- to pull him over.

17       Q.    Okay.  We'll get -- and we'll get to that in

18   a minute.

19             Do you -- never mind.

20             I guess why don't you just tell me your side

21   of the story.  What did -- what happened that night?

22       A.    From the beginning, like I said, we were on

23   patrol going from one location to another, like, to

24   investigate.  We were in an unmarked vehicle, even

25   though we were in marked clothing, APD state-approved

Griffin vs. City of Atlanta                Donald Vickers

```
 1    clothing.  As -- I was driving.  Abad was the

 2    passenger.

 3          I made a left off Howell Mill onto

 4    Chattahoochee Boulevard.  I believe it's -- I believe

 5    it's Boulevard.  No.  Chattahoochee Ave.  When I made

 6    the right turn, got down to -- close to the bridge,

 7    that's when I noticed the car driving in my lane,

 8    coming at me head-on.  I had just enough time to

 9    swerve.

10          And then we turned around, got behind the

11    vehicle.  And we were trying to get a unit to respond

12    and let the zone know what was going on.  And we were

13    also trying to figure out -- he -- once he got to

14    Howell Mill, he went the wrong way.  He went up a

15    one-way street.  He was supposed to make a right or

16    left and he chose to go straight up a one-way street.

17          Once he makes those -- once he went up the

18    one-way street, I don't know those street names.  I

19    know the location.  I know the routes, but I don't

20    know the street names.

21          So we were trying to give radio our location

22    and get a unit there and let everybody there know what

23    he was doing -- or the driver was doing.  We didn't

24    know who it was at the time.  He made another left

25    turn, and I briefly lost sight of him.
```

Griffin vs. City of Atlanta                Donald Vickers

```
 1            And when I got down to the intersection, or

 2    close to it, trying to see if he went right or left,

 3    we realized, once again, he went straight and drove

 4    off a retaining wall and had landed in somebody's

 5    backyard.

 6            At that point, Abad jumped out of the

 7    passenger seat and ran down towards the vehicle.  I

 8    got out and tried to look at the road sign at the

 9    intersection to give radio our location.  Once I could

10    hear they had our location, I went to assist.

11            While I was doing that, I could hear Abad

12    giving commands, loud verbal commands.  "Get out of

13    the car.  Stop the car.  Atlanta Police."  I really

14    couldn't see, though.  But we had -- we had a vehicle

15    actually blocking the driveway.  The homeowner's

16    vehicle was blocking the driveway.

17            So I couldn't see.  I could only hear and,

18    you know, get a glimpse of the vehicle's lights

19    reflecting off the house and other objects and stuff,

20    because it was raining.

21            Once I got there, I could see that Abad had

22    the -- had Mr. Griffin out of the car, and I could

23    hear that his -- his tone, his verbal commands, had

24    kind of got back to a normal tone.  But I saw that he

25    had his hands on a -- kind of a control hold on
```

```
 1    Mr. Griffin's shoulder.  And I remember seeing

 2    Mr. Griffin shove his hand off and telling

 3    Officer Abad to hold on.

 4           At that point, Mr. Griffin had objected --

 5    you know, was obstructing several times, and then he

 6    physically pushed Abad's hand away and I tackled him.

 7    And we put him in two pair of handcuffs, because he

 8    was -- he was kind of too big to put in one pair

 9    without, you know, really forcing it.

10           And once I tackled him, his demeanor changed

11    completely, and so did ours.  He was arrested.  Took

12    several minutes for me to get the homeowner to move

13    the vehicle so we could get Mr. Griffin's vehicle out,

14    because it had to be towed.

15           Mr. Griffin landed in a backyard.  I don't

16    know how he did it exactly, but he was able to get his

17    vehicle to turn around and -- but he landed in some

18    loose gravel in the -- in a homeowner's backyard.

19           And once Mr. Griffin was out of the car and

20    we went to tow it, we got the homeowner to move his

21    vehicle so we could put Mr. Griffin's vehicle -- just

22    drive it up out of the driveway.

23           So for whatever reason Mr. Griffin -- I

24    think it's because he was on the gas too hard -- I

25    mean, that's the only thing I can think of -- where
```

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                    10/21/2020

1    his tires were spinning in the gravel.  That's why he

2    couldn't get out of it.  But, once again, he had

3    nowhere to go.  He was coming at Abad head-on.

4              And that was pretty much it.  He was

5    arrested and taken to Grady detention.

6         Q.   Okay.  So when you first saw Mr. Griffin,

7    you claim that he almost hit you head-on.  Right?

8         A.   That's correct.

9         Q.   Do you have any evidence to prove that?

10        A.   No, sir.  I don't think --

11        Q.   Was there a --

12        A.   -- there's any evidence to prove that.

13        Q.   Was there a dashcam in the vehicle you were

14   driving?

15        A.   No, sir.

16        Q.   Why not?

17        A.   That is a undercover vehicle, and it is not

18   equipped with a dashcam.

19        Q.   So the only -- the only proof that you have

20   is your word.  Is that right?

21        A.   My word -- well, let's back up.  You -- the

22   only proof that I had that he was coming at me

23   head-on --

24        Q.   Yes.

25        A.   -- or the whole thing?

Griffin vs. City of Atlanta                    Donald Vickers

```
 1        Q.    The only -- the only proof that you have --

 2        A.    Okay.

 3        Q.    -- that he was coming at you head-on is your

 4  word.

 5        A.    That's -- and Abad's.   That's it.

 6        Q.    So then the -- then, I guess, more

 7  accurately, the only proof you have is the word of two

 8  officers who are being sued in federal court for

 9  police brutality.   Is that right?

10            MS. MILLER:   Objection.

11            But you can answer.

12        A.    That's correct.

13  BY MR. KAHN:

14        Q.    On the night of the question, you were in an

15  unmarked police car.   Is that correct?

16        A.    That's correct.

17        Q.    And what was the make and model of that

18  vehicle?

19        A.    I think it's a Dodge Dart.   I don't know the

20  year.   I don't even remember the color.   I know it was

21  a dark color.

22        Q.    Was that vehicle equipped with any police

23  lights?

24        A.    No, sir.   Once again, it's an undercover

25  vehicle that we were using.
```

```
 1        Q.   Was it -- did it have one of those -- one of

 2   those little lights that you can put on the top of the

 3   car like you see in the movies?

 4        A.   No, sir.

 5        Q.   Was the vehicle equipped with a siren or --

 6        A.   No, sir.

 7        Q.   -- a PA system?

 8        A.   No, sir.

 9        Q.   So were there -- were there any markings on

10   the car that would have allowed Mr. Griffin to know

11   that he was being followed by a police officer?

12             MS. MILLER:  Objection.

13             But you can answer.

14        A.   No, sir.  To be honest, I wasn't even aware

15   if he even knew we were behind him, because he was so

16   far ahead of us.

17   BY MR. KAHN:

18        Q.   Why didn't you pull Mr. Griffin over after

19   he allegedly almost hit you head-on?

20        A.   We didn't have a unit there to pull him

21   over, and he did -- he kept going.  He blew through

22   the intersection and went up a one-way street.  Units

23   were trying to get to us, but by the time the units

24   got there, he had already -- matter of fact, by the

25   time the units got there, he was pretty much being
```

1    detained at that point.

2        Q.   Why didn't you wait until the units got

3    there to approach Mr. Griffin?

4        A.   Because Mr. Griffin was in somebody's

5    backyard unable to leave.  He was still trying to flee

6    from us.  We got out on foot and made the encounter.

7        Q.   Well, if he was unable to leave, then why

8    wouldn't you just wait for the police to get there?

9        A.   We didn't know if he was going to get out

10   and try to run.  We didn't -- we didn't know

11   anything -- we didn't know who the driver was.  We

12   didn't know if it was a female, male.  We didn't know

13   if there was more people in the vehicle.

14       Q.   And so you said this several times in the

15   police report: claimed that Mr. Griffin drove off of a

16   ledge.  Is that right?

17       A.   That's correct.

18       Q.   Now, did you actually observe Mr. Griffin

19   drive over any ledge?

20       A.   The only thing -- the only way he could have

21   got back there was to drive over a ledge.  The

22   vehicle -- the homeowner's vehicle was blocking the

23   driveway, and the only way to get Mr. Griffin's

24   vehicle back there is to keep going straight.  In

25   order to do that, you have to drive over the retaining

1    **wall.**

2        Q.   So that -- that's all good.  But did you

3    actually observe Mr. Griffin drive over any ledge?

4        **A.   I mean, I guess -- no.  I didn't -- I**

5    **didn't -- I saw the brake lights.  I saw them in the**

6    **backyard.  I saw that -- the homeowner had -- it was**

7    **solar panel lights, the landscaping lights.  They had**

8    **been struck by Mr. Griffin's vehicle.**

9            MR. KAHN:  All right.  I'll move to strike

10   that --

11       **A.   Once again, the only --**

12           MR. KAHN:  -- that as --

13       **A.   -- way to do that --**

14           MR. KAHN:  -- nonresponsive.

15       **A.   -- is to go over that way.**

16           MR. KAHN:  Move to strike that as

17   nonresponsive.

18   BY MR. KAHN:

19       Q.   Officer A- -- excuse me.

20           Officer Vickers, is there any video showing

21   Mr. Griffin drive off of any ledge?

22       **A.   Not that I know of.**

23       Q.   So, again, the only proof of that that we

24   have is your word and Defendant Abad's word.  Is that

25   correct?

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 31 of 204

Exhibit D
Griffin vs. City of Atlanta                 Donald Vickers                      10/21/2020

```
 1        A.    And the damages.

 2        Q.    Is it your position that Mr. Griffin hurt

 3   his ankle when he allegedly drove over this ledge?

 4        A.    No, sir.  We don't know how he hurt his

 5   ankle.  It would not be fair for me to say exactly how

 6   he hurt his ankle.  I mean, it's --

 7        Q.    How do you --

 8        A.    -- a good possibility.

 9        Q.    You said it's a good possibility that he

10   hurt his ankle from driving off the ledge?

11        A.    Yes, sir.

12        Q.    How do -- how do you personally think that

13   he hurt his ankle?

14        A.    I don't think.  I don't know, sir.

15        Q.    Do you know any of the details of

16   Mr. Griffin's injuries?

17        A.    Any -- I know from what I heard, he -- or

18   was shown a broken ankle in two spots, two locations.

19   Is that correct?  I don't . . .

20        Q.    So let me pull up an exhibit for you.

21              Can you see Plaintiff's Exhibit 30 on your

22   screen?

23        A.    I see a portion.  Okay.

24        Q.    Sir, can you see --

25        A.    I see where it says 30, but I'm looking at
```

1    **a . . .**

2         Q.    It's a X-ray scan.

3         **A.    Oh, I see it.  Okay.  Yes, sir.**

4         Q.    Okay.  Have you ever seen --

5         **A.    I see it.**

6         Q.    Have you ever seen this X-ray scan of

7    Mr. Griffin's ankle after the surgery?

8         **A.    I think only what was, I think, on the AJC.**

9    **I may have seen it before, but I don't recall.**

10        Q.    Do you see the ten screws and the metal rod

11   in his ankle?

12        **A.    I do.**

13        Q.    And do you really think that driving off of

14   a ledge did that to him?

15             MS. NAIR:  We need to stop for a moment.

16   Ms. Miller is not on the line.

17             MR. KAHN:  Oh.

18             (OFF THE RECORD 11:35-11:38 A.M.)

19             COURT REPORTER:  (Reads record.)

20             MS. MILLER:  Thank you.  Can I just have the

21   exhibit number of that exhibit?

22             MR. KAHN:  Yes.  It's Plaintiff's

23   Exhibit 30.  And I'm going to share my screen again.

24             That's the wrong one.  Sorry.

25

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 33 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                    10/21/2020

```
 1    BY MR. KAHN:

 2         Q.   All right.  So, Officer Vickers, can you see

 3    the -- my screen again, Plaintiff's Exhibit 30?

 4         A.   I can.  Yes, sir, I can.

 5         Q.   Okay.  Thank you.

 6              And so the question that was pending before

 7    we stopped -- I'll just reask it.  And that -- okay.

 8              So the -- so we're looking at Plaintiff's

 9    Exhibit 30, and my question is is do you really think

10    that driving off of a ledge did that to Mr. Griffin's

11    ankle?

12              MS. MILLER:  Objection.

13              But you can answer.

14         A.   I think it's very possible.

15    BY MR. KAHN:

16         Q.   And what are your qualifications to opine on

17    that?

18         A.   I don't know if you want to say

19    qualifications or experience, but I've seen a lot of

20    accidents.  They're -- what they can do to a human

21    body is pretty horrific.

22         Q.   But you didn't see this accident --

23         A.   I've seen --

24         Q.   -- as you call it, did you?

25         A.   No, I did not physically witness that
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 34 of 204

Exhibit D
Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

1  **accident.**

2      Q.   So you stayed in the car while Abad

3  approached Mr. Griffin.  Is that right?

4      **A.   No, sir.  I was not in the car.  I was**

5  **outside the car trying to secure the vehicle and**

6  **looking at our location on the road signs and giving**

7  **it over radio to -- giving it over to the dispatch so**

8  **the units could, you know, arrive to where we were at,**

9  **and then I approached.**

10      Q.   Okay.  And you said that there was a car --

11  the homeowner's car was blocking your view to the

12  bottom of the driveway.  That's correct?  Is that

13  correct?

14      **A.   I think between the hill, the angle of the**

15  **vehicle, and, yes, the homeowner's car -- I think if**

16  **the homeowner's car was not there, I'd be able to see**

17  **pretty much the whole encounter with Abad and the**

18  **vehicle -- the suspect vehicle.**

19      Q.   Now, at what point after you left your car

20  did you first see Abad standing by Mr. Griffin's car?

21      **A.   As I started to approach, coming down the**

22  **driveway between the car and the house.**

23      Q.   And could you tell me what you -- what you

24  saw when you first saw that?

25      **A.   Well, I saw Abad giving -- I saw and heard**

Griffin vs. City of Atlanta                  Donald Vickers

```
 1   Abad giving orders for Mr. Griffin to get out of the

 2   car.  Abad had a control hold on Mr. Griffin, you

 3   know.  Mr. Griffin swiped Abad's hand away, and then

 4   that's when I ran up and tackled him.

 5        Q.   And, sir, none of that is on video.

 6        A.   Mr. Griffin was --

 7        Q.   Right?

 8        A.   -- bigger than Abad.

 9        Q.   Sir, none of what -- none of what --

10        A.   Yes, sir.

11        Q.   -- you -- sorry.  None of what you saw was

12   on video.  Right?

13        A.   If my video didn't catch it, Abad's did.

14        Q.   So the first time that we see you on video,

15   though, is on Abad's body cam when you lunge toward

16   Mr. Griffin.  Is that right?

17        A.   I believe so.

18        Q.   Did you have a body cam on your person at

19   the time?

20        A.   I did, sir.

21        Q.   And why wasn't it activated when you tackled

22   Mr. Griffin?

23        A.   For whatever reason, we don't know.  I can't

24   answer that.  I don't know.  I remember as I was

25   running down -- I can't remember if it was off or it
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 36 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1    just wasn't recording.  I just can't recall what was

2    going on with the camera.  But once I noticed it, I

3    activated it as quick and best as I could.

4        Q.    So is there something that you -- that you

5    need to do physically to activate the body camera?

6        A.    It has to be turned on.  That was an older

7    camera.  That was either my second or third camera

8    that I had gone through.  The -- for whatever reason,

9    that one was acting up.  I don't know if this was a

10    user error or a device malfunction.

11            But you have to turn it on.  Once you turn

12    the camera on, it goes into a buffer mode.  While it's

13    in buffering mode, you can tap the center button

14    twice, and it's supposed to record.  It will go back

15    about two minutes.  And then once it gets to where you

16    hit the button, the audio will kick in.

17        Q.    And do you claim that you tapped the button

18    and it just didn't turn on?

19        A.    At this point, I don't -- I don't know.  I

20    honestly don't know.  I know that when I seen that it

21    wasn't recording, I did my very best to cut it on as

22    soon as possible.

23        Q.    Is there a separate button for sound and

24    audio that you control?

25        A.    No, sir.  On that camera there might -- no.

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1    You can't control the -- you can only control -- the
 2    camera will -- the body-worn camera will beep.  But as
 3    far as picking up volume, I don't think you can
 4    control that.
 5         Q.   So there's no way -- if you were -- if you
 6    were wearing that camera that you were wearing on the
 7    night in question, there's no way that you could leave
 8    the video operational but press a button to turn the
 9    sound off while leave the video running.
10         A.   No, sir.  If there is, I'm not aware of
11    that.
12         Q.   Is there a reason that you didn't activate
13    your body camera before you got out of the car like
14    Abad did?
15         A.   It -- I don't -- I don't know why it wasn't
16    activated, sir.
17         Q.   And why -- there's a two-minute period at
18    the beginning of your body cam video where the sound
19    was turned off.  Is that right?
20         A.   Okay.  If there's -- that's the buffering
21    part.  So, like I said, it's in buffering mode.  You
22    want it to record; you hit the button twice.  It will
23    go back two minutes.  Once it gets to that point after
24    the two minutes where you hit the button, the audio
25    kicks in.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 38 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                        10/21/2020

```
 1        Q.   I see.  At what point did you decide to
 2   tackle Mr. Griffin?
 3        A.   Once he pushed Abad's hand away.
 4        Q.   And why did you decide to tackle
 5   Mr. Griffin?
 6        A.   He was obstructing Abad and not obeying his
 7   commands.  And then once you swipe an officer's hands,
 8   you become a threat at that point, and I alleviated
 9   it.
10        Q.   Is there anything else that you could have
11   done to get in there?
12        A.   From the distance I was at, I mean -- Monday
13   night quarterbacking, possibly.  I wouldn't want to
14   tase.  If I missed, then I would hit Abad -- possibly
15   hit Abad.  So I went for a tackle.
16        Q.   Did you know that Mr. Griffin's ankle was
17   hurt after you tackled him?
18        A.   Shortly after, yes, sir.
19        Q.   How shortly after did you realize that
20   Mr. Griffin's ankle was hurt?
21        A.   That, I can't recall.
22        Q.   Did you ever call an ambulance to come check
23   on Mr. Griffin?
24        A.   It was determined -- we checked, and it was
25   determined that with him having a hurt ankle and
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 39 of 204

Exhibit D
10/21/2020
Griffin vs. City of Atlanta                Donald Vickers

```
 1   having units already there, I could get him to the
 2   hospital quicker by having a unit do the transport.
 3   We would have got him quicker -- got him to Grady
 4   quicker and got him out of the rain.
 5        Q.   So that's a no; you never called an
 6   ambulance to check on Mr. Griffin.  Is that -- is that
 7   right?
 8        A.   It -- no.  It was determined that the
 9   ambulance was going to take longer than our units
10   would.  It was going to take longer to get him to the
11   hospital than our units would.  I don't remember how
12   it was -- I don't know if it's because our units were
13   already there or if Grady was at a -- you know, a
14   standstill.
15        Q.   Sure.  And I understand that, sir.  What I'm
16   asking you is whether or not you called an ambulance
17   to check on Mr. Griffin.
18        A.   That, I can't recall.  Wait.  Hold on.  You
19   said to transport or to check on?
20        Q.   To check on Mr. Griffin.
21        A.   You mean -- just to be clear, you're talking
22   about when Griffin's at the scene, have a Grady unit
23   come and check on him.  Correct?
24        Q.   Correct.  At any time while --
25        A.   Okay.  So --
```

```
 1        Q.   -- on the scene, did you call an ambulance

 2   to come check on Mr. Griffin?

 3        A.   Like I said, you know, no.

 4        Q.   Will you agree that it was obvious that

 5   Mr. Griffin was in pain as he was walking around in

 6   that backyard?

 7        A.   Once again, I don't remember seeing

 8   Mr. Griffin walking.

 9        Q.   All right.  I want to show you some video

10   clips.

11             Can you see Plaintiff's Exhibit 1.2 on your

12   screen, sir?

13        A.   I see a video.  I don't see the 1.2 that

14   you're talking about.

15        Q.   All right.  Well, I'm going to --

16        A.   Okay.  I see it.

17        Q.   Okay.  Great.

18        A.   Okay.

19        Q.   All right.  Well, so the first video I'm

20   going to show you is marked Plaintiff's Exhibit 1.2.

21             (Video plays.)

22   BY MR. KAHN:

23        Q.   All right.  Do you think that you did

24   anything wrong in Plaintiff's Exhibit 1.2?

25        A.   No, sir.
```

Griffin vs. City of Atlanta                    Donald Vickers

```
 1         Q.   Do you think the Atlanta Police Department

 2   encourages police officers to act the way that you did

 3   in Plaintiff's Exhibit 1.2?

 4         A.   If the situation calls for it, yes.

 5         Q.   Do they teach that sort of thing at the

 6   police academy?

 7              MS. MILLER:  Objection.

 8              But you can answer if you know.

 9         A.   As far as when somebody's obstructing, to

10   take them down as quick as possible to alleviate the

11   threat, yes.

12   BY MR. KAHN:

13         Q.   Did Abad do anything to stop you from

14   tackling Mr. Griffin?

15         A.   No, sir.

16         Q.   If Abad had waved his hand and told you to

17   stop, would you have still tackled Mr. Griffin?

18              MS. MILLER:  Objection.

19              But you can answer.

20              MR. KAHN:  What's the basis of that

21   objection? just so I can cure the question.

22              MS. MILLER:  Are you asking a fact witness a

23   hypothetical?

24              MR. KAHN:  What is the basis -- I asked you

25   what is the basis of your objection.
```

```
 1                MS. MILLER:  Well, that is the basis of my

 2       objection.

 3                MR. KAHN:  So it's an improper hypothetical?

 4       That would be the answer to -- that would be your

 5       objection?

 6                MS. MILLER:  Yes.

 7                MR. KAHN:  Okay.  All right.  Noted.

 8       BY MR. KAHN:

 9           Q.   So, sir, I'm going to ask you the question

10       again.

11                If Abad had waved his hand and told you to

12       stop, would you have still tackled Mr. Griffin?

13                MS. MILLER:  Same objection.

14                But you can answer.

15           A.   Probably not, being that it was probably not

16       a threat then.  If I felt like Mr. Griffin was still a

17       threat, yes, I would have.

18       BY MR. KAHN:

19           Q.   It would have been possible for Abad --

20           A.   It depends on if I felt like he was a threat

21       or not.

22           Q.   Sure.  It would have been possible for Abad

23       to wave his hand and tell you to stop.  Right?

24                MS. MILLER:  Objection.

25                You can answer.
```

```
 1        A.   He'd have to be really fast about it.  I

 2   mean, by that -- I mean, at that point Mr. Griffin

 3   swiped Abad's hand down towards his side.  I

 4   mean . . .

 5   BY MR. KAHN:

 6        Q.   If Abad had said --

 7        A.   I don't know how --

 8        Q.   Sorry.  I didn't realize you weren't done.

 9             If Abad had said, "Hey, Vickers, hold up,"

10   would you have still tackled Mr. Griffin?

11             MS. MILLER:  Objection.

12             But you can answer.

13        A.   Once again, if I felt like it was a threat,

14   yes, I would have.

15   BY MR. KAHN:

16        Q.   But if Abad had said, "Hey, Vickers, hold

17   up," would there -- would you -- what reason would you

18   have to believe that there was a threat?

19             MS. MILLER:  Same objection.

20             But you can answer.

21        A.   If Abad was able to say that,

22   hypothetically, hypothetically it leads me to believe

23   that there wouldn't be a threat, and I would see that

24   there was no threat, and I probably would not tackle.

25   Well, I wouldn't tackle if there wasn't any threat.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 44 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                     10/21/2020

```
 1    BY MR. KAHN:

 2         Q.    Okay.  And it would have been possible for

 3    Abad to do that.  Right?

 4              MS. MILLER:  Objection.

 5              But you can answer.

 6         A.    Not in that time span, no, sir.  And there

 7    was a threat.

 8    BY MR. KAHN:

 9         Q.    When Mr. Griffin got out of the car, he put

10    his weight on his left foot, didn't he?

11         A.    That, I don't know.  I'd have -- I don't

12    know.

13         Q.    Let's look at the video again.  All right.

14    I'm showing you Plaintiff's Exhibit 1.2 again.

15              (Video plays.)

16    BY MR. KAHN:

17         Q.    When Mr. Griffin got out of the car, he put

18    his weight on his left foot, didn't he?

19         A.    Okay.  Yeah.  He stood up, yes, sir.

20         Q.    Did you hear Mr. Griffin cry out in pain as

21    he got out of the car?

22         A.    No, sir.

23         Q.    Did you hear Mr. Griffin complain about his

24    ankle hurting as he got out of the car?

25         A.    No, sir.
```

1    Q.   He didn't do any of that, did he?

2    **A.   No, sir.**

3    Q.   In fact, Mr. Griffin was standing up

4    straight, wasn't he?

5    **A.   He was standing up on both feet.**

6    Q.   He didn't have any trouble balancing before

7    you tackled him, did he?

8    **A.   Not that I could see.**

9    Q.   Did you hear Mr. Griffin slurring his words

10   at any time before you tackled him?

11   **A.   No, sir.**

12   Q.   And that's because he wasn't slurring his

13   words.  Right?

14   **A.   No, sir.  I mean correct.**

15   Q.   Did you hear Mr. Griffin scream out in pain

16   as you tackled him?

17   **A.   On the video, sir.**

18   Q.   As we sit here today, do you think that you

19   were completely justified in tackling Mr. Griffin?

20   **A.   Yes, sir.**

21   Q.   Do you think you should have done anything

22   differently?

23   **A.   No, sir.**

24   Q.   You claim you tackled Mr. Griffin because

25   you thought he was resisting.  Right?

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 46 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                    10/21/2020

```
 1        A.    No.  He was resisting, sir.

 2        Q.    And I believe the words that you used during

 3   the OPS investigation were that you thought it was

 4   going to be a fight on your hands.  Is that -- is that

 5   right?

 6        A.    There was a good chance, yes.  That was

 7   going through my mind, yes.

 8        Q.    All right.  I'm going to show you another

 9   video that's been marked as Plaintiff's Exhibit 1.3.

10            Can you -- can you see the screen, sir?

11        A.    Yes, sir.

12        Q.    And you're -- you have no problem hearing

13   any of the video footage, do you?

14        A.    So far, no.

15        Q.    Okay.  Excellent.

16            (Video plays.)

17   BY MR. KAHN:

18        Q.    Now, isn't it true that when you -- or isn't

19   it true that you didn't start charging at Mr. Griffin

20   until he had already brushed Abad's hand away and was

21   standing still?

22        A.    I started charging once I seen that he

23   pushed Abad's hand away, and then I charged.

24        Q.    Sure.  But isn't it true that you didn't

25   start charging until after he had already brushed the
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 47 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                        10/21/2020

 1  hand away and at that point was standing still?

 2       A.    That's correct.

 3       Q.    All right.  I'm going to show you another

 4  video.  We're going to look at a clip that's been

 5  premarked as Plaintiff's Exhibit 1.4.

 6            (Video plays.)

 7  BY MR. KAHN:

 8       Q.    Did you hear Mr. Griffin say, "I can't move

 9  my leg"?

10       A.    I heard him on the video talking to Abad,

11  yes, sir.

12       Q.    But did you hear him say, "I can't move my

13  leg"?

14            MS. MILLER:  Objection.  Just to clarify,

15  are you talking about in the video or today -- I mean

16  or at the date of the incident?

17            MR. KAHN:  I'm asking him questions about

18  the video.

19            MS. MILLER:  Okay.

20  BY MR. KAHN:

21       Q.    So I'll ask -- I'll ask it again, sir.  In

22  Plaintiff's Exhibit 1.4 did you hear Mr. Griffin say,

23  "I can't move my leg"?

24       A.    In the video, I hear that.

25       Q.    Did you hear Abad ask Mr. Griffin if his leg

 1   was broken and Mr. Griffin responded, "I mean, you

 2   guys hurt it"?

 3        **A.    In the video, I hear that, yes, sir.**

 4        Q.    Now, in the video did you hear Mr. Griffin

 5   slur his words when he said, "I can't move my leg"?

 6        **A.    No, sir.**

 7        Q.    And that's because he was not slurring.

 8   Right?

 9        **A.    That's correct.**

10        Q.    And did you hear Mr. Griffin slur his words

11   when he said, "I mean, you guys hurt it"?

12        **A.    You asked if I heard him slurring then?**

13        Q.    Um-hum.

14        **A.    No, sir, I did not hear him slur.**

15        Q.    And that's because he was not slurring at

16   that time either.  Is that right?

17        **A.    That's correct.**

18        Q.    I'm going to show you a video that's been

19   premarked as Plaintiff's Exhibit 4.1.

20             (Video plays.)

21             MR. KAHN:  I think we lost Officer Vickers.

22   Oh, there he is.

23        **A.    Can you see me?**

24   BY MR. KAHN:

25        Q.    Yes, I can see you now.

Griffin vs. City of Atlanta                 Donald Vickers

```
 1              Sir, in Plaintiff's Exhibit 4.1 Abad makes
 2   Mr. Griffin stand up and walk.  Right?
 3       A.    I can't see anybody else.
 4       Q.    So in --
 5              THE WITNESS:  Ms. Miller, I can't --
 6              MR. KAHN:  Oh.
 7              THE WITNESS:  -- see you.
 8              MS. MILLER:  I'm still here.
 9   BY MR. KAHN:
10       Q.    All right.  So the question was, sir, in
11   Plaintiff's Exhibit 4.1, the video we just looked at,
12   Abad makes Mr. Griffin stand up and walk.  Right?
13       A.    I see that -- maybe I saw it wrong, but -- I
14   might have to see it again, but I did see that Abad
15   did try to get Mr. Griffin to stand.  It looked like
16   Mr. Griffin was standing on his left foot.  I thought
17   his left foot was the one that was hurt.  Or was it
18   the right?  Did I get that mixed up?
19       Q.    Sir, the question was --
20              MR. KAHN:  And I'm going to move to strike
21   that as nonresponsive to the question.
22   BY MR. KAHN:
23       Q.    The question is is in Plaintiff's
24   Exhibit 4.1 Abad makes Mr. Griffin stand up and walk.
25   Correct?
```

 1      **A.   He tried to get Abad to stand.  I don't know**

 2   **that he tried to get him to walk.  I know he tried to**

 3   **get him to stand.**

 4      Q.   Let's look at the video again.

 5           (Video plays.)

 6      **A.   You lost me.**

 7   BY MR. KAHN:

 8      Q.   You can't see the video?

 9      **A.   I can see it now.  The computer cut out for**

10   **a second.  But I see it.  You can go ahead.**

11           (Video plays.)

12   BY MR. KAHN:

13      Q.   So, sir, the question was in Plaintiff's

14   Exhibit 4.1, the video that we just watched for a

15   second time, Abad makes Mr. Griffin stand up and walk.

16   Correct?

17           MS. MILLER:  Objection.  Asked and answered.

18           You can answer if you have something new to

19   add.

20      **A.   He made Mr. Griffin stand, and I don't know**

21   **if that was Mr. Griffin -- him trying to make**

22   **Mr. Griffin walk.  I'm -- he made Mr. Griffin stand,**

23   **and I don't know if he was not sure about the broke or**

24   **not.  So --**

25

```
 1   BY MR. KAHN:

 2       Q.   Abad --

 3       A.   -- yes, he did stand.  I don't know if he

 4   was trying to make him walk on a -- on a injury.

 5       Q.   Sure.  Well, I guess, let's break it down.

 6   In that video that we just watched, Abad was standing

 7   behind Mr. Griffin.  Correct?

 8       A.   Beside him, but yes.

 9       Q.   And Officer Abad --

10       A.   Beside, behind.

11       Q.   And Officer Abad was urging Mr. Griffin to

12   walk forward.  Correct?

13       A.   That's correct.

14       Q.   Okay.  Now, it looked like in that video

15   that Mr. Griffin was in pain, didn't it?

16       A.   Yes, sir.

17       Q.   Now, did you call an ambulance after it was

18   clear that Mr. Griffin couldn't walk?

19       A.   No.

20       Q.   Did any of the other --

21       A.   Like I said before, it was determined that

22   us getting him treatment was quicker.

23       Q.   Did any of the other police officers call an

24   ambulance?

25       A.   I don't know that a 4 was called.  I know --
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 52 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

 1    **I don't think they did, no, sir.**

 2        Q.   Okay.  Well, do you think Abad did anything

 3    wrong in the video we just watched?

 4        **A.   No, sir.**

 5        Q.   So it was okay for Abad to make a seriously

 6    injured citizen walk around on a broken ankle?

 7            MS. MILLER:  Objection.

 8            But you can answer.

 9        **A.   I don't know if Abad was trying to make him**

10    **walk -- cause further injury to Mr. Griffin.  I don't**

11    **know what Abad was thinking.**

12            **It's about to tell me my computer's about to**

13    **cut off for some reason.**

14            **Seems like it's working now.  This computer**

15    **may cut off.  It if it does, I'll join right back as**

16    **soon as I figure out what's going on with it.**

17    BY MR. KAHN:

18        Q.   Okay.  So I just -- I'm going to ask that

19    question one more time just to get a clear answer for

20    the record.

21            So, in your opinion, it was okay for Abad to

22    make a seriously injured citizen walk around on a

23    broken ankle.

24            MS. MILLER:  Objection.

25            But you can answer.

```
 1          A.    It would not be okay to make Mr. Griffin

 2    walk on a hurt ankle.

 3    BY MR. KAHN:

 4          Q.    All right.   I'm going to show you another

 5    video.   This one is going to be marked as Plaintiff's

 6    Exhibit 2.2.

 7                (Video plays.)

 8    BY MR. KAHN:

 9          Q.    Did you hear the other officer say, "He's

10    got a lot of weight on it," and then you responded,

11    "Just a little bit," in the video we just watched?

12                MR. KAHN:   We lost him.

13                (OFF THE RECORD 12:08-12:14 P.M.)

14    BY MR. KAHN:

15          Q.    And before we get back into the substantive

16    questions, I've just got to ask, Officer Vickers,

17    during the brief time that we were off of the

18    deposition, did you have any conversations with

19    Mr. Miller, Ms. Parks, or Ms. Nair?

20          A.    I did just to let them know that the

21    computer went down and that I'd be back up as soon as

22    the computer comes up.

23          Q.    Okay.   Excellent.

24                What was the -- what was the last thing you

25    heard me -- or did you see any of the video of
```

Griffin vs. City of Atlanta                 Donald Vickers

```
 1   Plaintiff's Exhibit 2.2?

 2           I'll just start --

 3       A.   I think I saw it.  You might want to play it

 4   again.

 5       Q.   I'll start there.  Okay.

 6           All right.  So I'm going to play Plaintiff's

 7   Exhibit 2.2.

 8           (Video plays.)

 9   BY MR. KAHN:

10       Q.   All right, sir.  And so my question -- my

11   first question is did you hear where the other officer

12   said, "He's got a lot of weight on it," and you

13   responded, "Just a little bit"?

14       A.   I did.

15       Q.   And you were joking about Mr. Griffin's

16   weight.  Correct?

17       A.   There's a bit about -- yes.

18       Q.   I'm sorry.  What was your response?

19       A.   Yes.

20       Q.   Is it okay to make fun of a citizen's

21   weight?

22       A.   I wasn't making fun of his weight.

23       Q.   Does APD tolerate that sort of behavior?

24       A.   Like I said, I wasn't making fun of his

25   weight.  He's a bigger guy.  I mean, that's a fact.  I
```

Griffin vs. City of Atlanta                  Donald Vickers

1   **wasn't making fun of his weight.**

2       Q.   Okay.  Well, did you hear where you were

3   talking to the other officer in the video and said, "I

4   did, like, 50," and then said, "There's the skid

5   marks"?

6       A.   **I did hear that.**

7       Q.   Isn't it true that you were bragging to

8   another officer about tackling Mr. Griffin?

9       A.   **Just showing him what happened.**

10      Q.   So it's not true that you were --

11      A.   **Showing the officer --**

12      Q.   -- bragging --

13      A.   **-- what happened.**

14      Q.   It's not true, sir, that you were bragging

15  to another officer?

16      A.   **Like I said, I was just advising the other**

17  **officer what happened.**

18      Q.   And you laughed after you advised the other

19  officer what happened, as you just put it, didn't you?

20      A.   **I did chuckle, yes.**

21      Q.   What's so funny about what happened?

22      A.   **Like I mentioned before, it's not funny.**

23  **Just, you know -- you just -- you don't touch a**

24  **officer.  You don't -- you don't -- you don't resist.**

25      Q.   If it's not funny --

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 56 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1      **A.   We expect Mr. Griffin to follow the order.**

2      Q.   If it's not funny, then why did you laugh?

3      **A.   Also, like I said, I didn't expect him to**

4   **fall the way he did.**

5      Q.   Is it okay to laugh at a citizen who you've

6   seriously injured?

7          MS. MILLER:  Objection.

8          But you can answer.

9      **A.   I don't think it's nice to poke fun or**

10  **bully, but to come to an understanding, I didn't see**

11  **anything wrong with it.**

12  BY MR. KAHN:

13     Q.   So there was nothing wrong with laughing at

14  Mr. Griffin as he lay on the ground in pain?

15     **A.   I wasn't laughing about Mr. Griffin being in**

16  **pain.**

17     Q.   What was it that you were laughing about?

18     **A.   Just the fact you have to listen to lawful**

19  **orders.**

20     Q.   And so that's funny to you?

21     **A.   If I'm -- you know . . .**

22     Q.   So then you find that funny.  Is that right?

23     **A.   The tackle?**

24     Q.   I don't -- you -- sir, you were the one who

25  was laughing, and my question was what was funny.

Griffin vs. City of Atlanta                 Donald Vickers

```
 1    Only you know that.

 2        A.    Just laughing at the tackle and that he fell

 3    the way he did.  I was not laughing at his pain.

 4        Q.    All right.  I'm going to play -- we're going

 5    to leave off right where I left on the video -- where

 6    we paused it -- on Plaintiff's Exhibit 2.2.

 7           (Video plays.)

 8    BY MR. KAHN:

 9        Q.    Did you hear where you said, "We're laughing

10    at you because you fell pretty hard after pushing an

11    officer, man.  I find that funny, man"?

12        A.    I did hear that.

13        Q.    As we sit here today, do you still find that

14    funny?

15        A.    It was just -- you telling it, no.

16        Q.    I'm sorry.  What was that?

17        A.    You telling it; us talking about it, no.

18        Q.    That's not quite my question.

19           As we sit here today, do you find the same

20    thing that you were laughing about in that video that

21    I just showed you -- do you still find that to be

22    funny?

23        A.    I understand why I was laughing then.

24        Q.    So do you still find it funny, as we sit

25    here today?
```

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1        A.    It's kind of old now.  No.

 2        Q.    So it's not funny because it's old now?

 3        A.    Trying to make light of a situation then is

 4   different than talking about it now.

 5        Q.    So it's not so funny anymore, is it?

 6        A.    Like I say, trying to make light of that

 7   situation then; talking about it now, no.

 8        Q.    I'm going to show you another video.  This

 9   one is premarked as Plaintiff's Exhibit 4.2.

10             (Video plays.)

11   BY MR. KAHN:

12        Q.    Did you hear when you told Mr. Griffin,

13   "You're such a little girl right now"?

14        A.    I did.

15        Q.    Is it okay for police officers to hurt a

16   citizen and then insult them?

17        A.    Not particularly, no.

18        Q.    But that's what you did, though, isn't it?

19        A.    No, sir.

20        Q.    You did not insult Mr. Griffin?

21        A.    I was making awareness of letting -- no,

22   sir.  I was not trying to insult Mr. Griffin.

23        Q.    So then tell me what did you mean when you

24   said, "You're such a little girl right now"?

25        A.    I mean, I've seen a lot of injuries, had a
```

1    lot of injuries, seen a lot of people with a -- a lot

2    weaker than Mr. Griffin have some serious injuries,

3    and I've never heard a grown man sound like that.  And

4    I -- I think the alcohol and stuff played a role in

5    it.

6         Q.   So, sir, isn't it true that you --

7         A.   And I was just trying to make him aware of

8    it.

9         Q.   You were trying to make him aware that he

10   sounded like a little girl to you.  Is that -- is that

11   what you're saying?

12        A.   That's correct.  Sometimes when people are

13   intoxicated, they don't -- they don't understand what

14   they're saying or doing.

15        Q.   Sir, how -- can you explain to me how

16   calling someone a little girl, letting them know that

17   you think they're being a little girl is not an

18   insult?

19        A.   I'm sorry.  Can you say that again, please?

20        Q.   How is calling another person or telling

21   another person that they're such a little girl not an

22   insult to that person?

23        A.   It's more of just awareness.  A you're

24   better -- you're better than this.  You're stronger

25   than this.  I mean . . .

```
 1          Q.   So why didn't you use those inspirational

 2     words --

 3          A.   I was not trying to insult him.

 4          Q.   If you weren't trying to insult him, if you

 5     were trying to tell him that "You're stronger than

 6     this; you're better than this," then why didn't you

 7     just tell him that?

 8          A.   Saying -- when somebody's intoxicated and

 9     stuff, you can only reason with them so much.  I

10     wasn't trying to have a big moment there.  I was just

11     trying to, you know, let him know, "Hey, this is what

12     you're sounding out -- like right now."

13          Q.   Did you hear you and the other police

14     officer laughing and joking about Mr. Griffin?

15          A.   What part of Mr. Griffin were we laughing

16     and joking about?

17          Q.   Sir, that is my question.

18          A.   I don't understand the question.

19          Q.   My question was is did you hear you and the

20     other officer laughing and joking about Mr. Griffin.

21          A.   If you're referring to the video you just

22     showed me, if we were laughing and joking, we were not

23     trying to exclude Mr. Griffin from it.  We weren't

24     trying to pick on him or anything like that.  We were

25     just making him aware what he sounds like and dealing
```

```
 1   with the situation at hand.

 2       Q.   So is this a group of three friends joking

 3   around to you?  Is that what you're saying?

 4       A.   No.  We're not -- like the officer said, we

 5   didn't know Mr. Griffin.  We weren't judging him.

 6   Mr. Griffin made a mistake.  That didn't mean he was a

 7   horrible person.  It didn't mean that we didn't --

 8   still didn't have to take care of him.

 9       Q.   Have you seen the movie "Major Payne"?

10       A.   I have.

11       Q.   What was that reference to "Major Payne"

12   that you were talking about?

13       A.   It's a point in the movie that -- a lot of

14   people find it funny when they talk about how you take

15   one pain to get rid of another pain.  Once again,

16   trying to get light of the situation.  I even asked

17   him -- me saying, "Hey, you seen 'Major Payne'?" --

18   that was me talking to Mr. Griffin.  "Have you seen

19   the movie?"

20       Q.   That was you talking to Mr. Griffin.  Let's

21   take another look at that video.

22            (Video plays.)

23   BY MR. KAHN:

24       Q.   So you just said, "You're such a little girl

25   right now.  What's wrong with you?"  That was just a
```

```
 1   little motivation for him to keep getting up to the

 2   top of the driveway?

 3       A.   No.  At that point we were still trying to

 4   figure out what was wrong with Mr. Griffin.  I

 5   believed, due to his intoxication, him saying he had a

 6   leg pain, but he kept putting his weight on the same

 7   ankle that's hurt.  A person that's not intoxicated

 8   doesn't normally do that.

 9            And so I was trying to -- it was a moment of

10   trying to figure out what's actually going on with

11   Mr. Griffin and dealing with his intoxication.

12       Q.   Well, sir, are you -- are you a paramedic?

13       A.   No.  But I've had several broken ankle --

14   bones in my ankle and -- including other bones.

15       Q.   Do you have a medical degree?

16       A.   I've also been tackled several times.  I've

17   also been tackled several times.  And, no, I don't

18   have a medical degree.

19       Q.   So wouldn't it have been better to let the

20   doctors or the paramedics make that evaluation instead

21   of walking Mr. Griffin around on a broken ankle?

22       A.   Us standing him up right there was trying to

23   get him to care.  We didn't realize that he was

24   severely hurt.  Once we did realize that, we left him

25   there, and we backed the vehicle up to him.  And we
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 63 of 204

Exhibit D
10/21/2020
Griffin vs. City of Atlanta                    Donald Vickers

1    turned him around and got him into that vehicle as

2    best we could so we could transport him to Grady as

3    soon as possible.

4        Q.    All right.  So let's go back to the video.

5            (Video plays.)

6    BY MR. KAHN:

7        Q.    So, sir, if I understand correctly, is it

8    your testimony today that we did not just look at a

9    video of you and another officer laughing and joking

10   about Mr. Griffin?

11       A.    We were joking about a movie, and we were

12   trying to get -- well, I can't tell you what the other

13   officer's doing, but I can tell you that it was my

14   attempts to get Griffin to lighten up and to get his

15   mind off his current situation.

16       Q.    Does the police academy teach recruits to

17   mock injured citizens?

18       A.    No, sir.

19       Q.    That's not okay, is it?

20       A.    No, sir.

21       Q.    Why did you make Mr. Griffin try to walk

22   after you saw how much pain he was in?

23       A.    Once we saw how much pain he was in, then I

24   did not try to make him walk.

25       Q.    Well, the video that we just looked at,

```
 1    Plaintiff's 4.2, Exhibit 4.2 -- wasn't that after you

 2    had already seen Officer Abad try to make him walk and

 3    he fell down in pain?

 4         A.   Yes.  And that's why me and the other

 5    officer there were holding Mr. Griffin up, and he

 6    was -- the attempts was to put his weight on his good

 7    ankle, but he wanted to put his weight on his bad

 8    ankle.  We never wanted him to walk on his bad ankle.

 9         Q.   All right.  I'm going to show you another

10    video clip.  This is going to be Plaintiff's

11    Exhibit 3.3.

12              (Video plays.)

13    BY MR. KAHN:

14         Q.   What's that vehicle that you're trying to

15    load Mr. Griffin into?

16         A.   That is a -- our wagon.  It's one of our

17    wagons that we use to transport.

18         Q.   Did you see the other officer grab

19    Mr. Griffin by the ankle?

20         A.   He grabbed him by the upper leg.

21         Q.   Is there anything wrong with the way that

22    any of the officers in Plaintiff's Exhibit 3.3

23    behaved?

24         A.   Them not knowing the current situation and

25    everything, no, I don't think so.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 65 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1      Q.    Was there anything wrong with your body cam

2   on April 5th, 2019?

3      **A.    That, I don't know, sir.**

4      Q.    Well, didn't you tell the OPS investigator

5   that you had a problem with it?

6      **A.    If that was the date, then, yes, sir.**

7      Q.    Let's just pull up the exhibit.

8           Can you see Plaintiff's Exhibit 42 on your

9   screen?

10     **A.    I can.**

11     Q.    Do you see -- let me zoom in on this so we

12  can see it better.

13          Do you see where Plaintiff's Exhibit 42

14  summarizes what you told Investigator Nixon and it

15  says, "For whatever reason, it wasn't operating the

16  way it should have -- or should of or I don't know."

17          That's right there.

18     **A.    Yes, sir, I see it.**

19     Q.    And did -- I read that correctly?

20     **A.    Yes, sir.**

21     Q.    So then you told Investigator Nixon that

22  your body camera wasn't working.  Right?

23     **A.    Yes, sir.  I don't know if it was -- like I**

24  **said before, I don't know if it was a user error or if**

25  **it was a camera malfunction.**

1          Q.    Well, we know for a fact that it was not a

2    camera malfunction, don't we?

3               MS. MILLER:   Objection.

4               But you can answer if you know.

5          **A.    No, sir.**

6    BY MR. KAHN:

7          Q.    Excuse --

8          **A.    No, sir.**

9          Q.    We do -- we do not know that?

10         **A.    I don't know that, sir.   That was an old**

11   **camera -- to go further into it -- old camera.**

12   **There's a switch at the top.   There's been many**

13   **complaints with the old camera that the switch was**

14   **easy to turn off and on.   I don't know if I kept**

15   **hitting it.   I don't know.   Or I don't know if it was**

16   **the camera itself that was messed up.**

17         Q.    All right.   Can you see the screen -- my

18   screen in Plaintiff's Exhibit 42, sir?

19         **A.    Yes, sir.**

20         Q.    Do you see where it says "A diagnostic

21   evaluation of the BWC issued to SPO Vickers at the

22   time of this incident does not indicate that the

23   device suffered any type of malfunction -- or failure

24   or malfunction attributed to anything other than the

25   failure of the operator to properly activate the

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 67 of 204

Exhibit D
10/21/2020
Griffin vs. City of Atlanta                Donald Vickers

 1   device.  SPO Vickers did not report any issues about

 2   his camera at the time or immediately after this

 3   incident occurred."

 4           Did I read that correctly, sir?

 5       A.  Yes, sir.

 6       Q.  So isn't it true, then, sir, that we know

 7   for a fact that there was no malfunction with the

 8   camera, the body camera?

 9           MS. MILLER:  Objection.

10       A.  Once again --

11           MS. MILLER:  But you can answer if you know.

12       A.  No, sir.  We don't know.  I did make issues

13   about the camera not working.  I can't tell you

14   exactly when that was made.  But also I can tell you,

15   like I said, sometimes -- and I guess it's possible

16   that my camera could have been one of them as well --

17   the on-and-off button was easy to get hit and switched

18   on and off.  It could be done accidentally.  I don't

19   know, sir.

20   BY MR. KAHN:

21       Q.  Is it your testimony that you -- that you

22   just don't remember the -- you don't remember at what

23   point you realized that the camera was off and tried

24   to turn it on?

25       A.   No, sir.  I don't remember the exact point,

```
 1   no, sir.

 2        Q.   Okay.  Is it unusual for police officers to

 3   turn off their body camera in the middle of an arrest?

 4             MS. MILLER:  Objection.

 5             But you can -- I'm sorry.  You can answer if

 6   you know.

 7        A.   With current policy, no, sir.  I mean, it --

 8   you're not supposed to.

 9   BY MR. KAHN:

10        Q.   So I know you're not supposed to.  The

11   question is is it unusual for police officers to turn

12   off their body camera in the middle of an arrest.

13             MS. MILLER:  Same objection.

14             But you can answer.

15        A.   That -- there has to be some reason for it,

16   sir.

17   BY MR. KAHN:

18        Q.   Well, is that something that happens

19   frequently in the Atlanta Police Department?

20             MS. MILLER:  Objection.

21        A.   Not that I know of.

22   BY MR. KAHN:

23        Q.   Isn't the point of the body camera so it

24   captures the entire event?

25        A.   For the most part, yes, sir.
```

```
 1        Q.    Now, have you ever heard of police officers

 2   turning off their body camera after the use of force

 3   to get their stories straight with each other?

 4        A.    You cut out a little bit.

 5        Q.    Sure.

 6        A.    Can you repeat that?

 7        Q.    I can.  I can.

 8             The question was have you ever heard of

 9   police officers turning off their body cam after the

10   use of force in order to get their stories straight

11   with each other.

12        A.    After the incident -- not to get their

13   stories straight, but just to collaborate everything

14   that took place and add everything together.

15        Q.    So it is -- it is common, then, for police

16   officers to turn their body camera off and talk about

17   the use of force at the scene of the arrest.

18             MS. MILLER:  Objection.

19             But you can answer if you know.

20        A.    Only after the incident's over, sir.

21   BY MR. KAHN:

22        Q.    All right.  I want to show you a few more

23   video clips.

24             All right.  We're going to take a look at

25   Plaintiff's Exhibit 2.5.
```

```
 1                    (Video plays.)

 2    BY MR. KAHN:

 3         Q.   Did you hear yourself say, "Hey I'm going to

 4    save my camera life," just before the video ended?

 5         A.   That's correct.

 6         Q.   And I'm -- let me -- I didn't mean to get

 7    rid of that screen.  If you'll give me just a moment

 8    here.

 9              And if you look at the upper right-hand

10    corner of Plaintiff's Exhibit 2.5, you can see that it

11    says "T08:11:00."  Correct?

12         A.   Yes, sir.

13         Q.   And that's a time stamp.  Right?

14         A.   I believe so, yes, sir.

15         Q.   All right.  I'm going to show you what's

16    been premarked as Plaintiff's Exhibit 5.2.

17         A.   I can't see anything, sir.

18         Q.   You didn't see the video I just showed?

19         A.   No.  I can -- I can hear something, but I

20    can't see anything.

21              MS. MILLER:  It wasn't displayed on the

22    screen.

23    BY MR. KAHN:

24         Q.   I see.  Let me -- let me try that again.

25              Can you see it now?
```

```
 1        A.   Yes, sir.

 2        Q.   Okay.

 3             (Video plays.)

 4   BY MR. KAHN:

 5        Q.   And you hear yourself say, "Hey, everyone

 6   still on?"

 7        A.   The audio when you're talking is going in

 8   and out.  You're asking if I hear myself say, "Hey, is

 9   everybody still on?"  Is that correct?

10        Q.   Yes, sir.  Yes, sir.

11        A.   Yes, sir, I hear that.

12        Q.   And that was confirming whether or not all

13   the other officers in your general vicinity were on

14   their body cam footage.  Correct?

15        A.   That's correct.  Because I was cutting mine

16   off.  I wanted to make sure theirs get it.

17        Q.   And if you look at the upper right-hand

18   corner, the end of that -- this video is T08:11:16.

19   Correct?

20        A.   That's correct.

21        Q.   All right.  Now I'm going to show you -- can

22   you see my screen?

23        A.   Yes, sir.

24        Q.   I'm going to show you Plaintiff's Exhibit --

25             MR. KAHN:  It looks like -- who is Mr. Kane?
```

Griffin vs. City of Atlanta                    Donald Vickers

```
 1            MS. MILLER:  Okay.  It looks like we had
 2   Abad set to join at around 12:50 to start his
 3   deposition at 1.  And so he's going to go off.  Can
 4   we -- can -- I mean, do we have a time that we believe
 5   this deposition will be over for him to start?
 6            MR. KAHN:  I am not going to finish by 1.  I
 7   can tell you that.  Do you need to take a minute to
 8   speak with Officer Abad?
 9            MS. PARKS:  Can we go off the record?
10            MS. MILLER:  Officer Abad -- yes.  Can we go
11   off the record, please?
12            (OFF THE RECORD 12:45-12:48 P.M.)
13   BY MR. KAHN:
14        Q.   So I'm going to -- I'm going to share my
15   screen with you again, sir, and show you a video
16   that's been marked as Plaintiff's Exhibit 3.1.
17            (Video plays.)
18   BY MR. KAHN:
19        Q.   Now, 3-point -- Plaintiff's Exhibit 3.1
20   shows you reactivating your body camera.  Is that
21   correct?
22        A.   That's correct.
23        Q.   And we see the time stamp here at the
24   beginning of Plaintiff's Exhibit 3.1 says "T08:12:42."
25   Right?
```

```
 1        A.    That's correct.

 2        Q.    And doesn't that mean that you turned your

 3   body cam off for just under two minutes?

 4        A.    I believe so, yes.

 5        Q.    Why did you do that?

 6        A.    The only thing I can say is from the initial

 7   cutoff, it was to conserve battery life.  Why I had to

 8   cut it back on, I don't know.  I'm assuming because

 9   I'm probably going to have to deal with Mr. Griffin

10   again.

11        Q.    Who did you speak to during --

12        A.    And if I'm going to deal with Mr. Griffin, I

13   want it on.

14        Q.    Sure.  During the -- during the

15   approximately two minutes that your camera was off,

16   who did you speak to?

17        A.    That, I don't know.  I can't make out that

18   officer, and I don't know if I was speaking to that

19   officer.

20        Q.    Did you -- did you talk to anybody in the

21   approximately two minutes that your camera was off?

22        A.    I'm assuming I did being that I was right

23   there with those officers.  I'm sure we spoke on

24   something.  I don't know what.

25        Q.    Do you have any recollection about what you
```

```
 1   spoke -- or about what you spoke and to whom you spoke

 2   it?

 3        A.   You broke up.  I'm sorry.

 4        Q.   Do you have any recollection of who you

 5   spoke with?

 6        A.   No, sir, I don't.

 7        Q.   During that almost two-minute period that

 8   you turned your body cam off, did you get with the

 9   other police officers to make sure that your stories

10   lined up?

11        A.   I don't think so, sir.  They didn't have

12   anything to do with the case.  Unless it's just Abad.

13   Those other officers really weren't there.

14        Q.   I think we can see that -- let me share --

15   let me share the other exhibit with you.  Plaintiff's

16   Exhibit 3.1 it was.

17             That's the wrong exhibit.  Excuse me.

18             I think we can see from Plaintiff's

19   Exhibit 5.2 that it was Abad sitting in the driver's

20   seat of a police vehicle.  Do you see that?

21        A.   Yes, sir, I do.  I see the side of his face,

22   yes, sir.

23        Q.   Okay.  Excellent.  So then I'll ask the

24   question just once more now that we've established

25   that fact.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 75 of 204
Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                        10/21/2020

```
 1              During the almost two-minute period that you

 2     turned your body cam off while you were standing

 3     directly next to Mr. -- or Officer Abad, did you get

 4     with Officer Abad to compare stories and line -- make

 5     sure they line up?

 6          A.   Being that that was Abad, we probably did

 7     talk.  What we talked about, I can't recall.

 8          Q.   Do you think that you compared stories to

 9     make sure they lined up?

10          A.   We probably talked about the incident.  I

11     don't -- I don't know what we talked about, sir.

12          Q.   So for all -- for all we know, you could

13     have talked with Officer Abad, compared stories, and

14     made sure that y'all were on the same page.  Is that

15     right?

16          A.   Possibly.  Yeah.  I don't -- I don't --

17     that's possible.

18          Q.   Is there anything wrong with what you did in

19     those videos we just looked at?

20          A.   I believe Abad's camera was on.  Knowing

21     policy, I probably shouldn't have cut my camera off.

22          Q.   So is there anything wrong with what you

23     did?

24          A.   Like I said, I probably shouldn't have cut

25     my camera off.  Did it -- did it change the outcome or
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 76 of 204

Exhibit D
Griffin vs. City of Atlanta                 Donald Vickers                      10/21/2020

```
 1   anything?  Was there any foul play?  No, sir.

 2            MR. KAHN:  Move to strike that as

 3   nonresponsive.

 4   BY MR. KAHN:

 5       Q.   Are cops allowed to just turn off their body

 6   cameras whenever they want?

 7       A.   Not during a case, sir.  Not during an

 8   incident where I'm dealing with the suspect or --

 9   well, suspect.  There'd have to be something pretty

10   major to cut it off like that when I'm dealing

11   face-to-face with a suspect.

12       Q.   There are rules against doing that, in fact,

13   aren't there?  There are rules against cutting off

14   your body camera whenever you want.

15       A.   We have a policy, yes, sir.

16       Q.   Don't you think that the jury in this case

17   deserves to hear what you said during those

18   approximately two minutes that your camera's off while

19   you were standing next to Officer Abad?

20            MS. MILLER:  Objection.

21            But you can answer.

22       A.   What I said wasn't to Mr. Griffin.

23   Mr. Griffin was not there.  So I don't think it would

24   have made or break anything.  Like I said, there was

25   no foul play.  So I don't think so.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 77 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                          10/21/2020

```
 1    BY MR. KAHN:

 2        Q.   After the incident on April 5th, did you

 3    speak with Officer Abad about what happened at any --

 4    at any time?

 5        A.   Yes, sir, I'm sure we did.

 6        Q.   On how many occasions did you speak with

 7    Officer Abad about this case?

 8        A.   I couldn't even give you a ballpark.  I

 9    don't know.  We spoke several times.

10        Q.   Several times.  Did either of you speculate

11    that -- oh, I didn't mean -- I didn't realize you

12    weren't -- you weren't through.  You can -- you can

13    finish.

14        A.   Oh, I was just going to say we really didn't

15    speak on it until -- we probably spoke on it maybe,

16    you know, just with people around, "Hey, this is what

17    we did last night," or whatever.  But that was pretty

18    much dropped.  And then probably, you know, a few

19    months later, when we found out there was a complaint,

20    we -- it probably brought things back up again, but

21    that's it.

22        Q.   Did either of you speculate that Mr. Griffin

23    might make a complaint?

24              MS. MILLER:  Objection.

25              But you can answer if you know.
```

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1        A.   We didn't know.  We didn't know.  We

 2   didn't . . .

 3   BY MR. KAHN:

 4        Q.   Did either of you have -- or I'll ask just

 5   for you.

 6             Did you speculate that Mr. Griffin might

 7   make a complaint?

 8        A.   I can't -- can't really recall.  I don't --

 9   I don't think it's speculating.  Maybe a thought will

10   go through your head.  That happens on a lot of cases.

11        Q.   Sure.

12        A.   So, I mean, the better answer I just -- I

13   can't recall.

14        Q.   That's fair.

15             Were you surprised to learn that Mr. Griffin

16   had, in fact, filed a complaint?

17        A.   I think when we found out, yeah, we were.

18        Q.   Did you ever send text messages to Abad

19   about what happened with Mr. Griffin?

20        A.   Not that I know of.

21        Q.   Do you -- do you and Abad ever communicate

22   through text message socially?

23        A.   Me and him?  Very rarely.  I think we

24   usually just call one another.

25        Q.   So there are no text messages out there in
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 79 of 204

Exhibit D
Griffin vs. City of Atlanta                    Donald Vickers                        10/21/2020

 1   which the two of you are discussing this case?

 2        A.   Not that I know of.

 3        Q.   Did you meet with Abad at any time before

 4   the OPS interviews to talk about what happened on

 5   April 5th?

 6        A.   I think we bumped each other in

 7   headquarters -- excuse me -- a few weeks ago.  But we

 8   were just passing each other in the hall, whatever,

 9   saying "hey" to each other.  We didn't really -- we've

10   never planned to say, "Hey, let's meet and let's talk

11   about this or discuss this."  No.

12        Q.   And so just to clarify, I'm talking about

13   the OPS interviews, so the internal affairs

14   investigation about Tyler's complaint.  Before you

15   were interviewed by Investigator Nixon, did -- sorry.

16   Let me just strike that.  That was a terrible

17   question.

18             So my question is is specifically, before

19   your OPS interviews with Investigator Nixon, did

20   either you -- did either of you get together -- you

21   being Abad -- get together to talk about this case

22   before the interview?

23        A.   Okay.  So when it was going through internal

24   affairs, OPS, we were still working side by side with

25   each other.  So I'm sure we talked about it a little

```
 1   bit.

 2        Q.   At any point did you -- did you talk to each

 3   other about what you would say to Investigator Nixon?

 4        A.   I mean, I can't recall everything that was

 5   said.  I mean, I think it would be natural for us to

 6   kind of give a little, you know, speculation of what

 7   questions they might would ask us or whatever, but I

 8   don't think -- I mean, I can't -- I can't really

 9   recall.

10        Q.   Did you and Abad practice how you would

11   answer certain questions that you talked about?

12        A.   No, sir.  We never practiced, rehearsed, or

13   anything like that.  Not that -- not that I can

14   recall.

15        Q.   At any time did you ask Abad to testify a

16   certain way?

17        A.   No, sir.

18        Q.   At any time did Abad ask you to testify a

19   certain way?

20        A.   No, sir.

21        Q.   I want to ask you a few questions about the

22   police report in this case.

23             Sir, can you see Plaintiff's Exhibit 48 on

24   your screen?

25        A.   I can.
```

Griffin vs. City of Atlanta                Donald Vickers

```
 1        Q.   All right.  I'm going to flip down here to

 2   the narrative.  Do you see where the police report

 3   says Mr. Griffin, quote, was having difficulty

 4   maintaining balance on his own as he was leaning onto

 5   Abad's arm that was holding his shirt to assist him in

 6   balancing?

 7        A.   Yes, sir, I see it.

 8        Q.   And we watched -- we watched a video of that

 9   occurrence today, didn't we?

10        A.   Yes, sir.

11        Q.   And you testified that Mr. Griffin had no

12   trouble maintaining his balance, didn't you?

13        A.   No.  I didn't say he had trouble maintaining

14   his balance.  I said he was standing -- he did have

15   his arm up on the door.  It doesn't take much leverage

16   to hold yourself up to keep yourself from falling if

17   you're holding onto a car or door.  Mr. Griffin was

18   doing it with me and the other officer when we had him

19   standing.

20        Q.   I didn't see Mr. Griffin holding Abad's arm

21   for balance.  Did you?

22        A.   I don't recall him holding Abad's arm --

23   Abad's arm for balance.

24        Q.   And so that part of the police report is

25   false, isn't it?
```

```
 1              MS. MILLER:  Objection.

 2              But you can answer if you know.

 3      A.   I'm not Abad.  I didn't write the report.

 4  Mr. Griffin was holding himself up.  Abad didn't go

 5  back and look at the video after the arrest.  So he

 6  was going off his own memory and his own -- you know,

 7  what he recalled.

 8  BY MR. KAHN:

 9      Q.   Sir, so that part of the police report is

10  not true.  Right?

11              MS. MILLER:  Objection.

12              But you can answer if you know.

13      A.   It's not true as far as from what I could

14  tell.  He wasn't leaning to Abad's arm, but he was

15  using the door on the car for balance.

16  BY MR. KAHN:

17      Q.   Let's look at the video again.  Let me show

18  you Plaintiff's Exhibit 1.3.

19              (Video plays.)

20  BY MR. KAHN:

21      Q.   Where in Plaintiff's Exhibit 1.3 did you see

22  Mr. Griffin hold Abad for balance?

23      A.   Like I said, I did -- I didn't recall seeing

24  Mr. Griffin holding Abad's arm for balance.

25      Q.   He didn't do that.
```

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1            So my question to you, then, is how can we

 2   trust anything that Abad says if he's willing to lie

 3   in a police report?

 4            MS. MILLER:  Objection.  Yeah.  I'm going to

 5   instruct you not to answer that.

 6            MR. KAHN:  On what basis are you going to

 7   instruct him not to answer that?  Is this

 8   attorney-client privileged information?  Because

 9   that's the only legitimate basis for you to do so.

10            MS. MILLER:  The question was whether Abad

11   was lying in the police report and why could we trust

12   that.  Is that the question?

13            MR. KAHN:  Well, the question was how can we

14   trust Abad -- anything Abad says if he's willing to

15   lie in the police report.

16            MS. MILLER:  Okay.  I'll take that objection

17   back.  I'll withdraw that objection.

18            Go ahead.  You can answer if you know,

19   Officer Vickers -- SPO Vickers.

20   BY MR. KAHN:

21       Q.   Just so we have --

22       A.   Like I said --

23       Q.   So we have a clean record, I'm going to ask

24   that question one more time.

25            And the question is how can we trust
```

Exhibit D

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1   anything Abad says if he's willing to lie in a police

 2   report?

 3        A.   There's a big difference between lying and

 4   going off what you recall.  Like I said, I could see

 5   Mr. Griffin using the car to hold himself up -- his

 6   balance.  Abad probably remembers it a little

 7   differently.

 8             I don't see how you can just -- I mean, I

 9   think you can tell the difference between a blatant

10   lie and, you know, going off memory or what Abad

11   recalled.

12        Q.   All right.  Were you investigated by the

13   Office of Professional Standards for the way that you

14   treated Mr. Griffin?

15        A.   Yes, sir, I was.

16        Q.   Were you investigated for the use of

17   excessive force?

18        A.   Yes, sir.

19        Q.   What was the finding of that investigation?

20        A.   There -- the case is still open as far as I

21   know.

22        Q.   The OPS investigation is open as far as you

23   know?

24        A.   Yeah.  They haven't got back to me on the

25   whole -- the whole findings and of the use of force.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 85 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1        Q.   So no one has -- no one has spoken to you

2    about the investigative findings of the use of force

3    and the other allegations concerning Mr. Griffin?

4        **A.   Yes, sir.  I haven't -- I haven't signed**

5    **anything on use of force or other allegations as far**

6    **as that.  The only thing I've received was body-worn**

7    **camera.  That's the only thing I've been informed**

8    **about.**

9        Q.   Well, I guess, then, let me ask you this:

10   Do you think that you should be sustained on your

11   allegation of excessive force?

12       **A.   Absolutely.**

13       Q.   You absolutely think it should be sustained?

14       **A.   Yes, sir.**

15       Q.   All right.  Let's go through some of your --

16   some of the --

17       **A.   It should --**

18       Q.   -- investigative --

19       **A.   -- be --**

20       Q.   -- papers.  All right.  I'm going to show

21   you Plaintiff's Exhibit 42 if I can find it.  All

22   right.

23            So we're going to go to the first page of

24   Plaintiff's Exhibit 42.  So the first page of this

25   exhibit shows the investigation disposition for each

Griffin vs. City of Atlanta                    Donald Vickers

```
 1   of the claims that were brought against you.  Correct?
 2       A.   That's correct.
 3       Q.   Do you see first it says that you were
 4   exonerated for maltreatment or unnecessary force?
 5       A.   I think this is the first time I've seen
 6   this.  If you don't mind, just give me a sec.
 7       Q.   Yeah.  Of course.  Of course.
 8       A.   Okay.  I'm sorry.  I -- at first when I was
 9   reading it, it looked like something different.  Go
10   ahead, sir.
11       Q.   Do you agree with that finding?
12       A.   With not sustained?
13       Q.   With exonerated.
14       A.   Yes, sir.
15       Q.   Now, have you heard the testimony of any of
16   the other police officers in this case?
17       A.   No, sir.
18       Q.   So you haven't heard Investigator Nixon's
19   testimony on behalf of the City of Atlanta that the
20   force that you used was excessive?
21       A.   No, sir.  I haven't -- I haven't heard that.
22       Q.   All right.  I'm going to pull up a little
23   exhibit here.
24            Can you see the -- can you see what appears
25   to be the cover page of a 30(b)(6) deposition of
```

1   Arthur Nixon?

2       A.   Yes, sir.

3       Q.   All right.  I'm going to scroll down here.

4   And do you see the highlighted text where it says "Do

5   you think there's anything wrong with the way that

6   Defendant Vickers acted in Plaintiff's Exhibit 1.2?"

7            And then Investigator Nixon responds, "Yes."

8            Do you see that?

9       A.   Yes, sir.

10      Q.   And then the next question -- Ms. Nair

11  raised an objection; so I'm going to omit that from

12  what I read to you, but let the record show that it is

13  there.

14           And then I asked Investigator Nixon, "Do you

15  think that Defendant Vickers was justified in his use

16  of force?"

17           To which he responds, "Again, I would have

18  handled it differently.  I wouldn't have tackled

19  someone like that for a swiping of the hand.  So I

20  would have handled -- I would not have tackled."

21           Do you see that?

22      A.   I do.

23      Q.   What do you think about that?

24      A.   I don't know what he's experienced or

25  anything like that.  That's -- I mean, he wasn't

Griffin vs. City of Atlanta                Donald Vickers

1   **there.  I was.  I saw a threat, and I handled it.**

2       Q.   Now, have you heard SPO Fite's testimony,

3   your own use-of-force instructor, that was on behalf

4   of the City of Atlanta, that the force that you used

5   against Mr. Griffin was excessive?

6       **A.   No, sir.**

7       Q.   Can you -- can you now see what appears to

8   be the cover page of a 30(b)(6) deposition of Patrick

9   Fite?

10      **A.   Yes, sir, I can see that.**

11      Q.   Do you see where it says -- and it's on two

12  pages; so I'm -- so I'll have to scroll.  But do you

13  see where it says "So I'm going to ask the question

14  again.  That was an answer, but it -- I don't think it

15  answered my question.  And that's, based on what you

16  saw, Mr. Fite, was the use of force justified in the

17  video"?

18          And then Mr. Fite responds -- SPO Fite

19  responds, "From what I saw, I wouldn't think so."

20          Do you see that?

21      **A.   Okay.**

22      Q.   And you see that the --

23      **A.   I see it.**

24      Q.   You see that there was no objection by the

25  City of Atlanta for this bit of testimony.  Correct?

Griffin vs. City of Atlanta                    Donald Vickers

```
 1        A.    I see that.

 2        Q.    So it's on behalf of the City of Atlanta in

 3   this case.  Right?

 4              MS. MILLER:  Objection.

 5              But you can answer if --

 6        A.    I'm sorry.

 7              MS. MILLER:  -- you know.

 8        A.    I didn't hear your question.

 9   BY MR. KAHN:

10        Q.    I'll withdraw that.

11        A.    I didn't hear the question.  All I heard

12   was --

13        Q.    It's fine.  I'll withdraw it.  It is

14   binding; so it doesn't matter.

15              Well, let me just ask you, Officer Vickers,

16   what do you think about that testimony?

17        A.    Once again, that's how he would have handled

18   it.  That's what he saw.  I was there.  I saw and felt

19   a threat, and I handled it.

20        Q.    So you did testify that SPO Fite was your

21   instructor for use of force, didn't you?

22        A.    That's correct.

23        Q.    So do you think the jury should listen to

24   what SPO Fite has to say about the way that you acted?

25        A.    That's up to the jury.
```

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1          Q.   Do you have any idea why you were exonerated

 2    on the use of excessive force if two senior-ranking

 3    officials, including the person who investigated you,

 4    thought the force that you used was excessive?

 5               MS. MILLER:  Objection.

 6               But you can answer that question.

 7          A.   Once again, I don't know what they were

 8    feeling, what they were thinking.  But as far as

 9    exonerated, there was a threat.  I felt the threat.

10    There was a danger.  I took care of it.

11    BY MR. KAHN:

12          Q.   Isn't it -- isn't it because the use of

13    excessive force is tolerated by the City of Atlanta

14    Police Department?

15               MS. MILLER:  Objection.

16               But you can answer if you know.

17          A.   I think the City of Atlanta does a good job

18    on treating everybody fairly.

19    BY MR. KAHN:

20          Q.   All right.  Let's go back to Plaintiff's

21    Exhibit 42.  Do you see next where it says that you

22    were sustained for violating the rule on reporting

23    when force was used?

24          A.   Yes, sir, I see that.

25          Q.   Do you agree with that finding?
```

1    **A.    That's their policy.  This is the first time**

2    **I've seen of it.  I'm not running a judgment on it.  I**

3    **can say that a report definitely wouldn't have hurt.**

4        Q.    So then what we're looking at here, this

5    sustained finding -- that means that you failed to

6    report the use of force against Mr. Griffin, doesn't

7    it?

8        **A.    No.  I don't think it says I failed to**

9    **report the use of force.  We notified a supervisor of**

10   **the incident.**

11       Q.    Well, then why were you sustained for

12   failing to report force when it's required?

13       **A.    Because I didn't do a written report.**

14       Q.    Next, it says that you were sustained for an

15   unsatisfactory performance.

16             Do you see that?

17       **A.    I do see that, sir.**

18       Q.    What -- do you agree with that finding that

19   you performed unsatisfactorily?

20       **A.    Like I said, this is the first time I've**

21   **seen all this.  I'd like to see what parts -- but I**

22   **can't give you a definite answer on that right now.**

23       Q.    Well, do you agree that your performance in

24   the videos that we've watched was not satisfactory?

25       **A.    I can't answer that right now.**

Griffin vs. City of Atlanta                  Donald Vickers

```
1          Q.   Why not?

2          A.   I haven't evaluated it.  I don't -- when

3     they say "unsatisfactory," I don't know which parts

4     they're talking about.

5          Q.   All right.  That's fair.  We'll get into

6     that.

7               Next, it says that you were -- there was a

8     sustained finding for failing to conform to

9     directives -- the conformance to directives work rule.

10              Do you see that?

11         A.   I do see that one.

12         Q.   And that was -- that violation was about

13    your conduct regarding the body cam and Tyler Griffin.

14    Is that right?

15         A.   That's correct, sir.

16         Q.   Do you agree with that finding, that

17    sustained finding?

18         A.   I do, sir.

19         Q.   And then, finally, it says you were -- you

20    were sustained for violating the rule about

21    appropriate action that is required.

22              Do you see that one?

23         A.   I do see that one.

24         Q.   And does that relate to your failure to call

25    for medical attention for Mr. Griffin?
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 93 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1      A.   It could.  I don't -- like I said, I can't

 2  agree to it, because I don't know which part they're

 3  talking about.

 4      Q.   Okay.  So based on what we're looking at

 5  here, you were found to have violated all of the rules

 6  that you were accused of violating except for the use

 7  of force.  Correct?

 8      A.   That's correct.

 9      Q.   Do you understand that to mean that the City

10  of Atlanta supports and condones the force that you

11  did use against Mr. Griffin?

12          MS. MILLER:  Objection.

13          But you can answer.

14      A.   I do.  I believe they looked into it.  They

15  obviously did an investigation.  They -- they're

16  accusing me of all this other stuff.  I think after

17  doing an investigation, they can see that once

18  Mr. Griffin was no longer a danger or a threat, his

19  well-being was a concern of mine.

20  BY MR. KAHN:

21      Q.   All right.  We're going to flip over to

22  page 3.  All right.  Do you see the highlighted text

23  that says "SPO Vickers did not relay pertinent

24  information to his supervisor (nor in writing)

25  concerning the tackling of and injury sustained by
```

1    Mr. Griffin"?

2        A.    I do see that.

3        Q.    Why didn't you tell your supervisor about

4    the force that you used on Mr. Griffin?

5        A.    That was mentioned.  I think -- I think

6    because it was done over air, over radio.  At that

7    time, when I was dealing with that, the supervisors

8    and the zone was going through a lot.  I may have not

9    made myself clear.

10       Q.    So is it your testimony that you think

11   Plaintiff's Exhibit 42, which is an OPS document, is

12   incorrect?

13       A.    Do I think it's -- if no supervisor was

14   aware of it, I guess I didn't make myself clear.

15   That's all I can say.

16       Q.    Did you know that you were supposed to tell

17   your supervisor when you used force in the field?

18       A.    Yes, sir.

19       Q.    So is it fair to say, then, that you chose

20   not to tell your supervisor?

21       A.    No, sir, that's not fair.

22       Q.    Let's flip to page 4.  Do you see the

23   highlighted text?  And I'm going to -- I'm going to --

24   for the record, I'm going to omit the parenthetical.

25            Do you see the highlighted text that says

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

 1    "SPO Vickers' multiple failures during this incident

 2    as indicated . . . place him in clear violation of

 3    ADP.SOP.2010 Work Rules 4.2.37"?

 4         A.   Yes, sir.

 5         Q.   Did you know at the time that you were

 6    supposed to call an ambulance for Mr. Griffin?

 7         A.   Yes, sir.  At that time, it was my goal to

 8    get Mr. Griffin to the hospital as soon as possible

 9    and get him the care he needed, and I knew that we

10    could get him there quicker than the Grady EMS units

11    could arrive.  And, you know, it was raining and

12    stuff.

13              I guess, you know, I should have took the

14    extra time and had Mr. Griffin sit out there and wait,

15    if that's what they're saying.

16         Q.   Do you see the highlighted text that says

17    "SPO Vickers' body-worn camera was not activated at

18    the onset of this call for service and did not start

19    recording until he had already made the tackle of

20    Griffin and was on the ground with him"?

21         A.   Yes, sir, I see that.

22         Q.   And you told Investigator Nixon that there

23    was a problem with your camera.

24         A.   Yes, sir.

25         Q.   I guess we already looked at this, but I'm

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 96 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1  going to go through it again.
 2      A.   I told him that I had problems with my
 3  camera.  I don't know --
 4      Q.   Sorry.  What?
 5      A.   I told him I was having problems with the
 6  camera.  Now, as far as that incident, like I said --
 7  you asked me about -- I don't know if that was a
 8  malfunction or if that was a user error.
 9      Q.   Don't -- do you -- do you understand what --
10  this text to mean in this OPS document that it was not
11  a malfunction; that it was, in fact, a user error?
12  You being the user.
13      A.   Okay.  Once again, that just shows that the
14  camera's been switched on and off.  That doesn't mean
15  that the button's loose, and it doesn't mean that it
16  didn't accidentally get switched off.
17           And I don't work for that unit.  I don't
18  know the diagnostics that they do on the camera.  I
19  mean, I see what you -- when you do an audit, I can
20  see that.  But other than just using the camera and
21  able to see the audit -- what it tells you to do, I
22  don't know what-all it can pick up and what it can't
23  pick up as far as errors.
24      Q.   Well, did you --
25      A.   I mean, I had -- the camera before that had
```

Exhibit D

Griffin vs. City of Atlanta                  Donald Vickers                      10/21/2020

```
 1   a screw that came out of it.

 2        Q.   Did you appeal this finding --

 3        A.   Are you going to let me finish?

 4        Q.   -- made by OPS?

 5             You're still speaking?

 6        A.   Actually, that just came down to me -- no.

 7   It came down.  I signed it.  We have a new camera now.

 8   And to be honest, I'm over it.  But I signed it.

 9             There's -- because there's no way for me to

10   prove what happened that day.  So I gave them my

11   story, and they stuck to their guns.  And that's all

12   that can be done.

13             But, like I mentioned before, one of the

14   cameras I turned in had a screw that was coming out of

15   it.  The audit doesn't pull that up.  The audit

16   doesn't show, hey, camera's missing a screw.

17        Q.   Well, how do you know that?

18        A.   They showed me the audits.  It just shows

19   you when the camera was activated, when it was

20   recording, what it recorded, and when it was turned

21   off and on.

22        Q.   Well, what was your punishment for

23   everything that you did to Mr. Griffin?

24        A.   Like I said, I haven't signed anything yet;

25   so I don't know.
```

```
1        Q.    You haven't been -- you haven't been

2   suspended for this?

3        A.    The camera -- I just got that.  I will be

4   suspended for that.

5        Q.    So when I say -- when I say what is your

6   punishment for everything that you did for -- to

7   Mr. Griffin, I mean everything we just went through in

8   Plaintiff's Exhibit 42 and not necessarily the

9   excessive force.  So have you been informed of what

10  your punishment will be for all of the rule violations

11  that we just --

12       A.    Not at this time, I have not.  At this time

13  I have not.

14       Q.    But, then, how are you aware that you will

15  be suspended?

16       A.    Only for the body camera.  Only for the body

17  camera.  I -- that's a separate unit that handle --

18  the body camera unit -- from what I'm told, they deal

19  with just the body camera issues and policy.

20              So they just finished their findings, and I

21  met with them last week.  I believe it was last week.

22  Whatever the 15th was.  Yeah, it was last week.

23       Q.    All right.  Have you seen Plaintiff's

24  Exhibit 45 before?

25       A.    No, I don't think I've seen this.
```

```
 1        Q.   I want to go through a few -- a few of these
 2   things anyway.
 3             So do you see where it says -- there's a
 4   category that says "Rule."  Do you see where it says
 5   Rule 4.2.51?
 6        A.   I do.
 7        Q.   And as we know, that was for failing to
 8   report the use of force.  Correct?
 9        A.   Yeah.  I'd have to look back to make sure it
10   matched the -- I assume so.
11        Q.   And then we have the "Recommended Action,"
12   and it says "OA."  Oral admonishment?
13        A.   Okay.
14        Q.   I am asking you.  Is that -- is that what
15   you understand that to mean?
16        A.   I believe so.  Forgive me.  This is my first
17   time seeing this.  I don't think I've ever seen a form
18   before.  So this is my first time looking at it.  But
19   that -- yeah.  I'm pretty sure that's what that means.
20        Q.   Well, what happens typically during an oral
21   admonishment?
22        A.   This is just my understanding:  That an oral
23   would be given -- oral reprimand -- within a reckoning
24   period.  If it happens again, it goes up to a category
25   higher, and --
```

1    Q.    Did --

2    **A.    -- so on.**

3    Q.    Sorry.

4          Is an oral admonishment really that big of a

5    deal?

6    **A.    It can be, yes, sir.**

7    Q.    Well, how many -- how many times have you

8    received an oral admonishment in your career as an

9    Atlanta police officer?

10   **A.    That, I don't know.  But I can guarantee you**

11   **it's not for the same thing.**

12   Q.    Sure.  I'm just asking generally.

13   **A.    That, I don't know, sir.  I couldn't even**

14   **give you a ballpark.  I apologize.**

15   Q.    Would it be -- is that because there are too

16   many oral admonishments to remember?

17   **A.    No.  It's probably only a couple.  I just --**

18   **I just couldn't give you a -- an accurate number.**

19   Q.    Okay.  Do you see where underneath that rule

20   it says Rule 4.2.37?

21   **A.    I do.**

22   Q.    And that's the rule for failing to transport

23   someone to the hospital by ambulance.  And for that,

24   it looks like you got a "WR."

25          Do you see that?

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 101 of 204

Exhibit D
Griffin vs. City of Atlanta              Donald Vickers              10/21/2020

```
 1        A.    Yeah, I see that.

 2        Q.    And "WR," my understanding, is a -- is a

 3   written reprimand.  Is that your understanding?

 4        A.    Yes, sir.

 5        Q.    And is a written reprimand sort of on the --

 6   on the scale of police punishment, is that just sort

 7   of like a little more serious than an oral

 8   admonishment?

 9        A.    It's more serious, yes, sir.

10        Q.    For a written reprimand, do they essentially

11   just give you a letter that says, you know, "Don't do

12   that again"?

13        A.    No, sir.  It sits in a -- it sits in your

14   file, and you have a reckoning period or probation

15   period that, with a same violation in that category

16   or -- category of violation in that SOP, your

17   punishment is a lot harsher.

18        Q.    Do you -- are you given --

19        A.    It's not like you're just going to be

20   written up again.

21        Q.    So are you given -- when you receive a

22   written reprimand, do you receive a -- personally

23   receive a copy of it?

24        A.    Yes, sir.

25        Q.    Are you a -- are you writing something right
```

1    now, sir?

2        A.    I'm just writing the rules in the -- like I

3    said, this is new to me.  So I'm just writing that.

4        Q.    I see.  I see.

5        A.    Would you like to see it?  It's

6    scribble-scrabble.

7        Q.    Not at this time.  Thank you.

8              So I guess for the time that --

9        A.    I tell you what --

10       Q.    Yes.  Do you need to take a break?

11       A.    No.  No, I don't need to take a break.  I

12   was done.  I was just writing the one, two, three,

13   four categories there.

14       Q.    I see.

15       A.    Five.

16       Q.    So my question -- the rule that we just

17   looked at for the failing -- for the failing to

18   transport Mr. Griffin by ambulance -- that was the

19   second one, and you are given a written reprimand for

20   it.  So my question is so APD shoves a man with a

21   broken ankle into the back of a wagon, and all they do

22   is write you a letter?

23             MS. MILLER:  Objection.

24   BY MR. KAHN:

25       Q.    Is that -- is that right?

Exhibit D

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1                  MS. MILLER:  You can --

 2        A.    Sorry.

 3                  MS. MILLER:  You can answer if you know.

 4        A.    All I heard was a little bit of static and

 5   then "Objection."  The connection was lost.

 6   BY MR. KAHN:

 7        Q.    Sure.  I'll repeat it.

 8              So APD shoves a man with a broken ankle into

 9   the back of a wagon, and all they do is write you a

10   letter.  Is that right?

11                  MS. MILLER:  Objection.

12        A.    That's not right.

13   BY MR. KAHN:

14        Q.    That's not right?  Well, what does this

15   mean, then?

16        A.    Nobody was shoved.

17        Q.    And then so here we have -- we have

18   Rule 4.2.33, and that was for failing to activate the

19   body camera.  Right?

20        A.    That's correct.

21        Q.    And for that, it looks like there was a

22   recommended suspension of three days.

23              Do you see that?

24        A.    That's correct.  I do see that.

25        Q.    How many -- how many days were you actually
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 104 of 204

Exhibit D
Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

1    given for that suspension?

2        A.    Three days.

3        Q.    They didn't reduce it down to two days?

4        A.    No, sir.

5        Q.    Would you say that of the -- of the things

6    that you were found -- of the sustained findings, that

7    the failure to activate the body camera is the most

8    serious offense?

9        A.    Out of all these -- I'm sorry.  Just to be

10   clear, can you repeat that?

11       Q.    Yeah.  Yeah.  So of the -- of the rule

12   violations for which you were sustained, would it be

13   fair to say that the failure to activate the body

14   camera is the most serious?

15       A.    It's the most severe punishment.

16       Q.    And would you agree that the reason that

17   that punishment is the most severe is because body

18   camera is really important to a case like this?

19       A.    Yes, sir.  I think that's fair to agree to.

20       Q.    And body camera footage is generally more

21   reliable than a police officer's testimony, isn't it?

22       A.    No, sir.

23       Q.    You don't think that body camera that's

24   video footage showing an actual event is more reliable

25   than someone's verbal testimony?

1    **A.    I think they both have their pros and cons.**

2    Q.    And do you see where it says Rule 4.1.1?

3    **A.    I do, sir.**

4    Q.    And that -- that was for your verbal abuse

5    of Mr. Griffin, wasn't it?

6    **A.    I'm assuming so.  I -- like I said, I don't**

7    **know.**

8    Q.    And for your verbal abuse of Mr. Griffin,

9    you were given an oral admonishment.  Right?

10    **A.    It appears that.**

11    Q.    And then in this -- in this worksheet

12    there's no punishment for the force that you used on

13    Mr. Griffin.  Right?

14    **A.    That's correct.**

15    Q.    So would you agree, then, that what that

16    means is that an Atlanta police officer can do what

17    you did to Mr. Griffin and get away with it so long as

18    they activate their body camera, they tell their

19    supervisor, and call an ambulance?

20    **A.    As long as they're on the call, yes, sir.**

21    Q.    Do you think that you were appropriately

22    punished for everything you did to Mr. Griffin?

23    **A.    Not -- this is -- like I said, this is the**

24    **first time I've looked at all this.  I'd like to read**

25    **it over before I give a complete answer on that.**

1    Q.    Okay.  That's fair.

2          How many times have you been investigated by

3    OPS?

4    **A.    A few times.  I can't count the number.  I**

5    **mean, I can't give you exact number right now.  A**

6    **ballpark figure?  I want to say somewhere around three**

7    **to five maybe.**

8    Q.    And of those -- of those OPS investigations,

9    how many of them were for the use of force?

10   **A.    That, I don't know.**

11   Q.    Was it -- it was more than one, though.

12   Right?

13   **A.    That's correct.**

14   Q.    Let's talk about Ricky Usher.  Do you -- do

15   you recall an OPS investigation into one of your

16   interactions with a man named Ricky Usher?

17   **A.    I do.**

18   Q.    What happened with Mr. Usher?

19   **A.    You want the whole incident?**

20   Q.    You can give me an abbreviated version, just

21   beginning with the -- his allegations of excessive

22   force.  Or whatever you -- whatever you want to --

23   **A.    The complaint came -- that was my second**

24   **time dealing with Ricky Usher on the same violation.**

25   **It was a City charge at the time.  I don't remember**

```
 1   exactly what the charge was.  But he pretty much told

 2   me he wasn't going to go to jail.  I end up having to

 3   use my OC spray on him.

 4           To give you an idea how big Ricky Usher is,

 5   he's a -- he's a lot taller than I am and outweighs me

 6   by 100 pounds.

 7           While I was trying to get him detained, I

 8   sprayed him.  He had a female friend -- I want to say

 9   it was his girlfriend -- came from behind me and

10   pushed me at the same time.  She tried again, but I

11   sprayed in her direction.  And she stayed away from

12   the spray, and that kept her away from me in time to

13   take Mr. Usher to the ground.

14           While Mr. Usher was in handcuffs and I was

15   trying to get him to a car, he was able to use his

16   back to throw me up against the back and top of a

17   police car.  As I came down on the ground, I grabbed

18   his feet.  And when his feet went out from under him,

19   he hit the ground.  And I was able to struggle to get

20   him into the back of a patrol car.

21           And he was transported to -- I think he went

22   to -- straight to jail.  I don't think he had any

23   injuries.  I think he went straight to jail.  I can't

24   remember that part.

25           We went to court on it.  Took the judge
```

1    about anywhere from 10 to 20 minutes to say that he

2    was tired of hearing Ricky and his girlfriend's lies.

3    The judge straight up said, "I hear that enough."  And

4    he charged them both with guilty and even fined the

5    female, who I did not charge.  It took OPS quite a

6    while to close out the case.

7           And fast-forward some years later; I meet

8    Ricky Usher outside a -- well, he's outside a, you

9    know -- outside a -- I was working at a shelter, a

10   warming shelter for the City.  Ricky Usher just

11   happened to be working for the City too.

12          He came up to me and told me that he's

13   working for the City now and he's not what he used to

14   be.  Whether that was true or not, I don't know.  But

15   that's the story.

16        Q.   All right.

17        A.   And I was given not sustained on that.

18        Q.   Did you use your foot to push Mr. Usher into

19   the vehicle after he was already handcuffed?

20        A.   That was one of the things that -- his

21   complaints were -- that I used my foot.  I think he --

22   I believe he accused me of kicking him in the head.

23   That was a pretty big struggle.  And I didn't want the

24   fact that my foot may have touched his head -- even

25   though it may not have been a kick, I didn't want

Griffin vs. City of Atlanta                  Donald Vickers

 1    people to perceive it as a kick.  So for there, I

 2    couldn't recall.

 3              Did I use my foot to shove Ricky in the back

 4    of a patrol car?  If that's what it took, I don't

 5    know.

 6        Q.   All right.  Can you see Plaintiff's

 7    Exhibit 53 on your screen?

 8        A.   Yes, I can.

 9        Q.   Have you ever seen this document before?

10        A.   That, I don't know.  Is this from Ricky?

11        Q.   Yes.

12        A.   No, I have not seen this document.  I was

13    informed by the chief at the time -- the deputy

14    chief -- that it was going to be not sustained.

15        Q.   Do you see where it says that you were

16    sustained for use of unnecessary force?

17        A.   I see it now.

18        Q.   I take it you disagree with that finding.

19        A.   100 percent.

20        Q.   All right.  Can you -- can you see

21    Plaintiff's Exhibit 54 on your screen?

22        A.   Yes, sir, I can.

23        Q.   So these are -- these -- or this at least

24    includes the witness statements from the

25    investigation.  I want to ask you about a few things

```
 1   in here.  Go to the second page.

 2           All right.  Do you see -- let me -- do you

 3   see that highlighted text that says "Ms. Williams said

 4   Officer Vickers told Mr. Usher, 'Hey, motherfucker,

 5   come here.  I'm talking to you.'  Ms. Williams said

 6   Officer Vickers repeated this statement twice and then

 7   grabbed Mr. Usher from behind and started choking

 8   him."

 9           Did I read that correctly?

10       A.   I see the statement.  Yes, sir.

11       Q.   Did you, in fact, say, "Hey, motherfucker,

12   come here," to Mr. Usher?

13       A.   That, I can't recall.  I can tell you

14   that -- that, I can't recall.

15       Q.   Let me -- well, let me ask you this:  Is

16   that an appropriate way for a police officer to speak

17   to a citizen?

18       A.   If you are a criminal and "sir" and "ma'am"

19   was not working, but then all of a sudden I used those

20   words and it works, I think it's appropriate.

21       Q.   All right.  Do you see the highlighted text

22   that says "Mr. Usher said, without any warning, even

23   though he did state that Officer Vickers told him to

24   stop, Officer Vickers came up behind him and tried to

25   put him in a chokehold.  However, he was able to shake
```

Exhibit D

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

1    Officer Vickers off of him"?

2         **A.    Yes, sir, I see that.**

3         Q.    Is that -- is that a true statement?

4         **A.    No, sir.  And it doesn't make sense.**

5         Q.    All right.  Do you see where it says that

6    you said, "Get up you fat, black piece of shit and get

7    in the car"?

8         **A.    Yes, sir, I see that.**

9         Q.    Did you, in fact, say those words?

10        **A.    Absolutely not.**

11        Q.    Why do you think Mr. Usher said that you

12   said that?

13        **A.    Because at that time, I guess, he was a**

14   **no-good person.  And the reason I can recall it is**

15   **because I remember that was one of the allegations**

16   **that he had against me with the internal affairs.  And**

17   **I remember he went to court with that same allegation.**

18   **And that's -- it stuck with me for a while.**

19        Q.    Do you see where it says "Officer Vickers

20   kicked him approximately four or five times on both

21   his right and left side and then the left side of his

22   chest and back, causing soreness in his ribs"?

23        **A.    Yes, sir, I see that.**

24        Q.    Is that true?

25        **A.    That's absolutely false.  If, in fact, my**

 1   **foot ever made contact with Ricky, it was never more**

 2   **than once.**

 3        Q.   Sir, can you see Plaintiff's Exhibit 52 on

 4   your screen?

 5        **A.   Yes, sir, I can.**

 6        Q.   Have you ever seen Plaintiff's Exhibit 52?

 7        **A.   I don't believe so.  Is this still regarding**

 8   **Ricky Usher?**

 9        Q.   It is.

10        **A.   I can see the -- no, sir, I don't recall**

11   **ever seeing this.**

12        Q.   It -- does it appear that Plaintiff's 50- --

13   Plaintiff's Exhibit 52 is a document recommending that

14   you be suspended for five days for your use of

15   excessive force?

16        **A.   Yes, sir.  It says that.**

17        Q.   And were you, in fact, suspended after the

18   investigation into Mr. Usher's complaints?

19        **A.   No, sir, I was not.**

20        Q.   So you were not suspended for any period of

21   time after Mr. Usher complained that you used

22   excessive force against him?

23        **A.   No, sir, I was not suspended.**

24        Q.   Okay.  Have you ever seen Plaintiff's

25   Exhibit 58 before?  And this is an internal memo

```
 1   requesting that the final disposition be changed from

 2   sustained to not sustained regarding Ricky Usher.

 3        A.   Okay.  I don't recall this letter, but the

 4   sustained to not sustained sounds more familiar to me.

 5        Q.   Is it normal for a deputy chief or any other

 6   employee of the City of Atlanta to change the final

 7   disposition after an OPS investigation?

 8             MS. MILLER:  Objection.

 9             But you can answer if you know.

10        A.   That, I don't know, sir.  I really don't.

11   BY MR. KAHN:

12        Q.   Have you ever heard of something like that

13   before?

14        A.   I mean, what comes from OPS is -- my

15   understanding, that's a proposed action.  It's up to

16   the chief to actually hand it out or not.

17        Q.   Do you have any idea why the deputy chief

18   changed your disposition from sustained to not

19   sustained?

20        A.   I guess through further investigation it was

21   determined that I didn't do it, that the allegations

22   were false.

23        Q.   Do you know that, or are you -- or are you

24   guessing?

25        A.   Well, I met with the deputy chief, and we
```

Griffin vs. City of Atlanta                    Donald Vickers
Exhibit D
10/21/2020

1    discussed it, and that's what he said.  So . . .

2        Q.   So you're friendly with Deputy Chief Finley?

3             MS. MILLER:  Objection.

4        A.   No, I'm not.

5             MS. MILLER:  But you can answer.

6        A.   I worked underneath him.  I worked

7    underneath him, sir.

8    BY MR. KAHN:

9        Q.   Have you ever, you know, grabbed a beer with

10   Deputy Chief Finley?

11       A.   I've never seen him out- -- if I saw him

12   outside of work, it's because I live in the same zone

13   that I work.  But we never went out and hung out

14   together, no, sir.

15       Q.   Did you ever thank him for changing the

16   disposition from sustained to not sustained?

17       A.   In a roundabout way I did say thank you;

18   however, I was actually hoping for exonerated.

19       Q.   What was this -- you said you spoke to

20   Deputy Chief Finley about the investigation.  What was

21   that -- tell me about that conversation.

22       A.   Well, OPS did -- they handled, I guess, the

23   complaint, and then they forwarded it up to the chief.

24   And I had to go meet with the chief to -- because they

25   were issuing out five days, and only the chief can do

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 115 of 204

Exhibit D

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

 1    that.

 2            And there was a statement that was made that

 3    it must be my statement, but luckily I had the

 4    original statement from the beginning.  It was not the

 5    correct statement.  I don't know what the means was

 6    behind it or whatever, but I gave my original

 7    statement.  He knew my actions, and he determined his

 8    findings.

 9        Q.   Do you recall -- and we've been going for a

10    while now.  Are you -- are you okay to keep going?

11            MR. KAHN:  Does anyone need a restroom break

12    or anything?

13            MS. MILLER:  I'm fine to keep going if

14    SPO Vickers is.

15            MR. KAHN:  You're good to go?  All right.

16    Well, let's --

17            THE WITNESS:  Keep going.

18            MR. KAHN:  -- keep going.  All rightee.

19    BY MR. KAHN:

20        Q.   Sir, do you recall an incident in which you

21    aimed an assault rifle at several young men at the

22    Underground Atlanta?

23        A.   I remember pulling out an assault rifle in

24    Underground Atlanta.  I never aimed it at anybody.

25        Q.   What happened there?

1    A.    I was out of work due to an injury, a

2    shattered elbow, due to work-related causes.  My

3    girlfriend at the time, who is now my wife, was

4    working at the Underground.  Like I said, I worked and

5    lived in the same zone.  Underground was real close to

6    it.  So instead of her paying for parking, I told her

7    I'd pick her up after work.

8              Well, I fell asleep.  Didn't hear the phone

9    go off.  Woke up late.  Rushed out the door.  Grabbed

10   my keys, my badge, and put them in the jeans I was

11   wearing, and I ran out the door to go get her.  It's

12   only a few blocks away.

13             As I was going to Underground Atlanta,

14   there's a turnaround -- a turnabout.  I was witnessing

15   four security guards, unarmed, pushing and shoving

16   three other guys.  After they shoved the guys and

17   pushed the guys off the property -- or at least out of

18   the -- the hangout area where everybody was, you know,

19   partying and drinking and stuff, the three guys

20   started making threats.

21             And one security guard, who was unarmed,

22   told the guys, "Hey, go get your guns," or whatever.

23   You know, "I'll be right here."

24             Well, two of the guys stayed.  They're

25   telling the other guy, "Go get the guns."  One guy

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1    acts like he's leaving.  I reached down for my phone;

 2    realized I didn't have my phone.

 3           The security guards can see me, the way I'm

 4    positioned, but the three guys cannot.  I put my badge

 5    up at the window or put it around my neck so they can

 6    see through the window.  I tapped it.  They give me a

 7    nod.  I get out.  I go to my trunk.  I grab my rifle

 8    with one hand, turn the light on so it lights the

 9    rifle up so that they can see it, and told the guys,

10    "Hey" -- once I got the three guys' attention, I told

11    them, "Look, I don't want anything.  Just leave.

12    Don't come back.  Just leave.  Just leave."

13           They took off.  I walked to the security

14    guards.  I asked them if they could -- I made sure

15    they were all right.  And I said, "Hey, can you just

16    walk me to the bar that my girlfriend works at."

17    Because I know how it looked.  You know, you can't see

18    the badge.  All you see is a white T-shirt and jeans.

19    And they were like, "Sure."

20           So one of them walked with me.  When I got

21    down there, there was nobody at the front.  So I had

22    to leave.  Go back home.  I grabbed my phone, and

23    that's when I made the phone call to my girlfriend.

24    And she had already started walking.  I went to pick

25    her up.
```

```
 1              And at that time I was friendly with the
 2    cops around.  They knew my car and stuff.  And they
 3    didn't realize it was me.  I got pulled over.  We all
 4    talked about it.  And then one brand-new lieutenant
 5    decided to take it further, and he tried to put
 6    charges on me.
 7        Q.   Were you arrested?
 8        A.   Those charges never made it to court.
 9              He tried to arrest me.  He -- it's -- what
10    he did was completely wrong.  To put a reckless
11    conduct charge on somebody, you have to arrest them.
12    You have to make a physical arrest.  I'm a reckless
13    conduct person; you got to lock me up.  You got to
14    take me to jail.
15              Well, after spending all night letting them
16    draw my blood and giving a urine test to make sure I
17    wasn't drinking and everything, they didn't even get a
18    statement from me.  He finally decided that he was
19    going to put charges on me.  So he wrote a ticket.  He
20    said, "Don't worry.  I'm not taking you to jail."  And
21    I told him, "You have to."
22              Well, that ticket -- long story short,
23    another officer knew that it was -- it wasn't going to
24    work either.  So he forced an officer to take the
25    ticket to jail.  Here it is, I'm thinking I'm going to
```

1    have to see myself in court to plead on this case.

2    And the courts never accepted it.  The jail never

3    accepted the ticket or anything.  I paid for a lawyer

4    I didn't need.  I never saw the inside of a jail.  I

5    never saw the inside of a courtroom.

6         And then it was later determined that the

7    only thing that they could get me on was the fact

8    that, because I put the badge around my neck, it

9    identified myself as a police officer, and at that

10   time I was not rightfully certified; so I broke a

11   policy.  And they gave me -- I don't remember what the

12   punishment was for that.

13        Q.   All right.  Well, thank you.

14             At any point did you -- did you chamber a

15   round into the rifle?

16        A.   No, sir, I did not chamber a round.  That

17   was brought up several times.  The AR-15 has a

18   charging handle that you use to chamber a round.  When

19   I pulled the rifle and I pointed it up to the sky, the

20   charging handle fell down.  It came unstacked, and I

21   popped it back up in place.

22             I guess somebody thought I chambered a

23   round.  Even still, no crime committed.  But it didn't

24   happen.

25        Q.   Did you verbally identify yourself as a

Griffin vs. City of Atlanta                Donald Vickers

```
 1    police officer to anyone?

 2         A.   No.  The security guards knew me.  They knew

 3    my girlfriend.  I didn't know they knew me.  When I

 4    put the badge around and I tapped it so that they

 5    could see it and -- you know, show that, hey, I'm a

 6    friendly.  I'm a police.  They saw the badge; they

 7    knew who I was.  And I later found out one of them did

 8    actually know me.

 9         Q.   But after this ordeal, did you then walk

10    through Underground Atlanta with a assault rifle in

11    your hand?

12         A.   There is a passage that you use to get to

13    the bar.  I walked through that passage.  This is when

14    most of the bars are closed.  There's only a few

15    people out.

16              I tried not to make a big scene.  But once I

17    got to the window where the bar is -- the bar front --

18    I could see that there was nobody in the front, and I

19    didn't want to bang on the glass to cause more

20    disturbance.  That's when I turned around and said,

21    "Hey, I'll just go back and get my phone."  And that's

22    what I did.

23         Q.   Officer Vickers, can you see Plaintiff's

24    Exhibit 56 on your screen?

25         A.   I can.
```

```
 1         Q.   And this -- Plaintiff's Exhibit 56 shows

 2    that you were suspended for three days as a result of

 3    the Underground Atlanta incident.  Is that right?

 4         A.   I don't think I was suspended three days.

 5         Q.   How long were you suspended?

 6         A.   I can't recall, but I don't think I -- I

 7    don't think I got suspended three days.

 8         Q.   Other than --

 9         A.   The "Conduct" was dropped.

10         Q.   I see.  Other than Tyler Griffin and Ricky

11    Usher, have there been any other complaints against

12    you for the use of success -- excessive force?

13         A.   One that I recall, and I don't know the

14    guy's name.  He did not complain on me.  A third-party

15    person did.  And that's going to the civilian review

16    board right now.  No investigation was done ON that

17    case.

18              MR. KAHN:  Okay.  All right.  Let's take a

19    quick break and reconvene at 2:10.

20              MS. MILLER:  Okay.

21              MR. KAHN:  All right.  I thank you-all.

22              (OFF THE RECORD 2:04-2:13 P.M.)

23    BY MR. KAHN:

24         Q.   Can you see Plaintiff's Exhibit 52 on your

25    screen?
```

1      **A.   Yes, sir, I can.**

2      Q.   Okay.  Great.  I just want to -- we can

3  probably make this pretty quick.  I just want to know

4  basically what you remember about each of these, these

5  incidents.  So I guess I -- we'll just go through them

6  one at a time.  Can -- let me pull it up so it's --

7  you can see it better.

8           What -- do you see the first citizen's --

9  citizen complaint that is listed on the disciplinary

10 history?

11     **A.   Yes, sir, I do.**

12     Q.   What was -- what was that about?

13     **A.   I see the date, but I could not tell you**

14 **what complaint that is.  I don't -- I have no idea.**

15     Q.   Do you see the -- you see the second

16 complaint, the internal complaint?

17     **A.   Yeah, I see the internal complaint.**

18     Q.   It looks like there was -- that was just

19 regarding absence, like, an absence from duty,

20 meaning, like, you missed a day of work or something?

21     **A.   Yes, sir.  With just the dates, I don't**

22 **know.  It's hard for me to remember last week.  I'm**

23 **sorry.  I -- with just the dates alone, it's going to**

24 **be hard for me to explain any of this.**

25     Q.   Okay.  That's fair.

```
 1              You know what?  We'll just -- we'll skip --
 2    we'll skip this part.
 3              Does the name -- the names Tyler and Ashley
 4    Toomer mean anything to you?
 5        A.    Tyler and Ashley?
 6        Q.    Toomer, T-o-o-m-e-r.
 7        A.    I don't know why -- I kind of recognize the
 8    name, but I don't know why.
 9        Q.    Okay.  So I'm going to pull up Plaintiff's
10    Exhibit 57.  Can you see that on your screen?
11        A.    Yes, sir, I see 57.
12        Q.    All right.  So if you'll see at the bottom,
13    Plaintiff's Exhibit 57 is an e-mail from the Atlanta
14    Citizens Review Board investigating an allegation of
15    misconduct.
16              Do you see that highlighted text?
17        A.    Yes, sir, I do.
18        Q.    Can you tell me what is this -- what's this
19    incident on August 6th, 2016?
20        A.    Okay.  This one I recall.  I believe I --
21    this is one I've been waiting on for a while now.  I
22    believe it's Tyler -- I'm not sure -- was a male
23    suspect at the time.  He was at a gas station.  He
24    tore the gas station apart.  Tore the parking lot a
25    lot.  He dumped all the trash that was in the parking
```

Griffin vs. City of Atlanta                Donald Vickers

```
 1   lot out of the trash cans and everything, because the

 2   store clerk wouldn't give him some money or let him in

 3   the store.

 4           He then busted out the store clerk's window.

 5   And in the process, he cut his arm somewhere.  I can't

 6   remember where, but he cut his arm.  Nothing severe,

 7   but it was bleeding.

 8           I arrived.  He was still on scene.  Didn't

 9   understand exactly what was going on.  I detained him.

10   The store clerk came out to me and said, "Look, man,

11   you got to help me out, but I don't want to

12   prosecute."

13           I'm, like, "Well, I can't just charge him if

14   you're not going to prosecute."  And I was, like,

15   "Well, I got to run him anyway to see who I'm dealing

16   with."

17           Just so happened when I ran him, he came

18   back with a warrant.  I said, "Look, you don't want to

19   prosecute him.  I'll just take him in on the warrant."

20   I don't remember what the warrant was for.

21           But because he was bleeding -- it -- like I

22   said, it wasn't -- it wasn't nothing big.  He didn't

23   want to go to the hospital.  I was like -- but I knew

24   the jails weren't going to take him with him bleeding

25   a little bit.  So I took him to Grady.
```

Griffin vs. City of Atlanta                 Donald Vickers

```
 1              While at Grady, he started acting out.
 2    Got -- using lot of profanity towards the nurses.  Got
 3    a thing against womens -- womens -- females.  He kept
 4    claiming he was some kind of big old original gangster
 5    rapper, whatever.  And he was just making a big old
 6    scene to the point where the nurse that's supposed to
 7    check him in and get his vitals and stuff -- she's,
 8    like, "I can't even deal with him.  Just take him
 9    straight to the back."
10              So I took him to the back to the -- to the
11    corrections area where they detain all the people at
12    Grady.  While back there, he encountered some more
13    females.  And I was holding his arm because he was
14    intoxicated.  I was holding his arm, walking him.  Per
15    policy, I had my hands on the suspect, you know.
16              Well, he pushed his shoulder away from me
17    and then pulled it back into me, knocking my body
18    camera off, shoving me a little bit.  He was a little
19    guy.  It didn't do much damage to me.  But it knocked
20    my camera on the ground.  I realized, you know, he's
21    going to continue to mess up.
22              They pointed to the door I needed to take
23    him to.  The door's one of those push doors that's got
24    the bar in the middle and you push it, and it's
25    supposed to open up.  Well, I didn't know that it was
```

1    locked.  So, you know, I grab him up, and we're

2    marching to the door.  And we both hit the door, but

3    because he's so light and drunk, he falls on the

4    ground.

5              He's not hurt.  But he starts apologizing.

6    "I'm sorry.  I'm sorry."

7              And I told him, "Hey, all right.  No

8    worries.  I got you at the hospital.  You're hurt."

9              He goes, "No.  I'm sorry.  I'm sorry."

10             I told him, "Fresh start."  I said, "Let me

11   get you up."  I got him up.  We put him back there so

12   they -- he could get treatment for his little cut and

13   sober up.

14             While I was back there, couple corrections

15   officers came to me and said, "Look, make sure you do

16   a report.  We got a lady down at the end -- she hates

17   law enforcement.  She's complained on everybody here.

18   She's going to make a complaint."

19             I said, "No worries.  Thank you."

20             Grady has cameras.  All of that was on

21   video.

22             I poked my head out the door, and sure

23   enough I looked at the lady, and it appeared to me she

24   was burning a hole through me.  So I made sure to go

25   do a report, let a supervisor know and everything.

```
 1              I had a doctor on the scene who was shaking

 2    his head "yes" at me, like, no problem.  He says he's

 3    not hurt, you know.

 4              Few days later that lady did complain.

 5    Well, I don't know when she complained, but it came

 6    back to me a few days later.  Went to internal

 7    affairs.  And I said, "Okay.  Well, go pull the

 8    cameras up.  Go speak to all the witnesses."

 9              She claimed that I knocked the guy out.

10    That I rammed him into the door, knocking him

11    unconscious.  And that was it.

12         Q.   Sure.

13         A.   So there's no doctor that revived him.

14         Q.   Officer Vickers, I think -- I think there

15    may -- we may be confusing two different events.  But

16    this is the -- the one that you just described -- so

17    I'm going to pull up -- if you'll give me just a

18    minute here.

19              Can you see Plaintiff's Exhibit A on your

20    screen?

21         A.   I can.

22         Q.   So this is a -- and we'll go through some of

23    this stuff.  This is about 60 pages of documents that

24    the City produced to us last night, you know, a few

25    hours before your deposition.  And so -- and this --
```

 1    all these documents relate to Willie Thurmond, who I

 2    believe is the individual that you have been talking

 3    about.

 4        A.    Okay.  Yeah.  That's who I was talking

 5    about.

 6        Q.    Yeah.

 7        A.    I apologize.

 8        Q.    So we'll go -- I've got some follow-up

 9    questions on that, and we'll go through those, and

10    then we'll go back to the other one since you already

11    started talking about it.

12             So, obviously, you recall the incident.  You

13    told me what happened.  When Mr. Thurmond ran into the

14    door or was pushed into the door, however you want to

15    call it, was he handcuffed?

16        A.    Yes, sir.

17        Q.    All right.  I want to -- I'm going to flip

18    to page 8 in this document.  So we're looking at

19    page 8 of these -- of Plaintiff's Exhibit A, which

20    appears to be a notice of final adverse action

21    suggesting a two-day suspension.  Is that -- do you

22    agree with that?

23        A.    I disagree.  That's -- I'm fighting that.

24        Q.    I'm sorry.  Is this -- is that what this

25    document appears to be?

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1        A.   Yeah.  Yes.  That's the document, yes, sir.

 2        Q.   And so as I understand it, you have not, in

 3   fact, been suspended for this alleged violation.

 4        A.   No.  I was suspended.  The chief at the time

 5   over our unit -- even though there was no

 6   investigation done.  By the time they did an

 7   investigation, the camera feed had been -- they waited

 8   way past 14 days to go do any kind of pick up of the

 9   surveillance.  They didn't talk to any witnesses.

10   They didn't get statements from anybody.  They said

11   just go ahead and give me the two days and let me

12   fight it in the civilian reviewer -- review --

13        Q.   Okay.

14        A.   -- board.  So that's --

15        Q.   So you were --

16        A.   -- what that is.

17        Q.   So you were -- you were found to have used

18   excessive force and suspended for that.  Is that

19   right?

20        A.   Yes, sir.

21        Q.   And then you're just -- and you're --

22        A.   Yes, sir.

23        Q.   -- in the process of fighting it on the back

24   end.  Is that correct?  That's correct?

25        A.   That's correct.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 130 of 204

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1    Q.   Look at -- look at page 14.  So here's a --

2   this is another -- what appears to be another final

3   adverse action related to the same incident, but it

4   says not sustained.  Have you ever seen this?

5       **A.   I don't think so, sir.**

6    Q.   So you don't have any idea which of the ones

7   that we just looked at is the actual final -- final

8   notice?

9       **A.   And what I'm think- -- what I'm thinking is**

10  **internal affairs, OPS -- they send it up as not**

11  **sustained, but when it hit the chief's desk, he**

12  **changed it.**

13   Q.   I see.  All right, I'm going to flip to

14  page 19 here.  Do you see the -- do you see the

15  highlighted text on this document, which is Bates

16  label 001059, that says "After reviewing the

17  above-mentioned OPS investigative file involving

18  Officer Vickers, I do not agree with the sustaining of

19  Work Rule 4.2.33"?

20      **A.   Yes, sir.**

21   Q.   So again -- I want to ask this again.  I

22  asked you earlier.  Is it -- would you say it's

23  normal -- it's a normal occurrence for a

24  higher-ranking officer to recommend that an OPS

25  finding be changed from sustained to not sustained or

 1    exonerated?

 2            MS. MILLER:  Objection.

 3            But you can answer if you know.

 4        **A.   Like I said, it's -- to the best of my**

 5    **knowledge, it's up to OPS to do their part of the**

 6    **investigation, and it gets forwarded up to their chain**

 7    **of command.  Their chain of command is supposed to**

 8    **look it over and agree or disagree with it and have**

 9    **their ruling.**

10    BY MR. KAHN:

11        Q.   I see.

12        **A.   Like, in this chain of command, the major**

13    **disagreed with OPS.**

14        Q.   So OPS serves as an independent body to

15    investigate police misconduct.  Right?

16        **A.   I'm sorry.  Could you say that again?**

17        Q.   Sure.  Would you -- would you agree that OPS

18    serves as an independent body to investigate police

19    misconduct, among other things?

20        **A.   Yes, sir, I do.**

21        Q.   So why is it okay for someone who works

22    directly with an officer to change a finding of an

23    independent OPS investigation?

24            MS. MILLER:  Objection.

25            But you can answer if you know.

Griffin vs. City of Atlanta                Donald Vickers

```
 1        A.   So I can't really answer your question,

 2   because these are all higher-ups.  That's my major.

 3   He has a office of his own.  The people that work

 4   directly underneath him are the captains, the

 5   lieutenants, and the sergeants.  I'm right at the

 6   bottom of the totem pole.

 7            This was a --

 8   BY MR. KAHN:

 9        Q.   I see.

10        A.   -- letter that it looks like he sent.  After

11   OPS said not sustained, the chief came back and said,

12   "No.  Go ahead and sustain it."  And the major, after

13   looking at it, who has a lot of investigative

14   experience, wrote a letter back.

15        Q.   Okay.

16        A.   Obviously, they didn't agree with the chief.

17   So . . .

18        Q.   Would you agree that the practice of

19   allowing City of Atlanta employees outside of OPS to

20   change the final disposition of an investigation

21   leaves room for police officers to sort of look out

22   for their own?

23        A.   No, sir.  These are -- these -- this chain

24   of command -- they're all appointed.  They're all

25   appointed positions.  OPS -- they have their chain of
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 133 of 204

Exhibit D

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

 1    **command as well, and then it goes up.**

 2        Q.   But this is -- this --

 3        **A.   So --**

 4        Q.   -- isn't the first time that we've seen a

 5    document with a higher-up recommending that one of

 6    your excessive force violations be changed to not

 7    sustained, is it?

 8            MS. MILLER:  Objection.  I don't think that

 9    this was an excessive force violation, and it even

10    said so in the document.

11            MR. KAHN:  Okay.  I -- your objection is

12    noted.

13    BY MR. KAHN:

14        Q.   Officer Vickers, if you'd like to answer the

15    question, you're free to do so.

16        **A.   Can you ask the question again?**

17        Q.   This isn't the first document that we've

18    seen recommending one of your violations involving

19    excessive force be changed from not sustained -- or

20    excuse me -- to be changed from sustained to not

21    sustained, is it?

22            MS. MILLER:  Same objection.

23            But you can answer.

24        **A.   Yeah.  I mean, you can say that the chain of**

25    **command changes some of the rulings sometimes.  Yeah.**

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1   BY MR. KAHN:
 2       Q.   What's the point of OPS if the chain of
 3   command can just overturn it after an investigation?
 4       A.   It's really for not for me to answer that.
 5   But, to the best of my knowledge, it's no different
 6   than you have an investigator and then they have their
 7   chain of command.  No investigator -- sorry.  It said
 8   "unstable."  I don't know if you can hear me or not.
 9            You have investigators, and they have their
10   chain of command.  The investigators come up with it,
11   and their supervisors have to okay it.  Hey, I agree
12   with the findings.  I don't agree with the findings.
13   Hey, why didn't you do this.  Why didn't you do that,
14   you know.  So, I mean, that's the only way I can
15   answer your question.
16       Q.   Okay.  I'm going to flip to page 32.  Can
17   you see the highlighted text of this e-mail?  It says
18   "The officer was clearly mad about it and became
19   aggressive toward the patient, and that's when he went
20   full force into the locked door with the patient.  And
21   as a result, the patient fell to the floor and" --
22   it's a spelling error -- but "loss consciousness for a
23   minute."
24       A.   I can't --
25            MS. MILLER:  The document wasn't on the
```

```
 1   screen.  I'm sorry.
 2       A.   I can't see it.
 3   BY MR. KAHN:
 4       Q.   That is my fault.  I'll redo the question.
 5           So do you see, Officer Vickers, where it
 6   says "The officer was clearly mad about it and became
 7   aggressive toward the patient, and that's when he went
 8   full force into the locked door with the patient.  And
 9   as a result, the patient fell to the floor and loss
10   consciousness for a minute"?
11       A.   Yeah, I see it.
12       Q.   Is that -- is any of that true?
13       A.   No, sir.
14       Q.   Do you know -- do you -- do you know
15   anything about the person who complained about this
16   incident?
17       A.   If it's who I think it is, she was at the
18   other end of a very, very big room, and that room was
19   full of people.  All I know is, from the other
20   correction officers, they knew right away, because
21   they've had dealings with her before, that she was
22   going to be a problem for me.
23       Q.   Well, was she an employee of Grady?
24       A.   I'm only assuming by the way she was dressed
25   and the position that -- I mean where she was
```

```
 1    standing.  I'm thinking she was some kind of social

 2    worker, but I have no idea who she was.

 3        Q.   Okay.  And what do you -- how was she

 4    dressed?

 5        A.   I can't remember, but she wasn't, like, in a

 6    nurse's outfit or anything like that.  It was -- it

 7    was more like civilian clothes, like, just normal, you

 8    know business wear.

 9        Q.   I see.  Well, why do you think she said that

10    the man lost consciousness if he didn't, in fact, lose

11    consciousness?

12             MS. MILLER:  Objection.

13             But you can answer if you know.

14        A.   I don't know why she said any of those lies

15    she said.  And if I tried to guess, it would be

16    speculating, and I couldn't diagnose it.

17    BY MR. KAHN:

18        Q.   Okay.

19        A.   It was all false.  And, you know, like I

20    said, he was unconscious and we're in a hospital and

21    nobody revived him.  Where is the doctor that had to

22    revive him?

23        Q.   All right.  Go back to Plaintiff's

24    Exhibit 57.  So that was -- the incident that we just

25    spoke about was Willie Thurmond.  Do you have any idea
```

```
 1   what this highlighted incident is referring to?

 2       A.   I know the location, but, no, I don't know

 3   the incident.  I'm sorry.

 4       Q.   Okay.  Did -- have -- has there been any --

 5   well, I guess strike that.

 6            So we've spoken about Willie Thurmond, Tyler

 7   Griffin, and Ricky Usher, which are three cases that

 8   involve the use of force.  Other than those three

 9   cases, are there any other instances where you've been

10   accused of using too much force?

11       A.   Other than the ones we talked about, not

12   that I can recall.

13       Q.   Did any of the -- other than Mr. Griffin,

14   did any of the other people who accused you of using

15   too much force -- did any of those people file

16   lawsuits against you?

17       A.   Not that I'm aware of.

18       Q.   Has the City of Atlanta cautioned you at all

19   since Mr. Griffin's complaint against you?

20            MS. MILLER:  Objection.

21            But you can -- you can -- I'm sorry.

22            The City of Atlanta?  Who are you speaking

23   about?

24            MR. KAHN:  I'm talking about the City of

25   Atlanta.  I don't really know how I could be clearer
```

```
 1   than that.

 2          MS. MILLER:  Are you talking about his

 3   attorneys?  Are you talking about APD?  What -- I'm

 4   not sure.  So I'm -- I don't know if he can answer

 5   that question or not.

 6          MR. KAHN:  Ms. Miller, I understand that you

 7   may not understand it, but really you're not being

 8   deposed right now.  Officer Vickers is.  And what

 9   really matters is if he understands it.  And so if he

10   understands it, he's free to answer that question.  If

11   he does not understand it, as you have basically

12   instructed him, then I'm happy to reask it in a way

13   that he understands.

14          MS. MILLER:  Well, I was asking because I

15   wanted to know if there -- if I had an objection or

16   not.  If it's not about the City attorneys' office,

17   then that's fine.  If it is, then I'm going to tell

18   him not to answer.  So that was my clarification.

19          MR. KAHN:  Of course I am not asking for

20   attorney-client privileged information.

21          MS. MILLER:  Thank you.

22          MR. KAHN:  So I'll ask the question again.

23   BY MR. KAHN:

24          Q.   Officers Vickers, has the City of Atlanta

25   cautioned you at all since Mr. Griffin's complaint?
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 139 of 204

Exhibit D
10/21/2020
Griffin vs. City of Atlanta                    Donald Vickers

1      A.    Other than, you know, the incident what's --
2  you know, what's coming out of it, I -- I'm not -- I'm
3  not sure I understand your question.
4      Q.    Sure.  Like, has the --
5      A.    Cautioned me in what way?
6      Q.    Has the City said -- and of course I'm
7  paraphrasing.  Has the City said, like, "Vickers, if
8  this happens again, you will be fired"?
9      A.    Like I said, this case -- I see you have it,
10  but for me, they haven't come to me with all the
11  findings yet.  So, like I said, I don't think they're
12  done dealing with me yet.  So whatever caution they're
13  going to bring, I think that's yet to come.
14      Q.    I see.  All right.  We are -- we are nearly
15  done, and I appreciate your patience, sir.
16          Can you see Plaintiff's Exhibit 33 on your
17  screen?
18      A.    I can.
19      Q.    And does Plaintiff's Exhibit 33 appear to be
20  your performance evaluation for 2019?
21      A.    Yes, sir.
22      Q.    And you see the evaluation period?  It says
23  July 1st, 2018, through June 30th, 2019.  That would
24  necessarily include the date that you tackled
25  Mr. Griffin.  Right?

1      A.    Yes, sir.

2      Q.    And so any comments or criticisms or really

3  any, you know, commentary based on your conduct on

4  April 5th towards Mr. Griffin, to the extent it would

5  be noted at all, would be noted in this performance

6  evaluation.  Correct?

7      A.    Yes, sir.

8      Q.    All right.  We'll flip to page 2.

9      A.    Actually, that's not (audio transmission

10 failure).

11     Q.    I'm sorry.  What --

12     A.    That's not fair, because they would -- it's

13 not correct because they -- the findings haven't come

14 out yet.  This was all done in 2019.  So if anything

15 was to come out of it, it -- they wouldn't be able to

16 judge Griffin's case off this evaluation.  Does -- I

17 don't know if I'm being clear enough.

18          Even though the incident happened here, the

19 investigation wasn't complete.

20     Q.    Sure.  Well, let me ask you this:  Did

21 your -- the person reviewing this or rating -- the

22 rater it appears was Sergeant J. Davis.  Who is -- who

23 is Sergeant J. Davis in relation to you?

24     A.    He's an old supervisor sergeant that I used

25 to have.  He's gone to another unit now.

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

```
 1        Q.   At the time that he completed this review on

 2   6/30/19, was he aware of what happened with

 3   Mr. Griffin?

 4             MS. MILLER:  Objection.

 5             But you can answer if you know.

 6        A.   He became aware of it.  Like I said, he

 7   couldn't have -- he couldn't base the evaluation off

 8   that incident completely, being that it was under

 9   investigation.  And also I don't know that he was the

10   sergeant at the time of the actual incident.

11   BY MR. KAHN:

12        Q.   Okay.  Can you see -- can you see Goal 1 on

13   your screen?

14        A.   Yes, sir.

15        Q.   And you see Goal 1 says C-A-R-E, "C.A.R.E.:

16   Represents the department in a courteous and

17   professional manner."  Do you -- is that -- do you see

18   that?

19        A.   Yes, sir.

20        Q.   And under the goal there's a Comments

21   section.  Do you see that area under the goal?

22        A.   Yes, sir.

23        Q.   Isn't it true that the person performing

24   this evaluation -- Sergeant Davis in this case -- can

25   put anything they want in that Comments section?
```

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                    10/21/2020

```
 1        A.    Yes, sir.

 2        Q.    For example --

 3        A.    That's their comments.

 4        Q.    Sure.   Yeah.   And, for example, if the

 5   officer being evaluated was not courteous and not

 6   professional, the reviewing employee could say that in

 7   this Comments section.   Right?

 8        A.    Yes, sir.

 9        Q.    And then in your case, it looks like

10   Sergeant Davis said "Works with a sense of urgency.

11   Treats everyone fairly and with respect."

12              Do you see that?

13        A.    Yes, sir.

14        Q.    And he gave you a 4 in that category.   And

15   we'll scroll up, and 4 means "Highly effective.

16   Exceeds the expected performance standards on a

17   regular basis."   Right?

18        A.    Yes, sir.

19        Q.    So if APD thought that you were not being

20   courteous and not being professional, they could have

21   said -- they could have said exactly that in this

22   Comments section.

23              MS. MILLER:   Objection.

24              But you can answer.

25        A.    Yes, sir.
```

Case 1:20-cv-02514-VMC   Document 89-4   Filed 05/03/21   Page 143 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                         10/21/2020

```
 1   BY MR. KAHN:

 2        Q.    And then do you see the next comments -- the

 3   next goal is 4, and it says "Professionalism"?

 4        A.    Yes, sir, I see it.

 5        Q.    And do you see the highlighted comment

 6   underneath it?  It says "Displays concern and empathy

 7   with -- when interacting with citizens."

 8        A.    Yes, sir.

 9        Q.    And do you think that that is a true

10   statement about you?

11        A.    Yes, sir.

12        Q.    And do you -- do you remember when you said

13   to Mr. Griffin, "We're laughing because you fell

14   pretty hard after pushing an officer, man.  I find

15   that funny"?

16        A.    Yes, sir, I remember it.

17        Q.    That's not very courteous or professional,

18   would you say?

19        A.    I mean, it might not be nice, but I don't

20   think it was out of line.

21        Q.    Sure.  But do you think it was -- would you

22   describe that statement that you made as being

23   courteous?

24        A.    Is it supernice?  No.  He just pushed an

25   officer.  I let him know he messed up.  He made a
```

Griffin vs. City of Atlanta                Donald Vickers

```
 1  mistake.

 2      Q.   Do you think that your statements to

 3  Mr. Griffin or about Mr. Griffin -- I guess they were

 4  to.  Do you think that your statements to Mr. Griffin

 5  displayed empathy?

 6      A.   Can you say it one more time?  I want to

 7  make sure I hear it correctly.

 8      Q.   Sure.  Sure.  So do you think that the

 9  statements that you made to Mr. Griffin -- those

10  statements being "We're laughing because you fell

11  pretty hard after pushing an officer, man.  I find

12  that funny, man" -- that statement -- do you think

13  that that statement made to Mr. Griffin displayed

14  empathy?

15      A.   I think me telling Mr. Griffin "I want to

16  take care of you.  I want to get you to the Grady as

17  soon as possible" -- me holding Mr. Griffin up with

18  another officer so that he's not putting all his

19  weight on his leg -- I think that's showing empathy.

20           Letting him know, you know, there are

21  certain things you can't do when it comes to law

22  enforcement.  When a officer tells you to do something

23  and it's in the code of law, you need to do it.  I

24  think I'm empathy.

25      Q.   Do you remember when you -- from the video
```

```
 1   we watched earlier, when you told Mr. Griffin, "You're

 2   such a little girl right now"?

 3        A.    Yeah.  Something to that effect, yes, sir.

 4        Q.    Do you think -- do you think that that

 5   statement displayed concern for Mr. Griffin?

 6        A.    It's letting him know, hey, you know, it's

 7   not that serious.  It's not -- it's not, you know --

 8   it's not that it's not going to be taken care of.  I

 9   assured him that I --

10        Q.    Do you think --

11        A.    -- knew that he was in pain and that I

12   didn't want him to further injure him.

13        Q.    Do you think that the -- that that statement

14   displays empathy for Mr. Griffin?

15        A.    Along with -- as a whole, with everything

16   else, I think that there was plenty empathy there.

17        Q.    That wasn't my question.  I said do you

18   think that your statement -- that being "You're such a

19   little girl right now" -- do you think that that

20   statement displays empathy to Mr. Griffin?

21        A.    That standalone statement, no.

22        Q.    Do you think that you deserve this comment

23   in your performance review that says "Displays concern

24   and empathy when interacting with citizens"?

25        A.    Absolutely.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 146 of 204

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1      Q.    Would you ever testify against another

2   Atlanta police officer in an excessive force case?

3      **A.    If I saw excessive force, yes, I would make**

4   **sure something was done about it.**

5      Q.    But in your 15 years at the -- at the

6   department, you've never seen excessive force.  Right?

7      **A.    No, sir.**

8      Q.    Would --

9      **A.    And if I have, I surely cannot recall.**

10     Q.    Would you ever report another police officer

11  if you saw him or her do something you thought was

12  wrong?

13     **A.    There's different levels to that on how far**

14  **I think things need to go.  But, you know, I**

15  **definitely want to make sure it's taken care of**

16  **accordingly.**

17     Q.    Well, I guess would you agree that it's

18  generally frowned upon for a police officer to report

19  another police officer's misconduct?

20     **A.    I think I misheard you.  Could you say that**

21  **again?**

22     Q.    Sure.  Would you agree that it's generally

23  frowned upon for a police officer to report another

24  police officer's misconduct?

25     **A.    No.  Not when the accusation is true and**

1    **correct, no.**

2        Q.    Well, would you agree that police officers

3    who testify against other police officers are

4    ostracized?

5        **A.    I don't agree with that.**

6        Q.    Have you ever heard of a police officer who

7    testifies against another police officer or reports

8    another police officer referred to as a rat or a

9    snitch?

10       **A.    I mean, I've heard the term "rat" or**

11   **"snitch," but I've never heard it towards any police**

12   **officer that I know.**

13       Q.    Have you ever heard -- have you ever --

14       **A.    And I don't know anybody that would call a**

15   **police officer a rat.**

16       Q.    Have you ever heard anyone in the -- in the

17   City of Atlanta Police Department criticize another

18   police officer for reporting misconduct of another

19   police officer?

20       **A.    No.**

21       Q.    And, Mr. Vickers, you are under oath right

22   now.  You've never heard -- in your 15 years as a

23   police officer, you've never heard another Atlanta

24   police officer criticize another Atlanta police

25   officer for reporting another police officer?

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 148 of 204

Exhibit D
10/21/2020
Griffin vs. City of Atlanta                Donald Vickers

```
 1              MS. MILLER:  Objection.  Asked and answered.

 2              But you can answer again if -- you can

 3     answer if you have something to add.

 4         A.   You're asking if I witnessed it in -- say it

 5     one more time.  I want to make sure you -- I hear --

 6     BY MR. KAHN:

 7         Q.   Sure.

 8         A.   -- you correctly.

 9         Q.   And I could -- I can just sort of explain

10     what I'm asking instead of just repeating it -- the

11     question again.  And I'm happy to repeat it again.

12     But I -- what I'm looking -- like, what I'm asking you

13     about is, like, in your -- in your career as an

14     officer, have you ever seen or been -- or participated

15     in a conversation with another Atlanta police officer,

16     or witnessed it, where, you know, somebody reported

17     someone or testified against someone or told on

18     someone or whatever and said something -- and someone

19     or you or anyone said something negative about that

20     person?  Like, "Man, like, you know, screw John Smith.

21     He told on Tony."  You know, something like that.

22         A.   Okay.  If you want to say negative -- if you

23     want to use the term "negative" instead of calling

24     them a snitch or a rat, yeah, I've heard -- I mean, I

25     can't give you an example.  I can't think of a time,
```

1    but I'm sure I've heard an officer, "Man, so-and-so

2    went to -- went to, you know, internal affairs or

3    whatever for this or that."  And it might be, you

4    know, to their eyes, something petty or whatever.

5    Yeah, I've heard that.

6         Q.   Okay.  So then I guess it --

7         A.   But I can't think of it off the top --

8         Q.   Go ahead.

9         A.   -- of my head.

10        Q.   I'm sorry.  I didn't mean to cut you off.

11   It was just lagging a little bit.

12        A.   That's all right.  Off the top of my head, I

13   can't think of any.

14        Q.   I gotcha.

15        A.   Off the top of my head, I can't think of a

16   particular incident.

17        Q.   Okay.  That's fair.

18             So I guess, then, would it be fair to say,

19   then, that -- maybe I was just using the wrong words

20   before.

21             Would it be fair to say that there's sort of

22   like a culture within the City of Atlanta Police

23   Department that it's viewed negatively for another

24   police officer to sort of tell on another police

25   officer?

```
 1              MS. MILLER:  Objection.

 2              But you can answer if you know.

 3        A.    I can only tell you what I know.  And I

 4    think, because I've been around so long and I'm so --

 5    I'm pretty well known, that kind of stuff doesn't fly

 6    with me.  So another officer wouldn't put that in my

 7    direction for me to catch it.

 8    BY MR. KAHN:

 9        Q.    I see.

10        A.    So -- yeah.  I --

11        Q.    But I guess have you -- have you heard of --

12        A.    If somebody does something wrong, then --

13        Q.    I see.  Have you heard of that -- you've

14    heard of that sort of thing, though, just really

15    generally.  Like, people complaining about other

16    people, like, reporting stuff.

17        A.    Not officers.  I mean, I can -- I mean --

18    and, like I said, there's different levels of thing.

19    I mean, you know, rumors.  This place is like any

20    other big corporation.  There's a lot of rumors.

21              I mean, I heard a story where one of the

22    trainers at the academy was talking to a class,

23    training a class, did like that to -- you know,

24    touched the shoulder of another recruit.  The recruit

25    got real offended about it.  But that's just a story
```

Exhibit D
10/21/2020

1    to me.  I didn't witness it.  I -- it's coming from

2    the fifth party.  I don't -- you know, I can't put any

3    truth behind it.

4        Q.    Sure.

5        A.    It just doesn't happen in my element.  Not

6    in my environment, not in my circle.

7        Q.    In your -- well, in your experience with

8    APD, have you seen another police officer state on the

9    record that a fellow police officer used excessive

10   force?

11       A.    You cut out on the first part.  Can you say

12   it again?

13       Q.    Oh, sure.  In your experience with APD, have

14   you seen another police officer state on the record

15   that a fellow police officer used excessive force?

16       A.    I'm sure I have, but I can't tell you when.

17   I can't think of a time.  And, like I said, it was

18   nothing I witnessed.

19       Q.    Okay.  Have you heard of a department-wide

20   practice where officers refuse to bear witness against

21   a fellow officer who is alleged to have violated a

22   citizen's rights?

23       A.    I'm sorry.  One more time, please.

24       Q.    You need me to repeat the question?

25       A.    Please.

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 152 of 204

Exhibit D

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1        Q.    Okay.   Sure.   Have you heard of a

 2   department-wide practice where officers refuse to bear

 3   witness against a fellow officer who is alleged to

 4   have violated a citizen's rights?

 5        A.    No, sir, not in this department for sure.

 6        Q.    Have you ever heard of the phrase "the

 7   police code of silence"?

 8        A.    I've heard the phrase.  I don't buy into it.

 9        Q.    What is it -- what does that mean to you?

10        A.    It means I -- I can't say it exists.

11        Q.    All right.  All right.  Just a few more

12   questions.

13              Can you see Plaintiff's Exhibit 502?

14        A.    I do.

15        Q.    And so Plaintiff's Exhibit 502 -- it's an

16   excerpt from the Use of Force Advisory Council -- some

17   document that they put out -- which is a city

18   organization.  Do you see up at the top where it says

19   ". . . but there are lingering issues and

20   opportunities for improvement"?

21        A.    Yes, sir, I see that.

22        Q.    Would -- isn't that a nice way of saying

23   that there is a problem that needs to be fixed?

24              MS. MILLER:  Objection.

25              But you can answer if you know.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 153 of 204

Exhibit D
Griffin vs. City of Atlanta              Donald Vickers              10/21/2020

1       A.    I don't know anything about this article.  I

2   don't know anything about this study.  I can't speak

3   on it.

4   BY MR. KAHN:

5       Q.    All right.  Well, do you see where it says

6   "Despite declining arrests over the past 7 years,

7   reported annual use-of-force incidents have increased

8   on average 2 percent every year, with 615 total

9   incidents in 2019"?

10      A.    I see it.

11      Q.    Do you -- assuming that statistic to be

12  true, do you find that to be problematic?

13      A.    If it's true, sure.

14      Q.    If that -- if that statement -- if that fact

15  is true, would it be fair to say that there's a

16  systemic problem with police violence?

17      A.    Not necessarily.  Like I said, I'm not very

18  familiar with this article.  But looking into it, one

19  of the answers to this 2 percent -- to this -- to the

20  seven -- over the past seven years, decline in reports

21  of arrest -- maybe it could have something to do with

22  the mentally challenged.  I don't know.

23          Maybe instead of -- they're not being

24  arrested.  Maybe they're sent to Grady 13.  I don't

25  know that they're being charged.  I don't know.  I

1    really can't speak on this article, sir.

2        Q.    Sure.  And I'm just -- I'm just asking you

3    based on the statistic -- like, let's just -- let's --

4    we can take the article down.

5            Just, you know, sitting -- as we sit here

6    today, assuming that every year there is a 2 percent

7    increase in use-of-force incidents, does that suggest

8    to you that there is a bigger-picture problem in play?

9        A.    If that article is correct, then, yes, there

10   could be.

11       Q.    Has anyone you know, either through work or

12   personally, said anything to you about the video of

13   you tackling Mr. Griffin?  And, obviously, that would

14   exclude communications with your lawyers.

15       A.    You know, like I said, this place is like

16   any other big organization.  There's going to be

17   rumors.  People -- you know, they've made comments

18   about it or statements about it, but nothing that I

19   can really recall.  I mean --

20       Q.    Sure.

21       A.    -- not out of the ordinary.

22       Q.    What sort of comments or rumors have you --

23   have you heard?

24       A.    You know, people -- "Hey, that was -- that

25   was you on the media?"

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 155 of 204

Exhibit D
Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

 1              "Yeah, that was me."  You know, stuff like

 2   that.

 3        Q.    Has anyone criticized your -- you know, seen

 4   the video and criticized you?

 5        A.    No one's criticized me personally, you know.

 6   To be honest with you, some people like the technique.

 7        Q.    What do you -- what do you mean by that?

 8        A.    Just when he had the threat, how actions

 9   were taken swift and quickly and, you know, direct.

10        Q.    So I guess --

11        A.    That's it.

12        Q.    The way that I interpret that to -- what

13   that -- what I interpret that to mean -- and feel free

14   to correct me if it's wrong -- but what that means to

15   me is that you have been applauded by other police

16   officers for your use of force against Tyler Griffin.

17   Is that right?

18        A.    Not applauded.  Not applauded.  I mean, we

19   don't -- we don't cheer when you hurt somebody or

20   anything like that.  But the technique -- hey, you

21   know what?  You were there.  You were able to do

22   something about it.  Good job.  That -- that's it.

23        Q.    Good job?  Okay.

24              Has anyone -- has anyone told you that you

25   used too much force against Mr. Griffin?

1    **A.    No.**

2        Q.    Are you embarrassed to have that video on

3    the news?

4    **A.    No, I'm not embarrassed.**

5        Q.    Are you proud of the -- that video?

6    **A.    No, I'm not proud of it.**

7        Q.    Do you have any regrets about the way that

8    you treated Mr. Griffin?

9    **A.    No, sir.**

10        Q.    Is there anything that you'd like to say to

11    Mr. Griffin on the record?

12    **A.    No, sir.**

13            MR. KAHN:    No further questions.

14            MS. MILLER:    Okay.    I do have a few

15    questions.

16                        EXAMINATION

17    BY MS. MILLER:

18        Q.    So, SPO Vickers, thanks again for being here

19    today.    I know it's been quite a while, and I'll try

20    to make this as quick as possible.

21            I want to go back to your line of testimony

22    when you spoke about turning off your camera.    Were

23    you near Mr. Griffin when you turned off your camera?

24    **A.    No.    I don't think I was ever near him when**

25    **I cut my camera off.**

1    Q.   Did you believe it was appropriate to turn

2    off your camera at that time?

3    **A.   As long as I was away from Mr. Griffin and I**

4    **wasn't dealing with him or affecting the case, I**

5    **didn't see an issue with it.**

6    Q.   Okay.  And why did you believe that it was

7    appropriate to turn off your camera at that time if

8    you were away from Mr. Griffin?

9    **A.   I think -- if I was away from Mr. Griffin,**

10   **the charges were done.  He was in handcuffs.  We were**

11   **simply trying to expedite his transportation to Grady.**

12   **There was nothing that was going to affect his case or**

13   **our decision.**

14   Q.   Okay.  Did you ever tell Mr. Griffin that

15   you did not want him to get hurt?

16   **A.   You broke out a little bit.**

17   Q.   Sure.  I'll repeat the question.

18        Did you ever tell Mr. Griffin that you

19   didn't want him to get hurt further?

20   **A.   Yes.  I made that clear.**

21   Q.   Okay.  And was that -- actually, I'll pull

22   up Defendant's Exhibit 1.  Let's see.  I'll share my

23   screen.

24        Okay.  And can you see a video on your

25   screen?

1    **A.    I can.**

2        Q.    Okay.  And this is Exhibit -- Defendant's

3    Exhibit 1, which has been previously marked as

4    Griffin v. COA -599.

5            And I'm going to start about 3 minutes into

6    the video.  I'm at 3 minutes and 3 seconds.  And I'm

7    going to play the video for a while and then ask you a

8    few questions.

9            (Video plays.)

10            MR. KAHN:  Staci, we can't hear any sound on

11    this.

12            MS. MILLER:  You can't hear any sound?

13            MR. KAHN:  Unh-unh.

14            MS. MILLER:  Okay.  So let me try to share

15    it again, then.

16            MR. KAHN:  So I actually just learned this

17    yesterday, but apparently when you share the screen,

18    there's, like, a little check box that gives you the

19    option to share computer audio.  And so that's what

20    I've been doing.

21            MS. MILLER:  Okay.  I thought that I clicked

22    that.  Let me try again.  So let me stop sharing.

23            Okay.  Let me try to share it again.  Okay.

24    I'm going to go back to 3 minutes and 3 seconds.

25    Okay.

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1                    (Video plays.)

 2                    MS. MILLER:  Let me stop.  Can you hear it

 3       now?

 4                    MR. KAHN:  Yes, I can.

 5                    MS. MILLER:  Okay.

 6            A.   I can.

 7                    (Video plays.)

 8       BY MS. MILLER:

 9            Q.   So, Officer Vickers, at this time when you

10       were in the -- when you were at the scene, did you

11       know what the injury to Mr. Griffin was?

12            A.   I think I was -- I was in the midst of

13       trying to find out.  I didn't know his exact injury I

14       don't think.

15            Q.   Okay.  I'll play a little bit more.

16                    (Video plays.)

17       BY MS. MILLER:

18            Q.   Did Mr. Griffin ever tell you that his ankle

19       was broken?

20            A.   No, ma'am.

21            Q.   Okay.

22            A.   I don't -- I don't believe -- I think -- he

23       kept his saying leg, his ankle.  We couldn't figure

24       out what it was.  At the time, I didn't know which one

25       he was talking about.
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 160 of 204

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

1        Q.   Okay.  And I'm going to move the video

2    forward a little bit, and then I'll have some more

3    questions for you.

4        **A.   Before you play it --**

5        Q.   Um-hum.

6        **A.   -- I got -- I got supervisors on the other**

7    **watch.  Can I just -- I got to yell out this door real**

8    **quick.  Okay?  So -- just before you play this.  Is**

9    **that okay?**

10       Q.   I'm sorry.  I'm sorry.  What did you say?

11       **A.   It's shift change.  So there's people -- the**

12   **new supervisors -- they don't even know that I'm still**

13   **out.  They're going to be looking for me.  They're**

14   **going to think I'm on the streets, and they're going**

15   **to be trying to find me.**

16       Q.   Okay.  So do we need to take a --

17       **A.   No.  I --**

18       Q.   -- take a quick break?

19       **A.   I just need 30 seconds.  About 5 seconds.**

20   **Can I get 5 seconds real quick?**

21       Q.   Okay.

22            MR. KAHN:  Yeah.  That's fine.  Fine by me.

23   Do what you need to do.

24            (Off-the-record discussion.)

25

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

```
 1   BY MS. MILLER:

 2        Q.   I'm sorry.  This was the wrong video.  Okay.

 3   So the next video -- let me stop sharing my screen.

 4   Okay.

 5             Okay.  So after this first video that we

 6   saw, did you help Mr. Griffin to the wagon?

 7        A.   Yes, ma'am, I did.

 8        Q.   Okay.  And did anyone else assist you in

 9   getting him to the wagon?

10        A.   Yes, ma'am.  Officer Simsell.

11        Q.   Okay.  Whose idea was it to bring the wagon

12   down the driveway?

13        A.   I believe that was my idea.

14        Q.   Okay.  And did you assist the wagon in

15   getting down the driveway?

16        A.   Yes, ma'am.

17        Q.   And why did you do that?

18        A.   Several reasons.  One, I wanted to make sure

19   the wagon driver got down there safe.  And, two, I

20   wanted to get the wagon as close to Mr. Griffin as I

21   possibly could.  That way he wouldn't have to walk.

22   We could get him on his strong ankle and help him into

23   the wagon.

24        Q.   Okay.  There was a line of questioning about

25   the OPS investigation into this matter, and I believe
```

Griffin vs. City of Atlanta                Donald Vickers

```
 1   your testimony was that you believe the use of force

 2   should be sustained.  Was that your testimony?

 3       A.   Yeah.  I said that on mistake.  I should

 4   have said not sustained or exonerated.  I was pushing

 5   for exonerated.

 6       Q.   Okay.  Why do you believe it should have

 7   been not sustained or exonerated?  And I'm talking

 8   about the use of force in this particular instance.

 9       A.   Once again, going back to the very

10   beginning, Mr. Griffin came with a threat.  There was

11   a danger there.  Once I took action and put

12   Mr. Griffin down, that threat and danger were gone and

13   my use of force was gone.  I only used that that

14   was -- that was called for.

15       Q.   Okay.  In your 15 years as a APD officer,

16   how many use-of-force complaints have you had against

17   you?

18       A.   I believe it's three.

19       Q.   Okay.  And how many of those were sustained?

20       A.   There was only one that's sustained that I'm

21   fighting.

22       Q.   Okay.  So to your knowledge, if there is a

23   investigation on use of force, there is -- if there is

24   a complaint of use of force, there is an investigation

25   into that matter.  Is that correct?
```

Griffin vs. City of Atlanta                    Donald Vickers

```
 1              MR. KAHN:  Objection.  It's leading.

 2         A.   Yes, ma'am.

 3    BY MS. MILLER:

 4         Q.   Okay.  And then after that investigation, is

 5    there a discipline that you receive?

 6         A.   Yes, ma'am.  The investigators -- they -- I

 7    guess they have a chart they go by, and depending on

 8    the necessary force is what they go with as far as the

 9    discipline.

10         Q.   Okay.  I am going to show you what I have

11    marked as Defendant's Exhibit 2.  And this is OPS File

12    No. 17-C-0353UAF, which is the matter that we have

13    spoken about previously that involved Mr. Thurmond.

14    And I will pull that up.

15              Okay.  Here we go.  Share screen.  Okay.

16    Okay.  Can you see my screen?

17         A.   I can.

18         Q.   Okay.  And I am at a page that has been

19    previously Bates-labeled Griffin versus COA 001043.

20    And I'm going to read to you from this particular

21    page.  It says "Attached is OPS Complaint

22    Investigation No. 17-C-0353-UAF involving Officer

23    Donald Vickers.  In reviewing the completed adverse

24    action, I do not concur with the disposition for Work

25    Rule 4.2.33 (Conformance to Directives) should be
```

```
 1    changed to not sustained."

 2              Did I read that correctly?

 3        A.    Yes, ma'am.

 4              MR. KAHN:  Objection.  Leading.

 5    BY MS. MILLER:

 6        Q.    Okay.  Do you know why Deputy Chief Glazier

 7    asked Major Hampton not to sustain this particular

 8    charge?

 9        A.    I don't know.

10        Q.    Okay.  And --

11        A.    This was --

12        Q.    Go ahead.

13        A.    Well, yeah.  He -- actually, I do.  He --

14    this case came from OPS.  Went to my major.  My

15    major -- well, it came to the chief.  The chief sent

16    it back down to the major to discipline me.  And the

17    major sent a letter back, like, "No.  The

18    investigation was wrong," or whatever.

19              Glazier -- this is a return letter, I guess,

20    from Chief Glazier basically saying, "Hey, go ahead

21    and just give him the time, and then let him fight it

22    in the civilian review board."  That's what I was --

23        Q.    Okay.

24        A.    -- told.

25        Q.    Okay.  And, to your knowledge, is this
```

```
 1    charge a use-of-force charge or a conformance to
 2    directives?
 3              MR. KAHN:  Object to -- objection.  Leading.
 4         A.   Yeah.  I mean, it's listed as conformance to
 5    directives.  What they were going off of, I don't
 6    know.
 7    BY MS. MILLER:
 8         Q.   Okay.  So did this conformance to
 9    direction -- conformance to directives decision have
10    anything to do with your use of force?
11         A.   It doesn't appear that way, no, ma'am.
12         Q.   Okay.  And then I'm going to share one more
13    exhibit that we'll mark as Defendant's Exhibit 3.
14              MR. KAHN:  I'm sorry.  Ms. Miller, did you
15    mark that whole -- all 58 pages as Defendant's
16    Exhibit 2?
17              MS. MILLER:  Yes.
18              MR. KAHN:  Okay.
19    BY MS. MILLER:
20         Q.   Okay.
21              MR. KAHN:  Let me just -- I just want to put
22    something on the record while you're looking.  I just
23    want the record to reflect that Defendant's Exhibit 2
24    is materially identical to Plaintiff's Exhibit A to
25    the deposition, which are documents that were produced
```

```
 1   last night less than -- you know, less than 12 hours

 2   before the deposition.

 3           MS. MILLER:  And that's fine.  I don't think

 4   that they're identical now, because I think you had

 5   some highlighting and different things.  So I would

 6   just like Defendant's Exhibit 2 to stand alone.

 7   Exhibit A can -- you can do what you would like --

 8           MR. KAHN:  Sure.

 9           MS. MILLER:  -- to do with --

10           MR. KAHN:  Yeah.

11           MS. MILLER:  -- that exhibit.

12           MR. KAHN:  Of course.  Yeah.

13           MS. MILLER:  Okay.  Okay.

14   BY MS. MILLER:

15       Q.   I've got to share my screen.  Okay.

16           Okay.  Defendant's Exhibit 3 is the OPS

17   investigation into File No. 10-C-0324-UAF, and I am

18   looking at page -- the page that has been previously

19   Bates-numbered as Griffin v. COA 000777.  Okay.  And

20   I'm going to read starting at the second paragraph.

21           So it says "After reviewing the contents of

22   this investigative file and considering the

23   information provided by Officer Vickers and his

24   representative during the employee response session, I

25   did not feel that the evidence contained in the
```

```
 1    investigative file supported and sustained charge as

 2    recommended by OPS."

 3              Do you know why Deputy Chief Finley made

 4    this statement to Major Dancy?

 5              MR. KAHN:  I'm going to just object to the

 6    form of that question.

 7    BY MS. MILLER:

 8         Q.   Okay.  And you can answer.

 9         A.   I believe he sent it because he saw the

10    investigation.  He's familiar with that area and the

11    facts.  He just knew the case.  He knew that I --

12    through the years, him working over me, I guess he

13    knew that that's not me.  And through his

14    investigation, he knew that I wouldn't do something

15    like that.  And there was no evidence to support any

16    of it.  I mean, even the judge saw it.

17              MS. MILLER:  Okay.  If you'll just give me

18    30 seconds, I'm going to review my notes.

19              Okay.  Those are all the questions that I

20    have for SPO Vickers.

21                      FURTHER EXAMINATION

22    BY MR. KAHN:

23         Q.   All right.  I just have a few questions, and

24    then we'll let you get out of here.  I know we've

25    taken up enough of your day.
```

```
 1              Would you -- would you agree that police
 2   officers should only use force if it's necessary?
 3        A.    Yes, sir.
 4        Q.    Will you agree that if required to use
 5   force, police officers should only use reasonable
 6   force?
 7        A.    Yes, sir.
 8        Q.    Would you agree that police officers should
 9   attempt to deescalate a situation before using force?
10        A.    If at all possible, yes, sir.
11        Q.    Is it fair to say that an officer's
12   subjective belief that force is necessary standing
13   alone is not enough to justify the use of force?
14              MS. MILLER:  Objection.
15              But you can answer if you know.
16        A.    You'll have to repeat it.  You broke up in
17   the middle of it.
18   BY MR. KAHN:
19        Q.    Sure.  Is it fair to say that an officer's
20   subjective belief that force is necessary standing
21   alone is not enough to justify the use of force?
22              MS. MILLER:  Same objection.
23              But you can answer.
24        A.    Yeah.  I believe it has to be looked into.
25   Yeah.  There's times that it wouldn't be justified.
```

Griffin vs. City of Atlanta                 Donald Vickers

```
 1   BY MR. KAHN:

 2       Q.   So I guess the question -- the question is

 3   is whether the -- whether an officer's subjective

 4   belief alone, meaning that is all that is being

 5   considered -- so an officer's subjective belief is not

 6   enough standing alone to justify the use of force.  Is

 7   that -- is that an accurate statement?

 8            MS. MILLER:  Objection.

 9            But you can answer.

10       A.   As long as it's reasonable.  As long as, you

11   know, the force seems reasonable, it's -- I mean, I

12   guess that's the only way to say it could be

13   justified.  It has to be reasonable.

14   BY MR. KAHN:

15       Q.   The decision to use force has to be

16   reasonable under an objective standard.  Correct?

17            MS. MILLER:  Objection.

18            But you can answer.

19       A.   I'm not sure I understand -- you'd have to

20   rephrase it or repeat it.

21   BY MR. KAHN:

22       Q.   Sure.  I'll try repeating it once, and then

23   I can rephrase it if it's a bad question.

24            The decision to -- a police officer's

25   decision to use force must be reasonable under an
```

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 170 of 204

Exhibit D
Griffin vs. City of Atlanta               Donald Vickers                    10/21/2020

```
 1   objective standard.  Right?
 2           MS. MILLER:  Same objection.
 3           But you can answer.
 4      A.   Yeah.  I wouldn't know how to answer that
 5   one.
 6   BY MR. KAHN:
 7      Q.   I'm so sorry.  What did you say?
 8      A.   I wouldn't know how to answer -- I wouldn't
 9   know how to answer that one.
10      Q.   Well -- all right.  When you're taught on
11   the use of force at the police academy, are you taught
12   the distinction between subjective belief and
13   objective belief of reasonableness?
14      A.   Yes.
15      Q.   And so what is your understanding of the
16   distinction between a subjective belief that force is
17   necessary and an objective belief that force is
18   necessary?
19      A.   So if you're saying -- I don't know.  I
20   guess if you want to rephrase it.  Is if -- if the
21   officer believes so doesn't necessarily mean it's so
22   and doesn't mean that a reasonable person would do the
23   same.  I don't know.
24      Q.   That's exactly what it means.
25      A.   That doesn't make it right.  I --
```

1      Q.   So that's a perfect way of saying it.   So

2   just because an officer believes that it's necessary

3   doesn't mean that a reasonable person believes it's

4   necessary.  Right?

5      **A.   That's right.**

6      Q.   And then --

7      **A.   Yeah.**

8      Q.   So in order for your use of force against

9   Mr. Griffin to be deemed reasonable and not excessive,

10   it would have to be reasonable to -- from an objective

11   standard, which is different from just your personal

12   belief.  Correct?

13      **A.   Okay.  I think I can agree to that.**

14         MR. KAHN:  Okay.  All right.  That's all I

15   have, unless you have anything more, Ms. Miller.

16         I just want to thank you, Officer Vickers,

17   for your time.  We've been here for about four and a

18   half hours, and I know that this has probably not been

19   the way that you would like to spend a Wednesday

20   morning.  And we do appreciate your time.

21         MS. MILLER:  Thank you, SPO Vickers.

22   Nothing further.

23         THE WITNESS:  Thank you, guys.

24         (DEPOSITION CONCLUDED AT 3:27 P.M.)

25         (Pursuant to Rule 30(e) of the Federal Rules

Griffin vs. City of Atlanta                    Donald Vickers

```
 1   of Civil Procedure and/or O.C.G.A. 9-11-30(e),

 2   signature of the witness has been reserved.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          The following reporter and firm disclosures
    were presented at this proceeding for review by
 2  counsel:

 3                   REPORTER DISCLOSURES

 4          The following representations and
    disclosures are made in compliance with Georgia Law,
 5  more specifically:
            Article 10(B) of the Rules and Regulations
 6  of the Board of Court Reporting (disclosure forms)
            O.C.G.A. 9-11-28(c) (disqualification of
 7  reporter for financial interest)
            O.C.G.A. 15-14-37(a) and (b) (prohibitions
 8  against contracts except on a case-by-case basis).
    - I am a certified reporter in the state of Georgia.
 9  - I am a subcontractor for Pope Reporting & Video.
    - I have been assigned to make a complete and
10    accurate record of these proceedings.
    - I have no relationship of interest in the matter
11    on which I am about to report which would
      disqualify me from making a verbatim record or
12    maintaining my obligation of impartiality in
      compliance with the Code of Professional Ethics.
13  - I have no direct contract with any party in this
      action and my compensation is determined solely by
14    the terms of my subcontractor agreement.

15                    FIRM DISCLOSURES

16  - Pope Reporting & Video was contacted to provide
      reporting services by the noticing or taking
17    attorney in this matter.
    - There is no agreement in place that is prohibited
18    by O.C.G.A. 15-14-37(a) and (b).  Any
      case-specific discounts are automatically applied
19    to all parties at such time as any party receives
      a discount.
20  - Transcripts:  The transcript of this proceeding as
      produced will be a true, correct, and complete
21    record of the colloquies, questions, and answers
      as submitted by the certified court reporter.
22  - Exhibits:  No changes will be made to the exhibits
      as submitted by the reporter, attorneys, or
23    witnesses.
    - Password-Protected Access:  Transcripts and
24    exhibits relating to this proceeding will be
      uploaded to a password-protected repository, to
25    which all ordering parties will have access.
```

Griffin vs. City of Atlanta                    Donald Vickers

```
 1              C E R T I F I C A T E

 2    STATE OF GEORGIA:

 3    COUNTY OF COBB:

 4              I hereby certify that the total transcript,

 5    pages 1 through 171, represent a true, complete, and

 6    correct transcript of the proceedings taken down by me

 7    in the case aforesaid (and exhibits admitted, if

 8    applicable); that the foregoing transcript is a true

 9    and correct record of the evidence given to the best

10    of my ability.

11              The above certification is expressly

12    withdrawn upon the disassembly or photocopying of the

13    foregoing transcript, unless said disassembly or

14    photocopying is done under the auspices of myself and

15    the signature and original seal is attached thereto.

16              I further certify that I am not a relative

17    or employee or attorney of any party, nor am I

18    financially interested in the outcome of the actions.

19              This 30th day of October, 2020.

20

21    _____

22    Jennifer Davis-McLain, RMR, CRR, CRC, CCR-2496
      Georgia Certified Court Reporter
23

24

25
```

Griffin vs. City of Atlanta                    Donald Vickers                        10/21/2020

VIA EMAIL


Date:  11/3/2020

To:  Staci Miller, Esq.

Re:  Signature of Deponent Donald Vickers


Greetings:

The deponent has reserved the right to read and sign. Please have the deponent review the attached transcript, noting any changes or corrections on the attached Errata.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Pope Reporting (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time below, the original transcript may be filed with the court without the signature of the deponent.


Date Errata due back at our offices:  12/10/2020


Please send completed Errata to:
Pope Reporting & Video, LLC
2741 Pangborn Road
Decatur, Georgia 30033
(404) 856-0966

Exhibit D

Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

## ERRATA

JOB NUMBER:  18497

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

_____ There are no changes noted.
_____ The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

Griffin vs. City of Atlanta                    Donald Vickers                    10/21/2020

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

_____

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this _____ day of

_____, _____.

_____

NOTARY PUBLIC

My Commission Expires: _____

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 178 of 204

Exhibit D
Griffin vs. City of Atlanta                Donald Vickers                10/21/2020

**WORD INDEX**

< 0 >
**000006**  4:8
**000008-000015**  4:6
**000055-00057**  4:10
**000102**  3:24
**000121**  4:22
**000188-000189**  4:19
**000611-000614**  4:15
**000618-000628**  4:17
**000745-000746**  4:12
**000762-000767**  4:4
**000774-000930**  5:11
**000775**  4:24
**000777**  165:19
**001041-001098**
 3:12  5:8
**001043**  162:19
**001059**  129:16

< 1 >
**1**  4:23  5:6  71:3, 6
 140:12, 15  156:22
 157:3  173:5
**1.2**  3:13  39:11, 13,
 20, 24  40:3  43:14
 86:6
**1.3**  3:14  45:9
 81:18, 21
**1.4**  3:15  46:5, 22
**1:20-cv-02514-TWT**
 1:1
**10**  2:5  107:1
**10(B**  2:22  172:5
**100**  106:6  108:19
**108**  4:12, 16
**10-C0324-UAF**
 5:10
**10-C-0324-UAF**
 4:17  165:17
**11:00**  1:1
**11:35-11:38**  31:18
**111**  4:10, 23
**119**  4:17
**11-page**  17:22
**12**  165:1
**12/21/11**  4:19

**12:08-12:14**  52:13
**12:45-12:48**  71:12
**12:50**  71:2
**122**  4:19
**126**  3:11
**13**  152:24
**138**  4:3
**14**  4:21  128:8
 129:1
**15**  13:17, 18, 19
 145:5  146:22
 161:15
**1-5**  1:1
**151**  5:3
**15-14-37(a**  172:7,
 18
**155**  3:4
**157**  5:6
**15th**  97:22
**16**  4:12
**162**  5:7
**165**  5:8
**166**  3:5
**17**  3:22
**171**  173:5
**17-C-03530UAF**
 5:8
**17-C-0353UAF**
 162:12
**17-C-0353-UAF**
 162:22
**18**  10:14  11:1, 8,
 11
**19**  129:14
**1st**  138:23

< 2 >
**2**  5:7  139:8  152:8,
 19  153:6  162:11
 164:16, 23  165:6
**2.2**  3:16  52:6
 53:1, 7  56:6
**2.5**  3:17  68:25
 69:10
**2/6/12**  4:12
**2:04-2:13**  120:22
**2:10**  120:19
**20**  107:1

**2011**  4:12
**2012**  4:23
**2016**  4:21  122:19
**2018**  138:23
**2019**  4:5  20:13
 64:2  138:20, 23
 139:14  152:9
**2020**  1:1  173:19
**21**  1:1
**21st**  13:18
**24**  3:22  17:18
 18:2
**2496**  1:1

< 3 >
**3**  4:5  5:8  92:22
 157:5, 6, 24  164:13
 165:16
**3.1**  3:18  71:16, 19,
 24  73:16
**3.3**  3:19  63:11, 22
**3:27**  170:24
**30**  3:24  30:21, 25
 31:23  32:3, 9
 159:19  166:18
**30(b)(6**  85:25  87:8
**30(e**  170:25
**30303**  2:12
**30324**  2:5
**30th**  138:23
 173:19
**32**  133:16
**33**  4:3  138:16, 19
**39**  3:13
**3-point**  71:19

< 4 >
**4**  50:25  93:22
 141:14, 15  142:3
**4.1**  3:20  47:19
 48:1, 11, 24  49:14
**4.1.1**  104:2
**4.2**  3:21  57:9  63:1
**4.2.33**  102:18
 129:19  162:25
**4.2.37**  94:3  99:20
**4.2.51**  98:5
**404.330.6402**  2:13
**404.587.8423**  2:6

**42**  4:5  64:8, 13
 65:18  84:21, 24
 89:21  93:11  97:8
**45**  3:14  4:6  97:24
**46**  3:15
**47**  3:20
**48**  4:8  79:23

< 5 >
**5**  159:19, 20
**5.2**  69:16  73:19
**50**  54:4  111:12
**5000**  2:12
**502**  5:3  151:13, 15
**52**  3:16  4:10
 111:3, 6, 13  120:24
**53**  4:12  108:7
**54**  4:16  108:21
**55**  2:11
**56**  4:17  119:24
 120:1
**57**  3:21  4:19
 122:10, 11, 13
 135:24
**58**  4:23  111:25
 164:15
**599**  157:4
**5th**  20:13, 19  64:2
 76:2  78:5  139:4

< 6 >
**6/30/19**  140:2
**60**  126:23
**615**  152:8
**63**  3:19
**64**  4:5
**69**  3:17
**6th**  20:17  122:19

< 7 >
**7**  3:4  152:6
**71**  3:18
**79**  4:8

< 8 >
**8**  127:18, 19

< 9 >

**9-11-28(c** 172:*6*
**9-11-30(e** 171:*1*
**97** 4:*6*

**< A >**
**a.m** 1:*1* 31:*18*
**ABAD** 1:*1* 7:*1*
19:*4, 21* 20:*1, 3, 21*
22:*1* 23:*6, 11, 21*
24:*3* 25:*3* 33:*2, 17,*
*20, 25* 34:*1, 2, 8*
36:*14* 37:*6, 14, 15*
40:*13, 16* 41:*11, 19,*
*22* 42:*6, 9, 16, 21*
43:*3* 46:*10, 25*
48:*1, 12, 14, 24*
49:*1, 15* 50:*2, 6, 9,*
*11* 51:*2, 5, 9, 11, 21*
63:*2* 71:*2, 8, 10*
73:*12, 19* 74:*3, 4, 6,*
*13* 75:*19* 76:*3, 7*
77:*18, 21* 78:*3, 21*
79:*10, 15, 18* 81:*3,*
*4, 22* 82:*2, 10, 14*
83:*1, 6, 10*
**Abad's** 24:*6* 26:*5*
29:*24* 34:*3, 13, 15*
37:*3* 42:*3* 45:*20,*
*23* 74:*20* 80:*5, 20,*
*22, 23* 81:*14, 24*
**abbreviated** 105:*20*
**ability** 173:*10*
**able** 24:*16* 33:*16*
42:*21* 95:*21*
106:*15, 19* 109:*25*
139:*15* 154:*21*
**above-mentioned**
129:*17*
**absence** 121:*19*
**Absolutely** 84:*12,*
*13* 110:*10, 25*
144:*25*
**abuse** 104:*4, 8*
**academy** 40:*6*
62:*16* 149:*22*
169:*11*
**accepted** 118:*2, 3*
**Access** 172:*23, 25*

**accident** 32:*22*
33:*1*
**accidentally** 66:*18*
95:*16*
**accidents** 32:*20*
**accurate** 99:*18*
168:*7* 172:*10*
**accurately** 26:*7*
**accusation** 145:*25*
**accused** 92:*6*
107:*22* 136:*10, 14*
**accusing** 92:*16*
**act** 40:*2*
**acted** 86:*6* 88:*24*
**acting** 35:*9* 124:*1*
**ACTION** 1:*1* 4:*12,*
*19* 91:*21* 98:*11*
112:*15* 127:*20*
129:*3* 161:*11*
162:*24* 172:*13*
**actions** 17:*10*
114:*7* 154:*8*
173:*18*
**activate** 35:*5*
36:*12* 65:*25*
102:*18* 103:*7, 13*
104:*18*
**activated** 34:*21*
35:*3* 36:*16* 94:*17*
96:*19*
**acts** 116:*1*
**actual** 103:*24*
129:*7* 140:*10*
**add** 49:*19* 68:*14*
147:*3*
**administer** 14:*16*
**administering** 6:*15*
**admitted** 173:*7*
**admonishment**
98:*12, 21* 99:*4, 8*
100:*8* 104:*9*
**admonishments**
99:*16*
**adopted** 10:*21*
**ADP.SOP.2010**
94:*3*
**Adverse** 4:*10, 17*
127:*20* 129:*3*

162:*23*
**advised** 54:*18*
**advising** 54:*16*
**Advisory** 5:*3*
151:*16*
**affairs** 78:*13, 24*
110:*16* 126:*7*
129:*10* 148:*2*
**affect** 156:*12*
**aforesaid** 173:*7*
**age** 10:*14* 11:*1, 11*
**aggressive** 133:*19*
134:*7*
**ago** 7:*20* 15:*11*
18:*23, 24, 25* 19:*2*
78:*7*
**agree** 39:*4* 85:*11*
89:*25* 90:*18, 23*
91:*16* 92:*2* 103:*16,*
*19* 104:*15* 127:*22*
129:*18* 130:*8, 17*
131:*16, 18* 133:*11,*
*12* 145:*17, 22*
146:*2, 5* 167:*1, 4, 8*
170:*13*
**agreement** 6:*4*
172:*14, 17*
**ahead** 27:*16* 49:*10*
82:*18* 85:*10*
128:*11* 131:*12*
148:*8* 163:*12, 20*
**aimed** 114:*21, 24*
**air** 93:*6*
**AJC** 31:*8*
**alarms** 10:*7*
**alcohol** 58:*4*
**ALISHA** 2:*10*
6:*24*
**allegation** 84:*11*
110:*17* 122:*14*
**allegations** 15:*14*
84:*3, 5* 105:*21*
110:*15* 112:*21*
**alleged** 128:*3*
150:*21* 151:*3*
**allegedly** 27:*19*
30:*3*
**alleviate** 40:*10*

**alleviated** 37:*8*
**allowed** 27:*10* 75:*5*
**allowing** 131:*19*
**ambulance** 37:*22*
38:*6, 9, 16* 39:*1*
50:*17, 24* 94:*6*
99:*23* 101:*18*
104:*19*
**amnair@atlantaga.g**
**ov** 2:*14*
**and/or** 171:*1*
**angle** 33:*14*
**ankle** 9:*24* 19:*5, 9*
30:*3, 5, 6, 10, 13, 18*
31:*7, 11* 32:*11*
37:*16, 20, 25* 43:*24*
51:*6, 23* 52:*2* 61:*7,*
*13, 14, 21* 63:*7, 8,*
*19* 101:*21* 102:*8*
158:*18, 23* 160:*22*
**annual** 152:*7*
**answer** 8:*8* 11:*16,*
*17* 12:*1, 12, 21, 25*
13:*4* 19:*7* 26:*11*
27:*13* 32:*13* 34:*24*
40:*8, 19* 41:*4, 14,*
*25* 42:*12, 20* 43:*5*
49:*18* 51:*8, 19, 25*
55:*8* 65:*4* 66:*11*
67:*5, 14* 68:*19*
75:*21* 76:*25* 77:*12*
79:*11* 81:*2, 12*
82:*5, 7, 18* 87:*14*
88:*5* 89:*6, 16*
90:*22, 25* 92:*13*
102:*3* 104:*25*
112:*9* 113:*5* 130:*3,*
*25* 131:*1* 132:*14,*
*23* 133:*4, 15*
135:*13* 137:*4, 10,*
*18* 140:*5* 141:*24*
147:*2, 3* 149:*2*
151:*25* 166:*8*
167:*15, 23* 168:*9,*
*18* 169:*3, 4, 8, 9*
**answered** 49:*17*
87:*15* 147:*1*
**answers** 152:*19*
172:*21*

**anybody** 48:*3*
72:20 114:*24*
128:*10* 146:*14*
**anymore** 57:*5*
**anyway** 98:2
123:*15*
**apart** 122:*24*
**APD** 5:*3* 13:*12, 16,*
*23* 14:*1* 21:*25*
53:23 101:*20*
102:*8* 137:*3*
141:*19* 150:*8, 13*
161:*15*
**APD's** 19:*11*
**apologize** 99:*14*
127:*7*
**apologizing** 125:*5*
**apparently** 157:*17*
**appeal** 96:2
**appear** 111:*12*
138:*19* 164:*11*
**APPEARANCES**
2:*1*
**appeared** 125:*23*
**appears** 18:*1*
85:*24* 87:*7* 104:*10*
127:*20, 25* 129:2
139:*22*
**applauded** 154:*15,*
*18*
**applicable** 173:*8*
**applied** 172:*18*
**appointed** 131:*24,*
*25*
**appreciate** 138:*15*
170:*20*
**approach** 28:*3*
33:*21*
**approached** 33:*3, 9*
**appropriate** 91:*21*
109:*16, 20* 156:*1, 7*
**appropriately**
104:*21*
**approximately**
72:*15, 21* 75:*18*
110:*20*
**April** 20:*13, 17, 19*
64:2 76:2 78:5

139:*4*
**AR-15** 118:*17*
**area** 20:*15, 23*
115:*18* 124:*11*
140:*21* 166:*10*
**arm** 80:*5, 15, 20,*
*22, 23* 81:*14, 24*
123:*5, 6* 124:*13, 14*
**arrest** 67:*3, 12*
68:*17* 81:*5* 117:*9,*
*11, 12* 152:*21*
**arrested** 24:*11*
25:*5* 117:*7* 152:*24*
**arrests** 152:*6*
**arrive** 33:8 94:*11*
**arrived** 123:*8*
**Arthur** 86:*1*
**Article** 2:*22* 152:*1,*
*18* 153:*1, 4, 9*
172:*5*
**arts** 12:*5, 9*
**Ashley** 122:*3, 5*
**asked** 40:*24* 47:*12*
49:*17* 60:*16* 86:*14*
95:*7* 116:*14*
129:*22* 147:*1*
163:*7*
**asking** 7:*13, 25*
10:*8* 20:*16* 38:*16*
40:*22* 46:*17* 70:*8*
98:*14* 99:*12*
137:*14, 19* 147:*4,*
*10, 12* 153:*2*
**asleep** 115:*8*
**assault** 114:*21, 23*
119:*10*
**assigned** 20:*21*
172:*9*
**assignment** 20:*13*
**assist** 23:*10* 80:*5*
160:*8, 14*
**assume** 98:*10*
**assuming** 72:*8, 22*
104:6 134:*24*
152:*11* 153:*6*
**assured** 144:*9*
**ATLANTA** 1:*1*
2:*5, 11, 12* 4:*8* 6:*5,*
*25* 7:*3* 12:*14* 16:*5*

23:*13* 40:*1* 67:*19*
85:*19* 87:*4, 25*
88:2 89:*13, 17*
92:*10* 99:9 104:*16*
112:6 114:22, *24*
115:*13* 119:*10*
120:*3* 122:*13*
131:*19* 136:*18, 22,*
*25* 137:*24* 145:2
146:*17, 23, 24*
147:*15* 148:*22*
**Atlanta's** 18:6
**Attached** 162:*21*
173:*15*
**attempt** 167:*9*
**attempts** 62:*14*
63:*6*
**attention** 91:*25*
116:*10*
**attorney** 6:*17*
172:*17* 173:*17*
**attorney-client**
16:*10* 82:8 137:*20*
**attorneys** 19:*14*
137:*3, 16* 172:*22*
**attributed** 65:*24*
**audio** 35:*16, 24*
36:*24* 70:7 139:*9*
157:*19*
**audit** 95:*19, 21*
96:*15*
**audits** 96:*18*
**August** 122:*19*
**auspices** 173:*14*
**automatically**
172:*18*
**Ave** 22:*5*
**Avenue** 2:*11*
**average** 152:*8*
**aware** 27:*14*
36:*10* 58:*7, 9*
59:25 93:*14* 97:*14*
136:*17* 140:*2, 6*
**awareness** 57:*21*
58:*23*

< B >
**back** 23:*24* 25:*21*
28:*21, 24* 35:*14*

36:23 51:*15* 52:*15,*
*21* 62:*4* 72:*8*
76:20 81:*5* 82:*17*
83:*24* 89:*20* 98:9
101:*21* 102:9
106:*16, 20* 108:*3*
110:22 116:*12, 22*
118:*21* 119:*21*
123:*18* 124:*9, 10,*
*12, 17* 125:*11, 14*
126:6 127:*10*
128:*23* 131:*11, 14*
135:*23* 155:*21*
157:*24* 161:*9*
163:*16, 17*
**backed** 61:*25*
**backyard** 21:*15*
23:*5* 24:*15, 18*
28:*5* 29:*6* 39:*6*
**bad** 63:*7, 8* 168:*23*
**badge** 115:*10*
116:*4, 18* 118:*8*
119:*4, 6*
**balance** 80:*4, 12,*
*14, 21, 23* 81:*15, 22,*
*24* 83:*6*
**balancing** 44:*6*
80:*6*
**ballpark** 76:*8*
99:*14* 105:*6*
**bang** 119:*19*
**bar** 116:*16* 119:*13,*
*17* 124:*24*
**bars** 119:*14*
**base** 19:*24* 140:*7*
**based** 87:*15* 92:*4*
139:*3* 153:*3*
**basically** 121:*4*
137:*11* 163:*20*
**basis** 40:*20, 24, 25*
41:*1* 82:*6, 9*
141:*17* 172:*8*
**Bates** 129:*15*
**Bates-labeled**
162:*19*
**Bates-numbered**
165:*19*
**battery** 72:*7*

**bear** 150:*20* 151:*2*
**beep** 36:2
**beer** 113:*9*
**beginning** 21:*22*
36:*18* 71:*24*
105:*21* 114:*4*
161:*10*
**behalf** 2:2, *7*
85:*19* 87:*3* 88:2
**behaved** 63:*23*
**behavior** 53:*23*
**belief** 167:*12, 20*
168:*4, 5* 169:*12, 13,
16, 17* 170:*12*
**believe** 10:*3* 18:*25*
22:*4* 34:*17* 42:*18,
22* 45:2 69:*14*
71:*4* 72:*4* 74:20
92:*14* 97:*21* 98:*16*
107:*22* 111:*7*
122:*20, 22* 127:2
156:*1, 6* 158:*22*
160:*13, 25* 161:*1, 6,
18* 166:*9* 167:*24*
**believed** 61:*5*
**believes** 169:*21*
170:*2, 3*
**best** 35:*3, 21* 62:2
130:*4* 133:*5* 173:*9*
**better** 58:*24* 59:*6*
61:*19* 64:*12* 77:*12*
121:*7*
**big** 24:*8* 59:*10*
83:*3* 99:*4* 106:*4*
107:*23* 119:*16*
123:*22* 124:*4, 5*
134:*18* 149:*20*
153:*16*
**bigger** 34:*8* 53:*25*
**bigger-picture**
153:*8*
**binding** 6:*15* 88:*14*
**bit** 19:*22* 20:*5*
52:*11* 53:*13, 17*
68:*4* 79:*1* 87:*25*
102:*4* 123:*25*
124:*18* 148:*11*
156:*16* 158:*15*

159:*2*
**black** 110:*6*
**blatant** 83:*9*
**bleeding** 123:*7, 21*,
24
**blew** 27:*21*
**blocking** 23:*15, 16*
28:*22* 33:*11*
**blocks** 115:*12*
**blood** 117:*16*
**Board** 2:22
120:*16* 122:*14*
128:*14* 163:22
172:*6*
**body** 18:*13, 16*
19:*3* 32:*21* 34:*15,
18* 35:*5* 36:*13, 18*
64:*1, 22* 66:*8* 67:*3,
12, 23* 68:2, *9, 16*
70:*14* 71:*20* 72:*3*
73:*8* 74:*2* 75:*5, 14*
91:*13* 97:*16, 18, 19*
102:*19* 103:*7, 13,
17, 20, 23* 104:*18*
124:*17* 130:*14, 18*
**body-worn** 36:2
84:*6* 94:*17*
**bones** 61:*14*
**bottom** 33:*12*
122:*12* 131:*6*
**Boulevard** 22:*4, 5*
**box** 157:*18*
**bragging** 54:*7, 12,
14*
**brake** 29:*5*
**branch** 9:*15*
**brand-new** 117:*4*
**break** 8:*5, 7, 9*
50:*5* 75:*24* 101:*10,
11* 114:*11* 120:*19*
159:*18*
**bridge** 22:*6*
**brief** 7:*23* 52:*17*
**Briefly** 9:*14* 10:*21,
22* 22:*25*
**bring** 10:*3* 138:*13*
160:*11*

**broke** 9:*19* 49:*23*
73:*3* 118:*10*
156:*16* 167:*16*
**broken** 19:*5, 9*
30:*18* 47:*1* 51:*6,
23* 61:*13, 21*
101:*21* 102:*8*
158:*19*
**brought** 15:*23*
17:*7, 9* 76:*20* 85:*1*
118:*17*
**brushed** 45:*20, 25*
**brutality** 26:*9*
**buffer** 35:*12*
**buffering** 35:*13*
36:*20, 21*
**bully** 55:*10*
**bumped** 78:*6*
**burglaries** 20:*23*
21:*1*
**burning** 125:*24*
**business** 135:*8*
**busted** 123:*4*
**Butler** 2:*4* 6:*19*
**button** 35:*13, 16,
17, 23* 36:*8, 22, 24*
66:*17*
**button's** 95:*15*
**buy** 151:*8*
**BWC** 65:*21*

**< C >**
**C.A.R.E** 140:*15*
**call** 32:*24* 37:*22*
39:*1* 50:*17, 23*
77:*24* 91:*24* 94:*6,
18* 104:*19, 20*
116:*23* 127:*15*
146:*14*
**called** 38:*5, 16*
50:*25* 161:*14*
**calling** 58:*16, 20*
147:*23*
**calls** 16:*17* 40:*4*
**cam** 34:*15, 18*
36:*18* 64:*1* 68:*9*
70:*14* 72:*3* 73:*8*
74:*2* 91:*13*

**camera** 18:*13, 16*
19:*3* 35:*2, 5, 7, 12,
25* 36:2, *6, 13*
64:22, *25* 65:*2, 11,
13, 16* 66:*2, 8, 13,
16, 23* 67:*3, 12, 23*
68:2, *16* 69:*4*
71:*20* 72:*15, 21*
74:*20, 21, 25* 75:*14*
84:*7* 94:*17, 23*
95:*3, 6, 18, 20, 25*
96:*7, 19* 97:*3, 16,
17, 18, 19* 102:*19*
103:*7, 14, 18, 20, 23*
104:*18* 124:*18, 20*
128:*7* 155:*22, 23,
25* 156:*2, 7*
**cameras** 75:*6*
96:*14* 125:*20*
126:*8*
**camera's** 75:*18*
95:*14* 96:*16*
**cans** 123:*1*
**capacity** 15:*12*
**captains** 131:*4*
**captures** 67:*24*
**car** 21:*3, 8, 10, 12*
22:*7* 23:*13, 22*
24:*19* 26:*15* 27:*3,
10* 33:2, *4, 5, 10, 11,
15, 16, 19, 20, 22*
34:*2* 36:*13* 43:*9,
17, 21, 24* 80:*17*
81:*15* 83:*5* 106:*15,
17, 20* 108:*4* 110:*7*
117:*2*
**care** 60:*8* 61:*23*
89:*10* 94:*9* 143:*16*
144:*8* 145:*15*
**C-A-R-E** 140:*15*
**career** 15:*1* 99:*8*
147:*13*
**case** 6:*4* 10:*9*
15:*14* 17:*1, 3, 6, 12*
18:*7, 14* 20:*1, 5, 7*
73:*12* 75:*7, 16*
76:*7* 78:*1, 21*
79:*22* 83:*20* 85:*16*
88:*3* 103:*18* 107:*6*

118:*1*  120:*17*
138:*9*  139:*16*
140:*24*  141:*9*
145:*2*  156:*4, 12*
163:*14*  166:*11*
173:*7*
**case-by-case** 172:*8*
**cases** 77:*10*  136:*7,*
*9*
**case-specific** 172:*18*
**catch** 34:*13*  149:*7*
**categories** 101:*13*
**category** 98:*4, 24*
100:*15, 16*  141:*14*
**cause** 51:*10*
119:*19*
**causes** 115:*2*
**causing** 110:*22*
**caution** 138:*12*
**cautioned** 136:*18*
137:*25*  138:*5*
**CCR-2496** 173:*22*
**center** 35:*13*
**certain** 79:*11, 16,*
*19*  143:*21*
**certification** 173:*11*
**Certified** 1:*1*
118:*10*  172:*8, 21*
173:*22*
**certify** 173:*4, 16*
**chain** 4:*19*  130:*6,*
*7, 12*  131:*23, 25*
132:*24*  133:*2, 7, 10*
**challenged** 152:*22*
**chamber** 118:*14,*
*16, 18*
**chambered** 118:*22*
**chance** 45:*6*
**change** 74:*25*
112:*6*  130:*22*
131:*20*  159:*11*
**changed** 24:*10*
112:*1, 18*  129:*12,*
*25*  132:*6, 19, 20*
163:*1*
**changes** 132:*25*
172:*22*
**changing** 113:*15*

**charge** 105:*25*
106:*1*  107:*5*
117:*11*  123:*13*
163:*8*  164:*1*  166:*1*
**charged** 45:*23*
107:*4*  152:*25*
**charges** 117:*6, 8,*
*19*  156:*10*
**charging** 45:*19, 22,*
*25*  118:*18, 20*
**chart** 162:*7*
**Chattahoochee**
22:*4, 5*
**check** 37:*22*  38:*6,*
*17, 19, 20, 23*  39:*2*
124:*7*  157:*18*
**checked** 37:*24*
**cheer** 154:*19*
**chest** 110:*22*
**chief** 108:*13, 14*
112:*5, 16, 17, 25*
113:*2, 10, 20, 23, 24,*
*25*  128:*4*  131:*11,*
*16*  163:*6, 15, 20*
166:*3*
**chief's** 129:*11*
**children** 11:*10*
**chokehold** 109:*25*
**choking** 109:*7*
**chose** 22:*16*  93:*19*
**chuckle** 54:*20*
**circle** 150:*6*
**citizen** 51:*6, 22*
55:*5*  57:*16*  109:*17*
121:*9*
**citizens** 62:*17*
122:*14*  142:*7*
144:*24*
**citizen's** 53:*20*
121:*8*  150:*22*
151:*4*
**CITY** 1:*1*  2:*11*
6:*5, 25*  7:*3*  12:*14*
16:*5*  18:*6*  20:*9, 10*
85:*19*  87:*4, 25*
88:*2*  89:*13, 17*
92:*9*  105:*25*
107:*10, 11, 13*
112:*6*  126:*24*

131:*19*  136:*18, 22,*
*24*  137:*16, 24*
138:*6, 7*  146:*17*
148:*22*  151:*17*
**CIVIL** 1:*1*  6:*6*
171:*1*
**civilian** 120:*15*
128:*12*  135:*7*
163:*22*
**claim** 25:*7*  35:*17*
44:*24*
**claimed** 28:*15*
126:*9*
**claiming** 124:*4*
**claims** 85:*1*
**clarification** 137:*18*
**clarify** 13:*4*  46:*14*
78:*12*
**class** 149:*22, 23*
**clean** 82:*23*
**cleaner** 8:*14*
**clear** 38:*21*  50:*18*
51:*19*  93:*9, 14*
94:*2*  103:*10*
139:*17*  156:*20*
**clearer** 136:*25*
**clearly** 133:*18*
134:*6*
**clerk** 123:*2, 10*
**clerk's** 123:*4*
**clicked** 157:*21*
**clip** 46:*4*  63:*10*
**clips** 39:*10*  68:*23*
**Close** 16:*22*  22:*6*
23:*2*  107:*6*  115:*5*
160:*20*
**closed** 119:*14*
**Closeout** 3:*11*  5:*7,*
*8*
**clothes** 135:*7*
**clothing** 21:*25*
22:*1*
**COA** 3:*12, 24*  4:*4,*
*6, 8, 10, 12, 15, 17,*
*19, 22, 24*  5:*8, 11*
157:*4*  162:*19*
165:*19*
**COBB** 173:*3*

**code** 143:*23*  151:*7*
172:*12*
**collaborate** 68:*13*
**college** 9:*11*
**colloquies** 172:*21*
**color** 26:*20, 21*
**Come** 13:*17*  37:*22*
38:*23*  39:*2*  55:*10*
109:*5, 12*  116:*12*
133:*10*  138:*10, 13*
139:*13, 15*
**comes** 52:*22*
112:*14*  143:*21*
**coming** 22:*8*  25:*3,*
*22*  26:*3*  33:*21*
96:*14*  138:*2*  150:*1*
**command** 130:*7,*
*12*  131:*24*  132:*1,*
*25*  133:*3, 7, 10*
**commands** 23:*12,*
*23*  37:*7*
**comment** 142:*5*
144:*22*
**commentary** 139:*3*
**comments** 139:*2*
140:*20, 25*  141:*3, 7,*
*22*  142:*2*  153:*17,*
*22*
**committed** 118:*23*
**common** 68:*15*
**communicate** 77:*21*
**communications**
153:*14*
**compare** 74:*4*
**compared** 74:*8, 13*
**compensation**
172:*13*
**complain** 43:*23*
120:*14*  126:*4*
**complained** 111:*21*
125:*17*  126:*5*
134:*15*
**complaining** 149:*15*
**Complaint** 3:*11*
4:*16*  5:*7, 8*  16:*25*
76:*19, 23*  77:*7, 16*
78:*14*  105:*23*
113:*23*  121:*9, 14,*
*16, 17*  125:*18*

Griffin vs. City of Atlanta               Donald Vickers

136:*19*  137:*25*
161:*24*  162:*21*
**complaints**  65:*13*
107:*21*  111:*18*
120:*11*  161:*16*
**complete**  104:*25*
139:*19*  172:*9, 20*
173:*5*
**completed**  140:*1*
162:*23*
**completely**  24:*11*
44:*19*  117:*10*
140:*8*
**compliance**  172:*4,*
*12*
**computer**  49:*9*
51:*14*  52:*21, 22*
157:*19*
**computer's**  51:*12*
**concern**  92:*19*
142:*6*  144:*5, 23*
**concerning**  84:*3*
92:*25*
**CONCLUDED**
170:*24*
**concur**  162:*24*
**conditions**  10:*4*
**condones**  92:*10*
**conduct**  91:*13*
117:*11, 13*  120:*9*
139:*3*
**CONDUCTED**  1:*1*
**CONFERENCE**
1:*1*
**confirming**  70:*12*
**conform**  91:*8*
**conformance**  91:*9*
162:*25*  164:*1, 4, 8,*
*9*
**confusing**  126:*15*
**connection**  102:*5*
**cons**  104:*1*
**consciousness**
133:*22*  134:*10*
135:*10, 11*
**conserve**  72:*7*
**consider**  15:*2*
**considered**  168:*5*

**considering**  165:*22*
**cont**  4:*1*  5:*1*
**contact**  111:*1*
**contacted**  172:*16*
**contained**  165:*25*
**contents**  165:*21*
**continue**  124:*21*
**Continuing**  3:*23*
**contract**  172:*13*
**contracting**  15:*21,*
*23*
**contracts**  172:*8*
**Control**  4:*17*  5:*8,*
*10*  23:*25*  34:*2*
35:*24*  36:*1, 4*
**conversation**
113:*21*  147:*15*
**conversations**  16:*4,*
*17*  19:*25*  52:*18*
**cops**  75:*5*  117:*2*
**copy**  100:*23*
**corner**  69:*10*
70:*18*
**corporation**  149:*20*
**Corps**  9:*16*
**correct**  18:*4*  25:*8*
26:*12, 15, 16*  28:*17*
29:*25*  30:*19*  33:*12,*
*13*  38:*23, 24*  44:*14*
46:*2*  47:*9, 17*
48:*25*  49:*16*  50:*7,*
*12, 13*  53:*16*  58:*12*
69:*5, 11*  70:*9, 14,*
*15, 19, 20*  71:*21, 22*
72:*1*  85:*1, 2*  87:*25*
88:*22*  91:*15*  92:*7,*
*8*  98:*8*  102:*20, 24*
104:*14*  105:*13*
114:*5*  128:*24, 25*
139:*6, 13*  146:*1*
153:*9*  154:*14*
161:*25*  168:*16*
170:*12*  172:*20*
173:*6, 9*
**correction**  134:*20*
**corrections**  124:*11*
125:*14*

**correctly**  62:*7*
64:*19*  66:*4*  109:*9*
143:*7*  147:*8*  163:*2*
**Correspondence**
4:*16*
**Council**  5:*3*
151:*16*
**COUNSEL**  2:*1, 23*
6:*13*  172:*2*
**count**  105:*4*
**COUNTY**  1:*1*
173:*3*
**couple**  16:*16*
99:*17*  125:*14*
**course**  14:*13*  85:*7*
137:*19*  138:*6*
165:*12*
**COURT**  1:*1*  2:*22,*
*23*  6:*10, 12, 15*  7:*4*
26:*8*  31:*19*  106:*25*
110:*17*  117:*8*
118:*1*  172:*6, 21*
173:*22*
**courteous**  140:*16*
141:*5, 20*  142:*17,*
*23*
**courtroom**  118:*5*
**courts**  118:*2*
**cousins**  10:*11*
**cover**  85:*25*  87:*8*
**COVID**  6:*9*
**CRC**  1:*1*  173:*22*
**creates**  8:*14*
**crime**  118:*23*
**criminal**  109:*18*
**criticisms**  139:*2*
**criticize**  146:*17, 24*
**criticized**  154:*3, 4,*
*5*
**CRR**  1:*1*  173:*22*
**cry**  43:*20*
**culture**  148:*22*
**cumulatively**  16:*18*
**cure**  40:*21*
**current**  13:*14*
62:*15*  63:*24*  67:*7*
**currently**  13:*9, 12*
**cut**  20:*22*  35:*21*
49:*9*  51:*13, 15*

68:*4*  72:*8*  74:*21,*
*24*  75:*10*  123:*5, 6*
125:*12*  148:*10*
150:*11*  155:*25*
**cutoff**  72:*7*
**cutting**  70:*15*
75:*13*

**< D >**
**damage**  124:*19*
**damages**  30:*1*
**Dancy**  166:*4*
**danger**  89:*10*
92:*18*  161:*11, 12*
**dark**  26:*21*
**Dart**  26:*19*
**dashcam**  25:*13, 18*
**date**  46:*16*  64:*6*
121:*13*  138:*24*
**dates**  121:*21, 23*
**Davis**  139:*22, 23*
140:*24*  141:*10*
**Davis-McLain**  1:*1*
173:*22*
**day**  20:*20*  96:*10*
121:*20*  166:*25*
173:*19*
**days**  16:*16*  102:*22,*
*25*  103:*2, 3*  111:*14*
113:*25*  120:*2, 4, 7*
126:*4, 6*  128:*8, 11*
**deal**  72:*9, 12*
97:*18*  99:*5*  124:*8*
**dealing**  59:*25*
61:*11*  75:*8, 10*
93:*7*  105:*24*
123:*15*  138:*12*
156:*4*
**dealings**  134:*21*
**Debra**  10:*23, 24*
**December**  4:*5*
**decide**  37:*1, 4*
**decided**  117:*5, 18*
**decision**  156:*13*
164:*9*  168:*15, 24,*
*25*
**decline**  152:*20*
**declining**  152:*6*

**deemed** 170:*9*
**deescalate** 167:*9*
**Defendant** 3:*22*
6:*3* 16:*1* 29:*24*
86:*6, 15*
**Defendants** 1:*1*
2:*7* 5:*5, 14* 6:*23*
**Defendant's**
156:*22* 157:*2*
162:*11* 164:*13, 15,*
*23* 165:*6, 16*
**definite** 90:*22*
**definitely** 90:*3*
145:*15*
**degree** 9:*11* 61:*15,*
*18*
**demeanor** 24:*10*
**Department** 2:*11*
4:*8* 40:*1* 67:*19*
89:*14* 140:*16*
145:*6* 146:*17*
148:*23* 151:*5*
**department-wide**
150:*19* 151:*2*
**depending** 162:*7*
**depends** 41:*20*
**deposed** 15:*11*
137:*8*
**DEPOSITION** 1:*1*
5:*14, 15* 6:*2, 4, 5, 8*
7:*14, 15* 8:*7* 16:*6,*
*14* 19:*12, 15* 52:*18*
71:*3, 5* 85:*25* 87:*8*
126:*25* 164:*25*
165:*2* 170:*24*
**deputy** 108:*13*
112:*5, 17, 25* 113:*2,*
*10, 20* 163:*6* 166:*3*
**describe** 142:*22*
**described** 126:*16*
**DESCRIPTION**
3:*9* 4:*2* 5:*2*
**deserve** 144:*22*
**deserves** 75:*17*
**desk** 129:*11*
**Despite** 152:*6*
**details** 30:*15*
**detain** 124:*11*

**detained** 28:*1*
106:*7* 123:*9*
**detention** 25:*5*
**determined** 37:*24,*
*25* 38:*8* 50:*21*
112:*21* 114:*7*
118:*6* 172:*13*
**device** 35:*10*
65:*23* 66:*1*
**diagnose** 135:*16*
**diagnostic** 65:*20*
**diagnostics** 95:*18*
**difference** 83:*3, 9*
**different** 8:*10*
16:*16* 57:*4* 85:*9*
126:*15* 133:*5*
145:*13* 149:*18*
165:*5* 170:*11*
**differently** 44:*22*
83:*7* 86:*18*
**difficulty** 80:*3*
**direct** 154:*9*
172:*13*
**direction** 106:*11*
149:*7* 164:*9*
**directives** 91:*9*
162:*25* 164:*2, 5, 9*
**directly** 74:*3*
130:*22* 131:*4*
**disagree** 108:*18*
127:*23* 130:*8*
**disagreed** 130:*13*
**disassembly**
173:*12, 13*
**discharged** 9:*18,*
*20* 10:*2*
**disciplinary** 121:*9*
**Discipline** 4:*6*
162:*5, 9* 163:*16*
**disclosure** 2:*23*
172:*6*
**disclosures** 172:*1,*
*3, 4, 15*
**discount** 172:*19*
**discounts** 172:*18*
**discovery** 17:*12*
18:*7, 12*
**discuss** 78:*11*

**discussed** 113:*1*
**discussing** 78:*1*
**discussion** 159:*24*
**dispatch** 33:*7*
**displayed** 69:*21*
143:*5, 13* 144:*5*
**Displays** 142:*6*
144:*14, 20, 23*
**disposition** 84:*25*
112:*1, 7, 18* 113:*16*
131:*20* 162:*24*
**disqualification**
172:*6*
**disqualify** 172:*11*
**distance** 37:*12*
**distinction** 169:*12,*
*16*
**distorted** 20:*16*
**DISTRICT** 1:*1*
**disturbance** 119:*20*
**DIVISION** 1:*1*
**divorced** 10:*23*
**doctor** 126:*1, 13*
135:*21*
**doctors** 61:*20*
**document** 17:*21,*
*23, 25* 93:*11* 95:*10*
108:*9, 12* 111:*13*
127:*18, 25* 128:*1*
129:*15* 132:*5, 10,*
*17* 133:*25* 151:*17*
**documents** 126:*23*
127:*1* 164:*25*
**Dodge** 26:*19*
**DOE** 1:*1*
**doing** 20:*15, 17*
22:*23* 23:*11* 58:*14*
62:*13* 75:*12* 80:*18*
92:*17* 157:*20*
**DONALD** 1:*1* 3:*3,*
*22* 4:*3, 8* 6:*3* 7:*5*
8:*18* 162:*23*
**door** 80:*15, 17*
81:*15* 115:*9, 11*
124:*22* 125:*2, 22*
126:*10* 127:*14*
133:*20* 134:*8*
159:*7*

**doors** 124:*23*
**door's** 124:*23*
**draw** 117:*16*
**dressed** 134:*24*
135:*4*
**drinking** 115:*19*
117:*17*
**drive** 24:*22* 28:*19,*
*21, 25* 29:*3, 21*
**driver** 22:*23*
28:*11* 160:*19*
**driver's** 73:*19*
**driveway** 23:*15, 16*
24:*22* 28:*23* 33:*12,*
*22* 61:*2* 160:*12, 15*
**driving** 22:*1, 7*
25:*14* 30:*10* 31:*13*
32:*10*
**dropped** 76:*18*
120:*9*
**drove** 21:*14* 23:*3*
28:*15* 30:*3*
**drunk** 125:*3*
**Due** 9:*22* 61:*5*
115:*1, 2*
**DUI** 14:*12, 13*
**duly** 7:*6*
**dumped** 122:*25*
**duty** 121:*19*

< E >
**earlier** 129:*22*
144:*1*
**early** 20:*12, 17*
**easy** 65:*14* 66:*17*
**effect** 144:*3*
**effective** 141:*15*
**either** 11:*13* 15:*25*
35:*7* 47:*16* 76:*10,*
*22* 77:*4* 78:*20*
117:*24* 153:*11*
**elbow** 115:*2*
**electronically** 5:*14*
**element** 150:*5*
**Elizabeth** 4:*21*
**E-mail** 4:*19*
122:*13* 133:*17*
**embarrassed** 155:*2,*
*4*

empathy 142:6 143:5, 14, 19, 24 144:14, 16, 20, 24
employ 13:9
employed 13:12
Employee 4:6 112:6 134:23 141:6 165:24 173:17
employees 131:19
EMS 94:10
encounter 28:6 33:17
encountered 124:12
encourages 40:2
ended 21:10 69:4
enforcement 13:25 125:17 143:22
entire 67:24
environment 150:6
equipped 25:18 26:22 27:5
error 35:10 64:24 95:8, 11 133:22
errors 95:23
Espy 4:21
ESQUIRE 2:3, 4, 7, 10
essentially 100:10
established 73:24
ET 1:1
Ethics 172:12
evaluated 91:2 141:5
Evaluation 4:3 61:20 65:21 138:20, 22 139:6, 16 140:7, 24
event 12:9 67:24 103:24
events 126:15
everybody 22:22 70:9 89:18 115:18 125:17
evidence 25:9, 12 165:25 166:15 173:9
exact 16:15 66:25 105:5 158:13

exactly 24:16 30:5 66:14 106:1 123:9 141:21 169:24
Examination 3:4, 5 7:8 155:16 166:21
EXAMINATIONS 3:1
examined 7:6
example 141:2, 4 147:25
Exceeds 141:16
Excellent 17:20 45:15 52:23 73:23
excerpt 5:3 151:16
excessive 14:20 15:3, 15 83:17 84:11 85:20 87:5 89:2, 4, 13 97:9 105:21 111:15, 22 120:12 128:18 132:6, 9, 19 145:2, 3, 6 150:9, 15 170:9
exclude 59:23 153:14
excluding 16:3
Excuse 20:20 29:19 65:7 73:17 78:7 132:20
EXHIBIT 3:9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24 4:2, 3, 5, 6, 8, 10, 12, 16, 17, 19, 23 5:2, 3, 6, 7, 8 17:18 18:2 30:20, 21 31:21, 23 32:3, 9 39:11, 20, 24 40:3 43:14 45:9 46:5, 22 47:19 48:1, 11, 24 49:14 52:6 53:1, 7 56:6 57:9 63:1, 11, 22 64:7, 8, 13 65:18 68:25 69:10, 16 70:24 71:16, 19, 24 73:15, 16, 17, 19 79:23 81:18, 21 84:21, 24, 25 85:23 86:6 89:21 93:11

97:8, 24 108:7, 21 111:3, 6, 13, 25 119:24 120:1, 24 122:10, 13 126:19 127:19 135:24 138:16, 19 151:13, 15 156:22 157:2, 3 162:11 164:13, 16, 23, 24 165:6, 7, 11, 16
EXHIBITS 3:8 4:1 5:1, 11, 14 172:22, 24 173:7
exists 151:10
exonerated 85:4, 13 89:1, 9 113:18 130:1 161:4, 5, 7
expect 55:1, 3
expected 141:16
expedite 156:11
experience 14:1 32:19 131:14 150:7, 13
experienced 86:24
explain 58:15 121:24 147:9
expressly 173:11
extent 139:4
extra 94:14
eyes 148:4

< F >
face 73:21
face-to-face 75:11
fact 27:24 40:22 44:3 53:25 55:18 65:1 66:7 73:25 75:12 77:16 95:11 107:24 109:11 110:9, 25 111:17 118:7 128:3 135:10 152:14
facts 166:11
failed 90:5, 8
failing 90:12 91:8 98:7 99:22 101:17 102:18

failure 65:23, 25 91:24 103:7, 13 139:10
failures 94:1
Fair 7:22 14:11 30:5 77:14 91:5 93:19, 21 103:13, 19 105:1 121:25 139:12 148:17, 18, 21 152:15 167:11, 19
fairly 89:18 141:11
fall 55:4
falling 80:16
falls 125:3
false 80:25 110:25 112:22 135:19
familiar 112:4 152:18 166:10
family 8:24 10:10, 11, 13, 22 11:7 19:16, 18
far 14:13 18:12 20:11, 17 27:16 36:3 40:9 45:14 81:13 83:20, 22 84:5 89:8 95:6, 23 145:13 162:8
fast 42:1
fast-forward 107:7
fat 110:6
fault 134:4
February 13:17, 18
Federal 6:6 26:8 170:25
feed 128:7
feel 18:3 154:13 165:25
feeling 89:8
feet 44:5 106:18
fell 56:2, 10 63:3 115:8 118:20 133:21 134:9 142:13 143:10
fellow 150:9, 15, 21 151:3
felt 41:16, 20 42:13 88:18 89:9

Griffin vs. City of Atlanta                    Donald Vickers

female  28:*12*
  106:*8*  107:*5*
females  124:*3, 13*
field  14:*16*  93:*17*
fifth  150:*2*
fight  45:*4*  128:*12*
  163:*21*
fighting  12:*8*
  127:*23*  128:*23*
  161:*21*
figure  22:*13*  51:*16*
  61:*4, 10*  105:*6*
  158:*23*
FILE  1:*1*  3:*11*
  5:*7, 8*  100:*14*
  129:*17*  136:*15*
  162:*11*  165:*17, 22*
  166:*1*
filed  17:*1*  77:*16*
Final  4:*17*  112:*1,
6*  127:*20*  129:*2, 7*
  131:*20*
finally  91:*19*
  117:*18*
financial  172:*7*
financially  173:*18*
find  55:*22*  56:*11,
13, 19, 21, 24*  60:*14*
  84:*21*  142:*14*
  143:*11*  152:*12*
  158:*13*  159:*15*
finding  83:*19*
  85:*11*  89:*25*  90:*5,
18*  91:*8, 16, 17*
  96:*2*  108:*18*
  129:*25*  130:*22*
findings  83:*25*
  84:*2*  97:*20*  103:*6*
  114:*8*  133:*12*
  138:*11*  139:*13*
fine  88:*13*  114:*13*
  137:*17*  159:*22*
  165:*3*
fined  107:*4*
finish  8:*13*  71:*6*
  76:*13*  96:*3*
finished  97:*20*
Finley  113:*2, 10,*

20  166:*3*
fired  138:*8*
Firm  2:*4*  6:*19*
  172:*1, 15*
First  3:*22*  7:*6*
  10:*20*  25:*6*  33:*20,
24*  34:*14*  39:*19*
  53:*11*  84:*23, 24*
  85:*3, 5, 8*  90:*1, 20*
  98:*16, 18*  104:*24*
  121:*8*  132:*4, 17*
  150:*11*  160:*5*
fistfight  11:*13, 21*
fistfights  12:*10*
FIT  20:*21*
Fite  14:*5, 8*  87:*9,
16, 18*  88:*20, 24*
Fite's  87:*2*
Five  101:*15*  105:*7*
  110:*20*  111:*14*
  113:*25*
fixed  151:*23*
fled  21:*9*
flee  28:*5*
flip  80:*1*  92:*21*
  93:*22*  127:*17*
  129:*13*  133:*16*
  139:*8*
floor  133:*21*  134:*9*
fly  149:*5*
folks  10:*25*
follow  55:*1*
followed  27:*11*
following  172:*1, 4*
follows  7:*7*
follow-up  127:*8*
foot  28:*6*  43:*10,
18*  48:*16, 17*
  107:*18, 21, 24*
  108:*3*  111:*1*
footage  18:*14, 16*
  19:*3*  45:*13*  70:*14*
  103:*20, 24*
football  9:*4, 6, 9*
Force  5:*3*  14:*6, 20,
24*  15:*3, 15, 19*
  68:*2, 10, 17*  83:*17,
25*  84:*2, 5, 11*  85:*4,
20*  86:*16*  87:*4, 16*

88:*21*  89:*2, 4, 13,
23*  90:*6, 9, 12*  92:*7,
10*  93:*4, 17*  97:*9*
  98:*8*  104:*12*  105:*9,
22*  108:*16*  111:*15,
22*  120:*12*  128:*18*
  132:*6, 9, 19*  133:*20*
  134:*8*  136:*8, 10, 15*
  145:*2, 3, 6*  150:*10,
15*  151:*16*  154:*16,
25*  161:*1, 8, 13, 23,
24*  162:*8*  164:*10*
  167:*2, 5, 6, 9, 12, 13,
20, 21*  168:*6, 11, 15,
25*  169:*11, 16, 17*
  170:*8*
forced  117:*24*
forcing  24:*9*
foregoing  173:*8, 13*
Forgive  98:*16*
form  98:*17*  166:*6*
forms  172:*6*
forward  50:*12*
  159:*2*
forwarded  113:*23*
  130:*6*
foul  75:*1, 25*
found  76:*19*  77:*17*
  92:*5*  103:*6*  119:*7*
  128:*17*
four  101:*13*
  110:*20*  115:*15*
  170:*17*
fractures  9:*25*
free  132:*15*
  137:*10*  154:*13*
frequently  67:*19*
Fresh  125:*10*
friend  106:*8*
friendly  113:*2*
  117:*1*  119:*6*
friends  19:*24*  60:*2*
front  116:*21*
  119:*17, 18*
frowned  145:*18, 23*
full  8:*16, 18*
  133:*20*  134:*8, 19*
fun  53:*20, 22, 24*
  54:*1*  55:*9*

funny  54:*21, 22, 25*
  55:*2, 20, 22, 25*
  56:*11, 14, 22, 24*
  57:*2, 5*  60:*14*
  142:*15*  143:*12*
Further  3:*5*  51:*10*
  65:*11*  112:*20*
  117:*5*  144:*12*
  155:*13*  156:*19*
  166:*21*  170:*22*
  173:*16*
FY2019  4:*3*

< G >
gangster  124:*4*
gas  24:*24*  122:*23,
24*
general  70:*13*
generally  21:*1*
  99:*12*  103:*20*
  145:*18, 22*  149:*15*
Georgia  1:*1*  2:*5,
12, 22*  8:*22*  10:*14*
  11:*1*  172:*4, 8*
  173:*2, 22*
getting  50:*22*  61:*1*
  160:*9, 15*
GIANNOTTI  2:*4*
  6:*20*
girl  57:*13, 24*
  58:*10, 16, 17, 21*
  60:*24*  144:*2, 19*
girlfriend  106:*9*
  115:*3*  116:*16, 23*
  119:*3*
girlfriend's  107:*2*
give  7:*23*  17:*15*
  22:*21*  23:*9*  69:*7*
  76:*8*  79:*6*  85:*6*
  90:*22*  99:*14, 18*
  100:*11*  104:*25*
  105:*5, 20*  106:*4*
  116:*6*  123:*2*
  126:*17*  128:*11*
  147:*25*  163:*21*
  166:*17*
given  7:*17*  98:*23*
  100:*18, 21*  101:*19*

103:*1*  104:*9*  107:*17*  173:*9*

**gives**  157:*18*

**giving**  23:*12*  33:*6, 7, 25*  34:*1*  117:*16*

**glass**  119:*19*

**Glazier**  163:*6, 19, 20*

**glimpse**  23:*18*

**go**  9:*1*  22:*16*  25:*3*  29:*15*  35:*14*  36:*23*  49:*10*  62:*4*  65:*11*  71:*3, 9, 10*  77:*10*  81:*4*  82:*18*  84:*15, 23*  85:*9*  89:*20*  95:*1*  98:*1*  106:*2*  109:*1*  113:*24*  114:*15*  115:*9, 11, 22, 25*  116:*7, 22*  119:*21*  121:*5*  123:*23*  125:*24*  126:*7, 8, 22*  127:*8, 9, 10*  128:*8, 11*  131:*12*  135:*23*  145:*14*  148:*8*  155:*21*  157:*24*  162:*7, 8, 15*  163:*12, 20*

**goal**  94:*7*  140:*12, 15, 20, 21*  142:*3*

**goes**  10:*9*  35:*12*  98:*24*  125:*9*  132:*1*

**going**  7:*25*  8:*14*  17:*14*  20:*10, 24*  21:*4, 23*  22:*12*  27:*21*  28:*9, 24*  31:*23*  35:*2*  38:*9, 10*  39:*15, 20*  41:*9*  45:*4, 7, 8*  46:*3, 4*  47:*18*  48:*20*  51:*16, 18*  52:*4, 5*  53:*6*  56:*4*  57:*8*  61:*10*  63:*9, 10*  68:*24*  69:*3, 15*  70:*7, 21, 24*  71:*3, 6, 14*  72:*9, 12*  76:*14*  78:*23*  80:*1*  81:*6*  82:*4, 6, 23*  83:*4, 10*  84:*20, 23*  85:*22*  86:*3, 11*

87:*13*  92:*21*  93:*8, 23, 24*  95:*1*  96:*3*  100:*19*  106:*2*  108:*14*  114:*9, 10, 13, 17, 18*  115:*13*  117:*19, 23, 25*  120:*15*  121:*23*  122:*9*  123:*9, 14, 24*  124:*21*  125:*18*  126:*17*  127:*17*  129:*13*  133:*16*  134:*22*  137:*17*  138:*13*  144:*8*  153:*16*  156:*12*  157:*5, 7, 24*  159:*1, 13, 14*  161:*9*  162:*10, 20*  164:*5, 12*  165:*20*  166:*5, 18*

**Good**  6:*24*  7:*2, 10*  29:*2*  30:*8, 9*  45:*6*  63:*6*  89:*17*  114:*15*  154:*22, 23*

**gotcha**  148:*14*

**grab**  63:*18*  116:*7*  125:*1*

**grabbed**  63:*20*  106:*17*  109:*7*  113:*9*  115:*9*  116:*22*

**Grady**  25:*5*  38:*3, 13, 22*  62:*2*  94:*10*  123:*25*  124:*1, 12*  125:*20*  134:*23*  143:*16*  152:*24*  156:*11*

**gravel**  24:*18*  25:*1*

**Great**  39:*17*  121:*2*

**GRIFFIN**  1:*1*  3:*12, 24*  4:*4, 6, 8, 10, 12, 15, 17, 19, 22, 24*  5:*8, 11*  6:*5*  7:*12*  18:*17*  19:*4, 8*  23:*22*  24:*2, 4, 15, 19, 23*  25:*6*  27:*10, 18*  28:*3, 4, 15, 18*  29:*3, 21*  30:*2*  33:*3*  34:*1, 2, 3, 6, 16, 22*  37:*2, 5, 23*  38:*6, 17,*

20  39:*2, 5, 8*  40:*14, 17*  41:*12, 16*  42:*2, 10*  43:*9, 17, 20, 23*  44:*3, 9, 15, 19, 24*  45:*19*  46:*8, 22, 25*  47:*1, 4, 10*  48:*2, 12, 15, 16, 24*  49:*15, 20, 21, 22*  50:*7, 11, 15, 18*  51:*10*  52:*1*  54:*8*  55:*1, 14, 15*  57:*12, 20, 22*  58:*2*  59:*14, 15, 20, 23*  60:*5, 6, 18, 20*  61:*4, 11, 21*  62:*10, 14, 21*  63:*5, 15, 19*  72:*9, 12*  75:*22, 23*  76:*22*  77:*6, 15, 19*  80:*3, 11, 17, 20*  81:*4, 22, 24*  83:*5, 14*  84:*3*  87:*5*  90:*6*  91:*13, 25*  92:*11, 18*  93:*1, 4*  94:*6, 8, 14, 20*  96:*23*  97:*7*  101:*18*  104:*5, 8, 13, 17, 22*  120:*10*  136:*7, 13*  138:*25*  139:*4*  140:*3*  142:*13*  143:*3, 4, 9, 13, 15, 17*  144:*1, 5, 14, 20*  153:*13*  154:*16, 25*  155:*8, 11, 23*  156:*3, 8, 9, 14, 18*  157:*4*  158:*11, 18*  160:*6, 20*  161:*10, 12*  162:*19*  165:*19*  170:*9*

**Griffin's**  21:*8*  24:*1, 13, 21*  28:*23*  29:*8*  30:*16*  31:*7*  32:*10*  33:*20*  37:*16, 20*  38:*22*  53:*15*  136:*19*  137:*25*  139:*16*

**ground**  7:*23*  55:*14*  94:*20*  106:*13, 17, 19*  124:*20*  125:*4*

**group**  60:*2*

**grow**  8:*19, 20*

**grown**  58:*3*

**guarantee**  99:*10*

**guard**  115:*21*

**guards**  115:*15*  116:*3, 14*  119:*2*

**guess**  7:*23*  12:*6*  15:*22*  17:*7*  21:*20*  26:*6*  29:*4*  50:*5*  66:*15*  84:*9*  93:*14*  94:*13, 25*  101:*8*  110:*13*  112:*20*  113:*22*  118:*22*  121:*5*  135:*15*  136:*5*  143:*3*  145:*17*  148:*6, 18*  149:*11*  154:*10*  162:*7*  163:*19*  166:*12*  168:*2, 12*  169:*20*

**guessing**  112:*24*

**guilty**  107:*4*

**guns**  96:*11*  115:*22, 25*

**guy**  53:*25*  115:*25*  124:*19*  126:*9*

**guys**  47:*2, 11*  115:*16, 17, 19, 22, 24*  116:*4, 9, 10*  170:*23*

**guy's**  120:*14*

**< H >**

**hair**  9:*24*

**half**  19:*2*  170:*18*

**hall**  78:*8*

**Hampton**  163:*7*

**hand**  24:*2, 6*  34:*3*  37:*3*  40:*16*  41:*11, 23*  42:*3*  45:*20, 23*  46:*1*  60:*1*  86:*19*  112:*16*  116:*8*  119:*11*

**handcuffed**  107:*19*  127:*15*

**handcuffs**  24:*7*  106:*14*  156:*10*

**handle**  97:*17*  118:*18, 20*

**handled** 86:*18*, *20*
87:*1* 88:*17*, *19*
113:*22*
**hands** 23:*25* 37:*7*
45:*4* 124:*15*
**hangout** 115:*18*
**happen** 118:*24*
150:*5*
**happened** 15:*18*,
*22* 21:*21* 54:*9*, *13*,
*17*, *19*, *21* 76:*3*
77:*19* 78:*4* 96:*10*
105:*18* 107:*11*
114:*25* 123:*17*
127:*13* 139:*18*
140:*2*
**happens** 67:*18*
77:*10* 98:*20*, *24*
138:*8*
**happy** 17:*10*
137:*12* 147:*11*
**hard** 13:*7* 24:*24*
56:*10* 121:*22*, *24*
142:*14* 143:*11*
**harder** 8:*11*
**harsher** 100:*17*
**hates** 125:*16*
**head** 77:*10* 107:*22*,
*24* 125:*22* 126:*2*
148:*9*, *12*, *15*
**head-on** 22:*8* 25:*3*,
*7*, *23* 26:*3* 27:*19*
**headquarters** 78:*7*
**hear** 8:*2* 13:*7*
15:*6* 18:*10* 23:*10*,
*11*, *17*, *23* 43:*20*, *23*
44:*9*, *15* 46:*8*, *12*,
*22*, *24*, *25* 47:*3*, *4*,
*10*, *14* 52:*9* 53:*11*
54:*2*, *6* 56:*9*, *12*
57:*12* 59:*13*, *19*
69:*3*, *19* 70:*5*, *8*, *11*
75:*17* 88:*8*, *11*
107:*3* 115:*8* 133:*8*
143:*7* 147:*5*
157:*10*, *12* 158:*2*
**heard** 7:*11* 15:*5*
20:*9* 30:*17* 33:*25*
46:*10* 47:*12* 52:*25*

58:*3* 68:*1*, *8* 85:*15*,
*18*, *21* 87:*2* 88:*11*
102:*4* 112:*12*
146:*6*, *10*, *11*, *13*, *16*,
*22*, *23* 147:*24*
148:*1*, *5* 149:*11*, *13*,
*14*, *21* 150:*19*
151:*1*, *6*, *8* 153:*23*
**hearing** 45:*12*
107:*2*
**He'd** 42:*1*
**help** 123:*11* 160:*6*,
*22*
**Hey** 42:*9*, *16*
59:*11* 60:*17* 69:*3*
70:*5*, *8* 76:*16* 78:*9*,
*10* 96:*16* 109:*4*, *11*
115:*22* 116:*10*, *15*
119:*5*, *21* 125:*7*
133:*11*, *13* 144:*6*
153:*24* 154:*20*
163:*20*
**high** 9:*1*, *2*, *3*
11:*14*
**higher** 98:*25*
**higher-ranking**
129:*24*
**higher-up** 132:*5*
**higher-ups** 131:*2*
**highlighted** 86:*4*
92:*22* 93:*23*, *25*
94:*16* 109:*3*, *21*
122:*16* 129:*15*
133:*17* 136:*1*
142:*5*
**highlighting** 165:*5*
**Highly** 141:*15*
**hill** 33:*14*
**history** 121:*10*
**hit** 25:*7* 27:*19*
35:*16* 36:*22*, *24*
37:*14*, *15* 66:*17*
106:*19* 125:*2*
129:*11*
**hitting** 65:*15*
**hold** 23:*25* 24:*3*
34:*2* 38:*18* 42:*9*,
*16* 80:*16* 81:*22*
83:*5*

**holding** 63:*5* 80:*5*,
*17*, *20*, *22* 81:*4*, *24*
124:*13*, *14* 143:*17*
**hole** 125:*24*
**Holly** 10:*22*
**home** 116:*22*
**homeowner** 24:*12*,
*20* 29:*6*
**homeowner's**
23:*15* 24:*18* 28:*22*
33:*11*, *15*, *16*
**honest** 7:*20* 15:*16*
27:*14* 96:*8* 154:*6*
**Honestly** 18:*8*
35:*20*
**honorable** 10:*4*
**honorably** 10:*1*
**hoping** 113:*18*
**horrible** 60:*7*
**horrific** 32:*21*
**hospital** 38:*2*, *11*
94:*8* 99:*23* 123:*23*
125:*8* 135:*20*
**hot** 12:*17* 20:*24*
**hour** 16:*19*, *20*
**hours** 16:*21*, *22*
126:*25* 165:*1*
170:*18*
**house** 23:*19* 33:*22*
**Howell** 22:*3*, *14*
**human** 32:*20*
**hung** 113:*13*
**hurt** 30:*2*, *4*, *6*, *10*,
*13* 37:*17*, *20*, *25*
47:*2*, *11* 48:*17*
52:*2* 57:*15* 61:*7*,
*24* 90:*3* 125:*5*, *8*
126:*3* 154:*19*
156:*15*, *19*
**hurting** 43:*24*
**hypothetical** 40:*23*
41:*3*
**hypothetically**
42:*22*

**< I >**
**idea** 89:*1* 106:*4*
112:*17* 121:*14*

129:*6* 135:*2*, *25*
160:*11*, *13*
**identical** 164:*24*
165:*4*
**identified** 118:*9*
**identify** 118:*25*
**immediate** 11:*7*
**immediately** 66:*2*
**impartiality** 172:*12*
**important** 103:*18*
**improper** 41:*3*
**improvement**
151:*20*
**incident** 46:*16*
65:*22* 66:*3* 68:*12*
74:*10* 75:*8* 76:*2*
90:*10* 94:*1* 95:*6*
105:*19* 114:*20*
120:*3* 122:*19*
127:*12* 129:*3*
134:*16* 135:*24*
136:*1*, *3* 138:*1*
139:*18* 140:*8*, *10*
148:*16*
**incidents** 121:*5*
152:*7*, *9* 153:*7*
**incident's** 68:*20*
**include** 21:*2*
138:*24*
**includes** 108:*24*
**including** 6:*8*
61:*14* 89:*3*
**incorrect** 93:*12*
**increase** 153:*7*
**increased** 152:*7*
**independent**
130:*14*, *18*, *23*
**INDEX** 3:*1*, *8* 4:*1*
5:*1*
**indicate** 65:*22*
**indicated** 94:*2*
**individual** 127:*2*
**information** 82:*8*
92:*24* 137:*20*
165:*23*
**informed** 84:*7*
97:*9* 108:*13*
**initial** 72:*6*
**injure** 144:*12*

**injured** 51:6, 22
55:6 62:17
**injuries** 30:16
57:25 58:1, 2
106:23
**injury** 9:22, 23, 24
50:4 51:10 92:25
115:1 158:11, 13
**inside** 118:4, 5
**inspirational** 59:1
**instance** 161:8
**instances** 136:9
**instruct** 82:5, 7
**instructed** 137:12
**instructor** 14:5
87:3 88:21
**insult** 57:16, 20, 22
58:18, 22 59:3, 4
**interacting** 142:7
144:24
**interactions** 105:16
**interest** 172:7, 10
**interested** 173:18
**Internal** 4:16
78:13, 23 110:16
111:25 121:16, 17
126:6 129:10
148:2
**interpret** 154:12, 13
**Interrogatories**
3:23
**intersection** 23:1, 9
27:22
**interview** 78:22
**interviewed** 78:15
**interviews** 78:4, 13, 19
**intoxicated** 58:13
59:8 61:7 124:14
**intoxication** 61:5, 11
**introduce** 6:13
**investigate** 20:25
21:24 130:15, 18
**investigated** 83:12, 16 89:3 105:2
**investigating**
122:14

**investigation** 20:11
45:3 78:14 83:19, 22 84:25 92:15, 17
105:15 108:25
111:18 112:7, 20
113:20 120:16
128:6, 7 130:6, 23
131:20 133:3
139:19 140:9
160:25 161:23, 24
162:4, 22 163:18
165:17 166:10, 14
**investigations** 105:8
**investigative** 84:2, 18 129:17 131:13
165:22 166:1
**investigator** 64:4, 14, 21 78:15, 19
79:3 85:18 86:7, 14 94:22 133:6, 7
**investigators** 133:9, 10 162:6
**involve** 136:8
**involved** 162:13
**involving** 15:14
129:17 132:18
162:22
**issue** 156:5
**issued** 65:21
**issues** 66:1, 12
97:19 151:19
**issuing** 113:25

**< J >**
**J.D** 4:14, 23
**JACQUITA** 2:10
7:2
**jail** 106:2, 22, 23
117:14, 20, 25
118:2, 4
**jails** 123:24
**japarks@atlantaga.
gov** 2:14
**jeans** 115:10
116:18
**Jennifer** 1:1
173:22

**job** 13:14 15:21, 23 89:17 154:22, 23
**JOHN** 1:1 147:20
**join** 51:15 71:2
**joking** 53:15
59:14, 16, 20, 22
60:2 62:9, 11
**Jr** 8:18
**judge** 106:25
107:3 139:16
166:16
**judging** 60:5
**judgment** 90:2
**July** 138:23
**jumbled** 13:6
**jumbling** 8:15
**jumped** 23:6
**June** 4:23 138:23
**jury** 10:9, 12
75:16 88:23, 25
**justified** 44:19
86:15 87:16
167:25 168:13
**justify** 167:13, 21
168:6

**< K >**
**KAHN** 2:3 3:4, 5
6:2, 18 7:9, 11
11:20 12:2, 16, 22
19:10 26:13 27:17
29:9, 12, 14, 16, 18
31:17, 22 32:1, 15
39:22 40:12, 20, 24
41:3, 7, 8, 18 42:5, 15 43:1, 8, 16
45:17 46:7, 17, 20
47:21, 24 48:6, 9, 20, 22 49:7, 12
50:1 51:17 52:3, 8, 12, 14 53:9 55:12
56:8 57:11 60:23
62:6 63:13 65:6
66:20 67:9, 17, 22
68:21 69:2, 23
70:4, 25 71:6, 13, 18 75:2, 4 76:1
77:3 81:8, 16, 20

82:6, 13, 20 88:9
89:11, 19 92:20
101:24 102:6, 13
112:11 113:8
114:11, 15, 18, 19
120:18, 21, 23
130:10 131:8
132:11, 13 133:1
134:3 135:17
136:24 137:6, 19, 22, 23 140:11
142:1 147:6 149:8
152:4 155:13
157:10, 13, 16
158:4 159:22
162:1 163:4 164:3, 14, 18, 21 165:8, 10, 12 166:5, 22
167:18 168:1, 14, 21 169:6 170:14
**Kane** 70:25
**keep** 28:24 61:1
80:16 114:10, 13, 17, 18
**kept** 27:21 61:6
65:14 106:12
124:3 158:23
**keys** 115:10
**kick** 35:16 107:25
108:1
**kicked** 110:20
**kicking** 107:22
**kicks** 36:25
**kids** 11:8
**kind** 23:24, 25
24:8 57:1 79:6
122:7 124:4 128:8
135:1 149:5
**knew** 27:15 94:9
114:7 117:2, 23
119:2, 3, 7 123:23
134:20 144:11
166:11, 13, 14
**knocked** 124:19
126:9
**knocking** 124:17
126:10
**know** 7:19, 20 8:3, 6, 11, 13 10:8, 11

11:2  12:8  13:3
14:8, 9, 16  15:7
16:8, 9, 12, 23
19:23  20:8, 9, 10
22:12, 18, 19, 20, 22,
24  23:18  24:5, 9,
16  26:19, 20  27:10
28:9, 10, 11, 12
29:22  30:4, 14, 15,
17  32:18  33:8
34:3, 23, 24  35:9,
19, 20  36:15  37:16
38:12, 13  39:3
40:8  42:7  43:11,
12  49:1, 2, 20, 23
50:3, 25  51:9, 11
52:20  54:23  55:21
56:1  58:16  59:11
60:5  64:3, 16, 23,
24  65:1, 4, 9, 10, 14,
15  66:6, 11, 12, 19
67:6, 10, 21  68:19
72:8, 17, 18, 24
74:11, 12  76:9, 16,
18, 25  77:1, 20
78:2  79:6  81:2, 6,
12  82:18  83:10, 21,
23  86:24  88:7
89:7, 16  91:3  92:2
93:16  94:5, 11, 13
95:3, 7, 18, 22
96:17, 25  98:7
99:10, 13  100:11
102:3  104:7
105:10  107:9, 14
108:5, 10  112:9, 10,
23  113:9  114:5
115:18, 23  116:17
119:3, 5, 8  120:13
121:3, 22  122:1, 7,
8  124:15, 20, 25
125:1, 25  126:3, 5,
24  130:3, 25  133:8,
14  134:14, 19
135:8, 13, 14, 19
136:2, 25  137:4, 15
138:1, 2  139:3, 17
140:5, 9  142:25
143:20  144:6, 7

145:14  146:12, 14
147:16, 20, 21
148:2, 4  149:2, 3,
19, 23  150:2
151:25  152:1, 2, 22,
25  153:5, 11, 15, 17,
24  154:1, 3, 5, 9, 21
155:19  158:11, 13,
24  159:12  163:6, 9
164:6  165:1  166:3,
24  167:15  168:11
169:4, 8, 9, 19, 23
170:18
knowing  63:24
74:20
knowledge  130:5
133:5  161:22
163:25
known  149:5

< L >
label  129:16
lady  125:16, 23
126:4
lag  8:3
lagging  148:11
landed  23:4  24:15,
17
landscaping  29:7
lane  22:7
Laney  11:9
Larry  10:22
late  115:9
laugh  55:2, 5
laughed  54:18
laughing  55:13, 15,
17, 25  56:2, 3, 9, 20,
23  59:14, 15, 20, 22
62:9  142:13
143:10
Law  2:4, 11  6:19
13:25  125:17
143:21, 23  172:4
lawful  55:18
lawsuit  7:18  15:25
lawsuits  136:16
lawyer  118:3
lawyers  16:4, 7, 11,

13, 19  153:14
lay  55:14
leading  162:1
163:4  164:3
leads  42:22
leaning  80:4  81:14
learn  77:15
learned  157:16
leave  28:5, 7  36:7,
9  56:5  116:11, 12,
22
leaves  131:21
leaving  116:1
ledge  28:16, 19, 21
29:3, 21  30:3, 10
31:14  32:10
left  22:3, 16, 24
23:2  33:19  43:10,
18  48:16, 17  56:5
61:24  110:21
leg  46:9, 13, 23, 25
47:5  61:6  63:20
143:19  158:23
legitimate  82:9
Lenox  2:5
letter  100:11
101:22  102:10
112:3  131:10, 14
163:17, 19
letting  57:21
58:16  117:15
143:20  144:6
levels  145:13
149:18
leverage  80:15
License  1:1
lie  82:2, 15  83:1,
10
lies  107:2  135:14
Lieutenant  4:6, 14,
16, 23  117:4
lieutenants  131:5
life  69:4  72:7
light  57:3, 6  60:16
116:8  125:3
lighten  62:14
lights  23:18  26:23
27:2  29:5, 7  116:8

line  31:16  74:4, 5
142:20  155:21
160:24
lined  73:10  74:9
lines  8:15
lingering  151:19
list  10:15, 18
listed  11:6  121:9
164:4
listen  55:18  88:23
listing  10:19
little  8:11  19:22
20:5, 16  27:2
52:11  53:13  57:13,
24  58:10, 16, 17, 21
60:24  61:1  68:4
78:25  79:6  83:6
85:22  100:7  102:4
123:25  124:18
125:12  144:2, 19
148:11  156:16
157:18  158:15
159:2
live  113:12
lived  115:5
load  63:15
located  1:1
location  20:24
21:23  22:19, 21
23:9, 10  33:6
136:2
locations  30:18
lock  117:13
locked  125:1
133:20  134:8
long  7:20  13:16,
19  15:11  104:17,
20  117:22  120:5
149:4  156:3
168:10
longer  16:24  38:9,
10  92:18
look  23:8  43:13
46:4  49:4  60:21
62:8  68:24  69:9
70:17  81:5, 17
98:9  116:11
123:10, 18  125:15

Griffin vs. City of Atlanta                    Donald Vickers

129:*1*  130:*8*
131:*21*
**looked**  48:*11, 15*
50:*14*  62:*25*  74:*19*
85:*9*  92:*14*  94:*25*
101:*17*  104:*24*
116:*17*  125:*23*
129:*7*  167:*24*
**looking**  30:*25*
32:*8*  33:*6*  90:*4*
92:*4*  98:*18*  127:*18*
131:*13*  147:*12*
152:*18*  159:*13*
164:*22*  165:*18*
**looks**  70:*25*  71:*1*
99:*24*  102:*21*
121:*18*  131:*10*
141:*9*
**loose**  24:*18*  95:*15*
**lose**  135:*10*
**loss**  133:*22*  134:*9*
**lost**  22:*25*  47:*21*
49:*6*  52:*12*  102:*5*
135:*10*
**lot**  8:*23*  9:*8*
32:*19*  52:*10*  53:*12*
57:*25*  58:*1*  60:*13*
77:*10*  93:*8*  100:*17*
106:*5*  122:*24, 25*
123:*1*  124:*2*
131:*13*  149:*20*
**loud**  23:*12*
**luckily**  114:*3*
**lunge**  34:*15*
**lying**  82:*11*  83:*3*
**LYNDALL**  2:*3*
6:*20*

**< M >**
**ma'am**  109:*18*
158:*20*  160:*7, 10,
16*  162:*2, 6*  163:*3*
164:*11*
**mad**  133:*18*  134:*6*
**Madam**  6:*10*
**maintaining**  80:*4,
12, 13*  172:*12*
**Major**  60:*9, 11, 17*
75:*10*  130:*12*

131:2, *12*  163:*7, 14,
15, 16, 17*  166:*4*
**making**  19:*4*  21:*2*
53:*22, 24*  54:*1*
57:*21*  59:*25*
115:*20*  124:*5*
172:*11*
**male**  28:*12*  122:*22*
**malfunction**  35:*10*
64:*25*  65:*2, 23, 24*
66:*7*  95:*8, 11*
**maltreatment**  85:*4*
**man**  56:*11*  58:*3*
101:*20*  102:*8*
105:*16*  123:*10*
135:*10*  142:*14*
143:*11, 12*  147:*20*
148:*1*
**manner**  140:*17*
**marching**  125:*2*
**MARIE**  2:*10*  6:*24*
**Marietta**  9:*2*
**Marine**  9:*16*
**Marines**  9:*18*
**mark**  164:*13, 15*
**marked**  5:*11, 14*
21:*6, 7, 25*  39:*20*
45:*9*  52:*5*  71:*16*
157:*3*  162:*11*
**markings**  27:*9*
**marks**  54:*5*
**married**  11:*3*
**martial**  12:*5, 9*
**matched**  98:*10*
**materially**  164:*24*
**Matt**  6:*18*  7:*11*
**matt@butlerfirm.co
m**  2:*6*
**matter**  27:*24*
88:*14*  160:*25*
161:*25*  162:*12*
172:*10, 17*
**matters**  137:*9*
**MATTHEW**  1:*1*
2:*3*
**mean**  14:*9*  15:*6*
16:*15*  19:*24*  20:*14*
24:*25*  29:*4*  30:*6*
37:*12*  38:*21*  42:*2,*

*4*  44:*14*  46:*15*
47:*1, 11*  53:*25*
57:*23, 25*  58:*25*
60:*6, 7*  67:*7*  69:*6*
71:*4*  72:*2*  76:*11*
77:*12*  79:*4, 5, 8*
83:*8*  86:*25*  92:*9*
95:*10, 14, 15, 19, 25*
97:*7*  98:*15*  102:*15*
105:*5*  112:*14*
122:*4*  132:*24*
133:*14*  134:*25*
142:*19*  146:*10*
147:*24*  148:*10*
149:*17, 19, 21*
151:*9*  153:*19*
154:*7, 13, 18*  164:*4*
166:*16*  168:*11*
169:*21, 22*  170:*3*
**meaning**  121:*20*
168:*4*
**means**  90:*5*  98:*19*
104:*16*  114:*5*
141:*15*  151:*10*
154:*14*  169:*24*
**meant**  13:*7*
**media**  153:*25*
**medical**  61:*15, 18*
91:*25*
**meet**  78:*3, 10*
107:*7*  113:*24*
**members**  10:*11, 13*
19:*16, 18*
**memo**  111:*25*
**Memorandum**  4:*5,
14, 23*
**memory**  81:*6*
83:*10*
**men**  114:*21*
**mentally**  152:*22*
**Mentioned**  19:*16*
54:*22*  93:*5*  96:*13*
**mess**  124:*21*
**message**  77:*22*
**messages**  77:*18, 25*
**messed**  65:*16*
142:*25*
**met**  16:*16*  97:*21*

112:*25*
**metal**  31:*10*
**middle**  67:*3, 12*
124:*24*  167:*17*
**midst**  158:*12*
**military**  8:*24*  9:*13*
11:*14*
**Mill**  22:*3, 14*
**MILLER**  2:*7*  3:*4*
6:*22*  11:*15, 18, 23,
25*  12:*11, 19, 21*
19:*6*  26:*10*  27:*12*
31:*16, 20*  32:*12*
40:*7, 18, 22*  41:*1, 6,
13, 24*  42:*11, 19*
43:*4*  46:*14, 19*
48:*5, 8*  49:*17*  51:*7,
24*  52:*19*  55:*7*
65:*3*  66:*9, 11*  67:*4,
13, 20*  68:*18*  69:*21*
71:*1, 10*  75:*20*
76:*24*  81:*1, 11*
82:*4, 10, 16*  88:*4, 7*
89:*5, 15*  92:*12*
101:*23*  102:*1, 3, 11*
112:*8*  113:*3, 5*
114:*13*  120:*20*
130:*2, 24*  132:*8, 22*
133:*25*  135:*12*
136:*20*  137:*2, 6, 14,
21*  140:*4*  141:*23*
147:*1*  149:*1*
151:*24*  155:*14, 17*
157:*12, 14, 21*
158:*2, 5, 8, 17*
160:*1*  162:*3*  163:*5*
164:*7, 14, 17, 19*
165:*3, 9, 11, 13, 14*
166:*7, 17*  167:*14,
22*  168:*8, 17*  169:*2*
170:*15, 21*
**mind**  10:*19*  21:*19*
45:*7*  62:*15*  85:*6*
**mine**  70:*15*  92:*19*
**minimum**  14:*14*
**minute**  21:*18*  71:*7*
126:*18*  133:*23*
134:*10*

**minutes** 24:*12*
*35*:*15* 36:*23*, *24*
*72*:*3*, *15*, *21* 75:*18*
107:*1* 157:*5*, *6*, *24*
**misconduct** 122:*15*
130:*15*, *19* 145:*19*,
*24* 146:*18*
**misheard** 145:*20*
**missed** 37:*14*
121:*20*
**missing** 96:*16*
**mistake** 60:*6*
143:*1* 161:*3*
**mixed** 12:*5*, *9*
48:*18*
**mock** 62:*17*
**mode** 35:*12*, *13*
36:*21*
**model** 26:*17*
**modify** 12:*6*
**moment** 31:*15*
59:*10* 61:*9* 69:*7*
**Monday** 37:*12*
**money** 123:*2*
**months** 76:*19*
**MORGAN** 2:*3*
6:*20*
**morgan@butlerfirm**
**.com** 2:*7*
**morning** 6:*24* 7:*2*,
*10* 20:*12*, *17*
170:*20*
**motherfucker**
109:*4*, *11*
**motivation** 61:*1*
**move** 24:*12*, *20*
29:*9*, *16* 46:*8*, *12*,
*23* 47:*5* 48:*20*
75:*2* 159:*1*
**movie** 60:*9*, *13*, *19*
62:*11*
**movies** 27:*3*
**multiple** 94:*1*

**< N >**
**NAIR** 2:*10* 6:*24*
31:*15* 52:*19* 86:*10*

**name** 7:*11* 8:*16*,
*18* 10:*20* 120:*14*
122:*3*, *8*
**named** 105:*16*
**names** 22:*18*, *20*
122:*3*
**narrative** 80:*2*
**natural** 79:*5*
**nature** 9:*23*
**NE** 2:*5*
**near** 155:*23*, *24*
**nearly** 138:*14*
**necessarily** 97:*8*
138:*24* 152:*17*
169:*21*
**necessary** 162:*8*
167:*2*, *12*, *20*
169:*17*, *18* 170:*2*, *4*
**neck** 116:*5* 118:*8*
**need** 8:*5*, *7* 10:*9*,
*10* 18:*4* 31:*15*
35:*5* 71:*7* 101:*10*,
*11* 114:*11* 118:*4*
143:*23* 145:*14*
150:*24* 159:*16*, *19*,
*23*
**needed** 94:*9*
124:*22*
**needs** 151:*23*
**negative** 147:*19*, *22*,
*23*
**negatively** 148:*23*
**neighborhood**
15:*18*
**never** 15:*7*, *8*
21:*19* 38:*5* 58:*3*
63:*8* 78:*10* 79:*12*
111:*1* 113:*11*, *13*
114:*24* 117:*8*
118:*2*, *4*, *5* 145:*6*
146:*11*, *22*, *23*
**new** 49:*18* 96:*7*
101:*3* 159:*12*
**news** 155:*3*
**nice** 55:*9* 142:*19*
151:*22*
**night** 21:*21* 26:*14*
36:*7* 37:*13* 76:*17*

117:*15* 126:*24*
165:*1*
**Nixon** 64:*14*, *21*
78:*15*, *19* 79:*3*
86:*1*, *7*, *14* 94:*22*
**Nixon's** 85:*18*
**nod** 116:*7*
**no-good** 110:*14*
**nonresponsive**
29:*14*, *17* 48:*21*
75:*3*
**normal** 23:*24*
112:*5* 129:*23*
135:*7*
**normally** 61:*8*
**NORTHERN** 1:*1*
**Noted** 41:*7* 132:*12*
139:*5*
**notes** 166:*18*
**Notice** 4:*10*, *17*
6:*3* 127:*20* 129:*8*
**noticed** 22:*7* 35:*2*
**noticing** 6:*17*
172:*16*
**notified** 90:*9*
**number** 31:*21*
99:*18* 105:*4*, *5*
**nurse** 124:*6*
**nurses** 124:*2*
**nurse's** 135:*6*

**< O >**
**O.C.G.A** 171:*1*
172:*6*, *7*, *18*
**OA** 98:*12*
**oath** 6:*15* 146:*21*
**obeying** 37:*6*
**Object** 164:*3*
166:*5*
**objected** 24:*4*
**objection** 6:*14*, *21*,
*23* 11:*15*, *25* 12:*11*,
*19* 19:*6* 26:*10*
27:*12* 32:*12* 40:*7*,
*18*, *21*, *25* 41:*2*, *5*,
*13*, *24* 42:*11*, *19*
43:*4* 46:*14* 49:*17*
51:*7*, *24* 55:*7* 65:*3*
66:*9* 67:*4*, *13*, *20*

68:*18* 75:*20* 76:*24*
81:*1*, *11* 82:*4*, *16*,
*17* 86:*11* 87:*24*
88:*4* 89:*5*, *15*
92:*12* 101:*23*
102:*5*, *11* 112:*8*
113:*3* 130:*2*, *24*
132:*8*, *11*, *22*
135:*12* 136:*20*
137:*15* 140:*4*
141:*23* 147:*1*
149:*1* 151:*24*
162:*1* 163:*4* 164:*3*
167:*14*, *22* 168:*8*,
*17* 169:*2*
**objections** 7:*1*, *3*
13:*7*
**objective** 168:*16*
169:*1*, *13*, *17*
170:*10*
**objects** 23:*19*
**obligation** 172:*12*
**observe** 28:*18* 29:*3*
37:*6* 40:*9*
**obstructing** 24:*5*
**obvious** 39:*4*
**obviously** 92:*15*
127:*12* 131:*16*
153:*13*
**OC** 106:*3*
**occasions** 76:*6*
**occurred** 66:*3*
**occurrence** 80:*9*
129:*23*
**October** 1:*1* 4:*12*
173:*19*
**offended** 149:*25*
**Offense** 4:*10* 13:*7*
103:*8*
**office** 6:*20* 83:*13*
131:*3* 137:*16*
**officer** 6:*15*, *25*
7:*1*, *10* 8:*19* 13:*15*
14:*19*, *23* 15:*1*, *2*,
*12* 19:*4* 24:*3*
27:*11* 29:*19*, *20*
32:*2* 47:*21* 50:*9*,
*11* 52:*9*, *16* 53:*11*
54:*3*, *8*, *11*, *15*, *17*,

*19*, *24*  56:*11*  59:*14*,
*20*  60:*4*  62:*9*  63:*2*,
*5*, *18*  71:*8*, *10*
72:*18*, *19*  74:*3*, *4*,
*13*  75:*19*  76:*3*, *7*
80:*18*  82:*19*  88:*15*
99:*9*  104:*16*  109:*4*,
*6*, *16*, *23*, *24*  110:*1*,
*19*  117:*23*, *24*
118:*9*  119:*1*, *23*
126:*14*  129:*18*, *24*
130:*22*  132:*14*
133:*18*  134:*5*, *6*
137:*8*  141:*5*
142:*14*, *25*  143:*11*,
*18*, *22*  145:*2*, *10*, *18*,
*23*  146:*6*, *7*, *8*, *12*,
*15*, *18*, *19*, *23*, *24*, *25*
147:*14*, *15*  148:*1*,
*24*, *25*  149:*6*  150:*8*,
*9*, *14*, *15*, *21*  151:*3*
158:*9*  160:*10*
161:*15*  162:*22*
165:*23*  169:*21*
170:*2*, *16*
**officers** 26:*8*  40:*2*
50:*23*  57:*15*  63:*22*
67:*2*, *11*  68:*1*, *9*, *16*
70:*13*  72:*23*  73:*9*,
*13*  85:*16*  125:*15*
131:*21*  134:*20*
137:*24*  146:*2*, *3*
149:*17*  150:*20*
151:*2*  154:*16*
167:*2*, *5*, *8*
**officer's** 37:*7*
62:*13*  103:*21*
145:*19*, *24*  167:*11*,
*19*  168:*3*, *5*, *24*
**official** 14:*22*
**officials** 89:*3*
**Off-the-record**
159:*24*
**Oh** 31:*3*, *17*  47:*22*
48:*6*  76:*11*, *14*
150:*13*
**old** 57:*1*, *2*  65:*10*,
*11*, *13*  124:*4*, *5*

139:*24*
**older** 35:*6*
**omit** 86:*11*  93:*24*
**on-and-off** 66:*17*
**Once** 12:*4*  19:*23*
22:*13*, *17*  23:*3*, *9*,
*21*  24:*10*, *19*  25:*2*
26:*24*  29:*11*  35:*2*,
*11*, *15*  36:*23*  37:*3*,
*7*  39:*7*  42:*13*
45:*22*  60:*15*  61:*24*
62:*23*  66:*10*  73:*24*
88:*17*  89:*7*  92:*17*
95:*13*  111:*2*
116:*10*  119:*16*
161:*9*, *11*  168:*22*
**ones** 129:*6*  136:*11*
**one's** 154:*5*
**one-way** 22:*15*, *16*,
*18*  27:*22*
**onset** 94:*18*
**open** 83:*20*, *22*
124:*25*
**operating** 19:*12*
64:*15*
**operational** 36:*8*
**operator** 65:*25*
**opine** 32:*16*
**opinion** 51:*21*
**opportunities**
151:*20*
**OPS** 3:*11*  5:*7*, *8*,
*10*  45:*3*  64:*4*  78:*4*,
*13*, *19*, *24*  83:*22*
93:*11*  95:*10*  96:*4*
105:*3*, *8*, *15*  107:*5*
112:*7*, *14*  113:*22*
129:*10*, *17*, *24*
130:*5*, *13*, *14*, *17*, *23*
131:*11*, *19*, *25*
133:*2*  160:*25*
162:*11*, *21*  163:*14*
165:*16*  166:*2*
**option** 157:*19*
**Oral** 98:*12*, *20*, *22*,
*23*  99:*4*, *8*, *16*
100:*7*  104:*9*
**ordeal** 119:*9*

**order** 28:*25*  55:*1*
68:*10*  170:*8*
**ordering** 172:*25*
**orders** 34:*1*  55:*19*
**ordinary** 153:*21*
**organization**
151:*18*  153:*16*
**organized** 12:*8*
**original** 114:*4*, *6*
124:*4*  173:*15*
**Osborne** 9:*2*
**ostracized** 146:*4*
**outcome** 74:*25*
173:*18*
**outfit** 135:*6*
**Outside** 12:*8*, *13*
14:*10*  33:*5*  107:*8*,
*9*  113:*12*  131:*19*
**outweighs** 106:*5*
**overturn** 133:*3*

**< P >**
**P.M** 52:*13*  71:*12*
120:*22*  170:*24*
**PA** 27:*7*
**PAGE** 3:*2*, *9*  4:*2*
5:*2*  74:*14*  84:*23*,
*24*  85:*25*  87:*8*
92:*22*  93:*22*  109:*1*
127:*18*, *19*  129:*1*,
*14*  133:*16*  139:*8*
162:*18*, *21*  165:*18*
**pages** 87:*12*
126:*23*  164:*15*
173:*5*
**paid** 118:*3*
**pain** 39:*5*  43:*20*
44:*15*  50:*15*  55:*14*,
*16*  56:*3*  60:*15*
61:*6*  62:*22*, *23*
63:*3*  144:*11*
**pair** 24:*7*, *8*
**pandemic** 6:*9*
**panel** 29:*7*
**papers** 84:*20*
**paragraph** 165:*20*
**paramedic** 61:*12*
**paramedics** 61:*20*

**paraphrasing** 138:*7*
**parenthetical** 93:*24*
**parking** 115:*6*
122:*24*, *25*
**PARKS** 2:*10*  7:*2*
52:*19*  71:*9*
**part** 36:*21*  59:*15*
67:*25*  80:*24*  81:*9*
92:*2*  106:*24*  122:*2*
130:*5*  150:*11*
**participated** 147:*14*
**particular** 148:*16*
161:*8*  162:*20*
163:*7*
**particularly** 57:*17*
**parties** 172:*19*, *25*
**parts** 90:*21*  91:*3*
**party** 7:*17*  15:*25*
150:*2*  172:*13*, *19*
173:*17*
**partying** 115:*19*
**passage** 119:*12*, *13*
**passenger** 22:*2*
23:*7*
**passing** 78:*8*
**Password-Protected**
172:*23*, *24*
**patience** 138:*15*
**patient** 133:*19*, *20*,
*21*  134:*7*, *8*, *9*
**Patrick** 14:*5*  87:*8*
**patrol** 21:*23*
106:*20*  108:*4*
**patrolling** 21:*1*
**Paul** 8:*18*
**pause** 8:*6*
**paused** 56:*6*
**paying** 115:*6*
**Payne** 60:*9*, *11*, *17*
**pending** 8:*8*  32:*6*
**people** 10:*7*  11:*5*
28:*13*  58:*1*, *12*
60:*14*  76:*16*  108:*1*
119:*15*  124:*11*
131:*3*  134:*19*
136:*14*, *15*  149:*15*,
*16*  153:*17*, *24*
154:*6*  159:*11*
**perceive** 108:*1*

Griffin vs. City of Atlanta                    Donald Vickers

**percent** 108:*19*
152:8, *19* 153:6
**perfect** 170:*1*
**Performance** 4:*3*
90:*15*, *23* 138:20
139:*5* 141:*16*
144:23
**performed** 90:*19*
**performing** 140:23
**period** 36:*17* 73:7
74:*1* 98:24 100:*14*,
*15* 111:20 138:22
**permitted** 6:7
**person** 34:*18*
58:20, *21, 22* 60:7
61:7 89:*3* 110:*14*
117:*13* 120:*15*
134:*15* 139:*21*
140:23 147:*20*
169:22 170:*3*
**personal** 170:*11*
**personally** 14:8
15:8 30:*12* 100:22
153:*12* 154:5
**pertinent** 92:23
**petty** 148:*4*
**phone** 16:*17*
115:8 116:*1, 2, 22,*
*23* 119:*21*
**photocopying**
173:*12, 14*
**phrase** 151:6, 8
**physical** 117:*12*
**physically** 15:*4, 7*
24:6 32:25 35:5
**pick** 10:9 59:*24*
95:22, *23* 115:7
116:*24* 128:8
**picking** 36:*3*
**pictures** 8:*1*
**piece** 110:6
**place** 68:*14* 94:2
118:*21* 149:*19*
153:*15* 172:*17*
**places** 8:*10*
**Plaintiff** 1:*1* 2:2
3:*10* 6:*19* 15:25
**Plaintiff's** 3:22
5:*11* 17:*17* 18:2

30:*21* 31:22 32:*3,*
*8* 39:*11, 20, 24*
40:*3* 43:*14* 45:9
46:5, *22* 47:*19*
48:*1, 11, 23* 49:*13*
52:5 53:*1, 6* 56:6
57:9 63:*1, 10, 22*
64:8, *13* 65:*18*
68:25 69:*10, 16*
70:24 71:*16, 19, 24*
73:*15, 18* 79:23
81:*18, 21* 84:*21, 24*
86:6 89:20 93:*11*
97:8, *23* 108:6, *21*
111:*3, 6, 12, 13, 24*
119:23 120:*1, 24*
122:9, *13* 126:*19*
127:*19* 135:23
138:*16, 19* 151:*13,*
*15* 164:24
**planned** 78:*10*
**play** 9:*3, 4, 5* 53:*3,*
*6* 56:*4* 75:*1, 25*
153:8 157:7
158:*15* 159:*4, 8*
**played** 9:5, *8* 58:*4*
**plays** 39:2*1* 43:*15*
45:*16* 46:6 47:20
49:5, *11* 52:7 53:8
56:7 57:*10* 60:22
62:5 63:*12* 69:*1*
70:*3* 71:*17* 81:*19*
157:9 158:*1, 7, 16*
**plead** 118:*1*
**please** 6:*10, 13, 16*
8:*16* 10:*17* 58:*19*
71:*11* 150:23, 25
**plenty** 144:*16*
**point** 23:6 24:4
28:*1* 33:*19* 35:*19*
36:23 37:*1, 8* 42:2
46:*1* 60:*13* 61:*3*
66:23, *25* 67:23
79:2 118:*14* 124:6
133:2
**Pointe** 2:5
**pointed** 118:*19*
124:22

**poke** 55:9
**poked** 125:22
**pole** 131:6
**Police** 4:8 13:*15*
15:*1, 12* 23:*13*
26:9, *15, 22* 27:*11*
28:8, *15* 40:*1, 2, 6*
50:23 57:*15* 59:*13*
62:*16* 67:2, *11, 19*
68:*1, 9, 15* 73:9, *20*
79:22 80:2, *24*
81:9 82:*3, 11, 15*
83:*1* 85:*16* 89:*14*
99:9 100:6 103:2*1*
104:*16* 106:*17*
109:*16* 118:9
119:*1, 6* 130:*15, 18*
131:*21* 145:2, *10,*
*18, 19, 23, 24* 146:2,
*3, 6, 7, 8, 11, 15, 17,*
*18, 19, 23, 24, 25*
147:*15* 148:22, *24*
150:8, 9, *14, 15*
151:7 152:*16*
154:*15* 167:*1, 5, 8*
168:24 169:*11*
**policy** 67:7 74:2*1*
75:*15* 90:*1* 97:*19*
118:*11* 124:*15*
**Pope** 172:9, *16*
**popped** 118:2*1*
**portion** 30:23
**position** 9:5 30:2
134:25
**positioned** 116:*4*
**positions** 131:25
**possibility** 30:8, *9*
**possible** 32:*14*
35:22 40:*10* 41:*19,*
*22* 43:2 62:*3*
66:*15* 74:*17* 94:8
143:*17* 155:20
167:*10*
**possibly** 37:*13, 14*
74:*16* 160:2*1*
**pounds** 106:6
**practice** 79:*10*
131:*18* 150:20

151:2
**practiced** 79:*12*
**predating** 14:*1*
**premarked** 46:5
47:*19* 57:9 69:*15*
**prepare** 16:6
**preparing** 16:*19*
**present** 2:23
**presented** 172:*1*
**press** 36:8
**pretty** 20:8 25:*4*
27:25 32:2*1* 33:*17*
56:*10* 75:9 76:*17*
98:*19* 106:*1*
107:23 121:*3*
142:*14* 143:*11*
149:5
**previously** 157:*3*
162:*13, 19* 165:*18*
**Price** 10:*24*
**prior** 5:*14*
**privilege** 16:*10*
**privileged** 82:8
137:20
**probably** 16:2*0*
41:*15* 42:*24* 72:9
74:6, *10, 21, 24*
76:*15, 18, 20* 83:6
99:*17* 121:*3*
170:*18*
**probation** 100:*14*
**problem** 45:*12*
64:5 94:23 126:2
134:22 151:23
152:*16* 153:8
**problematic** 152:*12*
**problems** 95:2, *5*
**Procedure** 6:7
171:*1*
**procedures** 19:*12*
**proceeding** 2:*24*
14:23 172:*1, 20, 24*
**proceedings**
172:*10* 173:6
**process** 123:5
128:23
**produced** 126:*24*
164:25 172:*20*
**profanity** 124:2

Griffin vs. City of Atlanta                    Donald Vickers

**Professional** 83:*13*
140:*17* 141:6, *20*
142:*17* 172:*12*
**Professionalism**
142:*3*
**prohibited** 172:*17*
**prohibitions** 172:7
**proof** 25:*19*, 22
26:*1, 7* 29:*23*
**properly** 65:*25*
**property** 115:*17*
**Proposed** 4:*10*
112:*15*
**pros** 104:*1*
**prosecute** 123:*12*,
*14, 19*
**proud** 155:5, 6
**prove** 25:9, *12*
96:*10*
**provide** 172:*16*
**provided** 165:*23*
**provoke** 13:5
**pull** 21:5, 6, 7, *10*,
*13, 16* 27:*18*, 20
30:20 64:7 85:22
96:*15* 121:6 122:9
126:7, *17* 156:*21*
162:*14*
**pulled** 117:*3*
118:*19* 124:*17*
**pulling** 114:*23*
**punished** 104:22
**punishment** 96:22
97:6, *10* 100:6, *17*
103:*15, 17* 104:*12*
118:*12*
**purposes** 6:7
**Pursuant** 2:22 6:*3*,
*6* 170:*25*
**push** 107:*18*
124:*23, 24*
**pushed** 24:6 37:*3*
45:*23* 106:*10*
115:*17* 124:*16*
127:*14* 142:*24*
**pushing** 56:*10*
115:*15* 142:*14*
143:*11* 161:*4*

**put** 24:7, *8, 21*
27:2 43:*9, 17*
54:*19* 63:*6, 7*
109:25 115:*10*
116:*4, 5* 117:*5, 10,
19* 118:*8* 119:*4*
125:*11* 140:25
149:6 150:*2*
151:*17* 161:*11*
164:*21*
**putting** 61:*6*
143:*18*

**< Q >**
**qualifications**
32:*16, 19*
**quarterbacking**
37:*13*
**question** 8:2, *4, 8,
9, 13* 9:*19, 21* 10:7
12:7 26:*14* 32:6, *9*
36:7 40:*21* 41:9
48:*10, 19, 21, 23*
49:*13* 51:*19* 53:*10,
11* 55:25 56:*18*
59:*17, 18, 19* 67:*11*
68:*8* 73:*24* 78:*17,
18* 82:*1, 10, 12, 13,
24, 25* 86:*10* 87:*13,
15* 88:*8, 11* 89:6
101:*16, 20* 131:*1*
132:*15, 16* 133:*15*
134:*4* 137:*5, 10, 22*
138:*3* 144:*17*
147:*11* 150:*24*
156:*17* 166:6
168:2, *23*
**questioning** 160:*24*
**questions** 7:*25*
46:*17* 52:*16* 79:7,
*11, 21* 127:9
151:*12* 155:*13, 15*
157:8 159:*3*
166:*19, 23* 172:*21*
**quick** 8:7 17:*15*
35:*3* 40:*10* 120:*19*
121:*3* 155:*20*
159:8, *18, 20*

**quicker** 38:2, *3, 4*
50:22 94:*10*
**quickly** 154:9
**quite** 56:*18* 107:5
155:*19*
**quote** 80:*3*

**< R >**
**radio** 22:*21* 23:9
33:7 93:6
**rain** 38:4
**raining** 23:*20*
94:*11*
**raised** 86:*11*
**rammed** 126:*10*
**ran** 23:7 34:4
115:*11* 123:*17*
127:*13*
**rapper** 124:5
**rarely** 77:*23*
**rat** 146:8, *10, 15*
147:*24*
**rater** 139:22
**rating** 139:*21*
**reached** 116:*1*
**reactivating** 71:*20*
**read** 64:*19* 66:4
86:*12* 104:*24*
109:9 162:*20*
163:2 165:*20*
**reading** 85:9
**Reads** 31:*19*
**ready** 16:*13* 19:*12*
**real** 17:*15* 115:5
149:25 159:7, *20*
**realize** 37:*19* 42:8
61:*23, 24* 76:*11*
117:*3*
**realized** 23:*3*
66:*23* 116:2
124:*20*
**really** 23:*13* 24:9
31:*13* 32:9 42:*1*
73:*13* 76:*14* 77:8
78:9 79:8 99:*4*
103:*18* 112:*10*
131:*1* 133:*4*
136:25 137:7, 9

139:2 149:*14*
153:*1, 19*
**reask** 8:*4* 32:7
137:*12*
**reason** 10:*8* 24:*23*
34:*23* 35:8 36:*12*
42:*17* 51:*13* 59:9
64:*15* 67:*15*
103:*16* 110:*14*
**reasonable** 167:5
168:*10, 11, 13, 16,
25* 169:22 170:*3, 9,
10*
**reasonableness**
169:*13*
**reasons** 160:*18*
**recall** 12:*13* 31:9
35:*1* 37:*21* 38:*18*
74:7 77:8, *13* 79:*4,
9, 14* 80:22 81:*23*
83:*4* 105:*15* 108:*2*
109:*13, 14* 110:*14*
111:*10* 112:*3*
114:9, *20* 120:6, *13*
122:20 127:*12*
136:*12* 145:9
153:*19*
**recalled** 81:7
83:*11*
**receive** 100:*21*, 22,
23 162:5
**received** 84:6 99:8
**receives** 172:*19*
**reckless** 117:*10, 12*
**reckoning** 98:*23*
100:*14*
**recognize** 122:7
**recollection** 72:*25*
73:*4*
**recommend** 129:*24*
**Recommended**
98:*11* 102:22
166:2
**recommending**
111:*13* 132:*5, 18*
**reconvene** 120:*19*
**record** 6:*14* 8:*14,
17* 31:*18, 19* 35:*14*
36:22 51:20 52:*13*

Case 1:20-cv-02514-VMC    Document 89-4    Filed 05/03/21    Page 196 of 204

Exhibit D
Griffin vs. City of Atlanta                 Donald Vickers                    10/21/2020

71:*9, 11, 12*  82:*23*
86:*12*  93:*24*
120:22  150:*9, 14*
155:*11*  164:22, *23*
172:*10, 11, 21*
173:*9*
**recorded**  96:*20*
**recording**  35:*1, 21*
94:*19*  96:*20*
**recruit**  13:*23*
149:*24*
**recruits**  62:*16*
**redo**  134:*4*
**reduce**  103:*3*
**reference**  60:*11*
**referred**  146:*8*
**referring**  59:*21*
136:*1*
**reflect**  164:*23*
**reflecting**  23:*19*
**refuse**  150:*20*
151:*2*
**regarding**  91:*13*
111:*7*  112:*2*
121:*19*
**regrets**  155:*7*
**regular**  141:*17*
**Regulations**  2:*22*
172:*5*
**rehearsed**  79:*12*
**relate**  91:*24*  127:*1*
**related**  129:*3*
**relating**  172:*24*
**relation**  139:*23*
**relationship**  10:*20*
172:*10*
**relative**  173:*16*
**relay**  92:*23*
**reliable**  103:*21, 24*
**remember**  15:*16*
18:*21*  19:*8*  24:*1*
26:*20*  34:*24, 25*
38:*11*  39:*7*  66:*22,
25*  99:*16*  105:*25*
106:*24*  110:*15, 17*
114:*23*  118:*11*
121:*4, 22*  123:*6, 20*
135:*5*  142:*12, 16*

143:*25*
**remembers**  83:*6*
**REMOTE**  2:*1*
10:*11*
**repeat**  68:*6*  102:*7*
103:*10*  147:*11*
150:*24*  156:*17*
167:*16*  168:*20*
**repeated**  109:*6*
**repeating**  147:*10*
168:*22*
**rephrase**  8:*4*
168:*20, 23*  169:*20*
**Report**  3:*11*  4:*10*
5:*7, 10*  28:*15*  66:*1*
79:*22*  80:*2, 24*
81:*3, 9*  82:*3, 11, 15*
83:*2*  90:*3, 6, 9, 12,
13*  98:*8*  125:*16, 25*
145:*10, 18, 23*
172:*11*
**reported**  14:*19*
147:*16*  152:*7*
**Reporter**  1:*1*  2:*23*
6:*10, 12*  7:*4*  31:*19*
172:*1, 3, 7, 8, 21, 22*
173:*22*
**Reporting**  2:*22*
89:22  146:*18, 25*
149:*16*  172:*6, 9, 16*
**reports**  146:*7*
152:*20*
**repository**  172:*24*
**represent**  7:*11*
173:*5*
**representations**
172:*4*
**representative**
165:*24*
**Represents**  140:*16*
**reprimand**  98:*23*
100:*3, 5, 10, 22*
101:*19*
**requesting**  112:*1*
**required**  90:*12*
91:*21*  167:*4*
**requirement**  14:*15*
**reserved**  171:*2*
**resist**  54:*24*

**resisting**  44:*25*
45:*1*
**respect**  141:*11*
**respond**  22:*11*
**responded**  47:*1*
52:*10*  53:*13*
**responds**  86:*7, 17*
87:*18, 19*
**Response**  3:*22*
53:*18*  165:*24*
**responses**  17:*12*
18:*7*
**restroom**  114:*11*
**result**  120:*2*
133:*21*  134:*9*
**retaining**  21:*14*
23:*4*  28:*25*
**return**  163:*19*
**review**  18:*6*  19:*11*
120:*15*  122:*14*
128:*12*  140:*1*
144:*23*  163:*22*
166:*18*  172:*1*
**reviewed**  16:*25*
17:*11*  18:*9, 11*
**reviewer**  128:*12*
**reviewing**  18:*3*
129:*16*  139:*21*
141:*6*  162:*23*
165:*21*
**revive**  135:*22*
**revived**  126:*13*
135:*21*
**ribs**  110:*22*
**Ricky**  105:*14, 16,
24*  106:*4*  107:*2, 8,
10*  108:*3, 10*  111:*1,
8*  112:*2*  120:*10*
136:*7*
**rid**  60:*15*  69:*7*
**rifle**  114:*21, 23*
116:*7, 9*  118:*15, 19*
119:*10*
**right**  7:*10*  12:*6*
16:*3*  17:*14, 17*
20:*12*  22:*6, 15*
23:*2*  25:*7, 20*  26:*9*
28:*16*  29:*9*  32:*2*
33:*3*  34:*7, 12, 16*

36:*19*  38:*7*  39:*9,
15, 19, 23*  41:*7, 23*
43:*3, 13*  44:*13, 25*
45:*5, 8*  46:*3*  47:*8,
16*  48:*2, 10, 12, 18*
51:*15*  52:*4*  53:*6,
10*  55:*22*  56:*4, 5*
57:*13, 24*  59:*12*
60:*25*  61:*22*  62:*4*
63:*9*  64:*17, 22*
65:*17*  68:22, *24*
69:*13, 15*  70:*21*
71:*25*  72:22  74:*15*
80:*1*  81:*10*  83:*12*
84:*15, 20, 22*  85:22
86:*3*  88:*3*  89:*20*
90:22, *25*  91:*5, 14*
92:*21, 22*  97:*23*
100:*25*  101:*25*
102:*10, 12, 14, 19*
104:*9, 13*  105:*5, 12*
107:*16*  108:*6, 20*
109:*2, 21*  110:*5, 21*
114:*15*  115:*23*
116:*15*  118:*13*
120:*3, 16, 18, 21*
122:*12*  125:*7*
127:*17*  128:*19*
129:*13*  130:*15*
131:*5*  134:*20*
135:*23*  137:*8*
138:*14, 25*  139:*8*
141:*7, 17*  144:*2, 19*
145:*6*  146:*21*
148:*12*  151:*11*
152:*5*  154:*17*
166:*23*  169:*1, 10,
25*  170:*4, 5, 14*
**rightee**  114:*18*
**rightfully**  118:*10*
**right-hand**  69:*9*
70:*17*
**rights**  150:*22*
151:*4*
**RMR**  1:*1*  173:*22*
**road**  23:*8*  33:*6*
**rod**  31:*10*
**Rogers**  10:*22, 23*
**role**  58:*4*

Griffin vs. City of Atlanta                 Donald Vickers

**room** 131:*21*
134:*18*
**round** 118:*15, 16,
18, 23*
**roundabout** 113:*17*
**routes** 22:*19*
**rude** 13:5
**rule** 89:22 91:*9,
20* 97:*10* 98:*4, 5*
99:*19, 20, 22*
101:*16* 102:*18*
103:*11* 104:2
129:*19* 162:*25*
170:*25*
**Rules** 2:22 6:6, *7*
7:*24* 75:*12, 13*
92:5 94:*3* 101:2
170:*25* 172:5
**ruling** 130:9
**rulings** 132:25
**rumors** 149:*19, 20*
153:*17, 22*
**run** 20:*25* 28:*10*
123:15
**running** 34:*25*
36:9 90:2
**Rushed** 115:9

**< S >**
**safe** 160:*19*
**Safety** 9:7
**satisfactory** 90:*24*
**save** 69:*4*
**saw** 23:*24* 25:6
29:*5, 6* 33:*24, 25*
34:*11* 48:*13* 53:3
62:22, *23* 87:*1, 16,
19* 88:*18* 113:*11*
118:*4, 5* 119:6
145:*3, 11* 160:6
166:9, *16*
**saying** 58:*11, 14*
59:8 60:*3, 17* 61:5
78:9 94:*15* 151:22
158:*23* 163:*20*
169:*19* 170:*1*
**says** 30:*25* 64:*15*
65:20 69:*11* 71:24
80:*3* 82:2, *14* 83:*1*

85:*3* 86:*4* 87:*11,
13* 89:21 90:*8, 14*
91:*7, 19* 92:23
93:*25* 94:*16* 98:*3,
4, 12* 99:20 100:*11*
104:2 108:*15*
109:*3, 22* 110:*5, 19*
111:*16* 126:2
129:*4, 16* 133:*17*
134:6 138:22
140:*15* 142:*3, 6*
144:23 151:*18*
152:5 162:*21*
165:*21*
**scale** 100:6
**scan** 31:2, 6
**scene** 38:22 39:*1*
68:*17* 119:*16*
123:8 124:6 126:*1*
158:*10*
**school** 9:*1, 2, 3*
11:*14*
**scream** 44:*15*
**screen** 17:*15, 18*
30:22 31:*23* 32:*3*
39:*12* 45:*10* 64:9
65:*17, 18* 69:7, 22
70:22 71:*15* 79:*24*
108:7, *21* 111:*4*
119:*24* 120:*25*
122:*10* 126:*20*
134:*1* 138:*17*
140:*13* 156:*23, 25*
157:*17* 160:*3*
162:*15, 16* 165:*15*
**screw** 96:*1, 14, 16*
147:*20*
**screws** 31:*10*
**scribble-scrabble**
101:6
**scroll** 17:*22, 23*
86:*3* 87:*12* 141:*15*
**seal** 173:*15*
**seat** 23:7 73:*20*
**sec** 85:6
**second** 17:*16* 35:7
49:*10, 15* 101:*19*
105:*23* 109:*1*
121:*15* 165:*20*

**seconds** 157:6, *24*
159:*19, 20* 166:*18*
**section** 140:*21, 25*
141:7, 22
**secure** 33:5
**security** 115:*15, 21*
116:*3, 13* 119:2
**see** 15:*24* 17:*17*
23:2, *14, 17, 21*
27:*3* 30:*21, 23, 24,
25* 31:*3, 5, 10* 32:2,
22* 33:*16, 20* 34:*14*
37:*1* 39:*11, 13, 16*
42:*23* 44:8 45:*10*
47:*23, 25* 48:*3, 7,
13, 14* 49:*8, 9, 10*
52:*25* 55:*10* 63:*18*
64:8, *11, 12, 13, 18*
65:*17, 20* 69:*10, 17,
18, 20, 24, 25* 70:22
71:*23* 73:*14, 18, 20,
21* 79:*23* 80:*2, 7,
20* 81:*21* 83:*4, 8*
85:*3, 24* 86:*4, 8, 21*
87:*7, 10, 11, 13, 20,
22, 23, 24* 88:*1*
89:*21, 24* 90:*16, 17,
21* 91:*10, 11, 22, 23*
92:*17, 22* 93:*2, 22,
25* 94:*16, 21* 95:*19,
20, 21* 98:*3, 4*
99:*19, 25* 100:*1*
101:*4, 5, 14* 102:*23,
24* 104:2 108:*6, 15,
17, 20* 109:*2, 3, 10,
21* 110:*2, 5, 8, 19,
23* 111:*3, 10* 116:*3,
6, 9, 17, 18* 118:*1*
119:*5, 18, 23*
120:*10, 24* 121:*7, 8,
13, 15, 17* 122:*10,
11, 12, 16* 123:*15*
126:*19* 129:*13, 14*
130:*11* 131:9
133:*17* 134:*2, 5, 11*
135:9 138:*9, 14, 16,
22* 140:*12, 15, 17,
21* 141:*12* 142:*2, 4,
5* 149:*9, 13* 151:*13,*

*18, 21* 152:5, *10*
156:5, 22, *24*
162:*16*
**seeing** 19:*8* 24:*1*
39:7 81:*23* 98:*17*
111:*11*
**seen** 15:2, *4* 17:*21,
25* 18:*16* 19:*3*
31:*4, 6, 9* 32:*19, 23*
35:20 45:22 57:*25*
58:*1* 60:*9, 17, 18*
63:2 85:5 90:2, *21*
97:*23, 25* 98:*17*
108:9, *12* 111:*6, 24*
113:*11* 129:*4*
132:*4, 18* 145:6
147:*14* 150:8, *14*
154:*3*
**send** 77:*18* 129:*10*
**Senior** 13:*15*
**senior-ranking** 89:2
**sense** 110:*4* 141:*10*
**sent** 131:*10*
152:*24* 163:*15, 17*
166:9
**separate** 18:22
35:23 97:*17*
**September** 4:*21*
**Sergeant** 139:22,
*23, 24* 140:*10, 24*
141:*10*
**sergeants** 131:5
**serious** 58:2 100:*7,
9* 103:*8, 14* 144:7
**seriously** 51:*5, 22*
55:6
**serve** 9:*15*
**served** 9:*13*
**serves** 130:*14, 18*
**service** 9:*17* 94:*18*
**services** 172:*16*
**session** 165:*24*
**set** 71:2
**seven** 152:*20*
**severe** 103:*15, 17*
123:6
**severely** 61:*24*
**shake** 109:*25*
**shaking** 126:*1*

Griffin vs. City of Atlanta          Donald Vickers

**share** 17:*15* 31:*23*
71:*14* 73:*14*, *15*
156:*22* 157:*14*, *17*,
*19*, *23* 162:*15*
164:*12* 165:*15*
**sharing** 157:*22*
160:*3*
**shattered** 115:*2*
**shelter** 107:*9*, *10*
**shift** 159:*11*
**shirt** 80:*5*
**shit** 110:*6*
**shooting** 15:*17*
**short** 117:*22*
**Shortly** 37:*18*, *19*
**shoulder** 24:*1*
124:*16* 149:*24*
**shove** 24:2 108:*3*
**shoved** 102:*16*
115:*16*
**shoves** 101:*20*
102:*8*
**shoving** 115:*15*
124:*18*
**show** 7:*25* 39:*9*,
*20* 45:*8* 46:*3*
47:*18* 52:*4* 57:*8*
63:*9* 68:*22* 69:*15*
70:*21*, *24* 71:*15*
81:*17* 84:*20* 86:*12*
96:*16* 119:*5*
162:*10*
**showed** 18:*12*
56:*21* 59:*22* 69:*18*
96:*18*
**showing** 19:*4*
29:*20* 43:*14* 54:*9*,
*11* 103:*24* 143:*19*
**shown** 30:*18*
**shows** 71:*20* 84:*25*
95:*13* 96:*18* 120:*1*
**shuffled** 8:*22*
**side** 21:*20* 42:*3*
73:*21* 78:*24*
110:*21*
**sight** 22:*25*
**sign** 23:*8*
**signature** 171:*2*
173:*15*

**signed** 4:*12*, *19*
84:*4* 96:*7*, *8*, *24*
**signs** 33:*6*
**silence** 151:*7*
**simply** 156:*11*
**Simsell** 160:*10*
**sir** 6:*12* 8:*21*, *25*
9:*11*, *12*, *17*, *21*, *22*
10:*5* 11:*3* 12:*3*, *20*,
*24*, *25* 13:*1* 14:*2*, *4*,
*7*, *9*, *18*, *21*, *25* 15:*4*
16:*2*, *25* 18:*1*, *5*
19:*13* 20:*19* 25:*10*,
*15* 26:*24* 27:*4*, *6*, *8*,
*14* 30:*4*, *11*, *14*, *24*
31:*3* 32:*4* 33:*4*
34:*5*, *9*, *10*, *20*
35:*25* 36:*10*, *16*
37:*18* 38:*15* 39:*12*,
*25* 40:*15* 41:*9*
43:*6*, *19*, *22*, *25*
44:*2*, *11*, *14*, *17*, *20*,
*23* 45:*1*, *10*, *11*
46:*11*, *21* 47:*3*, *6*,
*14* 48:*1*, *10*, *19*
49:*13* 50:*16* 51:*1*,
*4* 53:*10* 54:*14*
55:*24* 57:*19*, *22*
58:*6*, *15* 59:*17*
61:*12* 62:*7*, *18*, *20*
64:*3*, *6*, *18*, *20*, *23*
65:*5*, *8*, *10*, *18*, *19*
66:*4*, *5*, *6*, *12*, *19*, *25*
67:*1*, *7*, *16*, *25*
68:*20* 69:*12*, *14*, *17*
70:*1*, *10*, *11*, *23*
71:*15* 73:*6*, *11*, *21*,
*22* 74:*11* 75:*1*, *7*,
*15* 76:*5* 79:*12*, *17*,
*20*, *23* 80:*7*, *10*
81:*9* 83:*15*, *18*
84:*4*, *14* 85:*10*, *14*,
*17*, *21* 86:*2*, *9* 87:*6*,
*10* 89:*24* 90:*17*
91:*15*, *18* 93:*18*, *21*
94:*4*, *7*, *21*, *24* 96:*6*,
*13* 100:*4*, *9*, *13*, *24*
101:*1* 103:*4*, *19*, *22*
104:*3*, *20* 108:*22*

109:*10*, *18* 110:*2*, *4*,
*8*, *23* 111:*3*, *5*, *10*,
*16*, *19*, *23* 112:*10*
113:*7*, *14* 114:*20*
118:*16* 121:*1*, *11*,
*21* 122:*11*, *17*
127:*16* 128:*1*, *20*,
*22* 129:*5*, *20*
130:*20* 131:*23*
134:*13* 138:*15*, *21*
139:*1*, *7* 140:*14*, *19*,
*22* 141:*1*, *8*, *13*, *18*,
*25* 142:*4*, *8*, *11*, *16*
144:*3* 145:*7* 151:*5*,
*21* 153:*1* 155:*9*, *12*
167:*3*, *7*, *10*
**siren** 27:*5*
**sit** 44:*18* 56:*13*, *19*,
*24* 94:*14* 153:*5*
**sits** 100:*13*
**sitting** 73:*19* 153:*5*
**situation** 40:*4*
57:*3*, *7* 60:*1*, *16*
62:*15* 63:*24* 167:*9*
**sjmiller@atlantaga.**
**gov** 2:*13*
**skid** 54:*4*
**skip** 122:*1*, *2*
**sky** 118:*19*
**slowly** 17:*23*
**slur** 47:*5*, *10*, *14*
**slurring** 44:*9*, *12*
47:*7*, *12*, *15*
**Smith** 147:*20*
**snitch** 146:*9*, *11*
147:*24*
**so-and-so** 148:*1*
**sober** 125:*13*
**sobriety** 14:*17*
**social** 135:*1*
**socially** 77:*22*
**solar** 29:*7*
**solely** 172:*13*
**somebody** 21:*16*
117:*11* 118:*22*
147:*16* 149:*12*
154:*19*

**somebody's** 21:*15*
23:*4* 28:*4* 40:*9*
59:*8*
**someone's** 103:*25*
**soon** 35:*22* 51:*16*
52:*21* 62:*3* 94:*8*
143:*17*
**SOP** 100:*16*
**soreness** 110:*22*
**sorry** 10:*24* 12:*23*
18:*10*, *24* 31:*24*
34:*11* 42:*8* 53:*18*
56:*16* 58:*19* 67:*5*
73:*3* 78:*15* 85:*8*
88:*6* 95:*4* 99:*3*
102:*2* 103:*9*
121:*23* 125:*6*, *9*
127:*24* 130:*16*
133:*7* 134:*1* 136:*3*,
*21* 139:*11* 148:*10*
150:*23* 159:*10*
160:*2* 164:*14*
169:*7*
**sort** 7:*24* 20:*14*
40:*5* 53:*23* 100:*5*,
*6* 131:*21* 147:*9*
148:*21*, *24* 149:*14*
153:*22*
**sound** 35:*23* 36:*9*,
*18* 58:*3* 157:*10*, *12*
**sounded** 58:*10*
**sounding** 59:*12*
**sounds** 59:*25*
112:*4*
**span** 43:*6*
**speak** 8:*11* 19:*14*,
*18*, *21* 20:*7* 71:*8*
72:*11*, *16* 76:*3*, *6*,
*15* 109:*16* 126:*8*
152:*2* 153:*1*
**speaking** 16:*7*, *13*
72:*18* 96:*5* 136:*22*
**special** 9:*7*
**specifically** 19:*25*
78:*18* 172:*5*
**speculate** 76:*10*, *22*
77:*6*
**speculating** 77:*9*

135:16
**speculation**  79:6
**spelling**  133:22
**spend**  16:13
170:19
**spending**  117:15
**spent**  16:18
**spinning**  25:1
**SPO**  13:20  14:5, 8
65:21  66:1  82:19
87:2, 18  88:20, 24
92:23  94:1, 17
114:14  155:18
166:20  170:21
**spoke**  16:24  20:2
72:23  73:1, 5  76:9,
15  113:19  135:25
155:22
**spoken**  84:1  136:6
162:13
**sports**  9:3
**spots**  30:18
**spray**  106:3, 12
**sprayed**  106:8, 11
**STACI**  2:7  6:22
157:10
**stamp**  69:13  71:23
**stand**  48:2, 12, 15,
24  49:1, 3, 15, 20,
22  50:3  165:6
**standalone**  144:21
**standard**  19:11
168:16  169:1
170:11
**Standards**  83:13
141:16
**standing**  15:8
33:20  44:3, 5
45:21  46:1  48:16
50:6  61:22  74:2
75:19  80:14, 19
135:1  167:12, 20
168:6
**standstill**  38:14
**start**  7:13  13:23
45:19, 25  53:2, 5
71:2, 5  94:18
125:10  157:5

**started**  33:21
45:22  109:7
115:20  116:24
124:1  127:11
**starting**  165:20
**starts**  125:5
**state**  6:14  8:16
109:23  150:8, 14
172:8  173:2
**state-approved**
21:25
**statement**  2:23
109:6, 10  110:3
114:2, 3, 4, 5, 7
117:18  142:10, 22
143:12, 13  144:5,
13, 18, 20, 21
152:14  166:4
168:7
**statements**  108:24
128:10  143:2, 4, 9,
10  153:18
**STATES**  1:1
**static**  102:4
**station**  122:23, 24
**statistic**  152:11
153:3
**stayed**  33:2
106:11  115:24
**Steed**  4:16
**stood**  43:19
**stop**  21:4  23:13
31:15  40:13, 17
41:12, 23  109:24
157:22  158:2
160:3
**stopped**  32:7
**stops**  21:2
**store**  123:2, 3, 4, 10
**stories**  68:3, 10, 13
73:9  74:4, 8, 13
**story**  21:21  96:11
107:15  117:22
149:21, 25
**straight**  22:16
23:3  28:24  44:4
68:3, 10, 13  106:22,
23  107:3  124:9

**street**  22:15, 16, 18,
20  27:22
**streets**  159:14
**strike**  29:9, 16
48:20  75:2  78:16
136:5
**strong**  160:22
**stronger**  58:24
59:5
**struck**  29:8
**struggle**  106:19
107:23
**stuck**  96:11  110:18
**study**  152:2
**stuff**  23:19  58:4
59:9  92:16  94:12
115:19  117:2
124:7  126:23
149:5, 16  154:1
**subcontractor**
172:9, 14
**subjective**  167:12,
20  168:3, 5  169:12,
16
**submitted**  2:23
172:21, 22
**substance**  16:11
**substantive**  52:15
**success**  120:12
**sudden**  109:19
**sued**  26:8
**suffered**  65:23
**suggest**  153:7
**suggesting**  127:21
**Suite**  2:12
**summarizes**  64:14
**supernice**  142:24
**supervisor**  90:9
92:24  93:3, 13, 17,
20  104:19  125:25
139:24
**supervisors**  93:7
133:11  159:6, 12
**support**  166:15
**supported**  166:1
**supports**  92:10
**supposed**  22:15
35:14  67:8, 10

93:16  94:6  124:6,
25  130:7
**Sure**  6:18  10:10
16:25  38:15  41:22
45:24  49:23  50:5
68:5  70:16  72:14,
23  73:9  74:5, 9, 14
76:5  77:11  78:25
98:9, 19  99:12
102:7  116:14, 19
117:16  122:22
125:15, 22, 24
126:12  130:17
137:4  138:3, 4
139:20  141:4
142:21  143:7, 8
145:4, 15, 22  147:5,
7  148:1  150:4, 13,
16  151:1, 5  152:13
153:2, 20  156:17
160:18  165:8
167:19  168:19, 22
**surely**  145:9
**surgery**  31:7
**surprised**  77:15
**surveillance**  20:25
128:9
**suspect**  33:18
75:8, 9, 11  122:23
124:15
**suspended**  97:2, 4,
15  111:14, 17, 20,
23  120:2, 4, 5, 7
128:3, 4, 18
**suspension**  102:22
103:1  127:21
**sustain**  131:12
163:7
**sustained**  84:10, 13
85:12  89:22  90:5,
11, 14  91:8, 17, 20
92:25  103:6, 12
107:17  108:14, 16
112:2, 4, 18, 19
113:16  129:4, 11,
25  131:11  132:7,
19, 20, 21  161:2, 4,
7, 19, 20  163:1

Griffin vs. City of Atlanta                Donald Vickers

166:*1*
**sustaining** 129:*18*
**SW** 2:*11*
**swear** 6:*10*
**swerve** 22:*9*
**swift** 154:*9*
**swipe** 37:*7*
**swiped** 34:*3* 42:*3*
**swiping** 86:*19*
**switch** 65:*12, 13*
**switched** 66:*17*
95:*14, 16*
**sworn** 7:*6*
**system** 27:*7*
**systemic** 152:*16*

**< T >**
**T08:11:00** 69:*11*
**T08:11:16** 70:*18*
**T08:12:42** 71:*24*
**tackle** 37:*2, 4, 15*
42:*24, 25* 55:*23*
56:*2* 94:*19*
**tackled** 18:*17*
24:*6, 10* 34:*4, 21*
37:*17* 40:*17* 41:*12*
42:*10* 44:*7, 10, 16,
24* 61:*16, 17* 86:*18,
20* 138:*24*
**tackling** 9:*8* 40:*14*
44:*19* 54:*8* 92:*25*
153:*13*
**take** 8:*5, 7, 9* 38:*9,
10* 40:*10* 60:*8, 14,
21* 68:*24* 71:*7*
80:*15* 82:*16*
101:*10, 11* 106:*13*
108:*18* 117:*5, 14,
24* 120:*18* 123:*19,
24* 124:*8, 22*
143:*16* 153:*4*
159:*16, 18*
**taken** 6:*3, 4, 6, 8*
7:*14* 17:*10* 25:*5*
144:*8* 145:*15*
154:*9* 166:*25*
173:*6*
**talk** 20:*4* 60:*14*
68:*16* 72:*20* 74:*7*

78:*4, 10, 21* 79:*2*
105:*14* 128:*9*
**talked** 19:*22* 74:*7,
10, 11, 13* 78:*25*
79:*11* 117:*4*
136:*11*
**talking** 38:*21*
39:*14* 46:*10, 15*
54:*3* 56:*17* 57:*4, 7*
60:*12, 18, 20* 70:*7*
78:*12* 91:*4* 92:*3*
109:*5* 127:*2, 4, 11*
136:*24* 137:*2, 3*
149:*22* 158:*25*
161:*7*
**taller** 106:*5*
**tap** 35:*13*
**tapped** 35:*17*
116:*6* 119:*4*
**tase** 37:*14*
**taught** 169:*10, 11*
**teach** 40:*5* 62:*16*
**teams** 9:*7*
**technique** 154:*6, 20*
**tell** 7:*24* 11:*24*
12:*4, 15* 16:*15*
17:*8* 21:*20* 33:*23*
41:*23* 51:*12* 57:*23*
59:*5, 7* 62:*12, 13*
64:*4* 66:*13, 14*
71:*7* 81:*14* 83:*9*
93:*3, 16, 20* 101:*9*
104:*18* 109:*13*
113:*21* 121:*13*
122:*18* 137:*17*
148:*24* 149:*3*
150:*16* 156:*14, 18*
158:*18*
**telling** 24:*2* 56:*15,
17* 58:*20* 115:*25*
143:*15*
**tells** 95:*21* 143:*22*
**temper** 12:*18*
**ten** 31:*10*
**term** 146:*10*
147:*23*
**terms** 172:*14*
**terrible** 78:*16*
**test** 14:*17* 117:*16*

**testified** 7:*7* 14:*22*
80:*11* 147:*17*
**testifies** 146:*7*
**testify** 79:*15, 18*
88:*20* 145:*1* 146:*3*
**testimony** 62:*8*
66:*21* 85:*15, 19*
87:*2, 25* 88:*16*
93:*10* 103:*21, 25*
155:*21* 161:*1, 2*
**text** 77:*18, 22, 25*
86:*4* 92:*22* 93:*23,
25* 94:*16* 95:*10*
109:*3, 21* 122:*16*
129:*15* 133:*17*
**Thank** 7:*4* 9:*17*
10:*6* 13:*2, 11*
31:*20* 32:*5* 101:*7*
113:*15, 17* 118:*13*
120:*21* 125:*19*
137:*21* 170:*16, 21,
23*
**thanks** 155:*18*
**thefts** 20:*23*
**theirs** 70:*16*
**thereto** 173:*15*
**thing** 24:*25* 25:*25*
28:*20* 40:*5* 52:*24*
56:*20* 72:*6* 84:*6, 7*
99:*11* 118:*7* 124:*3*
149:*14, 18*
**things** 76:*20* 98:*2*
103:*5* 107:*20*
108:*25* 130:*19*
143:*21* 145:*14*
165:*5*
**think** 13:*21* 15:*17,
18, 19* 16:*24* 18:*8,
11, 22* 20:*2, 3*
24:*24, 25* 25:*10*
26:*19* 30:*12, 14*
31:*8, 13* 32:*9, 14*
33:*14, 15* 36:*3*
39:*23* 40:*1* 44:*18,
21* 47:*21* 51:*1, 2*
53:*3* 55:*9* 58:*4, 17*
63:*25* 73:*11, 14, 18*
74:*8* 75:*16, 23, 25*
77:*9, 17, 23* 78:*6*

79:*5, 8* 83:*9* 84:*10,
13* 85:*5* 86:*5, 15,
23* 87:*14, 19* 88:*16,
23* 89:*17* 90:*8*
92:*16* 93:*5, 10, 13*
97:*25* 98:*17*
103:*19, 23* 104:*1,
21* 106:*21, 22, 23*
107:*21* 109:*20*
110:*11* 120:*4, 6, 7*
126:*14* 129:*5, 9*
132:*8* 134:*17*
135:*9* 138:*11, 13*
142:*9, 20, 21* 143:*2,
4, 8, 12, 15, 19, 24*
144:*4, 10, 13, 16, 18,
19, 22* 145:*14, 20*
147:*25* 148:*7, 13,
15* 149:*4* 150:*17*
155:*24* 156:*9*
158:*12, 14, 22*
159:*14* 165:*3, 4*
170:*13*
**thinking** 51:*11*
89:*8* 117:*25* 129:*9*
135:*1*
**third** 35:*7*
**third-party** 120:*14*
**THOMAS** 2:*4*
**thought** 44:*25*
45:*3* 48:*16* 77:*9*
89:*4* 118:*22*
141:*19* 145:*11*
157:*21*
**threat** 37:*8* 40:*11*
41:*16, 17, 20* 42:*13,
18, 23, 24, 25* 43:*7*
87:*1* 88:*19* 89:*9*
92:*18* 154:*8*
161:*10, 12*
**threats** 115:*20*
**three** 10:*25* 18:*22*
60:*2* 101:*12*
102:*22* 103:*2*
105:*6* 115:*16, 19*
116:*4, 10* 120:*2, 4,
7* 136:*7, 8* 161:*18*
**throw** 106:*16*

Griffin vs. City of Atlanta                    Donald Vickers

**Thurmond** 127:*1*, *13* 135:*25* 136:*6* 162:*13*

**Thursday** 20:*3*

**ticket** 117:*19*, *22*, *25* 118:*3*

**time** 15:6, *11* 16:*12*, *15* 18:*19*, *22* 20:2 22:8, *24* 27:23, *25* 34:*14*, *19* 38:24 43:6 44:*10* 47:*16* 49:*15* 51:*19* 52:*17* 65:22 66:2 69:*13* 71:*4*, *23* 76:4 78:*3* 79:*15*, *18* 82:24 85:5 90:*1*, *20* 93:7 94:*5*, *7*, *14* 97:*12* 98:*17*, *18* 101:7, *8* 104:24 105:*24*, *25* 106:*10*, *12* 108:*13* 110:*13* 111:*21* 115:*3* 117:*1* 118:*10* 121:6 122:*23* 128:*4*, *6* 132:*4* 140:*1*, *10* 143:6 147:*5*, *25* 150:*17*, *23* 156:2, *7* 158:*9*, *24* 163:*21* 170:*17*, *20* 172:*19*

**times** 11:*21* 24:5 28:*14* 61:*16*, *17* 76:*9*, *10* 99:7 105:2, *4* 110:*20* 118:*17* 167:25

**tired** 107:2

**tires** 25:*1*

**title** 13:*14*

**today** 16:6 44:*18* 46:*15* 56:*13*, *19*, 25 62:8 80:9 153:6 155:*19*

**toddlers** 11:*12*

**told** 40:*16* 41:*11* 57:*12* 64:*14*, *21* 94:22 95:2, *5* 97:*18* 106:*1* 107:*12* 109:*4*, *23* 115:6, *22* 116:9, *10*

117:*21* 125:7, *10* 127:*13* 144:*1* 147:*17*, *21* 154:24 163:*24*

**tolerate** 53:*23*

**tolerated** 89:*13*

**Tom** 6:*20*

**tom@butlerfirm.com** 2:7

**tone** 23:*23*, *24*

**Tony** 147:*21*

**Toomer** 122:*4*, *6*

**T-o-o-m-e-r** 122:6

**top** 27:2 61:2 65:*12* 106:*16* 148:7, *12*, *15* 151:*18*

**tore** 122:*24*

**total** 152:8 173:*4*

**totem** 131:6

**touch** 19:*24* 54:*23*

**touched** 107:*24* 149:*24*

**tow** 24:*20*

**towed** 24:*14*

**traffic** 21:2, *4*

**trainers** 149:*22*

**training** 14:*3*, *12* 149:*23*

**transcript** 172:*20* 173:*4*, *6*, *8*, *13*

**Transcripts** 172:*20*, *23*

**transmission** 139:*9*

**transport** 38:*2*, *19* 62:2 63:*17* 99:22 101:*18*

**transportation** 156:*11*

**transported** 106:*21*

**trash** 122:*25* 123:*1*

**treated** 83:*14* 155:*8*

**treating** 89:*18*

**treatment** 50:22 125:*12*

**Treats** 141:*11*

**trial** 6:8 10:9

**tried** 23:8 49:*1*, *2* 66:23 106:*10* 109:*24* 117:*5*, *9* 119:*16* 135:*15*

**Trinity** 2:*11*

**trouble** 44:6 80:*12*, *13*

**true** 45:*18*, *19*, *24* 54:7, *10*, *14* 58:6 66:6 81:*10*, *13* 107:*14* 110:*3*, *24* 134:*12* 140:*23* 142:9 145:*25* 152:*12*, *13*, *15* 172:*20* 173:*5*, *8*

**trunk** 116:7

**trust** 82:*2*, *11*, *14*, *25*

**truth** 150:*3*

**try** 28:*10* 48:*15* 62:*21*, *24* 63:2 69:*24* 155:*19* 157:*14*, *22*, *23* 168:22

**trying** 13:5 20:22 21:9 22:*11*, *13*, *21* 23:2 27:*23* 28:5 33:5 49:*21* 50:4 51:9 57:*3*, *6*, *22* 58:7, *9* 59:*3*, *4*, *5*, *10*, *11*, *23*, *24* 60:*16* 61:*3*, *9*, *10*, *22* 62:*12* 63:*14* 106:7, *15* 156:*11* 158:*13* 159:*15*

**T-shirt** 116:*18*

**turn** 22:6, *25* 24:*17* 35:*11*, *18* 36:8 65:*14* 66:24 67:*3*, *11* 68:*16* 75:5 116:8 156:*1*, *7*

**turnabout** 115:*14*

**turnaround** 115:*14*

**turned** 22:*10* 35:6 36:*19* 62:*1* 72:2 73:8 74:2 96:*14*, *20* 119:*20* 155:*23*

**turning** 68:2, *9* 155:*22*

**twice** 35:*14* 36:22 109:6

**two** 13:22 16:*21*, *22* 18:*23*, *24*, *25* 19:2 24:7 26:7 30:*18* 35:*15* 36:*23*, *24* 72:*3*, *15*, *21* 75:*18* 78:*1* 87:*11* 89:2 101:*12* 103:*3* 115:*24* 126:*15* 128:*11* 160:*19*

**two-day** 127:*21*

**two-minute** 36:*17* 73:7 74:*1*

**TYLER** 1:*1* 6:*4* 7:*12* 91:*13* 120:*10* 122:*3*, *5*, *22* 136:6 154:*16*

**Tyler's** 78:*14*

**type** 65:*23*

**typically** 98:*20*

**< U >**

**Um-hum** 47:*13* 159:*5*

**unable** 28:*5*, *7*

**unarmed** 115:*15*, *21*

**unconscious** 126:*11* 135:*20*

**undercover** 25:*17* 26:*24*

**undergone** 14:*3*

**Underground** 114:22, *24* 115:*4*, *5*, *13* 119:*10* 120:*3*

**underneath** 99:*19* 113:6, *7* 131:*4* 142:*6*

**understand** 8:2 13:*10* 17:*3* 38:*15* 56:*23* 58:*13* 59:*18* 62:7 92:9 95:9 98:*15* 123:9 128:2 137:6, *7*, *11* 138:*3* 168:*19*

**understanding** 17:6, 9  55:10 98:22  100:2, 3 112:15  169:15

**understands** 137:9, 10, 13

**Unh-unh** 157:13

**unit** 19:23  20:21 21:5, 6, 7, 12, 15 22:11, 22  27:20 38:2, 22  95:17 97:17, 18  128:5 139:25

**UNITED** 1:1

**units** 21:10  27:22, 23, 25  28:2  33:8 38:1, 9, 11, 12 94:10

**unmarked** 21:3, 24 26:15

**unnecessary** 85:4 108:16

**unreasonable** 14:23

**unsatisfactorily** 90:19

**unsatisfactory** 90:15  91:3

**unstable** 133:8

**unstacked** 118:20

**unusual** 67:2, 11

**uploaded** 172:24

**upper** 63:20  69:9 70:17

**urgency** 141:10

**urging** 50:11

**urine** 117:16

**Use** 5:3  6:8  14:6, 20  15:2, 19  59:1 63:17  68:2, 10, 17 83:16, 25  84:2, 5 86:15  87:16  88:21 89:2, 12  90:6, 9 92:6, 11  98:8 105:9  106:3, 15 107:18  108:3, 16 111:14  118:18 119:12  120:12 136:8  147:23 151:16  154:16

**161**:1, 8, 13, 23, 24 164:10  167:2, 4, 5, 13, 21  168:6, 15, 25 169:11  170:8

**use-of-force** 14:3 87:3  152:7  153:7 161:16  164:1

**user** 35:10  64:24 95:8, 11, 12

**Usher** 105:14, 16, 18, 24  106:4, 13, 14 107:8, 10, 18  109:4, 7, 12, 22  110:11 111:8, 21  112:2 120:11  136:7

**Usher's** 111:18

**usually** 77:24

**< V >**

**vehicle** 21:4, 6, 24 22:11  23:7, 14, 16 24:13, 17, 21  25:13, 17  26:18, 22, 25 27:5  28:13, 22, 24 29:8  33:5, 15, 18 61:25  62:1  63:14 73:20  107:19

**vehicle's** 23:18

**verbal** 23:12, 23 103:25  104:4, 8

**verbally** 118:25

**verbatim** 172:11

**version** 105:20

**versus** 6:5  162:19

**vicinity** 70:13

**VICKERS** 1:1  3:3, 22  4:3, 8  6:3, 25 7:5, 10  8:18, 19 11:9  29:20  32:2 42:9, 16  47:21 52:16  65:21  66:1 82:19  86:6, 15 88:15  92:23  94:1, 17  109:4, 6, 23, 24 110:1, 19  114:14 119:23  126:14 129:18  132:14 134:5  137:8, 24 138:7  146:21

**155**:18  158:9 162:23  165:23 166:20  170:16, 21

**VIDEO** 1:1  3:13, 14, 15, 16, 17, 18, 19, 20, 21  5:6  18:21 29:20  34:5, 12, 13, 14  36:8, 9, 18  39:9, 13, 19, 21  43:13, 15 44:17  45:9, 13, 16 46:4, 6, 10, 15, 18, 24  47:3, 4, 18, 20 48:11  49:4, 5, 8, 11, 14  50:6, 14  51:3 52:5, 7, 11, 25  53:8 54:3  56:5, 7, 20 57:8, 10  59:21 60:21, 22  62:4, 5, 9, 25  63:10, 12  68:23 69:1, 4, 18  70:3, 18 71:15, 17  80:8 81:5, 17, 19  87:17 103:24  125:21 143:25  153:12 154:4  155:2, 5 156:24  157:6, 7, 9 158:1, 7, 16  159:1 160:2, 3, 5  172:9, 16

**videos** 8:1  18:22 74:19  90:24

**VIDEOTAPED** 1:1

**view** 33:11

**viewed** 148:23

**violated** 92:5 150:21  151:4

**violating** 89:22 91:20  92:6

**violation** 91:12 94:2  100:15, 16 105:24  128:3 132:9

**violations** 97:10 103:12  132:6, 18

**violence** 152:16

**vitals** 124:7

**volume** 36:3

**< W >**

**wagon** 63:16 101:21  102:9 160:6, 9, 11, 14, 19, 20, 23

**wagons** 63:17

**wait** 8:12  28:2, 8 38:18  94:14

**waited** 128:7

**waiting** 122:21

**walk** 19:5  48:2, 12, 24  49:2, 15, 22 50:4, 12, 18  51:6, 10, 22  52:2  62:21, 24  63:2, 8  116:16 119:9  160:21

**walked** 116:13, 20 119:13

**walking** 19:8  39:5, 8  61:21  116:24 124:14

**wall** 21:14  23:4 29:1

**want** 7:13  10:15 11:7  16:12  17:7, 8 32:18  36:22  37:13 39:9  53:3  68:22 72:13  75:6, 14 79:21  98:1  105:6, 19, 22  106:8 107:23, 25  108:25 116:11  119:19 121:2, 3  123:11, 18, 23  127:14, 17 129:21  140:25 143:6, 15, 16 144:12  145:15 147:5, 22, 23 155:21  156:15, 19 164:21, 23  169:20 170:16

**wanted** 21:5  63:7, 8  70:16  137:15 160:18, 20

**warming** 107:10

**warning** 109:22

**warrant** 123:18, 19, 20

**watch** 18:13  159:7

**watched** 18:*19*
49:*14* 50:6 51:*3*
52:11 80:8 90:24
144:*1*
**watching** 18:*21*
**wave** 41:*23*
**waved** 40:*16* 41:11
**way** 22:*14* 28:20,
*23* 29:*13, 15* 36:5,
*7* 40:2 55:4 56:*3*
63:21 64:*16* 79:*16,*
*19* 83:*13* 86:5
88:24 96:9 109:16
113:*17* 116:*3*
128:8 133:14
134:*24* 137:*12*
138:5 151:22
154:*12* 155:7
160:*21* 164:*11*
168:*12* 170:*1, 19*
**weaker** 58:*2*
**wear** 135:*8*
**wearing** 36:*6*
115:*11*
**Webb** 4:*14, 23*
**Wednesday** 170:*19*
**week** 19:*2* 20:*1*
97:*21, 22* 121:22
**weeks** 18:*23, 24, 25*
19:*2* 78:7
**weight** 43:*10, 18*
52:*10* 53:*12, 16, 21,*
*22, 25* 54:*1* 61:6
63:*6, 7* 143:*19*
**Well** 12:6 25:*21*
28:7 33:*25* 39:*15,*
*19* 41:*1* 42:*25*
50:5 51:*2* 54:*2*
61:*12* 62:*12, 25*
64:*4* 65:*1* 66:*16*
67:*18* 75:9 82:*13*
84:*9* 88:*15* 90:*11,*
*23* 95:24 96:*17, 22*
98:*20* 99:*7* 102:*14*
107:8 109:*15*
112:*25* 113:22
114:*16* 115:8, *24*
117:*15, 22* 118:*13*
123:*13, 15* 124:*16,*

*25* 126:5, *7* 132:*1*
134:*23* 135:9
136:5 137:*14*
139:*20* 145:*17*
146:2 149:5 150:7
152:5 163:*13, 15*
169:*10*
**well-being** 92:*19*
**Went** 9:*2* 22:*14,*
*17* 23:*2, 3, 10*
24:*20* 27:22 37:*15*
52:*21* 97:*7* 106:*18,*
*21, 23, 25* 110:*17*
113:*13* 116:*24*
126:*6* 133:*19*
134:7 148:*2*
163:*14*
**we're** 8:*10* 19:*24*
32:8 46:*4* 56:*4, 9*
60:*4* 68:24 84:*23*
90:*4* 92:*4, 21*
125:*1* 127:*18*
135:*20* 142:*13*
143:*10*
**we've** 73:*24* 78:9
90:*24* 114:9 132:*4,*
*17* 136:6 166:*24*
170:*17*
**what-all** 95:*22*
**white** 116:*18*
**wife** 11:*5, 8, 9*
19:*20* 115:*3*
**Williams** 109:*3, 5*
**Willie** 127:*1*
135:*25* 136:*6*
**willing** 82:2, *14*
83:*1*
**window** 116:*5, 6*
119:*17* 123:*4*
**Winkle** 10:*22*
**withdraw** 82:*17*
88:*10, 13*
**withdrawn** 173:*12*
**Witness** 1:*1* 6:*11,*
*16* 7:*15, 16* 11:*17*
15:*11* 32:*25* 40:22
48:*5, 7* 108:24
114:*17* 150:*1, 20*

151:*3* 170:*23*
171:*2*
**witnessed** 15:*7, 9*
147:*4, 16* 150:*18*
**witnesses** 126:*8*
128:*9* 172:*23*
**witnessing** 115:*14*
**Woke** 115:*9*
**womens** 124:*3*
**word** 25:*20, 21*
26:*4, 7* 29:*24*
**words** 44:*9, 13*
45:*2* 47:*5, 10* 59:*2*
109:*20* 110:*9*
148:*19*
**work** 14:*10* 15:22
20:*5, 18* 91:9 94:*3*
95:*17* 113:*12, 13*
115:*1, 7* 117:*24*
121:*20* 129:*19*
131:*3* 153:*11*
162:*24*
**worked** 113:*6*
115:*4*
**worker** 135:*2*
**working** 20:*22*
51:*14* 64:*22* 66:*13*
78:*24* 107:*9, 11, 13*
109:*19* 115:*4*
166:*12*
**work-related** 115:*2*
**works** 19:*23*
109:*20* 116:*16*
130:*21* 141:*10*
**Worksheet** 4:*8*
104:*11*
**worries** 125:*8, 19*
**worry** 117:*20*
**WR** 99:*24* 100:*2*
**wrecked** 21:*12*
**wrecking** 21:*10*
**write** 81:*3* 101:22
102:*9*
**writing** 92:*24*
100:*25* 101:*2, 3, 12*
**written** 2:*23*
90:*13* 100:*3, 5, 10,*
*20, 22* 101:*19*

**wrong** 16:*23*
22:*14* 31:*24* 39:24
48:*13* 51:*3* 55:*11,*
*13* 60:*25* 61:*4*
63:*21* 64:*1* 73:*17*
74:*18, 22* 86:5
117:*10* 145:*12*
148:*19* 149:*12*
154:*14* 160:*2*
163:*18*
**wrote** 117:*19*
131:*14*

< X >
**X-ray** 3:*24* 31:*2, 6*

< Y >
**y'all** 20:*4* 74:*14*
**Yeah** 10:*19* 11:*12*
43:*19* 74:*16* 77:*17*
82:*4* 83:*24* 85:*7*
97:*22* 98:*9, 19*
100:*1* 103:*11*
121:*17* 127:*4, 6*
128:*1* 132:*24, 25*
134:*11* 141:*4*
144:*3* 147:*24*
148:*5* 149:*10*
154:*1* 159:22
161:*3* 163:*13*
164:*4* 165:*10, 12*
167:*24, 25* 169:*4*
170:*7*
**year** 26:*20* 152:*8*
153:*6*
**years** 13:*17, 18, 19,*
*22* 107:*7* 145:*5*
146:*22* 152:*6, 20*
161:*15* 166:*12*
**yell** 159:*7*
**yesterday** 157:*17*
**you-all** 120:*21*
**young** 114:*21*

< Z >
**Zenelaj** 4:*6*
**zone** 22:*12* 93:*8*
113:*12* 115:*5*

Griffin vs. City of Atlanta                    Donald Vickers

**Zoom**  6:9, *16*  8:*15*
  13:*6*  64:*11*