IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TYLER GRIFFIN,

                                    CIVIL ACTION FILE
     Plaintiff,                     NO.: 1:20-cv-2514-TWT
v.
CITY OF ATLANTA, DONALD
VICKERS, MATTHEW ABAD,
and JOHN DOE #1-5,
     Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE DEPOSITION OF
SCOTT DEFOE

March 26, 2021
1:00 p.m.

(All attendees appeared remotely via
videoconferencing or teleconferencing.)


Lori Johnston, CCR
Certified Court Reporter #5682-4498-7599-2576



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 2

```
 1                    APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff:

 4

 5   MATTHEW KAHN, Esquire

 6        Butler Law Firm

 7        10 Lenox Pointe

 8        Atlanta, Georgia 30324

 9        (678) 498-5648

10        (678) 306-4646 (facsimile)

11        matt@butlerfirm.com

12

13   On behalf of the Defendants:

14

15   ALISHA MARIE S. NAIR, Esquire

16   STACI J. MILLER, Esquire

17   JACQUITA PARKS, Esquire

18        City of Atlanta Department of Law

19        55 Trinity Avenue, SW

20        Suite 5000

21        Atlanta, Georgia 30303

22        (404) 546-4185

23        (404) 588-3239 (facsimile)

24        amnair@atlantaga.gov

25
```

Case 1:20-cv-02514-VMC    Document 89-13    Filed 05/03/21    Page 3 of 185
Tyler Griffin vs City of Atlanta, et al.                                              Exhibit M
Scott DeFoe                                                                  March 26, 2021

```
 1                    INDEX TO EXAMINATION

 2

 3        Witness:  SCOTT DEFOE

 4

 5        Examination                               Page

 6        By Ms. Nair                                  5

 7

 8

 9

10

11

12                    INDEX TO EXHIBITS

13

14     Exhibit           Description              Page

15

16     City's 1          Amended Depo Notice         6

17     City's 2          Original Depo Notice        7

18     City's 3          Rule 26 Report             53

19     City's 4          Supplemental Rule 26 Report 54

20     City's 5          Abad Depo Transcript       63

21     City's 6          Body-Worn Camera Video    101

22

23     (Copies of City's Exhibits 1 through 6 have been attached to

24     the original transcript.)

25
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
Exhibit M
March 26, 2021

Page 4

```
1              Deposition of SCOTT DEFOE

2                   March 26, 2021

3                       *****

4         MS. NAIR: This is the deposition of Scott DeFoe taken

5      in the case of Tyler Griffin versus City of Atlanta,

6      Donald Vickers, Matthew Abad, and John Does 1 through 5,

7      civil action number 120-CV2514, on Friday, March 26, 2001

8      (sic) at one o'clock p.m. via the Zoom video conferencing

9      platform.

10        My name is Alisha Marie Nair and I, along with Staci

11     Miller and Jacquita Parks, represent Defendants City of

12     Atlanta, Donald Vickers and Matthew Abad in this lawsuit.

13     This deposition is being taken pursuant to notice and

14     agreement of counsel for any and all purposes allowed

15     under the Georgia Civil Procedure Act.

16        If you could please swear in the witness?

17        MR. KAHN: It's -- and just it's the Federal Rules of

18     Civil Procedure.

19        MS. NAIR: Federal Rules of Civil Procedure.  Thank

20     you.  It is.

21     (The witness is sworn in.)

22  Whereupon,

23                     SCOTT DEFOE,

24  having been first duly sworn, was examined and testified as

25  follows:
```



Page 5

```
 1                         EXAMINATION

 2   BY MS. NAIR:

 3        Q    Mr. DeFoe, I'm going to ask you a series of questions

 4   and I ask that you answer the questions to the best of your

 5   ability.  Please do not respond by nodding your head to answer

 6   the questions.  Allow me to complete my question before you

 7   answer.  And then please answer with a yes or a no or some

 8   other verbal response.  Is that okay?

 9        A    Yes, ma'am.

10        Q    If you are confused by any question that I ask,

11   please tell me and I can rephrase it or explain what I mean.

12   Is that okay?

13        A    It sure is, ma'am.  Thank you.

14        Q    And if you answer, I will assume that you understood

15   the question. Is that fair?

16        A    Yes, ma'am.

17             MS. NAIR: Counsel, can we agree to reserve all

18        objections until the use of transcript except as to the

19        form of the question or the responsiveness of the answer?

20             MR. KAHN: We'll be making objections pursuant to the

21        Federal Rules of Civil Procedure.

22             MS. NAIR: Okay.

23             MR. KAHN: And the same Rules of Evidence.

24             MS. NAIR: Okay.  So you don't agree?

25             MR. KAHN: Correct.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe                                                    March 26, 2021

Exhibit M

Page 6

1          MS. NAIR: Okay.

2    BY MS. NAIR:

3          Q    **Mr. DeFoe, please state your name for the record.**

4          A    It's Scott S-C-O-T-T, Allen A-L-L-E-N and DeFoe is

5    D-E- capital F-O-E.

6          Q    **Mr. DeFoe, I'm going to share my screen with you.**

7          (Whereupon, City Defendant's Exhibit No. 1 was introduced

8    and marked for identification.)

9          Q    **This is what has been marked or will be marked as the**

10   **City Defendant's Exhibit 1.  Have you had an opportunity to**

11   **review this document?**

12         A    Yes, ma'am.

13         Q    **And you're here today in response to the deposition**

14   **notice that I just showed you at Exhibit 1.  Is that correct?**

15         A    Yes, ma'am.

16         Q    **Do you understand that you're under oath today?**

17         A    I do, ma'am.

18         Q    **Are you under the influence of any substance that**

19   **would prevent you from testifying truthfully today?**

20         A    No, ma'am.

21         Q    **And you are here today as an expert witness on behalf**

22   **of the plaintiff, Tyler Griffin.  Is that correct?**

23         A    Yes, ma'am.

24         Q    **All right.  I'm going to share my screen with you**

25   **again.**

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 7

```
 1          (Whereupon, City Defendant's Exhibit No. 2 was introduced

 2     and marked for identification.)

 3          Q     Are you able to see my screen?

 4          A     Yes, ma'am.

 5          Q     I'm showing you now what's been marked as the City

 6     Defendant's Exhibit 2.  Do you recognize this document?

 7          A     I don't know if I received that deposition notice.

 8     Yes, actually I did.  I do recognize it now.

 9          Q     This is the original deposition notice that was for

10     this -- for your deposition.  Is that correct?

11          A     Yes, ma'am.

12          Q     And it was originally scheduled on Tuesday, March 23,

13     2021 at twelve o'clock p.m.?

14          A     Yes, ma'am.

15          Q     You've participated in a deposition before.  Is that

16     correct

17          A     Yes, ma'am.

18          Q     You've participated via the Zoom platform?

19          A     Yes, ma'am.

20          Q     Who retained you first for this case?

21          A     I believe it was Mr. KAHN called me directly and we

22     had a -- and then we had a subsequent phone call with Mr.

23     Butler, a Zoom phone call, where we discussed the case.

24          Q     When were you retained?

25          A     On November 9, 2020.
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 8

1    Q    I want to move and turn your attention to your

2    education.  You graduated from college?

3    A    Three colleges, ma'am, yes.

4    Q    Your CV that you produced says that you have a

5    bachelor's degree.  Is that correct?

6    A    Yes, ma'am.

7    Q    And that bachelor's degree is in what?

8    A    In Criminal Justice.

9    Q    And that's from a university in Boston?

10   A    Yes, ma'am.  Northeastern University.

11   Q    And then you have two master's degrees.  Is that

12   correct?

13   A    Yes, ma'am.

14   Q    Your first master's degree, what is that in?

15   A    In Public Administration.

16   Q    And your second master's degree?

17   A    A Master of Legal Studies with a concentration in

18   alternative dispute resolution.

19   Q    And that is from a school in California.  Is that

20   correct?

21   A    Yes, ma'am.

22   Q    Is that Pepperdine?

23   A    It is, ma'am.

24   Q    And when did you finish your master's degree in law

25   from Pepperdine?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 9

| 1 | A | 2020. |
|---|---|---|
| **2** | **Q** | **Congratulations.** |
| 3 | A | Thank you, ma'am. |
| **4** | **Q** | **Where are you currently employed?** |
| 5 | A | I have my own company, ma'am. |
| **6** | **Q** | **And what is that name of your company?** |
| 7 | A | On-Scene Consulting Group. |
| **8** | **Q** | **How long have you had On-Scene Consulting Group?** |
| 9 | A | I opened the company up in 2012. |

**10    Q    You say you opened the company in 2012.  Can you tell**
**11  me what that means?**

12       A    Yes, I opened up the LLC with another -- I had a
13   partner initially in 2012 and then he left the company in 2015,
14   I believe.  And then from 2015 to present, I have been the sole
15   owner of the company.

**16       Q    Has the purpose of On-Scene Consulting remained the**
**17  same since 2012?**

18       A    No, we were doing a little bit different things,
19   myself and my former partner.  We were doing technical advising
20   for TV and film.  We were doing risk and vulnerability
21   assessments for security related matters.  It wasn't until
22   2014, 2015 is when I solely took the company over to
23   concentrate on functioning as an expert witness and a private
24   investigator.

**25       Q    Where is this On-Scene Consulting Group located?**

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 10

```
 1        A    At my home.  And that's in Huntington Beach,

 2   California.

 3        Q    For On-Scene Consulting you have a retainer that you

 4   establish for your consulting purposes.  Is that correct?

 5        A    Yes, ma'am.

 6        Q    Your fees are $4000 for the retainer?

 7        A    That's correct.

 8        Q    And it consists of $375 per hour to review the case

 9   and to consult with the attorneys?

10        A    And write any report that may be necessary in the

11   matter.

12        Q    So that's in addition to reviewing the case and

13   consulting?

14        A    Yes.  If it's a -- if a report is required, if it's a

15   federal matter -- if it's a state action sometimes reports are

16   not required.  But it may require a report.  And other things

17   as well; site visits, being such as that.

18        Q    So all of the things you just mentioned can be

19   included for the $475 per hour?

20        A    At 375 per hour.

21        Q    Oh.  Excuse me.  375 per hour.

22        A    That's correct.

23        Q    And then for $475 an hour, that's for testimony.  Is

24   that correct?

25        A    That's for depositions and trial, yes.
```

Elizabeth Gallo
COURT REPORTING, LLC

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

1    Q    But it's for your testimony specifically in
2    depositions or trial?

3         MR. KAHN: Objection.  Asked and answered.

4    A    It's for the time that I spend in depositions or
5    trial testifying.

6    BY MS. NAIR:

7    Q    So I'll ask you again.  Is the -- the $475 an hour
8    for time spent in depositions and/or trial and for your
9    testimony?

10        MR. KAHN: Objection.  Asked and answered.  And
11        argumentative.

12    A    Is not being -- the question is unique.  It's -- it's
13    not I'm not getting paid to testify.  I'm getting paid for my
14    time to testify.

15    BY MS. NAIR:

16    Q    So in your own words can you tell me what you are
17    receiving $475 an hour for?

18        MR. KAHN: Objection.  Asked and answered.
19        Argumentative.

20    A    For my time associated with a deposition such as
21    this, for the time associated with going, attending and/or
22    testifying at trial on the date of trial.

23    BY MS. NAIR:

24    Q    How many hours have you spent in total for this case?
25    For review and consultation?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 12

1       A    I -- my first invoice included 42.5 hours.  And since

2   that time, I've expended approximately 11 hours.  That includes

3   reviewing additional material and deposition preparation.

4       Q    How many hours did you spend on deposition

5   preparation?

6       A    Approximately five hours.

7       Q    Was that alone or with attorneys?

8       A    I spent approximately -- I think about 60 minutes,

9   one hour, last night speaking to Mr. Kahn.  I spoke to him for

10  approximately five minutes this morning.  Other than that, it

11  was spent reviewing the material from the case file.

12      Q    Where did you work before beginning your consulting

13  group?

14      A    In law enforcement, ma'am.

15      Q    Where did you work before beginning your -- your

16  consulting group?

17      A    Well, I've had a lot of jobs, ma'am, going back to

18  when I was 15 years old.  But formal -- formal employment after

19  graduating from college, I initially started -- I was hired by

20  United States Customs Service.  I was a special agent assigned

21  to the Organized Crime Drug Task Force in San Francisco,

22  California.  I did that for approximately a little under two

23  years.  I joined the Los Angeles Police Department in November

24  of 1989.  Worked there full-time through 2010.  I stayed a

25  Level I reserve from 2010 to March of 2016.  After I graduated

Tyler Griffin vs City of Atlanta, et al.                                          Exhibit M
Scott DeFoe                                                                  March 26, 2021

Page 13

1  full-time in 2010, I worked in corporate security for a period

2  of approximately three years.  Went back into law enforcement

3  in 2013 to 2014.  Worked at the Riverside County Sheriff's

4  Department for one year.  From 2014 to 2017, went back into

5  corporate security while I was working part-time as an expert.

6  And then from 2017 -- from September 2017 to present, I've been

7  a full-time expert and consultant.

8       **Q    I want to talk about how long you have in total**

9  **worked in patrol.  Do you know?**

10           MR. KAHN: Objection.  Vague.

11           MS. NAIR: I can restate --

12      A    Total time as an  --

13           MS. NAIR: -- I can restate the question.

14  BY MS. NAIR:

15      **Q    How long have you served as a patrol officer in your**

16  **career?**

17      A    I've never tabulated a total time.  I've worked there

18  as an officer, I worked there as a sergeant.  So in LAPD, even

19  though you may be working a gang unit, you'll still work

20  patrol.  Working in S.W.A.T a couple of days a month, we work

21  in a patrol function.  So overall, if I would estimate

22  cumulatively, total time strictly patrol probably maybe six

23  years.  And then I went into specialized assignments.

24      **Q    I want to talk about these specialized assignments.**

25  **Your Operations-Central Bureau CRASH, that was a gang unit?  Is**

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                          March 26, 2021

Page 14

1   that correct?

2        A    Yes, ma'am.

3        Q    How long did you spend with that unit?

4        A    The Operations Central Bureau CRASH, let me go to my

5   CV right quick.  In that time period, probably about two-and-

6   half-years I worked that assignment.

7        Q    And that was your main assignment?

8        A    Well, for the two-and-a-half years, yes.  I was

9   working Operations Central Bureau CRASH as a main assignment

10  for about two-and-a-half years of the – of that time on my CV

11  for that six-year period.

12       Q    I want to turn your attention to when you were a

13  Police Officer III in the Wilshire area vice.  How long were

14  you there?

15       A    I was in vice approximately a year.  I got injured

16  and then I went back for a couple of months and then I went to

17  patrol after that.

18       Q    You were undercover?

19       A    Yes, ma'am.

20       Q    It was in controlled environments?

21            MR. KAHN: Objection.  Vague.

22       A    A controlled environment?  I don't understand.

23  BY MS. NAIR:

24       Q    I'll restate the question.  Your assignment was

25  dealing with controlled groups.  Is that correct?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

1          MR. KAHN: Objection.  Vague.

2     A     No, ma'am.  A vice in -- at least in LAPD is

3   prostitution, gambling and bookmaking.  So it's an undercover

4   assignment where you work for crimes involving -- investigating

5   prostitution, gambling and bookmaking.  Probably 90 percent of

6   the work is dealing with prostitution.

7   BY MS. NAIR:

8     **Q     When I say controlled, then, when you're dealing with**

9   **prostitution, you identify who the prostitutes are?**

10    A     Sometimes.  Sometimes it's random because you're

11  operating in an undercover capacity and so you may, you know,

12  pick a prostitute up.  Obviously, believing that it's a

13  prostitute.  And then you work in an undercover capacity to see

14  if you can ascertain the violation of prostitution.  Sometimes

15  you identify who they are based on prior interactions or

16  because they may be part of an injunction involving

17  prostitution, especially in the Hollywood area of California.

18    **Q     When you say you pick them up, are you picking them**

19  **up in a car?**

20    A     Typically, yes.  That's typically -- it's a -- you're

21  working in an undercover capacity and, obviously, to pick them

22  up in a car.  There's been times on foot but typically, it's in

23  a car.

24    **Q     How many times would you say you have done it on**

25  **foot?**

Tyler Griffin vs City of Atlanta, et al.                                                          Exhibit M
Scott DeFoe                                                                                March 26, 2021

Page 16

```
 1              MR. KAHN: Objection.  Vague.

 2       A    Probably a dozen times maybe.  Not that often.  It

 3  just depends.  Sometimes you can't get areas where you can get

 4  a car in.  There are areas that prostitutes -- where you

 5  basically have to go on foot.  And that's in the Hollywood and

 6  West Hollywood area.

 7  BY MS. NAIR:

 8       Q    Percentage-wise, how many times did you pick up

 9  prostitutes in a car?

10       A    Ninety --

11              MR. KAHN: Objection.  Vague.  And misleading.

12       A    Probably 99 percent of the time.  You're typically

13  working in a vehicle.

14  BY MS. NAIR:

15       Q    In a vehicle to pick up prostitutes?

16       A    Yes, ma'am.

17              MR. KAHN: Object to the form of that question.

18  BY MS. NAIR:

19       Q    While you were working as a police officer in the

20  Wilshire-Vine area vice, you were ambushed?

21       A    Yes, ma'am.

22       Q    You received a Purple Heart for that incident.  Is

23  that correct?

24       A    For the injuries associated with the incident, ma'am.

25       Q    The injuries that you're speaking of is that you
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 17

1    received two gunshot wounds?

2        A    Yes, ma'am.

3        Q    And that was after you were ambushed?

4        A    Yes.  I mean, I was ambushed and then the ambush

5    resulted in me being wounded two times.

6        Q    I want to turn your attention to when you were

7    working for the Federal Law Enforcement Organized Joint Task

8    Force.  You were an agent and an undercover operative.  Is that

9    correct?

10       A    Yes, ma'am.

11       Q    While you were an agent, did you routinely research

12   your target prior to attempting to make an arrest?

13            MR. KAHN: Objection.  Vague.

14       A    Yes, ma'am.

15   BY MS. NAIR:

16       Q    As a part of your research of your target, did you

17   conduct surveillance?

18       A    Yes, ma'am.

19       Q    As a part of your research, did you identify the true

20   identity, to the best of your ability, of your target?

21       A    Yes, ma'am.

22       Q    When you sought to effectuate an arrest upon a

23   target, did you establish parameters and borders and safety

24   measures to safely effectuate an arrest?

25       A    We attempted to.  Sometimes you can't because the

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

1  target may be moving, but traditionally, if the target is

2  stationary or locked down, yes, you utilize tactics to try to

3  contain that specific target prior to arresting them.

4      **Q    That information or those tactics were taught to you**

5  **during your training.  Is that correct?**

6      A    Yes, ma'am.

7      **Q    Have you ever --**

8      A    As well as what's -- I'm sorry.  As well as

9  on-the-job training as well, not specifically during

10  standardized training.  I'm sorry to cut you off.

11      **Q    Were you ever a supervisor while working with the**

12  **Federal Law Enforcement Drug Task Force?**

13      A    No, ma'am.  I was entry-level.  I was a new agent

14  during that time.

15      **Q    You relied on the instruction of your superiors,**

16  **during that time.  Is that correct?**

17      A    At times, yes.

18      **Q    When you say, "at times," when did you not rely on**

19  **the instruction of your supervisors while working for the**

20  **Federal Law Enforcement Organized Joint Task Force?**

21          MR. KAHN: Objection.  Vague.

22      A    Well, I initiated an investigation that had never

23  been done before with the Federal government.  And that was

24  something that was kind of groundbreaking investigation that I

25  spearheaded that no supervisors had done before.  So in

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                        March 26, 2021

Page 19

1    that -- that particular investigation, I -- I took that upon

2    myself.  But the other ones were multiagency team effort as we

3    approached, you know, people that were drug smuggling and money

4    laundering.

5    BY MS. NAIR:

6        **Q    So outside of that isolated incident, you can't**

7    **recall any other time when you did not rely on the direction of**

8    **your superiors?**

9            MR. KAHN: Objection.  Misstates his testimony.

10    Vague.

11        A    No, counselor.  There's a lot of different things you

12    do without asking your supervisor.  I mean, surveillance,

13    typing reports, effecting arrest.  You know, you're -- they're

14    overseeing.  A supervisor is overseeing the operation but the

15    expectation is that -- that you're going to know how to do your

16    job without constant oversight.  So you would rely on

17    supervisors for oversight direction if necessary but you also

18    have the autonomy to do your job as you're required to do, as

19    the reason why you were hired.

20    BY MS. NAIR:

21        **Q    After you completed your work, your work would always**

22    **be reviewed by a superior.  Is that correct?**

23        A    If it was written work that required to write a

24    report, sure.  There was always a review process above my rank

25    with the government.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 20

1    Q    And if you failed to comply with any of the

2    procedures, then you could potentially stand to be reprimanded

3    for your actions.  Is that correct?

4    A    Sure.  I was never reprimanded but yes.  I mean, if

5    the -- if you did not meet the expectations of what your job

6    assignment was, yes.  There could be discipline, including

7    being reprimanded.

8    Q    Have you ever served in law enforcement outside of

9    California?

10   A    I've worked outside of California law enforcement but

11   cases that emanated in California.  So -- but not work for

12   another law enforcement agency outside of California.

13   Q    You would agree that demographics of people can vary

14   from state to state?

15   A    Yes, ma'am.

16   Q    You would also agree that demographics of crime can

17   vary from state to state?

18   A    Yes, ma'am.

19   Q    You would agree that laws can vary from state to

20   state?

21        MR. KAHN: Objection.

22   A    Yes, ma'am.

23        MR. KAHN: Vague.

24   BY MS. NAIR:

25   Q    For example, the laws in California are not identical

Page 21

1    to the laws in Georgia?

2        A    That's correct.

3        Q    You would agree --

4            MR. KAHN: I'm going to just object to that question

5        as vague also.

6    BY MS. NAIR:

7        Q    You would agree that rules can vary from law

8    enforcement agency to law enforcement agency?

9        A    Yes, ma'am.

10       Q    You have worked for multiple agencies.  Is that

11   correct?

12       A    Yes, ma'am.

13       Q    You would agree that there is no single set standard

14   of rules for all law enforcement agencies?

15       A    I agree with that, ma'am, yes.

16       Q    You conducted research and edited the 2000 LAPD

17   Department Manual.  Is that correct?

18       A    Yes, ma'am.

19       Q    You would agree that you were tasked with improving

20   the manual?

21       A    I think that's the overarching objective, yes, is to

22   obviously have the most current and up-to-date and relevant

23   manual that the Department could have.  Yes, so I agree with

24   that statement.

25       Q    When did you conduct the research and edit the 2000

Tyler Griffin vs City of Atlanta, et al.                              Exhibit M
Scott DeFoe                                                      March 26, 2021

Page 22

1    LAPD Department Manual?

2        A    I was a sergeant in Management Services Division, so

3    that would have been, I believe, in 1998, around that time, to

4    1999.  You'd -- you'd get the manual ramped up with research

5    prior to the -- the year that it's going to be disseminated,

6    which would be 2000.  So I believe it was the latter part of

7    1998 through the first part of 1999.

8        **Q    I want to turn your attention to your expertise.**

9    **What is your expertise?**

10       A    I could -- I dance relatively well.  I mean, I -- I

11   mean, all kidding aside.  In law enforcement or in overall?

12       **Q    Whatever expertise you have, what is your expertise?**

13           MR. KAHN: Objection.  Vague.

14       A    Well, as an expert, a police expert if we're talking

15   about this matter, I -- police procedures and tactics; special

16   weapons and tactics; narcotics; informants; vehicle pursuits;

17   surveillance; security.  I am a martial arts expert, multiple

18   disciplines.  I still box as of today.  Use of force, both

19   lethal and less than lethal; canine; jail operations; police

20   corruption or internal investigations; vice, which we spoke

21   about earlier, which is prostitution, gambling and bookmaking

22   typically; evidence analysis and preservation; premise

23   liability and foreseeability matters that typically involve the

24   security deployment, security training, security use of force.

25   Those are the overarching broad categories but there are



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

1   others.  But that's -- that's to be general.

2        Q    I want to turn specifically to use of force.  You did

3   list that as one of your areas of expertise.  Is that correct?

4        A    Yes, ma'am.

5        Q    How did you develop your expertise in the area of use

6   of force?

7        A    I would have to say through my training at the

8   Federal Law Enforcement Training Center; my training with the

9   Los Angeles Police Department; instructed use of force through

10  all the units that I've supervised; attended a lot of seminars

11  on use of force during my time with the Los Angeles Police

12  Department and outside of the Los Angeles Police Department; I

13  taught internationally with other -- other -- in other

14  countries; I taught internationally here in the United States

15  on the use of force, both lethal and less than lethal.  As it

16  relates to less lethal force, part of defensive tactics cadre

17  with LAPD; part of the implementation of ground fighting or

18  ground defense fighting as it relates to weapon retention with

19  the Los Angeles Police Department.  I've debriefed hundreds of

20  use of force incidents during my tenure with Metropolitan

21  Division Canine and S.W.A.T. as a supervisor, including

22  critical debriefs.  I've been retained on approximately 450

23  cases throughout the United States, probably 90 percent of them

24  involved the use of force component, both with law enforcement

25  and/or security.  Testified in 149 depositions, 98 percent of

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 24

1    them involved the use of force.  Qualified as an expert in

2    State and Federal court approximately 34 times as a use of

3    force expert.  Approximately about 30 years in this

4    conversation of using force, both lethal and less than lethal.

5        Q    I want to talk specifically about your retaining

6    cases because you just stated that you have been retained in

7    450 cases.  Is that correct?

8        A    That's -- I think 450 to 470, I think that's the

9    range.  I haven't -- I think it's about 450 to 470 cases.

10       Q    So the 450 to 470 cases that you have been retained

11   in, how many have been for the plaintiff?

12       A    Well, I can break this down.  30 percent of my cases

13   are security cases, premise liability matters.  And of the 30

14   percent, I'm probably 60 percent plaintiff, 40 percent defense

15   for my retentions.  As it relates to police related matters,

16   like something we're talking about today, I've been retained

17   approximately 98 percent by the plaintiff and I have

18   approximately five matters -- four open matters, pardon me,

19   with the Attorney General's Office in San Francisco where I'm

20   defending officers in California Department of Correction

21   personnel and their use of force.

22       Q    Okay.  I need to backup one step.  How many cases of

23   the use of force cases that you have been retained on for have

24   been for plaintiffs?

25               MR. KAHN: Object to the form of the question.  Vague.

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 25

```
1        A    Well, at -- for use of force in security matters, 60
2   percent plaintiff, 40 percent defense.  As it relates to police
3   matters, 95 to 98 percent plaintiff, 2 to 5 percent defense.
4   Or less.
5        Q    Okay.  So now that we're narrowing it down to police
6   matters, when you're saying, "police matters," what are you
7   speaking of?
8        A    Anything involving the federal government as it
9   relates to the use of force.  It might be internal
10  investigation.  It may be a municipality, such as Atlanta
11  Police Department.  So also corrections.  It may be California
12  Department of Corrections.  It may be correctional officers
13  throughout the country.  So that's what I'm speaking of, both
14  police officers, federal employees, and correctional personnel.
15       Q    Okay.  And you said 95 to 98 percent of those have
16  been for the plaintiff?
17       A    Yes, ma'am.
18       Q    How many cases, if you know, does that equate to?
19       A    Oh, I don't know.
20       Q    A number?
21       A    I don't have -- I don't have a number.  But
22  it's -- as I mentioned, what I do know and I -- is all -- all
23  the plaintiff cases -- pardon me, ma'am -- defense cases, I've
24  only been retained five times on defense related matters,
25  defending officers and/or correctional personnel with the
```



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

1   Attorney General's Office in San Francisco.  The remaining

2   matters have all been for the plaintiff thus far.

