# EXHIBIT A

# BUTLER LAW FIRM

December 21, 2020

**VIA ELECTRONIC MAIL**

Staci Miller
City of Atlanta Law Dep't
55 Trinity Avenue SW, Suite 5000
Atlanta, GA 30303
smiller@atlantaga.gov

> RE: **Tyler Griffin v. City of Atlanta, et al.**
> **Case No. 1:20-CV-02514-TWT**
> **U.S.D.C., Northern District of Georgia**

Dear Ms. Miller,

Plaintiff respectfully asks, under Rule 11 of the Federal Rules of Civil Procedure, that the City Defendants refrain from moving for summary judgment. Although motions for summary judgment have become common since *Celotex*, they are not appropriate in every case and would not be appropriate here given the strength of the evidentiary record. *See generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (summary judgment standard). Briefing and arguing over summary judgment would be a bad use of the Court's and parties' time, and motions seeking summary adjudication would violate Rule 11(b).

We hope you will agree. In the event that the City filed such a motion, Plaintiff would seek sanctions under Rule 11(c) for the reasons set forth below.

1. **Rule 11**

Rule 11 states that a party's signature on a document certifies that the paper: (1) is not being presented for an improper purpose, such as to harass or delay; (2) the legal contentions are warranted under existing law or of a non-frivolous argument for the extension of the law; and (3) the allegations have factual support. Fed. R. Civ. P. 11(b)(1)-(3); *see also Cook-Benjamin v. MHM Correctional Serv., Inc.*, 571 Fed. App'x 944, 948 (11th Cir. 2014) ("Rule 11 sanctions are proper (1) when a party files a pleading

that has no reasonable factual basis; (2) when a party files a pleading that is based on a legal theory that has no reasonable chance of success . . .; and (3) when a party files a pleading in bad faith for an improper purpose.") (citations omitted).

Under Rule 11(c), a party's failure to ensure that its allegations comply with these standards constitutes grounds for a court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).

In analyzing the propriety of Rule 11 sanctions, "a district court must first determine whether a party's claims are 'objectively frivolous' in view of the facts or law." *Cook-Benjamin*, 571 Fed. App'x at 948 (citations omitted). If they are, the court must determine whether "the person who signed the pleading 'should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry.'" *Id.* (citations omitted). If the City files any motions for summary judgment, this letter will serve as evidence that the City was aware its claims for qualified immunity were "objectively frivolous," but it still chose to file the motion(s).

The duty to make a reasonable inquiry is a continuing one. *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997). Thus, Rule 11 "allows sanctions when an attorney continues 'insisting upon a position after it is no longer tenable'" such as Defendants' continued denial of wrongdoing, despite the numerous admissions that Vickers used excessive force by high-ranking police officers. *See id.* (citing Fed. R. Civ. P. 11 advisory committee notes).

"'Rule 11 sanctions are designed to discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses.'" *Didie v. Howes*, 988 F.2d 1097, 1104 (11th Cir. 1993) (quoting *Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987)). A district court's imposition of Rule 11 sanctions is reviewed under the deferential abuse of discretion standard. *Battles*, 127 F.3d at 1300 (citations omitted).

If the City files any motions for summary judgment based on a purported claim of qualified immunity, Rule 11 sanctions would be warranted. A motion for summary judgment, if filed, would violate Defendants' duty under Rule 11 for three reasons. First, Defendants' motion, if filed, would lack any legitimate factual basis—the supervisor who trained Vickers,[1] the Chief of Police at the time,[2] *and* the officer who wrote the police department's internal report into the incident[3] have all testified in deposition that Vickers's conduct was not justified. Second, Defendants' motion, if filed, would not be warranted by existing law. Finally, given the factual record and lack of legal support, a motion for summary judgment would have no legitimate purpose.

---

[1] Fite 30(b)(6) Dep., 16:24-17:4, 24:15-20, 27:22-24.
[2] Shields Dep., 37:6-12, 45:12-20, 47:2-8, 49:17-24, 16:22.
[3] Nixon 30(b)(6) Dep., 39:5-17.

