IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TYLER GRIFFIN,

      Plaintiff,

        v.

CITY OF ATLANTA, et al.,


      Defendants.

CIVIL ACTION FILE
NO. 1:20-CV-2514-TWT

## OPINION AND ORDER

This is a civil rights case. It is before the Court on the Defendants'
Motion for Summary Judgment [Doc. 125]. For the reasons set forth below, the
Defendants' Motion for Summary Judgment [Doc. 125] is GRANTED in part
and DENIED in part.

### I.    Background

During an interaction with officers from the Atlanta Police Department,
the Plaintiff, Tyler Griffin, suffered a broken ankle. As a result of this
encounter, the Plaintiff filed suit against the Officers involved, the Defendants
Matthew Abad and Donald Vickers, as well as the City of Atlanta ("the City").
The Plaintiff brings separate claims against Officer Abad and Officer Vickers
under 42 U.S.C. § 1983 (Counts I & II) and seeks to hold the City liable under
a *Monell* theory (Count III). The Defendants previously moved for summary
judgment on these claims, and their Motion was denied for failure to conform

to this Court's Local Rules. (*See* Aug. 3, 2021 Order.) However, this Court granted the Defendants leave to file a second Motion for Summary Judgment, which the Court turns to now.

## II.   Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.   Discussion

The Court's analysis begins with establishing the factual record of this case at the summary judgment stage. As the Eleventh Circuit recently noted in a case involving body camera footage:

> The facts at the summary judgment stage are not necessarily the true, historical facts or what a jury may ultimately find. Instead, the facts at this stage are what a reasonable jury could find from the evidence and the videos viewed in the light most favorable to the non-moving party[.]

2

*Johnson v. City of Miami Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021). The events most significant in this case were captured clearly on Officer Vickers' body camera. Where relevant, the Court will rely on that video to provide a description of these events. Where video is unavailable for a certain fact alleged, the Court will admit the undisputed or improperly disputed facts from the Parties' Statement of Undisputed Facts.

On April 5, 2019, the Defendants Matthew Abad and Donald Vickers were assigned to the Atlanta Police Department Zone 1 Investigative Field Team in an effort to locate stolen vehicles. (Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ¶ 1.) Officers Abad and Vickers noticed the Plaintiff's vehicle and began following him. (*Id.* ¶ 4.) The Plaintiff noticed he was being followed, as well, but the Officers' car had no markings or siren that would indicate the car was driven by police officers. (Pl.'s Statement of Additional Facts ¶¶ 2–3.) The Plaintiff then pulled into the driveway of 755 Bellemeade Avenue to see if the car would continue to follow him. (Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ¶ 5; Pl.'s Statement of Additional Facts ¶ 5.) While in the driveway, the Plaintiff turned his car around. (*Id.* ¶ 6.) Officer Abad left his vehicle and began to approach the Plaintiff's car, which was coming up the sloped driveway towards the street. (Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ¶¶ 6–7.) At this point, Officer Abad's body camera

3

begins recording audio. (Officer Abad's Body Worn Camera footage, at 1:59 [hereinafter "Abad BWC"].) At this point, Officer Abad is at least twenty feet away from the Plaintiff's car. (*Id.* at 2:02.) Officer Abad raises his service weapon and points it at the Plaintiff's car as he walks towards it. (*Id.*) Officer Abad begins giving verbal instructions, saying "Hey! Stop the car! Stop the car! Stop the car!" (*Id.* at 2:02–2:07.) After the third time, the engine of the Plaintiff's car can be heard revving twice, and Officer Abad continues his verbal commands to stop the car and shines his flashlight in the Plaintiff's face. (*Id.* at 2:07–2:10.) Officer Abad, who has been continuously walking towards the car with his weapon drawn, reaches the car and touches the driver-side mirror as he continues his verbal commands through the Plaintiff's open window. (*Id.* at 2:10.) At this time, he identifies himself for the first time as a police officer, yelling, "Get out of the fucking car! Atlanta Police!" (*Id.* at 2:11–2:13.) The Plaintiff's car begins to roll backwards down the driveway towards the backyard, and Officer Abad follows, continuing his verbal commands. (*Id.* 2:13–2:16.) After the car stops, the Plaintiff says, "You said, 'Get out of the car?'" (*Id.* at 2:17.) Officer Abad confirms, saying, "Get out of the car, now." The Plaintiff responds, "For what?" (*Id.* 2:18.) Officer Abad continues his commands, the car door opens with his hand on it, and the Plaintiff asks again, "For what?" (*Id.* at 2:19–2:27.) The Plaintiff puts the car in park and begin to step out of the vehicle. (*Id.* at 2:28–2:33.) The video does not show clearly when Officer Abad's hand touches the Plaintiff's left shoulder, but as he stands,