3        **Q    And when were you retained on those five cases**

4   **defending officers on behalf of the State Attorney General's**

5   **office?**

6        A    I think going back -- in the last year-and-a-half,

7   two years, I have three open cases with them now but two

8   have -- they've -- they resolved, they defeated the motion for

9   summary judgment.  Or they prevailed on the motion for summary

10  judgment, pardon me.  The other three are open right now.

11       **Q    And of those cases, how many have you provided**

12  **deposition or just testimony on hearing, deposition or live**

13  **testimony?**

14       A    None as of now.

15       **Q    Okay.  On the other 98 percent of your cases where**

16  **you have represented -- or excuse me -- have been retained as**

17  **an expert for plaintiff, how many of those cases have resulted**

18  **in your testimony?**

19       A    I'd have to say 90 percent of the 149 depositions

20  (Zoom audio skip) I've been in -- for -- I think only the --for

21  deposition testimony, pardon me.  I think my trial testimony, I

22  think total is -- I've testified at trial a total of 34 times

23  and I think 31 times have been for the plaintiff in police

24  related matters and the other three have been for the plaintiff

25  in security related matters.

Exhibit M

March 26, 2021

1    Q    So all have been in security -- or excuse me -- all

2    have been for the plaintiff?  For trial testimony?

3    A    For both security and -- and police, I think they've

4    only been for the -- the plaintiff.  I know they've only been

5    for the plaintiff in police related matters but security

6    matters, I don't believe that I've testified at trial on behalf

7    of the defense as of yet.  Most of those cases settle.

8    Q    So we have 149 depositions, to which 90 percent are

9    for the plaintiff, and we have 35 trial testimonies.  Is that

10   correct?

11   A    Thirty-four.

12   Q    Thirty-four?  When was the last time you had trial

13   testimony?

14   A    I thought it was going to be this week but I did not

15   end up testifying.  I will next week now.  So I apologize, by

16   the way, for the -- the change of schedule.  The court remained

17   opened up and it was very abrupt.  I had found out myself last

18   week.

19   The last testimony, ma'am, that I was in trial for was

20   right before COVID broke out.  Yeah, the last trial testimony

21   was -- if you have my record, it's -- it's on page 26 of 30.

22   It's number 156.  It was a -- a -- it's the Penalosa (ph.)

23   matter.  March 5, 2020.

24   Q    Okay.  I want to go back to something you just

25   stated.  You've said -- you apologized for the disruption of

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021

Exhibit M

Page 28

1   the scheduling.  You found out something last week.  What were

2   you saying?

3       A    Oh, regarding this deposition.  No, I -- I learned

4   that I had to be in court on Tuesday of this week, which

5   disrupted this scheduling of this deposition.  I notified Mr.

6   KAHN and then I did, in fact, go to the court but I was not

7   called to testify due to some scheduling in the court.  So I

8   had to report to Federal Court in Santa Ana this week, which

9   disrupted this deposition that was supposed to be held the

10  other day.

11      Q    You had to report live for that testimony in court,

12  you stated?  I'm having a little bit of trouble --

13      A    Yes.

14      Q    -- with connection.  Forgive me.

15      A    Yes, ma'am.  I had to report to court.  I didn't end

16  up testifying but I had to report -- physically report to the

17  courtroom in the Eisinger versus Anaheim Police Department

18  matter.

19      Q    And you reported to that courtroom on Tuesday of this

20  week?

21      A    Yes.  Yesterday as well.

22      Q    Okay.  Of the 170 cases, that you have been retained

23  on, I guess, there might be 169, that have involved your

24  testimony, whether deposition or trial, involving police

25  related matters, how many times have you rendered an opinion on

Page 29

1   behalf of the plaintiffs?

2       A    There's many times, ma'am, and I think your numbers

3   are off.  I don't know what current list of trial testimony you

4   have.  But of all of the times that I've testified, there's

5   been many cases where I believe that the use of force is

6   reasonable up to a point, maybe the use of a Taser, maybe the

7   use of strikes.  I believe those forced options are reasonable.

8   But I may have an issue with the ultimate use of lethal force.

9   I've also testified in matters where I believe the use of

10  lethal force was appropriate but the pre-shooting tactics were

11  inappropriate or they were negligent.  So it just depends on

12  the case.  Many of my reports are outlined and, I believe, you

13  know, many of the things the officers did were correct on the

14  day of that incident but just maybe ultimately, that the

15  ultimate use of lethal force -- if it's a lethal force matter,

16  was unreasonable or inappropriate based on the totality of the

17  circumstances.

18      Q    Thank you.  That wasn't my question.  My question

19  was, and I'll restate it, how many times have you rendered an

20  opinion on behalf of the plaintiffs?

21           MR. KAHN: Object to the form of the question.

22      A    In trial or in -- in deposition?

23  BY MS. NAIR:

24      Q    Both.

25           MR. KAHN: Object to the form of the question.



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 30

```
 1       A    An opinion?  Or I don't understand the question.

 2   BY MS. NAIR:

 3       Q    You rendered opinions in this case, correct?

 4       A    Yes, ma'am.

 5       Q    In fact, you rendered 16 opinions in this case.  Is

 6   that correct?

 7       A    That sounds about right.

 8       Q    Please, go see your report and review and make sure

 9   that I'm accurate.

10       A    I will.  Give me one second, please.  You're

11   accurate.

12            MR. KAHN: Yeah, I'm going to just object.  It just

13       misstates the record.  The original report contains 16 and

14       then supplemental report has the 17th opinion.  Yeah.  But

15       go ahead.

16            MS. NAIR: Mr. Kahn, I would ask that you refrain from

17       testifying.  If you have an objection, please state your

18       objection for the record.  And I ask that is not be a

19       speaking objection --

20            MR. KAHN: I just --

21            MS. NAIR: -- and I will continue.

22            MR. KAHN: I just did state my objection.

23   BY MS. NAIR:

24       Q    Mr. DeFoe --

25            MR. KAHN: No.  You've got to let me finish putting my
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

```
1        objection on the record.  If you're going to misstate the
2        facts in this case, then I'm going to correct it by making
3        an objection to your misstatement of the facts and that's
4        what I just did.
5            MS. NAIR: Are you done with your objection, Mr. Kahn?
6            MR. KAHN: Yes.
7   BY MS. NAIR:
8        Q    Mr. Defoe, of the cases in which you have been
9   rendered or been retained as an expert on police involved
10  matters, we can agree that that is around 170, correct?
11       A    I've been retained a lot more than that on police
12  related matters.  I've been retained a total of 470 times and
13  probably 350 or so have been police related matters.
14       Q    Of the 350, you have been called to testify in a
15  deposition or in trial approximately 170 times.  Is that
16  correct?
17       A    Let me look at the numbers, ma'am.  Total of 182
18  times is deposition and trial.  Total times and -- yes, it's
19  182 times.
20       Q    Now, we're going to use your number of 182 and then
21  we're going to move forward with the questions based on your
22  number of 182.  Is that fair?
23       A    Okay.  I'm ready.
24       Q    Of the 182 retained cases that you have provided
25  testimony on behalf of the plaintiff, how many times have you
```

Case 1:20-cv-02514-VMC   Document 89-13   Filed 05/03/21   Page 32 of 185
Tyler Griffin vs City of Atlanta, et al.                                        Exhibit M
Scott DeFoe                                                      March 26, 2021

Page 32

1   rendered an opinion in favor of the plaintiff?

2          MR. KAHN: Object to the form of the question.

3      A   Well, all of the matters that I've retained on -- by

4   the plaintiff I render opinions for the plaintiff.  But out of

5   that 182, as I mentioned, probably 30 percent of those are

6   security matters; are not police matters.  So they're

7   not -- but all of those thus far on police related matters have

8   been for the plaintiff.  I don't know if that explains it.

9   BY MS. NAIR:

10     Q   Okay.  So I just did a little bit of simple math.

11  182 cases times 70 percent is 127 cases.  So you believe that

12  you have testified either in deposition or trial 127 times on

13  police related matters for the plaintiff.  Is that correct?

14         MR. KAHN: Object to the form of the question.  And

15      objection based on -- it's argumentative.

16     A   I mean, I -- that sounds about right.  I don't know

17  the exact number, ma'am.  I'm not tabulated that, but if that's

18  30 percent of -- in your mouth, then it's - I'll proximate and

19  say yes, that sounds about right.

20  BY MS. NAIR:

21     Q   Okay.  So of these 70 percent of those trial cases or

22  those testimony cases, you stated that you have always rendered

23  an opinion on behalf of the -- of the plaintiffs.  Is that

24  correct?

25         MR. KAHN: Object to the form of the question.



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 33

1       A    Not always, ma'am, because as I mentioned earlier,

2   there are times even when I did my report, I'd find that the

3   officer's actions were reasonable up to a point.  But overall,

4   yes, the opinions have been for the plaintiff, ultimately,

5   because I was retained by the plaintiff.

6   BY MS. NAIR:

7       **Q    So your opinion changes based on who retains you?**

8           MR. KAHN: Objection.  Argumentative.  Vague.

9       Misstates the testimony.

10      A    No, ma'am.  My -- I -- I decline approximately 40

11  percent of the cases I'm asked to take.  The ones I do agree to

12  take, I render opinions based on my objective review of the

13  material.  Many of those times that's on behalf of the actual

14  defense because I believe the officer's actions were reasonable

15  up to a certain point.  So it's not -- I'm not being paid or my

16  opinions are not based on who retains me.  My opinions are

17  based on my objective review of the facts of the matter.

18  BY MS. NAIR:

19      **Q    So when you testified just a moment ago that, of**

20  **course, my opinion is in favor of the plaintiff, I**

21  **misunderstood that testimony.  Is that correct?**

22          MR. KAHN: Objection.  Mr. DeFoe has no idea what

23      you're -- what you're thinking and what you understand and

24      don't understand.  It misstates his testimony.

25      A    Ma'am, if I'm retained by the defense, then obviously

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

1   I formulate opinions for the defense based on my

2   review -- objective review of the facts.  If I'm retained by

3   the plaintiff, then obviously I formulate opinions based on my

4   objective review of the facts.  So my -- my opinions are

5   predicated on my review of the case file in a particular matter

6   and -- and as I mentioned, yes, if I'm retained by the defense,

7   there may be opinions that I have formulated that are for the

8   defense.  I also, with the caveat that there's many times I

9   take cases and once I've reviewed the material, I turn that

10   case back to the attorney because I cannot assist them with the

11   case.  That happens quite frequently with attorneys I work with

12   quite a bit.

13        **Q    When you say you cannot assist them with the case,**

14   **you mean what?**

15        A    Well, I've sent back retainers or partial retainers

16   to attorneys quite frequently.  When I -- maybe a body-worn

17   camera is produced, now that brings different light to the

18   incident.  And maybe new evidence that comes in, that now I

19   can't support the plaintiff's claim as an expert or the

20   defendant's claim, depending on which side I'm being retained

21   by, and let them know I can't assist with the matter.  So I've

22   done that on a number of occasions and sent back retainers and

23   sent back partial retainers because I can't assist them with

24   the matter because the facts have changed from our initial

25   conversation to now I have received a discovery material, and

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 35

1    after reviewing the material, my opinions would not assist

2    whoever's retaining me.  So I let them know I can't function as

3    their expert.

4        Q    When you say, "cannot assist them," is your testimony

5    that you cannot render an opinion on behalf of their claim?

6            MR. KAHN: He just answered that exact question.  So

7        asked and answered.

8        A    Well, no.  I -- I formulate objective opinions.  I'm

9    not part of anyone's legal team.  So I form objective opinions

10   and I let that attorney know that -- retain me based on new

11   evidence or based on video evidence or whatever the evidence

12   may be, I cannot assist with that matter.  They can continue to

13   retain me if they choose to but it may not be in their benefit

14   once I formulate my opinions and submit them to them.  So

15   what's happened in the past is that I have sent back retainers

16   or declined matters once I've reviewed material in a particular

17   matter.

18   BY MS. NAIR:

19       Q    So I'm going to go two parts to that question.  You

20   said you sent back retainers.  Correct?

21       A    Yes, ma'am.

22       Q    And then you said you've declined to render an

23   opinion.  Is that correct?

24       A    Yeah, my -- ma'am, as I mentioned, I'm very

25   conservative about what I take.  I decline about 40 percent of

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                              March 26, 2021

Page 36

1   what I'm asked to take during the week of the number of

2   attorneys who call me throughout the United States.  So yes, I

3   will let them know once I review the material, because

4   initially, ma'am, when you take a case, you're just getting

5   preliminary material.  Especially in, you know, use of lethal

6   force.  So as the material becomes available, I let the

7   attorneys know that based on my review of the material, I can't

8   assist them with the matter because I'm -- my opinions would

9   not benefit them in any way.  I'm going to -- the opinions are

10  going to be objective based on my review of the material in the

11  case and it may not be of their benefit.  They can continue to

12  retain me if they choose to but based on that conversation --

13      Q    Okay.  Have --

14      A    -- it's --

15      Q    I apologize.  I interrupted you.  Continue.

16      A    No worries.  But no, I will let them know that I

17  can't -- I can't assist based on -- based on my review of the

18  material that's, you know, may be sent to me.  And it's

19  typically body-worn camera, because that's typically the most

20  difficult to get on departments that actually use body-worn

21  camera.  That's -- that's difficult to obtain through discovery

22  so that sometimes is very revealing, and it later be changes my

23  opinions in the matter based on my review of the additional

24  material.

25      Q    Has there ever been a time that you have sent back



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 37

1    the retainer that the attorneys have stated, "No, we still

2    would like your opinion"?

3            MR. KAHN: Objection.  Vague.

4        A    No, ma'am.  I -- I can't support their case or I

5    can't provide opinions that would be in favor of the plaintiff

6    or defendant, whoever it may be.  And so, yes, I -- I will send

7    them back the retainer.  I've never had an attorney say, "No,

8    we'd like you to submit a Rule 26 report anyway."  They will

9    agree with my recommendation and I'll send them back the

10   retainer if I have not used to the retainer, or I will just

11   set -- let them know I can't assist with the case.

12   BY MS. NAIR:

13       Q    I want to break down to the number that we use, that

14   we agreed upon was your number, which was 182 cases, which you

15   have been retained on behalf of the plaintiff involving police

16   related matters.  Of --

17           MR. KAHN: Object to the form of the question.

18           MS. NAIR: I haven't asked the question.  Do you want

19       to keep your objection?

20           MR. KAHN: Well, it sounded like a question to me, but

21       go ahead and continue if -- if there's more to it.

22           MS. NAIR: You want to keep your objection?

23           MR. KAHN: Yeah, it sounded like a question.

24           MS. NAIR: For the record, I have not asked the

25       question yet.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 38

```
 1   BY MS. NAIR:
 2        Q    Of the 182 cases retained on behalf of the plaintiff,
 3   how many of those cases involved the lethal use of force?
 4             MR. KAHN: Object to the form of the question.
 5        A    Ma'am, I think you're -- I think there's some
 6   confusion.  I'm not saying you're confused.  I may be confusing
 7   you.  On my record of trial testimony, which is 30 pages long,
 8   that I submitted with my report, it's been changed since then
 9   because I've had multiple depositions since I turned in this
10   report.  It's 182 times, so within there there's trial and
11   deposition.  Some of these cases are both deposition and trial
12   of the same case but they're not specifically for the
13   plaintiff.  As I mentioned, you know, they're for the plaintiff
14   and the defense.  So -- and I have not only been retained 182
15   times by the plaintiff.  I don't know the exact number but as I
16   mentioned, on police cases, which is 70 percent of my workload,
17   98 percent of that is for the plaintiff and I've been retained
18   about 450 to 470 times.  I've never been asked to do the math
19   as I am here today, so I don't -- I don't know the actual
20   numbers.  But I can just tell you that of all of my depositions
21   on police cases -- and of that, there's not 182; there's a
22   total of 148 -- the ones that I have been retained on by
23   the -- for -- regarding a police matter, have all been
24   regarding a plaintiff matter thus far.  I have not been deposed
25   on any of the Attorney General matters yet as those
```



Page 39

1    matters -- some have resolved and some are still open.  So I

2    don't understand that you're using the word 182.  That's the

3    total number of deposition and trials, but many of those are

4    duplicative because there would be a deposition and then I go

5    to trial on the same case on that list of trial testimony.

6    BY MS. NAIR:

7        **Q    So of the cases, how many involve the lethal use of**

8    **force?**

9            MR. KAHN: Object to the form of the question.  Of

10       what cases?

11   BY MS. NAIR:

12       **Q    Of the 148 cases that you have been deposed upon that**

13   **are the police cases, how many of those involved the lethal use**

14   **of force?**

15       A    You know, I've never -- I've never tabulated.

16   I'll -- I'll make an estimate of maybe 70, 60 percent, maybe.

17           MS. NAIR: May I have a moment please?  Actually, at

18       this time, it's a good time for us to take a five-minute

19       break.

20       (Whereupon, the proceedings were in recess from 1:51 p.m.

21   until 1:56 p.m.)

22   BY MS. NAIR:

23       **Q    Okay.  I believe the last question was of the 148**

24   **police cases that we were speaking of, how many of those had**

25   **involved the lethal use of force and you said around 78**

Exhibit M

Page 40

1   percent, correct?

2        MR. KAHN: Object to the form of the question.

3        A    Can you repeat that, ma'am?  I didn't capture that.

4   I'm sorry.

5   BY MS. NAIR:

6        Q    It's okay.  I think where we stopped before

7   we -- before I took a break was of the 148 police cases that we

8   were speaking of, how many of those cases had involved the

9   lethal use of force and I believe you said about 78 percent of

10  them.  Is that correct?

11       A    Well, the depositions you're going to 148 is

12  that -- those aren't only police cases.  Those are police and

13  security cases so that's why I'm confused.  I've been deposed

14  148 times.  I can go through the 148 cases now if you'd like

15  and -- and tabulate how many were police cases, how many were

16  security cases.  And of those --

17       Q    No.

18       A    -- I can let you know what--

19       Q    That's not necessary.

20       MR. KAHN: Please -- please let him finish speaking,

21       Ms. Nair.

22       A    I can let you know, ma'am --

23  BY MS. NAIR:

24       Q    I apologize.

25       A    -- how many are the lethal --  no worries, ma'am. I

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 41

1  don't -- I'm not offended.  I can let you know how many of

2  those were -- I would probably say that of my police cases,

3  overall, if this helps you out or -- or narrows it down,

4  overall, probably 75 to 80 percent overall of my police

5  retained cases I've been retained on involve the use of lethal

6  force where somebody dies.

7       **Q     Thank you.  Have you testified in a case for**

8  **plaintiff's counsel in a case titled Favors v. City of Atlanta?**

9       A    That's one of the Atlanta cases I've testified in,

10 yes.

11      **Q     And you provided deposition testimony in that case,**

12 **correct?**

13      A    Yes, ma'am.

14      **Q     Do you need an opportunity to review that document to**

15 **refresh your recollection as to how many cases you've testified**

16 **in regarding lethal use of force?**

17      A    No, ma'am.  I don't have that deposition testimony in

18 front of me but no, I would have – I don't recall what I

19 testified.

20      **Q     If I show you it, could that help refresh your**

21 **recollection?**

22      A    Sure.

23      **Q     All right.  I'm going to share my screen.  Are you**

24 **able to see my screen?**

25      A    Yes, ma'am.



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021
Exhibit M

Page 42

1    Q    All right.  And are you able to see pages 9 and 10?

2         MR. KAHN: And Ms. Nair --

3    A    Yes, ma'am.

4         MR. KAHN: -- I will object it.  Would you mind

5    sending a copy of this since it wasn't produced in

6    discovery?  You can drop a --

7         MS. NAIR: No, sir.  This is to refresh his

8    recollection.

9         MR. KAHN: So you are declining to provide a copy of

10   the PDF of the document that you're cross-examining Mr.

11   DeFoe with?

12   BY MS. NAIR:

13   Q    Mr. DeFoe, does this refresh your recollection?

14        MR. KAHN: Are -- are you declining to provide a copy

15   of this PDF that you're using in this deposition?

16        MS. NAIR: I'll consider it.

17   BY MS. NAIR:

18   Q    Mr. DeFoe, does this refresh your recollection?

19        MR. KAHN: Object to this --

20   A    Yes, ma'am.  It -- it does.  It says out of the 250

21   times that 90 percent have been involved in lethal use of

22   force.  That may be police shooting, head strikes.  But as I

23   mentioned, that was 250 times.  I've been retained about 450

24   times.  So those numbers would be a little bit different now.

25   Q    I understand.  You --

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 43

1      A    At the time of -- yeah, at the -- at the time of this

2   deposition, it was 250.  I've been retained on a couple hundred

3   other matters since then.  So when I testified at 90 -- 90

4   percent for lethal use of force, ma'am, that was probably right

5   as an estimation at the time.  I don't -- I'm not saying there

6   was -- that was incorrect as to what I testified for.

7      Q    I understand.  This specifically says that you at

8   that time had 102 -- that was your 102nd deposition and 22nd

9   trial testimony.  Is that correct?

10     A    Yes, ma'am.

11     Q    Okay.  And so since that time, you have increased

12  your trial testimony to -- or excuse me -- your deposition

13  testimony to about 148, correct?  Overall?

14     A    Yes, ma'am.

15          MR. KAHN: Objection.

16     A    Yes.  This will be the 149th.

17  BY MS. NAIR:

18     Q    And not all of those 149 you agree involve police

19  related matters, correct?

20          MR. KAHN: Objection.  Asked and answered --

21     A    Yes, ma'am.

22          MR. KAHN: --  many, many times.

23     A    Yes, ma'am.

24  BY MS. NAIR:

25     Q    I'm sorry.  You interrupted --

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 44

1      A    That's correct.

2      Q    -- answer.  Thank you.  Of the cases in which you

3  provided deposition testimony for use of force cases, how many

4  involved the non-lethal use of force?

5      A    I'm estimating.  Probably 80 percent may have a

6  non-lethal use of force component to them, in addition to use

7  of lethal force.

8      Q    How many solely had a non-lethal use of force?

9      A    Where there were non-lethal matters?  Probably 25, 30

10 percent of my total number of police cases are just non-lethal

11 use of force, canine, beanbag, shotgun, Taser, pepper spray,

12 things such as that.

13     Q    How many of those were canine?  Percentage-wise?

14     A    On retention, total retention?

15     Q    Yes, sir.  We are only operating in the world of the

16 deposition and trial testimony retained cases on behalf of the

17 plaintiff.

18     A    Okay.  Probably that I've been -- that I've been

19 deposed on or trial on regarding canine, probably four cases.

20 Four or five cases.

21     Q    How many involving OC spray or otherwise known as

22 pepper spray?

23     A    I don't know, ma'am.  10, 20 percent of the cases

24 have a -- had pepper spray and OC spray involved in them.

25     Q    How many involving Tasers?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 45

1      A    Once again, as an estimation probably 20, 25 percent

2   are Taser cases.

3      Q    And I'm speaking solely Taser cases, not involving

4   the lethal use of force as well.  Only the non-lethal use of

5   force.

6           MR. KAHN: Object to the form of the question.

7      A    Well, are you including Taser and OC spray and Taser

8   and control holds, or Taser and other things, or just the use

9   of the electronic control device by itself?  Because that maybe

10  a dozen or so, just Taser cases without any other use of force.

11  But there's typically other applications of force at times

12  proceeding or after the use of the Taser.

13  BY MS. NAIR:

14     Q    How many involved takedowns without any other use of

15  force?

16     A    Just takedowns by themselves, I don't know.  Probably

17  a handful, maybe six, that are just -- of someone tackling

18  someone, in that -- something as similar to the facts in this

19  case.  I think probably about six or so.  Five or six.

20     Q    What steps did you take to prepare -- well, before I

21  go there, actually, let me take a step back.  You -- in the

22  case of Scott DeFoe, The City of Los Angeles, there were

23  allegations that the City of Los Angeles took no action to

24  correct the retaliatory acts of its officers against the

25  plaintiff for reporting sexual, inappropriate comments of your



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 46

1    superior.  Is that correct?

2              MR. KAHN: Object to the form of the question to the

3         extent that there is even really a question in there.

4         A    Yes, that was part of my claim.  Yes, ma'am.

5    BY MS. NAIR:

6         Q    **What steps did you take to prepare for this**

7    **deposition today, outside of meeting with the -- actually, I**

8    **apologize.  I apologize.  Can you tell us more about that case?**

9    **Because you said that involved -- that was a part of your**

10   **claim.  Tell us more about that claim.**

11             MR. KAHN: Object to the form of the --

12        A    On which --

13             MR. KAHN: -- question.

14        A    The claim that I had against the City, ma'am?

15   BY MS. NAIR:

16        Q    **Yes.**

17        A    Sure.  I was a sergeant assigned to LAPD Special

18   Weapons and Tactics.  That is S.W.A.T.  We have a new -- had a

19   new lieutenant named Lopez that was -- was assigned to S.W.A.T.

20   Had a very business relationship with Mr. Lopez.  My wife, who

21   at the time was a detective with the Los Angeles Police

22   Department, was asked by her commanding officer during the

23   opening of our new police administration building to wear a

24   nostalgic 1930s LAPD uniform that one of the first women police

25   officers wore.  It's like an -- almost like a heavy-wool-type,

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 47

1  you know, dress uniform that they compelled women to wear back

2  in the 30s or 40s, I believe it was.

3          THE WITNESS:   Bless you, Mr. Kahn.

4      A    And the -- my wife begrudgingly decided she was going

5  to be retiring one month after -- before that but she agreed to

6  do it.  And on a Saturday, which was the day of -- my wife had

7  worked this detail, my lieutenant in S.W.A.T texts me on my

8  City phone, was that my wife at the new police administration

9  building wearing an antique uniform?  And I typed him back,

10  "Yes."  I was getting my three boys ready to go play soccer,

11  they had a game or something to that effect.  And then he typed

12  back, "It's hot . . . the temperature, that is."  So I took

13  that as being somewhat suggestive and we didn't have that kind

14  of relationship.  So I saw Mr. Lopez or Lieutenant Lopez prior

15  to picking up ammunition to go to the shooting range the

16  following Tuesday, and told him don't, you know, we don't have

17  that kind of relationship that you can comment on how my wife

18  looks in a police uniform.  He apologized, it's kind of water

19  under the bridge.  I didn't think anything of it after that.

20  LAPD sent me back to India -- Mumbai, India -- after the Mumbai

21  terrorist attack.  When I returned -- well, let me go back.

22  Prior to that, I started getting a couple of notice to correct

23  deficiencies from incidents that occurred, like, six months

24  prior.  They weren't even relevant, saying "Hey, by the way on

25  that S.W.A.T call up, you should have done this but you done

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 48

1    that"  Which I knew, being the second most tenured sergeant in

2    S.W.A.T at the time, that there was no doubt he was being

3    petty, I thought retaliatory, regarding me bringing what I

4    believe to be misconduct to his attention.  I told my captain

5    at the time before leaving for India, "Hey listen, I'm not

6    looking to make a complain.  Just tell Lieutenant Lopez to

7    knock it off.  This is what it's about."  I sent him the

8    message, what he had sent.  He -- he felt that the message was

9    inappropriate.  I got back from India with LAPD  I was the

10   S.W.A.T representative that went to training and teach their

11   S.W.A.T component there after the Mumbai terrorist attack.

12   When I returned, they told me that they were going to transfer

13   me out of S.W.A.T and move me to Canine because I couldn't get

14   along with Lieutenant Lopez.  So the L.A. Police protectively

15   get involved.  We filed a grievance.  They didn't resolve it at

16   the grievance level.  I filed a lawsuit.  The lawsuit was

17   resolved.  In return of my filing the lawsuit, they went back

18   and realized that I didn't attend -- I didn't sleep at a hotel

19   during a training I had a year before, that I wasn't -- I was

20   required to sleep at the hotel but I didn't.  I didn't put in

21   any type of voucher to get refunded.  I just -- I lived five

22   miles from the hotel so having three boys that are athletes, I

23   go home at night after work, which I did.  And he went back,

24   once again, as a retaliatory action and took offense to that,

25   even though he was aware of it a year prior.  So that's what

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 49

1    the lawsuit was about.  The lawsuit was resolved.  I stayed as

2    a reserve with LAPD but after the lawsuit for six years, which

3    means I volunteered my time for free.  I had a great

4    relationship with the Department until I finally separated

5    March of 2016.

6    BY MS. NAIR:

7        Q    So there was a counterclaim against you for failure

8    to follow procedure within the Los Angeles Police Department.

9    Is that correct?

10       A    Yes, ma'am.  I -- I, you know, once again, part of

11   the training for that leadership institute was that you should

12   sleep at the hotel because other sergeants from around the

13   state go there and they want you to mingle and, you know,

14   socialize, which I don't socialize with police officers after I

15   get done with work.  And so, I -- that was part of the training

16   and there was -- and I ended up getting a notice to correct

17   deficiencies for not sleeping at the hotel, which I agree to.

18   I, you know, if you have to sleep at the hotel, you sleep at

19   the hotel.  But there was never any impropriety of putting in

20   for the voucher for the hotel.  I never once submitted any

21   documents.  Myself and another sergeant who lived close by to

22   the training -- the training was in Costa Mesa, California.  It

23   may not mean anything to you, but I live in Huntington Beach,

24   which is literally a couple of exits on the freeway.  So

25   training ended at five o'clock, I went home, rather than sleep

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 50

```
 1  at a Hilton Hotel and hang around with a bunch of police

 2  officers.  So that was -- that's what that was about.