2. **The evidentiary record is strong.**

When considering motions for summary judgment, including as to qualified immunity, courts "constru[e] all facts and mak[e] all reasonable inferences in the light most favorable to the non-moving party." *Tinker v. Beasley*, 429 F.3d 1324, 1326 (11th Cir. 2005). Modern litigators have seen that language so often that it makes their eyes glaze over, **but we respectfully suggest that the City think hard about that evidentiary standard before filing any motion.** It means that if evidence favoring the non-movant exists, *the Court credits that evidence.* In other words, even if the parties disagree about the credibility of a witness, "[i]t is a hornbook principle that it is not proper for a district court to assess witness credibility when consideration a motion for summary judgment as such determinations are reserved for the jury." *Allen-Sherrod v. Henry Cty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007).

The evidence in this case is abundant and strong. Plaintiff addresses the evidence in detail in the sections that follow but notes here that the Report of Scott DeFoe *alone* would require the Court to deny any motion for summary judgment that the Defendants could conceivably file. *See* DeFoe Report at 9-38. When one also considers that the City's own 30(b)(6) deponents, supervisors, instructors, and then-current Chief of Police have testified that Defendants' conduct was inappropriate, the futility of any motion for summary judgment becomes—in our opinion—clear.

3. **A claim of qualified immunity would lack legal and factual support.**

### 3.1. **Defendant Vickers used excessive force.**

Defendant Vickers is liable for his use of excessive force under 42 U.S.C. § 1983. It is well established that citizens have a constitutional right to be free from the use of excessive force. The relevant question is "how much force is too much?" The Fourth Amendment's "objective reasonableness" standard governs. In the Eleventh Circuit, the trial court must consider the following factors to determine whether an officer's use of force was objectively reasonable: "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically.'" *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)). Each *Hadley* factor weighs in favor of finding Vickers used objectively unreasonable force.

Here, there was *no* need for Vickers to use force.[4]  Mr. Griffin was not a flight risk or a danger to Vickers or Abad.[5]  Nevertheless, Vickers tackled Mr. Griffin at full speed, breaking Mr. Griffin's ankle in three places.[6]  Because no force was necessary, any amount of force used was too much.  Moreover, Mr. Griffin suffered a serious and permanent injury to his left ankle.[7]  Mr. Griffin will likely need another surgery in the future.  Finally, Vickers was acting in bad faith.[8]  Then-Chief of Police Erika Shields condemned Vickers' behavior, as did the City's Rule 30(b)(6) witnesses.[9]

### 3.2.    Defendant Vickers is not entitled to qualified immunity.

As to qualified immunity, the relevant question would be whether Vickers' conduct violated a "clearly established right."  The answer is "yes."

A plaintiff can show the violation of a "clearly established right" by pointing to a case with "materially similar facts" or the plaintiff can "'show that a broader, clearly established principle should control the novel facts in [a] situation.'"  *Sebastian v. Ortiz*, 918 F.3d 1301, 1310 (11th Cir. 2019) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).  The law in the Eleventh Circuit "is clear that serious and substantial injuries caused during a suspect's arrest when a suspect is neither resisting an officer's commands nor posing a risk of flight may substantiate an excessive force claim."  *Sebastian*, 918 F.3d at 1311; *see also Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008); *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Slicker v. Jackson*, 215 F.3d 1225, 1232 (11th Cir. 2000); *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997); *Brown v. City of Atlanta*, 2020 WL 5633399 (N.D. Ga. Sept. 21, 2020).

*Smith v. Mattox* clearly established that where an arrestee demonstrates compliance, but the officer nonetheless inflicts gratuitous and substantial injury using ordinary arrest tactics, then the officer may have used excessive force.  127 F.3d 1416 (11th Cir. 1997).  In *Smith v. Mattox*, an officer approached a citizen while investigating an anonymous tip.  *Id.* at 1417.  The citizen raised a baseball bat in a threatening way and then fled.  *Id.* at 1418.  After a short chase, the citizen, much like Mr. Griffin, "docilely submitted to arrest" when an officer ordered him to "get down."  *Id.*  Despite compliance, the officer put his knee into the citizen's back and broke the citizen's arm.  *Id.*  The Court held that the officer was not entitled to qualified immunity (despite initial resistance)

---

[4] Shields Dep., 37:6-12, 44:3-6, 47:2-22; Nixon 30(b)(6) Dep., 39:5-17; Fite 30(b)(6) Dep., 16:24-17:4, 24:15-20, 27:22-24; Reese 30(b)(6) Dep., 69:4-70:11, 76:3-77:13.