4

Officer Abad is grabbing the Plaintiff's shirt. (*Id.* at 2:34.) Officer Abad says, "What are you doing, man?" (*Id.*) The Plaintiff responds, "What do you mean what am I doing?" (*Id.*) Officer Abad repeats, saying "Tell me, what are you doing?" (*Id.* at 2:35.) As Officer Abad says this, the Plaintiff raises his arm, and the top of his forearm pushes Officer Abad's hand off of his shoulder. (*Id.* at 2:36.) To the left, Officer Vickers can be seen walking down the driveway towards Officer Abad and the Plaintiff. (*Id.*) As the Plaintiff moves Officer Abad's hand off of his shoulder, he says, "Wait a minute, hold on. Don't grab me like that." (*Id.*) Officer Vickers, having seen the Plaintiff move Officer Abad's hand, begins a sprint towards the Plaintiff and tackles him. (*Id.* at 2:36–2:40.) The time between the Plaintiff moving Officer Abad's hand and Officer Vickers' tackle is approximately 2.5 seconds. After Officer Vickers and the Plaintiff hit the ground, Officer Vickers yells, "No 'hold on!' No 'hold on!' No 'hold on!'" (*Id.* at 2:40–2:43.) Officer Abad's voice then obscures Officer Vickers': "You do not swipe my hands from me! Do you understand?" (*Id.* at 2:43–2:46.)

As the Plaintiff is on the ground, Officer Vickers is over him and tells Officer Abad to check the car for any other occupants or weapons. (*Id.* at 2:50.) While Officer Vickers is handcuffing the Plaintiff, the two engage in a conversation:

> Officer Vickers: I don't know what you're thinking. When an officer tells you to do something, you do it.
> Griffin: I did it.
> Officer Vickers: No, you didn't do it!
> Griffin: I did.

Officer Vickers: Pushing that officer off of you like that, no.
Griffin: I would never do that.
Officer Abad: You did, though.

(*Id.* at 3:12–3:31.) At this point, Officer Abad appears to lean over towards the Plaintiff in an apparent effort to get him on his feet, and his body camera is obscured. (*Id.* at 3:31.) Though the image is obscured, you can hear the Plaintiff say, "Ow! Wait." (*Id.* at 3:32.) Officer Abad responds, "Let's go." (*Id.* at 3:33.) After the Plaintiff says "Ow!" again, Officer Abad says, "We're going to get up. Tuck your leg under you." (*Id.* at 3:34–3:36.) The Plaintiff responds, "I can't move my leg. You guys--" (*Id.* at 3:38.) Officer Abad interrupts him, "Is it broken?" (*Id.* at 3:39.) The Plaintiff answers, "I mean, you guys hurt it." (*Id.* at 3:40–3:41.) Officer Abad then instructs the Plaintiff, "Tuck it under you, and use that to get up." (*Id.* at 3:43–3:44.) The Plaintiff again makes a noise indicating pain and says, "The left one hurt." (*Id.* at 3:45–3:48.) Officer Vickers then says, "So you need to go to the hospital? We'll take you to the hospital. Put your foot under you and get up." (*Id.* at 3:49–3:52.) Officer Vickers continues, "You want to try to take off . . . when I'm telling you to stop. I watched you spin the tires, and you backed up, and I ran up on you. You realized you were stuck and that's why you got out the car. Put your foot under you and get up!" (*Id.* 3:52–4:04.) As Officer Vickers is saying this, the Plaintiff repeatedly says, "I wouldn't do that." (*Id.*) He continues saying things along these lines as Officer Vickers changes his mind: "Actually, leave him right there until the ride gets here." (*Id.* at 4:06–4:08.)