 3       Q    You don't hang out with police officers after work?

 4            MR. KAHN: Objection.

 5       A    I try not to, ma'am when I --

 6            MR. KAHN: Objection.

 7       A    -- when I work there.  I -- I go home after work.  I

 8  have three kids and no, I -- I don't social -- I never was one

 9  to socialize with -- with police officers or any other grown

10  men after I get done with work.  I'm a dad with three boys and

11  I have a wife who is working as well.  So after work, I go

12  home.  Especially my assignments were so unique that I was

13  getting called out at all hours of the night.  So anytime you

14  could get home before you were going to get subject to a

15  S.W.A.T call out or canine call out, I always went home after

16  work.

17  BY MS. NAIR:

18       Q    Have you ever had a case that settled pre-suit

19  against a municipality?

20            MR. KAHN: Object to the form of the question.  Vague.

21       A    Pre-suit, well, you know, I don't know.  I was an

22  expert on the George Floyd case.  And I don't know if that was

23  completely filed at the time.  I know it just settled, that

24  matter just settled.  So I don't know if there was actually a

25  complaint for damages that was filed.  I didn't receive one if
```

Page 51

```
 1   there was, so.  But that -- that case just settled and that was

 2   pre-suit.  I think that's the only one that -- on police cases.

 3   Many premises liability cases, security cases tend to settle

 4   before they're even filed.  But for police cases, I think that

 5   may have been the only one.

 6        Q    Have you ever brought an action against a

 7   municipality or an employer that has --

 8        A    Other than the one we just --

 9        Q    -- settled pre-suit?

10        A    No, ma'am.  Only case of action -- I've never been

11   sued and I've -- the only action I had was the one I discussed

12   regarding the retaliatory action regarding the suggestive

13   comment that was sent to me on my BlackBerry.

14        Q    That you perceive was suggestive, correct?

15             MR. KAHN: Object to the form of the question.

16        A    Well, they resolved the case.  So they settled the

17   case.  I'm assuming that they believed it as well.

18   BY MS. NAIR:

19        Q    What steps did you take to prepare for this

20   deposition today, outside of the-hour conversation that you had

21   with Mr. KAHN yesterday, the five-minute conversation you had

22   with him this morning, and the review for three hours of the

23   materials?

24        A    Well, being that I have been deposed by another

25   Atlanta Police Department case, I have to extra prepare because
```



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 52

1    I know what I'm in store for for the day.  So I -- I treat a

2    deposition almost like a final exam in college.  I have so many

3    cases that I go ahead and I review, rereview the case file.  I

4    review the documents, I rereview my report.  Print out material

5    that's associated with the case that I received in way of

6    discovery.  I obviously look at my opinions and anticipate what

7    I think you're going to ask here today.  And just

8    re-familiarize myself with the case, so.  In addition, as

9    I -- after I submitted my report, I did --

10            THE WITNESS:   Bless you.

11       A    -- I did receive some additional documents from

12   plaintiff's counsel that are outlined on my supplemental

13   report.  I reviewed them as well since my -- my submission of

14   the report.  So primarily just to -- to cap it, just reviewed

15   my report, supplemental documents for about four or five hours

16   yesterday.

17   BY MS. NAIR:

18       **Q    Okay.  I'm showing -- actually, you said you received**

19   **additional documents from plaintiff's counsel that you put in**

20   **your supplemental report?  When did you --**

21       A    Yes.

22       **Q    -- receive those documents?**

23       A    I think at some point -- I don't know if they came

24   in -- well, I didn't look at them until, I think, about a week

25   or so ago, ten days ago.  I don't know if they came in one

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 53

1   e-mail or in more than one e-mail but I believe about ten days

2   to two weeks ago, the four documents.

3       (Whereupon, City Defendant's Exhibit No. 3 was introduced

4   and marked for identification.)

5       Q    I'm going to share my screen with you and show you

6   what's been marked as Defense Exhibit -- City Defendant's

7   Exhibit 3.  Can you see my screen?

8       A    Yes, ma'am.

9       Q    Okay.  Do you recognize this document?

10      A    Yes, ma'am.

11      Q    This is your Rule 26 report that you prepared in this

12  case?

13      A    That's correct

14          MR. KAHN: I'll just -- I'll just object to -- I mean,

15      he can't tell you what it is.  There are 43 pages to this

16      document and you're showing a third of a single page.

17          MS. NAIR: There are 79 pages to this document.

18          MR. KAHN: Okay.  Well, there are 79 pages to that

19      document and he is looking at a third of a page.  So there

20      is no way that he can tell you what it -- it is.

21  BY MS. NAIR:

22      Q    I will represent to you, Mr. DeFoe, that this is your

23  report and I'll scroll through it very briefly if you'll take

24  time to scroll through it with me.

25      A    Okay.


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 54

1      Q    Additionally, your CV and your fee schedule.  Have

2  you had an opportunity to review briefly what I just scrolled

3  through?

4      A    Yes, ma'am.

5      Q    Do you recognize this document?

6      A    Yes, ma'am.

7      Q    Is this document dated for December 4, 2020?

8      A    Is it what, ma'am?

9      Q    Dated for December 4, 2020?

10     A    I apologize.  Yes, ma'am, that's correct.

11     Q    The report, does it contain all of the opinions that

12  you had formulated in this case up until December 4, 2020?

13     A    Yes, ma'am.

14     Q    I'm going to stop sharing my screen with you for a

15  moment.  I want to share my screen again.

16     (Whereupon, City Defendant's Exhibit No. 4 was introduced

17  and marked for identification.)

18     Q    Are you able to see my screen?

19     A    Yes, ma'am.

20     Q    I'm showing you what has been marked as City

21  Defendant's Exhibit 4.  It is two pages.  Do you recognize this

22  document?

23     A    Yes, ma'am.

24     Q    This is your Supplemental Rule 26 report that you

25  prepared in this case?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 55

```
 1      A    Yes, ma'am.

 2      Q    Is it dated from March 25, 2021?

 3      A    Yes, ma'am.

 4      Q    You reviewed additional materials to create this

 5  Supplemental Rule 26 report.  Is that correct?

 6      A    Yes, ma'am.

 7      Q    And who provided those materials to you?

 8      A    Plaintiff's counsel, Mr. Kahn.

 9      Q    And how were they provided to you?

10      A    By way of e-mail.

11      Q    You testified that they were provided approximately

12  ten days ago?

13      A    I think so.  I mean, it's kind of a guess.  I think

14  it might have been a week at that point.  I think -- I think

15  that's when I received those documents.  I think.  I think that

16  seems about right.  I don't know if they came in one or two

17  e-mails but those are the only supplemental documents I

18  reviewed, thus since submitting my report on December 4.

19      Q    You would agree that you did not receive those

20  materials as of March 3, 2021?

21           MR. KAHN: Object to the form of the question.

22      A    Yes, I didn't believe I -- I didn't receive those

23  prior to March 3.  I think it was later than that.

24  BY MS. NAIR:

25      Q    When were you asked to provide a Supplemental Rule 26
```

Page 56

1    report?

2         A    At some point about a week ago.

3         Q    Was it before or after you notified plaintiff's

4    counsel that you had a trial --

5         A    It was before.

6         Q    -- to attend?

7         A    It was prior to that, ma'am.

8         Q    Does this supplemental report contain all of the

9    opinions that you have formed in this case?

10        A    From the materials that I received thus far.  And

11   since my submission of my Rule 26 report on December 4, yes.

12        Q    Have you formed any new opinions between the time you

13   submitted this report yesterday until the time you appeared

14   today for your deposition?

15        A    No, ma'am.

16        Q    When you were asked to form a report, when were you

17   told you needed to produce that report by?

18             MR. KAHN: I'm going to object.  I think that's

19        protected from disclosure by the work product doctrine

20        under Rule 26.  And I'll instruct him not to answer.

21   BY MS. NAIR:

22        Q    Were you instructed or were you asked to produce a

23   report prior to -- you produced this report on March 25, 2021.

24   Is that correct?

25        A    Yes, ma'am.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 57

1    Q    Why did you not produce this report prior to March
2    25, 2021?

3    A    I didn't know I had to produce it prior to that.

4    Q    When you say you didn't know you had to report or
5    produce it prior to that date, you testified earlier that you
6    received the documents and the request about a week ago,
7    correct?

8         MR. KAHN: Object to the form of the question.

9    A    Yes, ma'am.

10   BY MS. NAIR:

11   Q    You knew that you had a deposition scheduled for
12   Tuesday, March 23?

13   A    Yes, ma'am.

14   Q    Thus, you would have needed to report your findings
15   in a supplemental report prior to that date, correct?

16   A    I didn't know -- I didn't know -- counsel never told
17   me when a supplemental report was due or if I had to submit one
18   at all.  What he advised me was to review the additional
19   materials and if there were any supplemental opinions that I
20   had that we can discuss them and I could put them in the
21   report.

22   Q    When did you discuss that?

23   A    Approximately a week ago.

24   Q    When you say, "approximately a week ago," we're now
25   on Friday.  So are you saying Friday of last week?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 58

1      A    I think before then.  I think maybe -- I think

2   Tuesday or Wednesday of last week.  I think I had a deposition

3   last Thursday, I believe.  So I think it was preceding the

4   deposition.  I think approximately -- I think around the 16th

5   or the 17th of March.

6      Q    So around the 16th or 17th of March, when you were

7   asked to -- or to review the additional materials and then to

8   provide a report if you thought necessary, you weren't given a

9   timeframe at that point in which to provide a report is what

10  you are stating?

11          MR. KAHN: Object to the form of the question.  And

12      also, same objection.  Work product under Rule 26.  I'll

13      instruct him not to answer.

14  BY MS. NAIR:

15     Q    Turning back to City Defendant's Exhibit 3, you

16  listed materials that you reviewed in producing your opinion as

17  of December 4, 2020.  Do you have that document in front of

18  you?

19     A    Yes, ma'am.

20     Q    Do you need for me to share that document on my

21  screen?

22     A    No, ma'am.  You don't need to do that.

23     Q    In this document, you list what I can see as numbered

24  documents of items that you have reviewed, correct?

25     A    Yes, ma'am.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 59

1        Q       And it ends on page 7 of 43 of your report.  Is that

2    correct?

3        A       Yes, ma'am.

4        Q       There are 71 items listed.  Is that fair?

5        A       That's fair, ma'am.  Yes.

6        Q       Now, as there are 71 items, to be clear, you have two

7    No. 3s listed on page 2 of 43 of your report.  Is that fair?

8        A       I do.  That's fair and that's incorrect.  That's a

9    typo.  My apologies.

10       Q       So actually, there are a total of 72 documents that

11   you reviewed in this case as of December 4, 2020.

12       A       Yes, ma'am.

13       Q       Is that correct?

14       A       Yes, ma'am.

15       Q       Did you rely upon all 72 documents in forming your

16   opinions as of December 4, 2020?

17       A       Yes, ma'am.

18       Q       Were there any documents that are not listed here in

19   this report at Defendant's Exhibit 3 that you relied upon in

20   forming your opinion as of December 4, 2020?

21       A       No, ma'am.

22       Q       Of the 72 documents that are listed here, were there

23   any that you relied upon more than others?

24       A       Obviously -- obviously, the body-worn camera video is

25   important.  Obviously, the -- specifically, the 57-second one

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 60

1   that's -- all of them actually that's listed there as No. 3.

2   In fact, it should be No. 4.  The body-worn camera videos were

3   the most compelling to me just because they -- they told the

4   story of what transpired as it relates to the use of force, as

5   it relates to the pre-force tactics and actions by Officer Abad

6   and Officer Vickers.  As it relates to, you know, the issue

7   regarding the Department's failure to take any type of action.

8   Those involved both the body-worn camera as well as prior

9   complaints, specifically regarding Officer Vickers' complaint

10  history, prior complaint history.  So it just depends on the

11  opinion as to which of the documents I relied most on.

12       Q    I want to turn your attention back to City

13  Defendant's Exhibit 4 and that is your supplemental report,

14  dated March 25, 2021.  Do you need for me to share my screen

15  with you or do you have a copy in front of you?

16       A    I have a copy, ma'am.  You don't need to do that.

17       Q    You list materials reviewed in producing your opinion

18  as of March 25, 2021.  And those materials are listed as No. 1

19  through 4 in this report.  Is that accurate?

20       A    Yes, ma'am.

21       Q    These four documents are in addition to the 72

22  documents that you originally reviewed in forming your original

23  opinion on December 4, 2020.  Is that correct?

24       A    Yes, ma'am.

25       Q    Outside of these four documents and the 72 original

Exhibit M

March 26, 2021

Page 61

1  documents, are there any other documents that you relied upon

2  in forming your opinion for this March 25, 2021 Supplemental

3  Rule 26 report?

4      A    No, ma'am.

5      Q    Of the four documents listed, were there any that you

6  relied upon more than others?

7      A    I think as it relates to the supplemental opinions, I

8  think the -- the two would have been the -- would have been

9  obviously Chief -- former Chief Shields' deposition transcript,

10 was -- was quite compelling.  And then obviously, the renewed

11 motion to compel and brief in support were the two primarily

12 that I relied on.  I reviewed both of them.  The top two were

13 the ones that seemed to more -- are the basis for my opinions

14 in the supplemental report.

15         MS. NAIR: And that this time, I'll take a five-minute

16     break.  Thank you.

17         THE WITNESS:   Thank you, ma'am.

18     (Whereupon, the proceedings were in recess from 2:30 p.m.

19 until 2:35 p.m.)

20 BY MS. NAIR:

21     Q    I want to turn your attention to City Defendant's

22 Exhibit 3.  And since you've already stated you have it in

23 front of you, I'll just go through it.  Is that fair?

24     A    Yes, ma'am.

25     Q    Opinion 1, you state that you believe Officer Vickers

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

Page 62

1   and Abad both acted unreasonably in terms of requesting a

2   marked patrol car or air support.  Is that your opinion?

3        A    Yes.

4        Q    You based your opinion on the deposition testimony of

5   Officer Abad?

6             MR. KAHN: Object to the form of the question.

7        A    Part of it.  I mean, that's part of my opinion but

8   no, I based it on proper police tactics, standard police

9   practices, utilization of proper tactics proceeding a vehicle

10  stop.  So that's one of -- one of, you know, his opinion

11  supports my opinion.  Or pardon me. His testimony supports my

12  opinion but no, that's -- that's part of the basis for my

13  opinion.

14  BY MS. NAIR:

15       Q    Did you also base your opinion on your experience and

16  training?

17       A    Yes, ma'am.

18       Q    You did not state a specific Atlanta Police

19  Department work rule in forming your opinion.  Is that correct?

20       A    That's correct.

21       Q    Your opinion is that a reasonable officer would have

22  requested a marked APD patrol car.  Is that correct?

23       A    Yes, ma'am.

24       Q    Your opinion is also that both Officer Vickers and

25  Abad failed to request a marked APD patrol car.  Is that

Page 63

1    correct?

2        A    Yes, ma'am.

3        Q    And your opinion is also that both Officer Vickers

4    and Abad should have requested marked APD air support.  Is that

5    correct?

6        A    Yes, ma'am.

7        Q    Let's talk about the deposition of -- the testimony

8    of Officer Abad.  You specifically state that you relied on

9    Officer Abad saying that he agrees that police officer vehicles

10   are required to be marked so citizens can identify the vehicle

11   as a police vehicle.  Is that correct?

12       A    Yes, ma'am.

13       Q    And you cite to Officer Abad's deposition transcript

14   at page 22.  Is that correct?

15       A    Yes, ma'am.

16       (Whereupon, City Defendant's Exhibit No. 5 was introduced

17   and marked for identification.)

18       Q    I want to turn your attention to what's been marked

19   as the City Defendant's Exhibit No. 5.  And I'm going to share

20   my screen with you.  Do you recognize this document?

21       A    It appears to be Officer Abad's deposition

22   transcript.

23       MR. KAHN: Yeah.  I'm going to -- just to object.

24       This is a 125-page document and you're asking him to

25       identify based on the first page.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
Exhibit M
March 26, 2021

Page 64

```
 1   BY MS. NAIR:
 2       Q    Based on the first page, do you recognize this
 3   document?
 4            MR. KAHN: Object to the --
 5       A    It appears to be Officer -- the document appears to
 6   be Officer Abad's deposition transcript.
 7   BY MS. NAIR:
 8       Q    I'm going to purport to you that this is the
 9   transcript that you state in your report that you reviewed.
10   Okay?  I'm going to go to page 22 of that document. Can you
11   read aloud line 17 through 22 of this page?
12       A    Through 22?
13       Q    17 through 22.
14       A    Sure.
15       "QUESTION --
16       Q    Sorry.  Excuse me.
17       A    -- Would you agree --
18       Q    17 -- sorry.  Excuse me.  17 through 24.
19       A    Would you agree that police vehicles are required to
20   be marked so citizens can identify the vehicle as a police
21   vehicle?
22       "When you ask that question, do you mean, all vehicles
23   utilized by the police department?
24       "I'm referring to, like, a marked police vehicle.
25       "Oh, yes, sir."
```

Elizabeth Gallo
COURT REPORTING, LLC

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 65

1       Q    You would agree that that testimony is slightly

2   different than what you put in your December 4 report?

3            MR. KAHN: Object to the form of the question.

4       A    No, I -- I believe it's the same exact statement that

5   I put in my report.

6   BY MS. NAIR:

7       Q    Officer Abad in this -- excuse me.  So this is the

8   testimony that you are relying upon for your report.  Is that

9   correct?

10      A    It's part of the -- the basis for my opinion No. 1 in

11  this matter, yes.

12      Q    Okay.  But specifically, the part that you pulled

13  out, is this the basis of the testimony here that you were

14  referring to?

15           MR. KAHN: Object to the form of the question.  He

16      didn't pull anything out.  You did.

17      A    Yes.  The transcript that I noted in my report

18  is -- doesn't -- is a basis that supports my opinion, I didn't

19  rely solely on his testimony on this.  But yes, it -- it

20  supports my opinion in this case based on his testimony.

21  BY MS. NAIR:

22      Q    In Officer Abad's deposition, he was agreeing that

23  marked police vehicles should be marked so that citizens can

24  identify them.  You would agree with that?

25           MR. KAHN: Object to the form of the question.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 66

1       A    Yes, ma'am, I agree with that and that's what I noted

2   in my report.

3   BY MS. NAIR:

4       Q    **You stated in your report that he agreed that police**

5   **officer vehicles are required to be marked.  Is that correct?**

6       A    Yes, ma'am.

7       Q    **When Officer Abad sought clarity regarding all**

8   **vehicles utilized by the police department, would you agree**

9   **that the question was clarified to only include marked**

10  **vehicles?**

11          MR. KAHN: Object to the form of the question.

12      A    Yes, it was -- it was -- the question was, I'm

13  referring to, like, a marked police vehicle.  Oh, yes, sir, is

14  what he stated, which is identical to what I typed in my

15  report.

16  BY MS. NAIR:

17      Q    **You would agree then that it was not covering all**

18  **police vehicles?**

19      A    No.  The ones that -- the reason for the vehicles

20  being marked is what he stated; so citizens can readily

21  identify them as police vehicles.

22      Q    **Okay.  Is it your understanding that the car that**

23  **Officer Vickers and Abad were in was issued to them by the**

24  **Atlanta Police Department?**

25      A    Yes, ma'am.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 67

1      Q    Is it your understanding that police departments

2   utilize undercover cars?

3      A    I'm familiar with that, ma'am, yes.

4      Q    In your training and experience as an undercover

5   officer, is it your understanding that police are not always in

6   marked patrol cars?

7      A    Yes, when they're working undercover operations.

8   Yes, ma'am.

9      Q    Is it your understanding that Officer Vickers and

10   Officer Abad were working in an undercover capacity?

11      A    According to their testimony, yes, ma'am.

12      Q    You -- I'm going to stop sharing my screen.  You

13   state that Mr. Griffin may have reasonably perceived that he

14   was going to be a victim of a crime and possibly carjacked.

15      A    Can you repeat that?

16      Q    You state that Mr. Griffin may have reasonably

17   perceived that he was going to be a victim of a crime and

18   possibly carjacked. Is that correct?

19      A    Yes, ma'am.

20      Q    You would agree that that's not the only reasonable

21   perception that Mr. Griffin could have had?

22          MR. KAHN: Object to the form of the question.

23      A    Yeah, I mean, he could have thought -- based on what

24   my review of the body-worn camera, I believe it was reasonable

25   for him to believe that he was carjacked based on Officer

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 68

```
 1  Abad's actions and his attire he was wearing.
 2  BY MS. NAIR:
 3      Q    And that would have occurred at the time that the
 4  stop actually was effectuated.  Is that correct?
 5          MR. KAHN: Objection.  Vague,
 6      A    Yeah, so the -- or the vehicle stopped itself more so
 7  than the stop was effectuated.
 8  BY MS. NAIR:
 9      Q    Because you would agree that Officers Vickers and
10  Abad were not in a marked patrol car?
11      A    Yes, ma'am.
12      Q    And is it just as reasonable, based on your training
13  and experience, that Mr. Griffin could have believed he was
14  being followed by police and did not want to get arrested?
15          MR. KAHN: Object to the form of the question.
16      A    Yeah, there's a possibility.  I don't know what he
17  was believing at the time.
18  BY MS. NAIR:
19      Q    I understand.  But you put in your report as a basis
20  for your opinion what could have been a reasonable perception
21  of Mr. Griffin, correct?
22      A    Yes, ma'am.  Based on Officer Abad's actions and his
23  attire, yes, ma'am.  I think it would be reasonable that the
24  way in which he approached the car and how he was dressed would
25  make a reasonable person believe, potentially, that they're
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 69

1    being carjacked.

2        Q    Okay.  And if a person was under the influence of

3    alcohol, he could have been -- he could have reasonably

4    believed that he was being followed by police and did not want

5    to get arrested.  Is that correct?

6            MR. KAHN: Objection.  Improper hypothetical.  And

7        just to the form of the question.

8        A    Possibly.

9    BY MS. NAIR:

10       Q    Is it also reasonable that he could have believed

11   that he was being followed by police and did not want to get

12   arrested, especially in a case where he was driving the wrong

13   way on the road, which initiated the car to follow him?

14           MR. KAHN: Object to the form of the question.

15       Compound.  Vague.  And unclear whether we're still engaged

16       in this improper hypothetical.

17       A    Yes, he could have believed that.  Once again, I

18   don't know what his belief systems were but he could have

19   believed that he was being stopped by the police or followed by

20   the police and did not want to be arrested based on some

21   driving infractions that he committed.

22   BY MS. NAIR:

23       Q    So you don't know what Mr. Griffin could have

24   believed, correct?

25           MR. KAHN: Objection.


Elizabeth Gallo
COURT REPORTING, LLC

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 70

```
 1        A     That's correct.

 2   BY MS. NAIR:

 3        Q     But there are multiple, reasonable beliefs that could

 4   have been in Mr. Griffin's mind?

 5        A     Yes.  That he could have -- there could have been

 6   multiple beliefs in his mind at the time as to why he didn't

 7   want to stop; if he reasonably believed they're police officers

 8   or believed that he was being carjacked, or whatnot.  My

 9   opinion is based on what I observed, the actions on the

10   body-worn camera, what a reasonable person would believe based

11   on observing Officer Abad and then his attire as well as his

12   actions.

13        Q     Okay.  Opinion No. 1 does not opine on the practice,

14   policy or procedure of the City of Atlanta Police Department.

15   Is that correct?

16        A     It does not -- it's not supported by that but

17   typically, police tactics as it relates -- standard police

18   practice as it relates to conducting vehicle stops are

19   consistent throughout the United States.  And -- and working in

20   an undercover capacity is also a tactic that officers deploy

21   consistently throughout the United States as to what they will

22   do when they are working in an undercover capacity, so as not

23   to be misidentified as a suspect or at a question as to whether

24   they are police or not, so.  But to  answer your question,

25   ma'am, it does not.  And my opinion is not supported by any
```


Elizabeth Gallo
COURT REPORTING, LLC

Case 1:20-cv-02514-VMC    Document 89-13    Filed 05/03/21    Page 71 of 185
Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                              March 26, 2021

Page 71

1    Atlanta Police Department directive that I have received thus

2    far in this case.