[5] DeFoe Rule 26 Report at 22 ("Based on my review of the facts and Body-Worn Camera footage in this matter, Mr. Tyler Griffin was being compliant and offering no form of physical resistance that would necessitate any force by Police Officer Matthew Abad.")

[6] Pl.'s Trial Ex. 30.1; Abad Dep., 25:5-20; Traub IME Report.

[7] Traub IME Report.

[8] Shields Dep., 47:9-22 ("Q. . . Vickers was not acting in good faith. Correct? A. I do not believe so, no.").

[9] Shields Dep., 37:6-12, 44:3-6, 47:2-22; Nixon 30(b)(6) Dep., 39:5-17; Fite 30(b)(6) Dep., 16:24-17:4, 24:15-20, 27:22-24; Reese 30(b)(6) Dep., 69:4-70:11, 76:3-77:13.

because the "broken arm was obviously unnecessary to restrain" the citizen when he "was offering no resistance at all." *Id.* at 1420.

*Smith* controls. The body worn camera footage shows that Mr. Griffin was standing completely still and talking to Abad when Vickers tackled him.[10] Stated differently, Mr. Griffin, much like the plaintiff in *Smith*, "docilely submitted" to Defendant Abad. Then-Chief of Police Erika Shields testified that Mr. Griffin did not do anything to warrant the use of force.[11] SPO Fite testified that Mr. Griffin was not trying to fight or flee.[12] Mr. Griffin was *not* resisting arrest, posed no danger, and was not a flight risk. Arguably, the record—including the City's *own* admissions—demonstrates that Vickers did, in fact, use excessive force. Even if the Court were to draw all inferences in favor of the *Defendants*—which is opposite of the summary judgment standard—there would still be an issue of fact as to the propriety of Defendants' actions.

As you know, under these circumstances Vickers would not be entitled to an interlocutory appeal from the denial of a motion for summary judgment based on qualified immunity. *Hall v. Flournoy*, 975 F.3d 1269, 1276 (11th Cir. 2020) (where no question exists as to whether a "clearly established" constitutional right was violated, but rather, only a question a fact about the force used, the defendant has no right to an interlocutory appeal from the denial of a motion for summary judgment on qualified immunity).

### 3.3.   Abad used excessive force and failed to intervene.

#### 3.3.1.   *Abad's excessive force precludes qualified immunity.*

Defendant Abad is liable for his use of excessive force under 42 U.S.C. § 1983 for grabbing Mr. Griffin for no reason and making Mr. Griffin walk on a broken ankle. Each of the *Hadley* factors weighs in favor of finding Abad used objectively unreasonable force. *Hadley*, 526 F.3d at 1329 (listing factors for finding excessive force: "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically.'")

Here, there was *no* need for Abad to grab Mr. Griffin.[13] At the time Abad grabbed Mr. Griffin, Mr. Griffin was "not unsteady on his feet where [Abad] would need to grab him to prevent him from falling."[14] Similarly, Mr. Griffin "was being compliant and offering no form of physical resistance that would necessitate any force by [Abad]."[15]

---

[10] Pl.'s Trial Ex. 1.3; Abad Dep., 46:21-24.
[11] Shields Dep., 45:12-20
[12] Fite 30(b)(6) Dep., 11:13-19.
[13] DeFoe Rule 26 Report at 17.
[14] DeFoe Rule 26 Report at 17.
[15] DeFoe Rule 26 Report at 17.