For the next several minutes, the Officers and the Plaintiff discuss and dispute the events leading up to their encounter while the Officers gather information about the Plaintiff and secure the scene. (*Id.* at 4:08–8:17.) Soon, other officers arrive on the scene. (*Id.* at 8:30.) Officer Abad returns to the Plaintiff, who has been seated and cuffed for five minutes, and they continue to dispute the events leading up to the takedown maneuver. (*Id.* at 8:58–9:30.) Officer Abad again attempts to move the Plaintiff, asking him to tuck his foot under himself and get up. (*Id.* at 9:30–9:32.) The Plaintiff asks, "Right?" (*Id.* at 9:33.) The Officer responds, "Doesn't matter which one, tuck it under you." (*Id.* at 9:34–9:36.) Officer Abad appears to help the Plaintiff to his feet, but the Plaintiff immediately shouts in pain. (*Id.* at 9:57.) As the Plaintiff walks several feet up the driveway, he repeatedly exclaims in pain and asks for help before yelling and falling to the ground. (*Id.* at 9:58–10:13.) The Plaintiff, who had not previously expressed a high level of pain when not putting pressure on his foot, appears to be at an elevated level of discomfort as he lies on the ground. (*Id.* at 10:14–10:35.) Officer Abad begins explaining the events to a nearby officer as other officers can be heard imploring the Plaintiff to get up. (*Id.* at 10:35–11:25.) At this point, Officer Abad leaves the Plaintiff's proximity to "get everything started." (*Id.* at 11:27.) During this time, as Officer Abad is at a distance from the Plaintiff, the Plaintiff can be heard exclaiming again in pain. (*Id.* at 12:45–13:00.) One of the officers later notes, "I've never heard a man howl like that in my life." (*Id.* at 14:14–14:20.) This scream overheard in

7

the distance occurred as Officer Vickers and some of his colleagues attempted to assist the Plaintiff walk up the driveway. (Vickers Body Worn Camera Footage, Part 1, at 9:50.)[1] Ultimately, x-rays indicated the Plaintiff broke his ankle and that surgery was performed to address the fracture. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Exs. 18 & 19.)

On these facts, the Plaintiff raises three claims. First, he alleges Officer Abad and Officer Vickers used excessive force in violation of 42 U.S.C. § 1983. Second, he alleges Officer Abad's failure to intervene in Officer Vickers' takedown maneuver constitutes a Section 1983 violation. And finally, he brings a *Monell* claim against the City, claiming that their failure to train and discipline Officer Vickers constitutes deliberate indifference sufficient to support a Section 1983 claim. In response, the Defendants claim that the Officers are entitled to qualified immunity and there is insufficient evidence in the record to support a *Monell* claim. The Court addresses each claim in turn.

### A.  The Plaintiff's Excessive Force Claim

The Plaintiff's excessive force claim against the Officers is subject to qualified immunity. Qualified immunity shields government officials acting in their discretionary authority from individual capacity suits unless they violate

---

[1] On September 8, 2021, this Court denied the Plaintiff's Motion to Use Numerical Subparts [Doc. 114]. However, in his Statement of Additional Facts, the Plaintiff continued to use these subparts in his citations. The Court expects the Plaintiff to make the required changes to the nomenclature before any subsequent filings relying on this evidence.

a plaintiff's clearly established constitutional or statutory rights. *Charles v. Johnson*, 18 F.4th 686, 698 (11th Cir. 2021). The Plaintiff does not contest that the Officers were acting outside of their discretionary authority, so the burden falls to him to provide evidence that the Officers violated his clearly established constitutional right to protection from   excessive force. In the arrest and investigatory stop context, the Fourth Amendment embodies this right. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017). As the Eleventh Circuit recently summarized in a case involving a tackle during an arrest:

> A reasonableness standard is used to judge the actions of the officer: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts[] and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate. The court must look at the totality of the circumstances in assessing the manner of arrest. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Charles*, 18 F.4th at 699 (internal quotation mark and citations omitted). The Eleventh Circuit uses a two-step inquiry to determine whether an officer has used excessive force. First, the Court must evaluate whether the type of force is categorically unconstitutional, and a tackle has never been deemed categorically unconstitutional. *Id.* (21). Because this force is not categorically unconstitutional, the Court must apply the factors handed down by the

9

Supreme Court in *Graham v. Connor*, 490 U.S. 386, 396 (1989), to determine if the force used under these particular circumstances was excessive. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Plaintiff makes two distinct excessive force claims here.[2] First, the Plaintiff argues that Officer Vickers' tackle was unreasonable under the circumstances and violated his clearly established constitutional rights. Second, he claims that the Officers' efforts to force him to walk on a broken ankle constitute unconstitutional excessive force.