3        **Q    And it's equally true that you agree that there are**

4    **no standard set of rules for police departments?**

5            MR. KAHN: Objection.  Vague.

6        A    Well, there are standard rules based on policies and

7    procedures that are standardized, the use of force policies.

8    But tactics are a little bit unique.  Tactics are typically

9    suggestion of best practices.  In many cases standard police

10   practices, because it's based on the totality of the

11   circumstances.  So there's not a must on police tactics.

12   Typically, what's recommended based on the totality of the

13   circumstances.

14   BY MS. NAIR:

15       **Q    So what we know is that Opinion No. 1 does not opine**

16   **on the practice, policy or procedure for the City of Atlanta,**

17   **correct?**

18       A    That's correct.

19       **Q    Opinion No. 1 does not opine on the use of force by**

20   **Officer Vickers.  Is that correct?**

21       A    That's correct.

22       **Q    Opinion No. 1 does not opine on the failure to report**

23   **use of force by either Officer Vickers or Officer Abad.  Is**

24   **that correct?**

25       A    Yeah.  And I mean, obviously if the utilization



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 72

1    or -- or prematurely unholstering the pistol could -- because

2    it's observed on the -- on the video as such.  So it's not

3    covered in that opinion but that could, as it's observed on a

4    video of him drawing and unnecessarily holstering his pistol,

5    that being Officer Abad, when he approached Mr. Griffin's

6    vehicle.

7         Q    Mr. DeFoe, maybe I misspoke.  My question is Opinion

8    No. 1.  Okay?  So we're --

9         A    You're correct, ma'am.

10        Q    -- speaking solely on Opinion No. 1.

11        A    Okay.

12        Q    Okay?  Opinion No. 1 does not opine on the failure to

13   report the use of force by either Officer Vickers or Officer

14   Abad.  Is that correct?

15        A    Yes, ma'am.

16        Q    Opinion No. 1 does not opine on the failure to stop

17   the use of force by Officer Abad.  Is that correct?

18        A    Yes, ma'am.

19        Q    Let's move to Opinion No. 2.  Opinion No. 2, you

20   state that you believe that Officers Vickers and Abad both

21   acted unreasonably in terms of remaining in a position of cover

22   and formulating an effective and safe tactical plan.  Is that

23   correct?

24             MR. KAHN: Objection.  That misstates what he has put

25        in his report.



Page 73

```
 1   BY MS. NAIR:
 2        Q    Okay.  I will pull your report up.  Please let me
 3   know when you can see my screen.
 4        A    I can see your screen, ma'am.
 5        Q    All right.  Is this your Opinion No. 2?
 6        A    Yes, ma'am.
 7        Q    Can you read what Opinion No. 2 states in the first
 8   sentence?
 9        A    Yes, ma'am.  "It is my opinion that a reasonable law
10   enforcement officer acted consistent with standard police
11   practices would have remained in a position of cover and
12   formulated an effective and safe tactical plan."
13        Q    Can you read the next sentence?
14        A    Yes, ma'am.  "It is my opinion, based on my review of
15   the facts in this matter, Atlanta Police Department Police
16   Officers Matthew Abad, No. 6898, and Donald Vickers, No. 4438,
17   failed to develop an effective and safe tactical plan when Mr.
18   Tyler Griffin stopped his vehicle."
19        Q    Would you agree that that is the final portion of
20   your opinion for No. 2?
21        A    When you say final --
22        Q    Or excuse me.
23        A    -- opinion --
24             MR. KAHN: Objection.  Vague.  And just incorrect.
25   BY MS. NAIR:
```



Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                           March 26, 2021

Page 74

1    Q    Can you read the next sentence?  Forgive me.

2    A    No, worries, ma'am.  Okay.  I believe it's -- "In

3  addition, it is my opinion, based on my review of the facts in

4  this matter, Atlanta Police Department Police Officers Matthew

5  Abad and Donald Vickers should have remained at a position of

6  cover at their police vehicle and should not have taken any

7  enforcement action until they formulated a tactical plan."

8    Q    Okay.  I'm going to stop sharing my screen.  You

9  based your opinion in part on the testimony from the deposition

10 of Officer Abad.  Is that correct?

11   A    Yes, ma'am.

12   Q    You also based your opinion on your experience and

13 training in part.  Is that correct?

14   A    Yes, ma'am.

15   Q    You do not state a specific Atlanta Police Department

16 rule in forming your opinion.  Is that correct?

17   A    Yes, ma'am.

18   Q    Your opinion or you opine in part that Officer

19 Vickers and Abad did not work as a team.  Would that be fair to

20 say?

21   A    Yes, ma'am.

22   Q    You also opine that Officer Vickers and Officer Abad

23 did not always maintain a position of advantage.  Is that

24 correct?

25   A    Yes, ma'am.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021
Exhibit M

Page 75

1    Q    You further opined that Officer Vickers and Abad did

2    not use available cover and concealment.  Is that correct?

3    A    Yes, ma'am.

4    Q    And your opinion that Officer Vickers and Abad also

5    did not ensure necessary equipment that was available within

6    the vehicle.  Is that correct?

7    A    Yes, ma'am.

8    Q    The caveat, however, to that opinion is that it is

9    when using a marked patrol vehicle if possible, correct?

10   A    Yes, ma'am.

11   Q    And you know that Officer Vickers and Officer Abad

12   did not have a marked patrol vehicle.

13   A    That's correct.

14   Q    However, you also note that Officer Vickers and

15   Officer Abad did utilize their body-worn cameras.  Is that

16   correct?

17        MR. KAHN: Object to the form of the question.  And it

18        misstates the record.

19   A    Officer Abad did.  Officer Vickers did not use his

20   body-worn camera until after the use of force on Mr. Griffin at

21   about the two-minute mark.

22   BY MS. NAIR:

23   Q    Did Officer Vickers use his body-worn camera?

24        MR. KAHN: Object to the form of the question.  Vague.

25   A    Not proceeding the use of force of Mr. Griffin,

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 76

1    ma'am, but after the use of force, yes.

2    BY MS. NAIR:

3        Q    And you had an opportunity to review that video,

4    correct?

5        A    Yes, ma'am.

6        Q    You actually list that as one of the items listed

7    that you reviewed out of the 72 items.  Is that correct?

8        A    Yes, ma'am.

9        Q    Opinion No. 2 does not opine on the practice, policy

10   or procedure of the City of Atlanta.  Is that a correct

11   statement?

12       A    Yes, ma'am.

13       Q    Opinion No. 2 does not opine on the use of force by

14   Officer Vickers.  Is that a correct statement?

15       A    Yes, ma'am.

16       Q    Opinion No. 2 does not opine on the failure to report

17   use of force by either Officer Vickers or Officer Abad.  Is

18   that correct?

19       A    Yes, ma'am.

20       Q    And is it also correct that Opinion No. 2 does not

21   opine on the failure to stop the use of force by Officer Abad?

22       A    Yes, ma'am.

23       Q    Let's move to Opinion No. 3.  You believe that

24   Officer Vickers and Abad both acted unreasonably in terms of

25   not utilizing available cover and not -- and walking into an

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021

Exhibit M

Page 77

1    open-air environment.  Is that correct?

2        A    Yes, ma'am.

3        Q    Your opinion is that Officer Vickers and Abad should

4    have remained in a position of cover until the arrival of

5    uniformed APD vehicles.  Is that your opinion?

6        A    Yes, ma'am.  Yes, ma'am.

7        Q    You also opine that the officers, Officer Abad and

8    Officer Vickers, should have established a perimeter.  Is that

9    your opinion?

10       A    Yes, ma'am.  That's correct.

11       Q    You based on your opinion on the deposition

12   testimony, in part, of Officer Vickers.  Is that correct?

13       A    Yes, ma'am.

14       Q    You also based your opinion on your experience and

15   training in part.  Is that correct?

16       A    Yes, ma'am.

17       Q    You, however, did not state a specific Atlanta Police

18   Department rule in forming your opinion.  Is that correct?

19       A    That's correct, ma'am.

20       Q    In your experience and training, how many times have

21   you established a perimeter when stopping a vehicle for a DUI?

22            MR. KAHN: Objection.  Lack of foundation.  Vague.

23       A    Well, it depends.  It depends on what preceded that

24   or if the person is going to run.  It depends.  In the

25   termination of a pursuit, where they suspect of a DUI may have

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                         March 26, 2021

Page 78

1    been the initial cause, maybe a couple of dozen times.  And

2    once again, the pursuit where you reasonably saw maybe drinking

3    or under the influence, maybe another couple dozen times beyond

4    that.

5    BY MS. NAIR:

6        Q    And a couple of dozen times out of how many, sir?

7             MR. KAHN: Objection.  Vague.

8        A    Hundreds of calls.  Probably thousands of calls

9    on -- on pulling vehicles over that may not initially yielded

10   or failed to yield to a peace officer, including myself.

11   BY MS. NAIR:

12       Q    Have you ever been written up for failure to

13   establish a perimeter on those thousands of calls that you did

14   not establish a perimeter?

15            MR. KAHN: Objection.  Misstates testimony.

16       A    No, I've never been written up for not establishing a

17   perimeter because I established a perimeter when I believed it

18   was necessary.

19   BY MS. NAIR:

20       Q    Have you ever been written up for walking up to a

21   vehicle on a DUI in those thousands of -- of those thousands of

22   cases you just mentioned?

23       A    No, because I never approached the front of the

24   vehicle on a DUI stop.  That would be contrary to my training.

25       Q    Opinion No. 3 does not opine on a practice, policy or

Case 1:20-cv-02514-VMC   Document 89-13   Filed 05/03/21   Page 79 of 185
Tyler Griffin vs City of Atlanta, et al.                           Exhibit M
Scott DeFoe                                                    March 26, 2021

Page 79

1   procedure of the City of Atlanta.  Is that correct?

2       A    That is correct.

3       Q    Opinion No. 3 does not opine on the use of force by

4   Officer Vickers.  Is that correct?

5       A    That's correct, ma'am.

6       Q    Opinion No. 3 does not opine on the failure to report

7   the use of force by either Officer Vickers or Officer Abad.  Is

8   that correct?

9       A    Yes, ma'am.

10      Q    And Opinion No. 3 does not opine on the failure to

11  stop the use of force by Officer Abad.  Is that correct?

12      A    Yes, ma'am.

13      Q    Moving on to Opinion No. 4.  You believe that Officer

14  Abad acted unreasonably in terms of unholstering his firearm

15  during this incident.  Is that accurate?

16      A    Yes, ma'am.

17      Q    Your opinion is that Officer Abad exercised poor

18  tactics when he unholstered his duty pistol and pointed it at

19  Mr. Griffin's car.  Is that correct?

20           MR. KAHN: Objection.  Misstates the evidence.

21      A    When he pointed the weapon at Mr. Griffin, yes,

22  ma'am.

23  BY MS. NAIR:

24      Q    Turn to your Opinion No. 4.  Let me know when you get

25  there.

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                                March 26, 2021

Page 80

```
 1      A    I'm here.

 2      Q    You're looking at page 16 of your report.  That's

 3   where I would like for you to be.

 4      A    I'm right here.

 5      Q    Are you there?

 6      A    Yes, ma'am.

 7      Q    Read the first sentence.

 8           MR. KAHN: Object --

 9      A    "It is my opinion --

10           MR. KAHN: -- object to the form.  It's not a

11      question.

12   BY MS. NAIR:

13      Q    Can you read the first sentence on page 16?

14      A    Yes, ma'am.  "It is my opinion the Atlanta Police

15   Department Police Officer Matthew Abad exercised poor tactics

16   when he unholstered his duty pistol and pointed it at Mr. Tyler

17   Griffin and/or his vehicle."

18      Q    And/or his vehicle, correct?

19      A    Yes, ma'am.

20      Q    Meaning that when he pointed it at either of those

21   things.  Is that correct?

22           MR. KAHN: Object to the form of the --

23      A    Yes.

24           MR. KAHN: -- question.

25      A    Yes, ma'am.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 81

1    BY MS. NAIR:

2        Q    Your opinion is that an officer's decision to draw or

3    exhibit a firearm should be a tactical decision, correct?

4        A    Yes, ma'am.  Based on the totality of the

5    circumstances.

6        Q    You base your opinion on APD Policy Manual APD SOP

7    2010 Work Rule 4.6.9, Use of Firearms, in part.  Is that

8    correct?

9        A    Yes, ma'am.

10       Q    Specifically, you say, "That employees shall not

11   point or aim firearms at persons in circumstances, unless the

12   discharge of that firearm would be justifiable," correct?

13       A    Yes, ma'am.

14       Q    You would agree that that Work Rule 4.6.9 does not

15   speak to the pointing or aiming a firearm at a vehicle?

16       A    That's correct.

17       Q    You also base your opinion in part on the deposition

18   testimony of SPO Patrick Fite.  Is that correct?

19       A    Yes, ma'am.  And amplified by -- the -- my review of

20   former Chief Shields' deposition transcript as well.

21       Q    Specifically, you state that it would not be -- that

22   Officer Fite stated that it would not be justifiable for

23   Officer Abad to fire his duty weapon at Mr. Griffin.  Is that

24   correct?

25           MR. KAHN: It's not --



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Page 82

```
1        A    That's not correct?

2             MS. NAIR: I'm sorry.  Mr. Kahn, if you have an

3        objection, can you please state, "Objection," and then

4        state your objection for the record?

5             MR. KAHN: I -- objection.  You misstated the opinion.

6   BY MS. NAIR:

7        Q    Let's turn to the document for clarity.  Let me know

8   when you are at your report for Opinion No. 4 and we will go to

9   what you relied upon.  On page 16 of 43, it states, "According

10  to SPO Patrick Fite, it would not be justifiable for Police

11  Officer Matthew Abad to fire his duty weapon at Mr. Tyler

12  Griffin."  Is that what you wrote?

13       A    Yes, ma'am.

14       Q    Is that what you based your -- or your opinion on in

15  part?

16       A    Yes, ma'am.

17       Q    You do not base your testimony for -- or excuse me.

18  You do not base your Opinion No. 4 on the deposition testimony

19  of Officer Abad.  Is that a fair statement?

20       A    You are right.  I do not, ma'am.

21       Q    I would like to turn your attention to what's been

22  marked as Defense Exhibit No. 3.  And I will pull it up for you

23  as you may not have this on your screen or in front of you.

24            MR. KAHN: Just for the record, I -- it's not Defense

25       Exhibit No. 3.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 83

```
 1              MS. NAIR: Exhibit No. 5.  Excuse me.  You're

 2        absolutely correct, Mr. Kahn.  Thank you.

 3   BY MS. NAIR:

 4        Q    I am pulling up Defense Exhibit No. 5.  Are you able

 5   to see that in front of you?

 6        A    Yes, ma'am.

 7        Q    And you would agree that Defense Exhibit No. 5 is the

 8   deposition testimony of Officer Abad?

 9        A    Yes, ma'am.

10        Q    I'm sorry.  I'm having trouble -- I'm getting

11   feedback.

12              MR. KAHN: He said  --

13        A    Yes, ma'am.  Can you hear me?  I can hear everybody

14   fine.

15   BY MS. NAIR:

16        Q    I can hear you now.  Thank you.  I'm sorry.  I

17   couldn't hear you before.  I can hear you now.

18        A    Yes.  And I agree --

19        Q    All right.

20        A    -- with your question.  The answer is yes, to your

21   question.

22        Q    Okay.  I want to move to page 28.  You would agree

23   that this is page 28 of the -- of the deposition of Officer

24   Abad, correct?

25        A    Yes.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 84

1      Q    Can you read aloud lines 8 through 15?

2      A    Sure.

3      "Isn't it true that you're not supposed to point a gun as

4  a citizen unless you'd be justified in shooting that citizen?

5      "ANSWER:  That is correct, which is why I had the firearm

6  at the low-ready position.

7      "Do you think it would be all right for you to shoot Mr.

8  Griffin while you had your gun pointed at him"?

9      Q    And then if you can read lines 18 through 20?

10     A    Yes, ma'am.

11     "Well, I had the firearm at the low-ready position.  No, I

12 don't think it was justified to fire."

13     Q    You would agree that this testimony states that

14 Mr. -- or Officer Abad did not have his firearm pointed

15 directly at Mr. Griffin but in a low-ready position?

16     A    It testifies to that.  He testified to that but

17 that's contrary to the video.  The low-ready position is a

18 45-degree-angle to the ground.  That pistol was pointed while

19 he held it in his left hand directly at Mr. Griffin, directly

20 through his window, directly at him, his head or torso based on

21 my review the video.  So it was not in a low-ready position.

22 So his testimony is -- it conflicts with the actual review of

23 the body-worn camera.

24     Q    In your opinion, correct?

25     A    Or we can play the video.  It's --the video is what



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 85

1   it is.  He's pointing the weapon at Mr. Griffin.  It's not my

2   opinion.  It's -- it's an observation I think that most people

3   would agree with if they just watched the video.

4        **Q    And the -- I'm going to stop sharing that part of my**

5   **screen with you.  The firearm that Mr. -- that Officer Abad had**

6   **also had a light attached to the top of the firearm. Is that**

7   **correct?**

8        A    Yes, ma'am.  It was mounted on the slide of the

9   firearm.

10       **Q    The slide being on the top?**

11       A    Yes, ma'am.

12       **Q    Meaning that if Officer Abad were pointing the**

13   **firearm at something, the light would be above that object.  Is**

14   **that correct?**

15       A    The light would be on the object he's pointing it at

16   if the light was activated.

17       **Q    You've had an opportunity to review the video,**

18   **correct?**

19       A    Yes, ma'am.

20       **Q    Do you know whether the light was activated or not?**

21       A    I don't believe it was.  I believe the muzzle of the

22   pistol was pointed directly at Mr. Griffin based on my review

23   of the video.

24       **Q    We may come back to that in a moment.  You**

25   **based -- Opinion No. 4 does not opine on a practice policy or**

Case 1:20-cv-02514-VMC    Document 89-13    Filed 05/03/21    Page 86 of 185
Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe                                                        Exhibit M
                                                        March 26, 2021

Page 86

```
 1   procedure of the City of Atlanta.  Is that correct?

 2        A    Policy, ma'am, we've already referenced it.  It's

 3   4.6.9.

 4        Q    You used that -- that work rule to support your

 5   opinion.  Is that correct?

 6        A    That, along with my observations and SPO Fite's

 7   testimony as well as former Chief Shields' testimony.

 8        Q    I understand.  But it does not opine on a practice,

 9   policy or procedure of the City of Atlanta?

10        A    It's directly from the Atlanta Police Department

11   Policy Manual APD SOP 2010 Work Rules, 4.6.9, Use of Firearms

12   with the corresponding CALEA Standard.

13        Q    Your opinion is that Officer Abad violated a work

14   rule, correct?

15        A    Yes, ma'am.

16        Q    Not that the City of Atlanta had a practice, policy

17   or procedure or custom that allowed Officer Abad to point his

18   firearm at an individual.  Is that correct?

19        A    Yes, ma'am.

20        Q    Further, Officer -- Opinion No. 4 does not opine on

21   the use of force by Officer Vickers.  Is that correct?

22        A    That's correct, ma'am.

23        Q    Opinion No. 4 does not opine on the failure to report

24   use of force by either Officer Vickers or Officer Abad.  Is

25   that correct?
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 87

```
 1        A    That's correct, ma'am.

 2        Q    And Opinion No. 4 does not opine on the failure to

 3   stop the use of force by Officer Abad.  Is that correct?

 4        A    Yes, ma'am.

 5        Q    Turning to Opinion No. 5.  You believe --

 6        A    By the way --

 7        Q    -- that Officer Abad --

 8        A    Your vide could be --

 9        Q    -- acted unreasonably in terms of --

10        A    Ma'am, your video is a little bit messed up.  It's

11   got a delay.  I don't know if anyone --

12             MR. KAHN: I'm having that same problem.

13             MS. MILLER:   I'm sorry.  Can we go off the record

14        briefly?

15             MS. NAIR: I can switch devices.

16             THE WITNESS:  Yeah, she's frozen now.

17             MR. KAHN: Yeah.  I can't -- I can't see or hear

18        anything.  It's just a frozen image.

19             MS. MILLER:   No problem.  Madam Court Reporter, can

20        we go off the record briefly so we can address this issue?

21             THE COURT REPORTER: Yes, ma'am.

22             MS. MILLER:   Thank you.

23        (Whereupon, the proceedings were in recess from 3:13 p.m.

24   until 3:18 p.m.)

25   BY MS. NAIR:
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 88

```
1       Q    Back on the record.  Mr. DeFoe, you believe Officer

2   Abad acted unreasonably in terms of grabbing Mr. Tyler

3   Griffin's shoulder area or shirt after Mr. Tyler exited his

4   vehicle.  Is that correct?

5       A    Yes, ma'am.

6       Q    You based your opinion on APD Policy Manual

7   Work Rule 4.2.50, Maltreatment or Unnecessary Force.  Is that

8   correct?

9       A    Yes, ma'am.

10      Q    Specifically, it says, "That employees are expressly

11  prohibited from the unnecessary or unreasonable use of force

12  against any person or property, and that employees shall only

13  use that force which is reasonably unnecessary to effect an

14  arrest, prevent an escape, necessarily restrict the movement of

15  a prisoner, defend himself or herself or another from physical

16  assault, or to accomplish other lawful objectives."  Is that

17  correct?

18      A    Yes, ma'am.

19      Q    You cite to United States Supreme Court that defines

20  reasonable use of force.  And that case states the severity of

21  the crime, whether the suspect poses an immediate threat to the

22  safety of officers or others, or whether the suspect is

23  actively resisting or attempting to evade arrest by flight.  Is

24  that accurate?

25      A    Yes, ma'am.
```



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 89

1      Q    You also based your opinion on the APD Policy

2    Manual's Standard Operating Procedure, APD SOP 3010, Use of

3    Force.  Is that correct?

4      A    Yes, ma'am.

5      Q    And this language mirrors the language that's in Work

6    Rule 4.2.50.  Is that accurate?

7      A    Yes, ma'am.

8      Q    Additionally, you based your opinion on Officer

9    Abad's deposition testimony.  Is that correct?

10     A    Part of it, as well as my review of the body-worn

11   camera video.

12     Q    I understand.  I want to turn your attention to

13   Exhibit No. 5, at page 28 through 29.  And again, I will share

14   my screen.  And this is Ms. -- Officer Abad's deposition at

15   page 28 or 29.  And 29.  Excuse me.  You did not include

16   Officer Abad's explanation for grabbing Mr. Griffin's shirt as

17   a basis for your opinion.  Is that correct?

18     A    That's correct.

19     Q    Finally, you based your opinion -- oh.  Excuse me.  I

20   wanted you to read his opinion, for his basis.  If you could

21   read on page 28, lines 22 through 25?

22     A    Yes, ma'am.

23   "Did you grab Mr. Griffin by the shirt when he got out of

24   the car?

25   "ANSWER:  Yes, sir.



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 90

1        "QUESTION:  Why did you do that"?

2        Q    And if you could read on page 29, lines 1 through 6?

3        A    "Just so I could maintain contact with him initially

4   so that he would -- I could gain some level of -- drop -- to

5   make sure he's not going to attempt to flee, get away or to

6   hang on to him.  His level of intoxication, I didn't know how

7   he would be on his feet, so I was hanging onto him."

8        Q    And then finally, if you can read lines 7 through 9?

9        A    "Was it absolutely necessary for you to grab Mr.

10  Griffin?"

11       And the response:

12       "ANSWER:  Yes, sir."

13       Q    You did not include that explanation in your report,

14  correct?

15       A    That's correct.

16       Q    Finally, you based your opinion in part on your

17  training and experience.  Is that accurate?

18       A    Yes, ma'am.

19       Q    Have you ever had an opportunity to apprehend an

20  individual by placing your hands on their shoulders?

21       A    Yes, ma'am.

22       Q    Opinion No. 5 does not opine on a practice, policy or

23  procedure of the City of Atlanta.  Is that correct?

24       A    It involves a policy and procedure of the City of

25  Atlanta.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 91

1    Q    I understand.  That's not my question.  My question

2    is, does it opine on the City creating a practice, policy or

3    procedure that the City encourages the violation of?

4        MR. KAHN: Objection.  Asked and answered.  That was

5        your question and he did answer your question.

6    BY MS. NAIR:

7    Q    You'll need to answer my question.

8    A    I understand that.  But I -- I'm not opining that

9    there is anything within the policy or procedure that advocates

10   the use of unreasonable force, if that's your question.  I

11   believe the use of  --

12   Q    Opinion --

13   A    -- unreasonable force is -- the use of unreasonable

14   force was based -- in my opinion is based on Officer Abad's

15   actions, not on the policy or procedure that's in place by the

16   Atlanta Police Department.

17   Q    Opinion No. 5 does not opine on the use of force by

18   Officer Vickers.

19   A    That's correct.

20   Q    Opinion No. 5 does not opine on the failure to report

21   the use of force by either Officer Vickers or Officer Abad.

22   A    That's correct.

23   Q    And Opinion No. 5 also does not opine on the failure

24   to stop the use of force by Officer Abad.  Is that correct?

25   A    That is correct.

Exhibit M

March 26, 2021

Page 92

1    Q    Turning to Opinion No. 6.  You believe that Officer

2    Abad failed to maintain self-control and anger to effectively

3    de-escalate the situation when he approached the driver-side

4    window.  Is that correct?

5    A    Yes, ma'am.

6    Q    You based your opinion on the APD Work Rule 4.2.2,

7    Courtesy.  Is that correct?

8    A    Partially, yes, ma'am.

9    Q    Specifically, that employees shall be civil, orderly

10   and courteous to the public, coworkers and supervisors and

11   shall not use coarse, insensitive, abusive, violent or profane

12   language.  They should become familiar with the communication

13   process for conducting a vehicle stop, remain consistently

14   courteous, sound professional, center their command presence

15   and deflect resistance.  Is that correct?

16   A    Yes, ma'am.

17   Q    A part of courtesy is to deflect resistance, correct?

18   A    Yes, ma'am.

19   Q    You also base your opinion in part on the deposition

20   testimony of Officer Abad.  Is that correct?

21   A    Yes, ma'am.

22   Q    According to your opinion, you based it on the fact

23   that according to Police Officer Abad, he did not tell Mr.

24   Tyler Griffin why he was being removed from the car by

25   gunpoint.  Is that correct?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 93

```
 1      A    Yes.
 2      Q    You also based your opinion on Officer Abad's
 3   body-worn camera.  Is that correct?
 4      A    Yes, ma'am.
 5      Q    Specifically, that Officer Abad stated, "Get out of
 6   the fucking car" twice as he approached Mr. Griffin's vehicle,
 7   while pointing his firearm.  Is that correct?
 8      A    Yes, ma'am.
 9      Q    Not to where you -- you don't go further in that
10   statement.  There's a comma there, correct?
11      A    Yes, ma'am.
12      Q    After firearm?
13      A    Yes.
14      Q    You don't state where he pointed the firearm,
15   correct?
16      A    In that statement, I do not, ma'am.  No.
17      Q    And this is your opinion.  Is that correct?
18      A    Right, because I can't determine when he's running up
19   to the car and where he's pointing his firearm.  It's not until
20   he gets to the car that I can discern that he's pointing the
21   firearm directly at Mr. Griffin.
22      Q    Opinion No. 6 does -- Opinion No. 6 six does not
23   opine on a practice, policy or procedure of the City of
24   Atlanta.  Is that correct?
25           MR. KAHN: Objection.  Vague.
```

Page 94

```
 1        A    Well, it is supported by a work rule, ma'am, as we
 2   mentioned earlier; 4.2.2.  But I'm not making any aspersions
 3   that the work rule itself is deficient or -- or one does not
 4   exist that would comport or somehow endorse this type of
 5   behavior by Officer Abad.
 6   BY MS. NAIR:
 7        Q    Opinion No. 6 does not opine on the use of force by
 8   Officer Vickers?
 9        A    That is correct.
10        Q    Opinion No. 6 does not opine on the failure to report
11   use of force by either Officer Vickers or Officer Abad?
12        A    That's correct.
13        Q    And Opinion No. 6 does not opine on the failure to
14   stop the use of force by Officer Abad?
15        A    That's correct, ma'am.
16        Q    Turning to Opinion No. 7, you believe Officer Abad
17   failed to intervene, intercede and prevent Officer Vickers from
18   tackling Mr. Griffin.  Is that correct?
19        A    Yes, ma'am.
20        Q    You opine that Officer Abad had the duty, ability and
21   opportunity to intercede, intervene, and prevent Officer
22   Vickers from tackling Mr. Griffin.  Is that correct?
23        A    Yes, ma'am.
24        Q    That he had all three or some of the three: duty,
25   ability --
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 95

```
 1      A    All three.
 2      Q    -- and opportunity.
 3           MR. KAHN: Objection --
 4      A    All three, ma'am.
 5           MS. NAIR: I'm sorry.  I didn't hear the objection.
 6           MR. KAHN: I said objection.  Vague.  The question was
 7      vague.  It was unclear what you were even talking about.
 8  BY MS. NAIR:
 9      Q    Do you believe that Officer Abad had all three, the
10  duty, ability and opportunity, to intercede or to intervene?
11      A    Yes, ma'am.  Yes, ma'am.
12      Q    You based your opinion on APD Work Rule 4.2.51, in
13  part, Duty to Intervene.  Is that correct?
14      A    Yes, ma'am.
15      Q    And that specifically says, "Any employee present and
16  observing or who becomes aware of another employee exhibiting
17  behaviors or performing actions that violate departmental
18  policy, state or federal law, or local ordinance shall
19  intercede to prevent such behaviors or actions when in a
20  position to do so safely."  Is that correct?
21      A    Yes, ma'am.
22      Q    Did I leave any word out?
23      A    It appears you covered it all.
24      Q    Did I add any words?
25      A    It doesn't appear you added any words.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 96

1          MR. KAHN: Objection.  There -- you did add an "s," a

2      letter, to behavior.

3          MS. NAIR: Mr. Kahn, are you testifying?

4          MR. KAHN: No, I was making an objection.

5          MS. NAIR: I would ask that you refrain from

6      testifying, Mr. Kahn.

7          MR. KAHN: Well, it shouldn't be a problem because I

8      was not testifying.  I was making an objection.

9   BY MS. NAIR:

10      Q    Additionally, Mr. DeFoe, you base your opinion on the

11  deposition testimony of Officer Abad.  Is that correct?

12      A    Yes, ma'am.

13      Q    Specifically, you state that according to Officer

14  Abad, he admits that he could have waved his hand to show

15  Police Officer Vickers that everything was fine.  Is that

16  correct?

17      A    Yes, ma'am.

18      Q    Let's turn your attention to Exhibit 5.  You did not

19  base your testimony on Officer Abad's testimony at -- your

20  opinion on Officer Abad's testimony at page 101.  Is that

21  correct?

22      A    What are you referring to, ma'am?  I would have to

23  read it.  I don't know what you're asking me.

24      Q    Well, before I get there, you're looking at your

25  Opinion No.7, correct?

Page 97

```
 1      A    Yes.