Abad's use of force set in motion a series of events that caused serious and permanent injury to Mr. Griffin's left ankle.[16]  Finally, Abad was acting in bad faith.  Plaintiff's Expert, Scott DeFoe, is a twenty-eight-year law enforcement veteran.  DeFoe opined that Abad acted unprofessionally and unethically by shouting at Mr. Griffin to "get out of the fucking car" and failing to tell Mr. Griffin why he was being removed from his car at gunpoint.[17]

Similarly, there was no reason for make Mr. Griffin walk on a broken ankle.[18]  At the time Abad made Mr. Griffin walk, he knew Mr. Griffin had seriously injured his ankle.[19]  Mr. Griffin experienced excruciating pain while walking on the broken ankle.[20]  Finally, Abad was clearly acting in bad faith.  Abad knew Mr. Griffin was injured, he knew he was supposed to call an ambulance, and he knew it was wrong to make a citizen walk on an injured ankle, but he chose to make Mr. Griffin walk anyway.[21]

Abad will not be entitled to qualified immunity for two reasons.  First, similar to Vickers, Abad violated a "clearly established" right when he used force on a citizen who was complying with commands and not resisting arrest.  *See Sebastian*, 918 F.3d at 1311; *see also Hadley*, 526 F.3d 1324; *Lee*, 284 F.3d 1188; *Slicker*, 215 F.3d at 1232; *Smith*, 127 F.3d 1416; *Brown*, 2020 WL 5633399.  Second, by making Mr. Griffin walk on a broken ankle, Abad's conduct "'was so far beyond the hazy border between excessive and acceptable force that [Abad] had to know he was violating the Constitution even without caselaw on point.'" *Sebastian v. Ortiz*, 918 F.3d at 1310 (11th Cir. 2019).

### 3.3.2.  *Abad's failure to intervene precludes qualified immunity.*

Defendant Abad is liable for failing to intervene under 42 U.S.C. § 1986.  *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000).  The relevant questions are whether the officer could have intervened and whether the officer intervened.  *Id.*; *see also Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998) ("[F]or an officer to be liable for failing to stop police brutality, the officer must be in a position to intervene[.]").  *Priester* found that an officer who "observes excessive force with 'the time and ability to intervene, but [does] nothing,' violates *clearly established law*." *Jackson v. Catanzariti*, No. 6:12-CV-113, 2019 WL 4874809, at *20 (S.D. Ga. Oct. 2, 2019) (quoting *Priester*, 208 F.3d at 927) (emphasis added).

---

[16] Traub IME Report.

[17] DeFoe Rule 26 Report at 20.

[18] Abad Dep., 49:22-51:2; Vickers Dep., 51:5-52:2; Reese 30(b)(6) Dep., 43:9-24, 45:3-6; Dean 30(b)(6) Dep., 30:3-9.

[19] Pl.'s Trial Ex. 1.4; Abad Dep., 30:21-23.

[20] Pl.'s Trial Ex. 4.1; DeFoe Rule 26 Report at 24 (". . . Mr. Griffin was in excruciating pain and should not have been compelled to stand up.")

[21] Pl.'s Trial Ex. 1.5 & 4.1; Abad Dep., 48:9-49:15, 49:22-51:2, 97:17-22.

Abad could have intervened but did not.[22]  Abad was facing Vickers as Vickers crouched and sprinted toward Mr. Griffin.[23]  Abad admitted that he could have waved his hand to show Vickers that everything was fine but did not.[24]  Abad admitted that he could have said, "hey, Vickers, everything is good," but did not.[25]  Despite having the ability to stop Vickers, Abad did nothing.[26]  At a minimum, a question of fact exists for the jury to decide whether Abad had the ability to intervene.  Like Vickers, Abad would not be entitled to an interlocutory appeal from the denial of a motion for summary judgment based on qualified immunity.  *Hall*, 975 F.3d at 1276.

### 4. The City's widespread failure to discipline its police officers was the moving force of Mr. Griffin's injuries.

A city can be held liable under 42 U.S.C. § 1983 for failing to discipline its officers where such a failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  Where the widespread practice of failing to discipline officers is the "moving force" behind a constitutional violation, the failure can be "properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.* at 389 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)).  Stated differently, a city is liable where its "'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution."  *Id.* at 394-95.