With regards to the tackle, there are genuine issues of material fact as to whether Officer Vickers violated the Plaintiff's Fourth Amendment rights, as a reasonable jury viewing the evidence in the light most favorable to the Plaintiff could find that Officer Vickers' tackle represented excessive force. During his brief interaction with Officer Abad outside the vehicle, the Plaintiff took no action beyond moving Officer Abad's hand that could be described as resistance or aggression. Drawing all inferences in his favor, the Plaintiff did not know the individuals approaching the car were police officers until Officer

---

[2] The Plaintiff appears to reference a third excessive force claim in his Opposition Brief, arguing that Officer Abad is liable "for grabbing Mr. Griffin for no reason[.]" (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 19.) However, the Plaintiff makes no reference to Officer Abad's grab in Count One of his Amended Complaint. As such, this claim is not properly before the Court.

Abad identified himself until after he revved his engine twice and began to roll backwards down the driveway. Once he stopped the car, he asked Officer Abad to confirm his instructions and eventually exited the car on his own volition. He did not raise his voice, move aggressively towards Officer Abad, or attempt to flee the scene. At most, he removed Officer Abad's hand from his shoulder. He did not follow that action with any aggression, verbal belligerence, or an attempt to flee the scene. Significantly, Officer Abad's body camera does not indicate that Officer Abad took any corrective or defensive action in response to the Plaintiff's action. In this way, the second and third *Graham* factors— whether the suspect poses an immediate threat to the Officers and whether the suspect is actively resisting or attempting to flee—lean in the Plaintiff's favor. The first *Graham* factor—the severity of the crime suspected—also leans in the Plaintiff's favor. The Plaintiff was stopped for suspicion of driving under the influence. But at the time of the takedown maneuver the Plaintiff was no longer behind the wheel of a car. Thus, any threat from potentially impaired or violent driving had abated. A reasonable jury could infer that the force used by Officer Vickers was disproportionate to the need based on the evidence in this record.

Nonetheless, Officer Vickers could be entitled to qualified immunity if the Plaintiff's constitutional right was not clearly established as of April 5, 2019. However, Eleventh Circuit precedent in effect on that date makes clear that the use of gratuitous force against an individual who is not resisting arrest

or posing a safety threat to an officer is a clear Fourth Amendment violation. *See, e.g.*, *Johnson*, 18 F.4th at 1274. Here, inferences in favor of the Plaintiff could lead the jury to find that he was neither resisting arrest, presenting a threat to the Officers' safety, nor attempting to flee. As such, under these inferences, a jury could determinate that Officer Vickers' takedown maneuver constituted clearly unconstitutional excessive force. Thus, there remain genuine issues of material fact as to whether Officer Vickers' tackle violated the Plaintiff's clearly established Fourth Amendment right, and he is not entitled to qualified immunity on this claim.

On the other hand, the Plaintiff's claim that the Officers forced him to walk on an injured ankle does not fit cleanly into an excessive force claim. The Eleventh Circuit appears to require an "application of force" when evaluating excessive force claims. *See, e.g.*, *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Unlike a typical excessive force claim, there was no application of force here. Instead, the Plaintiff claims that the Officers' insistence that he walk on his injured ankle constituted excessive force. The extent of the assistance provided to the Plaintiff by the Officers while asking him to walk is disputed by the Parties. (*See* Pl.'s Response to Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ¶ 17; Defs.' Response to Pl.'s Additional Facts ¶¶ 21, 26, 33.) In the video evidence, Officer Abad clearly has his hands on the Plaintiff, appearing to provide at least minimal support or guidance. However, even if the Officers offered no assistance to him, the

12

Plaintiff cannot point to an application of force that would support an excessive force claim against the Officers. Such a finding does not render such behavior immune from any constitutional claim. For example, arrestees who suffer injuries they feel are ignored by arresting officers could pursue a Fourteenth Amendment deliberate indifference claim. However, without evidence of an application of force by the Officers, the Plaintiff has failed to show a genuine issue of material fact that the Officers are liable for excessive force for forcing him to walk on his broken ankle. Thus, the Plaintiff's excessive force claim is limited to Officer Vickers' tackle.