 2      Q    You state that you -- your opinion is based on the

 3   deposition transcript of Mr. Abad at page 37.  Is that correct?

 4      A    Yes, ma'am.

 5      Q    You do not state that you base your testimony

 6   on -- your opinion on the testimony at page 101.  Is that

 7   correct?

 8      A    That's correct, ma'am.  Just page 37.

 9      Q    All right.  I want to review the full transcript of

10   Mr. -- of Officer Abad.  And then I would like for you to read

11   lines 17 through 24.

12      A    "QUESTION:  You may answer, Officer Abad.

13   "I did not have time, no.

14   "Were you looking at Officer Vickers when he tackled

15   Officer (sic) Griffin?

16   "ANSWER:  I was not looking at him, no.

17   "Did you have time to respond to the tackle by Officer

18   Vickers?

19   "ANSWER:  No.  No, ma'am."

20      MR. KAHN: And I'm just going to object to that

21      question.  It was based on an inadmissible, improper

22      question.

23      MS. NAIR: Which part, Mr. Kahn?  Because there are

24      three questions there.

25      MR. KAHN: Well, you had him read -- there's a
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 98

1    question by Ms. Parks at lines 11 through 14 and there's

2    an objection because it was a leading question, an

3    improper question.  And then Ms. Parks says, "You may

4    answer" that improper question.  And so any -- and the

5    answer to that improper question is also not admissible.

6    So it's an improper question that you were asking because

7    it's based on an inadmissible question that you're having

8    them read.  And so I'm objecting to it.

9         MS. NAIR: So that the record is clear, Mr. Kahn did

10    not object to the question beginning at lines 19, "Were

11    you looking at Officer Vickers when he tackled Tyler

12    Griffin," nor did he object to the question of "Did you

13    have time to respond to the tackle by Officer Vickers."

14    Just so that the record is clear.  And I'm going to move

15    on.

16         MR. KAHN: No objection to your colloquy.  And move to

17    strike it.

18    BY MS. NAIR:

19         Q    Additionally, you based your testimony on overarching

20    what all you were able to review for this case.  Is that

21    correct?

22         A    I base my opinion on my review -- review of the

23    testimony, the body-worn camera in this matter.  That's what

24    I -- I base my opinion on.

25         Q    Did you have an opportunity to see whether or not

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 99

1    Officer Abad, where he was looking?

2        A    I can't tell where he was looking.

3        Q    So you have no reason to dispute what Officer Abad

4    testified to?

5             MR. KAHN: Objection.  This is based on a misstatement

6             of evidence.

7        A    Ma'am, I don't make credibility determinations on

8    what witnesses testified to.  I don't know where he was

9    looking.  I know I was looking at the body-worn camera and I

10   believe that the use of force could have been prevented as he

11   states on page 37 by waving his hand to show Officer Vickers

12   that everything was okay prior to Officer Vickers sprinting

13   from another position and tackling Mr. Griffin to the ground.

14   BY MS. NAIR:

15       Q    I'll ask my question again.  Do you have any reason

16   to dispute what Officer Abad testified to in his deposition?

17            MR. KAHN: Objection.  Asked and answered.  He just

18            offered you an explanation as to why he disputes that.

19       A    Ma'am, I -- I dispute it based on my review of the

20   body-worn camera but I don't know specifically where Officer

21   Abad was looking at the time that Mr. -- Officer Vickers

22   sprinted the distance from his car and tackled Mr. Griffin to

23   the ground.

24   BY MS. NAIR:

25       Q    Let me be clear because I am sticking to a specific



Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                        March 26, 2021

Page 100

1    point and it does not involve the tackle.  My question to you,

2    Mr. DeFoe, is do you have any reason to dispute that Officer

3    Abad was not looking at Officer Vickers from the testimony that

4    he provided in his deposition?  Do you have anything that

5    pinpoints in anything that you've reviewed that can dispute

6    that point?

7         MR. KAHN: Ms. Nair, I'm going to issue the same

8         objection.  Asked and answered.  He just offered you an

9         opinion and just because you say the question louder

10        doesn't mean you're going to get a different answer.

11        MS. NAIR: Mr. Kahn, I would ask that you stop with

12        the oral arguments because it's becoming argumentative at

13        this point.  I would ask that you stop.  He has not --

14        MR. KAHN: Ms. Nair --

15        MS. NAIR: -- answered my question.

16        MR. KAHN: Ms. Nair, I am -- I am perfectly allowed to

17        put an objection on the record because the record is not

18        going to reflect that you were badgering our expert

19        witness.  Just because you asked the question three times

20        in a row and each time you ask it louder, I need to let

21        the record reflect that.  And I'm perfectly within reason

22        to do that because the record is --

23        MS. NAIR: We may have to get on the phone with the

24        Court.

25        MR. KAHN: -- the record is not going to pick up that

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                           March 26, 2021

Page 101

1        you were yelling at my witness.

2            MS. NAIR: I am not yelling and we may have to get on

3        the phone with the Court.  I'm going to take a ten-minute

4        break.

5        (Whereupon, the proceedings were in recess from 3:37 p.m.

6    until 3:40 p.m.)

7        (Whereupon, City Defendant's Exhibit No. 6 was introduced

8    and marked for identification.)

9    BY MS. NAIR:

10       Q    I want to turn your attention to what's been marked

11   as City Defendant's Exhibit No. 6.  And I'm going to share my

12   screen with you.  Let me know when you can see my screen, Mr.

13   DeFoe.

14       A    I can see it.

15       Q    Okay.  This is one of the documents that's a

16   body-worn camera clip.  It has been previously produced to

17   plaintiff's counsel as Griffin v. COA 760 and I'm going to play

18   this for you.  Okay?  So I want you to review this first and

19   then I'll ask you questions.  Is that fair?

20       A    Yes, ma'am.

21       (Whereupon, the video is played.)

22   BY MS. NAIR:

23       Q    Do you have an opportunity to review up to

24   second -- 21 seconds of this?

25       A    Can you re-do that for me, ma'am?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 102

1      Q    I can.

2      A    Thank you.

3      (Whereupon, the video is played.)

4    BY MS. NAIR:

5      Q    Did you have an opportunity to review it that time?

6      A    Yes, ma'am.

7      Q    Okay.

8           MR. KAHN: Does -- and let the record reflect that she

9      stopped at 19 this time.

10          MS. NAIR: I'll play it for the additional two seconds

11     for the record to be clear.

12     (Whereupon, the video is played.)

13          MS. NAIR: Was that better?

14   BY MS. NAIR:

15     Q    Now, were you able to review the full 21 seconds, Mr.

16   DeFoe?

17     A    Yes, ma'am.  Thank you.

18     Q    You're welcome.  So I'm going to rewind back to the

19   beginning.  Are you able to see at second zero, before it

20   begins, what is -- what are we looking at?

21     A    We're at Mr. Griffin with -- inside of his car.  It

22   appears to be his right hand on the steering wheel.  You can

23   see a pistol that's being held appears to be in a left hand,

24   somewhat canted semiautomatic pistol, somewhat canted towards

25   the ground area.

Page 103

1       Q      What does canted mean?

2       A      Canted is like a -- a position that folks who have

3    trained in firearms -- it means that it's pointed in -- at

4    somewhat of a tilted or off angle.  It's not directly pointed.

5    So it's canted down towards the ground.  Just like position

6    would be another way of saying it.

7       Q      Is the firearm pointed at Mr. Griffin?

8              MR. KAHN: Object to the form of the question.

9       A      At this point of the video, no.

10      (Whereupon, the video is played.)

11      A      Stop.

12   BY MS. NAIR:

13      Q      Are you frozen?

14      A      No, I'm good now.  I was for a second.  I thought I

15   was frozen.

16      Q      Okay. Let me rewind.

17      A      Okay.  Sorry.  I just thought there was -- yeah, I

18   thought my camera was frozen.

19      Q      No worries.  I'm going to play it again.

20      A      Okay.  Thank you.

21      (Whereupon, the video is played.)

22      Q      What do you see right here at second 22?  I mean,

23   second 2.  Excuse me.

24      A      Right at this moment or preceding it?

25      Q      Right at this moment, what do you see?

Page 104

```
1       A    A muzzle of the firearm appears to be pointed inside

2  of the driver compartment of the vehicle.  The light position,

3  which is mounted underneath the pistol, appears to be

4  illuminating the doorframe of the pistol.  Mr. Griffin's right

5  hand appears to be on the left portion of the steering wheel in

6  the driver's compartment of the vehicle.  Fingers alongside the

7  frame does not appear to be inside of the trigger guard of the

8  pistol.

9       Q    Okay.  I'm going to continue.  Oh.  Excuse me.  Whose

10 body-worn camera is this?

11      A    This appears to be Officer Abad's body-worn camera

12 because Officer Vickers didn't turn his on for, like, two

13 minutes.

14      Q    Okay.  And you stated that the finger is not in the

15 trigger position.  Is that correct?

16      A    It's not on the trigger at this position that I can

17 see ma'am, no.

18      Q    All right.  I'm going to continue.  What happens

19 between seconds 2 and 4?

20      A    The door is opening --

21      Q    That we just watched.

22      A    -- the driver side door of the vehicle is opened.

23      Q    And where is Officer Abad's right hand?

24      A    On the door.

25      (Whereupon, the video is played.)
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
Exhibit M
March 26, 2021

Page 105

1      Q    At second 4, what did we see in that second?

2           MR. KAHN: Object to the --

3      A    I can't see the pistol -- I cannot see the pistol

4   that illuminated.  The pistol seems to be canted once again

5   into the driver compartment of the vehicle.  I can't see

6   exactly where the muzzle is at that position due to the fact

7   that it's dark.  I cannot see Mr. Griffin inside of the vehicle

8   just based on this dimension from the body-worn camera video.

9   BY MS. NAIR:

10     Q    I'm going to continue.

11          (Whereupon, the video is played.)

12     Q    What, if anything, do you hear or see at -- between

13   second 4 and second 6 of this video?

14     A    Officer Abad tells him to get out of the vehicle.  A

15   weapon appears to be pointing in towards the driver

16   compartment.  You cannot see Mr. Griffin's right hand at this

17   time but his left hand, as we can see, is positioned on -- over

18   his left thigh area.

19     Q    I'm going to continue.

20          (Whereupon, the video is played.)

21     Q    Between second 6 through 12, what is occurring?

22     A    Mr. Griffin is getting out of the car.  He appears to

23   engage the -- the car into park.  It appears to be.  His hand

24   is down towards the gear shifter.  Takes off  his seatbelt and

25   starts getting out of the car.

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 106

1       Q     You would agree that at least 12 seconds have elapsed

2  since the time that we began viewing this clip of the video?

3       A     Yes, ma'am, I agree with that.

4       Q     I am going to continue.

5       (Whereupon, the video is played.)

6       Q     At second 13, what occurred that you could hear

7  and/or see?

8       A     Officer Abad says, "What are you doing, man."

9  Appears to bring his right arm up towards the shoulder area of

10 Mr. Griffin.

11      Q     You said seems to appear to bring his arm up towards?

12      A     It appears that his right arm is up on the shoulder,

13 upper arm area of Mr. Griffin based on my review of this.

14      Q     Does it appear that Officer Abad is reaching up?

15      A     I can't tell from this position.

16      (Whereupon, the video is played.)

17      Q     Between seconds 14 and 15, what, if anything, can you

18 see or hear?

19      A     You can see Officer Vickers appears to be working his

20 way towards the vehicle or walking in the direction.  You can

21 see Officer Abad's right arm in the upper area, upper shoulder

22 area of Officer -- of Mr. Griffin.  Pardon me.  Mr. Griffin's

23 right hand is on the doorframe and his left arm is down by his

24 side or almost down by his side.

25      Q     So it appears that Mr. Griffin is at least holding on

Page 107

1   to the door with his right hand?  Is that an accurate view?

2       A    Yeah, it's in the same position it was when he was

3   getting out of the car.  So he was getting out of the car like

4   we all do to use our arm to brace the car, and that's what he

5   appears to be doing when he was getting out of the car.

6       (Whereupon, the video was played.)

7       Q    What, if anything, did you see at -- at second 15?

8       A    It appears that there is some -- he is pulling up Mr.

9   Griffin back towards the car and -- and Mr. Griffin is holding

10  on to stabilize himself on the doorframe of the vehicle.  And

11  at this point, it seems like Officer Vickers is beginning now

12  to move his way towards their location.

13      Q    I'm going to play this and I might have to play it a

14  few times, but I want you to review seconds 15 through 18.

15  Okay?

16      A    Okay.

17      (Whereupon, the video is played.)

18      Q    And I'll rewind to second 16 again and begin it

19  there.  Okay?

20      A    Okay.

21      Q    And I'll play it again, and then I'll ask you

22  questions.  Forgive me.

23      (Whereupon, the video is played.)

24      Q    Okay.  This is at second 16.  You would agree what

25  we're looking at right now is at second 16?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 108

```
 1      A    Yes, ma'am.

 2      Q    Is -- are you able to see Officer Vickers in this

 3   scene?

 4      A    Yes, ma'am.

 5      Q    Does Officer Vickers appear to be upright or crouched

 6   down?

 7      A    Upright.

 8      Q    And that is at second 16 of the video.  Is that

 9   accurate?

10      A    Yes, ma'am.

11      Q    I'm going to push play.

12      (Whereupon, the video is played.)

13      Q    From 16 -- second 16 to second 18, did you ever see

14   Officer Vickers crouch down?

15      A    Right before he tackled Mr. Griffin, yes.

16      Q    I'm going -- because there's only two seconds in

17   between here, you would agree?  Between 16 and 18?

18      A    Between -- that sounds about right, two seconds.

19      Q    I'm going to back up again.  You agree that at second

20   16 --

21      (Whereupon, the video is played.)

22      Q    -- Officer Vickers is in an upright position.  Is

23   that correct?

24           MR. KAHN: Objection.  Asked and answered.

25      A    Yes, ma'am.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 109

```
 1  BY MS. NAIR:
 2      Q    At second 16, does Officer Vickers appear to crouch
 3  down?
 4           MR. KAHN: Objection.  Asked and answered.
 5      A    No, ma'am.
 6      (Whereupon, the video is played.)
 7  BY MS. NAIR:
 8      Q    At 17, second 17, does Officer Vickers appear to
 9  crouch down?
10      A    No, he appears to be sprinting.
11      Q    At second 16, was Officer Vickers sprinting?
12      A    16?  No, he seemed like he was moving towards -- I
13  can't tell if he's starting to run at 16.  It's not until
14  between 16 and 17 you can see the arms starting to swing to
15  generate momentum to run.
16      Q    I'll back up again so that you can have a different
17  view, so that you can answer the question accurately.
18      (Whereupon, the video is played.)
19      Q    Okay.  We're at 16.  Was he running at second 16?
20      A    Well, between 16 and 17 is when he started running.
21      Q    Okay.  And what point of the video are we at at this
22  time?
23      A    18 seconds.  At some point, I don't know if it's at
24  the end of 18 seconds, but 18 seconds is depicted on the
25  screen.
```

Page 110

1      Q    So you would agree that between second 16 and second

2    18, that Officer Vickers, from an upright position, began

3    running towards Mr. Griffin and had tackled Mr. Griffin?

4         MR. KAHN: Objection.  Asked and answered.  And

5      misstates Mr. DeFoe's prior testimony from today.

6      A    Yes, ma'am.  I -- through second 18.  I don't

7    think -- it doesn't end at 18.  He's tackling him at the 18th

8    second.  I don't know if it's -- if the tackle will continue

9    into the 19th second or not.

10   BY MS. NAIR:

11     Q    I understand.  What you would agree to is that it 16

12   through 18, after reviewing the video here today, that is when

13   the run began and the tackle took place?

14        MR. KAHN: Objection.  Misstates the evidence.

15     A    That I can tell on camera that the run begins at 16.

16   That's correct.

17   BY MS. NAIR:

18     Q    And that the tackle takes place at second 18.  Is

19   that correct?

20        MR. KAHN: Objection.

21     A    Yes, ma'am.

22        MR. KAHN: Misstates the evidence.

23   BY MS. NAIR:

24     Q    I'm sorry, Mr. DeFoe.  Is that what you saw from the

25   video?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 111

```
 1            MR. KAHN: Same objection.

 2       A    From this -- from this video, yes, ma'am.

 3  BY MS. NAIR:

 4       Q    Mr. DeFoe, in your own words, what do you see from

 5  seconds 16 through second 20?  And I'll play it for you and

 6  then allow you to state in your own words what you see.  Okay?

 7       A    What I see in here or just what I see?

 8       Q    What you see only.

 9       A    Okay.

10  (Whereupon, the video is played.)

11       Q    That went over to 20 but from 16 to 19, what did you

12  see?

13       A    Well, the -- at some point, the tackle occurs at 18.

14  I don't know at what point at 18.  And then he's taken to the

15  ground at some point at 18, at some point to 19.  And then he

16  continues with him on the ground, where we're at now at 20.

17       Q    Okay.  I want you to tell us what you see from Mr.

18  Griffin.  What does it appear that Mr. Griffin is doing at

19  second 17 to 18?

20  (Whereupon, the video is played.)

21       A    Well, it appears as we can -- we can all hear the

22  running of the feet, the footsteps coming down the pavement on

23  the wet ground.  He then appears to pan towards that because he

24  can hear the running.  And as he does -- I'm not being

25  presumptuous here but it appears he looks towards Officer
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 112

1    Vickers in a defensive posture as he's getting form tackled,

2    taken to the ground.

3        Q    Does it appear that at seconds 16 and 17, Mr. Griffin

4    was looking directly at Mr.-- at Officer Abad?

5        A    I can't tell, ma'am.  You can't tell what he's

6    looking at directly.

7        (Whereupon, the video is played.)

8        Q    Does it appear that he's looking in the direction of

9    Officer Abad's body-worn camera?

10            MR. KAHN: Objection.  Vague.

11       A    It's hard -- it's hard to discern if he's -- based on

12   this video shot of what he's looking into, it's hard to tell.

13       Q    Okay.

14       A    It's captured on the body-worn camera but I

15   don't -- I can't tell what he's looking at.

16       Q    When you say, "It's captured on the body-worn

17   camera," what's captured on the body-worn camera?

18       A    The running of -- of Officer Vickers and the tackling

19   of -- of Mr. Griffin.

20       Q    Right.  Are you able to see Mr. Griffin's face?

21       A    At what point?

22            MR. KAHN: Objection.  Vague.

23       (Whereupon, the video is played.)

24   BY MS. NAIR:

25       Q    At -- at second 16, which is where we are paused at

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 113

1    this moment, are you able to see a clear view of Mr. Griffin's

2    face?

3        A    Yeah, I -- I mean, there's an Axon body-camera right

4    through his face and his eyes but yeah, I can see his face.

5    The outline of his face.

6        Q    So then you would agree that his face is towards the

7    direction of the body-worn camera?

8            MR. KAHN: Objection.  Vague.

9        A    Yes.  Yes, ma'am.  Well, the body-worn camera is

10   picking up that image.  Where he's looking directly, I

11   don't -- I can't tell and I don't know.

12   BY MS. NAIR:

13       Q    Okay.  I'm going to stop -- well, actually, one other

14   question -- line of questions regarding this.

15       (Whereupon, the video is played.)

16       Q    At what second did you see -- let me restate that.

17   What did you just see occur between second 15 and second 17?

18   What did you see?

19           MR. KAHN: Objection.  Asked and answered.

20   BY MS. NAIR:

21       Q    From Mr. Griffin, what did you see between --

22           MR. KAHN: Objection.

23       A    Can you replay it?

24   BY MS. NAIR:

25       Q    I can.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 114

1      A    Can you -- yeah, I appreciate that because I wasn't.

2      (Whereupon, the video is played.)

3      Q    So between seconds 15 through 17, what did you see

4   Mr. Griffin do?

5      A    He starts looking to his right and I think in

6   response to hearing the running of Vickers down that driveway

7   in that rain and on that -- on that cement.

8      Q    Did you see Mr. Griffin swipe Officer Abad's hand

9   between 15 seconds and 17 seconds?

10         MR. KAHN: Objection.  Misstates the --

11     A    Yeah.  You'd have to play that again.  I wasn't

12  looking for that.

13  BY MS. NAIR:

14     Q    I'll play it again.  You would agree I'm starting at

15  second 15, correct?

16     A    Yes, ma'am.

17     (Whereupon, the video is played.)

18     Q    Did you see at that time?

19     A    He appears to push his hand away, yes, ma'am.

20     Q    Does Mr. Griffin push Officer Abad's hand away before

21  or after Officer Vickers begins running?

22     A    You'll have to go back again.  I wasn't looking for

23  that.

24     Q    I'll go back as many times as you need me to.

25     (Whereupon, the video is played.)

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 115

1    Q    Do you need me to  --

2    A    It appears that --

3    Q    -- play it again?

4    A    No, it appears that he -- he begins to run just as

5    the -- the moving of the -- of Officer Abad's hand off of his

6    shoulder in response to being grabbed, appears -- would -- is

7    when Officer Vickers appears to begin running.

8    Q    Okay.  I'm going to stop sharing that with you for

9    now.  Finally, your opinion for 7 -- Opinion No. 7 is

10   that -- is based off of your experience and training.  Is that

11   correct?

12   A    Yes, ma'am.

13   Q    After a detailed review of the video, in the two

14   seconds between which Officer Vickers began running and then

15   the tackle occurred, is it still your opinion that Officer Abad

16   had an opportunity, ability to intercede and intervene the

17   tackle?

18        MR. KAHN: Objection.  This misstates the evidence.

19        The video that you're showing, this -- it's not just one

20        second that's being captured.  It's, you know, there

21        are -- like, you press play and then multiple seconds pass

22        with one -- like, if it says 16 but it plays for more than

23        one second.  So it's just an inaccurate question.  And so

24        I'm sorry for -- for saying so much but that's my

25        objection.  It misstates the evidence in the sense that

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 116

1        that's an inaccurate phrasing of the question.

2        A    Yes, ma'am.  Based on my review of the video, there

3   was an opportunity for Officer Abad to intervene and wave off

4   Officer Vickers, especially because of the noise associated

5   with him running, as well as the -- my review of the video in

6   this matter.

7        **Q    And is it also your opinion that of - that Mr.**

8   **Griffin then had an opportunity and ability to move out of the**

9   **way?**

10       A    No, I don't believe that there was opportunity for

11  him to get out of the way because once he looked over, panned

12  to his right, and I think in the hearing or we can hear on the

13  video of the footsteps coming down from Officer Vickers, is

14  that at that time he has to process what's transpiring, and

15  then he didn't have time to move out of the way.  There is

16  really nowhere to go at that point.  He's against the side of

17  the car and Abad's in front of him, Officer Abad.  So I don't

18  think that Officer -- that Mr. Griffin could have moved

19  anywhere at that -- within that timeframe.

20       **Q    Is it because the timeframe was two seconds?**

21            MR. KAHN: Object to the form of the question.

22       A    Well, I -- once again, I don't know if it was

23  entirely a two-second duration because it -- the tackle gets

24  completed at the 18th to 19th second mark.  So during the

25  timeframe, there was not any time for Mr. Griffin to get out of

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 117

1   the way of -- of Officer Vickers at that point because he was

2   running full steam at him based on my review of the video.

3        Q    In addition, you based your opinion on the duty to

4   intervene that he should do so when in a position to do so

5   safely, correct?

6        A    Yes.

7        Q    You testified that you saw the - the initiation of

8   the run began between second 16 and 17 and had initiated the

9   tackle at second 18.  Do you believe that Officer Abad had an

10  opportunity to intervene safely within that two to three second

11  window?

12       MR. KAHN: Objection.  Misstates the testimony and

13       misstates the evidence.

14       A    Yes, ma'am.

15  BY MS. NAIR:

16       Q    So you also opine that -- that Mr. Griffin had

17  nowhere to go and no time to go anywhere?

18       A    Yes, ma'am.  Yes, ma'am.

19       Q    Opinion No. 7 does not opine -- excuse me.  Finally,

20  you base your opinion on your experience and training for

21  Opinion No. 7, correct?

22       A    Yes, ma'am.

23       Q    Opinion No. 7 does not opine on the failure to -- or

24  excuse me.  It only opines on the failure to stop the use of

25  force by Officer Abad.  Is that correct?

Page 118

```
 1      A    Yes, ma'am.