The City's widespread practice of failing to discipline officers has created a culture in which excessive force is tolerated.  The evidence shows five discrete ways the City's failure to discipline is a systemic problem.  First, despite the City's admissions that Vickers used excessive force on Mr. Griffin, OPS exonerated Vickers for his use of force.  Second, Vickers' had an extensive history of use of force and violence with no real consequences.  Third, the City has demonstrated a common practice of chain-of-command dismissing "sustained" findings of excessive force after OPS investigations.  Fourth, the City's frequently rejects ACRB's investigatory findings of excessive force.  Fifth, the City's performance evaluation process that fails to account for instances of police misconduct.

---

[22] DeFoe Rule 26 Report at 20 ("It is my opinion Atlanta Police Department Police Officer Matthew Abad; No. 6898, failed to intervene/intercede to prevent Atlanta Police Department Police Officer Donald Vickers, No. 4438, from tackling and causing Serious Physical Injury to Mr. Tyler Griffin.") (emphasis in original).
[23] Abad Dep., 37:20-23.
[24] Abad Dep., 37:24-38:3.
[25] Abad Dep., 38:4-8.
[26] Abad Dep., 37:17-38:8.

### 4.1.    The City exonerated Vickers on use-of-force.

OPS investigated Vickers and Abad for their treatment of Tyler Griffin. Incredibly, the City "exonerated" Vickers on the allegations of excessive force, meaning that the City's official position—despite the testimony of its own instructors and senior officers—was that Vickers' use of force was *not* excessive.[27]  This makes no sense since the City's representatives have testified that Vickers' use of force was not justified.[28]  In fact, the *same officer* who conducted the OPS investigation later testified, on behalf of the City, that Vickers' use of force was *not* justified.[29]  When confronted with clear use of excessive force, as conceded by many of the APD's supervisors and teachers, the City chose to *deny* that force was excessive and sweep the misconduct under the rug.  As the then-current Chief of Police has testified, the exoneration of Vickers is a "huge problem."[30]

### 4.2.    Vickers has an extensive history of using force.

This was not Vickers' first rodeo.  Abad testified that Vickers had "an extensive history of – he's got a history of having use of force documentations."[31]  Among his APD peers, Vickers has a reputation for using force with citizens.[32]  Vickers' previous misconduct includes chambering a live round into an assault rifle and aiming it at citizens, using pepper spray and kicking a handcuffed citizen in the back, slamming a handcuffed citizen into a glass door, and, of course, tackling Mr. Griffin.[33]

Vickers is a problem, and the City has known that for years.  Despite Vickers' extensive history of use of force, he has faced no real consequences.[34]

---

[27] *See* Pl.'s Trial Ex. 42 (Griffin OPS Summary); Nixon 30(b)(6) Dep., 18:20-19:7, ECF No. 52-9.  Notably, Defendant Abad was not even investigated for his use of force or failure to intervene.

[28] Nixon 30(b)(6) Dep., 39:5-17, ECF No. 52-9; Fite 30(b)(6) Dep., 16:24-17:4, 24:15-20, 27:22-24, ECF No. 52-7; Reese 30(b)(6) Dep., 76:3-77:13, ECF No. 52-5.

[29] Nixon 30(b)(6) Dep., 39:5-17, ECF No. 52-9.

[30] Shields Dep., 59:3-60:1; *see also* 52:16-53:12.

[31] Abad Dep., 79:4-6, 80:7-12, ECF No. 52-1.

[32] Abad Dep., 80:7-12, ECF No. 52-1; Dean 30(b)(6) Dep., 44:2-16, ECF No. 52-11.

[33] Pl.'s Trial Ex. 56 (assault rifle incident); Pl.'s Trial Ex. 53 (Usher OPS Summary); Pl.'s Trial Ex. 59 (Thurmond OPS Summary) Pl.'s Trial Ex. 42 (Griffin OPS Summary).  These only represent the times Vickers was *caught*.