### B. The Plaintiff's Failure to Intervene Claim

In a separate Section 1983 claim, the Plaintiff alleges that Officer Abad's failure to intervene in officer Vickers' excessive force represents a violation of his clearly established constitutional rights. In seeking summary judgment, the Defendants argue that Officer Abad did not have a reasonable opportunity to intervene or prevent Officer Vickers' allegedly excessive force. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 23–27.) In their view, because Officer Abad only had approximately 2.5 seconds to intervene in Officer Vickers' tackle, "the alleged use of force was not of a sufficient duration as to allow Officer Abad sufficient time to react or intervene. (*Id.* at 26.) They cite to Eleventh Circuit case law finding that officers who do not witness excessive force or lack an indication that excessive force is possible cannot be found liable for failing to intervene. (*Id.* at 25 (citing *Riley v. Newton*, 94 F.3d 632, 635 (11th

13

Cir. 1996). In response, the Plaintiff points to testimony from Officer Abad indicating that he could have prevented the tackle but did not do so. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 21.)

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." *Id.* As established above, genuine issues of material fact remain as to Officer Vickers' alleged use of excessive force. Therefore, if issues of fact remain as to whether Officer Abad was in a position to intervene in Officer Vickers' actions, he is not entitled to qualified immunity. The Court looks to controlling precedent to determine whether Officer Abad had an opportunity to intervene in Officer Vickers's takedown maneuver. The Eleventh Circuit has found that witnessing excessive use of force for two minutes and failing to intervene can represent a Fourth Amendment violation. *See Priester*, 208 F.3d at 925; *see also Grimes v. Rott*, 2021 WL 4427748, at *2 (11th Cir. Sept. 27, 2021). However, the Eleventh Circuit does not always look to a stopwatch to determine if an officer had an opportunity to intervene. In *Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1277 (11th Cir. 2021), the Eleventh Circuit found that officers who heard and saw another officer threaten a suspect with a taser and then ultimately deploy that taser while they were in close proximity were "close enough to at least attempt to intervene and stop" their fellow officer. The officers in *Helm* explicitly

14

argued that the tasings "happened quickly under rapidly evolving circumstances and that they did not have an opportunity to intervene." *Id.* The Eleventh Circuit disregarded this argument as "based on reading disputed factual issues in a light most favorable to the officers," and noted that one of the officers could have "tried to prevent [the tasing officer]—either physically or verbally—from tasing" the plaintiff. *Id.* As a result, the Panel affirmed the district court's denial of summary judgment on the basis of qualified immunity. Thus, it appears that officers who can perceive imminent excessive force but fail to intervene could face liability under Eleventh Circuit precedent.

Here, Officer Abad's body camera footage shows that Officer Vickers sprinted toward the Plaintiff and tackled him only 2.5 seconds after the Plaintiff removed Officer Abad's hand from his shoulder. This is an incredibly brief amount of time. But at the summary judgment stage, all inferences are drawn in the Plaintiff's favor. Here, Officer Abad testified in his deposition that he could have gestured or spoken in a manner to stop Officer Vickers from tackling the Plaintiff but did not do so:

> Q: Did you try to stop Vickers from tackling Mr. Griffin?
> A: No.
> Q: You were facing Vickers as he approached, weren't you?
> A: My body was facing toward that angle, yes sir.
> Q: You could have waved your hand to show Vickers that everything was fine, couldn't you?
> A: I could have.
> Q: But you did not do that, right?
> A: I did not.
> Q: And you could have said, ["H]ey, Vickers, everything is good," right?

A: It's possible, yes, sir.
Q: But you didn't do that either, did you?
A: No, sir.

(Abad Dep. at 37:17–38:8.) From his deposition testimony, it appears that Officer Abad acknowledges that he could have taken some action to prevent Officer Vickers' tackle. This testimony, along with the video evidence, indicates that a reasonable juror could find that Officer Abad had an opportunity to intervene in Officer Vickers' allegedly excessive use of force and failed to do so. "Once this Court establishes that the use of force is not entitled to qualified immunity and other officers could have intervened but did not, the Court does not conduct a separate clearly established analysis pertaining to [the] officer's failure to intervene." *Helm*, 989 F.3d at 1278. Accordingly, taking all the evidence in the light most favorable to the Plaintiff, there exist genuine issues of material fact as to whether Officer Abad violated the Plaintiff's clearly established constitutional rights by failing to intervene in Officer Vickers' tackle. *Id.*

### C. The Plaintiff's *Monell* Claim

In order "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Municipalities are not subject to claims relying upon *respondeat superior*: "It is only when the