 2      Q    It does not opine on the actual use of force by

 3   Officer Vickers, correct?

 4      A    That's correct, ma'am.

 5      Q    Turning to Opinion No. 8.  Your opinion is that

 6   Officer Griffin -- or excuse me.  Your -- there's an error in

 7   your -- your opinion in and of itself.  But that Officer

 8   Vickers used unnecessary and unreasonable force when he tackled

 9   Mr. Griffin.  Is that correct?

10           MR. KAHN: Objection to the form --

11      A    Yes, ma'am.

12           MR. KAHN: -- of the question.

13      A    Yes, I didn't add Mr. Griffin's last name.  I see

14   that typo that you're referring to.

15   BY MS. NAIR:

16      Q    How about you read what you believe in Opinion No. 8.

17   I don't want to mischaracterize.

18      A    Yes, ma'am.  "It is my opinion Atlanta Police

19   Department Police Officer Donald Vickers used unnecessary and

20   unreasonable force when he tackled Mr. Tyler Griffin, causing

21   serious physical injury to his left ankle.  Based on my review

22   of the facts and body-worn camera in this matter, Mr. Tyler

23   Griffin was being compliant, offering no form of physical

24   resistance that would necessitate any force by

25   Officer -- Police Officer" -- it should have been Police
```

Page 119

```
 1   Officer Donald Vickers, not Matthew Abad.

 2        Q    You base your opinion on APD Policy Manual SOP Work

 3   Rule 4.2.50, correct?

 4        A    Yes, ma'am.

 5        Q    You also base your opinion on the Use of Force SOP

 6   3010, correct?

 7        A    Yes, ma'am.

 8        Q    The languages mirror each other, correct?

 9        A    Yes, they're quite similar, ma'am.

10        Q    You also base your opinion on the testimony of

11   Officer Abad, Nixon, Fite, Reese and former Chief Erika

12   Shields.  Is that correct?

13        A    Yes, ma'am.

14        Q    And finally, on your training and experience,

15   correct?

16        A    Yes, ma'am.

17        Q    I want to turn your attention back to what's been

18   marked as Defendant's Exhibit 6.

19        (Whereupon, the video is played.)

20        Q    You state that you saw Officer Abad grab ahold of Mr.

21   Griffin, correct?

22        A    Yes, ma'am.

23        Q    And you -- your testimony was he reached up, correct?

24             MR. KAHN: Objection.  Misstates his testimony.

25        A    He -- that he grabbed his shoulder area.  Upper arm,
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

1    shoulder area is what I testified to.

2    BY MS. NAIR:

3        Q    Does it appear or how -- does the appearance or the

4    weight of the individual, is that taken into consideration?

5            MR. KAHN: Objection.  Vague.  Confusing.

6        A    Well, it depends.  I mean, I don't believe any force

7    is necessary in this case with Mr. Griffin so regardless of how

8    much he weighed.  Looking at a subject's weight compared to an

9    officer's weight may be a consideration on a type of force

10   option but based on my review the video here, there was no

11   force necessary at any point by Officer Abad or Officer

12   Vickers.

13   BY MS. NAIR:

14       Q    I understand.  When you look at the use of force

15   language in Work Rule 4.2.50, it says that it may be necessary

16   to defend themselves or another from physical assault.  Is that

17   correct?

18       A    Yes, ma'am.

19       Q    And you would agree that -- that Officer Abad's hand

20   was swiped away by Mr. Vickers (sic) immediately

21   preceding -- or excuse me -- that Officer Abad immediately

22   preceding officer Vickers tackling him.

23           MR. KAHN: Objection.  Misstates the evidence.

24           THE WITNESS:   I'm going to have to change -- switch

25       off to get out of these earbuds real quick because they're

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 121

1    dying.  So I'm going to go ahead and go to -- give me one

2    second.  Okay?

3         Can you guys hear me?

4         MS. NAIR: Yes.

5         MR. KAHN: Yeah.

6         THE WITNESS:  All right.  Great.  Sorry about that.

7    So much for this new technology I picked up.

8         A    Okay.  Yes.  Can you repeat the question, ma'am?

9    I'm sorry for the interruption.

10        MS. NAIR: Madam Court Reporter, can you please read

11   back the question?

12        THE COURT REPORTER:  Certainly.  Give me just a

13   second.

14   (Whereupon, the court reporter read back the previous

15   question.)

16        MR. KAHN:  And then I had made an objection that it

17   misstates the evidence.

18        THE COURT REPORTER: Yes, there was an objection and

19   then that was when the witness needed to switch the

20   earbuds.

21   A    Yes, ma'am.  I don't believe that he swiped his hand

22   away.  I believe there was a startled response.  If I grabbed

23   you on your shoulder unexpectedly, I think that would be a

24   normal startled response and I think that's what Mr. Griffin

25   did based on my review of the video.  It wasn't as to assault

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 122

```
 1   or the assault of or even being resistant towards officer Abad,

 2   based on my review.  I believe it was a normal startled

 3   response by someone being grabbed unexpectedly.

 4   BY MS. NAIR:

 5        Q    I want to go back now to the language that Mr.

 6   Griffin used and I want you to listen carefully for that

 7   language.  Okay?

 8        A    Yes, ma'am.

 9        (Whereupon, the video is played.)

10        Q    Did you hear what Mr. Griffin said in that video?

11        A    He said, "Wait a minute, hold on."

12        Q    There's more.  Maybe you need to turn up your

13   earbuds.

14        A    No, my earbuds are fine.  I -- I was just --

15        Q    Okay.

16        A    -- listening for that.  I can hear loud and clear,

17   ma'am.

18        (Whereupon, the video is played.)

19        Q    Okay.  Did you hear that time?

20        A    It sounds like --it sounds like Officer Abad said,

21   "Don't grab me like that."

22        Q    Do you see Mr. Griffin's mouth moving in this?

23        (Whereupon, the video is played.)

24        A    Yeah, you're -- you're right.  It is -- I stand

25   corrected.  It is Mr. Griffin that says that.
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 123

1    Q    **What does Mr. Griffin say?**

2    A    "Don't grab me like that."

3    Q    **And who was Mr. Griffin talking to?**

4    A    Mr. Abad.  Or Officer.  Pardon me.

5    Q    **And your testimony is that's not resistance?**

6         MR. KAHN: Objection.  Asked --

7    A    An officer --

8         MR. KAHN: -- and answered.

9    A    -- a citizen cannot then resist excessive force,

10   ma'am.

11   BY MS. NAIR:

12   Q    **So then your testimony is that he did resist?**

13   A    No, I'm -- I mean, at the startled response and

14   simultaneously say, "Don't grab me like that" as a startled

15   response so there was no reason for Officer Abad to grab him.

16   He justifies that there was something related to escape,

17   falling down, which does not reflect on the video.  There's no

18   reason to put hands on him.  He wasn't effecting an arrest,

19   overcoming any resistance or preventing of any escape.  So

20   there was no reason for him to initiate any force option at

21   all.  So I think Mr. Griffin's response to being grabbed and

22   saying, "Don't grab me like that," is a reasonable response to

23   someone who's unnecessarily being grabbed by a police officer.

24   Q    **So you saw that Mr. Griffin moved his -- at minimum,**

25   **moved Officer Abad's hand simultaneously to saying, "Don't grab**

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 124

1    me like that," correct?

2           MR. KAHN: Objection --

3    A    Yes, ma'am.

4           MR. KAHN: -- misstates the evidence.

5    BY MS. NAIR:

6    Q    Your -- your opinion for No. 8 was based off of the

7    testimony of other officers.  In the testimony of the other

8    officers, did they say that they would not have done that?

9           MR. KAHN: Object to the form of the question.

10   A    Yes.

11   BY MS. NAIR:

12   Q    And --

13   A    OPS Nixon -- OPS Investigating Officer Nixon stated

14   on page 39 of his deposition he would not have tackled Mr.

15   Griffin.  Abad stated he was not scared when Mr. Griffin

16   brushed his hand away.  Abad said that.  So yes.  And obviously

17   Chief -- former Chief Shields agrees as well.  And then SPO

18   Fite, who everyone respects on your police department -- or on

19   the police department, pardon me, agrees as well that the force

20   is not justified.

21   Q    Did they -- you reviewed everyone's testimony,

22   correct?

23          MR. KAHN: Object to the form of the question.

24   A    Well, everyone that I -- the testimony I was

25   provided.  I don't know if there was any additional discovery I



Georgia Reporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 125

1   did not receive.  The numbers on the material that's enumerated

2   on my Rule 26 report and then the supplemental material and my

3   supplemental report is what I reviewed.  I don't -- I don't

4   know if there's any additional material.

5   BY MS. NAIR:

6       Q    I understand.  For the material that we agreed is in

7   the universe of this case that you used to draw for your

8   opinion, being those 72 documents and the additional four

9   documents, you reviewed all the testimony within those

10  documents.  Is that accurate?

11      A    Yes, ma'am.

12      Q    In those deposition testimony, did you review the

13  times in which different officers stated that they in

14  themselves would not have responded in that way but that it was

15  what was in the mind of Officer Vickers at the time of tackle.

16          MR. KAHN: Objection due to the form of the question

17          and it misstates the testimony of City of Atlanta 30(b)(6)

18          representatives that were appointed by the City to speak

19          on behalf of the City.

20      A    Yeah, I don't recall that regarding what they were

21  thinking about at the time, what they thought at the time.  I

22  just know what they responded to as relates to the

23  reasonableness of the force.

24  BY MS. NAIR:

25      Q    Did you see where they said they were speaking in



Page 126

```
1    their personal capacity, not as officers of this -- or not as

2    the official City response?

3              MR. KAHN: Same objection.  Misstates the testimony.

4         A    I believe that on -- well, at least on regarding your

5    last statement on deposition of 30(b)(6) Quentin Reese, I don't

6    recall if you -- I do recall one of the depositions or maybe

7    two that you asked if they are speaking on their personal not

8    professional testimony.  I believe you did ask that or someone

9    asked that I believe in -- in the deposition transcripts that I

10   reviewed.  I believe it was you, Ms. Nair.

11   BY MS. NAIR:

12        Q    You didn't include that in your opinion, correct?

13             MR. KAHN: Object to the form of the question.  Vague.

14        A    Well, I didn't need to because I-- my understanding

15   of reviewing 30(b)(6) depositions that they're representatives

16   for the City as person most knowledgeable related to the

17   issues.  So I believe their opinions are valid as it relates to

18   the matter they're asked to testify.

19   BY MS. NAIR:

20        Q    So your opinion is that you didn't have to?

21             MR. KAHN: Objection.  Misstates what he just said.

22        A    No, I -- what I would offer, ma'am, is that, you

23   know, if they provide an opinion as Chief Shields did and SPO

24   Fite did, and Nixon did and Quentin Reese did, is that they all

25   believed that -- that the force was unreasonable.  And even
```



Page 127

1    Officer Abad, who states that he's looking at it now, that

2    Vickers should have done things differently.  He said that he

3    was not scared at the time.  He was at the scene of the time.

4    So I think based on those comments, it may be self-serving I

5    think on his part.  Nonetheless, they were -- he did in fact

6    state that.

7    BY MS. NAIR:

8        Q    I'm sorry.  You didn't answer my question.

9        A    I'm sorry.

10            MS. NAIR: Can you repeat back my question, Madam

11       Court Reporter?

12            THE COURT REPORTER:  Give me just a second.

13            MR.KAHN:  And I'm just going to object to that.  He

14       completely responded to your question.

15       (Whereupon, the court reporter read back the previous

16    question.)

17    BY MS. NAIR:

18       Q    Can you answer my question, Mr. DeFoe?

19            MR. KAHN: There is no pending question.

20    BY MS. NAIR:

21       Q    Is it your opinion that you didn't have to?

22            MR. KAHN: Objection.  Vague.  Again, objection to the

23       form of the question.

24       A    No, ma'am.  I reviewed all of the information in this

25    matter that I listed on my report, the 72 items and then the

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 128

1    four additional items, and I believe I put relevant testimony

2    in my report that the supports -- supports the basis for my

3    opinions.

4    BY MS. NAIR:

5        Q    Okay.  Moving on to Opinion No. 9.  Or let me back

6    up.  Opinion No. 8, it does not opine on the practice, policy

7    or procedure of the City of Atlanta.  Is that correct?

8            MR. KAHN: Objection.  Vague.

9        A    It involves a policy and procedure but not

10   specifically as that there is any inadequacies of the policy at

11   hand.

12   BY MS. NAIR:

13       Q    Opinion No. 8 does not opine on the failure to stop

14   the use of force by Officer Abad.  Is that correct?

15       A    No.  I think 8 is specifically -- it relates to the

16   use of force by Vickers.

17       Q    And Opinion No. 8 does not opine on the failure to

18   report the use of force by either Officer Vickers or Officer

19   Abad.  Is that correct?

20       A    Yes, ma'am.

21       Q    Moving forward to Opinion No. 9.  Your opinion that

22   Officers Abad and Vickers failed to immediately summon medical

23   assistance for Mr. Griffin after he was tackled by Officer

24   Vickers.  Is that correct?

25       A    Yes, as well as forcing him to stand up after being

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 129

1    injured.

2        Q    Your opinion in No. 9 does not opine on the practice,

3    policy or procedure being deficient in the City of Atlanta.   Is

4    that correct?

5        A    Yes, ma'am, that is correct.

6        Q    It does not opine on the use of force by Officer

7    Vickers?

8        A    That's correct, ma'am.

9        Q    It does not opine on the failure to report the use of

10   force by either Officer Vickers or Officer Abad?

11       A    Yes, ma'am.  That's correct.

12       Q    And it does not opine on the failure to stop the use

13   of force by Officer Abad.  Is that correct?

14       A    Yes, ma'am, that's correct.

15       Q    Opinion No. 10.  It's your opinion that Officer Abad

16   and Vickers failed to immediately summon the Atlanta Police

17   Department supervisor to the scene.  Is that correct?

18       A    Yes, ma'am.

19       Q    Opinion No. 10 does not opine on a deficiency of a

20   practice, policy or procedure of the City of Atlanta.  Is that

21   correct?

22       Q    That's correct, ma'am.

23       Q    It does not opine -- Opinion No. 10 does not opine on

24   the use of force by Officer Vickers.

25       A    Well, it involved in the use of force of Officer

Elizabeth Gallo
COURT REPORTING, LLC

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021
Exhibit M

Page 130

1    Vickers because he used force, so summoning a supervisor to

2    complete the investigation is part and parcel, but not

3    specifically at the application of force.  No, ma'am.

4         Q    It does not opine on the failure to report the use of

5    force?

6         A    Well, it does opine on reporting the use of force,

7    yes, ma'am.

8         Q    Okay.  Turning your attention to --

9         A    And that's --

10        Q    Excuse me?

11        A    Yeah, I was just completing -- yes.  I mean, if

12   you -- on page 27 out of 43 of my report, I outlined the

13   reporting requirements for LAPD -- excuse me -- for APD Policy

14   2010.

15        Q    Your opinion for No. 10 is on page 26 of 43.  Is that

16   correct?

17        A    It begins on 26 of 43.

18        Q    It begins with, "It is my opinion," correct?

19        A    Yes.

20        Q    "That they failed to immediately summon an Atlanta

21   Police Department supervisor."

22        A     To the scene  --

23        Q    Correct?

24        A    -- to conduct -- to the scene to conduct the use of

25   force investigation, yes.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 131

1    Q    Right.  And then based on your review of the facts in

2  this matter, Officer Vickers did not complete an initial report

3  that accurately documented the force he used on Mr. Tyler,

4  correct?

5    A    That's correct.

6    Q    And that Matthew Abad failed to document that Police

7  Officer Vickers sprinted and tackled Mr. Griffin, but rather

8  made the following statement:  "That Officer Vickers grabbed

9  hold of the driver, took him to the ground so that he was able

10  to regain control and retain him," correct?

11       MR. KAHN: Objection.  Deliberately misstates the

12       opinion.

13    A    Can you repeat that, ma'am?  I haven't read that?

14  BY MS. NAIR:

15    Q    That officer -- that Mr. Griffin -- or excuse me.

16  "That Officer Abad failed to document that Officer Vickers

17  sprinted and tackled Mr. Griffin, but rather intentionally and

18  inaccurately documented the following:  that Officer Vickers

19  grabbed hold of the driver and took him to the ground so that

20  he was able to regain control and detain him."

21    A    That's correct, ma'am.

22    Q    Those are your words, correct?

23    A    Yes, ma'am.  Verbatim from my report.

24    Q    Okay.  Nowhere in your opinion does it speak of the

25  failure to report.  It talks of the failure to accurately

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 132

1    report.  Is that correct?

2         A    It -- no, it's both report and accurately report.

3    Because by failing to summon -- by failing to summon Sergeant

4    Thompson, who was present at the time and working, he was never

5    contacted for his testimony in this matter and he was available

6    to be summoned.  So they initially did not report the use of

7    force at all and only force that was used was regarding taking

8    him to the ground and not tackling.  So there is inaccurately

9    reporting force and then -- but initially not reporting force

10   at all, which is a violation of APD SOP 2010.  It's outlined on

11   page 27 of 43 on my report.

12        Q    Turning to Opinion No. 11.  You'll find that the

13   Atlanta Police Department failed to complete a use of force

14   investigation, as well as initiate suspected work rule

15   violations that should have been investigated by the Office of

16   Professional Standards.  Is that correct?

17        A    Yes, ma'am.

18        Q    And you based your opinion on Work Rules, correct?

19        A    Yes, ma'am.

20        Q    Is it your understanding that there was an actual OPS

21   investigation into this matter?

22        A    Yes -- yes, ma'am.  There was.

23        Q    So as to paragraph or Opinion No. 11, where was the

24   failure to complete the use of force investigation?

25        A    It comes at the time of the use of force, which



Page 133

```
 1  critical is -- from the initiation of the use of force, because
 2  responding to the scene of where it transpired, I know that
 3  they initiated an investigation afterwards in this matter, but
 4  once a complaint was made by Mr. Griffin.  But it wasn't until
 5  that point that it was initiated based off -- by the
 6  Department.  That being responding to the force, being
 7  appropriately notified by Officer Vickers and Officer Abad,
 8  doing a use of force investigation at the scene, reviewing
 9  body-worn camera that would have depicted the use of excessive
10  force in my -- in my opinion by Officer Vickers, as well as all
11  the other issues I outlined earlier my deposition testimony
12  that are outlined in my report.  And then initiate an
13  investigation at that point.  It wasn't until a complaint was
14  made in this matter that then did the Department took action.
15  That should have been done at the time in which force was used
16  and medical treatment was not provided and all those other
17  issues that are outlined in -- in my report and discussed here
18  during my deposition.
19       Q    So your opinion in No. 10 is that Officer Abad and
20  Vickers did not initially report it, but your opinion in No. 11
21  is that the Atlanta Police Department should have known and
22  initiated something that wasn't reported to them?
23            MR. KAHN: Object to the form of --
24       A    Yes.
25            MR. KAHN: --  the question.
```

Page 134

1       A     Yes, ma'am.  It's incumbent on a, that you -- you

2    make from the incident that it should have been monitored by

3    the supervisors on patrol of this matter.  There was obviously

4    an incident that transpired that I believe necessitated a

5    supervisor to respond and that did not occur.  There was

6    someone who was not provided medical treatment at the scene.

7    There was someone who was pushed into an old paddy wagon or

8    transport vehicle unnecessarily and then forced to go to the

9    hospital by way of -- of transport vehicle.  So the Department

10   should have monitored the call, should have responded to the

11   call.  And -- but it's primarily based on the opinions outlined

12   in No. 10, and that is based on the officers not reporting the

13   use of force in this matter.  And not just Officer Abad and

14   Officer Vickers, but everyone who else was present.  Johnson,

15   all the other officers who did, in fact, show up at the scene,

16   you know, had the responsibility and duty to report the use of

17   force and the injuries to Mr. Griffin and that did not

18   transpire.

19   BY MS. NAIR:

20       Q     **The use of force as you stated in the recording is**

21   **for those who witnessed the use of force or used use of force,**

22   **correct?**

23       A     Yes, ma'am.

24       Q     **Those are the individuals who had a requirement to**

25   **report the use of force.  Is that correct?**



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 135

1    A    Or those people who would become -- if they become

2    knowledgeable of the use of force.  If there is an injury

3    associate with someone who came after the fact.  They may not

4    have used it or may not have enforced it.  But now they know

5    about it because of the circumstances.  Someone is injured,

6    they heard about it, there's comments being made, as there were

7    numerous, inappropriate comments being made, that a reasonable

8    officer would know that force occurred.  There was numerous

9    opportunities to summon a supervisor to the scene to properly

10   investigate this matter and it was not done, even though

11   Sergeant Thompson, based on his testimony, would have responded

12   and appropriately completed an investigation.

13   **Q    Opinion No. 12 is based on unprofessional**

14   **interactions with Mr. Griffin by -- by Officer Abad and Officer**

15   **Vickers.  Is that correct?**

16   A    As well as Thomas, see, I mentioned Johnson before.

17   It was actually Thomas, my mistake.  Yes.  I mean, I think

18   initially in there that unprofessionally regarding Abad and

19   Vickers in this case.  But also about lying in my -- to support

20   my opinion, there are some -- a lot of things that were stated

21   in this case were stated by -- the (Zoom audio drop) in the

22   presence of Officer Thomas as well as by Officer Thomas which

23   is clearly misconduct and should have been reported to a

24   supervisor without delay.  And I believe once again after

25   reviewing this, had they properly reviewed this case, Officer

Tyler Griffin vs City of Atlanta, et al.                                                    Exhibit M
Scott DeFoe                                                                          March 26, 2021

Page 136

1    Thomas should have a -- a complaint initiated against -- and

2    everyone who was in -- earshot of those comments without

3    reporting them should have been -- had a complaint initiated

4    foe failure to report the misconduct.

5        Q    Mr. DeFoe, I'm going to ask you to stick to the

6    opinions that you listed in your report.  And then I'm going to

7    ask you to stick to it, based off of your testimony previously,

8    that you have not drawn any further opinions.  Now in Opinion

9    No. 12 --

10        MR. KAHN: Objection to that -- that colloquy.  You're

11        talking to me about speaking objections.  You're sitting

12        here trying to create a -- you're testifying for the City.

13        I mean, I just object and move to strike that entire

14        whatever you want to call that colloquy.

15   BY MS. NAIR:

16        Q    I'm going to turn your attention back to your opinion

17   in -- for Opinion No. 12 on page 30.  Your opinion, you would

18   agree, is listed in that first paragraph.  Is that correct?

19        A    Yes, ma'am.

20        Q    The rest of the information for Opinion No. 12 is

21   what you are using to support your opinion, correct?

22        A    Yes, ma'am.

23        Q    So your opinion is simply based on Officer Abad and

24   Officer Vickers acting unprofessionally during their

25   interaction with Mr. Griffin.  Is that correct?



Case 1:20-cv-02514-VMC    Document 89-13    Filed 05/03/21    Page 137 of 185

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

1          MR. KAHN: I'm going to object here.  You're trying to

2      improperly limit the scope of what he says in his report.

3      He can offer whatever opinion he wants to based on what's

4      in his report.

5          A    Yes, ma'am.  And with the caveat that I don't

6      know what you're going to ask in a deposition so I can use

7      this opportunity to amplify my opinions.

8  BY MS. NAIR:

9      Q    So you have a new opinion that you are adding to

10 Opinion No. 12?

11         MR. KAHN: Objection.  Argumentative and just

12     blatantly and deliberately misstates the testimony.

13     A    Well, I'm just saying -- once again, I'm not adding

14 anything, ma'am.  It's already outlined in my opinion based on

15 what Thomas stated on the first bullet point of mine.  So I'm

16 not adding a new opinion.  I'm not -- I'm just amplifying what

17 I had stated earlier, but I'm not changing or augmenting my

18 opinion.  I'm just amplifying it by testifying based on your

19 question.

20 BY MS. NAIR:

21     Q    So on page 32 of 43 where you say, "I base my opinion

22 on the following facts and testimony," the listed documents are

23 what you are using to base your opinion that was already

24 previously stated on page 30 of 43 for Opinion No. 12.  Is that

25 correct?

Page 138

```
1            MR. KAHN: Object to the form of the question.

2       A    Yes, ma'am.  That is correct.

3    BY MS. NAIR:

4       Q    Opinion No. 12 does not opine on the use of force by

5    Officer Vickers.  Is that correct?

6       A    No.

7       Q    Opinion No. 12 does not opine on the deficient

8    policy, practice or procedure for the City of Atlanta.  Is that

9    correct?

10      A    That is correct.

11      Q    Opinion No. 12 does not opine on the failure to

12   report the use of force by either Officer Vickers or Officer

13   Abad.

14      A    That's correct, ma'am.

15      Q    And Opinion No. 12 does not opine on the failure to

16   stop the use of force by Officer Abad.  Is that correct?

17      A    That's correct, ma'am.

18      Q    Turning to Opinion No. 13.

19           MR. KAHN: Ms. Nair, let's take a -- we've been going

20           for a little over an hour now.  Could -- let's take a

21           break and just go to the restroom real quick.

22           MS. NAIR: How long of a break would you like, Mr.

23           Kahn?

24           MR. KAHN: I probably just need maybe two minutes.

25           MS. NAIR: Let's take a five-minute break and
```

Page 139

```
1       Come -- well, let's come back at 4:45.

2       (Whereupon, the proceedings were in recess from 4:37 p.m.

3  until 4:46 p.m.)

4  BY MS. NAIR:

5       Q    So we're moving now to Opinion No. 13.  Are you

6  there, Mr. DeFoe?

7       A    Yes, ma'am, I'm here.

8       Q    Okay.  It's your opinion that there was a failure by

9  the Atlanta Police Department to provide training to Officers

10 Abad and Vickers or a departure from training by Officers Abad

11 and Vickers on the following subject matters:  working together

12 as a team; use of available concealment; contact and cover

13 officers; tactical plans; verbal strategies; active listening

14 skills; visual (sic) stops; undercover plainclothes operations;

15 drawing and exhibiting a firearm; use of reasonable force;

16 summoning medical treatment for injured individuals; use of

17 force reporting and documentation; summoning a supervisor to a

18 scene involving an officer's use of force; diffusing and

19 de-escalating techniques or de-escalation techniques;

20 requesting additional follow-up information; and leadership,

21 ethics and professionalism.