[34] Shields Dep., 67:20-25 ("Q. So is it okay for the City of Atlanta to employ a police officer who has aimed a loaded assault rifle at citizens for no reason, unnecessarily pepper-sprayed and kicked a citizen in the back, and slammed a citizen into a glass door? A. No."); Shields Dep., 70:25-71:9 (". . . I will definitely say that I'm not -- there would -- clearly, we're not – **we're not doing all that we need to do. Whether it's a discipline problem or a procedural problem -- I imagine it's a blend.** Clearly, there's procedurally adjustments that have to be made to ensure that this is not happening.") (emphasis added).

### 4.3.    Chain-of-command routinely dismisses OPS findings.

Two of the excessive force allegations against Vickers exemplify the City's widespread failure to discipline police officers who use excessive force.  Twice *before* this incident, OPS investigated Vickers for his use of force on a citizen and OPS found the use of force **was excessive**.[35]  That is, OPS "sustained" the excessive force allegations and recommended a punishment.[36]  However, on both occasions Vickers' supervisor rejected the OPS recommendations and unilaterally changed the findings from "sustained" to "not sustained."[37]  That is a *big* deal.  If an officer's supervisor can simply reject OPS's independent investigation, then there is **no real oversight**.  Police officers can use force with impunity. [38]

### 4.4.    The City frequently rejects ACRB investigatory findings.

The City's process for dealing with excessive force is deficient.  The Atlanta Citizen's Review Board ("ACRB") is an independent agency designed to provide citizen oversight for police misconduct.  The ACRB investigates allegations of excessive force, much like OPS, and delivers recommendations to the City.  In recent years, there have been *at least* seven instances in which the ACRB investigated use of force allegations under APD's Standard Operating Procedures ("SOPs"), found excessive force, and recommended a punishment—but the City dismissed the allegations.[39]  A table summarizing the *known* instances is below.[40]

| ARCB Investigation | City of Atlanta Response |
|---|---|
| 10/25/19 – ACRB found Sgt. Darren Barr used excessive force by placing a taser on a citizen's neck and recommended a finding of "sustained." | 12/9/19 – The City rejected the ACRB's recommendation and found that Sgt. Barr's use of force was "within policy" and issued a finding of "exonerated." |
| 9/22/16 – ACRB found that Officers Alex Crawford and Laszlo Szutor used excessive force when they grabbed a citizen and slammed him against a wall and recommended a finding of "sustained." | 11/2/16 – The City rejected the ACRB's recommendation and issues a finding of "not sustained. |

---

[35] *See* GRIFFIN V. COA 000775-778 & 001043-001047.

[36] *See* GRIFFIN V. COA 000775-778 & 001043-001047.

[37] *See* GRIFFIN V. COA 000775-778 & 001043-001047.

[38] *See* Nixon 30(b)(6) Dep., 24:9-16 ("Q. And would it be fair to say that without real consequences for using excessive force, police officers could use force with impunity? A. I can see where that would happen, yes.").

[39] *See* Pl.'s Resp. City's ROGs, No. 7; *see also* GRIFFIN 00971-00989.

[40] Plaintiff requested documents showing instances in which the City rejected ACRB findings, but the City failed to respond to Plaintiff's request.  As you know that request is subject to Plaintiff's pending Motion to Compel.  ECF No. 53.

| ARCB Investigation | City of Atlanta Response |
|---|---|
| 7/8/15 – ACRB found that Officer Denis Joseph used excessive force by slamming a citizen's head into a wall and recommended a finding of "sustained" and a 5-day suspension. | 12/16/16 – The City rejected the ACRB's recommendation and issued a finding of "exonerated." |
| 12/30/14 – ACRB found that Officer Robert Fisher used excessive force and recommended a finding of "sustained" and termination. | 1/27/15 – The City rejected the ACRB's recommendation and issued a finding of "not sustained." |
| 9/30/14 – ACRB found that Officer Denis Joseph used excessive force by pointing his gun at a citizen and twisting her arm and recommended a finding of "sustained" and a 15-day suspension. | 12/18/14 – The City rejected the ACRB's recommendation and issued a finding of "not sustained." |
| 7/16/14 – ACRB found that Officer Antwan Denson used excessive force when he tased a fifteen-year-old boy and recommended a finding of "sustained" and a 4-day suspension. | 8/5/14 – The City rejected the ACRB's recommendation and issued a finding of "exonerated." |
| 6/20/13 – ACRB found that Sgt. Eddie Smith used excessive force on a citizen and recommended a finding of "sustained" and a 5-day suspension. | 7/30/14 – The City rejected the ACRB's recommendation and issued a finding of "not sustained." |