16

execution of the government policy or custom inflects the injury that the municipality may be held liable." *Id.* (internal quotation marks and punctuation omitted). In his Amended Complaint, the Plaintiff alleges that the City of Atlanta failed to properly train or discipline its police officers, and these failures resulted in his injuries. (Am. Compl. ¶¶ 112–13.) "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

In their Motion for Summary Judgement, the Defendants argue that even if the Plaintiff's constitutional rights were violated, there is insufficient evidence that the City maintains a policy or custom that caused this violation. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 15.) The Defendants note that the Officers received thousands of hours of training during their careers and received an annual one-hour training on use of force. (*Id.* at 18–19.) Further, the Defendants claim that the Plaintiff has failed to show that any custom or policy caused the injury in question. (*Id.* at 20–23.) In response, the Plaintiff highlights five alleged deficiencies that indicate that "the City's failure to discipline is a systemic problem of which the City is necessarily aware." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 24.) Among these alleged deficiencies is the City's failure to discipline previous instances of Officer Vickers using excessive force and that negative findings of the Office of Professional Standards ("OPS") and the Atlanta Citizen's Review Board

17

("ACRB") are often overruled by supervisors. (*Id.* at 26–30.) Finally, the Plaintiff argues that these deficiencies were the moving force behind the Plaintiff's constitutional injuries.

As shown above, there remain genuine issues of material facts as to whether the Plaintiff's constitutional rights were violated. Thus, to survive the Defendants' Motion here, the Plaintiff must highlight genuine issues of material fact as to a City policy or custom constituting deliberate indifference towards his constitutional rights and that the custom or policy caused his constitutional injury. *See Favors v. City of Atlanta*, 849 F. App'x 813, 817 (11th Cir. 2021). To show the requisite deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998). Thus, there are two elements of deliberate indifference in the failure-to-train context: first, notice to the municipality "of the need to train in the particular area that allegedly caused the constitutional violation here[;]" and second, a deliberate choice by the municipality "not to take any action despite that notice." *Favors*, 849 F. App'x at 817–18.

The Plaintiff constructs a mosaic of evidence that, when viewed in the light most favorable to him, casts the City's training and discipline of police officers as generally deficient. For example, the Plaintiff points to seven instances where the ACRB recommended a finding of "sustained" in excessive

18

force complaints that were rejected by the City. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 28–30.) Further, the Plaintiff provides evidence of past incidents involving Officer Vickers where complaints for misconduct were made and, in some cases, sustained. (*Id.* at 26, n. 112.) To a third-party observer, this evidence raises some concern about the process and policies underlying the Atlanta Police Department disciplinary and training functions. However, in this context, more specificity is needed to support a *Monell* claim. As the Eleventh Circuit has repeatedly noted, a municipality must be on "notice of a need to train or supervise in a *particular area*[.]" *Gold*, 151 F.3d at 1351 (emphasis added). Training against generally excessive force is not specific enough under this limitation. For example, in *Gold*, a man arrested under Florida's disorderly conduct statute complained of excessive force when the arresting officers secured his handcuffs too tightly. *Id.* at 1348. However, the Eleventh Circuit relieved a municipality of *Monell* liability because the Plaintiff presented neither "evidence of prior constitutional violations or false arrests involving Florida's disorderly conduct statute[]" nor "evidence of a single prior incident in which a City police officer caused an injury by excessive force in handcuffing." *Id.* at 1351. In *Favors*, the evaluation of the City's notice was limited to "the particular area that allegedly caused the constitutional violation here—namely the use of deadly force in apprehending a suspect in a vehicle." 849 F. App'x at 818. While the Plaintiff's evidence paints a concerning picture, the evidence is not limited to the "particular area" at issue here,

19

namely a takedown maneuver utilized during an arrest. This limitation may appear somewhat formalistic, but it follows the clear warning in the Supreme Court's seminal ruling on municipality liability in this context:

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto *respondeat superior* liability on municipalities—a result we rejected in *Monell*[.]

*City of Canton*, 489 U.S. at 391–92 (internal quotation marks and citations omitted). Accordingly, the Plaintiff's evidence does not create a genuine issue of material fact as to the whether the City was on notice of the allegedly unconstitutional behavior. Because this notice is an essential element of his claim here, the Plaintiff's *Monell* claim fails.

## IV.   Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment [Doc. 125] is GRANTED in part and DENIED in part.

SO ORDERED, this ___4th___ day of February, 2022.

THOMAS W. THRASH, JR.
United States District Judge