22       That is the extent of your -- or excuse me.  Did I miss

23 anything out of that read?

24       A    Just one thing, ma'am.  That was vehicle stops, not

25 visual.  I picked up on that as vehicle stops as one of the
```



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe                                                                    March 26, 2021

Exhibit M

Page 140

1   items in there.  Yes.  In addition to that, the opinion follows

2   on page 34, as well.

3        Q    Correct.  And then you said that this failure can be

4   seen as endorsing and perpetuating inadequate discipline,

5   training, and failure to enforce written policies and establish

6   standards, correct?

7        A    Yes, ma'am.

8        Q    In addition, you said -- well, I want to stop there.

9   You said that it can be seen as endorsing and perpetuating an

10  active discipline, training, and failure to enforce.  Why do

11  you say it is endorsing?

12       A    Well, once again, it -- it -- well, it can.  Because

13  once again, I can't affirmatively say it will endorse.  It can

14  endorse when you don't enforce some of those things.  Not just

15  ultimately the -- I mean, we know that the use of force was

16  exonerated in this case.  But even in the areas that were

17  sustained in this matter by APD, if you're not looking at the

18  pre-incident tactics, such as communication, cover concealment,

19  all of these other areas that weren't even -- weren't even

20  discussed in the -- in the complaint other than as a fact

21  pattern, you create and perpetuate and ratify the behavior to

22  think that that type of activity is going to be endorsed by the

23  Department.  And specifically as it relates to the tactics of

24  Abad initially -- Officer Abad, pardon me -- as it relates to

25  just because the number of -- of officer involved shootings



Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                             March 26, 2021

Page 141

1  regarding shooting into moving vehicles, when you don't look at

2  the pre-shooting tactics such as Officer Abad's situation in

3  this matter, approaching a vehicle with a gun out, approaching

4  it from the front, not using proper tactics, you would see that

5  many of those instances, although it did not occur in this

6  case, result in the use of lethal force in the shooting in a

7  moving vehicle cases on dozens that I've looked at involving

8  the Atlanta Police Department in my other matters.  So I think

9  that needed to be obviously discussed and trained.  And based

10 on my review of this matter, not only was none of this trained,

11 none of it was even documented in their -- in their annual

12 evaluations, none of it was discussed at all.  And even at the

13 time of Officer Vickers' deposition transcript, he hadn't even

14 been disciplined in the sense of at the time of taking

15 the -- the reduced days off that he received.  So that in

16 itself endorses, perpetuates and ratifies behavior based on the

17 Department's failure to implement certain pre-incident actions

18 in this matter.

19      Q    I want to pause there.  Your opinion in that first

20 paragraph is based on the failure to train.  You said provide

21 training, correct?

22      A    Yes, ma'am.

23      Q    All of the things that you just testified to were

24 after the training.  I think you testified to the annual report

25 and some other matters but sticking specifically to the

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 142

1    training, what evidence do you have that they were not trained?

2        A    Well, also ma'am, on page 34 it says --

3            MR. KAHN: I'm sorry.

4        A    -- ability to endorse --

5            MR. KAHN: Let me interject.  I'm sorry.  I was trying

6        to object but I was on mute.  Sorry about that.

7            I just want to object to that little colloquy that

8        Ms. Nair just made.  And object to the form of the

9        question and move to strike the colloquy.

10   BY MS. NAIR:

11       Q    What evidence do you have that they did not train

12   Officer Abad and Officer Vickers as to the items listed on page

13   33 in your Opinion No. 13?

14           MR. KAHN: Object to the form.

15       A    Right.  I -- I don't have evidence that they did

16       not train them.  As you can see in my department -- in my

17       opinion, it's more a departure from training as part of my

18       opinion.  But when you mentioned the question regarding

19       the failure, it's only -- only for training but it's

20       inadequate discipline training and failure to enforce

21       written policies and established standards.  And that is

22       policies that they already have existing in place.  The

23       failure to enforce those policies is what the second part

24       of that first opinion is, which follows on page 34 of my

25       report.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe                                                                    March 26, 2021

Page 143

```
1   BY MS. NAIR:

2       Q    I understand.  I want to stick to the training, Mr.

3   DeFoe.  Can we stick -- can we agree to stick to that portion?

4            MR. KAHN: Objection.  Argumentative.  He just

5       explained to you how his opinion relates to training.  So

6       it misstates the -- the testimony.

7       A    What was your question, ma'am?

8   BY MS. NAIR:

9       Q    Can we agree to stick to the training?

10           MR. KAHN: Objection.  Vague.

11      A    Sure.  Yeah.  I'll agree to any question you want to

12  ask me, ma'am.  I may not agree with the question but

13  I'll -- I'll do my best to answer to the best of my ability.

14  BY MS. NAIR:

15      Q    Okay.  So as to the training, is it your testimony

16  that you don't have any evidence that they failed to provide

17  training?

18           MR. KAHN: Objection.  Asked and answered.  Misstates

19      testimony.  Misstates evidence.

20      A    Preceding this incident I do not have any, other than

21  the fact of the actions by the officers in this case would lead

22  a reasonable officer to believe they weren't appropriately

23  trained or there was a departure from training.  So I don't

24  know.  That was never asked and the -- the OPS investigation

25  never looked at, which was confounding to me, the issues
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 144

1    arounding (sic) -- around the training.  Not only do we need to

2    discipline but I think it's equally important we need to

3    properly train to ensure that these incidents don't happen

4    again.  As Chief Shields stated, would there be a likelihood

5    that someone like Vickers would use force in the future and her

6    response was yes.  So I think that's critically important as to

7    why we train, to reduce these incidents, especially reduce the

8    instance of inappropriate excessive force and maltreatment and

9    other things that occurred in this matter.

10   BY MS. NAIR:

11       **Q    And you would agree that they are trained and that's**

12   **the reason for their training?**

13            MR. KAHN: Objection.  Compound question.  And vague.

14       A    I don't -- I can't agree with that, ma'am.  My

15   opinion is that there is a failure to train or there's a

16   departure from training.  What I did review and what -- on the

17   body-worn camera in this incident -- or cameras, make that

18   plural -- is that there was either a departure from training or

19   a failure to train.  If the standard operating procedure is

20   that we run up on cars from the front with our pistol out by

21   ourselves formulating a plan, if that is the training, then

22   there is a failure to train.  If the training is that we do not

23   do that; we appropriately request backup; we approach vehicles

24   from the rear; we use proper tactics; proper cover; proper

25   concealment; we don't cuss at people when we approach them; we


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 145

1   don't use profanity, if that's the training, then there was a

2   departure from training.  So I don't know.  All I know is what

3   the end result is what the body-worn camera revealed in this

4   matter; that there was either a significant departure from

5   training or a failure to train.  And all those items that I

6   outlined on page 32 of my report.

7   BY MS. NAIR:

8        Q    Your other opinion --

9        A    Page --

10       Q    -- it -- forgive me.  Go ahead.

11       A    No, I meant page 33.  I misspoke, ma'am.

12       Q    Your opinions that we talked about earlier, where you

13   cited Officer Vickers and Abad, was for departures from their

14   training, correct?

15            MR. KAHN: Objection.  Misstates testimony.

16       A    Well, either failure to provide or departure from.

17   And the -- the only reason I believe there is a failure to

18   provide, ma'am, is that the -- if there was a departure, that

19   departure should have been outlined in the OPS investigation.

20   That the use of tactics were poor, the use of communication was

21   poor, the use of -- all those other things irrespective of the

22   profanity and the maltreatment and the failure to provide

23   medical treatment and the failure to summon a supervisor.  But

24   the pre-incident tactics were never discussed and never looked

25   at, is that we don't approach vehicles like that.  We don't do



Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                          March 26, 2021

Page 146

1   that if we to alleviate shooting into moving vehicles.  We

2   don't want our officers to get hurt.  We don't want officers to

3   get injured or killed so we're going to use better tactics and

4   provide better training.  Being that was not discussed as a

5   poor tactic and poor training, let's me believe that there

6   wasn't any training in that area, at least, as it relates to

7   approaching a vehicle undercover or plainclothes operations, a

8   vehicle stop, things such as that.

9   BY MS. NAIR:

10      **Q    You would agree that the officers had on -- or**

11  **identified themselves as officers at minimum?**

12          MR. KAHN: Objection.  Misstates the evidence.

13      A    Well, what I saw is that I could tell -- I could tell

14  the entire attire.  I mean, Abad had a beanie on and was

15  running up with his pistol canted in a position that you

16  typically see in a movie, not consistent with police training.

17  And was yelling out profanity while he was telling him to stop

18  the car.  As I harken back to my previous opinion, would make a

19  reasonable person believe they're being carjacked because

20  officers typically don't dress like that.  That's why the

21  uniform, patrol officer in a marked black and white, is so much

22  more important.  Especially if you reasonably believe someone

23  is under the influence.  That's -- especially if you believe

24  that.  And giving people a reasonable opportunity to comply

25  with what you're telling them to do.



Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                           March 26, 2021

```
 1              MS. NAIR: I'm sorry.  I have -- Madam Court Reporter,
 2         can you repeat that -- my question?  Because I just missed
 3         it.
 4              MR. KAHN: Objection.  Asked and answered, to reading
 5         back the question.
 6         (Whereupon, the court reporter read back the previous
 7    question.)
 8    BY MS. NAIR:
 9         Q    Did the officers identify themselves as officers?
10              MR. KAHN: Objection.  Asked and answered.
11         A    At what point?   I don't believe -- Officer Vickers
12    never said a word until he tackled Mr. Griffin, so there was no
13    identification on his part.  Officer Abad, when he told him to
14    get the eff out of the car and pointing the pistol at him, I
15    think at that point when he looked up, it would be reasonable
16    at that point for Mr. Griffin to believe that it was a police
17    officer.  But proceeding that, I don't believe that it would
18    have been reasonable or for a person to look and say this is
19    the police, an individual with a beanie running at me with his
20    weapon canted in a one-handed shooting position, which once
21    again, is not typical to what you would see by a trained police
22    officer, running at the -- in the front of my car, yelling at
23    me to shut the effing thing off and get the eff out of the car.
24    So I don't think that -- eventually, I think when he was at the
25    window, I think Officer Griffin (sic) believed that it was a
```

Page 148

1 police officer based on his actions, but once again, I hope I'm

2 not being presumptuous here. But proceeding that

3 arriving -- arriving at the window, I think it would be

4 reasonable for them -- for him to believe that he did not know

5 what was going on.

6 BY MS. NAIR:

7     **Q   You -- you opined that the Atlanta Police Department**

8 **failed to properly discipline to include terminating police**

9 **Officers Abad and -- and Vickers, correct?**

10     A   Yes, ma'am.

11     **Q   In fact, there was an investigation in this case,**

12 **correct?**

13     A   There was.

14     **Q   And some of the allegations were sustained, correct?**

15     A   Yes, ma'am.

16     **Q   And they were disciplined as a result of the**

17 **sustained allegations, correct?**

18     A   Once again, there was a discipline imposed, that was

19 ultimately reduced on Vickers. And at the time of his

20 deposition, he hadn't even been disciplined at that point? In

21 a sense, he had not taken his days off, the three days off,

22 that he was given for this incident by the Department.

23     **Q   So is it that they failed to discipline or they**

24 **didn't discipline in a manner that you felt is appropriate?**

25     MR. KAHN: Object to the form of the question.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 149

1      Argumentative.

2      A    Well, the fact that they did not sustain the use of

3   excessive force by Vickers is confounding, when SPO Fite agreed

4   that it was by far excessive.  Quentin Reese agreed it was

5   excessive.  Nixon agreed it was excessive.  Chief Shields

6   agreed that it was excessive.  That the Department itself found

7   that the -- that there was exoneration on Vickers.  I think

8   what is confounding is on pages 59 to 60 of -- of Chief

9   Shields' deposition where she states she believes it was a huge

10  problem that OPS exonerated Vickers on the use of force.

11  Shields believes there's a much larger issue is what she

12  stated, which was telling me that she, as the former chief,

13  believed that the exoneration of Vickers on the use of force

14  was a much larger issue, which I believe speaks to -- I think

15  provides obviously legal opinions save for the normal component

16  of ratifying, endorsing and perpetuating behavior, specifically

17  as it relates to the officer's use of excessive force.

18  BY MS. NAIR:

19      Q    **Mr. DeFoe, is it your opinion that they failed to**

20  **discipline or that they did not discipline adequately?**

21          MR. KAHN: Objection.  Asked and answered.  Just

22      answered that --

23          MS. NAIR: Mr. DeFoe has not answered my question. In

24      fact, Mr. DeFoe has told me what he found -- finds

25      interesting about Chief Shields.  I'm asking him a

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 150

1      specific question.  Please allow your witness to answer.

2            MR. KAHN: He -- I'm just objecting to you asking the

3      same question to which he just answered.

4      A     Yes, there was discipline.  I thought the discipline

5   was clearly inadequate based on the -- this incident at hand.

6   BY MS. NAIR:

7      Q     Thank you.  Moving on to a Opinion No. 14, your

8   opinion is that Officer Vickers failed to activate his

9   body-worn camera until after the use of excessive and

10  unreasonable force.  Is that correct?

11     A     Yes, ma'am.

12     Q     You are not a doctor.  Is that correct?

13     A     No, ma'am, I'm not a doctor.

14           MR. KAHN: Objection.  Argumentative.

15  BY MS. NAIR:

16     Q     You have a qualification -- did you get an education

17  in becoming a medical doctor, Mr. DeFoe?  Did I miss that

18  earlier?

19           MR. KAHN: Objection.  Argumentative.  And asked and

20     answered.  He just said he's not a doctor.

21     A     Medical doctor, no, ma'am.  I did not go to medical

22  school.

23  BY MS. NAIR:

24     Q     Okay.  You based your -- your opinion for No. 14

25  based on Investigator Nixon, specifically that it was the wrong

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

Page 151

1    way -- it was wrong the way that Police Officer Vickers turned

2    his camera off, correct?

3        A    Yes.  That's what Nixon stated but -- but not just

4    that, ma'am.  It's the fact that I reviewed the Vickers

5    body-worn camera and it does not -- does not pick up any of the

6    incident at all.  It's all post-incident related material and

7    the investigation determined as well that it was two minutes

8    into the investigation that he then activated his -- his

9    camera.

10       Q    I understand.  Your opinion only discussed the

11   failure to activate the camera until after what you say he used

12   excessive and unreasonable force, correct?

13       A    Yes.

14       Q    So the information that you're using to, in part,

15   base your opinion on does not have to do with activating his

16   body-worn camera, but has to do with turning off the body-worn

17   camera.  Is that correct?

18       A    According to the -- the statement by Arthur Nixon on

19   page 39 of his deposition, yes.

20       Q    Did you base -- you did not -- that nowhere in this

21   opinion do you state what Officer Vickers stated as a reason

22   for why he did not activate his body-worn camera.  Is that

23   accurate?

24       MR. KAHN: Objection to the form of the question

25       because it is very confusing.



Page 152

```
 1      A    No, ma'am, I did not put any testimony in there
 2  regarding Officer Vickers' reasons for him not activating his
 3  body-worn camera prior to the use of excessive force.
 4  BY MS. NAIR:
 5      Q    Moving on -- or forgive me.  For Opinion Nos. 12, 13,
 6  and 14, I'm going to group those three together.  And Opinion
 7  Nos. 12, 13 and 14, they do not opine on the use of force by
 8  Officer Vickers.  Is that correct?
 9      A    That is correct.
10      Q    Nos. 12, 13 and 14 do not opine on the failure to
11  report the use of force by Officer Vickers and Officer Abad.
12  Is that correct?
13      A    Well, part of Opinion No. 13 does discuss the failure
14  to summon an APD supervisor to scene, and all the officers that
15  are listed there.  So it does -- it does discuss that failure.
16      Q    Opinion Nos. 12, 13 and 14 do not opine on the
17  failure to stop the use of force by Officer Abad.  Is that
18  correct?
19      A    Well, it does.  On No. 13 Opinion, page 34, 43, I
20  discussed -- it's noted in there failure to intervene and
21  intercede Abad, midway through in the paragraph.
22      Q    Moving on to Opinion No. 15.  It is your opinion that
23  APD failed to document the incident involving Mr. Griffin that
24  occurred on April 5, 2019 in Officer Abad's performance
25  evaluation.  Is that correct?
```



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021

Page 153

```
 1      A    Yes, ma'am.
 2      Q    You based your opinion on your training and
 3  experience in conducting hundreds of annual performance
 4  evaluations.
 5      A    Partly, yes.
 6      Q    You do not base this on any Atlanta Police Department
 7  Work Rule or Standard Operating Procedure?
 8      A    That is correct.
 9      Q    So when you say failure to do something, that is
10  based on what you would have done when you were an evaluator?
11           MR. KAHN: Object to the form of the question.
12      A    No.  No, ma'am, because the -- the evaluation period
13  specifically for Vickers on his evaluation form for the City of
14  Atlanta 2019 evaluation report, the evaluation period is July
15  1, 2018 to June 30, 2019.  So this incident fell within that
16  timeframe.  And it was never noted, documented that there was a
17  pending complaint.  It was never supplemented after the
18  conclusion of the complaint.  And Officer Vickers was given a
19  whopping 3.75 out of 4, overall weighting of 100 percent.  And
20  the only thing he didn't get a perfect score on was
21  administrative duties.  That's the only thing that he didn't
22  get a perfect score on in looking at.  So it's not just my
23  opinion.  It's their own evaluation that they complete out
24  that's for that evaluation period.  And during this evaluation
25  period, this incident occurred.  And it's incredulous to me
```



Case 1:20-cv-02514-VMC    Document 89-13    Filed 05/03/21    Page 154 of 185
Exhibit M

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 154

1    that they would have issued him an evaluation endorsing his

2    behavior on April 5, when they knew that it occurred during

3    this evaluation period that can be used for future promotions,

4    for advance pay grade opportunities, and other things within

5    the Department, and it was never supplemented or nor did I

6    receive a copy that -- by the way, in the course of this

7    evaluation that transpired, they initially gave him a 4 and

8    represents the Department in a courteous and professional

9    manner.  Now, we're taking that one back and we're going to

10   properly -- we're going to appropriately go ahead and assign

11   him what he should get.  But instead, they wrote, "He treats

12   everyone fairly and with respect" on this rating that occurred

13   during this rating period, which is not an accurate depiction

14   of his work during that time period.  So yes, this is

15   what -- when we endorse behavior, it's because of these bogus

16   ratings like this that are put in place that don't mean

17   anything to anyone other than the officer themselves, that let

18   them know that they did a great job.  But we know based on the

19   review of the body-worn camera and the Department knows based

20   on the review of the body-worn camera and the chief knows and

21   the 30(b)(6) people know in this case, that that was not a

22   reflection of what he did during this review period.

23        Q    Thank you for telling me about Officer Vickers.  I

24   want to turn your attention to my question and I'll go back.

25   My question is for your Opinion No. 15, which is in relation to

Page 155

1    Officer Abad and his evaluation and my only question to you was

2    were you basing your opinion for No. 15 on your experiences?

3    And I'll turn your attention to page 36 of 43 of your report.

4              MR. KAHN: Is that the end of the question?

5              MS. NAIR: I haven't asked the question yet.

6              MR. KAHN: But you've done a lot of talking for not

7         asking a question.

8              MS. NAIR: We're going to take a break.  We'll take a

9         five-minute break.

10             MR. KAHN: You want to let the witness answer that

11        pending question?

12             MS. NAIR: I haven't asked the question.  And we are

13        going to take a five-minute break.

14             MR. KAHN: All right.

15        (Whereupon, the proceedings were in recess from 5:12 p.m.

16   to 5:16 p.m.)

17   BY MS. NAIR:

18        Q    Mr. DeFoe, my question is based on Opinion No. 15 and

19   is in reference to you Officer Abad.  Okay?

20        A    Yeah, that was my -- my bad.  I just went on my

21   monologue and I didn't even realize that.  I thought you were

22   talking about Vickers.  I'm sorry about that.

23        Q    It's okay.  But I just want to go back to Officer

24   Abad.  And you based your opinion on that you are completing

25   evaluations, which is listed on page 36 of 43 in the last

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 156

1   paragraph for Opinion No. 15.  Is that correct?

2        A    Yes, partially.  And as well as the outline -- the

3   actually -- the among -- critical of seeing a highly effective

4   outstanding rating.  And that's on page 36.  Based on the areas

5   in which he was rated in, based on his -- his actions on April

6   5.

7        Q    So for Goal No. 1: Care, he -- Officer Abad received

8   highly effective, which is a number 4, correct?

9        A    Yes, he did, ma'am.

10       Q    And the highest rating is outstanding, you would

11  agree?

12       A    Yes.  The highest rating is a 4.  Or a 5.  Excuse me.

13       Q    So there was room for improvement for Officer Abad.

14  Is that correct?

15            MR. KAHN: Objection.  Misleading.

16       A    Yes, he could go from a 4 to a 5.  There is -- there

17  is room for improvement.

18  BY MS. NAIR:

19       Q    And you would agree that the evaluation covers the

20  span of a year.  And in this case, the fiscal year 2019,

21  correct?

22       A    It does, ma'am.  Yes.

23       Q    Would you also agree, based on your review of the

24  documents that you stated you reviewed in this case, including

25  the transcript of the 30(b)(6) witnesses, that the evaluators

Page 157

1    are not trained on pinpointing specific instances in the

2    evaluation?

3         A    I don't recall that but that wouldn't make any sense.

4         Q    If that were the testimony of the 30(b)(6) witnesses,

5    that the -- that the supervising officers are not told that

6    they have to put in specific instances, would you agree that it

7    would not be a requirement for them to put in specific

8    instances?

9              MR. KAHN: Object to the form of the question.

10        A    Well, sure, as it relates -- especially relates in

11   misconduct.  If you're -- if you're speaking directly on Abad

12   on Goal No. 1 like you stated that treats everyone fairly and

13   with respect, you can agree that's not the case in this -- in

14   this matter.  You don't cuss at citizens, you don't lock

15   citizens, you don't do any of those things.  And you shouldn't

16   receive a highly -- if that's what's highly effective is,

17   that's the benchmark for highly effective, then I think Atlanta

18   Police Department's got some work to do, if that's what the

19   benchmark is.  Because I think everyone can agree that that's

20   not how -- those actions are not highly effective.  And

21   comments would be fine.  Had an issue in April and since then

22   has been on a program to, you know, whatever it may be or

23   attended some additional training, and then he made some great

24   advances and that's a, you know, would be something that will

25   be documented in the rating, or an actual reflection of his



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 158

1   work history for that year.  So there are some things that are

2   noted in there.  So as equally as we can know good things, we

3   should be able to objectively know things that are -- that fell

4   below the standard.

5   BY MS. NAIR:

6       **Q   You would agree that there are no specific instances**

7   **of good things, good times or specific instances of when**

8   **Officer Abad acted in a courteous and professional manner in**

9   **this evaluation?**

10      A   Well, there's none noted.  You're correct.  There are

11  none noted.  It doesn't mean there shouldn't be.  And that's

12  typically -- that's what the box is for; to highlight that

13  could -- he had some great comments and treated people

14  professionally with respect and that should be, you know,

15  outlined.  Maybe a citizen accommodation or something should be

16  put in there.  So the reader for future promotion or a pay

17  grade advancement to a specialized unit will know well, what

18  does this mean?  This blanketed boilerplate language that's in

19  the same exact language that's in Vickers' report doesn't give

20  the reader, the evaluator or future evaluator of someone coming

21  into a new unit or promoted to sergeant or what not, on the

22  next level, would be, doesn't give them an actual depiction of

23  that person's actions during that entire year.  This seems like

24  this -- this evaluation was done in about three minutes.  And

25  it's very, very important that officers and subordinates to


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 159

1    accurately reflect to provide positive feedback and as well as

2    to provide, you know, to let them know they did a great job,

3    and then outline those things that they do well in during that

4    evaluation period.

5        Q    That is your opinion, correct?

6        A    That's the opinion of -- yeah.  That's -- that is my

7    opinion of a performance evaluation.  I think that's a

8    reasonable opinion based on my completing hundreds of

9    performance evaluations during my tenure.

10       Q    You know how to pull out the testimony of individuals

11   and put it in your opinion, correct?

12            MR. KAHN: Objection.  Vague.

13       A    I do not -- yes.  I support my opinion at times

14   with -- with testimony if it's relevant to my opinion, yes.

15   BY MS. NAIR:

16       Q    In fact, in Opinion No. 14, you. on page 35 of 43,

17   you actually supported your opinion and based your opinion on

18   information from one of the depositions of Arthur Nixon,

19   correct?

20       A    I did, yes, ma'am.

21       Q    And we already agreed that that information was not

22   directly relevant to your opinion in No. 14, correct?

23       A    Well, I don't disagree that it was relevant because

24   he's saying that he shouldn't have shut it off.  What that

25   means is that Vickers had -- Officer Vickers had his camera on

Case 1:20-cv-02514-VMC   Document 89-13   Filed 05/03/21   Page 160 of 185
Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                           March 26, 2021

Page 160

1   and then shut it off to perform the excessive force or the

2   tackle, and then turned it back on again.  That's -- that's

3   what I discerned from -- from reading of that.

4        Q    And your opinion was that he failed to activate his

5   body-worn camera until after the excessive force and those are

6   your words, correct?

7        A    Right.  But once again, there was no -- there was no

8   body-worn camera proceeding this incident that would

9   show -- that was at least disclosed that would show the Vickers

10  shut off his body-worn camera, then performed the tackle, then

11  put it back on after the use of force.  If that -- if that

12  body-worn camera footage exists, then that should be disclosed.

13  If it does not, then the question would be why did he turn it

14  on preceding the use of the -- the excessive force.

15       Q    For Opinion No. 15, you did not support your opinion

16  with any testimony from any 30(b)(6) witness, correct?

17            MR. KAHN: Objection.  Misstates --

18       A    I would if I --

19            MR. KAHN: -- misstates the -- the report.

20       A    I did not quote any 30(b)(6) witness regarding the

21  performance evaluations in Opinion Nos. 15 or 16.