Chief Shields testified that the pattern of OPS rejecting ACRB findings is "problematic."[41]  Specifically, Chief Shields testified that:

> . . . I still believe that if you have the proper people looking at these files, people who understand where policing needs to get to, that APD has the capacity to hold people accountable. **But for whatever reason, there definitely -- what we're seeing today is there's definitely some stopgaps where -- that just are not acceptable**.[42]

---

[41] Shields Dep., 74:21-75:7 ("Q. If, looking at the same investigations, ACRB frequently finds excessive force and sustains allegations, but OPS dismisses the same allegations, is that problematic? A. Yes.").
[42] Shields Dep., 75:14-22 (emphasis added).

This pattern shows that Atlanta police officers can use force with impunity.

### 4.5.    The City's performance evaluation process is spurious.

APD's performance evaluation process is another way the City allows officers to use force with impunity.  One stated purpose of APD performance reviews is to "identify performance problems."[43]  Despite these stated goals, APD performance reviews **do not** show instances of egregious misconduct because even when officers have misbehaved, they still receive high performance evaluations that make their personnel files look good.[44]  For example, on his performance evaluation for the year including the subject incident, Defendant Vickers received high marks and was even commended for being "courteous," despite the excessive forcefulness, cruelty, and mockery with which he treated Mr. Griffin.[45]  APD has demonstrated that its police officers can receive positive performance reviews even though those same officers have committed egregious violations of the SOPs.  As Sergeant Reese testified, on behalf of the City:

> Q. Would you agree that if bad cops get good reviews, the department needs to change something about its performance evaluation process?
>
> A. I would say that if that is the case, then, yes, they would need to review that.
>
> Q. Would you agree that if bad cops get good reviews, the department needs to be held accountable?
>
> A. I would say yes, they do.

Reese Dep., 52:17-24.

Plaintiff's expert, Scott DeFoe, opined that the City's deficient performance evaluation process "can be seen as endorsing and perpetuating inadequate discipline, training, and failure to enforce written policies and established standards."[46]  Specifically, APD "failed to document [the] incident involving Mr. Tyler Griffin that occurred on April 5, 2019 . . . even though it occurred during the Evaluation Period . . ."[47]

Given these facts, the City will not be entitled to summary judgment on Plaintiff's *Monell* claim.  Further, as you know, the "qualified immunity" analysis does not apply to *Monell* claims.  *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997).

---

[43] Reese 30(b)(6) Dep., 19:13-16, ECF No. 52-5.
[44] Reese 30(b)(6) Dep., 19:17-21:25, ECF No. 52-5.
[45] Pl.'s Trial Ex. 33 (2018-2019 Performance Evaluation).
[46] DeFoe Rule 26 Report at 36-37.
[47] DeFoe Rule 26 Report at 35-36.

**5.  A motion for summary judgment would only result in undue delay.**

The evidence shows that Vickers and Abad used objectively unreasonable and unnecessary force on Mr. Griffin, Abad stood by and did nothing even though he could have stopped Vickers, and it all happened because the City's widespread failure to discipline its police officers.  If the City files a motion for summary judgment claiming its officers are entitled to qualified immunity, such a motion would be 'objectively frivolous.'  Likewise, material questions of fact preclude summary judgment on Plaintiff's *Monell* claim.  The outcome would be the denial of any motion, which would only result in extended delay.

We are open to further discussion, but we believe this letter sets forth the factual and legal basis for our position.  If you have any questions, please do not hesitate to call.

Sincerely,

*/s/ Matt Kahn*

Matt Kahn

Enclosures
cc:

Jeb Butler, via email only (jeb@butlerfirm.com)
Nina Hickson, via email only (ninarhickson@atlantaga.gov)
Alisha Marie Nair, via email only (amnair@atlantaga.gov)
Jacquita Parks, via email only (japarks@atlantaga.gov)