22  BY MS. NAIR:

23       Q    Okay.  The testimony of the 30(b)(6) witnesses in

24  part discuss the evaluations of Officer Abad and Officer

25  Vickers.  Is that correct?



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 161

```
 1      A    I believe so, yes.

 2      Q    The testimony described the evaluation as being an

 3  overarching evaluation of that year.  Is that correct?

 4      A    That's what was stated, yes.

 5      Q    The OPS investigation becomes a part of an officer's

 6  permanent record.  Is that correct?

 7      A    It should, yes.

 8      Q    Does it become a part of their record or does it not?

 9      A    It depends because I know in some other cases I have

10  with the Atlanta PD, there are shooting investigations that

11  go -- send me back to 2013, 2014 that still have not been

12  investigated yet.  So an officer who may be promoting at a

13  certain time in 2019, 2020 is not even going to have that OPS

14  investigation in their file because it's not been completed

15  yet.

16      But yes, all completed evaluated OPS investigations that,

17  a, should be done in a timely manner.  And secondly, yes,

18  should be part of an officer's permanent record and fall in

19  their personnel package as they progress through their career.

20      Q    Is that should again?  My question is does it become

21  a part of their permanent record?  And let me be more specific.

22  In this case, is the OPS investigation a part of Officer Abad's

23  permanent record for this incident?

24          MR. KAHN: Object to the form of that question and

25          strike the -- move to strike the colloquy that preceded
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe
March 26, 2021

Exhibit M

Page 162

1      it.

2        A    I don't know.  I have not seen his permanent record.

3   I know that it's -- I know that's on his record but it -- at

4   the time in which I had, I don't believe that it's been -- it

5   was adjudicated at the time.  It just shows an open -- it

6   shows -- actually, it doesn't even -- yeah, it doesn't -- it's

7   not even a -- it's not been -- I'm looking at the record on

8   Bates 587 and 588.  I don't see the final disposition on

9   Officer Abad's disciplinary history, unless I'm missing it.

10  BY MS. NAIR:

11       **Q    Moving on to -- or excuse me -- does Opinion No. 15**

12  **opine on a policy, practice or procedure of the City of Atlanta**

13  **being deficient?**

14       A    Well, it doesn't state that but what I mentioned in

15  my -- in my comments specific to Officer Vickers when I spoke

16  and I answered the wrong question, right when you were

17  referring to Officer Abad and I didn't actively listen to what

18  you were saying, is that yes, I believe if it's -- I didn't

19  note that in my opinion but being that you asked me of this

20  now, yes.  The -- my opinion is if you're looking at best

21  practices, and I note this is Opinion Nos. 15 and 16, is that

22  the -- an officer's work should be appropriately documented

23  during the annual evaluation.  All the good stuff and then if

24  there is some bad stuff.  And that should be put in there for

25  the next evaluator to look at to get a good snapshot of what

Page 163

1  type of employee that person is.  It doesn't have to have

2  personal information in there, but specifically that received a

3  complaint for A,B and C and this is what the discipline was,

4  and that should be in there.  And any action statement by the

5  Department to rectify any type of performance-related issues,

6  and how that person responded to those performance issues.

7  Maybe training, maybe discipline, it may be a compilation of

8  both.  That should -- I believe should be in a performance

9  evaluation.  That's -- was in every one of my performance

10  evaluations I received and those that I wrote through my

11  26 -year law enforcement career to get that employee the best

12  understanding of what the benchmarks are; did they meet them or

13  exceed them or did they fall short of them and why.  And then

14  what systems we can put in place so they can better perform at,

15  you know, throughout their career.  If not, I think it's -- the

16  evaluation itself is -- is worthless.

17      Q    **Mr. DeFoe, does paragraph (sic) 15 opine on a**

18  **practice, policy or procedure of the City of Atlanta being**

19  **deficient?**

20          MR. KAHN: Objection --

21      A    No, the paragraph is --

22          MR. KAHN: -- asked and answered.  He just gave you

23      the answer that question.

24          MS. NAIR:  He has not answered, Mr. Kahn, and he's

25      getting ready to.  Please allow him to.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 164

1    A    Yes, ma'am.  No, it does not.  My report does not.

2    You -- the previous question you asked me I think was more

3    open-ended as to what I believe regarding policy and practice,

4    and that's what I discussed.  But my report does not outline

5    that.  I just amplified my opinion that you asked me about.

6    BY MS. NAIR:

7    Q    Your Opinion No. 15 does not opine on the use of

8    force by Officer Vickers.  Is that correct?

9    A    That's correct.

10   Q    Your Opinion No. 15 does not opine on the failure to

11   report the use of force by either Officer Vickers or Officer

12   Abad.  Is that correct?

13   A    That's correct

14   Q    And -- and Opinion No. 15 does not opine on the

15   failure to stop the use of force by Officer Abad.  Is that

16   correct?

17   A    That's correct.

18   Q    Turning your attention to paragraph -- or excuse

19   me -- Opinion No. 16.  Let me know when you're there.

20   A    I'm here.

21   Q    Your opinion is that the Atlanta Police Department

22   failed to document this incident involving Mr. Vickers in his

23   performance evaluation.  Is that correct?

24   A    Yes, ma'am.

25   Q    Your opinion is based upon, in part, your training

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 165

1    and experience.  Is that correct?

2         A    Yes, ma'am.

3         Q    Your opinion is based, in part, as well to Matthew

4    Abad's testimony in his transcript.  Is that correct?

5         A    Yes, ma'am.

6         Q    You have no reason to know whether -- excuse me.  You

7    have no information that Officer Abad has ever been a

8    supervisor.  Is that correct?

9         A    No, I don't believe he has, ma'am.  At least, not up

10   to the time of the deposition, unless he's been promoted since.

11        Q    You have no information on what the supervisors are

12   trained -- scratch that.  You have no information as to whether

13   Officer Abad is knowledgeable about what the supervisors are

14   trained on as to what to put into the reports or the

15   evaluations.  Is that correct?

16        A    No, I don't believe he -- if he's not writing

17   evaluations in -- in a capacity as a supervisor, then I

18   wouldn't assume he'd be trained in that capacity.

19        Q    And Officer Abad's opinion is just that of a

20   layperson, correct?

21             MR. KAHN: Objection.  Calls for a legal conclusion.

22        You know, Officer Abad may qualify as an expert himself to

23        give that opinion.

24        A    No, I don't think he's a layperson, ma'am.  He -- he

25   receives ratings or performance evaluations from supervisors on



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 166

1    the Department.  So I think he's got a knowledge of how or what

2    the expectation is and he even outlines that, which is once

3    again self-serving because I believe his performance

4    evaluations should reflect the same.  But he believes that it's

5    misleading because, you know, what Vickers didn't do or did do

6    during this evaluation.  And I believe both of their

7    evaluations should have depicted their actions at the time of

8    this incident.  So, you know, he's an employee so he

9    understands the performance evaluation process or should.  So I

10   wouldn't say he's a layperson.  I think he knows more than

11   most, but he's not been at a capacity to supervise or complete

12   performance evaluations based on my review of the testimony.

13   BY MS. NAIR:

14        Q    You state that you base this -- this opinion on

15   Officer Abad's testimony at page -- Officer Abad's testimony at

16   page 88.  I want to share the transcript of Officer Abad.

17   Please tell me when you can see my screen.

18        A    I can see it, ma'am.

19        Q    In this, you base it -- you say that Officer Abad

20   agrees that the actions of Officer Vickers should have been

21   documented in his performance evaluation and that he believes

22   that the evaluation was misleading, correct?

23        A    Yes.

24        Q    Your opinion is based off of an improper question

25   that was asked and properly objected to by defense counsel

Page 167

```
 1              MR. KAHN: Objection.  Calls for a legal conclusion.

 2  BY MS. NAIR:

 3      Q    I want you to read -- well, actually you can answer

 4  that question.

 5      A    Ma'am, I have no idea.  That will be up to the trier

 6  of fact issue if the question was, you know, or whatever you

 7  stated earlier.  I don't make any determinations relating to

 8  any attorney's objections in any case.  I just answer the

 9  questions.

10      Q    I understand.  I want you to read the question

11  at -- beginning at line 16.

12      A    Yes, ma'am.

13      "Wouldn't it be fair to say that this performance

14  evaluation is misleading because it would lead the reader to

15  believe that Donald Vickers is highly effective and exceeds the

16  expected performance levels on a regular basis?"

17      Q    And the answer to that -- the question was objected

18  to, you agree?

19      A    Ms. Parks objected to the question.

20      Q    And what was the answer?

21      A    Answer is "That's correct."

22      Q    I want you to tell me was the answer, "That's

23  correct," was it being to the evaluation is misleading, or was

24  it to it will lead the reader to believe that Donald Vickers is

25  highly effective, or would it be to that it exceeded the
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 168

1    expectation -- expected performance standards on a regular

2    basis?

3            MR. KAHN: Object to the form of the question.  Calls

4        for a legal conclusion.  Compound.  Confusing.  Vague.

5        Just a bad question.

6    BY MS. NAIR:

7        Q    So can you tell us what -- that's correct -- what

8    part of that question it answers.

9            MR. KAHN: Object to form.

10       A    It appears that all of it is.  I mean, it

11   didn't -- he didn't, you know, bifurcate it in any way.  It

12   says that it's correct that -- where the question was asked,

13   "Would it be fair to say the performance evaluation is

14   misleading," and then goes on and he said, "That's correct."

15   So based on the way that I discern that answer was that he

16   agreed with the totality of the question, not part of it or

17   not.  So if there's only part of it, I don't -- I don't know,

18   ma'am.

19   BY MS. NAIR:

20       Q    So if it's part of the question, you -- you don't

21   know whether he agreed with all the question or part of the

22   question?

23           MR. KAHN: Objection.  Calls for speculation.  Calls

24       for a legal conclusion.  Object to the form of the

25       question.  And asked and answered.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 169

1    A    Yeah, ma'am, I don't know.  I hope that if he agreed,

2    saying, "That's correct," he would qualify that statement with

3    I agree with part of it, whatever it may be.  But he just said,

4    "That's correct," so I took that as him agreeing with the

5    statement that was asked of him by plaintiff's counsel.

6    BY MS. NAIR:

7    **Q    But you, in your own -- in your own opinion, did not**

8    **put all of that information as to what he agreed to in your**

9    **opinion?**

10        MR. KAHN: Objection to the form of the question.  And

11        just misstates the testimony that's on the screen right

12        now.  Question and answer.

13    A    Well, ma'am, I -- the way that I -- the way I looked

14    at this and as I look at it now does not change is that he

15    agrees to the question asked that the performance evaluation is

16    misleading, does it leave -- leave the reader to believe that

17    Donald Vickers is highly effective and exceeds the expected

18    performance standards on a regular basis?  That's correct.

19    That's the way I look at.  If it's -- can it be looked at

20    another way?  I don't know.

21    BY MS. NAIR:

22    **Q    Because if there's an objection, and that's going to**

23    **be for the judge to decide, correct?**

24        MR. KAHN: Objection.  Misstates  --

25    A    Yeah, well --

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

```
 1              MR. KAHN: -- the testimony and seeks a legal
 2       conclusion again.
 3       A    Yes, ma'am.  That's an ultimate trier of fact issue,
 4   a judge issue.  That's not -- that's well outside of my scope.
 5   BY MS. NAIR:
 6       Q    Mr. DeFoe, do you know if Officer Abad's supervisor
 7   or Officer Vickers' supervisor -- well, stick with Abad.  Do
 8   you know if Officer Abad's supervisor knew about this incident
 9   at the time of the report?
10       A    If he knew about it?  As in was he aware that this
11   occurred?
12       Q    Yes.
13       A    -- it occurred in (sic) April 5, 2019 and the
14   evaluation was June 30.  So I don't know.  We know that the
15   same supervisor wrote the evaluations for both -- both Abad
16   and -- Officer Abad and -- and Vickers.
17       Q    Do you know if the supervisor who wrote Officer
18   Vickers' evaluation knew of this incident at the time of the
19   completion of his evaluation?
20       A    No, I don't know.
21       Q    Did any of the testimony that you reviewed inform you
22   that there was a reason why the supervisor should have known of
23   this incident prior to writing the evaluation?
24       A    Well, typically, ma'am, is that when there's a
25   complaint initiated, that complaint or the date of the
```

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 171

1    complaint and is typically listed on someone's disciplinary

2    history.  Then once it's been adjudicated and there's been a

3    proper finding, exonerates, sustained, whatever it is, than

4    that's added to the disciplinary history.  Because you're going

5    to want to know if there's an allegation of misconduct, and

6    open one, for a number of reasons.  Depending on the level of

7    the allegations, you're going to want the Department to be

8    aware of that to ensure that that type of behavior does not

9    repeat itself.  So I don't know.  But typically what happens,

10   having worked Internal Affairs, is that, you know, if there's

11   an allegation against officer whoever it may be, that you're

12   going to go ahead and put that there's been a complaint and

13   that the complaint is being investigated.  And then, if

14   that's -- and then ultimately, the findings of that complaint

15   will be updated on that person's disciplinary history.

16        Q    With Opinion No. 16, it does not opine on a practice,

17   policy or procedure for the City of Atlanta being deficient.

18   Is that correct?

19        A    Well, as I mentioned earlier, if it's not a

20   policy -- there's not -- the paragraph does not state that.

21   You are correct.  But if you're asking me anything outside of

22   that, I have to form my opinion.

23        Q    Opinion No. 16 does not opine on the use of force by

24   Officer Vickers. Is that correct?

25        A    Does not opine, that is correct.



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Page 172

1      Q    Opinion No. 16 does not opine on the failure to

2   report use of force by ether Officer Vickers or Officer Abad.

3   Is that correct?

4      A    Yes, ma'am.

5      Q    Opinion No. 16 does not opine on the failure to stop

6   the use of force by Officer Abad. Is that correct?

7      A    Yes, ma'am.

8      Q    I want to turn your attention to what's been

9   previously marked as Defense Exhibit 4, which is your

10  supplemental report.  It is not enumerated as an additional or

11  as a numbered opinion.  However, is this what you referenced as

12  Opinion No. 17, or rather what your attorney or plaintiff's

13  attorney represented as Opinion No. 17.  Is that correct?

14          MR. KAHN: Object to the form of the question.

15     A    Yes, ma'am.  That's correct, ma'am.

16  BY MS. NAIR:

17     Q    Your opinion -- what is your opinion for Opinion No.

18  17?

19     A    Well, I agree with Chief Shields when she stated that

20  Defendant Vickers should have been terminated after the

21  incident, which she -- I -- I agree with her opinion on that.

22  At her deposition, based on the -- my understanding and reading

23  of that complaint and the subsequent arrest of Officer Vickers.

24  Number two, where it says the disparity between HCRB

25  investigations found that officers use force, that's based on

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

1    my review of multiple ACRB investigations.  Specifically, the

2    ones that are outlined in the motion to compel.  There's a

3    total of seven that were -- that were outlined in the motion to

4    compel.

5          And I agree that there is a disparity and because of that

6    disparity, there are some issues associated with that

7    and -- and which, once again, falls into Opinion No. 3

8    regarding Chiefs Shields stating the disparity between ACRB

9    investigations and OPS investigations would be problematic is

10   what she states in her deposition.  And in -- in addition to

11   that, that the issues surrounding OPS investigation finding

12   Vickers -- exonerating Vickers on the use of force where

13   Atlanta PD's 30(b)(6) witnesses that were offered up as -- as

14   experts, persons most knowledgeable to the matter opined and

15   former Chief Shields agree that the force itself by Defendant

16   Vickers, Officer Vickers, excuse me, was excessive.  But more

17   importantly and added to amplify that is, as I mentioned

18   earlier, on pages 59 and 60 of her deposition, that being Ms.

19   Shields, she believes there's a huge problem that OPS

20   exonerated Officer Vickers and believes there's a much larger

21   issue, which speaks to a much broader issue as it relates to a

22   Department-wide issue, not just germane to this one issue.

23         And then lastly, No. 4, the issue regarding Deputy Chief

24   Finley, and that's going as OPS conducting investigations and

25   they've been reduced.  In this case, the -- in both cases, the

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe                                                                    Exhibit M
                                                                        March 26, 2021

Page 174

1    issue -- in this case -- the penalty has been reduced to a

2    point where now -- now that you're sending this message that

3    you're endorsing the behavior because this incident in itself,

4    which I believe the Griffin incident should have been a

5    termination as well based -- by both officers for the failure

6    to report the use of force and only report it after they were

7    caught.  That in itself should be -- it's an integrity issue.

8    They should have both been terminated.

9         And so that's where the overarching Opinion No. 17 is and

10   it follows up to the following page that I have already

11   discussed regarding the -- the issue with the evaluations we

12   talked about in those earlier opinions.  And then, lastly, the

13   issue regarding disciplining the officers and that specifically

14   is related to the opinions by SPO Fite in this matter only to

15   be counter exonerated by the Department when their own subject

16   matter expert, including their former chief, found that the

17   force itself was excessive.

18        Q    Okay.  I want to turn your attention to an incident

19   that occurred -- excuse me.  Have you ever been arrested?

20        A    Yes, ma'am.

21        Q    What for?

22        A    An altercation about 31 years ago.

23        Q    What is an altercation?

24        A    A fight.

25        Q    Can you explain more than a fight?

Tyler Griffin vs City of Atlanta, et al.                                   Exhibit M
Scott DeFoe                                                        March 26, 2021

Page 175

1       A    Sure.  I was not within the course and scope of my

2    employment.  I was off duty.  I was a new officer at LAPD.  I

3    think I had about 13 months in the Department.  I was out with

4    my roommate's friends, who were Marines at the time.  Went to a

5    couple of bars downtown Los Angeles, ended up at a restaurant.

6    One of the bar -- one of the patrons that were in front of us

7    in this very long line to get into this after-hours restaurant

8    engaged in somewhat of a verbal dispute with one of the Marines

9    I was with in line.  They went in probably 30 minutes before we

10   did.  We get seated unfortunately, right next to them when we

11   ended up going in.  So the party finished his meal, he

12   challenged one of the Marines I was with to fight.  Went

13   outside -- he agreed to it.  Went outside.  I got -- tried to

14   break up the fight.  I got involved in the fight and it

15   resulted in my arrest.  The case was ultimately dismissed.  I

16   took a suspension from the police department and that was it.

17      **Q    You said you were young?**

18           MR. KAHN: Objection.  Vague.  Argumentative.

19      A    A lot younger than I am now.  I was--I think I was

20   23, 24 years old, I think.

21   BY MS. NAIR:

22      **Q    Does 25 sound more accurate?**

23           MR. KAHN: Objection.  Argumentative.

24      A    I think --

25           MR. KAHN: Let the record reflect that she is

Page 176

1    antagonizing the witness.

2        A    I think -- well, I think it might be 25.  It was July

3    of 1991.  I was born in '65.  I think I was -- yes, I was 25.

4    I would turn 26 in August of that year.  So just shy of my 26th

5    birthday.

6    BY MS. NAIR:

7        Q    **Have you ever been disqualified as an expert?**

8        A    No, ma'am.

9        Q    **Were you dismissed from the police department as a**

10   **result of the actions?  You said you were suspended, but were**

11   **you dismissed for the --**

12       A    No.

13       Q    **-- fight?**

14       A    No, I had a 25-year-career after that, including

15   promotions and -- and all of those other things that went along

16   with them.  No, I received a suspension as -- and I took

17   responsibility for my actions. I received a suspension, worked

18   my suspension on my days off as a civilian for free.  Came back

19   and had a great career and multiple promotions and no, I took

20   responsibility.  I exercised poor judgment on my part, got

21   involved in a fight.  Could have done a lot of things different

22   that evening.  And it was good learning lesson for me as I

23   progressed through my career.

24       Q    **What is the poor judgment of?**

25            MR. KAHN: Objection.



Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 177

1       A    First fight --

2   BY MS. NAIR:

3       **Q    Did I understand your testimony to say that you were**

4   **trying to break up the fight?**

5       A    Oh, I had poor judgment.  No, I -- there's plenty of

6   opportunities that -- that will come your way that you could

7   have acted on.  A, I should not have agreed to take my

8   roommate's friends out who were Marines that just got out of

9   the Marine Corps.  That was poor judgment number one.  The

10  second poor judgment, even though I was a designated driver was

11  at the time in which the bickering back and forth in the line

12  between the Marine and the other patron, that should have been

13  a clue that it was time to leave.  I didn't follow that clue.

14  Went inside and we were sitting down right next to the person

15  and tempers were still going back.  I had another opportunity

16  to leave the scene, which I didn't do.  That was clue number

17  three.  I thought getting outside and breaking up the fight was

18  the right thing to do when I got involved in a fight.  But then

19  I left the scene.  That was clue number four, which is poor

20  decision-making on my part, and that was it.  So that was four

21  opportunities for me to make the decisions and -- and I did not

22  that night being involved in that altercation.

23          MS. NAIR: I have nothing else for this witness.

24      Thank you.

25          THE WITNESS:   Thank you, ma'am.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

March 26, 2021

Exhibit M

Page 178

1        MR. KAHN: All right.  Let's -- give me -- give me

2    five minutes and then I think we'll most likely just call

3    it a day.  But just give me five minutes and then I'll be

4    right back.

5    (Whereupon, the proceedings were in recess from 5:50 p.m.

6    to 5:53 p.m.)

7        MR. KAHN:  So I just want to put one thing record,

8    and then -- and then we're done.  I just want to say

9    that -- let the record reflect that we started at one

10   o'clock p.m. Eastern daylight time and we're finishing up

11   at five hours and fifty-three minutes.  It's 5:53 p.m.

12   Eastern daylight Time.  The City has not yet paid Mr.

13   DeFoe for his time and so they -- they owe Mr. DeFoe for

14   six hours of his time.

15       And we have no questions for the witness.

16       THE WITNESS:  Counsel, I think you're wrong on your

17   hours.  I think they only owe me -- I think we started at

18   ten, so I think you're one hour over.  I think it's just

19   under five hours.

20       MR. KAHN: Oh.  That is right.  That is correct.

21       THE WITNESS:  Yeah.  Don't try to send any more than

22   they need to pay.

23       MR. KAHN: So I went to law school because I'm not

24   good at math.  I couldn't be a doctor.

25       MS. NAIR: If we can go off the record?

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M
March 26, 2021

Page 179

1          (Whereupon, the proceedings were in recess from 5:54 to

2      5:56.)

3              THE COURT REPORTER: Before we go off, did we decide

4      on signature?

5              MR. KAHN: I guess we'll read and sign.

6              THE COURT REPORTER: And did anyone wish to order a

7      copy of the transcript at this time?

8              MS. NAIR: Yes.  The City is going to order a copy of

9      the transcript.  I don't know if the -- well, I guess if

10     they're reading and signing.

11             MR. KAHN: We'll go ahead and order.

12             THE COURT REPORTER: Okay.  And PDFs or printed and

13     electronic?

14             MS. NAIR: PDF is fine for us.

15             MR. KAHN: Yeah, for now.

16

17             (All exhibits were received and marked for

18     identification following the conclusion of the deposition.)

19

20         (Whereupon the deposition of Scott DeFoe was concluded at

21     approximately 5:56 p.m.)

22

23         (Pursuant to Rule 30(e) of the Federal Rules of Civil

24     Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness

25     was reserved.)

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 180

1   STATE OF GEORGIA      )

2   COUNTY OF DEKALB      )

3

4       I hereby certify that the foregoing transcript was

5   reported, as stated in the caption, and the questions and

6   answers thereto were reduced to typewriting under my direction;

7   that the foregoing pages represent a true, complete and correct

8   transcript of the evidence given upon said hearing, and I

9   further certify that I am not of kin or counsel to the parties

10  in the case; am not in the employ of counsel for any of said

11  parties; nor am I in any way interested in the result of said

12  case.

13

14

15      _____/s/_____
        Lori Johnston
16      CCR 5682-4498-7599-2576

17

18

19

20

21                                                      181

22

23

24

25

Elizabeth Gallo
COURT REPORTING, LLC

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 181

```
 1              DISCLOSURE OF NO CONTRACT

 2         I, Lori Johnston, do hereby disclose pursuant to Article

 3    10.B of the Rules and Regulations of the Board of Court

 4    Reporting of the Judicial Council of Georgia that Elizabeth

 5    Gallo Court Reporting, LLC was contacted by the party taking the

 6    deposition to provide court reporting services for this

 7    deposition and there is no contract that is prohibited by

 8    O.C.G.A. Section 15-14-37(a) and (b) or Article 7.C of the Rules

 9    and Regulations of the Board for the taking of this deposition.

10

11         There is no contract to provide court reporting services

12    between Elizabeth Gallo Court Reporting, LLC or any person with

13    whom Elizabeth Gallo Court Reporting, LLC has a principal and

14    agency relationship nor any attorney at law in this action,

15    party to this action, or party having a financial interest in

16    this action.  Any and all financial arrangements beyond our

17    usual and customary rates have been disclosed and offered to all

18    parties.

19

20         This 11th day of April 2021.

21

22              _____/s/_____

23              Lori Johnston

24              CCR 5682-4498-7599-2576

25              Elizabeth Gallo Court Reporting, LLC
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.                                    Exhibit M
Scott DeFoe                                                        March 26, 2021

1    CASE:  Tyler Griffin vs City of Atlanta, et al.

2    NAME OF WITNESS:    Scott DeFoe

3        The preceding deposition was taken

4    in the matter, on the date and at the time and

5    place set out on the title page hereof.

6        It was requested that the deposition

7    be taken by the reporter and that same be

8    reduced to typewritten form.

9        It was agreed by and between counsel

10   and the parties that the deponent will read and

11   sign the transcript of said deposition. Said jurat

12   is to be returned, within 30 days after the transcript

13   is made available, to the following address:

14            Elizabeth Gallo Court Reporting, LLC

15            2900 Chamblee Tucker Road

16            Building 13, First Floor

17            Atlanta, Georgia 30341

18   If an errata is executed and returned

19   to EGCR within the 30 days allocated by law,

20   the executed errata will be sent to the taking

21   attorney for filing with the original transcript.

22   Should an executed errata not be forwarded from

23   EGCR to the taking attorney for filing, the

24   deposition was not reviewed and signed by the

25   deponent within 30 days.

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Page 183

```
 1   NAME OF CASE:      Tyler Griffin vs City of Atlanta, et al.
     DATE OF DEPOSITION: 03/26/2021
 2   NAME OF WITNESS:   Scott DeFoe

 3   EGCR JOB NO.:      75823

 4                   CERTIFICATE

 5        Before me this day personally
     appeared SCOTT DEFOE, who, being duly
 6   sworn, states that the foregoing transcript of
     his/her deposition, taken in the matter, on
 7   the date and at the time and place set out on
     the title page hereof, constitutes a true and
 8   accurate transcript of said deposition.

 9                   _____

10                   SCOTT DEFOE

11        SUBSCRIBED and SWORN to before me

12   this _____ day of _____ 20____.

13   in the jurisdiction aforesaid.

14   _____    _____

15   My Commission Expires      Notary Public

16      STATE OF _____

17      COUNTY/CITY OF _____

18

19      []   No changes made to the Errata Sheet;

20   therefore, I am returning only this signed,

21   notarized certificate.

22      []   I am returning this signed,

23   notarized certificate and Errata Sheet with

24   changes noted.

25
```

**Elizabeth Gallo**
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe                                                          March 26, 2021

Exhibit M

                                                                    Page 184

1                    Errata Sheet

2    NAME OF CASE:      Tyler Griffin vs City of Atlanta, et al.

3    DATE OF DEPOSITION: 03/26/2021

4    NAME OF WITNESS:   Scott DeFoe

5    Reason Codes:  1. To clarify the record

6                   2. To correct transcription errors

7                   3. Other
     _____
8    _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23

24   SIGNATURE:_____DATE:_____

25            Scott DeFoe

Tyler Griffin vs City of Atlanta, et al.
Scott DeFoe

Exhibit M

March 26, 2021

Page 185

```
1                    Errata Sheet

2    NAME OF CASE:      Tyler Griffin vs City of Atlanta, et al.

3    DATE OF DEPOSITION: 03/26/2021

4    NAME OF WITNESS:    Scott DeFoe

5    Reason Codes:  1. To clarify the record

6                   2. To correct transcription errors

7                   3. Other
     _____
8    _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23

24   SIGNATURE:_____DATE:_____

25            Scott DeFoe
```